# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

```
UNITED STATES OF AMERICA,      )
                               ) Case No.:  4:06cr36-RH
              Plaintiff,       )
                               ) Tallahassee, Florida
vs.                            ) November 2, 2006
                               )
GREGORY DIXON and ALAN MOORE,  )
                               )
              Defendants.      )
_____)
```

## TESTIMONY OF ALFRED A. BARNES

**TRANSCRIPT OF EXCERPT OF FOURTH DAY OF TRIAL
BEFORE THE HONORABLE ROBERT L. HINKLE,
CHIEF UNITED STATES DISTRICT JUDGE, and a jury**

APPEARANCES:

For the Plaintiff:        Gregory R. Miller
                          United States Attorney
                          By:  ROBERT O. DAVIS
                               P. ALAN SPROWLS
                               Assistant U.S. Attorneys
                          111 North Adams Street
                          Tallahassee, Florida 32301

For the Defendant,        Messer, Caparello & Self, P.A.
Gregory Dixon:            By:  THOMAS MARSHALL FINDLEY
                               SEAN SHAW
                               Attorneys at Law
                          215 South Monroe Street
                          Suite 701
                          Tallahassee, Florida   32301

For the Defendant,        Harper & Harper Law Firm, P.A.
Alan Moore:               By:  ROBERT AUGUSTUS HARPER
                               ROBERT AUGUSTUS HARPER, III
                               Attorneys at Law
                          325 West Park Avenue
                          Tallahassee, Florida   32301

*PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT PRODUCED BY COMPUTER*

**JUDY A. NOLTON, RPR**
*Official United States Court Reporter*
*111 North Adams Street * Tallahassee, Florida  32301-7717*
*(850) 561-6822*

1                      *  *  *  *  *  *  *  *

2            MR. DAVIS:  Your Honor, the government calls Alfred

3    Barnes.

4            DEPUTY CLERK:  Please raise your right hand.

5        **ALFRED A. BARNES, GOVERNMENT WITNESS, DULY SWORN**

6            DEPUTY CLERK:  Be seated.

7            Please, state your full name and spell your last

8    name for the record.

9            THE WITNESS:  Alfred A. Barnes.  B-a-r-n-e-s.

10                      DIRECT EXAMINATION

11   BY MR. DAVIS:

12   Q.  Good morning, Mr. Barnes.

13   A.  Good morning.

14   Q.  Would you please tell the jury where you live?

15   A.  I was born in Thomasville, Georgia.

16   Q.  Is that where you live now?

17   A.  Yes, sir.

18   Q.  And where did you work, Mr. Barnes?

19   A.  I worked at Federal Correctional Institution here in

20   Tallahassee, Florida.

21   Q.  Are you still employed there, Mr. Barnes?

22   A.  No, sir.

23   Q.  And when did you start working at the Federal

24   Correctional Institution in Tallahassee?

25   A.  I started working at the FCI in April of 1994.

*Alfred Barnes - Direct*

1   Q.  And prior to that, did you have any other employment,

2   Mr. Barnes?

3   A.  Yes, sir.

4   Q.  What was that?

5   A.  I was in the United States Air Force almost 12 years.  I

6   worked for the Georgia Department of Corrections for a year

7   and a half.

8   Q.  Mr. Barnes, are you a named defendant in this

9   prosecution?

10  A.  Yes, sir.

11  Q.  Did you plead guilty to the conspiracy charge in this

12  indictment?

13  A.  Yes, sir.

14  Q.  Did you enter into a Plea and Cooperation Agreement with

15  the government?

16  A.  Yes, sir.

17  Q.  And as part of that Plea and Cooperation Agreement, were

18  eight other counts dropped against you?

19  A.  Yes, sir.

20  Q.  Now, do you know the seriousness of the charges to which

21  you pled, Mr. Barnes?

22  A.  Yes, sir.

23  Q.  Did you plead to the most serious charge, Mr. Barnes?

24  A.  Yes, sir.

25  Q.  Now, were you arrested on June 21st of 2006, Mr. Barnes?

1    A.   Yes, sir.

2    Q.   And at the time of your arrest were you interviewed by

3    investigators?

4    A.   Yes, sir, I was.

5    Q.   Did you make statements to those investigators concerning

6    the charges contained in this indictment?

7    A.   Yes, sir.

8    Q.   Were those statements true?

9    A.   No, sir.  I lied.

10   Q.   Did you deny your involvement?

11   A.   Yes, sir.

12   Q.   Mr. Barnes, have you in the past been questioned about

13   your improper conduct at the Federal Correctional Institution

14   in Tallahassee?

15   A.   Yes, sir, I have.

16   Q.   In past investigations?

17   A.   Yes, sir.

18   Q.   And have you denied your involvement in those improper

19   activities?

20   A.   I did deny.

21   Q.   And were those statements also not true?

22   A.   They were not true, but I lied about it.

23   Q.   Now, Mr. Barnes, when you were a correctional officer,

24   what was your understanding of your duties as a correctional

25   officer in Tallahassee?

*Alfred Barnes - Direct*

1    A.   To make sure all of the inmates are provided a safe

2    environment to work, to make sure that they follow all rules

3    and regulations.

4    Q.   And what are those rules and regulations?

5    A.   There are different rules.  To make sure they are in the

6    right housing unit, to make sure that they are not smoking in

7    the unit, make sure they are not fighting.

8         MR. HARPER:  Objection, Your Honor, a pretrial

9    matter.

10        THE COURT:  Overruled.

11   BY MR. DAVIS:

12   Q.   So, you said your understanding is to make sure they are

13   not smoking, they're not fighting?

14   A.   Not fighting, they are in their proper housing unit.

15   Q.   Were there any regulations you're aware of concerning

16   sexual contact with inmates?

17   A.   Yes, sir.

18   Q.   And how are you aware of those?

19   A.   We had annual training once a year, and also they usually

20   pass out a pamphlet explaining about sexual contact with

21   inmates, sexual abuse.

22   Q.   Did you attend that annual training, Mr. Barnes?

23   A.   Yes, sir.

24   Q.   What do you remember from that annual training?

25   A.   There were a variety of topics we went over.  They

*Alfred Barnes - Direct*

6

1   emphasized -- based it a lot about the sexual contact about

2   the inmates.

3   Q.  What was the sexual contact with inmates?  What was the

4   rule?  What did you understand was the rule?

5   A.  That no staff member could have no sexual contact with

6   inmates.

7   Q.  There is no exception to that?

8   A.  Can you repeat again?

9   Q.  Is there any exception to that?

10  A.  There is no exception to that, zero tolerance.

11  Q.  What else do you remember from that training?

12  A.  They talked about past correctional officers that have

13  went over the line with inmates, and that got prosecuted in

14  the past that had sexual contact with inmates.

15  Q.  Do you remember anything about showing favoritism?

16  A.  Yes, sir.

17  Q.  What is the rule about showing favoritism?

18  A.  There is zero tolerance for favoritism with inmates.

19  Q.  How about personal relationships?

20  A.  No personal relationships, sir.

21  Q.  Did they also discuss contraband?

22  A.  Yes, sir.

23  Q.  What is your understanding of the training you received

24  on contraband?

25  A.  Contraband is anything that is not authorized by the

1    Bureau of Prisons and the Federal Correctional Institution.

2    You also have to have the authorization of the warden.

3    Q.  Did you have an understanding of what you might be able

4    to give to inmates, Mr. Barnes?

5    A.  Yes, sir.  They have a manual out what correctional

6    officers could give the inmates.

7    Q.  And what can correctional officers give inmates?

8    A.  Whatever is provided to the inmates on the FCI's property

9    list.  They also have a commissary list that was provided to

10   us and also the inmates.

11   Q.  So, you were allowed to give inmates stuff from the

12   commissary?

13   A.  No, sir.  They can provide -- they can go and purchase

14   stuff from the commissary.

15   Q.  Were you allowed to give the inmates anything?

16   A.  No, sir, except for such things like toiletries in the

17   housing unit, you know --

18   Q.  Would that toilet paper?

19   A.  Toilet paper.

20   Q.  Feminine products?

21   A.  Feminine products, soap.

22   Q.  And soap?

23   A.  Yes, sir.

24   Q.  In this training you talked about, did you have any

25   instruction on what you were to do if you uncovered a

*Alfred Barnes - Direct*

1   violation of these regulations?

2   A.   Yes, sir.

3   Q.   What were you supposed to do?

4   A.   You were supposed to bring it to the attention of the

5   inmate, you write it up on the incident report, and you

6   notify your supervisor on duty.

7   Q.   Mr. Barnes, when you were a correctional officer at FCI,

8   did you have sex with inmates?

9   A.   Yes, sir, I did.

10   Q.   Who did you have sex with?

11   A.   I had sex with Phyllis Fleming, Shonnie Daniels, Latoya

12   Brown, Sabrina Bowie.

13   Q.   Did you have sex with other inmates as well?

14   A.   Yes, sir.

15   Q.   Let's talk about Phyllis Fleming.  When did you start

16   having sex with Phyllis Flemming?

17   A.   The inmates arrived there in 1996, and I think the

18   relationship started in the end of '96, early '97.

19   Q.   When you say the inmates arrived, what do you mean by

20   that, when you said the inmates arrived in 1996?

21   A.   Yeah.  We was in a transition period at that time.  We

22   had male inmates, and we was in a transition period getting

23   male inmates out of Tallahassee and bringing in female

24   inmates.

25   Q.   So female inmates arrived in 1996?

1   A.   Yes, sir.

2   Q.   And you said by 1997, you were in a relationship with one

3   of those female inmates?

4   A.   Yes, sir.

5   Q.   What was the nature of your relationship with her?

6   A.   It was a friendly relationship that turned sexually.  I

7   used to bring her contraband.

8   Q.   What contraband did you bring her?

9   A.   I brought her Black & Milds, makeup, nail polish, weave,

10  different type of cosmetics for females.

11  Q.   Why did you bring her that contraband?

12  A.   Because we had a relationship sexually.

13  Q.   Did you bring her that contraband so she would have sex

14  with you?

15  A.   I brought the relationship because that -- since I had

16  crossed the line sexually, I knew that what she wanted, so I

17  had to bring it to her.

18  Q.   Did you give her any money as well?

19  A.   Yes, sir, I did.

20  Q.   In fact, didn't you give her three $20 bills?

21  A.   Yes, sir.

22  Q.   Were those three $20 bills later recovered by

23  investigators?

24  A.   Yes, sir.

25  Q.   And were you questioned about those three $20 bills?

*Alfred Barnes - Direct*

1    A.   Yes, sir.

2    Q.   And did you deny at that time that you gave them to her?

3    A.   Yes, sir, I did deny it.

4    Q.   Now, what happened as a result of that investigation with

5    Phyllis Fleming?

6    A.   Eventually, it came to the U.S. Attorney's Office.   I

7    don't know exactly what happened on her side, but they ended

8    up throwing the investigation out.

9    Q.   What happened to you?

10   A.   I was reassigned at that time to the Federal Detention

11   Center for almost two years, until the investigation was

12   over.   Eventually it was over, then that gave me a chance to

13   go back to the FCI where the females was.

14   Q.   So, during the pendency of the investigation, you were

15   put down with the men in the Federal Detention Center; is

16   that correct?

17   A.   Yes, sir.

18   Q.   At the end of that investigation you were allowed to

19   return to the FCI?

20   A.   Yes, sir.

21   Q.   And were any charges brought against you at the end of

22   that investigation?

23   A.   No, sir.

24   Q.   What happened when you returned to the Federal

25   Correctional Institution where the women were?

*Alfred Barnes - Direct*

1   A.   When I returned to the -- when I returned back to the

2   FCI, I was assigned to the Special Housing Unit, and I got

3   involved with another inmate in the Special Housing Unit

4   named Sherrye Booze.

5   Q.   How did that come about?

6   A.   She was an older lady in the Special Housing Unit, and I

7   was the number one officer there, and we just started

8   talking, general conversation, and we became involved by just

9   talking.

10   Q.   Did you have sex with Sherrye Booze?

11   A.   No, sir.

12   Q.   What was the nature of your relationship then?

13   A.   It was just a friendly relationship that I got to know

14   her, and she was a short-term inmate.  She wasn't going to be

15   there too long, and she wanted some hair dye, because she was

16   getting ready to depart.  So, I brought the hair dye in the

17   Special Housing Unit and gave it to her.  And I was planning

18   on getting with her once she got out.

19   Q.   So, you were planning on seeing her once she got out?

20   A.   Yes, sir.

21   Q.   Now, after your relationship with Sherrye Booze, what

22   happened?

23   A.   They reassigned me back down to the Federal Detention

24   Center.

25   Q.   Was there another investigation involving Sherrye Booze?

*Alfred Barnes - Direct*

1   A.  Not as I know of.  Just with me, I know there was an

2   investigation.

3   Q.  What was that investigation involving you?

4   A.  It was dealing with me providing her hair dye in the

5   Special Housing Unit.

6   Q.  So, there was an investigation of the hair dye to Sherrye

7   Booze in the Special Housing Unit?

8   A.  Yes, sir.

9   Q.  And were you asked questions during that investigation?

10  A.  Yes, sir, I was.

11  Q.  And did you deny --

12  A.  Yes, sir, I did deny.

13  Q.  Were those denials false?

14  A.  Yes, sir, they were false.

15  Q.  So then you're back at the Federal Detention Center

16  again?

17  A.  Yes, sir.

18  Q.  How long were you at the Federal Detention Center this

19  time?  Do you recall?

20  A.  I can't recall exactly.  I know it was anywhere from a

21  year to 18 months.

22  Q.  Can you help me with the timing of what year that would

23  be?  Do you remember when you came back to the Federal

24  Correctional Institution?

25  A.  It had to be with, the Fleming incident was early '97.

*Alfred Barnes - Direct*

1   It was maybe 2001.

2   Q.  So, 2001 was when happened?  Were you back at the jail or

3   were you back at the Federal Correctional Institution?

4   A.  I had moved back to the FCI after the investigation with

5   Phyllis Fleming.

6   Q.  So, by 2001 the Phyllis Fleming investigation was over

7   and you were back in the FCI?

8   A.  Yes, sir.

9   Q.  And in 2001, then, you gave contraband to Sherrye Booze;

10  is that correct?

11  A.  Correct.

12  Q.  That led to a second investigation, correct?

13  A.  Yes, sir.

14  Q.  And you testified that it was a year to 18 months that

15  you were then sent back to the Federal Detention Center?

16  A.  I think that's a good estimation.

17  Q.  So 2001, a year and a half later, would be 2002 to 2003?

18  A.  Yes, sir.

19  Q.  So, did you return then to the Federal Correctional

20  Institution in 2002 to 2003?

21  A.  Yes, sir, I did.

22  Q.  What happened when you returned to the Federal

23  Correctional Institution in 2002 to 2003?

24  A.  I was assigned back to the FCI just working, and I think

25  I was assigned the morning watch post.  I was working a

*Alfred Barnes - Direct*

1  variety of units, working the F unit, D unit in the morning

2  watch, the 12 midnight to the 8 a.m. shift.

3  Q.  I would like to ask you about those shifts.  Can you tell

4  me what the shifts run?

5  A.  You've got a variety of shifts.  You've got the number

6  one shift, which is the morning watch shift, which runs from

7  12 midnight to 8 in the morning.  Then you've got the day

8  shift that runs from really 7:45 a.m. until 4 p.m.  Then

9  you've got the evening shift, which runs from 4 p.m. to 12:00

10  midnight.

11  Q.  Did you have a preference for which shift you wanted to

12  take?

13  A.  Yes, sir.

14  Q.  What shift did you prefer?

15  A.  I preferred the morning watch shift, the number one

16  shift.

17  Q.  Now, it's called morning watch, but it's really from

18  midnight to 8?

19  A.  Yes, sir, the midnight shift.

20  Q.  Why did you prefer that shift?

21  A.  For me it was, it's easier for me, when I'm off duty, to

22  do things while I'm off during the time, and plus there's not

23  too many staff members around at that time.

24  Q.  So, when you're off duty, you mean during the regular

25  workday, 9-to-5?

*Alfred Barnes - Direct*

1   A.  Yes, sir.  I can do more thing when I get off.  Like,

2   when I work the midnight shift to 8:00, and I get off in the

3   morning and, you know, do my errands at the house and still

4   have plenty time to go to sleep and come back to work at

5   night.

6   Q.  And you said the other reason is because there's less

7   staff around from 12-to-8?

8   A.  Yes, sir.

9   Q.  Why was that important?

10  A.  Because you don't have to really worry about interacting

11  with them; and, if you was doing things like I was doing, you

12  didn't have to really worry about people walking up on you,

13  being around you.

14  Q.  Let's go back to your return to the Federal Correctional

15  Institution in 2002 and 2003.

16       You testified that you were on morning watch, which is

17  the 12:00 to the 8:00 watch; is that correct?

18  A.  Yes, sir.

19  Q.  That's your recollection?

20  A.  Yes, sir.

21  Q.  Did there come a time when you met another inmate that

22  you became involved with?

23  A.  Yes, sir.

24  Q.  And who was that?

25  A.  Her name was Shonnie Daniels.

*Alfred Barnes - Direct*

1   Q.   And how did that come about?

2   A.   I had met Shonnie previously in the Special Housing Unit

3   during the -- I think the Sherrye Booze incident, that she

4   was being transferred away from Tallahassee to Marianna, and

5   she just happened to come back at the time I got reassigned

6   back to the FCI, and I met her in the G unit on the morning

7   watch shift.

8   Q.   Did you get to know Ms. Daniels when you were in the G

9   unit in the morning watch?

10   A.   Yes, sir.

11   Q.   Now, wasn't she asleep from 12-to-8?

12   A.   She's supposed to been asleep, but during that time you

13   could have inmates running around.  They're supposed to be in

14   their quarters, but in units like that you've got three

15   levels, and it's hard to maintain all three levels at one

16   time.  As you're making your rounds, the inmates know where

17   you at.  They know you're on the first floor, they'll be

18   moving on the second and third floor.  When you go up on the

19   second and third floor to make rounds, they be moving on the

20   first floor.  You know, it's just the chance you take making

21   your rounds.  You can't keep up with all of them at the same

22   time.

23   Q.   How did your relationship with Ms. Daniels develop?

24   A.   It turned personal with Shonnie, a real close

25   relationship.

*Alfred Barnes - Direct*

1  Q.  You say real close, what happened?

2  A.  We became involved intimately.

3  Q.  Did you have sex with Ms. Daniels?

4  A.  Yes, sir, several times.

5  Q.  And did you bring her contraband?

6  A.  Yes, sir.

7  Q.  Why did you bring her contraband?

8  A.  I brought her contraband for the favors she was doing for

9  me, sexual relationship; and also, you know, just to keep

10 things quiet.

11 Q.  How did you -- how did the contraband relationship with

12 Shonnie Daniels work out?  Explain that to the jury.

13 A.  How did it work?  Well, sometimes I would go out and

14 purchase things for her and bring them in.  Sometimes she

15 will have one of her relatives send money to an address that

16 I provided to Shonnie.  She would send me money.  I cashed

17 the money order, and I go out and purchase items for her and

18 bring them back in to her.

19 Q.  Now, you say that you provided her with an address?

20 A.  Yes, sir, I did.

21 Q.  Just for the privacy of the person whose address that is,

22 can you tell me what city and state that address is located

23 in?

24 A.  It's located in Thomasville, Georgia.

25 Q.  Was that address of someone related to you?

*Alfred Barnes - Direct*

1   A.   Yes, sir, it was.

2   Q.   Who was it?

3   A.   My mother's.

4   Q.   Did you live there at that time?

5   A.   No, sir.

6   Q.   What instructions did you give to Ms. Daniels about

7   mailing to that address?

8   A.   I would have her tell her relatives to just get the money

9   order, leave it blank, and I gave her an alias name to put on

10   it.

11   Q.   You gave her an alias name to put on -- you just told her

12   to leave the money order blank, so you gave her an alias name

13   to put on the money order or on the letter?

14   A.   Normally, they would leave the money order blank.  I

15   would fill it out.  But the address itself, I would give her

16   an alias name and the correct address.

17   Q.   I want to show you an exhibit that has been -- no, I

18   don't right now.

19        What alias name did you use?

20   A.   I used Frank Allen.  I used C. Jordan.

21   Q.   And you're not Frank Allen, are you?

22   A.   No, sir.

23   Q.   Are you C. Jordan?

24   A.   No, sir.

25   Q.   When they mailed the money to that address, what would

*Alfred Barnes - Direct*

1   you do?

2   A.   I would get the money order, and I would -- normally,

3   when I get there to the house, my mom would tell me I have

4   mail there, I look on it, I open the envelope up.  The money

5   orders would be inside and it would be blank.  I would fill

6   it out and take it to the bank and cash it.

7   Q.   Was that money for you or was that to pay for contraband?

8   A.   It would be -- some might be for me and some would be,

9   mostly, to purchase contraband.

10  Q.   Okay.  How much was for you?  Do you remember dollar

11  amounts that you would make per --

12  A.   Normally, Shonnie, it wasn't that much.  Normally, maybe

13  a hundred dollars, and I might get half and purchase the

14  other half with contraband.

15  Q.   So, a hundred dollar check she would send you, you would

16  take $50 for yourself?

17  A.   Yes, sir.

18  Q.   And you would take $50 and buy contraband?

19  A.   Yes, sir.

20  Q.   And what type of contraband did you buy for the $50?

21  A.   I would buy her Black & Milds, I would buy her makeup,

22  lipstick, gloss, sometimes cigarette lighters.

23  Q.   Were those valuable items inside the FCI compound?

24  A.   Yes, sir.

25  Q.   How much did a pack of Black & Milds cost you?

*Alfred Barnes - Direct*

1    A.   It would cost me anywhere from $1.89 to $2.

2    Q.   Do you know how much they would be sold for on the

3    compound?

4    A.   Yes, sir.

5    Q.   How much were they sold for on the compound?

6    A.   Normally they range from $15.

7    Q.   Now, what -- you testified that Shonnie Daniels sent you

8    money at that address for contraband.

9    A.   Yes, sir.

10   Q.   Did she also give you anything else for that contraband?

11   A.   Sex.

12   Q.   Let's go back to relationships you had with inmates at

13   the Federal Correctional Institution.

14        How long did that relationship with Shonnie Daniels last?

15   A.   It lasted -- I don't know the exact date that she came

16   back, but it lasted from, I'd say, end of 2002 until 2004 --

17   I believe 2004.

18   Q.   Why did it end?

19   A.   Because I was trying to get away from her.  The pressure

20   and the stress that it came out of the relationship was

21   getting the best of me, so I was basically trying to get away

22   from her.

23   Q.   So you were ending it?

24   A.   Sir?

25   Q.   You were ending it?

*Alfred Barnes - Direct*

1   A.   Yes, sir.   It was taking too much on me, and the

2   relationship was so open and widespread everybody knew what

3   was going on, all of the inmates and staff members, and I

4   just wanted to get away from her.

5   Q.   Did Ms. Daniels ultimately leave prison as well?

6   A.   Yes, sir.

7   Q.   I guess it ended completely when she left prison; is that

8   correct?

9   A.   Yes, sir.

10  Q.   Did you engage in a sexual relationship with any other

11  inmates at FCI-Tallahassee?

12  A.   Yes, sir.

13  Q.   And who was that?

14  A.   Sabrina Bowie.

15  Q.   Tell me about that relationship.

16  A.   It was a relationship that started out with working in

17  the G unit, the midnight shift.   I was making rounds.   I just

18  happen to come across her.   We started talking and

19  conversating, and it ended up being sexual.

20  Q.   Now, you said the midnight shift that time, correct?

21  A.   Yes.

22  Q.   Is the same thing as the morning watch?

23  A.   Correct.

24  Q.   Just confusing for us to think that midnight and morning

25  are different, but it's the 12-to-8 shift.

*Alfred Barnes - Direct*

1   A.   12 to 8 a.m. shift.

2   Q.   So, your testimony is you began talking with Sabrina

3   Bowie?

4   A.   Yes, sir.

5   Q.   How did your relationship develop?

6   A.   It developed by me just making rounds in the housing

7   unit.  They might be up on the midnight shift watching TV

8   sometimes, and I just happen to start talking to her.  She

9   started taking comfort in me, and the relationship started

10   from there.

11   Q.   After you got to be friendly, what was the next

12   development in your relationship?

13   A.   I started bringing her contraband in to her.

14   Q.   How did you give her that contraband?

15   A.   I would bring it with me when I come to work at night.  I

16   would go around to her room or she might be up, and I just

17   give it to her.

18   Q.   You would just give it to her?

19   A.   Yes, sir.

20   Q.   Did there come a time when your relationship became

21   sexual?

22   A.   Yes, sir.

23   Q.   And when did that happen?

24   A.   What year did that happen?

25   Q.   Yes, if you recall.

*Alfred Barnes - Direct*

1   A.   I can't recall a year, but I know it had to be maybe

2   2004.

3   Q.   2004?

4   A.   Yes, sir.

5   Q.   Do you remember what unit you were in?

6   A.   I was working in G unit.  I'm sorry.  That was the F

7   unit.

8   Q.   That was F unit?

9   A.   Yes, sir.

10   Q.   Do you remember where Ms. Bowie was?

11   A.   Yes, sir.

12   Q.   Where was she?

13   A.   She would have been on the west side.

14   Q.   What was the west side?

15   A.   It was the drug program unit.

16   Q.   Is that where you gave Ms. Bowie the contraband?

17   A.   Yes, sir.  Sometimes she would come to the office where I

18   would talk to her.

19   Q.   If you weren't working F?

20   A.   If I wasn't working F, normally I hold it for her and

21   bring it to her.

22   Q.   Okay.  Describe the first time you had sex with

23   Ms. Bowie?

24   A.   At that time in the office, F, you couldn't turn the

25   lights off in the office area because of staff members having

1  them off during the shift, so what happened was --

2  Q.  If I can stop you.  What do you mean, you couldn't turn

3  off because the staff members --

4  A.  Yeah.  They had put a shield over the light switch in the

5  office area, because of previous conduct with inmates or

6  staff members having the lights off during the shift.  So,

7  what they did, they wanted them lights to stay on, and so

8  they put a shield over the light switch.

9  Q.  So, you met her in the office in the F unit?

10  A.  Yes, sir.  At that time, like I said about the lights,

11  you had to go into a boiler room and turn the lights off in

12  that area, and that's what I usually do.  I'd leave the main

13  office area, walk around the corridor to the right, the east

14  side, and there is a boiler room there, and there's a breaker

15  box inside of that boiler room.

16  Q.  Let me just get an exhibit and show you, and you may be

17  able to show us.

18        MR. DAVIS:  Excuse me, Your Honor.  May I approach?

19        THE COURT:  You may.

20  BY MR. DAVIS:

21  Q.  I'm showing you what has been marked as Government's

22  Exhibit 19.

23      Does that look like the room you are talking about in F

24  unit?

25  A.  Yes, sir.

*Alfred Barnes - Direct*

1    Q.  And if you can take that little pen to the side there,

2    can you show us where the breaker box is?

3    A.  (Witness complies.)

4    Q.  So, your testimony is, because they had put a plate over

5    the light switch, you had to get up out of that office and

6    walk to this room to turn off the lights?

7    A.  Yes, sir.

8    Q.  Why did you want to turn off the lights?

9    A.  I usually turned the lights off because I didn't want to

10   be seen.  Also, you're sleeping, you know, if somebody walks

11   up, they couldn't see you if you're sleeping.

12   Q.  Were you allowed to sleep on the shift?

13   A.  No, sir.

14   Q.  So, you and Ms. Bowie are in the office in F unit?

15   A.  Yes, sir.

16   Q.  And what happened next?

17   A.  Once I turned the lights off -- normally, I make rounds

18   to make sure there aren't any inmates moving, and what I do,

19   I would normally knock on her door, I would signal for her,

20   she would come out of the west side, and she'd come into the

21   office area where the lights would be turned off, and I would

22   be in the office area there, and she would come there in the

23   office area, and we would have sex there.  Sometimes it would

24   be oral.  Sometimes it would be sex, intercourse.

25   Q.  Did you have any discussions with Ms. Bowie as to why you

*Alfred Barnes - Direct*

1   were having sex?

2   A.  Yes, sir.

3   Q.  What were those discussions?

4   A.  It could be anything about me bringing her contraband for

5   sex.

6   Q.  Did you bring Ms. Bowie contraband after you had sex with

7   her?

8   A.  Yes, sir.

9   Q.  And did you bring her contraband every time after you had

10  sex with her?

11  A.  Yes, sir.

12  Q.  In addition to Ms. Bowie, you previously testified that

13  you had sex with Latoya Brown as well?

14  A.  Yes, sir.

15  Q.  Can you tell us about that?

16  A.  That was a relationship that started in G unit on the

17  morning watch shift.  And I just got to meet Ms. Brown, a

18  relationship started, we had sex several times.  From that

19  point went on, I started bringing her contraband also.

20  Q.  Do you remember what year that was?

21  A.  I don't know exactly, but I know it had to be around

22  maybe 2004, also.

23  Q.  So, in 2004, you were having a relationship with Sabrina

24  Bowie?

25  A.  Sabrina Bowie --

*Alfred Barnes - Direct*

1  Q.  And in 2004 you were also having a relationship with

2  Latoya Brown?

3  A.  Latoya Brown and Shonnie Daniels.

4  Q.  And Shonnie Daniels.  What was your relationship with

5  Latoya Brown?

6  A.  It was just a relationship that started as a friendly

7  relationship and then real personal.  She took a liking to me

8  and ended up being sexual, and me bringing her contraband.

9  Q.  You brought her in contraband.  Why did you bring her

10  contraband?

11  A.  I brought her in contraband really to be quiet about what

12  was going on between us.

13  Q.  Did you have any information that led you to consider

14  Sabrina Bowie has somebody you wanted to have sex with?

15  A.  At the present time, when initially I met her, I didn't.

16  Q.  Later on did you have information as to why she was a

17  good person to have sex with?  Let me rephrase that question.

18      How did you choose these people that you had sex with, or

19  did you choose them?

20  A.  Normally, I would choose them after I sit there for a

21  while, and I watch them and see what their demeanor is.

22  Normally, it wouldn't be something immediately.  It would be

23  after a while, like it might be a week or two, just by making

24  rounds and seeing how the individual handles themselves, do

25  they stay to themselves, do they hang out with a lot of other

*Alfred Barnes - Direct*

1    inmates.

2    Q.   So, were you trying to evaluate whether or not it was

3    safe to approach them?

4    A.   Yes.

5    Q.   And why was that?

6    A.   Because I think that would be the same way, not to have

7    an inmate most of the time talking and being around a whole

8    bunch of inmates.  I know that a lot of times they would be

9    talking, and you really don't them to -- you really don't

10   want the inmate involved with other inmates at all, because

11   rumors get to start, and you want to keep things maybe quiet,

12   you want to keep it on the down low.

13   Q.   You say you want to keep things quiet, you want to keep

14   it on the down low?

15   A.   Yes, sir, you want keep things -- that she will keep that

16   secret between me and her.

17   Q.   What happens if she didn't keep that secret?

18   A.   Normally, once it got on the compound and once it spreads

19   over the compound with all of the rest of the inmates, other

20   inmates hear about it, some inmates might approach you about

21   it, "Oh, I heard you got a relationship with Bowie or

22   Daniels," and you don't want that, because eventually you

23   think it might get back to SIA or the SIS, and you didn't

24   want that.

25   Q.   And the SIA or the SIS were the people on the compound

1   that investigated those incidents?

2   A.  Yes, sir.

3   Q.  And were those the people who investigated your prior

4   incident with Phyllis Fleming?

5   A.  Yes, sir.

6   Q.  And your prior incident with the contraband for Shirley

7   Booze?

8   A.  Yes, sir.

9   Q.  Now, did you have a contraband relationship in addition

10  to Shonnie Daniels with anyone else?

11  A.  Yes, sir.

12  Q.  Did you have a relationship with -- well, tell me who you

13  had a relationship with, a contraband relationship.  Who else

14  did you have a contraband relationship with?

15  A.  I think with Delores Hamlet.

16  Q.  Anyone else?

17  A.  Deronda Hartline.

18  Q.  Tell me about your relationship with Deronda Hartline.

19  A.  Deronda Hartline, that started also in the F unit,

20  morning watch shift.  And it was just one day I was making

21  rounds, and I just happened to notice her in the room, and

22  she just seen me looking at her, and one night she just came

23  up to the office and started talking, just general

24  conversation.  At first she brought up about making money.  I

25  was kind of cautious at first, because normally I don't

1    really like inmates talk to me about that.  I think it's a

2    trap or something like that.  So, I kind of shrug it off the

3    first go-around.  I think maybe a week or two later, I was

4    just be making my rounds, and she might say, again, "Are you

5    thinking about that?"  I might say, "Well, are you working

6    for the SIA or are you working for the police?  Are you

7    trying to set somebody up?" or something like that.  She

8    said, "No, I'm not.  I just want to -- you know, I heard

9    about you previous in the past."  She knew something about my

10   past history with the inmates, and thought maybe she could

11   trust me about making money.

12       So, eventually we started that I trusted her and we

13   started a relationship just financially about making some

14   money for her and me.

15   Q.  So, there was no sexual contact in this relationship with

16   Deronda Hartline?

17   A.  No, sir.

18   Q.  But she paid you money in order to bring in contraband?

19   A.  Yes, sir.

20   Q.  Describe how that payment and contraband relationship

21   worked.

22   A.  Normally, sometimes she would have other inmates or other

23   relatives that she knew on the outside send me packages and

24   big boxes, which I had provided her the address with the same

25   alias name of C. Jordan.

1   Q.  Was that the same address in Thomasville, Georgia?

2   A.  Yes, sir.

3   Q.  Go ahead.  I didn't mean to interrupt.

4   A.  Yes.  She would send me boxes sometimes with all types of

5   different cosmetics in it, some underwear, Black & Milds, all

6   different types of women's cosmetics.  And sometimes in that

7   box it might contain a money order, and sometimes she'd just

8   send me a straight money order to that same address in

9   Thomasville, Georgia.  It would be a blank money order, which

10  I would fill out, and I would take to my bank and cash it.

11  Q.  Mr. Barnes, I'm going to show you what has been marked

12  for identification as Government's Exhibit 47.

13      Do you recognize what this is?

14  A.  Yes, sir.

15  Q.  Is this one of those money orders you were just talking

16  about?

17  A.  Yes, sir.

18  Q.  Is that your handwriting on the money order?

19  A.  Yes, sir.  That's my handwriting, which I --

20  Q.  This is the actual money order, is it not?

21  A.  Yes, sir, it is.

22      MR. DAVIS:  Your Honor, the government would move

23  Exhibit 47 into evidence.

24      MR. FINDLEY:  No objection.

25      THE COURT:  Government's 47 is admitted.

1        (GOVERNMENT EXHIBIT NO. 47:  Received in evidence.)

2     BY MR. DAVIS:

3     Q.  Mr. Barnes, can you describe to the jury what's on this

4     postal money order?

5     A.  That's the money order I received through Deronda

6     Hartline, through one of her friends, Ingrid Johnson.

7     Q.  Okay.  Now, in this case -- you said previously you like

8     to have these money orders not filled in; is that right?

9     A.  Yes, sir.

10    Q.  In this case did it come filled in?

11    A.  Yes, sir.  She had filled it in under the name, C.

12    Jordan.

13    Q.  I want to zoom in.  I want to make sure you can show

14    that.

15        Is that your handwriting "A. Barnes" on the money order?

16    A.  Yes, sir.

17    Q.  And is it possible -- can you take that pen and show

18    where the "C" and "J" for Jordan are?

19    A.  The "C" is right there where I wrote my "A" up.  The

20    Jordan is up under the "B-a-r-n-e-s" -- and I wrote over it.

21    It came as C. Jordan.  I put my initial "A" over it, to try

22    to cover the "C" up, and try to cover that up.  And then I

23    put the "B" over the "J-o-r-d-a-n," with my last name Barnes.

24    Q.  I'm going to take off your markings so we can see what

25    you're talking about.

*Alfred Barnes - Direct*

1     I see what you're saying there.  So, there's a "C"

2   underneath that "A"?

3   A.  Yes, sir.

4   Q.  And I can see a capital "J" underneath that "B"?

5   A.  Correct.

6   Q.  And you wrote it several times so that the "A. Barnes" is

7   darker than what was underneath there?

8   A.  Yes, sir.

9   Q.  Now, that money order was for $900; is that correct?

10  A.  Yes, sir.

11  Q.  It's a lot of money.

12  A.  Yes, sir.

13  Q.  What was that $900 for?

14  A.  Yes, sir.

15  Q.  Do you recall why you were getting a $900 money order?

16  A.  At that time she had gave me -- I think we split it half

17  and half, and the $450 for me to go and purchase contraband

18  with that money there, from different types of colognes and

19  perfumes and --

20  Q.  Was the original arrangement with Hartline that she would

21  send you money or she would send you packages?

22  A.  It started off with packages with money orders in them.

23  Q.  And how much were those money orders supposed to be?

24  A.  It could be $200 or $150, when it initially started off.

25  Q.  Okay.  Then did they provide you money to buy the

*Alfred Barnes - Direct*

1   contraband as well, or did they just provide the contraband?

2   A.   No, sir.   They provided me money to get contraband, also.

3   Q.   Okay.   And when you bought that contraband or received

4   that contraband, what did you do with it?

5   A.   Normally, I bring it on the midnight shift, which the 12

6   midnight to 8:00 in the morning shift.   I would bring it in

7   with me in my Florida State bag.   I used to carry a Florida

8   State -- it's like a cooler bag.   I might take me three or

9   four trips to get all of that contraband in.   So, normally, I

10  would do it over a week's period.   I might start one day,

11  skip a day, and alternate different days bringing in it.

12       And, like I say, it could be a variety of contraband

13  dealing with cologne, perfume, underwear, bras, makeup,

14  Black & Milds, all different types of women's cosmetics.

15  Q.   Now, you testified that that check came from Ingrid

16  Johnson.   Did there come a time when Inmate Hartline told you

17  that you should be in contact with somebody else besides

18  Ingrid Johnson?

19  A.   She told me it was somebody else, but I can't recall

20  exactly who it was.   I remember Ingrid specifically.

21  Q.   Okay.

22  A.   And later on she would have somebody named Hanky.

23  Q.   She mentioned a person named Hanky?

24  A.   Correct.

25  Q.   Did she tell you why you had to use Hanky and not Ingrid?

*Alfred Barnes - Direct*

1   A.  Yes, sir.  Because she had a falling out with Ingrid.  I

2   think she felt that Ingrid was cutting her on her money some

3   type of way, and they had fell out, and she told me that she

4   was using --

5           MR. HARPER:  Objection to what she said, Your Honor.

6           THE COURT:  Overruled.

7   BY MR. DAVIS:

8   Q.  Did you have trouble getting money from Ingrid?

9   A.  No, sir, I didn't.  At the time I didn't.  I didn't know

10  that they had a falling out with each other until I came

11  back.

12  Q.  Did there come a time when you gave Hartline a bank

13  account as opposed to the mail address?

14  A.  Yes, sir, I did.

15  Q.  Was that to make sure that the money got to you faster?

16  A.  Yes, sir.

17  Q.  But bringing it back up to the time you are no longer

18  dealing with Ingrid but you are in touch with Hanky?

19  A.  Yes, Hanky.

20  Q.  Now I will ask you, did you get a letter from Hartline

21  discussing Hanky?

22  A.  Yes, sir.

23  Q.  I want to show you what has been marked as Government's

24  Exhibit 46.  Can you see that letter, Mr. Barnes?

25  A.  Yes, sir.

1   Q.  And can you recognize who that letter is from?

2   A.  Yes, sir.

3   Q.  And who is that letter from?

4   A.  It's from Deronda Hartline.

5   Q.  And did she use this name "Deb," when she wrote to you?

6   A.  Yes.

7   Q.  And did she call you "Stranger"?

8   A.  Yes, sir.

9   Q.  Now, do you see the name right in there, "Hanky"?

10  A.  Yes, sir.

11  Q.  Just a take a minute to read this letter and tell me what

12  this letter communicates to you.

13  A.  It's, "Hi, Stranger:

14      "Listen, I just want to let you know I sent two more to

15  Hanky for the attorney, but make sure when we go shopping for

16  my friend, he gets only the specific items, okay?  We have

17  one silver chain with cross, four bottles of women's cologne,

18  four bleach packets with peroxide, 30 eyeliners wild colors,

19  30 polishes, wild colors.

20      "If there is more left get more polishes.  If there is

21  not enough to get the above listed items, take a few off.

22      "I'll call Hanky within the next few days to see if you

23  received this.  Once you get ready to see my --"

24      I can't see the bottom.

25  Q.  I'm sorry.

1    A.   "See my friend --"

2    Q.   Just hold one second.  I will pull it out.  I don't want

3    to make you seasick.  Can you still read that?

4    A.   Yes, sir.

5         "See my friend, call Hanky, so she'll know pretty much

6    when to expect them.  Okay?  Hopefully we'll see you soon.

7         "Sincerely, Deb."

8    Q.   When you got this letter, what did you understand

9    Hartline to be asking of you?

10   A.   She was asking me to get in contact with Hanky, and I

11   would call Hanky and give Hanky an address to send the money

12   to me.

13   Q.   Did you call Hanky?

14   A.   Yes, sir, I did.

15   Q.   And did you give Hanky an address?

16   A.   Yes, sir.

17   Q.   And did he, in fact, send you a money order?

18   A.   Yes, sir.

19   Q.   I would like to show you what has been marked for

20   identification as Government's Exhibit 48.

21        Do you see that exhibit marked for identification as

22   Number 48?

23   A.   Yes, sir.

24   Q.   And can you see that -- do you want me to go in closer on

25   that?

*Alfred Barnes - Direct*

1    A.   I can see it.

2    Q.   Whose handwriting is on that money order?

3    A.   That's my handwriting.

4    Q.   And what amount is this money order for?

5    A.   $600.

6    Q.   And what is the date on this money order?  Can you see

7    that?

8    A.   It looks like November 18th, 2005.

9    Q.   2005.  Is this the original of the money order you

10   received?

11   A.   Yes, sir.

12              MR. DAVIS:  Your Honor, the government would move

13   Exhibit 48 into evidence.

14              MR. FINDLEY:  No objection.

15              THE COURT:  Government 48 is admitted.

16        (**GOVERNMENT EXHIBIT NO. 48:**  Received in evidence.)

17   BY MR. DAVIS:

18   Q.   Let me move in a little bit closer.

19        Now, did this, as well as you can recall, did this come

20   to you in blank?

21   A.   It was a blank money order.

22   Q.   And did you sign your name there?

23   A.   Yes, sir, I did.

24   Q.   And you signed the "from name" as well?

25   A.   Yes, sir.

1   Q.   And that's for $600; is that correct?

2   A.   Yes, sir.

3   Q.   Now, when you received this money order, what did you do?

4   A.   I filled it out, went to my bank, and I cashed it.

5   Q.   What did you do with the money?

6   A.   The money I purchased contraband from packs of

7   cigarettes, and I brought them back in.  I don't know exactly

8   when I brought them back in, but I know it was a purchase of

9   cigarettes that I brought back in to Deronda Hartline.

10   Q.   I want to show you what has been admitted as Government's

11   Exhibit 49.  Do you recognize that?

12   A.   Yes, sir.

13   Q.   What is that?

14   A.   That's 305 cigarettes, that's nail and clear polishes,

15   eyeliner pencils, we've got earrings, we've got pencil

16   sharpeners.

17   Q.   Is that the contraband that you brought in?

18   A.   Yes, sir.

19   Q.   The list mentions a cross, cologne, Black & Milds.

20   A.   That's correct.

21   Q.   I'm looking at Government's Exhibit 46.  Did you just

22   decide to buy something else?

23   A.   No.  Like I say, I didn't bring everything in at one

24   time.

25   Q.   Okay.  Thank you.

 1      Now, you say you brought contraband in for Delores

 2   Hamlet.  Is that true?

 3   A.   Yes.

 4   Q.   What did you bring in to Delores Hamlet?

 5   A.   I brought her cartons of cigarettes.

 6   Q.   Was this before or after cigarettes banned on the

 7   compound?

 8   A.   This was after they were banned.

 9   Q.   Were cigarettes more available after they were banned on

10   the compound?

11   A.   Yes, sir, they were very valuable.

12   Q.   What was your arrangement with Delores Hamlet?

13   A.   My arrangement was that I would bring her cartons of

14   cigarettes, and she would pay me cash money.

15   Q.   She would pay you cash money for it?

16   A.   Yes.

17   Q.   How much did she pay you for a carton of cigarettes?

18   A.   When we first started off, I think she gave me -- I gave

19   her I think four cartons of cigarettes, and she initially

20   gave me $200 in cash that she got from visitation in some

21   type of way.

22   Q.   So that's four cartons for 200.  Was that $50 a carton?

23   A.   Yes, sir, but normally they would go higher than that.

24   Q.   So normally they would go higher?

25   A.   Yes, sir.  What I was doing, basically, was like fronting

*Alfred Barnes - Direct*

1   her, and eventually when she got more money, she would come

2   to me and give it to me.

3   Q.  So that was basically, as you say, fronting cigarettes?

4   A.  Yes, sir.

5   Q.  And she would take the cigarettes and sell them on the

6   compound?

7   A.  Yes, sir.

8   Q.  And split the money with you?

9   A.  Whatever money she could get, she would, like I said, she

10   was dealing with cash money with me, and whatever she could

11   get through visitation, whatever type of way she was getting

12   it, it normally would be cash money.

13   Q.  Okay.  Were you also selling cigarettes to Steven Brinson

14   down at the jail?

15   A.  It wasn't cigarettes.  It was the Bugle tobacco.

16   Q.  Okay.  Tobacco?

17   A.  Correct.

18   Q.  That's loose tobacco?

19   A.  Yes, sir, Bugle packs.

20   Q.  With rolling papers?

21   A.  Yes, sir.

22   Q.  And how much were you selling them to him for?

23   A.  Normally, he would try to make as much as he can.  It

24   might be $600 for rolling it up, but he could make 800

25   according to how he packaged the loose tobacco up, and he

1 would have his girlfriend or wife send maybe 250, at one time

2 it might be 3.

3 Q. Was that per pack of Bugle tobacco, or did it come in a

4 large container?

5 A. Well, the container I brought in was the large Bugle

6 tobacco.  It's a big can.

7 Q. Okay.

8 A. And I don't know how much loose tobacco is in it, but it

9 also had the wrappers in it, also.  Whatever he could make

10 off of it, you know, normally he would send me half of it.

11 Q. Now, did there come a time when you spoke with Gregory

12 Dixon about contraband?

13 A. Yes, sir.

14 Q. And when was that?

15 A. I don't know exactly the year, but I know there was a

16 conversation about contraband and about making money.

17 Q. Do you know what kind of contraband you were talking

18 about?

19 A. Cigarettes.

20 Q. So, does -- if it was cigarettes, would it -- when were

21 cigarettes available on the compound?

22 A. If I'm not mistaken, I think, when they were available, I

23 think they stopped in -- it might have been mid 2005.  I

24 think initially they stopped, if I'm not mistaken, they were

25 actually banned.  So, it had to be anywhere -- I think after

*Alfred Barnes - Direct*

1   2005 or --

2   Q.  So, when you had this conversation with Mr. Dixon, what

3   did you say or what did he say?

4   A.  It was basically about how you make money off of

5   cigarettes, get with the inmates and giving them an address,

6   and they would send you money orders.  You get the money, you

7   go buy the cigarettes, and bring it back to them.

8   Q.  So, you were discussing an address.  Who said what?  What

9   did Mr. Dixon say to you?

10  A.  I think it was basically, like, you find somebody that

11  you are comfortable with, they provide them --

12  Q.  Okay.  Did Mr. Dixon say that to you?

13  A.  Yes, sir.

14  Q.  What did he say?

15  A.  It was basically, like, if you can find an inmate that

16  you comfortable with, you can have them -- you give them an

17  address, and they can send you money, and you can go out and

18  purchase cigarettes and bring them back to them, and double

19  your money.  Some type of conversation like that.

20  Q.  Now, had you been engaged in the contraband scheme with

21  Deronda Hartline and Shonnie Daniels at this time?

22  A.  Yes, sir.  So, it wasn't knew to me what he was saying.

23  I was already involved in it.

24  Q.  So he wasn't telling you anything new?

25  A.  No, sir.

*Alfred Barnes - Direct*

44

1   Q.  Did Mr. Dixon tell you anything about him bringing in

2   contraband?

3   A.  He might've mentioned vaguely or something like that.  I

4   don't know exactly what he said.

5   Q.  Do you see Mr. Dixon here in the courtroom here today?

6   A.  Yes, sir.

7   Q.  You know Mr. Dixon?

8   A.  Yes, sir.

9   Q.  Can you point him out to the court?

10   A.  Yes, sir.

11   Q.  And what is her wearing?

12   A.  He's wearing kind of like a tan suit there with a brown

13   tie.

14          MR. DAVIS:  Your Honor, if the record would reflect

15   that Mr. Barnes has identified Defendant Dixon.

16   BY MR. DAVIS:

17   Q.  Did you ever switch units with other corrections

18   officers?

19   A.  Yes, sir.

20   Q.  And who did you switch units with?

21   A.  I switched with Officer Dixon.

22   Q.  Now, why did you want to switch units?

23   A.  I was switching to get away from the pressure of Shonnie

24   Daniels.

25   Q.  Do you remember when this was?

*Alfred Barnes - Direct*

1    A.  Yes, sir.  I may not know exactly, but it had to be 2004.

2    It might have been early March of -- might have been the

3    first quarter of 2004, January, February, or March.  I know

4    it was the year of 2004.  That might not be exact.

5    Q.  Where were you stationed at the time?

6    A.  Well, I was in F unit.

7    Q.  Did you discuss with Mr. Dixon why you wanted to leave F

8    unit?

9    A.  Yes, we discussed it.  I was telling him that I was

10   trying to, you know, get the pressure, getting away from

11   Shonnie.

12   Q.  You told him you wanted to switch to get away from

13   Shonnie Daniels?

14   A.  Yes.  You know, I know her name was hot, it was all over

15   the compound, inmates talking, and the pressure and stress.

16   Q.  Where was Mr. Dixon at that time?

17   A.  I think he was assigned to the Federal Detention Center.

18   Q.  So, did you want to switch to the Federal Detention

19   Center to get away from the females altogether?

20   A.  Yes, sir.

21   Q.  Did Mr. Dixon tell you why he wanted to switch?

22   A.  Well, sometimes he would say he wanted to switch just to

23   come over to F unit to see Bowie, or sometimes he might say

24   that he can get his mail by being there in the morning

25   instead of coming all the way over from the detention center

*Alfred Barnes - Direct*

1  to do it.

2  Q.  So, sometimes he had reasons like he just wanted to check

3  his mail?

4  A.  Yes, sir.

5  Q.  But did you just testify that he told you he wanted to

6  switch to F unit to see Bowie?

7  A.  Yes.

8  Q.  Would that be Sabrina Bowie?

9  A.  Correct.

10  Q.  Did he tell you anything else about Sabrina Bowie?

11  A.  I think it was a general conversation about her breasts,

12  think she had breasts augmentation, or she had a breast job.

13  Some dealings with sex, you know, to get to that, you know, I

14  want to get over there to Bowie, because I want to get me

15  some.

16  Q.  He said, "I want to get me some"?

17  A.  Yes, sir.

18  Q.  Did you ask Mr. Dixon to switch shifts or did he ask you

19  to switch shifts?

20  A.  Sometimes I might ask him, but sometimes he would ask me.

21  Q.  So he would ask you and you would ask him?

22  A.  Yes, sir.

23  Q.  And when you asked him, did he agree?

24  A.  Yes, sir.

25  Q.  And when he asked you, did you agree?

1    A.  Yes, sir.

2    Q.  How often did you switch shifts?

3    A.  Around that time it could have been anywhere from

4    three weeks, maybe 15 days.  I don't know exact.  I knew it

5    was several times.

6    Q.  Was it more than one day?

7    A.  Oh, yes, sir.

8    Q.  Now, after you had a shift, did you ever see Mr. Dixon

9    after you had switched shifts?

10   A.  Yes, sir.  I might see him before work.  Sometimes before

11   work, sometimes after work in the parking lot, or sometimes

12   before we go in on the midnight shift.

13   Q.  Did Mr. Dixon say anything to you in those times?

14   A.  I don't know exactly what it was, but, like, it might

15   have been, like, do you want to switch the next day; or, you

16   know, I seen Bowie -- it was something dealing with Bowie.

17   Q.  He said I've seen Bowie?

18   A.  Or I was with Bowie last night, or I've seen her, or it

19   was dealing with Bowie, but I couldn't tell you exactly what

20   it was.

21   Q.  Did he ever say he had sex with Bowie?

22   A.  Yes.  It was something like, I'm going -- not sex, but

23   I'm going to get me some tonight, or something like that, you

24   know.  He didn't exactly say "sex," but it was something that

25   I knew it was sexual.

*Alfred Barnes - Direct*

1   Q.   You understood it to be sex?

2   A.   Yes.

3   Q.   Did Mr. Dixon tell you anything about contraband and

4   Bowie?

5   A.   He might have mentioned one or two times about contraband

6   dealing with her.  He might have said it some type of way,

7   but I can't recall exactly.

8           MR. HARPER:  Your Honor, then I move that to be

9   stricken.

10          THE COURT:  Overruled.

11          MR. DAVIS:  May I have one moment, Your Honor.

12          THE COURT:  You may.

13  BY MR. DAVIS:

14  Q.   How well did you know Mr. Dixon?

15  A.   I've been knowing Mr. Dixon since when I arrived at the

16  FCI in 1994.

17  Q.   And you say you saw him in the parking lot or when shift

18  changed and you would talk?

19  A.   Yes, sir.

20  Q.   Did you talk with him otherwise when you were on duty?

21  A.   Yes.  We might talk about different things that he was

22  doing, like fishing and, you know, planting gardens, which he

23  liked to do a lot.  Basically, we'd talk about fishing, and,

24  you know, just talk about planting gardens.  He loves to

25  plant vegetables and loves to go fishing.

*Alfred Barnes - Direct*

49

1   Q.   Did you like fishing?

2   A.   Yes, sir.

3   Q.   Did you ever go fishing with Mr. Dixon?

4   A.   No, sir.

5   Q.   Did you ever see Mr. Dixon outside of work?

6   A.   No, sir.

7   Q.   Did you ever call Mr. Dixon or speak with him over the

8   telephone when you were at work?

9   A.   Yes, sir.

10  Q.   Did there come a time when you spoke to Mr. Dixon over

11  the phone and you heard Shonnie Daniels in the background?

12  A.   Yes, sir.

13  Q.   Can you tell us about that?

14  A.   It was a conversation, if I'm not mistaken, we were

15  working the evening shift, which is the 4 p.m. to 12 midnight

16  shift.  I was assigned to the Federal Detention Center, and

17  Mr. Dixon was assigned to the FCI housing unit, and he had

18  gave me a call in reference to Shonnie Daniels.

19  Q.   And you heard his voice on the other end of the line?

20  A.   Yes, sir.

21  Q.   Did you hear anything else?

22  A.   I could hear Shonnie Daniels in the background.

23  Q.   And what did Mr. Dixon say to you?

24  A.   He asked me something like, is Shonnie cool.

25  Q.   What does "cool" mean?

*Alfred Barnes - Direct*

1   A.   For me I'm thinking that she's down, she's an old stick,

2   that she's willing to do things with.

3   Q.   What did you answer back?

4   A.   I said, yeah, she's cool, she's cool with me.

5   Q.   Now, you testified that you talked to Mr. Dixon when you

6   were at work or on shift changes and in the parking lot?

7   A.   Yes, sir.

8   Q.   Did you have a conversation with Mr. Dixon in the parking

9   lot that you recall?

10   A.   Yes, sir.

11   Q.   And what happened during that conversation?

12   A.   I don't know exactly, it was something dealing with what

13   happened in F unit the night before, or contraband.

14   Something dealing with Bowie, Sabrina, sex.

15   Q.   Was there a time when you were having sex with Shonnie

16   Daniels?

17   A.   Yes, sir.

18   Q.   Were you almost caught on one occasion?

19   A.   Yes, sir.  I was telling him about the -- it was a

20   midnight shift, and Shonnie came over to the office.  I think

21   it was F.  And one of the other inmates had crossed over

22   through the corridor, and we was having oral sex there in the

23   office, and one of the inmates like walked in on.

24   Q.   So, you were in F unit?

25   A.   Yes, sir.

*Alfred Barnes - Direct*

1  Q.  And Shonnie Daniels came to see you in the office?

2  A.  Yes, she came from C unit.

3  Q.  And was she performing oral sex on you?

4  A.  Yes, sir.

5  Q.  And it was your testimony that another inmate was

6  crossing over and almost caught you?

7  A.  Yes, sir.  And I was telling Dixon something about it.  I

8  think that's when we got off from work, that we almost got

9  caught.

10 Q.  So, your testimony is that you told Officer Dixon that

11 you almost got caught with Shonnie Daniels having sex?

12 A.  Yes.

13 Q.  What did Officer Dixon say?

14 A.  He just said, you have to be more careful.

15 Q.  Do you know Officer Moore?

16 A.  Yes.

17 Q.  Do you see him in the courtroom here today?

18 A.  Yes, sir.

19 Q.  Can are you describe what he's wearing?

20 A.  He's the African-American male there with a purple suit

21 on, purple tie, white shirt.

22       MR. DAVIS:  If the record will reflect that the

23 witness identified Defendant Moore.

24 BY MR. DAVIS:

25 Q.  Did you ever have any conversations with Officer Moore?

*Alfred Barnes - Direct*

1    A.   Yes, sir.

2    Q.   Were you friendly with Officer Moore?

3    A.   Yes, sir.

4    Q.   What was the nature of your friendship with Officer

5    Moore?

6    A.   Just a friendship that started at the time I started

7    working there, and we talked about fishing.  We went fishing

8    I think once.

9    Q.   So you met him once outside of the office going fishing?

10   A.   I've seen him several times after work, but I know that

11   one time we went fishing together.

12   Q.   Was there an occasion when you asked Officer Moore to let

13   you see Shonnie Daniels?

14   A.   Yes.

15        MR. HARPER:  Objection to the leading form of the

16   question.

17        THE COURT:  Overruled.

18   BY MR. DAVIS:

19   Q.   Would you describe that occasion?

20   A.   It was the occasion that I was working the midnight

21   shift, the 12 midnight to 8:00 shift at the FCI.  I was

22   assigned to F unit.  He was assigned to C unit.  I had

23   another Officer Evans who had switched with me, because he

24   couldn't go to the Special Housing Unit that night.  He

25   didn't want to go there, because there was another inmate

1   locked up, and he was saying to me that, do you want to go

2   count the housing unit, because there's an inmate over there

3   that they didn't want to have contact with.  So, me and him

4   switched.  I went to the housing unit to count it.

5   Q.  What was Officer Evans' assignment?

6   A.  He was working the compound.

7   Q.  Okay.  So, you were in F unit?

8   A.  Correct.

9   Q.  You switched with Officer Evans, who had compound?

10  A.  Yes, sir.

11  Q.  And that was so Officer Evans wouldn't have to go to the

12  SHU; is that correct?

13  A.  Correct.

14  Q.  And then did you do the rest of the count for the

15  compound for him?

16  A.  I don't know exactly if I did all of the housing unit

17  count.  I know I counted the SHU.

18  Q.  Okay.

19  A.  I couldn't tell you exactly if I counted all of the rest

20  of the housing units.

21  Q.  Okay.  But you were still compound officer at that point?

22  A.  Yes, sir.

23  Q.  What did you do when you were compound officer at that

24  point?

25  A.  I remember going to C unit and seeing Officer Moore.

*Alfred Barnes - Direct*

1    Q.   And what did you say to Officer Moore?

2    A.   I told him that I wanted to see Shonnie Daniels, I had

3    had something for her.

4    Q.   Is that what you recall telling him?

5    A.   Yes, sir.

6    Q.   And what happened?

7    A.   Well, we exchanged keys.  I had the compound keys that

8    opens the front door to C unit.  I got his keys, which allows

9    me access to the wing doors in the administrative area.

10   Q.   I'm going to show you a schematic so you can show us

11   where these doors are.

12        What keys do you have you say?

13   A.   It's a compound key.  It's a key that allows you access

14   to the housing units on the compound.

15   Q.   Would that permit you to open this door here?

16   A.   Yes, sir.

17   Q.   Would your compound keys permit you to open any other

18   doors in that C unit there?

19   A.   No, sir, not that I can recall.

20   Q.   When you walked in the C unit, you were able to open the

21   door to get in; is that correct?

22   A.   Correct.

23   Q.   Where was Officer Moore?

24   A.   Officer Moore was in the office area.

25   Q.   Can you show us that on the diagram?

1   A.  If I'm not mistaken, it's right in front of the door as

2   you initially come in.

3   Q.  Okay.  Did you approach Officer Moore and ask him for the

4   keys?

5   A.  Yes, sir.

6   Q.  What did Officer Moore say?

7   A.  He gave me the keys.

8   Q.  He gave you the keys?

9   A.  Yes, sir.

10  Q.  Now, when you took those keys, what doors did you open?

11  Can you just touch the --

12  A.  Yes, sir.  I went to the C south side, which is there.

13          THE COURT:  Mr. Barnes, the machine gets real

14  sensitive if you drag too close to it, so you need to come in

15  more directly when you're marking on the screen.

16          THE WITNESS:  Yes, sir.

17  BY MR. DAVIS:

18  Q.  Can you show us the first door that you opened?

19  A.  (Witness complies.)

20  Q.  Okay.

21  A.  That's the C south, wing door.

22  Q.  What happened after you opened that door?

23  A.  I went around to the cubicle of Shonnie Daniels.

24  Q.  So, do you know where Shonnie Daniels' cubicle was?

25  A.  Yes, sir.

*Alfred Barnes - Direct*

1    Q.   And can you show us on this map?

2    A.   That might not be -- I might be one off there, but that's

3    the general location.

4    Q.   She was generally in that location right there?

5    A.   Yes, sir.

6    Q.   So, you walked in, walked down that aisle to see Shonnie

7    Daniels?

8    A.   Yes, sir.

9    Q.   Did you do anything more after that?

10   A.   I woke her up.

11   Q.   You woke her up?

12   A.   Yes, sir.

13   Q.   And then what did you do after you woke her up?

14   A.   I just told her to stay right there, I would come back to

15   her.  So, what I did there, she woke up and stood on the side

16   of her bed there.  And what I did then, I made a round on the

17   south side, down the aisle, through the back of the bathroom

18   areas, just to make sure there no other inmates was up moving

19   around.

20   Q.   And did you find any inmates that were up and moving

21   around?

22   A.   No, sir.

23   Q.   After you found that no inmates were up and moving

24   around, what did you do?

25   A.   I went and unlocked the door first.

*Alfred Barnes - Direct*

1   Q.  Which door did you unlock?

2   A.  The door to go back to that administrative area.

3   Q.  Can you mark that one?

4   A.  (Witness complies.)

5   Q.  Okay.  So, I just want to be clear, because there are a

6   lot of marks on this screen.

7       Is this where you're saying Shonnie Daniels's bunk was?

8   A.  Yes, sir.

9   Q.  That's marked with a zero?

10  A.  Correct.

11  Q.  And is this square where the door is?

12  A.  Yes, sir.

13  Q.  Okay.  I'm going to knock these off.  If you want to put

14  them back on, I'm just having trouble seeing it.

15      Now, after you had unlocked that door going in the back

16  area there, what did you do?

17  A.  I came back to the cube where Shonnie was.  I basically

18  just stood in the hallway.  She could see me standing right

19  there, and I gave her a signal to come towards me.

20  Q.  And what did she do?

21  A.  She came towards me.

22  Q.  And where did you go after that?

23  A.  We went back to the administrative area.

24  Q.  And what did you do when you went back there?

25  A.  We went into a staff bathroom.

*Alfred Barnes - Direct*

1   Q.   And what did you do in that staff bathroom?

2   A.   We had sex in the staff bathroom.

3   Q.   Can you just put your pen right down and put a point

4   where that staff bathroom is?

5   A.   (Witness complies.)

6   Q.   Okay.  Was that staff bathroom locked?

7   A.   No, sir.  It was unlocked.

8   Q.   After you had sex with Ms. Daniels, what did you do?

9   A.   Well, I came out first to make sure no inmates were

10  moving around, I just let her stay where she was.  I did a

11  general walk around to make sure no inmates was moving.  Then

12  I gave her a signal through the door where she can see me

13  through the opening in the door there.  She came back out,

14  and she went back to her cube.  I locked the door where she

15  had came out of, and I left and departed.  I locked the wing

16  door back and went back to the office where Moore was.

17  Q.   What did you do with the keys that you had?

18  A.   After I have secured the wing door back, I gave him his

19  keys back.

20  Q.   Did you say anything to him?

21  A.   I just told him that I talked to Shonnie, and I was okay,

22  I was going back on the compound.

23  Q.   Now, after that night, did there come a time when you

24  talked to Officer Moore again?

25  A.   Yes, sir.

*Alfred Barnes - Direct*

1    Q.   Do you recall when that was?

2    A.   I don't know exactly.  It could have been a week after

3    that or two weeks.

4    Q.   What happened?

5    A.   He was talking about the incident that night that, I know

6    you had sex in the bathroom, because I went in there after

7    you, and I could smell the odor.

8    Q.   So, he told you that he knew that you had sex in the

9    bathroom; is that correct?

10   A.   Yes, sir.

11   Q.   And what did you say back to Mr. Moore?

12   A.   I kind of like shrugged it off and laughed.  I didn't

13   really deny it, but I didn't really confess to it, also.

14   Q.   Did you have any further discussions with Officer Moore

15   concerning this incident?

16   A.   Yes, sir.  I couldn't tell you exactly how long after

17   that first initial talk about that, it could have been

18   another month, but it was always about that incident in the

19   bathroom.  He didn't -- he talked about me putting him in a

20   situation like that, that he don't appreciate me putting him

21   in a situation like that, and he hoped that nothing would

22   come out of this.

23   Q.   Did Officer Moore ever express interest in Shonnie

24   Daniels?

25   A.   He had talked about her a little bit, you know, he didn't

*Alfred Barnes - Direct*

1    say exactly he didn't have no contact with her, but he always

2    had the mindset that he -- if he wanted some of that, he

3    could get it.

4    Q.   You say, if he wanted some of that, what does that mean?

5    A.   That means that he thought that he could get with her

6    sexually, if he really pushed the -- really pushed it.

7    Q.   Now, you say that he said he thought he might be able to

8    have a relationship with Shonnie Daniels.

9              MR. HARPER:  Object to the characterization of the

10   testimony.

11             THE COURT:  Sustained.

12   BY MR. DAVIS:

13   Q.   Did Officer Moore ever work in a unit with Shonnie

14   Daniels?

15   A.   Yes, sir.

16   Q.   Do you know of anything unusual that occurred when he

17   worked in that unit with Shonnie Daniels?

18   A.   Yes, sir.

19   Q.   What do you know about that?

20   A.   Shonnie used to got early sometimes, go in the pill line,

21   which comes out early in the morning.  And she would

22   eventually come all the way down the compound to F unit where

23   I was.

24   Q.   So, how would Shonnie get out on the pill line?

25   A.   Officer Moore would have to let her out.

*Alfred Barnes - Direct*

1   Q.  Do you know if Shonnie Daniels had a card for the pill

2   line?

3   A.  As I can recall, she wasn't a diabetic or anything like

4   that.

5   Q.  And Ms. Daniels would come over to see you.  Is that what

6   you testified?

7   A.  Yes, she would come over to F unit, or sometimes she

8   would come to G unit.

9   Q.  Did you ever ask Officer Moore for any other favors

10  concerning contact with inmates?

11          MR. HARPER:  Objection, Your Honor, to the form of

12  that question.

13          THE COURT:  Overruled.

14          THE WITNESS:  Can you repeat it again?

15  BY MR. DAVIS:

16  Q.  Did you ever ask Officer Moore for any other favors for

17  your contacting inmates?

18  A.  No, sir, not that I can recall.

19  Q.  Did you ever talk to Officer Moore about other inmates?

20  A.  Yes, sir.

21  Q.  What other inmates?

22  A.  There was an inmate in his unit named Deborah Luna.

23  Q.  What did you discuss about Inmate Luna?

24  A.  It was dealing with -- Shonnie had told me that --

25  Q.  What did you and Mr. Moore discuss?

*Alfred Barnes - Direct*

1  A.  We discussed about her body, about the clothing she wear,

2  and that her -- that the print around her vagina is real huge

3  and real large.

4  Q.  What is "a print"?

5  A.  When she be wearing the shorts, it's got a -- it's like a

6  print that stays in front of the female that shows her vagina

7  area, and it was very huge and very large, was the

8  conversation he was telling me about.

9  Q.  Now, who was telling whom?

10  A.  Moore was telling me about Luna.

11  Q.  So, Moore was telling you this?

12  A.  Yes, sir.

13  Q.  Did there come a time when you shared the control booth

14  with Officer Spence?

15  A.  Yes, sir.

16  Q.  Did you talk with Officer Spence?

17  A.  Yes, sir.

18  Q.  And what did you discuss with Officer Spence?

19  A.  We were having a conversation about an indictment list

20  that was out dealing with several staff members that was on

21  this list.

22  Q.  Did he tell you what names he thought were on this list?

23  A.  Yes, sir.

24  Q.  And what names did he tell you?

25  A.  He mentioned he was on the list, I was on the list, Dixon

1  on the list, Hill was on the list.  He said Jimmy Knight was

2  on the list.  And I think that's all of the names I can

3  recall, sir.

4  Q.  Did you ever have a discussion with any other officers

5  concerning this list?

6  A.  Yes.

7  Q.  And who did you discuss this list with?

8  A.  Officer Dixon.

9  Q.  Do you recall what you said to Officer Dixon about this

10  list?

11  A.  Yes, sir.  It was talk basically about the same thing,

12  Spence was talking about these names that were supposedly be

13  on this indictment list, and I was basically trying to tell

14  him that in the past, dealing with me, normally the SIA, SIS,

15  they would call you in and question you about an

16  investigation dealing with females.  And I thought there was

17  no validity to the list, because I had been through

18  investigations before, and I just told him, there couldn't be

19  nothing to them, because the way the investigation went in

20  the past, if something come up on you, they normally will

21  call you in and question you about it.  And if there's

22  something to it, they will reassign you to the FDC.  And I

23  was told him that, if they ain't call you in and question you

24  about it, then there can't be no validity to it, because of

25  my past.

1  Q.  And who were you telling that to?

2  A.  Officer Dixon.

3  Q.  And did there come a time when Officer Johnson spoke to

4  you about a phone call he received?

5  A.  Yes, sir.

6  Q.  And what did that conversation involve?

7  A.  It was a phone call from Sabrina Bowie, and he wasn't

8  fully comfortable with the phone call.  He thought maybe the

9  phone was wired, and that he used one of his roommates to

10  talk to her on the telephone.

11  Q.  Do you know who that roommate was?

12  A.  I don't know exactly who it was, but it was somebody that

13  was staying with him at that time.

14          MR. DAVIS:  If I can have a moment, Your Honor?

15          THE COURT:  You may.

16  BY MR. DAVIS:

17  Q.  Did you know an inmate named Delores Hamlet?

18  A.  Yes, sir.

19  Q.  What was your relationship with Delores Hamlet?

20  A.  I come to the know Delores Hamlet through Shonnie

21  Daniels.  They have this thing on the compound, that these

22  inmate would have different inmates that their mother, and

23  she was like a mother figure for Shonnie Daniels, and Shonnie

24  had told her to come and see me.

25          MR. HARPER:  Objection.

1           THE COURT:  Sustained.

2    BY MR. DAVIS:

3    Q.  Did you give contraband to Delores Hamlet?

4    A.  Yes, sir, I did.

5    Q.  How did you get contraband to Delores Hamlet?

6    A.  I would bring it in with me when I come to work.

7    Q.  Was she in your unit?

8    A.  No, sir.

9    Q.  How did you get in contact with her?

10   A.  Normally, the day before, she would come and holler at

11   me, and I would tell her I would bring it back the next day.

12   And she would -- if he didn't know where I was, I just told

13   her to look around the compound, in the housing unit, to find

14   me.  If you don't see me on the compound or working the

15   housing unit, you know I didn't come in that night, because,

16   if I ain't mistaken, I could've been on sick and annual, and

17   I could've been -- if I came in that night, I didn't know

18   exactly where I was assigned to.  I could've been at the

19   detention center or I could've been at the FCI.  So, I just

20   basically told her just to look and see if I'm working.

21   Q.  Did you ever contact anyone to have her sent over?

22   A.  Yes, sir.

23   Q.  And who did you contact?

24   A.  I think I called Moore one time.  I was looking for her,

25   because she wasn't -- I was -- I think the shift was coming

1   to an end, and I had something for her, and I wanted to make

2   sure I get that contraband off of me before I leave.

3   Q.  So, the something that you had for her was contraband; is

4   that correct?

5   A.  Yes.

6   Q.  Do you remember what type of contraband?

7   A.  It was cartons of cigarettes.

8          MR. DAVIS:  That's all of the questions we have at

9   this time, Your Honor.

10         THE COURT:  Cross-examine, Mr. Findley?

11         MR. FINDLEY:  Yes, sir.

12                      CROSS-EXAMINATION

13  BY MR. FINDLEY:

14  Q.  Mr. Barnes, you have admitted here today that you have

15  lied in the past; is that correct?

16  A.  Yes, sir.

17  Q.  And you have lied on numerous occasions while being

18  employed by the Bureau of Prisons; is that correct?

19  A.  Yes.

20  Q.  You've lied from 1997, when you were caught with Phyllis

21  Fleming, all the way through this year; is that correct?

22  A.  Yes, sir.

23  Q.  You lied about Phyllis Fleming?

24  A.  Yes, sir.

25  Q.  You lied about Sherrye Booze?

*Alfred Barnes - Cross/Findley*

```
 1   A.  Yes, sir.

 2   Q.  And you lied about the inmates involved in this case; is

 3   that correct?

 4   A.  Yes, sir.

 5   Q.  Now, you pled guilty to a mail fraud conspiracy; isn't

 6   that true?

 7   A.  Yes, sir.

 8         MR. FINDLEY:  May I approach, Your Honor?

 9         THE COURT:  You may.

10   BY MR. FINDLEY:

11   Q.  Mr. Barnes, I would like to show you what we will mark as

12   Defendant Dixon's Exhibit 15.  I will ask you if you

13   recognize that document.

14   A.  Yes, sir.

15   Q.  What is it?

16   A.  It's a Plea and Cooperation Agreement.

17   Q.  And that's with the United States Attorney's Office for

18   the Northern District of Florida; is that correct?

19   A.  Yes, sir.

20   Q.  All right.  And in that agreement, isn't it true that the

21   maximum penalty that you face on the mail fraud conspiracy is

22   a penalty of imprisonment up to 20 years?

23   A.  That's correct.

24   Q.  So, you've agreed to cooperate with the government,

25   correct?
```

*Alfred Barnes - Cross/Findley*

1  A.  Yes, sir.

2  Q.  And you are hoping to get a reduction of your sentence by

3  cooperating?

4  A.  Yes, sir.

5  Q.  Now, in addition to the agreement with the government

6  that they may speak up for you in terms of your cooperation,

7  they also agreed to drop all of the other counts of the

8  indictment; is that correct?

9  A.  Yes, sir.

10  Q.  So, you're not pleading to any bribery counts?

11  A.  No, sir.

12  Q.  You're not pleading to any witness-tampering counts?

13  A.  No, sir.

14  Q.  You're not pleading to -- you're pleading to conspiracy

15  to commit mail fraud, correct?

16  A.  Yes, sir.

17  Q.  You are not pleading to conspiracy to commit extortion,

18  are you?

19  A.  No, sir.

20  Q.  And you are not pleading to conspiracy to tamper with

21  witnesses, either, are you?

22  A.  No, sir.

23  Q.  And, finally, you're not pleading with -- you're not

24  pleading guilty to conspiracy to have sex with inmates, are

25  you?

*Alfred Barnes - Cross/Findley*

1   A.   No, sir.

2   Q.   All right.   Did the government tell you that they needed

3   your testimony?

4   A.   Yes, sir.

5   Q.   Okay.   And that, as part of that bargain, they will go to

6   bat for you at sentencing.   Is that what they told you?

7   A.   Yes, sir.

8   Q.   They will bring to the attention of the court the

9   cooperation to the extent that it's in their sole discretion

10  to do so; is that correct?

11  A.   Yes, sir.

12  Q.   And you haven't been sentenced, yet?

13  A.   No, sir.

14  Q.   And you are hoping to get some credit for this

15  cooperation at your sentencing; is that correct?

16  A.   Yes, sir.

17  Q.   And, again, only the prosecution can decide whether your

18  testimony is good enough to merit a substantial assistance

19  motion?

20  A.   Yes, sir.

21  Q.   All right.   In fact, the prosecution can revoke your plea

22  agreement, if they believe you're not cooperating in a

23  sufficient way; isn't that true?

24  A.   Yes, sir.

25  Q.   All right.   And they could institute those charges again,

*Alfred Barnes - Cross/Findley*

1  if they believe your cooperation is not sufficient; isn't

2  that true?

3  A.  Yes, sir.

4  Q.  In addition to --

5       MR. FINDLEY:  Your Honor, I would offer Defendant's

6  15 into evidence.

7       MR. DAVIS:  No objection.

8       THE COURT:  Mr. Dixon's Exhibit 15 is admitted.

9       (**DEFENDANT DIXON EXHIBIT NO. 15:**  Received in evidence.)

10 BY MR. FINDLEY:

11 Q.  Now I would like to show you Defendant's Exhibit 16,

12 which is described as -- it's a document entitled, "Factual

13 Basis For Plea," in your case, and it's dated 9/14/06.  Do

14 you recognize that document?

15 A.  Yes, sir.

16 Q.  Is that the document that states the factual basis for

17 your plea of guilty?

18 A.  Yes, sir.

19 Q.  All right.  Now, did you sign the last page of that

20 document?

21 A.  Yes, sir.

22 Q.  And did you understand it when you signed it?

23 A.  Yes, sir.

24 Q.  Now, this statement of facts, this, quote, "Factual Basis

25 For Plea," end quote, does not mention Gregory Dixon, does

*Alfred Barnes - Cross/Findley*

1    it?

2    A.  No, sir, it doesn't.

3    Q.  It identifies another co-conspirator, Mr. Johnson, but it

4    doesn't identify Mr. Dixon; is that correct?

5    A.  Yes, sir.

6    Q.  Now, there is also a specific reference in --

7              MR. FINDLEY:  Your Honor, I would move in the Factual

8    Basis For Plea, Defendant's Exhibit 16.

9              MR. DAVIS:  Object, Your Honor, relevance.

10             MR. FINDLEY:  It's impeachment.

11             THE COURT:  Overruled.  Defendant's 16 is admitted.

12        (**DEFENDANT DIXON EXHIBIT NO. 16:**  Received in evidence.)

13   BY MR. FINDLEY:

14   Q.  Now, this is a document that you signed less than

15   two months ago, September 14th.

16   A.  Yes, sir.

17   Q.  Okay.  Now, in the document, when you're describing the

18   factual basis for your plea, you mentioned at page 3 -- if

19   you could turn to page 3 --

20             MR. DAVIS:  Your Honor, it's not the defendant's

21   statement.

22             THE COURT:  That objection is sustained.

23   BY MR. FINDLEY:

24   Q.  By signing that statement, did you adopt this factual

25   basis as your statement?

1   A.  I know it wasn't the exact statement, but it was a

2   statement I did sign.

3   Q.  And in the plea agreement didn't you tell this court that

4   that was an accurate description of the facts that formed the

5   basis for your plea?

6   A.  Yes, sir.

7         MR. FINDLEY:  Your Honor, I would move it in.

8         THE COURT:  I admitted the exhibit.

9         MR. FINDLEY:  Oh, I'm sorry.  I'll continue to

10  inquire.

11  BY MR. FINDLEY:

12  Q.  Now, page 3 of this exhibit, can you turn to page 3?

13  A.  Yes, sir.

14  Q.  First paragraph -- the first full paragraph says,

15  "Defendant Barnes accepted bribes in the form of payments

16  from Inmate 15."  Is that Deronda Hartline, to your

17  knowledge?

18  A.  Yes, sir.

19  Q.  All right.  And it was in exchange for providing her with

20  contraband.

21        "Inmate Number 15 would take orders from inmates who

22  would have those inmates mail money to an associate outside

23  of FCI-Tallahassee, who would then in turn use that money

24  either to purchase contraband or to provide that money to

25  Defendant Barnes to purchase contraband."

*Alfred Barnes - Cross/Findley*

1      Done of the money -- these are the money orders that went

2   to Thomasville, Georgia, correct?

3   A.   Yes.

4   Q.   And Mr. Dixon doesn't live in Thomasville, Georgia, does

5   he?

6   A.   No, sir.

7   Q.   And none of that money went to Mr. Dixon, did it?

8   A.   No, sir.

9   Q.   The next paragraph, it says, "Defendant also accepted

10   bribes in the form of payments and sexual favors from the

11   Inmate Number 1 -- " is that Shonnie Daniels?

12   A.   Yes, sir.

13   Q.   "-- in exchange for providing her with contraband."

14      You accepted bribes?

15   A.   Yes, sir.

16   Q.   But you --

17   A.   That's what it says.

18   Q.   All right.  Those bribes that you're referring to there,

19   were in no way benefitting Mr. Dixon; is that correct?

20   A.   No, sir.

21   Q.   That's correct, isn't it?

22   A.   That's correct.

23   Q.   All right.  Now, in the final paragraph, the document

24   states, "Defendant Barnes also accepted payments from an

25   individual known to him as Hanky."

*Alfred Barnes - Cross/Findley*

1      Now that was Agent Brunner, was it not?

2  A.  I couldn't tell you exactly who it is, but I know it was

3  an agent.

4  Q.  All right.  It was an agent posing in an undercover

5  capacity as an individual that you knew as Hanky, correct?

6  A.  Yes, sir.

7  Q.  All right.  So, it was undercover agent that sent the

8  money orders through the mails to your address in -- or your

9  mother's address in Thomasville, Georgia, correct?

10  A.  I think the one -- the one for $600.

11  Q.  Right.  And, again, none of that money went to Mr. Dixon;

12  is that correct?

13  A.  No, sir.

14  Q.  That's correct, isn't it?

15  A.  That's correct.

16  Q.  All right.  Mr. Dixon lives in Quincy, Florida; is that

17  true?

18  A.  I think he stays in Quincy.

19  Q.  You don't even know?

20  A.  Well, I know he stays in the Quincy area.  I couldn't

21  tell you what specific part.

22  Q.  You've never been to his house?

23  A.  No, sir.

24  Q.  And there is absolutely no statement in this document

25  that forms the factual basis for your plea of guilt to the

1    mail fraud conspiracy that mentions Mr. Dixon; is that true?

2    A.   That's true.

3    Q.   All right.  Now, you were present at the hearing in this

4    courtroom on June 22nd, 2006, the day after your arrest.  Do

5    you recall that?

6    A.   Yes, sir.

7    Q.   And do you recall when Mr. Jansen, who was then

8    representing Mr. Dixon, asked the United States Attorney

9    whether Mr. Dixon had any involvement in the mailing, and the

10   Assistant U.S. Attorney said, no, he did not.  Do you

11   remember that?  Do you remember that?

12   A.   I can't recall exactly.

13            MR. FINDLEY:  May I approach?

14            THE COURT:  You may.

15   BY MR. FINDLEY:

16   Q.   I would like to show you a copy of the document that we

17   will mark as Exhibit 17, which is a transcript of a hearing

18   at which you were present, as you described, on June 22,

19   2006, specifically page 24, line 12:

20      "Mr. Jansen:  I have a question.  I would like the

21   government to let the court know if Mr. Dixon has --"

22            MR. DAVIS:  Objection, relevance.

23            THE COURT:  Let me see you at the bench and bring the

24   transcript, please.

25            (Conference held at side-bar.)

 1           THE COURT:  Let me just say, before we get to this

 2   specific one, you'll do a lot better with me if you use this

 3   stuff honestly, then if you shade what this stuff is.  That

 4   statement of facts -- I'm going back a minute before we get to

 5   this specific one.

 6           That statement of facts is written by the government.

 7   It is not written by the defendant.  It frequently happens the

 8   defendants tell me everything in a statement of facts is not

 9   true.

10           Now, you got this man to say that everything in this

11   one was true, and maybe that's what he told me at the plea.

12   He testifies here, whatever he testifies here.

13           But when you start suggesting that that statement of

14   facts needs to be a full statement of everything that

15   happened, it doesn't.  The purpose of that statement of facts

16   is not to set out a full recitation of the government's case,

17   and it is certainly not to set out the government's case

18   against Mr. Dixon, because it is only used as a basis for the

19   plea by Mr. Barnes.

20           Now, when you start using a misleading or inaccurate

21   recitation of what a statement of facts is, or implying an

22   inaccurate view of what it is, and you're questioning, you put

23   the trial in a very awkward situation, because somebody needs

24   to tell them the truth, and it's hard for the prosecutors to

25   get up and testify to why they put that together.

*Alfred Barnes - Cross/Findley*

1          So, you're very close to me turning to the jury and

2    explaining to them what a statement of facts is; and, if I

3    have to turn to the jury and tell them something different

4    from what you just implied, you won't like it.

5          MR. FINDLEY:  I know.

6          THE COURT:  Because your credibility with the jury is

7    going to be important before we're done.  The only message is,

8    use this stuff honestly and don't imply something that is not

9    right.

10          Now let's get to this.

11          MR. FINDLEY:  Can I say one thing for the record?

12          THE COURT:  Yeah.

13          MR. FINDLEY:  For you, really.  In the plea

14    transcript, he does say that everything in it is true, so -- I

15    know some don't --

16          THE COURT:  Sometimes they tell me that.

17          MR. FINDLEY:  I --

18          THE COURT:  Okay.  And that's fine.

19          MR. FINDLEY:  I'm concerned that the court thinks

20    that --

21          THE COURT:  But he probably didn't say that's

22    everything that happened, because he wasn't, and I don't ask

23    him that.

24          MR. FINDLEY:  I didn't say that either.

25          THE COURT:  Where the privilege of advocacy stops and

*Alfred Barnes - Cross/Findley*

1  you cross the line is clear.  I'm just saying you will do

2  better with me if you scrupulously accurate when you use this

3  stuff.

4        Let me see this here.  This is the question.  Okay.

5  What's --

6        MR. SPROWLS:  I was just wondering why an attorney's

7  out-of-court statement isn't hearsay.

8        THE COURT:  Because you're authorized to make a

9  statement on behalf of your client.  United States versus

10  Deloach, 34 F.3d 1001, a 1994 decision.

11       MR. SPROWLS:  How much of that statement --

12       THE COURT:  There's some restrictions on use of

13  government statement, but --

14       MR. SPROWLS:  The statement versus advocacy, if you

15  will, or his --

16       THE COURT:  Right.  All Mr. Davis said is not that

17  the government is aware of, that Mr. Dixon had a connection

18  with the mailing.  So, as of that point, that's what the

19  government knew.  Do you have a different position now?

20       MR. DAVIS:  No, I don't think we have any information

21  that Mr. Dixon was involved in the Deronda Hartline mailing.

22       THE COURT:  So there you go.

23       MR. FINDLEY:  So we can use it?

24       THE COURT:  You can ask him and get the answer.  He

25  was present when this was said?

1          MR. FINDLEY:  Yes.  I would also like to offer it as

2     an admission by party opponent as evidence.  He can argue that

3     it means what it --

4          THE COURT:  Okay.  Don't do it with this witness.  I

5     will let you read this later, just publish it.  I'm not going

6     to put the whole transcript in, but I'll let you read this in

7     when you get to your case, that this question was asked and

8     this was the answer given in a court proceeding, just read it

9     in.

10          In terms of -- you object to the substance, but in

11     terms of the mechanics, is that acceptable, the way to publish

12     it?

13          MR. DAVIS:  Yes.  I don't want to have the whole

14     thing in, but that --

15          THE COURT:  Right.

16          MR. DAVIS:  -- reading it is fine.  I would like to

17     correct the record as to who wrote that statement and whether

18     or not it needed to contain everything in order to have a

19     plea.

20          THE COURT:  You can do that on redirect.

21          MR. DAVIS:  Okay.  But I don't think he knows that,

22     Your Honor.  I mean, I didn't coach him on what his plea meant

23     or anything like that, that's why he --

24          THE COURT:  Oh, you can ask him who wrote it.  You

25     can say something along the lines of, did anybody suggest that

1    this was supposed to be a full statement of everything that

2    happened?  Did anybody suggest this was supposed to indicate

3    what Mr. Dixon did?  Those are leading, but that gets the

4    point out.  It counters the questions on the other side.

5    There's really not any evidence on either side.  It's all

6    lawyer questions.  That will even up the field.

7              MR. FINDLEY:  Okay.

8              THE COURT:  If you'll do that, again, scrupulously,

9    accurately.

10             MR. DAVIS:  I try, Your Honor.

11         (End of side-bar conference.)

12             MR. FINDLEY:  May I approach, Your Honor?

13             THE COURT:  You may.

14   BY MR. FINDLEY:

15   Q.  Mr. Barnes, before that break, we were discussing the

16   transcript of the hearing on June 22, 2006, in this court,

17   and you were present, and Mr. Jansen asked, on behalf of

18   Mr. Dixon, "I have a question.  I would like the government

19   to let the court know if Mr. Dixon had any involvement in the

20   mailing, in any of the mailings.  I think that's important as

21   far as the events."

22         And Mr. Davis answered:  "Not that the government is

23   aware of, Your Honor."

24         Would you agree that Mr. Dixon was not involved in the

25   mailings?

*Alfred Barnes - Cross/Findley*

1   A.   During that hearing, there, I don't think he had anything

2   to do with it.

3   Q.   Okay.

4        Now, you mentioned in your direct testimony that there

5   were times that you had been alleged to have been involved in

6   misconduct with Ms. Fleming and with Mr. Booze, and you were

7   sent down to the FDC?

8   A.   Correct.

9   Q.   And the FDC is the male institution?

10  A.   Yes, sir.

11  Q.   And the females are housed up the hill, so to speak, at

12  FCI-Tallahassee; is that correct?

13  A.   Yes, sir.

14  Q.   And those are the units that involve the actions in the

15  alleged conspiracy in the indictment; is that correct?

16  A.   Yes, sir.

17  Q.   FDC is not involved in any of the acts that are involved

18  in the indictment; is that true?

19  A.   That's true.

20  Q.   All right.  In fact, you were in the FDC just prior to

21  the time -- to the end point of the indictment; isn't that

22  true?  You were in the FDC from, was it, for practically all

23  of 2005?

24  A.   Yes, sir.

25  Q.   All right.  Now, when you -- now, you mentioned that on

*Alfred Barnes - Cross/Findley*

1   occasion you would switch assignments with Mr. Dixon.

2   A.  Yes, sir.

3   Q.  And oftentimes that was for innocent reasons, was it not?

4   I mean, sometimes you wanted to get three days in a row for a

5   weekend; is that correct?

6   A.  I have done it in the past.

7   Q.  All right.  Were there other innocent reasons for

8   switching assignments with other guards?

9   A.  No, sir.

10  Q.  No, sir?

11  A.  Just switching --

12  Q.  Just to switch, just to switch, I want to have this day,

13  and you can have this day.

14  A.  Oh, yes.

15  Q.  That happened?

16  A.  I have done that.

17  Q.  Okay.  Now, you talked about several contraband

18  relationships, I believe was the word the Assistant U.S.

19  Attorney Davis used.  You said you had several different

20  contraband relationships with different inmates?

21  A.  Yes, sir.

22  Q.  So, you had a different contraband agreement with Shonnie

23  Daniels, for example?

24  A.  Yes, sir.

25  Q.  And a different agreement with Hartline?

1  A.  Yes, sir.

2  Q.  And a different agreement with Hamlet?

3  A.  Yes, sir.

4  Q.  Did you have different agreements with other inmates?

5  A.  Yes, sir.

6  Q.  And those were all separate and apart from each other; is

7  that correct?

8  A.  Yes, sir.

9  Q.  All right.  Now, let me talk about your statement that

10  you made to the agents, specifically Agents Neidert and

11  Escribano.  That's N-e-i-d-e-r-t and E-s-c-r-i-b-a-n-o.

12          MR. FINDLEY:  May I approach, Your Honor.

13          THE COURT:  You may.

14          MR. FINDLEY:  This is a 302.  I won't approach on

15  that, Your Honor, but I will ask him questions.

16  BY MR. FINDLEY:

17  Q.  Now, when you spoke to law enforcement, you told them

18  that there were no other guards that were involved in the

19  offense; isn't that true?  First of all, you said you weren't

20  involved in the offense, correct?

21  A.  I did say I wasn't involved.

22  Q.  And then you told them that there were no other guards,

23  to your knowledge, that brought contraband into the

24  institution; isn't that true?  That's what you told them?

25  A.  I could have said it.  I can't recall.

*Alfred Barnes - Cross/Findley*

1   Q.  You could have said it, you don't recall.

2       Did you deny ever covering up for other employees?

3   A.  Yes, sir.

4   Q.  Okay.  Now, you talked about a very general conversation

5   that you had with Mr. Dixon about using addresses.  Do you

6   have any knowledge of any specific address that Mr. Dixon

7   ever used?

8   A.  No, sir.

9   Q.  You don't have any knowledge that he actually used an

10  address, do you?

11  A.  He talked about an address, but no specific.

12  Q.  You don't know that he used an address?

13  A.  I don't know that he used one specifically.  I can't say.

14  Q.  You don't know that he used any at all?

15  A.  No, sir, expect for what he had stated to me.

16  Q.  He never used your Thomasville address?

17  A.  No, sir, he didn't.

18  Q.  And you can't identify any address that he might have

19  used?

20  A.  No, sir.

21  Q.  So, it would be speculation for you to state that he had

22  actually used an address?

23  A.  You can call it speculation.  I'm just going by what he

24  said to me.  I didn't know --

25  Q.  Right.  You don't know.  You don't know what he said -- I

1   mean, you don't know -- he didn't identify any address for

2   you that he used?

3   A.   No, sir.

4   Q.   All right.  Now, you mentioned also one -- getting back

5   to the switching of units.  You mentioned that sometimes you

6   would switch, and it was your idea because you wanted to get

7   away from Shonnie Daniels?

8   A.   Yes, sir.

9   Q.   And that was because you were trying to break off the

10  romantic relationship with Shonnie Daniels?

11  A.   Basically just to get away from her.

12  Q.   Get away from her.  Okay.

13       And you talked to Mr. Dixon about Shonnie Daniels on one

14  occasion and asked if she's cool?

15  A.   Yes, sir.

16  Q.   Now, couldn't that have meant that she was cool when it

17  came to contraband?

18  A.   It could've.

19  Q.   Okay.  Mr. Barnes, I realize that the government hasn't

20  made any promises to you regarding your cooperation, but is

21  it your expectation that you will be able to get a 5K1 motion

22  for downward departure?  Is that why you decided to plea

23  guilty?

24  A.   I pleaded guilty because I was caught.  I was guilty.

25  Q.   And isn't it true that you would like to get a reduction

*Alfred Barnes - Cross/Harper*

1   in your sentence by cooperating with the government?

2   A.  Yes, sir.

3         MR. FINDLEY:  That's all I have.

4         THE COURT:  Mr. Harper?

5         MR. HARPER:  Thank you, Your Honor.  May it please

6   the court.

7                         CROSS-EXAMINATION

8   BY MR. HARPER:

9   Q.  Mr. Barnes, on these statements counsel was asking you

10  about, particularly, starting with one on the June 22nd of

11  '06, do you remember that?

12  A.  Yes, sir.

13  Q.  Okay.  And some of those statements you make are true and

14  some are false, or are they all false, everything you said

15  was false?

16  A.  You're talking about the statements with the agents?

17  Q.  I'm sorry.  I couldn't understand you.

18  A.  Which statements are you talking about, sir?

19  Q.  I'm talking about the one on June 22nd to Escribano and

20  Mr. Neidert?

21  A.  I remember interviewing with them.

22  Q.  I'm sorry.  I couldn't hear you.

23  A.  I remember the interview.

24  Q.  Okay.  What I'm asking you is:

25        Do you remember some of the statements being true and

*Alfred Barnes - Cross/Harper*

1    some of your statements being false?

2          MR. DAVIS:  Objection, Your Honor.  The defendant has

3    not seen the statements.

4          THE COURT:  Overruled.  I think he was asking about

5    what he said orally, not about any written statement.  Maybe I

6    misunderstood.

7          MR. HARPER:  No, sir, that's exactly right.

8          THE COURT:  All right.

9    BY MR. HARPER:

10   Q.  Did you understand my question?

11   A.  Can you repeat again?

12   Q.  Surely.

13         THE COURT:  Mr. Barnes, I think it will help us hear

14   better if you don't get quite as close to that -- you're doing

15   a good job of keeping your voice up, and I hesitate to speak

16   to you, because I don't want you to get quieter, but if you

17   stay just a little further away from the microphone, we will

18   hear you a little bit better.  Thanks.

19   BY MR. HARPER:

20   Q.  What I'm asking you, and apparently not too well, you

21   remember first talking to these officers or talking to two

22   officers, I guess?

23   A.  Yes, sir.

24   Q.  All right.  And in talking to them you tell some true

25   things and you tell them some false things; is that right?

1   A.   Yes, sir.

2   Q.   And is that right?  Is everything true or is everything

3   false that you told them?

4   A.   Some things could've been true, some could've been false.

5   Q.   Okay.  And have you gone through the highlighter and

6   since your revelations here and since your plea in this case

7   and tried to show everybody, show the officers, what was true

8   and what was false?

9   A.   No, sir.

10  Q.   Okay.  So, what's true and what's false, we just have to

11  take your word for it; is that right?

12  A.   Yes, sir.

13  Q.   Okay.  So, when you talked about your family and your

14  children, you're probably telling the truth about that; is

15  that right?

16  A.   Yes, sir.

17  Q.   But when they asked you about things like, why were you

18  arrested, and you said you had no idea, that was probably

19  false, right?

20  A.   I had no idea I was going to get arrested.

21  Q.   Okay.  So, when they -- were you asked if you knew why

22  you were arrested today, and did you answer by saying you had

23  no idea?

24  A.   Yes, sir, I did.

25  Q.   Okay.  And what did you mean by that answer?  First of

*Alfred Barnes - Cross/Harper*

1    all, is that answer true or is that answer false?

2    A.   That's true.  I didn't know I was going to get arrested

3    that day when the indictment came down and they picked us up.

4    I had no idea that was coming.

5    Q.   And you had no idea you were doing anything wrong that

6    you would get arrested for?

7    A.   I know I was doing things wrong at the FCI and the FDC.

8    Q.   But you had no idea why you were being arrested that day.

9    Is what you're staying?

10   A.   It was a surprised being arrested, but even though I know

11   I was doing things wrong at the job, I had a -- I did say

12   that I didn't know, but I had an idea in my head what it was

13   in relation to.

14   Q.   The fact of the matter is, you had already been shown a

15   copy of the indictment earlier that day, hadn't you, by your

16   lawyer?

17   A.   I can't recall.  I can't recall, sir.

18   Q.   Do you remember -- did you tell the officers that the

19   indictment mentioned something about contraband?  Did you say

20   that to them?

21   A.   I can't recall.  I could've.

22   Q.   Do you remember, after being asked, if after reading the

23   indictment, you felt that the indictment was accurate, and

24   that you answered you had no idea?

25   A.   I could've made that statement.

1  Q.  You could have made that statement.  Let's say, let's ask

2  it this way:

3      If you said the statement, if you said you had no idea,

4  if the indictment was correct or not regarding contraband,

5  would that be true or false?

6  A.  Can you repeat that again?

7  Q.  Yes.  If the indictment mentions something about

8  contraband and you read it, would your answer that you had no

9  idea if the indictment was accurate, would that answer be

10  true or would that answer be false?

11  A.  If the indictment said anything about contraband, I knew

12  it was true.

13  Q.  Okay.  Why did you answer to the officers that you had no

14  idea?

15  A.  At that present moment I was lying about everything, you

16  know.

17  Q.  I thought you said you were lying about some things and

18  lying --

19  A.  Well, some things could've been true, the example like

20  you gave about my kids, you know.  There could've been some

21  statements that were true.  There could've been some

22  statements that I just lied about.

23  Q.  Okay.  Do you remember being asked about misconduct by

24  prison employees and correctional officers?

25  A.  I can't recall at this time, no.

*Alfred Barnes - Cross/Harper*

 1          MR. HARPER:  May I approach the witness, Your Honor?

 2          Your Honor, I'm going to be a while, if you're

 3   thinking about a break.

 4          THE COURT:  Let's go ahead and take the morning

 5   break.

 6          Members of the jury, recall my instructions.  Don't

 7   talk about the case.  We will be back with you in a few

 8   minutes.

 9          Jury out, please.

10     (The jury exited the courtroom at 10:29 a.m.)

11          THE COURT:  You may be seated.

12          Thank you, Mr. Barnes.  You may step down; and, if

13   you would, be back in that chair by 10:45.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Mr. Findley, I made a suggestion about

16   your ability to publish that portion of the transcript during

17   your case.  You went ahead and published it here, which is

18   fine.  Don't take my comment as an invitation to publish it

19   again.  Once is enough.  So, you've published that at this

20   point.

21          MR. FINDLEY:  Okay.

22          THE COURT:  Mr. Harper, I denied the motion to strike

23   when Mr. Barnes said something along the lines of this -- he

24   was asked about what Mr. Dixon had said, and he said,

25   approximately, Mr. Dixon might have said something, but I

1    don't recall it, and then you moved to strike.

2           It seems to me, if I strike that testimony, it leaves

3    nothing in the record about what Mr. Barnes knows about

4    whether Mr. Dixon said anything.  A more accurate description

5    of what Mr. Barnes knows is exactly what he said.  "I don't

6    recall it."  I thought that was accurate testimony, and the

7    gist of it, and so I wasn't going to try to parse out the part

8    where he said he might have said something.  I thought that

9    harmless, and it was better to leave the answer just like it

10   was.

11          Now, all of the questions about this document, I take

12   it that you plan to go through each of these statements.  I

13   think we're just wasting time.  I know what you want to do is

14   emphasize again and again and again and again and again and

15   again that he made an untrue statement on June 21st.  He

16   started off by admitting he denied it all on June 21st.

17          I'll let you repeat it a time or two, but I don't

18   want that repeated 25 times other 15 minutes.  And I think

19   that's where we are headed.

20          The way to use a prior inconsistent statement is,

21   first, to ask the witness here in court what happened.  Was

22   the light green or red?  And if the witness says the light was

23   green, then you really don't need to ask the question, did you

24   say six months ago that the light was green?  You can't start

25   off by saying, did you say six months that the light was

1    green?   First ask the witness here in court what happened.

2             Now, in this instance, it is going to be an

3    inconsistent statement.   When you ask him in court, he's going

4    to say something different than what he told the officers, and

5    so you can impeach him with the inconsistent statement.   But

6    you're going about it exactly the other way around.   You're

7    starting off by asking about the statement without ever asking

8    the question.

9             And, frankly, the government has already asked both

10   what happened, what color was the light, and did you make a

11   statement back on June 21st to the contrary?

12            So, you try the case the way you want to, but let's

13   don't spend 15 minutes going over that statement, when he's

14   already told you his version of what happened, and that he

15   gave an untrue statement back then.

16            If you want to go through each of the untrue things

17   he said back then, fine.   You know, that's appropriate.   He

18   gave untrue statements back then and you can go through them

19   one at a time, but let's do it more directly.   That's my

20   request.

21            MR. FINDLEY:   I have one comment I just want to

22   clarify on the record, not for purposes of putting anything

23   into evidence necessarily, but just for purposes of the

24   conversation we had at side-bar.   The plea transcript for

25   Mr. Barnes, on September 14, 2006, there is the question from

1    the court, "Is it all true?  And Mr. Barnes says, "Yes, sir."

2              THE COURT:  And you --

3              MR. FINDLEY:  I just wanted you to know that, for no

4    other reason than just you knew that.

5              THE COURT:  Well, and you told me that at side-bar,

6    and I understand.  If my comments suggested the contrary, I

7    didn't mean to.  I don't remember --

8              MR. FINDLEY:  I understand.

9              THE COURT:  I do lots of plea proceedings, most

10   recently before we started this morning, and I don't always

11   remember which witnesses say it's all true and which ones say

12   it's not.

13             My point of all that was, I don't mind the

14   interjection of some confusion.  That sometimes is a decent

15   trial -- is a trial tactic that's okay.  But you will do a lot

16   better with me if you'll just really turn square corners on

17   exactly what this establishes and what it doesn't establish.

18             When he doesn't bring up Mr. Dixon when he is talking

19   to the officers, you can argue both sides of what that proves.

20   Maybe he's just answering their questions.  But maybe, if he

21   really knew something, he should have told the officers.  So,

22   I understand the cross-examination along the lines of you had

23   an interview with the officer, and you never brought up

24   Mr. Dixon.  Fair question.

25             But when you start dealing with the statements of

1    facts that the government wrote for the specific purpose of

2    using Mr. Barnes' plea agreement, much less so.

3         The case I cited at side-bar, United States versus

4    Deloach is an Eleventh Circuit case from 1994.  It holds

5    inadmissible the statement by the prosecutor in that case, but

6    it does seem to recognize that a statement by a prosecutor can

7    be admissible if it is a statement of fact.  The suggestion

8    there is maybe it needs to be inconsistent with the

9    prosecution's position.  I'm not sure why that would be a

10   requirement.  It's a party admission, basically.  I think the

11   point of the case is, the statement by a prosecutor can be a

12   party admission just like the statement by the warden as

13   somebody acting on behalf of the government.

14        But it does impose some restrictions, and it would be

15   narrow circumstances under which that can be done.  It would

16   have to a statement of fact.

17        Your statement there was that he wasn't involved with

18   the mailing that you were aware of.  It seems to me that

19   doesn't prove very much, but what you told me at side-bar was,

20   it's still true.  You're not aware of any connection that

21   Mr. Dixon has with the actual mailing.  And so now Mr. Findley

22   has published that statement; and, hopefully, that will get

23   things a little more focused.  He knows what you will be

24   saying in closing a little better and --

25        MR. DAVIS:  Just limited to the mailing that we were

1    talking about as charged in the indictment.  I'm just being

2    very precise about what mailing we were admitting he wasn't

3    involved in.

4         THE COURT:  Was he involved in any other mailing?

5         MR. DAVIS:  Well, we have the testimony that we heard

6    today, that he discussed mails.  But I just want to be very

7    clear, Your Honor, that that statement was related to the

8    mailing that was the evidence we had about Barnes' mailing,

9    which we just put on again today through Mr. Barnes.

10        THE COURT:  Well, that would make sense.

11        MR. FINDLEY:  I know that we'll discuss this more in

12   detail when we're talking about a possible Rule 29, or at

13   least we'll argue that.  But I believe the testimony was that,

14   about an address that might be used and not mailing to that

15   address necessarily.

16        THE COURT:  Okay.

17        MR. HARPER:  Your Honor --

18        THE COURT:  And I'm sure we will talk about that at

19   that point.

20        MR. HARPER:  I certainly can tighten and turn my

21   radius around these corners, but one thing I did want to

22   develop with this witness about this statement is, he made

23   some statements that are true and some which are false, and

24   some which we would maintain are true, that none of the other

25   officers are involved.  So, that's the reason for my

1  examination was a little less perfect.

2          THE COURT:  So ask him if the other agents are

3  involved.  I mean, the government gets him to say, I made a

4  statement on June 21st, and it was all lies.  I take it you'd

5  like for the jury to decide he's not telling the truth, and

6  then you get up to cross-examine to say, "Oh, wait a minute,

7  you are not always a liar, sometimes you tell the truth."

8  What are we trying to accomplish?

9          MR. HARPER:  Well, when he says I didn't have -- none

10  of the other guards knew anything, I --

11          THE COURT:  Ask him if any of the other guards knew

12  anything.

13          MR. HARPER:  I will.  That's what I'm saying.  I'm

14  trying to get some advice.  I will be more direct.

15          THE COURT:  So, how are you going to use this

16  statement?  He says, "Oh, the other guards knew some things.

17          "Well, didn't you tell the officers they didn't know

18  anything?

19          "Yeah, I did."

20          That's fair cross-examination.

21          "I was lying about that, too."

22          But, boy, we're going at this --

23          MR. HARPER:  I think can be sharper after we have a

24  break.

25          THE COURT:  All right.  Perfect.  What else do we

*Alfred Barnes - Cross/Harper*

1    need to discuss before we break?

2         We'll start back in 10 minutes, 10:45 by that clock.

3    (A recess was taken at 10:38 a.m.)

4    (The proceedings resumed at 10:48 a.m.)

5    (Defendants present; jury not present.)

6         THE COURT:  Jury in, please.

7    (The jury entered the courtroom at 10:50 a.m.).

8         THE COURT:  All right.  You may be seated.

9         Mr. Barnes, you are still under oath.

10        Mr. Harper, you may proceed.

11        MR. HARPER:  Thank you.  May it please the court.

12   BY MR. HARPER:

13   Q.  Mr. Barnes, the statement of June the 21st or 22nd of

14   2006, I want to refer you back to that.

15       Do you remember telling the officers that you did not

16   have any knowledge of any other employees at FCI engaging in

17   any such activities as yours?

18   A.  I can't recall, but it's a possibility that I could have

19   said that.

20   Q.  It's true, I think you said, as far as Mr. Dixon was

21   concerned, that he was not engaged in your financial

22   dealings; is that right?

23   A.  That's right.

24   Q.  And that's also true, Mr. Moore was not engaged in your

25   financial dealings; is that right?

1   A.   That's right.

2   Q.   And when I say financial dealings, I mean use of the

3   mail, they didn't know you were using the mail; is that

4   right?

5   A.   No, sir.

6   Q.   And that's not something you shared with everybody out

7   there at the compound, is it?

8   A.   No, sir.  Generally, you wouldn't.

9   Q.   I couldn't hear you.

10  A.   No, sir, you wouldn't.

11  Q.   And there is an obvious reason, you'd get caught, right?

12  A.   Yes, sir.

13  Q.   Okay.  Mr. Moore is known as an honest cop out there, an

14  honest C.O.?

15  A.   Yes, sir.

16  Q.   As far as your plea agreement in the case, when

17  Mr. Findley was talking to you about the factual basis that

18  you gave in court, you didn't have an agreement with

19  Mr. Dixon as far as using the mail or as far as your

20  activities, did you?

21  A.   No, sir.

22  Q.   And you didn't have an agreement with Mr. Moore as far as

23  your using the mail or your activities; is that right?

24  A.   No, sir.

25  Q.   And there is no agreement that you and any of the

*Alfred Barnes - Cross/Harper*

1  officers would -- were working together as a big conspiracy

2  out there, was there?

3  A.  No, sir.

4  Q.  Okay.  And so y'all just worked at the same place.  Y'all

5  weren't in some kind of a gang, were you?

6  A.  No, sir.

7  Q.  And by that, your acts and activities, you wanted to --

8  you didn't wanted everybody to know, including the officers;

9  is that right?

10  A.  That's correct.

11  Q.  Okay.  And you succeeded or tried to succeed in that,

12  didn't you?

13  A.  Yes, sir.

14  Q.  In other words, your acts and activities were your own

15  independent acts, not a concert of action.  Is that fair to

16  say?

17  A.  That's fair to say.

18  Q.  And did you have some kind of a wink and nod or signal or

19  code that you used with the other officers?

20  A.  No, sir.

21  Q.  And so when you switched places at times, would you say

22  to the officers, look, I need to switch, because I've

23  contraband for Shonnie, or I've contraband for Ingrid, or

24  I've got contraband for any inmate?  Would you tell them

25  that?

*Alfred Barnes - Cross/Harper*

1  A.  No, sir.

2  Q.  And when you -- as a matter of fact, when you got keys

3  from Mr. Moore, you told him you were going to go to the

4  bathroom, didn't you?

5  A.  No, sir.  I told him I was going to talk to Inmate

6  Daniels, I had something for her.

7  Q.  Did you go to -- did you, in fact, go to the counselor's

8  office?

9  A.  No, I did not go to the counselor's office.

10  Q.  And there is a reason you didn't go to the counselor's

11  office, isn't there?

12  A.  No specific reason that I know of.

13  Q.  There is not a key on that ring to go to the counselor's

14  office, is there?

15  A.  I can't recall.  Not as I know of, sir.

16  Q.  Okay.  Correctional officers don't have keys to the

17  counselor's office, do they?

18  A.  Normally they don't.

19  Q.  Okay.  Unit officers, the guy in charge of the unit,

20  doesn't have a key to the counselor's office; is that right?

21  A.  No, sir, but it's according to what unit you're in.

22  Sometimes some of the counselor's office might be accessible,

23  like one of the units up there, like A.

24  Q.  What about F or what about C?

25  A.  No, sir.

*Alfred Barnes - Cross/Harper*

1   Q.   Is there any kind of an agreement or -- I guess "an

2   agreement" is as good a word as any -- that we have a plan

3   for Alfred Barnes to get rich out here, so we're going to

4   help him?  Is there any kind of agreement with the officers

5   for that to happen?

6   A.   No, sir.

7   Q.   Was there any kind of an agreement that we are going to

8   help Mr. Dixon or Mr. Moore to get rich?

9   A.   No, sir.

10   Q.   Is there any kind of an agreement that we're going to,

11   you know, do our best to disrupt the institution and violate

12   the rules and regulations?  Is there any kind of an agreement

13   or understanding that you were involved in to do that?

14   A.   No, sir.

15   Q.   This was just your only little private game or private

16   plan?

17   A.   Yes, sir.

18   Q.   Did you ever tell Mr. Moore, don't tell on me, brother,

19   don't tell on me, anything like that?

20   A.   No, sir.

21   Q.   Now, this transaction that you had with Hanky, which

22   later turned out to be an undercover operation, you, of

23   course, I assume did not know it was an undercover operation;

24   is that right?

25   A.   No, sir, I didn't.

1  Q.  Okay.  You fell into that trap; is that right?

2  A.  Yes.

3  Q.  Okay.  They succeeded in that operation; is that right?

4  A.  Yes, sir.

5  Q.  Do you know whether you were ever tape-recorded by an

6  inmate?

7  A.  Yes, sir.

8  Q.  How do you know that?

9  A.  I listened to it with my attorney.

10  Q.  So, you found out after the fact, right?

11  A.  Yes, sir.

12  Q.  You didn't know it was happening when it happened?

13  A.  No, sir.

14  Q.  Nobody came up and told you; is that right?

15  A.  No, sir.

16  Q.  You don't do a strip-search on the inmates and say, wait

17  a minute, are you wired or hot, or anything like that, did

18  you?

19  A.  No, sir.

20  Q.  Is there video surveillance out there on the premises?

21  A.  Not on the premises as I can recall, none in the housing

22  unit.

23  Q.  What about on the compound?

24  A.  No, sir.  They got cameras around the perimeter, but I

25  don't believe, as I recall, any being on the main compound.

1  Q.  So, they are pointed out, not pointed in.  Is that fair

2  to say, the cameras?

3  A.  Yes, sir.

4  Q.  Okay.  And there is no cameras aiming down the hallway in

5  the housing unit, certainly not any in the bathrooms?

6  A.  No, sir.

7  Q.  There's no cameras in the hallway?

8  A.  No, sir.

9  Q.  No cameras in the inmates' rooms?

10 A.  No, sir.

11 Q.  No cameras in the officers' offices?

12 A.  No, sir.

13 Q.  No cameras in the lobby area out there of the unit?

14 A.  No, sir.

15 Q.  And, similarly, Mr. Barnes, there are no recording

16 devices, to your knowledge, of that nature in those places

17 either, is there?

18 A.  No, sir.

19 Q.  Was there any kind of an agreement or understanding

20 between you and any of these officers that you would get a

21 lot of sex out there?

22 A.  There was no agreement between us.

23 Q.  I'm sorry.  I didn't hear you.

24 A.  No, sir, no agreement.

25 Q.  Was there any kind of wink or nod or silent understanding

*Alfred Barnes - Cross/Harper*

1   that you were going to be the grand stallion of FCI, and

2   everybody is going to help you get as much sex as you wanted

3   or could get?

4   A.  No, sir.

5   Q.  Was there any kind of understanding or agreement with

6   anybody that that was happening with you?

7   A.  No, sir.

8   Q.  And did you have an agreement with anybody else that you

9   would help them get sex as much as they could?

10  A.  No, sir.

11  Q.  Similarly, Mr. Barnes, did you have any type of agreement

12  or understanding with these officers -- and when I say "these

13  officers," I'm talking about Mr. Moore or Mr. Dixon -- about

14  helping them bring in contraband or letting them bring in

15  contraband?

16  A.  No, sir.

17  Q.  Did they have any agreement or did y'all have any

18  agreement so you could bring contraband in?

19  A.  No, sir.

20  Q.  As far as you -- well, I'll withdraw that.

21      How about -- we heard some testimony about, I think you

22  talked about the computers or the monitoring systems there.

23  Do you know about those?

24  A.  Yes, sir.

25  Q.  Okay.  Did you have any agreement with the officers here

*Alfred Barnes - Cross/Harper*

1  on trial to use the monitoring system to intimidate or

2  threaten inmates?

3  A.  No, sir.

4  Q.  Did you have any kind of an agreement or understanding

5  with these officers here that your misconduct would not be

6  reported?

7  A.  No, sir.

8  Q.  Okay.  Did you have any agreement with these officers

9  that you wouldn't report their misconduct if you found out

10  about it?

11  A.  No, sir, no agreement with them.

12  Q.  So, when you talk to Mr. Moore, you don't tell him you

13  have contraband or anything else, when you want to see

14  Shonnie Daniels or anybody?

15  A.  No, sir.

16  Q.  When you switched units with Mr. Dixon, you don't tell

17  him, do you, that you're trying to get closer to somebody

18  that you want to have sex with, do you?

19  A.  No, sir.

20  Q.  When you talked to Mr. Moore, he was upset with you about

21  putting him in a situation; is that right?

22  A.  He wasn't upset.

23  Q.  Well, he said you put him in a bad situation; is that

24  right?

25  A.  It was just a general conversation, you know, it wasn't

*Alfred Barnes - Cross/Harper*

1  like he was upset or anything like that.  He was just

2  smiling.

3  Q.  Was he happy -- was he happy that you put him --

4  A.  Well, I wouldn't say he was happy, you know, but there

5  was a concern there.

6  Q.  Okay.  But, in any event, it wasn't part of an agreement

7  so you could go and have sex with Shonnie Daniels; is that

8  right?

9  A.  No, sir.

10  Q.  You say, no, are you saying, it was -- no, it was not

11  part of an agreement?

12  A.  No, it was not part of an agreement.

13  Q.  When you said Shonnie would come out on the pill watch,

14  do you know what she was representing to Mr. Moore?

15  A.  No, sir, I don't.

16  Q.  Do you know -- was it always on Mr. Moore's shift when

17  you saw her out on the pill watch?

18  A.  No, sir, I can't say it was on his shift, but normally

19  it's going to be on the morning watch shift.  I can't say

20  it's going to be another shift, evening watch.  It's only

21  concerning the morning watch shift.

22  Q.  Do you know whether Ms. Daniels could or did obtain a

23  pass or prescription to be in that line legally?

24  A.  No, sir, I don't.

25  Q.  Do you know whether Ms. Daniels obtained or could obtain

*Alfred Barnes - Cross/Harper*

1   a pass to be in that line illegitimately?

2   A.   No, sir.

3   Q.   Is that line just for people with insulin, or is that

4   line for other people?

5   A.   For other people also.  I don't think it's get -- it

6   could diabetics, it could be other medical problems, or -- I

7   don't know specifics.

8   Q.   It's a pill line for people that need medications; is

9   that correct?

10  A.   Correct.

11  Q.   And it could be for any kind of medication; is that

12  right?

13  A.   Yes, sir.

14  Q.   It could be for pain medication; isn't that right?

15  A.   It could.

16  Q.   It could be pain medication that inmates could resell; is

17  that right?

18  A.   I don't know about selling, but it could.

19  Q.   The last thing is, I understand that your sentencing has

20  been put off until after the trial; is that right?

21  A.   Yes, sir.

22  Q.   And the date of that sentencing is when?

23  A.   December the 14th.

24          MR. HARPER:  Your Honor, I had a piece of paper, I

25  apparently left at my desk.  Can I retrieve that?  I think I'm

*Alfred Barnes - Redirect*

1    through.

2              THE COURT:  Surely.

3              MR. HARPER:  Your Honor, I think that's everything I

4    wanted to cover.  Thank you.

5              THE COURT:  All right.  Redirect?

6              MR. DAVIS:  Your Honor, may I approach?

7              THE COURT:  You may.

8                        REDIRECT EXAMINATION

9    BY MR. DAVIS:

10   Q.  Mr. Barnes, Mr. Findley asked you a series of questions

11   about whether or not you had lied in past statements to

12   investigators.

13   A.  Yes, sir.

14   Q.  And you said that you had given false information.

15   A.  Yes, sir.

16   Q.  In all of those past statements, isn't it true that you

17   had denied conduct?

18   A.  Yes, sir.

19   Q.  And in this statement you are admitting conduct?

20   A.  Yes, sir.

21   Q.  Mr. Findley asked you about your plea agreement, and you

22   indicated that you had pled to a mail fraud conspiracy.

23        Is it your understanding that that is the most serious

24   charge that was lodged against you in that indictment?

25   A.  Yes, sir.

*Alfred Barnes - Redirect*

1  Q.  And when you read that indictment on that morning in

2  June, how many legal documents had you read prior to that?

3  A.  None.

4  Q.  Was that a long indictment?

5  A.  Yes, sir.

6  Q.  Do you remember what it said?  Can you tell me what the

7  first paragraph of that indictment said?

8  A.  I know my name was on the top.  There was a list of names

9  and --

10  Q.  That's the style of the case, correct?

11  A.  Yes, sir.

12  Q.  But do you remember what was said in there?

13  A.  I don't know the specifics.

14  Q.  Mr. Findley also cross-examined you on a statement that

15  was written by the FBI; is that correct?

16  A.  Yes, sir.

17  Q.  Have you ever seen that statement before?

18  A.  No, sir.

19  Q.  Was that your statement?

20  A.  I made an oral statement to them, but I never seen

21  nothing written.

22  Q.  So, whatever those agents wrote down that day, they might

23  have gotten it right or wrong?

24  A.  Possibility, yes, sir.  I said oral.  I didn't see

25  nothing in writing.

1  Q.  Now, Mr. Findley showed you Defendant Dixon Exhibit

2  Number 15.

3         MR. DAVIS:  Your Honor, may I approach?

4         THE COURT:  You may.

5  BY MR. DAVIS:

6  Q.  Can you read this paragraph G, first sentence?

7  A.  Yes, sir.  It says, "Alfred Barnes agrees to cooperate

8  fully and truthfully with the United States Attorney and its

9  designated representatives."

10  Q.  Is that word "truthfully"?

11  A.  Yes, sir.

12  Q.  Mr. Barnes, Mr. Findley said that you could have this

13  agreement revoked and have all of the other charges imposed,

14  if you didn't comply with this agreement?

15  A.  He did say so.

16  Q.  Does this agreement require you to testify truthfully?

17  A.  No, sir.  If I want -- it says it's truthful, and that's

18  what I'm doing, truthfully.

19  Q.  I misunderstood you.  If you lie right now on the stand,

20  can the government revoke this agreement?

21  A.  No, sir.

22  Q.  Mr. Barnes --

23         MR. DAVIS:  May I approach, again, Your Honor?

24         THE COURT:  You may.

25  BY MR. DAVIS:

*Alfred Barnes - Redirect*

1   Q.   Would you read all of paragraph G for me, again?

2   A.   All of G?

3   Q.   Yes.

4   A.   "Alfred Barnes agrees to cooperate fully and truthfully

5   with the United States Attorney and his designated

6   representatives and with agencies identified by the United

7   States Attorney.  Such cooperation shall include, but is not

8   limited to, providing complete and truthful debriefings and

9   testimony at grand jury, trial, and at otherwise questioned

10  involving any matter under investigation."

11  Q.   Does that not say that you have to testify truthfully

12  here at trial?

13  A.   Yes, sir.

14  Q.   And what happens if you don't testify truthfully here at

15  trial?

16  A.   You could perjure yourself.

17  Q.   Would you please read under, "Revocation," paragraph A.2?

18  A.   "Defendant's statement or testimony has been untruthful

19  or incomplete."

20  Q.   And that's under the paragraph that says -- what does

21  that say there?

22  A.   It says, "The parties agree that the United States

23  Attorney may revoke this agreement upon showing --"

24  Q.   Does that indicate to you, if you lie on the stand, that

25  the government can revoke this agreement?

*Alfred Barnes - Redirect*

1   A.  Yes, sir.

2   Q.  So, in addition to requiring your cooperation, isn't it

3   true that this agreement requires you to testify truthfully?

4   A.  Yes, sir.

5   Q.  And what happens to you if you don't testify truthfully?

6   A.  They can invoke it.

7   Q.  Now, with regard to the Defendant's Exhibit Dixon Number

8   16, did anyone ever tell you that this had to be a complete

9   statement of the facts concerning your case?

10  A.  No, sir.

11  Q.  Did anyone ever tell you that this had to include

12  evidence that bore on other defendants?

13          MR. FINDLEY:  Leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, sir.

16  BY MR. DAVIS:

17  Q.  Isn't it true that this does not have to include anything

18  concerning Defendant Dixon?

19  A.  No, sir.

20  Q.  Mr. Barnes, does this have to include anything concerning

21  Defendant Dixon, not you?

22  A.  I'm sorry.  Yes, sir.

23  Q.  So, isn't it true that this doesn't have to include

24  anything concerning Defendant Dixon?

25  A.  Yes, sir.

*Alfred Barnes - Redirect*

1    Q.   For that matter, for any other defendant; is that true?

2    A.   Yes, sir.

3    Q.   This is just for your case; is that correct?

4    A.   Yes, sir.

5    Q.   Mr. Findley also asked you, when you spoke with Mr. Dixon

6    and he asked you whether or not Shonnie Daniels was cool --

7    A.   Yes, sir, he asked me.

8    Q.   -- he asked you whether or not "cool" could just have

9    meant contraband?

10   A.   Yes, sir, he did.

11   Q.   Could "cool" mean more than contraband?

12   A.   Yes, sir.

13   Q.   Could "cool" mean that you wouldn't snitch?

14   A.   Wouldn't snitch --

15        MR. FINDLEY:   Your Honor, I object.   Calls for

16   speculation.

17        THE COURT:   You can ask him his understanding of the

18   conversation.

19   BY MR. DAVIS:

20   Q.   What was your understanding of what "cool" meant?

21   A.   My understanding of the situation was that he had some

22   type of connection with Ms. Daniels, and that he felt

23   comfortable with her for whatever they was engaging in.

24   Q.   So that's your understanding?

25   A.   Yes, sir.

1   Q.   And you were talking with Dixon, you never really said,

2   look, I'm having sex with her and sharing contraband, but we

3   have this understanding, she's cool, right?

4   A.   Yes, sir.

5   Q.   Did you have discussions like that with other officers on

6   the compound?

7   A.   No, sir.

8   Q.   Did you ever talk to any other officers that you thought

9   were cool?

10   A.   No, sir.

11   Q.   Were there any other officers that were on the compound

12   that were cool?

13   A.   They could have been with other individuals, not with me.

14   Q.   How did you know or did you know that other officers were

15   engaged in activities on the compound?

16   A.   When you're working in that type of environment, the

17   inmates, they basically know everything what's going on.

18   Inmates will come up to you and have a conversation, talk

19   about other officers and what they're engaging in.

20   Q.   So, you heard from inmates that other officers were

21   engaged in other activities?

22   A.   Yes, sir.

23   Q.   Was it in your interest to go up to that officer and say,

24   hey, I'm doing the same thing, let's talk about it?

25   A.   No, sir.

*Alfred Barnes - Redirect*

1  Q.  Why is that?

2  A.  Because I didn't want them to know what I was doing, and

3  I'm sure that he didn't want me to know what was going on

4  with him.

5  Q.  When you heard from inmates that another officer was

6  engaged in activities, what was your reaction to that?

7  A.  I just -- I just listened and keep it to myself.

8  Q.  Did it influence how you acted with that officer?

9  A.  No, sir, it didn't.  I know that, if he was engaging with

10  other inmates, and I know I was doing the same thing that

11  it's a possibility that I could feel comfortable talking with

12  him.

13  Q.  Weren't you required to report that, if you heard that?

14  A.  Yes, sir, I was.

15  Q.  But you didn't report it?

16  A.  No, sir, I didn't.

17  Q.  Did you have concerns that that other officer would

18  report it if he heard it on you?

19  A.  Yes, sir.

20  Q.  What if he was cool?

21      MR. FINDLEY:  Objection.  Calls for speculation,

22  unclear.

23      THE COURT:  Sustained.

24  BY MR. DAVIS:

25  Q.  Mr. Barnes --

*Alfred Barnes - Redirect*

```
 1    A.  If he was cool --

 2            THE COURT:  Wait.  He's going to ask you another

 3    question.

 4            THE WITNESS:  Okay.

 5    BY MR. DAVIS:

 6    Q.  You said that you had to get off of the compound, or you

 7    couldn't deal with contraband with certain inmates because

 8    you were hot?

 9    A.  Yes, sir.

10    Q.  What does "hot" mean?

11    A.  That mean that my name was circulating a lot around the

12    compound.

13    Q.  So, other officers were hearing about your --

14    A.  I'm sure they was, and inmates.

15    Q.  Did any of those other officers turn you in?

16    A.  No, sir, they didn't.

17    Q.  And you know that because you weren't investigated?

18    A.  No, sir, I wasn't -- I didn't know I was being

19    investigated.

20    Q.  Was Officer Dixon involved in bringing in contraband?

21    A.  Yes, sir.

22    Q.  Were you aware of that?

23    A.  Yes, sir.

24    Q.  Did you turn him in?

25    A.  No, sir.
```

*Alfred Barnes - Redirect*

1   Q.   Didn't Officer Dixon talk to you about a mail scheme,

2   about cigarettes and inmates --

3         MR. FINDLEY:  Objection.  Leading.  He's leading.

4   It's asked and answered as well.

5         THE COURT:  If it kept going, it was going to get

6   leading.  I'll sustain the objection.  You can identify the

7   subject, but then don't lead him.

8   BY MR. DAVIS:

9   Q.   You testified earlier that you spoke with Dixon about --

10  Dixon spoke with you about using the mail address; is that

11  true?

12  A.   Yes, sir.

13  Q.   Did you report that when he told you about that mail

14  plan?

15  A.   No, sir.

16  Q.   Did Dixon tell you not to report that when he told you

17  that?

18  A.   No, sir.

19  Q.   Did you have an agreement with Mr. Dixon not to report

20  that mail plan?

21  A.   No, sir.

22  Q.   Then why didn't you report it?

23  A.   Because, like I said, the conversation on the compound

24  dealing with Mr. Dixon and me, my own self, I was already

25  doing the same thing, that I just wouldn't report it, because

1    I was doing wrong my own self.

2    Q.  Was there an understanding?

3    A.  It was no agreement.  It was kind of like a mutual

4    understanding, something like, I know I was doing wrong and

5    he was doing wrong, so what's the use of me turning him in, I

6    know I was doing the same thing?

7    Q.  You just said there was a mutual understanding?

8    A.  Yeah.  It was like, I knew that he was doing it, not from

9    him just telling me at that point there, but maybe later on,

10   but I know I was doing wrong, and that's the reason why I

11   didn't report it.

12   Q.  Was it an unspoken understanding?

13   A.  Repeat again?

14   Q.  Was it an unspoken understanding?

15   A.  Yes, sir.

16   Q.  Did you have that same understanding with any other

17   officers?

18   A.  No, sir.

19   Q.  How about with Officer Moore?

20   A.  Me and Moore, not too much about the contraband.

21   Q.  Let me ask you this:

22       When you asked Officer Moore for the key to go to the

23   back of C range, what did he say?

24   A.  He gave me the key.

25   Q.  And you told him that you had something for Shonnie

*Alfred Barnes - Redirect*

1  Daniels; is that correct?

2  A.  Yes, sir.

3  Q.  Was this at night?

4  A.  Yes, sir.

5  Q.  Now, you previously testified, as a correctional officer,

6  you weren't to give inmates anything except toilet paper and

7  feminine products; is that correct?

8  A.  That's correct, sir.

9  Q.  What legitimate item did you have to give Shonnie Daniels

10  at that time of night?

11  A.  Nothing legitimate, sir.

12  Q.  So, if it's not legitimate, what is it?

13  A.  It's contraband.

14  Q.  Now, did Officer Moore report you?

15  A.  No, sir.

16  Q.  You testified that a few days or a few weeks later,

17  Officer Moore came up to you and said that he knew you had

18  sex in that room, he could smell it, correct?

19  A.  That's correct.

20  Q.  Did Officer Moore report you?

21  A.  No, sir.

22  Q.  Now, you testified that you didn't have an agreement with

23  Officer Moore; is that correct?

24  A.  That's correct.

25  Q.  Did you have that mutual unstated understanding that you

 1   wouldn't turn him in and he wouldn't turn you in?

 2   A.  Yes, sir.

 3   Q.  You also stated in response to questions from counsel

 4   that there was no big agreement to have sex?

 5   A.  That's correct.

 6   Q.  But you testified, when I was asking you, that for -- I

 7   think you said a week and a half or at least a multi-day

 8   period, you switch assignments with Officer Dixon; is that

 9   correct?

10   A.  That's correct.

11   Q.  And let me get your testimony correct.  Didn't you

12   testify that you told Officer Dixon that you needed to get

13   away from Shonnie Daniels?

14   A.  Yes, sir.

15   Q.  And didn't you testify that Officer Dixon told you he

16   wanted to come down and see Sabrina Bowie?

17   A.  That's correct.

18   Q.  Now, when you agreed to shift assignments, was that an

19   agreement?

20   A.  That's an agreement between him and me.

21   Q.  I don't mean a written agreement.

22   A.  It wasn't a written.

23   Q.  Just an understanding?

24   A.  Just an understanding that we talked about.

25   Q.  Did that understanding involve your knowledge that he

*Alfred Barnes - Redirect*

1    wanted to come down and see Sabrina Bowie, and his knowledge

2    that you wanted to get away from somebody you were in

3    contraband agreement with?

4    A.  Yes, sir.

5    Q.  Is that another one of those mutual unstated

6    understandings?

7    A.  Yes, sir.

8    Q.  Mr. Harper made another statement.  I believe he said

9    your sentencing was put off until December.  Isn't it true

10   that your sentencing was only set one time?

11   A.  That's correct.

12   Q.  So, your sentencing has not been put off?

13   A.  No, sir.

14            MR. DAVIS:  Your Honor, may I have a moment?

15            THE COURT:  You may.

16            MR. DAVIS:  No further questions, Your Honor.

17            THE COURT:  Thank you, Mr. Barnes.  You may step

18   down.

19       (End of excerpt.)

20                 *   *   *   *   *   *   *   *

21

22

23

24

25

1

2   I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.  Any

3   redaction of personal data identifiers pursuant to the
Judicial Conference Policy on Privacy are noted within the

4   transcript.

5

6

7   <u>s/Judy A. Nolton</u>                    <u>*11/02/2006*</u>

8   Judy A. Nolton, RPR                Date
Official U.S. Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                              INDEX

 2

 3    WITNESS FOR THE GOVERNMENT:                      PAGE

 4
      ALFRED A. BARNES,
 5         DIRECT EXAMINATION BY MR. DAVIS              2
           CROSS-EXAMINATION BY MR. FINDLEY            66
 6         CROSS-EXAMINATION BY MR. HARPER             86
           REDIRECT EXAMINATION BY MR. DAVIS          109
 7

 8                 *   *   *   *   *   *   *   *

 9

10                     GOVERNMENT'S EXHIBITS

11

12    NO.:      DESCRIPTION                            PAGE

13      47   Money Order                               32
        48   Money Order dated 11/18/05                38
14

15                 *   *   *   *   *   *   *   *

16

17                   DEFENDANT DIXON EXHIBITS

18

19    NO.:      DESCRIPTION                            PAGE

        15   Alfred Barnes' Plea and Cooperation Agreement    70
20      16   Document entitled, "Factual Basis for Plea"      71

21

22

23

24

25
</pre>