**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

*UNITED STATES OF AMERICA,*     )
                        ) *Case No.:  4:06cr36/RH*
           *Plaintiff,*     )
                        ) *Tallahassee, Florida*
*vs.*                        ) *October 30, 2006*
                        ) *8:15 A.M.*
*GREGORY DIXON and ALAN MOORE,*   )
                        )
           *Defendants.*    )
_____ )

**VOLUME I**
**(Pages 1 through 127)**

**TRANSCRIPT OF ATTORNEY CONFERENCE AND FIRST DAY OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**CHIEF UNITED STATES DISTRICT JUDGE, and a jury**

<u>APPEARANCES</u>:

For the Plaintiff:        Gregory R. Miller
                            United States Attorney
                            By:  ROBERT O. DAVIS
                                 P. ALAN SPROWLS
                                 Assistant U.S. Attorneys
                            111 North Adams Street
                            Tallahassee, Florida 32301

For the Defendant,       Messer, Caparello & Self, P.A.
Gregory Dixon:           By:  THOMAS MARSHALL FINDLEY
                                 SEAN SHAW
                                 Attorneys at Law
                            215 South Monroe Street
                            Suite 701
                            Tallahassee, Florida   32301

For the Defendant,       Harper & Harper Law Firm, P.A.
Alan Moore:               By:  ROBERT AUGUSTUS HARPER
                                 ROBERT AUGUSTUS HARPER, III
                                 Attorneys at Law
                            325 West Park Avenue
                            Tallahassee, Florida   32301



***JUDY A. NOLTON, RPR***
*Official United States Court Reporter*
*111 North Adams Street * Tallahassee, Florida  32301-7717*
*(850) 561-6822*

1                    **JUDGES' CONFERENCE ROOM**

2       (Defendants not present.)

3            THE COURT:  Good morning.

4            MR. HARPER:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            Government ready for trial?

7            MR. SPROWLS:  Yes, sir.

8            THE COURT:  Defense ready for trial?

9            MR. FINDLEY:  Yes, Your Honor.

10            THE COURT:  Either side want the rule invoked?

11            MR. FINDLEY:  Yes, Your Honor.

12            THE COURT:  The rule is invoked.  Each side is

13   responsible for seeing that your witnesses abide by the

14   rules -- by the rule and don't disclose to any other witnesses

15   what happened in the courtroom.

16            Tell me who will be at counsel table.

17            MR. SPROWLS:  Myself, Mr. Davis -- Rob Davis -- as

18   co-counsel; and Pat Sanford, FBI; and a Jeff Brunner,

19   B-r-u-n-n-e-r.  He's a special agent with the Department of

20   Justice, Office of Inspector General.

21            MR. DAVIS:  I asked Mr. Findley this morning if he

22   had any objection to us having the two case agents and --

23            MR. FINDLEY:  I said we do object.  There should just

24   be one case agent.  We don't see any reason to have two.

25            THE COURT:  Do you expect both to testify?

1      MR. DAVIS:  I expect one of them to testify, and

2  there is a possibility that the other might testify; but the

3  way this case was handled, it was so large and lasted over

4  such a period of time, that both of them have in some parts

5  unique knowledge as to what happened during this

6  investigation.

7      MR. SPROWLS:  Of the two, Mr. Brunner would be the

8  more likely witness.

9      THE COURT:  Here's what you need to do, then, have

10  Mr. Sanford out of the courtroom when anyone testifies on a

11  subject for which two things are true:

12      First, that Mr. Sanford is himself going to testify;

13  and, second, his testimony is not just going to be a formal or

14  ministerial kind of thing, but something on which credibility

15  or recollection may matter.

16      I'm not sure there's likely to be anything like that;

17  but the point is, if it's the kind of thing that's right at

18  the core of the rule, where two witnesses are testifying to

19  what they saw, we ought to treat Mr. Sanford as an ordinary

20  witness would be treated.  So, if he's going to testify

21  whether a light was green or red, while some other witness is

22  testifying whether it's green or red, Mr. Sanford ought to be

23  out of the room.

24      MR. DAVIS:  So, in essence, he would be a fact

25  witness.

1          THE COURT:  If there is something on which he's going

2    to be a fact witness and on which it's the kind of thing where

3    credibility is an issue.

4          Now, if he comes in and says, "I've done a record

5    search, and there are no documents of this type at that

6    place," or something like that, that's different.

7          MR. SPROWLS:  I understand.  I think between the two,

8    Judge, it was possibly Mr. Brunner would testify as sort of a

9    summary witness, having the role of "I heard the testimony of

10   X who said Y."

11         THE COURT:  But I'm treating him as the case agent,

12   so he can be in the courtroom in that respect.

13         MR. SPROWLS:  Right, I understand.

14         THE COURT:  It sounded to me from your description

15   like he was more likely to be the one that you wanted as the

16   case agent like that, and that Mr. Sanford is less likely.

17         Is that a fair description?

18         MR. DAVIS:  I think that's correct, Your Honor.

19         THE COURT:  Does that solve our problem?

20         MR. FINDLEY:  Yes, Your Honor.

21         THE COURT:  I need witness lists.

22         MR. FINDLEY:  (Handing.)

23         MR. DAVIS:  (Handing.)

24         THE COURT:  Mr. Harper?

25         MR. HARPER:  I have no additional witnesses at this

1    time, Your Honor.

2            THE COURT:  Well --

3            MR. HARPER:  I anticipate the defendant testifying,

4    and we have some character witnesses, but I didn't bring a

5    formal list.

6            THE COURT:  Well, I need to know who they are.  I

7    can't have a juror who's nextdoor neighbor to a character

8    witness.

9            MR. HARPER:  I understand, Your Honor.  I just

10   stopped working at midnight and forgot to bring it.  I've got

11   it sitting on my desk.  I can call and get it.

12           THE COURT:  Yeah.  It will be down the way a little

13   bit in the jury selection when we get to that, but by then we

14   need -- before we are through picking the jury.  So, if you

15   can, get somebody to bring it over.  There will be a break

16   before we finish, so as long as we get it before we finish.

17           During the jury-selection process -- and this relates

18   to the motion in limine -- well, let's talk about jury

19   selection first.

20           I think what I propose to do with the Hill shoot-out,

21   is this, and you tell me whether this satisfies you:

22           I think what I propose to do is, after I've described

23   the case to the jury, tell them that, when officers went to

24   arrest one of the alleged co-conspirators, he pulled a gun and

25   shot an officer, and he was shot dead, and that that has

1   nothing to do with these two defendants.  There is no

2   allegation that they had anything to do with it.  They are

3   charged with stuff that happened earlier, and the shoot-out

4   doesn't have anything to do with the case.  Ordinarily, the

5   jury wouldn't even find out about it, except there's been some

6   publicity in the case, they may have heard about it.  I don't

7   want them sitting there wondering whether this is the case

8   that they heard about, so I've told them about it.  I'm not

9   trying to keep it secret.  It just doesn't have anything to do

10  with the case.  So, now you've heard it and ignore it.

11          MR. FINDLEY:  The only problem that I could foresee

12  is that they will -- the jury may conclude that here's a

13  co-conspirator of Mr. Dixon who was willing to shoot somebody,

14  and incorrectly they might conclude in furtherance of the

15  conspiracy, or something like that.  I think there is a danger

16  of prejudice to Mr. Dixon that his alleged co-conspirator

17  engaged in such an act.

18          THE COURT:  There is.  How would you like me to

19  handle it?

20          MR. FINDLEY:  Well, I know it's difficult.  I had

21  thought and thought and thought about this, and it seems to me

22  that one way to handle it might be to first ask the general

23  questions, and then each witness come up to side-bar to

24  determine if they know about it.  I know it's a laborious

25  process.

1          THE COURT:  No, I don't mind how laborious it is, but

2    let me tell you the concern that I have with that process.

3          I ask, okay, have you heard of the case?  Well, if I

4    don't tell them about the shooting, they may not know they've

5    heard of the case, because, of course, that's what got it in

6    the paper, mostly.  It was in the paper again this morning,

7    but that's mentioned in the story.

8          Second, if I have a prospective juror that doesn't

9    think he or she has heard about the case, after they've heard

10   the openings, they may say, "Oh, I wonder if this is that

11   case," or, if they are on the jury and nobody is supposed to

12   talk to them, and I hope nobody does, but if they are at

13   dinner tomorrow night and somebody says, "Well, how was your

14   day?" and they say, "Oh, I'm on a jury."  The person says,

15   "Oh, you're on that shoot-out case."  The person says, "Ah,

16   don't talk to me."

17         MR. FINDLEY:  I do like Your Honor's suggestion as

18   long as it's coupled with that this doesn't have anything to

19   do with this case, and that goes to our motion in limine.  I

20   think that solves the majority of the problem, and that's as

21   reasonable a solution as any as I can suggest.

22         MR. HARPER:  Your Honor, when Mr. Findley suggested

23   individual voir dire, I wish I had thought about that when I

24   made my request for my voir dire questions.  But I think your

25   idea is the best to identify those jurors.  And what I was

1    thinking is that maybe some jurors need individual voir dire

2    in the sense that they may not be able to put it out of their

3    mind, or something like that.

4         MR. FINDLEY:  I agree with that.

5         THE COURT:  I propose to -- I think I am going to

6    have some individual voir dire.  It's not going to be

7    extensive, but I do want to ask a few individual questions.  I

8    think I'm going to do it at the side-bar.  That's going to be

9    a little cumbersome.  There will be five of you.  It won't be

10   the easiest way to hear.  But I'm going to do it at side-bar

11   instead of running them into the courtroom one at a time.

12   First, logistically, that's a little bit difficult, because

13   with 40 of them, I'd have to put them back down in the jury

14   assembly room, and it's just difficult logistically.  But

15   that's not the real problem.  We can deal with the logistics.

16        If I bring them one at a time, what they say is more

17   likely to be in the newspaper tomorrow, which I would rather

18   avoid, and I just think we can do it easier and --

19        MR. FINDLEY:  That's fine.

20        THE COURT:  I think if I've got them at the side-bar

21   just with you, the jurors will be more likely to speak up and

22   share the information.  If I bring them in the courtroom one

23   at a time, and the audience is back there, and the reporters

24   and other people -- I don't know how many people will be in

25   the courtroom, but I suspect there will a few -- I think they

1    may be a little more hesitant to speak up.

2            What I propose to ask them, and I will just tell you

3    and you can comment on it, is whether they've heard of the

4    case.  I would have already asked them that in the big group.

5    And then something like, what did you think?  They can tell me

6    what they thought.  And then something along the lines of

7    this:

8            You've heard from the descriptions that one of the

9    allegations is that the defendants had sex with an inmate.  On

10   a scale of zero to 10, where zero doesn't offend you at all,

11   and 10 is, you think it's the crime of the century, tell me

12   how you respond to that allegation.

13           MR. FINDLEY:  I'm fine with that, as long as it's not

14   suggested that that's what they are on trial for, because they

15   are not on trial for sex with an inmate.

16           THE COURT:  I intend to make that clear to them as

17   well.  So, they'll have already heard that.  "Crime of the

18   century" is probably the wrong thing to say, but that it's a,

19   you know, it's the most immoral thing you've heard of as 10,

20   and zero you think it's perfectly fine as long as both people

21   consented, or you think it's perfectly fine.  I will try to do

22   a little better job articulating it.

23           But it seems to me that, if I was picking the jury

24   and I had peremptories to use, I might want to know whether

25   somebody thought this was just terrible or not so bad.

1          Does that work for the government?

2          MR. SPROWLS:  Yes, sir.

3          THE COURT:  Anybody think of a better way to get a

4     response to that?

5          MR. FINDLEY:  No, Your Honor.

6          THE COURT:  And then while I've got them there, I'm

7     going to ask them if they've been in jail or had close friends

8     or relatives in jail, and what their experience was in that

9     respect.  It seems to me that they'd rather express that out

10    of the hearing of everyone else.

11         MR. FINDLEY:  Okay.

12         THE COURT:  And my thought is that that's a, you

13    know, minute or two with each one there at the side-bar; and,

14    if we all kind of cooperate and do our best, you will be able

15    to hear.

16         I'm happy to have two lawyers for a party, but let's

17    get one closest to -- the logistics are hard there at the

18    bench.  So, have your second -- have your second attorney

19    behind everybody else's first attorney.

20         All right.  So, both defendants okay then with me

21    telling the jury that the shoot-out happened, and it's not

22    relevant to this case?

23         MR. FINDLEY:  Yes, Your Honor.

24         MR. HARPER:  Yes, Your Honor.

25         THE COURT:  Now, I also wanted to confirm, as part of

1   my description of the case, the contraband we're talking about

2   with these two defendants, is it contraband because it's in a

3   prison, or is it stuff that would be contraband even on the

4   street?

5           MR. SPROWLS:  Because it's in the prison, more

6   predominately, yes.

7           THE COURT:  And just as a general description, what

8   is it with these two?

9           MR. SPROWLS:  Cigars, cigarettes.

10          MR. DAVIS:  Gum, jewelry, perfume.

11          MR. SPROWLS:  Things like that.

12          THE COURT:  Okay.

13          MR. DAVIS:  Excuse me.  I should add alcohol as well,

14   Your Honor.

15          MR. FINDLEY:  It was my understanding there's no

16   alcohol involved for Mr. Dixon.

17          MR. HARPER:  Or Mr. Moore.

18          THE COURT:  Well, it's not anything I need to

19   mention, so I won't mention alcohol and the proof can be what

20   the proof is.

21          Let me ask the defendants:

22          Is it going to be an issue whether these defendants

23   had sex?

24          I think it's -- the charge is, for one of the

25   defendants, that it was with one defendant.  I think that's

1    Mr. Moore.  And then for Mr. Dixon the charge is with three --

2    not "with defendants," with inmates.  The charge is that

3    Mr. Moore had sex with one inmate, and Mr. Dixon had sex with

4    three inmates.

5         Is whether sex occurred going to be a dispute in the

6    case?

7         MR. FINDLEY:  Not for Mr. Dixon.

8         THE COURT:  Okay.  But it is for Mr. Moore?

9         MR. HARPER:  Yes, sir.

10        THE COURT:  Okay.  I'm going to voir dire on the

11   defendants' right to remain silent.  Is that acceptable?

12        MR. FINDLEY:  Yes.

13        MR. HARPER:  Yes.  Although, I frankly expect

14   Mr. Moore to testify.

15        MR. FINDLEY:  Probably Mr. Dixon will, too, but I'm

16   not sure yet.  It just depends on the government's case.

17        THE COURT:  All right.  But it's probably not

18   something that needs to be brought up in the voir dire.

19        MR. FINDLEY:  I certainly wouldn't insist on it, no.

20   I wouldn't ask for it.

21        THE COURT:  It is likely that there will be witnesses

22   who are charged in the same indictment who pled.

23        MR. DAVIS:  That's right.

24        THE COURT:  Okay.  I do intend to voir dire on

25   cooperating witnesses, including one or more who pled guilty

1    and tell them that the fact that somebody else pled guilty

2    doesn't mean that these defendants are guilty, and that's what

3    they are here to determine.

4         When I've finished, I may forget to ask, but if I

5    don't, if you want me to ask any more questions, let me know,

6    and -- so, when I get over to the bench, if I haven't asked

7    you before, before we strike the jury, if you've got something

8    else you want to know, bring it up.  If I failed to ask it,

9    it's just an oversight on my part.

10        Are the defendants able to exercise peremptories

11   jointly, or do you want me to split them up?

12        MR. FINDLEY:  I don't know.

13        MR. HARPER:  I would -- I think we can exercise them

14   jointly, Your Honor.

15        THE COURT:  Okay.

16        MR. HARPER:  We've been working pretty well together.

17        MR. FINDLEY:  That's probably true.  That's probably

18   true.  So, we can go with that.

19        THE COURT:  So, I'll do it that way.  You've got ten,

20   and the government has got six, and pick a spokesperson; and,

21   when we're going down the list, that's who I will look to say

22   accept or strike.

23        MR. HARPER:  Your Honor, just -- it might be better

24   for me to make a record on Mr. Moore.  Mr. Findley is the

25   spokesperson, and we concur with that.  There isn't a question

1    about that.

2            THE COURT:  I'll understand that you have concurred

3    unless you speak up to the contrary.

4            MR. HARPER:  All right.

5            THE COURT:  And also, all through the trial, when one

6    of you makes an objection, I assume that the other has adopted

7    it, unless you say something different.  You don't need to

8    join the objection.  I just treat the objection as being

9    joined in by the other defendant.

10           You've all heard my spiel on trial procedures.  When

11   there is an objection, I just want basically the title of the

12   objection.  So, "Objection, hearsay," or "Objection, personal

13   knowledge."  Not a speaking objection, not, "Objection,

14   there's no way this witness could know that information."

15           I don't want a response to an objection unless I ask

16   for it.

17           If there are in-court identifications, I'm not going

18   to comment on those.  So, you are welcome to say, "Let the

19   record reflect the witness has identified the defendant," or

20   which defendant.  But don't look to me to make a comment one

21   way or the other, since it is up to the jury to determine the

22   credibility of the identification.

23           The other general instruction I always tell people is

24   my strong preference is to resolve disputes not on the jury's

25   time.  So, when you know that issues may be coming up as

1   you've done with your motions in limine, please, bring them up

2   beforehand or after the trial day, and we'll deal with them

3   and keep the jury working while they are here.

4         What I'm going to try to do on scheduling of the

5   trial day is run pretty good periods in between breaks.  Start

6   at 8:30 in the morning, take a break that will be more like

7   12:45 or 1:00.  There will be a morning break, and then the

8   lunch break, and then run a couple of hours or even two hours

9   and 15 minutes and break at 4:00 and be done.

10         MR. FINDLEY:  An hour lunch break?

11         THE COURT:  An hour lunch break, and then quit at

12   4:00, so you can prepare for the next day.  We won't have the

13   afternoon break, and you can get almost as much trial time

14   that way.  But that requires attorneys being ready and

15   adhering to the rule of resolving disputes not on the jury's

16   time.  If we start taking more breaks, you can't run that

17   trial day.

18         Yes?

19         MR. DAVIS:  I saw your schedule, and it looked to me

20   as though there might be a half day by the end of the week.  I

21   just wanted to know for planning witnesses, Your Honor.

22         THE COURT:  I hope not.  I did have a major hearing

23   at 2:00 Friday that was a problem, but it's not there anymore.

24   So, I've gotten that out of the way.  I do think I've got a

25   sentencing set for 3:30 and 4:00; and, frankly, they may go to

1   4:00 and 4:30.  So, we may be able to run until 4:00 on

2   Friday.

3          If we run this trial day, where we get off at 4:00,

4   and people can deal with fires at the office or whatever, and

5   be more prepared, and jurors can deal with things that they

6   have to deal with, it's less essential to have a half day on

7   Friday.

8          Also, I -- I mean, I sometimes run half days on

9   Friday when the trial is going to be extensive.  I know the

10  comment in this case has been 2 weeks or it was 3 weeks at one

11  time, but I'm not sure from what I've seen so far that -- of

12  course, I don't know, I don't know what you have, but it

13  strikes me as not necessarily that long a trial.

14         What do you think?

15         MR. DAVIS:  I don't think it's at the 3-week level,

16  Your Honor, which was the original estimation when we had all

17  five defendants.

18         THE COURT:  Right.

19         MR. SPROWLS:  I think we will probably, if they are

20  going to call some or most of what we see on their list,

21  probably well into next week.  Don't you think?

22         MR. FINDLEY:  With ours and yours?

23         MR. DAVIS:  Yes.

24         MR. FINDLEY:  I understood from our conversation last

25  week that yours will take about a week.  I think ours will

1    probably take, just for Mr. Dixon, less than a day.

2         MR. HARPER:  I think mine will take about a day.

3         MR. SPROWLS:  So maybe mid week next week.

4         THE COURT:  Okay.  Again, I've got however long we

5    need.  So, my goal is to take as long as it takes to do it

6    well and not any longer.  Raise it with me again about

7    Wednesday, but I would not be surprised to run until 4:00 on

8    Friday.  I'm not going to tell the jurors they can count on

9    Friday afternoon off, yet.

10         MR. DAVIS:  I was just looking at your schedule and

11   trying to make sure that I had witnesses.

12         THE COURT:  The names of the inmates, those have not

13   been in the papers to date.  I think what I propose to do with

14   the trial is to use names and not try to do anything

15   different.

16         Does anybody have a different idea?  Had you plan to

17   do it differently?

18         MR. DAVIS:  No, Your Honor.  I think we anticipated

19   that the names would come out in trial.

20         THE COURT:  Okay.  We can deal later with

21   transcripts, if these are victims of sex crimes and their

22   names ought not be in the transcripts.  We can deal with

23   redaction issues like we do with others things, but that won't

24   have any affect on the trial.  The names will be used.

25         MR. DAVIS:  There is one strange issue under the

1    protective order.  The government turned over a 5K1 and a Rule

2    35 on one of the inmate witnesses named Cecile Greathouse.  It

3    was turned over subject to an order from the Eastern District

4    of California that it be kept under a protective order.  So, I

5    felt comfortable to turn it over under Your Honor's standing

6    protective order.

7           I hadn't had a chance to discuss this with opposing

8    counsel.  We plan to, of course, bring out in her testimony

9    that she did get a 5K1 and a Rule 35.  It's unclear to me from

10   the court's order -- and I can give the court a copy of it --

11   the court sort of tosses it over to you, Your Honor, and says,

12   "And its disclosure pursuant to *Brady* and other obligations

13   can be managed by you at trial."

14           THE COURT:  All right.

15           MR. DAVIS:  I just wanted Your Honor to be aware that

16   there was a court in the Eastern District that only sent us

17   the Rule 35 and 5K1 after entering an order that we were to

18   respect its secrecy.  So, we've turned that over.

19           And you saw the order, it was attached.

20           MR. FINDLEY:  I believe so, in one of the mounds.

21           THE COURT:  Do you plan to put the documents

22   themselves into evidence?

23           MR. DAVIS:  No.  We would certainly examine her and

24   bring that out, but I mean the defense has the right to cross

25   her on that.

 1          THE COURT:  Sure.  Well, let's deal with it if we

 2     need to.

 3          MR. DAVIS:  I just wanted Your Honor to be aware.

 4          THE COURT:  I mean, I've had cases where Plea and

 5     Cooperation Agreements were put into evidence.  We can seal

 6     those exhibits, if necessary, or if that's appropriate under

 7     that court's order.

 8          It doesn't seem to me that that court's order has

 9     anything to do with what questions you can ask the witnesses

10     at trial.  So, if it's just a question of asking them, you

11     could have done that whether you got the agreement from

12     California or not, so -- and I'm not going to restrict the

13     cross-examination on those things.

14          MR. DAVIS:  And I wasn't asking that, Your Honor.

15          THE COURT:  Right.

16          MR. DAVIS:  I was just letting you know that we did

17     have this unusual situation --

18          THE COURT:  Sure.

19          MR. DAVIS:  -- where the Eastern District entered

20     that order, and that I thought we had complied with it by

21     turning it over under your -- in discovery under your

22     protective order.

23          THE COURT:  Right.  My protective order always

24     limits -- already limits the use by the defense and the

25     disclosure by the defense.  Then, if somebody puts it into

1   evidence, we can deal with sealing those exhibits.  But,

2   again, that would be transparent, I mean, invisible, as far as

3   this trial goes and the jurors are concerned, they won't know

4   of any of that.

5          Motions in limine, we may have taken care of most of

6   this.

7          MR. DAVIS:  Your Honor, before you move off of the

8   Hill shooting, I did want to mention something.

9          THE COURT:  Okay.

10         MR. DAVIS:  I don't think the government intends to

11  put any information in about the Hill shooting.  In our

12  interviewing of the witnesses, from time to time witnesses

13  will inadvertently say, "It was about a month before the

14  shooting," or something like that.  We've tried to deal with

15  that.  So, I think Your Honor's plan of voir-diring on that at

16  least makes that less troublesome.

17         THE COURT:  Yeah.  I mean, witnesses remember what

18  they remember; but, if it's a month before the shooting, it's

19  a month before the arrests.

20         MR. DAVIS:  That's right.

21         THE COURT:  And they may be able to express it that

22  way.

23         MR. DAVIS:  And that's certainly how we've approached

24  it.  I did want to say that the government does intend to put

25  the two FBI witnesses on who witnessed the individual flights

1    of Mr. Dixon and Mr. Moore, to put that on for consciousness

2    on guilt, just to be clear on that.

3           THE COURT:  All right.

4           MR. FINDLEY:  We would certainly object.  I don't

5    think there's any good-faith basis for an argument that

6    Mr. Dixon fled.  I think it's Agent Wyckoff's 302 that will

7    show that he walked away; that he -- that she asked him if he

8    knew what was going on, and he said he didn't know.  Then he

9    got in his car, started his car.  And then the agents told him

10   he was under arrest, and he got out of the car.  He didn't get

11   out of the car right away, I guess Agent Wyckoff would say,

12   but I think this is not evidence of flight.  He didn't run; he

13   didn't drive away.

14          THE COURT:  Well, if that's the testimony, what are

15   you worried about?  I mean, they know he's arrested, he's

16   here.

17          MR. FINDLEY:  I understand that.  But it's just --

18   it's not relevant.  It's not relevant if it's -- and there is

19   a danger that they could conclude that he was attempting to

20   flee based on their argument from that evidence, but there's

21   no basis for it.

22          THE COURT:  Mr. Davis, what's the government's theory

23   of the flight?

24          MR. DAVIS:  Agent Wyckoff's statement to me, and

25   certainly in the 302 I believe as well, is that she identified

1   herself and asked him to get out of the car, and he wouldn't.

2   At that point the police had to come up and draw-down on him

3   in order to get him to stop and get out of the car.

4         So, we see it a little bit more of a situation full

5   of innuendo and suggestion as to what his intent was when he

6   didn't turn himself over to Agent Wyckoff.  But I think the

7   facts can be argued the other way.

8         THE COURT:  But he didn't go anywhere, he just sat

9   there.  So, you don't know if he was counting to ten like his

10  mother taught him to do or saying his prayer or running?

11        MR. DAVIS:  We don't know if he was counting to ten,

12  Your Honor, but --

13        MR. SPROWLS:  It wasn't until two armed officers took

14  their weapons out of their holsters and pointed it at him that

15  he stopped or that he complied with Agent Wyckoff's order.

16        MR. FINDLEY:  But the 302 will show that, when she

17  asked him, did he know what was going on, he said, "I don't

18  know."  And he didn't know she was an agent.  There would be

19  no reason for him to make something up.  And he was at the

20  FCI; whereas, the shooting occurred down at the FDC.  So, he

21  wouldn't have known.

22        THE COURT:  All right.  So, the question is, officer

23  comes up to make an arrest, says, "Get out of the car."  He

24  doesn't get out of the car until officers come and draw their

25  weapons and say, "Get out of the car," and then he gets out of

1    the car.

2              MR. DAVIS:  That's my understanding, Your Honor.

3              MR. SPROWLS:  And she is wearing a raid jacket.  As

4    far as -- I don't know if the question was, "Do you know

5    what's going on with regard to the shooting?"  That may not

6    have been.

7              THE COURT:  I'll look into it.  If anybody has any

8    authority on failure to surrender as opposed to actual flight,

9    I'd be interested.  But I'll be looking into it.

10             MR. SPROWLS:  That's going to be further down in the

11   case.

12             THE COURT:  Don't mention it in opening unless you

13   raise it back with me.  It may be before opening I've had a

14   chance to look at it, but -- because we would've had a break,

15   but otherwise don't bring it up until I have dealt with it

16   further.

17             MR. HARPER:  Are y'all planning the same thing with

18   Moore?

19             MR. DAVIS:  Yes.

20             MR. HARPER:  Okay.  Because with Mr. Moore the

21   evidence at the detention hearing was that officers came up

22   and Mr. Moore made the statement to the effect that, "If you'd

23   been a few minutes later, I would've been gone."  And at the

24   rehearing on the detention, we produced documents to show he

25   had an assignment at the hospital on FCI and was going to

1   another assignment, as opposed to any kind of -- and there is

2   not any physical evidence of his trying to flee.

3           THE COURT:  And the government's theory on him is --

4           MR. DAVIS:  What he said meant that he would've fled

5   the situation.

6           THE COURT:  All right.  Let's deal with that one the

7   same way.  I'll go look at that, not that he fled, but that he

8   said, "I would've fled."

9           MR. SPROWLS:  "Had you been a few minutes later, I'd

10  be gone," something along those lines.

11          THE COURT:  Right.

12          MR. DAVIS:  I think it was more along the lines of,

13  "If you hadn't gotten me, I'd be gone."  But we'll get with

14  the agent.

15          THE COURT:  All right.  I'll look at both of those.

16  Don't mention those until I've ruled on it further.

17          MR. SPROWLS:  The Mutt and Jeff here, Rob and I --

18  Mr. Davis and I have sort of split up the trial.  I'm going to

19  take more or less the first half.  So, I'm sort of deferring

20  to him right now because that's in his half, so --

21          THE COURT:  You are welcome to split -- and the same

22  thing over here -- you are welcome to split it up any way you

23  want, as long as you don't both do the same thing; that is,

24  don't re-plow the same ground that your colleague plowed.

25  But, other than that, you're welcome to split openings and

1    closings or -- not examinations of witnesses -- one witness/

2    one lawyer per party.  So, for examinations and objections and

3    the whole thing.

4         MR. DAVIS:  Your Honor, does that mean that we will

5    only have one defendant counsel crossing?

6         THE COURT:  No.  One for each defendant.

7         MR. DAVIS:  I see.

8         THE COURT:  So, Mr. Shaw and Mr. Findley can split

9    the witnesses up, but they can't both be making the objections

10   on the same witness.

11        MR. HARPER:  Mr. Findley and I have discussed about

12   going in different order than named in the indictment.

13        THE COURT:  You can go in any order you choose.  I'll

14   set an order, if there are too many instances where you sit

15   there and look at each other and nobody stands up.  But as

16   long as you know who is going first, you can flip-flop back

17   and forth.

18        Tell me who is going to make opening first.

19        MR. HARPER:  (Indicating.)

20        THE COURT:  Okay.  I'll call on Mr. Harper first for

21   opening.

22        And then on the defense witnesses, after Mr. Findley

23   puts on a witness, I'll call on Mr. Harper before the

24   government's examination.  So, both defendants inquire before

25   the government's cross.

1      And then I'll leave -- the attorney who called the

2 witness gets redirect, unless there is something in the cross

3 that goes only to the other person and really requires

4 examination.  But, generally, it will only be the lawyer who

5 called the witness who gets redirect.

6      Part of Mr. Dixon's motion in limine dealt with acts

7 of co-defendants until a conspiracy is shown.  I'm first

8 concerned with that with respect to co-conspirator hearsay.

9      Is there going to be any of that?

10      MR. SPROWLS:  I don't really think there will be.  I

11 think, if anything, what a co-conspirator would say is that --

12 we're trying to limit, at least I think we have been trying to

13 limit, our examination to what Mr. Dixon said, what Mr. Moore

14 said per that witness.

15      THE COURT:  Right.

16      MR. SPROWLS:  And I --

17      MR. DAVIS:  I think that's true, Your Honor, and we

18 are also --

19      THE COURT:  So, if you have statements by Mr. Spence,

20 and Mr. Spence is going to come testify, so you're not going

21 to call some other witness to say here's what Mr. Spence said.

22      MR. DAVIS:  Except there are occasions in which what

23 Mr. Spence said was the basis for action taken by a witness.

24 So, it wouldn't be admitted necessarily for the truth of it,

25 but at least to show why the witness did what they did.

1          THE COURT:  If that matters.  That often doesn't, I

2    understand, but if it matters, okay.

3          MR. SPROWLS:  When we get into the current and former

4    inmate testimony, just talking to them, so much of what they

5    did is based upon what they heard.  I mean, it's a very closed

6    community out there, and I think talking is a recreational

7    sport there.  And so it may not be true, but it's what they

8    heard; therefore, they went, you know, they went and did this,

9    they went and did that, they went and asked so and so.  It's

10   really difficult to sift that out of the core of the

11   testimony, because it's the basis for so much of what they

12   did.

13         THE COURT:  I understand, and that's a nonhearsay

14   use, if it really matters.  Again, it goes back to whether it

15   really matters why they went and did what they did.  So, just

16   go with that with some caution, and we'll deal with it

17   question by question, if we need to.

18         MR. FINDLEY:  I think Mr. Dixon is going to try to

19   take a hard line, but on a question-by-question basis, about

20   whether they're talking about rumors or stuff that they have

21   personal knowledge about, or things that they heard.  And we

22   think that, based on reading the grand jury testimony at

23   least, it seems like there is a lot of that, rumors coming in

24   when there's really no reason to ask the person, why did you

25   do what you did?  I think that's just a subterfuge to some

1  extent to get in a lot of those other comments.  So, we are

2  going to be very wary about that, but we can do it on a

3  case-by-case basis.

4       THE COURT:  I understand.  I think that's the only

5  way to deal with it, is by item by item.  I don't know how

6  many inmates will be testifying; but, if you get very many,

7  you'll get some who are very closed-mouth and hard to get to

8  talk, you'll get some who are very free with their testimony

9  and hard to get to stop, so --

10       I'm a little more tolerant with leading if the effort

11  at the leading is to keep somebody from going off into stuff

12  that's really not admissible and -- so, if you can control the

13  witnesses to admissible testimony, then so much the better.

14       I guess, so everybody will know, what I will try to

15  do with leading is -- I certainly don't want lawyers putting

16  words in the witnesses' mouths.  At the same time I understand

17  that you've got to get the witnesses to testify.  So, if you

18  have to drag it out of some, you get a little leeway there.

19  If you have others that are little too free and easy talking,

20  and you have to lead a little more to rope them in, I'm a

21  little more tolerant there, too.  So, we will do the best with

22  it we can question by question.

23       To the extent that the motion in limine wants me to

24  exclude acts that are not alleged in the superseding

25  indictment, I'm not quite sure what to do with that, other

1    than just to deny that part of the motion.

2         They don't have to allege in the superseding

3    indictment everything that happened.  So, the fact that it's

4    not in the indictment doesn't make it inadmissible.

5         And the same thing with acts by a co-defendant until

6    a conspiracy is shown, acts as opposed to statements may be

7    admissible, even if there is not a conspiracy.

8         What else do we need to do this morning?

9         MR. FINDLEY:  I have a second motion in limine that I

10   prepared yesterday, and I've provided a copy to the

11   government.

12        This is based on some evidence that we received

13   Thursday or Friday of last week.  There are some training

14   materials that are ethics training materials, and they cite

15   various provisions of Title 5 of the Code of Federal

16   Regulations relating to ethics, and they also make certain

17   comments like, there is no consensual sex with inmates, it's

18   always nonconsensual, and things like that, that's in some

19   Bureau of Prisons' program statements and in those training

20   materials.

21        So, we would just -- maybe it's not properly phrased

22   as a motion in limine, but we would want to be very cautious

23   that they are not putting in proof of violations of civil

24   regulations or, you know, other misconduct in order to prove

25   the violations of the criminal offenses.  And I just want

1  everybody to be aware that that is an argument that we have;

2  that, if they go too far and -- or even if they put in

3  evidence, you know, that it's intended to show they knew that

4  these were violations, so, for example, the ethics rules, that

5  is not a violation of a criminal offense.

6        THE COURT:  Well, that was covered in the earlier

7  motions in limine to dismiss or something.  It wasn't in the

8  outline --

9        MR. HARPER:  Motion to strike.

10       THE COURT:  -- that I just went through, but --

11  motion to strike, perhaps.

12       Part of the charge, as I understand it, is conspiracy

13  to deprive the government the right to honest services.  One

14  of the charges is bribery or soliciting a bribe.  Let me give

15  you a hypothetical:

16       The warden says, "You are to stay every day until

17  4:00.  It's my instruction.  Your shift doesn't end until

18  4:00."

19       The inmate comes to the officer and says, "I'll give

20  you 50 bucks, if you'll go home at 3:30."  He goes home at

21  3:30.

22       Now, going home at 3:30 is not a crime.  There is no

23  statute that says he has to stay until 4:00.  There's no

24  regulation that says he has to stay until 4:00.  He took a

25  bribe.

1          So, the question is not, is the warden's instruction

2     a criminal statute?  It's not.  But if you pay somebody not to

3     do what the warden told you to do, and part of your duty was

4     to do what the warden told you to do, you've taken a bribe.

5          That's the flaw in the motion to strike and a

6     possible flaw in what you're telling me.

7          You're right that they can't make the case into a

8     case of violating an instruction from the warden.  The charge

9     is what the charge is, and that's what they're going to have

10    to prove, and I'll hold them to that, and we'll make clear,

11    and you can make clear in your openings and closings what they

12    are charged with.  They are not charged with having sex with

13    inmates.  I will tell them that as part of the voir dire when

14    I describe this.  The charge is not having sex with inmates.

15          MR. HARPER:  The point I was trying to make, though,

16    Your Honor, that may be a bribe, but it's not punishable as an

17    honest services fraud, because honest services there has to be

18    a law which sets a fiduciary relationship, and I know the

19    standard instructions say it's implied by virtue of their

20    employment, but the --

21          THE COURT:  It's not a honest services fraud if

22    you --

23          MR. HARPER:  Leave early at 3:30?  I don't think it

24    is, Your Honor.

25          THE COURT:  It's not a bribe if you say, "Look, I

1   know your duty is to stay until 4:00, but I'm going to give

2   you 50 bucks to go home at 3:30," that's not a crime -- and

3   the guy says, "Okay, give me the 50 bucks," that's not

4   bribery?

5              MR. HARPER:  I think it's bribery.  I just don't

6   think it's honest services fraud.  I don't think it can be

7   punished as honest services fraud, Your Honor, is the point I

8   was trying to make.  I think we can go under Counts 15 and 16,

9   but not Count One.

10             THE COURT:  Okay.

11             MR. DAVIS:  Except to the extent that Count One

12  includes bribery, Your Honor.

13             THE COURT:  Well, I understand.

14             MR. HARPER:  I'm just saying --

15             THE COURT:  I confused you because I started talking

16  about honest services, and I switched with bribery with my

17  hypothetical.  So, I kind of did a bait and switch there with

18  my hypothetical.  But the point is, it doesn't have to be a

19  violation of a criminal statute under bribery, and I think the

20  same is true with honest services, but we can deal more with

21  that.  Of course, if it's admissible on any of these counts,

22  it's admissible.  So, you've alerted me to the problem, but I

23  don't think there is anything I can do with it yet.

24             MR. FINDLEY:  There are gray portions of those

25  training materials and the Bureau of Prisons' program

1  statements that aren't particularly relevant, and they deal

2  with violations of ethics standards and, particularly, under

3  403, the comment about there is no such thing as consensual

4  sex with inmates, I would request that that be redacted, if

5  they're going to offer that into evidence; and that any

6  violations of other civil regulations that aren't arguably

7  even an issue, that those also be redacted as well.

8        THE COURT:  Well, it's true that there can be no

9  proper sex with inmates, whether consensual or not, right?

10       MR. FINDLEY:  That's true.  But they say there can't

11  be consensual sex with inmates, and they are going to use that

12  for their proof, I'm sure.

13       THE COURT:  Well, if part of the defense is that it's

14  okay for an officer to have sex with an inmate, you need to

15  have a fallback position, because that one is not likely to

16  prevail.

17       MR. FINDLEY:  That's not the defense, but to say that

18  there is no such thing as consensual sex is not saying that

19  there is no such thing as an offense for --

20       THE COURT:  I understand, but I also know what that

21  statement is meant to get at.

22       You've now -- they just brought you the list of

23  jurors.  It looks like we have 41, and I can tell you just by

24  looking at it that the last one probably will be second.

25  She's going to be seated last, obviously, because she checked

 1   in a little later, but you can look at her pool sequence

 2   number, and she would actually be the second one.  So, when we

 3   go to picking the jury, we will actually go to her second.

 4        The rest of them we will go right down the list in

 5   the order they are on the list that you have received.  I will

 6   give you a minute with those, and I'll see you in the

 7   courtroom.

 8        MR. HARPER:  Two things, Your Honor, if I may,

 9   please?

10        THE COURT:  Where are the jurors right now?

11        DEPUTY CLERK:  I believe they are filing in.

12        THE COURT:  Okay.  We need to go very quickly.

13        MR. HARPER:  I understand.  Overview, if Mr. Brunner

14   is going to be an overview witness, I will object to him being

15   an overview witness.

16        Secondly, may we have water at counsel table?

17        THE COURT:  You can.  I would prefer you do it in the

18   little nondescript cups rather than in the

19   commercially-labeled bottles that get to look like an Aquafina

20   ad.

21        MR. HARPER:  And then lastly --

22        THE COURT:  And there's water there at the bench.

23   You can do that.  I can tell you that, you know, I don't have

24   water and the jurors don't have water, but you're welcome to

25   have all of the water you want.

1          MR. HARPER:  And lastly, I have a couple of lawyers

2     that aren't here this morning.  I don't know if they are going

3     to help me or not the way we started off, but Gus Harper and

4     Jonathan Chester may appear during the course of the trial.

5          THE COURT:  Introduce both of those when I call on

6     you to introduce yourself, and anybody else.

7          Mr. Findley, if you have a paralegal or someone in

8     and out of the courtroom, we just need to find out if the

9     jurors know them.

10         MR. DAVIS:  Your Honor, I just want to give you the

11    government's exhibit list.

12         THE COURT:  Okay.

13         MR. DAVIS:  I have given that to co-counsel.

14         THE COURT:  All right.  And, Mr. Harper, you owe me a

15    witness list.

16         MR. HARPER:  Yes.  As soon as I get a break, I will

17    get somebody to get it.

18         THE COURT:  Okay.  You need somebody from your office

19    to bring it over?

20         MR. HARPER:  Yes.

21         THE COURT:  I will get somebody to call your office

22    and tell them you said bring your witness list, because we

23    probably took your cell phone.

24         There is a phone in the attorney lounge.  But we need

25    to be in the courtroom pretty quickly, if they're coming in.

1   I'd like you to be in the courtroom within a couple of

2   minutes.  So, take time to get to the restroom, or whatever,

3   and get on in, or if you need to call the office, but do it

4   very quickly.  And, if you will let me know when everybody is

5   in the courtroom, we will start just as quickly as we can.

6          MR. FINDLEY:  Thank you, Your Honor.

7          MR. DAVIS:  Thank you, Your Honor.

8     (A recess was taken at 9:05 a.m.)

9     (The proceedings resumed at 9:09 a.m. in Open Court.)

10    (Jury selection not transcribed.)

11                 *   *   *   *   *   *   *   *

12    (A luncheon recess was taken at 1:03 p.m.)

13

                          **AFTERNOON SESSION**
14                           (2 P.M.)

15    (Defendants present; jury not present.)

16         THE COURT:  Please be seated.

17         Mr. Harper, I was told after we broke that you have

18    an issue.

19         MR. HARPER:  Yes, Your Honor.  This morning at the

20    pretrial conference it came to my attention for the first

21    time, with discussions with co-counsel, Mr. Findley, that

22    their defense is going to be possibly admission of some sexual

23    activity with the inmates, which gave rise to two issues that

24    I feel like I should address with the court.

25         One is whether that creates antagonistic defenses and

1  a prejudicial joinder under Rule 14, and maybe we can't

2  address that this early.

3      The second thing, I didn't want you to think I was

4  holding back or trying to sandbag the case, is, there's an old

5  case out there, it seems like it's a 1952 case or something

6  like that, *Deluna*, which is a district case.  I don't think

7  it's every been overruled.  It gives a defendant a severance

8  in a situation where a defense attorney feels compelled to

9  protect his client by commenting on one defendant testifying

10  or not testifying.

11      I've indicated that I thought Mr. Moore would be

12  testifying; but, if -- it may give rise to it, and I don't

13  want you to think I'm trying to create a mistrial by keeping

14  quiet or anything like that, but I feel like I need to get

15  that out and address it early that that potentiality is there.

16  And so I guess I --

17      THE COURT:  You don't want to comment then in opening

18  on the defendant testifying, do you?

19      MR. HARPER:  Your Honor, I think I might make that

20  request at this time.

21      THE COURT:  What would you say in opening?

22      MR. HARPER:  I don't think I'm going to say

23  anything -- you mean -- no.  Am I going to say anything?  I

24  thought you meant -- no, sir, I'm not.  I thought you asked if

25  I wanted a jury instruction.

1          THE COURT:  Oh, no.

2          MR. HARPER:  No, I'm not going to say anything in

3    opening.

4          THE COURT:  Okay.  Before you comment in closing, if

5    Mr. Dixon should choose not to testify, before you comment on

6    that, raise the issue with me, and we will deal with it at

7    that point.

8          MR. HARPER:  Yes, sir.

9          THE COURT:  But nothing else needs to be done right

10   now.

11         MR. HARPER:  I think that's right.

12         THE COURT:  Okay.  Anybody else thinks we need to do

13   anything about any of that at this point?

14         MR. FINDLEY:  No, Your Honor.

15         MR. SPROWLS:  No, Your Honor.

16         THE COURT:  All right.  Then we'll be in recess, and

17   I'll be back when the jurors are all here.  We have probably

18   about 5 minutes before they'll all be here and we'll start.

19   I'll give my preliminary instructions, then we'll go right

20   into opening.

21         How long do you think you will take for openings?

22         MR. SPROWLS:  Ten or 12 minutes.

23         MR. FINDLEY:  Fifteen minutes is about what I timed

24   it at.

25         MR. HARPER:  Fifteen or 20, Your Honor.

1        THE COURT:  All right.  Then we will get the

2   openings, and then we'll start in with the first witness, and

3   we'll get however far we can get.

4        MR. SPROWLS:  Yes, sir.

5        THE COURT:  And I am going to try to run on the

6   schedule I gave you, stop at 4:00 or so each afternoon.

7        All right.  I'll be back in a few minutes.  We'll be

8   in recess.

9   (A recess was taken at 2:04 p.m.)

10   (The proceedings resumed at 2:08 p.m.)

11   (Defendants present; jury not present.)

12        THE COURT:  Please be seated.

13        Bring the jurors in, please.

14   (The jury entered the courtroom at 2:10 p.m.)

15        All right.  You may be seated.

16        Members of the jury, we had an oath for you to take

17   at the beginning of the jury-selection process.  That was your

18   oath to answer truthfully the questions asked of you during

19   that process.  We now have one more oath for you to take.

20   This is your oath as the jury that will try this case.

21        The clerk will please administer the oath.

22        DEPUTY CLERK:  Please stand and raise your right

23   hand.

24   (Jury duly sworn.)

25        DEPUTY CLERK:  Thank you.

1          THE COURT:  You've now been sworn as the jury to try

2    this case.  By your verdict, you will decide the disputed

3    issues of fact.  I will decide all questions of law and

4    procedure that arise during the trial; and, before you retire

5    to deliberate together and to decide the case at the end of

6    the case, I will instruct you on -- that is, I will explain to

7    you -- the rules of law that you must follow and apply in

8    reaching your decision.

9          The evidence presented to you during the trial will

10   consist primarily of the testimony of witnesses and papers or

11   documents or tangible things that are referred to as

12   "exhibits."  You should pay close attention to the testimony

13   as it comes in, because it will be necessary for you to rely

14   on your memory and any notes you may choose to take concerning

15   what that testimony was.

16         As I told you during the jury-selection process, the

17   court reporter makes a stenographic record of everything that

18   is said during the trial, but typewritten transcripts will not

19   be prepared in time for your use as jurors, and so you should

20   not expect to receive them.

21         On the other hand, any exhibits that are admitted

22   into evidence will be available to you during your

23   deliberations.  So, if an exhibit is received in evidence, but

24   it's not fully read to you or shown to you at the time, don't

25   be concerned, because you will have that available to you

1   during your deliberations.

2            If you would like to take notes during the trial, you

3   may do so.  We've provided pads and pens for that purpose, if

4   you choose to take notes.  On the other hand, if you choose

5   not to take notes, you don't have to take notes.  So whether

6   to take notes or not is left up to each of you individually.

7            If you do decide to take notes, please be careful not

8   to get so involved in note-taking that you become distracted

9   from the ongoing proceedings.  Also, your notes should be used

10  only as aids to your memory.  Your own memory is your best and

11  most valuable tool for keeping track of what the testimony

12  was.

13           Thus, whether or not you take notes, you should rely

14  on your own independent memory of what the testimony was, and

15  you should not be unduly influenced by the notes of any other

16  juror.  Notes are not entitled no any greater weight than any

17  individual memory of each juror concerning what the testimony

18  was.

19           When we take breaks or overnight, please leave your

20  notepad right there on your chair.  The courtroom deputy clerk

21  will safeguard them for you overnight.  Nobody will look at

22  your notes.  We will have them back out for you in the

23  morning.

24           During the trial you should keep an open mind.  You

25  should avoid reaching any hasty impressions or conclusions.

1    Reserve your judgment until you have heard all of the

2    testimony and evidence, closing arguments of the lawyers and

3    my instructions to you on the applicable law.

4         Because of your obligation to keep an open mind

5    during the trial, coupled with your obligation then to decide

6    the case based only on the testimony and other evidence

7    presented here during the trial, you must not discuss the case

8    during the trial in any manner among yourselves or with anyone

9    else, nor should you permit anyone to discuss the case with

10   you or in your presence.  So, you won't be discussing the case

11   with anybody until the trial is over and you retire to

12   deliberate with the other members of the jury.

13        In addition, you must not have any conversations or

14   communications at all about the case or about anything else

15   with the lawyers or parties or anybody that has some

16   connection with one side of the case or the other.

17        The reason for this is to avoid even the appearance

18   of impropriety.  If you were coming to court in the morning or

19   leaving in the afternoon, and you stopped to talk to one of

20   the lawyers or parties, somebody involved in the case, a

21   witness, on the steps of the courthouse, they, of course,

22   would not talk with you about the case; but, if somebody was

23   down on the street corner and saw you talking to such a

24   person, they wouldn't know what you were talking about.  So,

25   to avoid even any appearance of possible impropriety, the

1    rules provide that people involved in the case on one side or

2    the other will not have any conversation with you at all while

3    you are serving on the jury.

4         You must avoid reading any newspaper stories that

5    might be published about the case, and you must avoid seeing

6    or hearing any television or radio coverage of the trial.

7    That, of course, goes to print newspapers or anything on the

8    internet.  Make sure that you don't see or hear or read any

9    media coverage about the case or anything written about the

10   case or said about the case from any other source.

11        Also, you must not visit the scene of any events that

12   might be talked about in the case.

13        The reason for these rules, of course, is that it

14   will be your duty to decide the case based only on the

15   evidence presented in this courtroom, not on the basis of

16   anything you might hear or see in any media or on your own.

17        From time to time during the trial, I may be called

18   upon to make rulings of law on objections or motions made by

19   the attorneys.  You should not infer or conclude from any

20   ruling I may make, or from anything I may say or do, that I

21   have any opinions on the merits of the case favoring one side

22   or the other.  And if I should sustain an objection to a

23   question that goes unanswered by the witness, you should not

24   guess or speculate on what answer might have been given, nor

25   should you draw any inference from the question itself.

1          During the trial it may be necessary for me to confer

2     with the lawyers from time to time out of your hearing with

3     regard to questions of law or procedure that require

4     consideration by me alone.  On some occasions I may do this at

5     the bench up here as I did during the jury-selection process.

6     On some occasions you may be excused from the courtroom and

7     allowed to go back to the jury room as a convenience to you

8     and to us.  I will try to limit any such interruptions as much

9     as possible, but you should remember always the importance of

10    the matter you are here to determine, and you should be

11    patient, even if the case may sometimes seem to go slowly.

12          The order of the trial's proceedings will be as

13    follows:

14          In just a moment the lawyers will have an opportunity

15    to address you in turn and make their opening statements.  The

16    government then will go forward with the calling of witnesses

17    and presentation of evidence during what is called "the

18    government's case-in-chief."

19          And, incidently, you're going to hear references to

20    "the government."  In federal criminal cases, charges are

21    brought in the name of the United States.  The convenient

22    description that's used in the trial process to refer to the

23    prosecution is "the government."  So, when you hear reference

24    to a "government exhibit," that means it's an exhibit that was

25    offered into evidence by the government.  That's what the term

1    "the government" will be used to mean.

2         When the government finishes, by announcing that the

3    government rests, the defendants then will have an

4    opportunity, if they wish, to proceed with witnesses and

5    evidence.  A defendant never has to present any evidence at

6    all.  The burden of proof is always on the government.

7         If a defendant does choose to present evidence, then,

8    when each of the defendants finish by announcing that they

9    rest, the government then will have an opportunity, within

10   certain limits, to again call witnesses or present evidence

11   during what is called "the rebuttal phase" of the trial.  The

12   government goes first and may rebut at the end because the law

13   places the burden of proof on the government.

14        Incidently, I should tell you, in that description I

15   referred to "the defendants."  Even though we are here having

16   one trial and there are two defendants, it really is a trial

17   of the case against each of the defendants separately.  They

18   are each separate parties.  They are not -- you shouldn't

19   treat them together.  You should treat them as separate

20   individuals.

21        When the evidence portion of the trial is completed,

22   the lawyers then will be given another opportunity to address

23   you and make their final arguments in the case.  After that I

24   will instruct you on the applicable law, and you will retire

25   to deliberate on your verdict.

1    I told you a little bit about the daily schedule

2 during the jury-selection process.  We will start in the

3 morning at 8:30.  We will try to stop in the afternoon at

4 4:00, maybe a little after 4:00, but in that ballpark, to give

5 you a chance to tend to the other affairs in your life after

6 4:00, and, frankly, give the lawyers a chance to prepare for

7 the next day to some extent.

8    We'll always have a break in the middle of the

9 morning.  You'll always get a lunch break.  It will generally

10 be an hour.  It will not come right at noon.  It will come

11 more like it did today, at 12:45 or 1:00.  Probably closer to

12 1:00.  What you will find is, if you went out there at noon,

13 the downtown restaurants would be full, and it would be hard

14 to get in.  By 1:00, they are pretty much empty.

15    Also, if we take a break from 1:00 to 2:00, that

16 means we can run about two hours in the afternoon before we

17 take a break and then -- not take a break but give you that

18 time away.  I try not to keep you sitting in that chair for

19 more than about two hours at a stretch.  So, the mid-morning

20 break and the sessions will be about two hours.

21    One question I sometimes get about breaks deals with

22 smoking.  During the morning break and if there is an

23 afternoon break, during any such break, you would be back in

24 the jury area, and you would not have an opportunity to smoke.

25 It's a nonsmoking building.  Over the lunch break, of course,

1    you are welcome to go out of the building; and, when you do

2    that, you're on your own.

3         Now, as told you, we begin by affording the lawyers

4    for each side an opportunity to make opening statements, in

5    which they may explain the issues in the case and summarize

6    the facts that they expect the evidence to show.

7         The lawyers' opening statements, and also the

8    closings argument they make at the end of the case, are not to

9    be considered by you either as evidence in the case or as your

10   instruction on the law.  Nonetheless, the opening statements

11   are intended to help you -- they are intended to help you

12   understand the evidence as it comes in and to understand the

13   issues in the case.

14        So, I ask that you now give the lawyers your close

15   attention as I recognize them for their opening statements.

16        Mr. Sprowls?

17        MR. SPROWLS:  Your Honor, Mr. Findley, Mr. Harper:

18        Good afternoon.  Again, to introduce, my name is Alan

19   Sprowls.  I'm an Assistant U.S. Attorney.  I'll be presenting

20   part of the government's case to you.  With me at counsel

21   table is Robert Davis, also an Assistant U.S. Attorney, and he

22   will be presenting part of the case as well.

23        What I'm going to do here is just basically try to

24   outline briefly the order of how we're going to present the

25   government's case or try to present the government's case.

1    I'm not going to cover every detail.  I'm sure you're thankful

2    for that.

3            First of all, we're going to start with an overview

4    of where most of the events happened; and that is, the Federal

5    Correctional Institution of Tallahassee.  You'll learn it's a

6    women's prison at present and has been for some years with

7    currently about 1,400 inmates.  We're going to try to give a

8    tour, a tour via photographs, schematics, and through the

9    testimony of an employee that's been out there for quite a few

10   years.

11           We are also going to let you learn about a few of the

12   computer systems that are in place out there that helps the

13   prison personnel to monitor the inmates insofar as where

14   they're housed -- I mean, with 1,400 folks, one could lose

15   track -- where they're housed, what bed they're in, what their

16   daily schedule is, what work they're doing, what courses

17   they're taking -- a lot of things about them.  And also that

18   they can monitor any phone call that's currently being made or

19   that was made and was recorded.  They can go on to the

20   computer equipment out there at any station and listen to the

21   inmates' conversations.

22           Next, we expect to present testimony about the duties

23   and the training of correctional officers.  We're not going to

24   cover everything; because, frankly, I don't think all of it is

25   relevant.

1        What's pertinent here, folks, though, we suggest, is

2   that they have a duty to abstain from having no sexual contact

3   with the inmates.

4        Also, we expect the evidence to show that they have a

5   duty not to bring in items and give them to the inmates.  We

6   will cover that a little bit more in just a second.

7        After we show you the institution, a little bit of

8   what the correctional officers are not to do, then we are

9   going to bring in current and former inmates.

10       Some of these inmates were solicited by correctional

11  officers to have sex; and in return they received gifts --

12  gifts like cigarettes, perfume, makeup, and some had money

13  deposited into their institution account.

14       Now, this may not seem like much -- perfume,

15  cigarettes -- but you're going to learn about the economy, the

16  prison economy, that things in prison can be sold among

17  inmates for a lot more money than one might imagine on the

18  outside.  For example, you may hear testimony that a single

19  cigarette, name-brand cigarette, will sell for between 8- and

20  $10; a pack anywhere from 65- to $100, depending on whether

21  it's generic or a name brand.

22       So, there is an economy going there.  So, if inmates

23  can get stuff from the outside, it can be used to their

24  advantage on the inside.

25       Other inmates you will hear from simply served as

1    lookouts, to allow the sexual activity to take place while

2    they watched and made sure nobody interrupted them.

3        Others simply heard that a correctional officer was

4    available or was bringing stuff in, and they merely approached

5    that officer and said, "Hey, how about me?"  And the

6    arrangement, thereafter, was just purely money -- bring in the

7    contraband, pay the officer money.

8        We expect that you will also hear that Correctional

9    Officer Alfred Barnes, as well Mr. Dixon here, had a plan

10   whereby the inmate or the friend of an inmate or a relative of

11   an inmate could mail money to an address outside of the

12   prison, which that officer had access to.  When I say "mail

13   money," mail a money order a check.  The officer would get

14   that, use that money to buy the contraband, because they

15   didn't want any out-of-pocket expenses, and bring it in.  Or

16   if you simply want to meet me, the correctional officer, and

17   give me the stuff you want me to bring in, I can do that, too.

18       Now, I'll briefly go over the charges.  The court

19   covered them earlier, and the one that I did want to cover a

20   little bit here is the first count, the conspiracy count, both

21   gentlemen are charged in the conspiracy count.

22       A conspiracy actually has several parts to it.  In

23   other words, it was not a conspiracy or an understanding to do

24   one thing.  It was a conspiracy to do multiple things, one of

25   which was to engage in bribery.  Will you have sex with me?

1    I'll bring you contraband, which is against my duty, for you.

2         Secondly, tampering with witnesses, attempting to

3    persuade these inmates from relaying the information to

4    supervisors, to exposing this conduct.

5         And, lastly, mail fraud.  I talked about the mailings

6    that Officer Barnes -- that we expect Officer Barnes and

7    Officer Dixon arranged to -- arranged that process or that

8    plan where the mails were used in the scheme which deprived

9    the government, the Bureau of Prisons, from its right of

10   honest services.  It's a mouthful, but that is part of it.

11   And I suggest, when it is over, that may be the essence of the

12   crimes charged here.

13        The court will instruct you on what conspiracy is.

14   We expect that that will be something to the effect that a

15   conspiracy is an agreement involving two or more -- you can't

16   conspire with yourself -- two or more to do something the law

17   forbids.

18        Now, I don't expect -- we do not expect that you will

19   hear testimony of a formal agreement; whereby, these certain

20   correctional officers sat down at a table and signed a piece

21   of paper and said, "We will agree not to be honest

22   correctional officers, so say we all," and they all sign it;

23   or they had a formal hand shake at some solemn ceremony.  No.

24        We suggest that this is going to be a much more

25   subtle understanding among, "Here's how it's done.  I'm not

1    going to tell on you, you don't tell on me."

2         The issue for you at trial's end will be:  Was there

3    such an understanding among these certain officers; and, if

4    so, was Mr. Dixon and Mr. Moore part of that understanding?

5         The other charges pertaining to both of them are

6    specific acts of bribery or specific acts of tampering with

7    the witnesses, the inmates.

8         A big issue, folks, there's just no getting around

9    it, is what is part and parcel to a case like this where

10   you're talking about a prison and where a lot of the witnesses

11   are inmates, most of our witnesses are inmates.  And they are

12   all, by virtue of where they are, they are all felons.  Some

13   of them have committed very serious crimes.  Some of them have

14   extensive records.  And we expect that you will hear

15   instructions at the end that you are to consider their

16   testimony with far more caution than someone without a felony

17   conviction.  We understand that.

18        At the end of the trial, folks, we expect that there

19   will be sufficient evidence to support a finding that

20   Mr. Dixon, Mr. Moore, and others, abused their authority over

21   inmates for personal benefit and, in so doing, abandoned their

22   duty to provide honest services as correctional officers.

23        Thank you for your attention.

24        THE COURT:  Mr. Findley?  Mr. Harper?

25        MR. HARPER:  Thank you, Your Honor.  May it please

```
 1    the court.
 2             Ladies and gentlemen of the jury, counsel,
 3    Mr. Findley:
 4             We've heard opening statement, that this is supposed
 5    to be a road map.  I would like to give you a little more
 6    detail of what we think the evidence will be and what we think
 7    the evidence will not be.
 8             If I may, I would like to make sure you understand a
 9    couple of things.  That I represent Alan Moore, and I'm a
10    defense attorney here.  I don't represent Mr. Dixon.  I
11    certainly wish Mr. Dixon well, but -- and I'm trying to work
12    with Mr. Findley, and we're both resisting the charges brought
13    by the government, but my obligation is to Mr. Moore.  And the
14    fact that Mr. Findley and I consult, I don't want to step on
15    his toes, I don't want him to step on my toes, but we have our
16    own individual obligation and our professional responsibility
17    to one person.
18             It gets confused when you start talking about an
19    agreement and an indictment and a list of witnesses.  As the
20    court told you, an indictment is basically an agreement to
21    commit an unlawful act.  In this case, there are four unlawful
22    acts that are charged to be the object of the conspiracy, and
23    those things are mail fraud, wire fraud, honest services
24    fraud, and bribery.
25             But the particulars of the case, as they pertain to
```

1    Mr. Moore, I want to go through in the indictment because it

2    boils down to sex.  And when you get to that basic point in

3    this case, you're going to see how important it is when

4    Mr. Sprowls says these women are convicted felons, because

5    you'll hear that they not only are convicted felons, they are

6    not nice women, they are not ladies.  And to say they have an

7    extensive record may be an understatement, because they're not

8    only -- you will hear evidence that not only do they have long

9    records, you will hear they have long records for everything

10   from trying to commit murder to drugs, heavy quantities of

11   drugs, not casual use, fraud, forgery, crimes of moral

12   turpitude, everything you can think of.  These are not ladies.

13          These women have a motive to lie, you will hear, and

14   that is to get a reduction of sentence.  In federal court, we

15   call it a Rule 35, and it's a motion that can only be filed by

16   the prosecuting attorney.  It can't be filed by the defense or

17   the defense attorney, only by the prosecutor.  And you will

18   hear that every one of these women, either -- and like

19   particularly, Shonnie Daniels, has gotten several reductions

20   of sentences by coming in and cooperating in cases, just

21   appearing, just showing up and getting a reduction of

22   sentence.  And that's the *modus operandi*, and it's not charged

23   as a conspiracy, but the motive, we submit, for these women to

24   make these accusations, which we submit as pertaining to

25   Mr. Moore, are not true.

1          In particular, as pertains to Mr. Moore, we have

2    Shonnie Daniels, who we submit is going to say, without any

3    corroboration, I believe, that Mr. Moore lets her out of the

4    housing unit so she can go engage in sex with somebody, a male

5    in this case; and I don't think they are all necessarily

6    heterosexual relationships, but, as far as our client is

7    concerned, it is.  You will hear that Sabrina Bowie and

8    Shirley Blackston are roommates and have concocted a story, we

9    submit, against Mr. Moore that he came in and had sex in front

10   of another inmate, had sex with an inmate in front of an

11   inmate, which is, we submit, pretty incredible.  And being two

12   roommates, of course, they are able to concoct a story that

13   nobody else would believe except an investigator out at the

14   correctional facility.

15          But you will be see in Counts 16 and 17 that

16   Mr. Moore is charged with having traded his code, if you will,

17   for sexual favors from Sabrina Bowie, and allegedly gave

18   Shirley Blackston cigarettes or gum or perfume or something

19   and risk his job so she'd keep quiet about it.  That's what he

20   supposedly did.

21          Where is the DNA?  There isn't any.

22          Where is the recording?  Where is the videotape?

23   There isn't any.

24          Where is the mail that Mr. Moore supposedly used?

25   There isn't any.

1          Where's the money that Mr. Moore supposedly got?

2   There isn't any.

3          So, this, we submit, is not only a marginal case, but

4   an incredible case.

5          These inmates, I think you will hear testimony, have

6   bad reputations, not only bad backgrounds, but bad

7   reputations.  They have reports written up about them.  They

8   are, like I said, not nice people.

9          On the other hand, Alan Moore is a vet, honorably

10  discharged, a correctional officer with the state system for

11  years, a correctional officer with the federal system for

12  years, and is on the carpet because of Sabrina Bowie and

13  Shirley Blackston.

14         You are going to hear from some officers who are

15  corrupt.  Barnes made a lot of money, a lot of money.  You're

16  going to hear from Lavon Spence who says he did all of those

17  things.  You're going to hear Mr. Johnson say he did some

18  things.  But I believe you're also going to hear Lavon Spence

19  say, "I did those things, but I didn't have any agreement, no

20  conspiracy.  I did those things, but it wasn't an agreement."

21         This is an agreement, a charge among the correctional

22  officers, not an agreement with the inmates to commit a

23  crime -- an agreement among the corrections officers.  And,

24  yet, one of the corrupt officers saying there was no such

25  agreement.  "I did have sex with an inmate," so says Lavon

1    Spence, but it wasn't in any agreement.  We had no agreement

2    to use the mails.  We had no agreement to use the wire.  We

3    had no understanding about bribery.  It was just something I

4    did."

5         And, ladies and gentlemen, if there is no

6    agreement -- that's what this charge is about -- if there is

7    no agreement, there is no crime committed punishable by this

8    indictment.

9         Well, I say that, that's not quite correct.  There is

10   no crime committed punishable by the indictment as charged in

11   Count One.  We still have the bribery count, we still have the

12   tampering count, which we submit didn't happen.

13        I've got details of the inmates' backgrounds that we

14   will share with you at a more appropriate time.  But as you

15   will see, as we go through the government's witnesses and you

16   hear Pamela Beauchamp and Latoya Brown and Dr. Carbonnell and

17   Demetrus Coonrod and Ms. Demorais and Ms. Hamlet and

18   Ms. Harris and Mr. Henson, and on and on and on, that that is

19   hardly going to have anything at all to do with Alan Moore.

20        The witnesses that I've identified -- Sabrina Bowie,

21   Shonnie Daniels and Shirley Blackston -- are the critical

22   witnesses that I'll ask you to pay particular attention to,

23   because we submit they are liars.  And at the end of the case,

24   we're going to ask you, and we believe the court will instruct

25   you, to find Mr. Moore not guilty.

1          THE COURT:  Mr. Findley?

2          MR. FINDLEY:  Yes, sir.  May it please the court,

3   counsel:

4          I think it's always best to start out in this type of

5   trial by letting the fact finders -- that is, you -- know what

6   is not contested and what is contested, hopefully, to make the

7   job a little easier and narrow the issues.

8          In this case we can narrow the issues for you a

9   little bit by telling you that Mr. Dixon admits that he had

10  consensual sex with some inmates over his many years of

11  service at the FCI-Tallahassee.  Although the government has

12  no physical evidence of that fact, Mr. Dixon has elected to be

13  straightforward about this and come in and admit that to you.

14         Mr. Dixon knows that it was wrong, it was a

15  misdemeanor criminal offense that is not charged in the

16  indictment that you are to consider.  He regrets it, and he's

17  extremely sorry for the pain that it's caused his family.

18         So you ask, why are we here then, if he admits that?

19         Well, the government in this indictment chose not to

20  charge him with that offense, and instead chose to charge him

21  with offenses that he did not commit.

22         The indictment has been discussed in some detail so

23  far, but I would like to go through it with you one more time,

24  because it is very important because it is your job as jurors

25  who took an oath to decide whether the facts that are

1    presented from the witness stand, not from the statements of

2    Mr. Sprowls or the statements of any lawyer, but from the

3    facts that come from that witness stand, whether those facts

4    meet the charges that are expressed in the indictment that you

5    will consider.

6            And in the indictment, Count One charges a

7    conspiracy, and you have heard how that's an agreement to

8    commit an unlawful act, an agreement, combined, people

9    combined together to bring forth this unlawful act.  It's not

10   an isolated act of unlawfulness.  It's an agreement among many

11   or two or more to commit an unlawful act.  And the conspiracy

12   in this case is charged to have four purposes:

13           One being a conspiracy or a joint venture to engage

14   in a corrupt scheme of bribery of public officials, or solicit

15   bribes.

16           The other being a conspiracy or agreement to use the

17   United States mails to engage in the scheme to deprive the

18   public of its intangible right to honest service.

19           The third purpose in Count One of the conspiracy

20   being the conspiracy to corruptly persuade persons with intent

21   to hinder, delay or prevent communications, not to superiors,

22   but to law enforcement, relating to the commission of a crime.

23           And, finally, the purpose alleged, the multiple

24   purpose -- the fourth multiple purpose alleged in the

25   conspiracy in Count One is an agreement or joint venture to

1  knowingly travel and/or use the mail to engage in an

2  interstate scheme to engage in extortion.

3        Those goes far beyond the offense that Mr. Dixon

4  admits that he committed, an offense which you are not called

5  upon to decide anything about in this trial.

6        The indictment also charges Mr. Dixon with bribery,

7  and you've heard the basis for that count, the alleged basis

8  for that count.  However, it's been very -- done in a very

9  shorthanded way.  There is much more to it than simply

10 providing something and then getting the benefit of a sexual

11 favor.  It's a very strict analysis where it has to be a *quid*

12 *pro quo*.

13       In this case, you will find that the gum was

14 distributed by Mr. Dixon, but not just to the few inmates that

15 he had sex with, but the prison population in general, to old

16 inmates.  He gave gum because he's a nice man, not because it

17 was a *quid pro quo* to engage in an official bribery, and

18 that's very important.

19       The indictment also charges Mr. Dixon with one count

20 of attempting to intimidate or corruptly persuade a witness so

21 as to hinder communications to law enforcement.  We anticipate

22 that the government will prove none of this.  None of the

23 charges in the indictment.

24       The indictment does not charge him with conspiracy to

25 have sex with inmates, so just get that out of your mind.  It

1   is not charged in the indictment, conspiracy to have sex with

2   inmates.  It is not charged as a criminal offense that he had

3   sex with inmates, he's not charged with conspiracy to bring in

4   contraband into the prison, and he's not charged with bringing

5   in contraband into the FCI-Tallahassee.

6          Finally, it's over-simplistic again to say he's

7   charged with conspiracy to deprive the public of the right to

8   intangible services, because that's not the offense that's

9   charged in the indictment.  The offense that's charged in the

10  indictment is conspiracy to engage in fraud using the

11  interstate mails in order to deprive the public of honest

12  services, and we feel that goes well beyond the facts that you

13  will hear from that witness stand.

14         Right now you must understand that the government has

15  not offered you any proof.  All you've heard Mr. Sprowls

16  telling you what he intends to show, so we need to start with

17  a clean slate and just listen to what those witnesses say.

18         What you will not hear from that witness stand -- I

19  anticipate that what you will not hear from that witness stand

20  is any evidence of any hard contraband -- no drugs, no

21  alcohol -- involving Mr. Dixon.  No videotapes of Mr. Dixon

22  bringing in contraband into the institution, even though there

23  were video monitors all over the place out there.  No

24  incriminating statement from Mr. Dixon that any agent or any

25  BOP person heard.  No fingerprints on any contraband that was

1    uncovered.   No wire transfers.   No telephone calls recorded.

2    No recorded conversations by wire, even though these inmates

3    were well aware of the process and work with these agents to

4    wear wires and go in and try to get statements from all of

5    these defendants, some of whom have now pled guilty.   There

6    isn't anything like that from Mr. Dixon.   And there is no

7    involvement with any mailing, which shoots the conspiracy

8    charge down by itself in major part.

9         I'm sure that they have tried to get him to say

10   things through the inmates out at that institution.   If you

11   think about it, you've got the Office of Inspector General out

12   there, and they are engaged in this investigation for a long

13   period prior to this.   They had all of these inmates at their

14   disposal.   All these inmates that wanted a Rule 35, as

15   Mr. Harper described it.   All wanting an ability to cut their

16   sentence.   All -- the agents had access to all of them, to go

17   wear a wire, see what you can get Mr. Dixon to say.   Yet, you

18   will hear nothing like that.   There is no proof of those

19   charges in this indictment.

20        I think you will not be impressed by the type of

21   witnesses that the government will rely on in this case.   One

22   inmate that the government will rely on is one that they

23   themselves, the U.S. Attorney's Office here, has described as

24   having, quote, repeatedly provided false information to law

25   enforcement, end quote.   That's the U.S. Attorney's Office

1    talking, not me.

2           In another case, this same inmate, quote,

3    significantly obstructed and impeded the prosecution, end

4    quote, of another case; and by doing so, quote, was, quote,

5    substantially devaluing the investigative efforts made using

6    her in an undercover capacity, end quote.

7           In fact, the U.S. Attorney's Office that gave that

8    fine opening statement said on a prior occasion that one of

9    these witnesses, quote, cannot be relied upon, end quote, in

10   an official court document.  That particular witness begged

11   and pleaded for a reduction in sentence.  She was twice denied

12   by this court before she started in on this investigation into

13   the conduct of the correctional officers at FCI.  Twice

14   rejected, facing a lengthy crack cocaine sentence, she chose

15   this avenue.

16          Even during this investigation, she pleaded with the

17   agents in the case saying, quote, when I was asked to

18   cooperate, I gave all I had, I didn't hold anything back, end

19   quote.  She also said in the same letter, quote, I don't know

20   what's the status of investigation with Officer Barnes, but he

21   needs to be stopped; he's abusing the system, also taking

22   advantage of our situation, end quote.

23          So, when she told them all that she knew, she told

24   them about Officer Barnes, who you will probably come to

25   believe was involved in some of the things that are charged in

1    the indictment, but not Mr. Dixon.

2          In saying that, in saying, "I told you everything I

3    know" in that particular letter to the agent, she didn't

4    mention Mr. Dixon.  So, presumably, if they believe that she

5    is telling the truth when she told them everything she knew at

6    that particular point in time, there wasn't anything about

7    Mr. Dixon, even though she was saying that she was telling

8    them everything she knew.

9          With respect to the witness tampering count, the only

10   person that they will call to try to convince you that

11   Mr. Dixon engaged in witness tampering, and this is a specific

12   date, March 18, 2006, the only person that they will call in

13   on that count is a convicted murderer, Latoya Brown.  Even

14   though she was then working for the government in March '06,

15   the alleged conversation between Ms. Brown and Mr. Dixon was

16   not recorded.  These two had no sexual relationship.  In fact,

17   they only had one brief conversation together in their entire

18   lives.  There is no way for Ms. Brown to get out unless she

19   cooperates with the government, and this is one of the paths

20   she chose to try to do so -- make something up about

21   Mr. Dixon.

22          The indictment, in fact, simply states that

23   Mr. Dixon, quote, questioned, end quote, her about cooperating

24   against Mr. Hill.  There is no allegation that he ever tried

25   to talk to this witness about the case against Mr. Dixon,

1    because she had no knowledge of anything to do with Mr. Dixon.

2         Again, it's obvious that this conversation occurred

3    at the direction of the government, but where's the tape?

4    Obviously, Mr. Dixon didn't say anything bad to her, or they

5    would have brought in the tapes, because you must recall that

6    or you will learn in this case that Latoya Brown had already

7    gotten Mr. Johnson, another co-defendant guard, to make a

8    statement while she was wearing a wire.  So, certainly, that

9    was a possibility, if the government wanted to prove that,

10   instead of just relying on the word of a convicted murderer.

11        Ultimately you will hear a lot of nonsense from a lot

12   of inmates who are all trying to punch their tickets for home.

13        Will the inmates testify against Mr. Dixon?  Sure.

14   There's two reasons why.  One, he's a guard who enforced

15   discipline at the institution; and, number two, they are

16   trying to cut their sentences.

17        So, there are certain things that Mr. Dixon did and

18   there are certain things that Mr. Dixon did not do.  The ones

19   that he did not do are the ones that are charged in the

20   indictment.

21        At least one inmate in this case has admitted lying

22   to get back at another lieutenant out at the Bureau of Prisons

23   at the institution.  She was asked why she lied.  She said she

24   was, quote, upset with the lieutenant, end quote.  She

25   admitted, quote, I was being ornery; I wasn't telling the

1   truth, end quote.

2          So, it's clear that these inmates -- I imagine that

3   she will admit that to you when she comes to the stand, that

4   she has lied about guards just because she wants to be ornery.

5   We will see if she is forthright enough to admit that.

6          And then to make it worse, the government plans to

7   use the man that was identified as the abuser, Mr. Barnes, to

8   come in and testify against Mr. Dixon.

9          Of course, Mr. Barnes also pled guilty and is working

10  on his own deal, so I urge you to use a good dose of

11  skepticism when you hear Mr. Barnes testify.

12         I would like to make a few comments on the contraband

13  issue out at the FCI-Tallahassee, because I think that would

14  be important to the alleged bribery and some of the other

15  offenses that the government has brought forward.

16         Was there contraband at the institution?  Undeniably.

17  In fact, I believe the agent will testify it was virtually

18  impossible to keep the inmates from having contraband.  And

19  when we're talking about contraband, again, we're not talking

20  about hard contraband, we're talking about what they will

21  describe as "nuisance contraband," which could include gum,

22  candy not sold in the commissary they will contend, but I will

23  contend that their definitions will show otherwise.

24         You will also hear evidence, I believe, that much of

25  the contraband that did come into the system was done with the

1    approval of superior officers out there or through no

2    involvement of these guards.  I believe you will hear that a

3    lot of the contraband that came in came in through the

4    visitation facility, over which these two guards had no

5    supervision, or through the rear gate, where there was a much

6    larger quantity of contraband that could be brought in over

7    which these two correctional officers had no supervision,

8    again.

9            They will make a great issue of cigars and cigarettes

10   in this case, yet the inmates were allowed to smoke and have

11   cigarettes during the great majority of the period of this

12   indictment.  You will see program statements from the Bureau

13   of Prisons that don't have cigars and cigarettes on the

14   contraband list.

15           You will hear that Mr. Dixon gave out bubble gum, but

16   you will also see that gum is not on the prohibited list.

17           In any event, as I mentioned before, Mr. Dixon gave

18   out gum to any inmate that wanted it, virtually.  He gave it

19   to older inmates, and I believe the government will admit that

20   he did so just on the basis of purely social relationships in

21   many instances.

22           In the final analysis, I believe that you will find

23   that much of this issue about what contraband could be in the

24   institution, what could they be allowed to have, a lot of it

25   was committed to the discretion of the guards, and I believe

1   that you will find that cigarettes were already all over the

2   place, gum wasn't sold, but it was available.  So, what I

3   anticipate you will find and conclude is that there is no *quid*

4   *pro quo,* the bribery charges.  If the gum was already readily

5   available, if the cigarettes were already readily available,

6   why would an inmate say, "I will give you sex in exchange for

7   a few packs of bubble gum"?  That's ridiculous, and you are

8   not to check your common sense at the door when you come into

9   this case.  You are to use your common sense.

10          I will also say that in our case, when we get a

11   chance to present evidence, you will find that Mr. Dixon has

12   been applauded by his superiors at the Bureau of Prisons for

13   strict enforcement of the policies.  He's been applauded for

14   his handling of the confiscation of contraband.  He's been

15   applauded for being -- expressly applauded for being able to

16   distinguish between what is dangerous contraband and what is

17   harmless.  One note on his evaluation said, quote, he knows

18   the difference between nuisance and hard contraband, end

19   quote.  Another says, quote, he identifies and disposes of

20   items of contraband accordingly with policy, end quote.

21   That's the Bureau of Prisons, the government saying that.

22          The last comment by Captain Horton on his 2006

23   evaluation in June of this year, shortly before the arrest,

24   quote, with those other nice comments, quote, thanks for all

25   you do, exclamation point, end quote.

*Barry Henson - Direct*

1    His superiors knew he was doing a good job.  His

2  co-workers knew he was doing a good job.  He got a raise

3  shortly before he was arrested.

4    When we get our chance, in addition to this evidence,

5  a former guard will come in and testify that Mr. Dixon would

6  not and could not have been involved in the type of conduct

7  charged in the superseding indictment.  And at the end of this

8  trial, you will know Mr. Dixon a little bit better.  You will

9  know that he started with the prison in 1992.  He's been in

10  the United States Navy, honorably discharged.  Received a

11  national defense service medal and other commendations.  He

12  has been given raise after raise out at the institution.  So,

13  I think what you will find is that the government has gotten a

14  little bit carried away in this superseding indictment.

15    Mr. Dixon admits that he had sex with inmates, and

16  he's sorry, but he did not commit the offenses in the

17  superseding indictment.  And at the conclusion of this case,

18  we will ask you to find him not guilty.

19    THE COURT:  Mr. Sprowls, please call your first

20  witness.

21    MR. SPROWLS:  Barry Henson.

22    DEPUTY CLERK:  Please raise your right hand.

23    **BARRY ALAN HENSON, GOVERNMENT WITNESS, DULY SWORN**

24    DEPUTY CLERK:  Be seated.

25    Please, state your full name and spell your last

*Barry Henson - Direct*

1   name for the record.

2          THE WITNESS:  Barry Alan Henson, H-e-n-s-o-n.

3                       DIRECT EXAMINATION

4   BY MR. SPROWLS:

5   Q.  Mr. Henson, where do you work?

6   A.  Federal Correctional Institution, Tallahassee.

7   Q.  And how long have you been there?

8   A.  I've been here 12 years.

9   Q.  How long have you been with the Bureau of Prisons?

10  A.  Twenty-two years.

11  Q.  What other facilities have you served at?

12  A.  FCI Ashton, Kentucky; FCI Sheraton, Oregon; FCI

13  Manchester, Kentucky; MCC Miami.

14  Q.  "MCC" standing for?

15  A.  Metropolitan Correctional Center.

16  Q.  Is it common for folks in working their way up through

17  the ranks of the Bureau of Prisons to have to be transferred?

18  A.  Yes, sir.

19  Q.  What is your current position at FCI?

20  A.  I'm the trust fund supervisor.

21  Q.  What does a trust fund supervisor do?

22  A.  I supervise or oversee the laundry services for the

23  inmates, the deposit fund which deals with commissary, the

24  inmate telephone system, and the central warehouse.

25  Q.  Central warehouse meaning?

*Barry Henson - Direct*

71

1    A.   Receiving all of the goods for the institution.

2    Q.   All right.  Mr. Henson, you may have already mentioned it

3    in the form of a question, but -- what agency runs the

4    federal prison system?

5    A.   The Federal Bureau of Prisons.

6    Q.   Okay.  And is it part of a larger agency?

7    A.   The Department of Justice.

8    Q.   So, who is at the -- who is the head of the Bureau of

9    Prisons?  Is it a -- what's that person known as?

10   A.   The director of the Bureau of Prisons.

11   Q.   And is that director appointed by the President?

12   A.   Actually, appointed by the Attorney General.

13   Q.   Attorney General.  What sort of facilities does the

14   Bureau of Prisons operate?

15   A.   We have Federal Prison Camps for low-level inmates.

16   Q.   When you say "low level," can you briefly describe what a

17   camp is designed for?

18   A.   Usually, serving less time, low-level offenses, not a

19   huge threat to the general public.

20   Q.   Are these minimum security facilities?

21   A.   Yes.

22   Q.   Okay.  What else?

23   A.   The Federal Correctional Institutions, usually they run

24   from low-level inmates, medium-level inmates.  We have

25   Metropolitan Detention Centers, Federal Detention Centers.

*Barry Henson - Direct*

1  Q.  What is the purpose of a detention center?

2  A.  Usually housing inmates short-term pending trial, pending

3  sentencing, pending movement to another facility.

4  Q.  So, if an individual is, say, charged with a crime, but

5  they're not released on bond, where would they go?

6  A.  Typically, they'd be housed in a detention center of some

7  sort.

8  Q.  All right.  A person has gone to trial, been found guilty

9  or has pled guilty, they're in custody, what's the next thing

10  that happens to them?

11  A.  They would be designated to an institution to serve their

12  sentence.

13  Q.  And that would be their permanent home, so to speak?

14  A.  Yes.

15  Q.  And while they are waiting for that designation to occur,

16  where are they housed?

17  A.  They would be housed still at a detention facility or a

18  holding center.

19  Q.  Okay.  What would be a higher security area institutions?

20  A.  One of the penitentiaries, which we have now Atlanta was

21  a penitentiary; Lewisburg, Pennsylvania; Terre Haute,

22  Indiana; Florence, Colorado.  They are a bunch more secure,

23  threat level is a lot higher with those types of inmates.

24  Q.  What's the highest most secure federal institution?

25  A.  Florence, Colorado, has the maximum, which houses -- they

*Barry Henson - Direct*

1  don't have a large population, but they are the most severe.

2  Q.  Does the Bureau of Prisons operate hospitals?

3  A.  Yes, sir.  We have, Carswell in Texas is a medical

4  facility for females; Springfield is a male medical facility;

5  Lexington, male.

6  Q.  Can the Bureau of Prisons medically pretty much treat any

7  disorder, an inmate who develops any disorder, or would that

8  be grounds to be discharged?

9  A.  No.  We -- the Bureau, for the most part, can treat just

10  about anything within their facilities.

11  Q.  Okay.  And where -- you've mentioned some locations.

12  Would it be fair to say that the facilities that you just

13  described are located pretty much coast to coast?

14  A.  Yes, sir.

15  Q.  And do you know about how many facilities the Bureau of

16  Prisons operates?

17  A.  Just over a hundred, I think.

18  Q.  Okay.  Let's focus on the Federal Correctional

19  Institution here.

20      Is it a male or female institution?

21  A.  The FCI, the correctional side, is female.

22  Q.  And at one time during your tenure here was it male?

23  A.  Yes, sir.

24  Q.  And when did it switch over, approximately?  Mid '90s?

25  A.  Yeah, '96.  Somewhere in there.

*Barry Henson - Direct*

1   Q.   Do you know approximately how many inmates are out there?

2   A.   The females stay about 1250 to 1300.

3          MR. SPROWLS:   May I approach the witness, Judge?

4          THE COURT:   You may.

5   BY MR. SPROWLS:

6   Q.   Mr. Henson, I'm going to show you a series of items, just

7   ask you to look at them and tell me if you recognize what

8   they are.

9   A.   Yes, sir.

10  Q.   And what are these items?

11  A.   This is the layout of the FCI from an aerial view.

12  Q.   Okay.   You're looking at what's been marked for

13  identification as Government's Exhibit 1?

14  A.   Yes, sir.

15  Q.   And the --

16  A.   The photographs are various housing units, areas inside

17  the units, the grounds inside.

18  Q.   And these two exhibits?

19  A.   You have one of the housing units' floor plans.

20  Q.   If you would, speak in the mike, please.

21  A.   Floor plans for two different types of housing units.

22  Q.   Do you recognize Exhibit 14 as F unit?

23  A.   Yes.

24  Q.   And this would be similar to the C unit?

25  A.   Yes.

*Barry Henson - Direct*

1    Q.  And that's Exhibit 12.

2         MR. SPROWLS:  Your Honor, at this point we would

3    offer Exhibits 1 through 30.

4         THE COURT:  Government --

5         MR. FINDLEY:  No objection.

6         MR. HARPER:  No objection.

7         THE COURT:  Government's Exhibits 1 through 30 are

8    admitted into evidence.

9    (**GOVERNMENT EXHIBIT NOS. 1 THROUGH 30:**  Received in

10   evidence.)

11        THE COURT:  Members of the jury, as we start, let me

12   tell you a couple of things about these screens.

13        The screens, we check these every morning before we

14   start trial, but sometimes we turn them on during the trial

15   and they don't work.  If your screen doesn't come on, let me

16   know.  There will be times when a document may be shown to a

17   witness that is not shown to you on purpose, and I'll deal

18   with that, if it comes up.  But in the meanwhile, if it's not

19   on -- if your particular unit doesn't come on, wave your hand

20   at me.

21        These flat screens are now 5 or 6 years old.  It's

22   not the most current technology.  You will see it a little

23   better, depending on the angle you look at it.  So, if it's a

24   little blurry, you might try a little bit different angle.

25   You are sharing them between the two, so please do your best

*Barry Henson - Direct*

1   with them.

2   BY MR. SPROWLS:

3   Q.  Mr. Henson, just a quick walk-through, right here, lower

4   right, I assume that's -- is that properly labeled, that

5   administration?

6   A.  Yes, sir.  That's the main entrance.

7   Q.  Okay.  And one would enter right under the "I" and the

8   "N"?

9   A.  Yes.

10  Q.  And they would go through the security-screening area?

11  A.  Yes, sir.

12  Q.  Okay.  Walking down this direction, just walking towards

13  where?

14  A.  The bottom floor would be walking toward the warden's

15  office and her complex there.

16  Q.  Okay.  This passageway here, is that essentially a

17  walkway to this building?

18  A.  Yes, just a hallway.

19  Q.  Okay.  Offices off to the sides?

20  A.  Yes, sir.

21  Q.  Okay.  I guess "medical" is self-explanatory.

22      What is G unit?

23  A.  It's just another one of the housing units for inmates.

24  Q.  Is it one of the older housing units out there?

25  A.  Yes, sir.

*Barry Henson - Direct*

1    Q.   Okay.   Let's just go alphabetically here.   A unit, what

2    is that?

3    A.   A dormitory.

4    Q.   B, C and D units are all dormitories?

5    A.   Yes, sir.

6    Q.   Are these laid out identically, as far as how the beds

7    and rooms and whatnot are configured?

8    A.   No, sir.

9    Q.   All right.   Let's go over here to what's been labeled

10   "SHU."   What is that?

11   A.   That's the Special Housing Unit.

12   Q.   What's the purpose of the Special Housing Unit?

13   A.   It serves several purposes.   In the FCI, it houses -- it

14   could be pretrial holdover, female inmates.   It could be

15   inmates pending investigation internal.   They could be --

16   have been found guilty of rule infractions and are serving a

17   period of disciplinary segregation in that.

18   Q.   If somebody is in the Special Housing Unit, have they

19   lost their general privileges to roam the compound?

20   A.   Yes.   They are separated completely from the population.

21   Q.   They're no longer able to go out on the track or to the

22   weight area and recreate in the afternoon?

23   A.   No, sir.   They don't come out of that building.

24   Q.   That's part of the penalty for going to the Special

25   Housing Unit, is it not?

*Barry Henson - Direct*

1  A.   Yes, sir.

2  Q.   Okay.  F unit?

3  A.   That is one of the newer housing units.  It has the honor

4  inmates on one side and drug abuse program participants on

5  the other side.

6  Q.   How does one get to be on the honor side?  What do you

7  mean by that?

8  A.   The inmates that have been there long enough, have

9  maintained clear conduct, and they have requested to go

10 there.  And they go and they're awaiting orders, and their

11 terms come up, if they have maintained clear conduct, they

12 would be eligible.

13 Q.   Okay.  Food services, is that --

14 A.   Right.  That's the kitchen, the dining hall.

15 Q.   Who does the cooking out there?

16 A.   The inmates do.

17 Q.   Okay.  Unicor, can you explain what that building is all

18 about?

19 A.   Unicor now, it's the -- it used to be a furniture

20 factory.  Inmates made furniture for government agencies and

21 the like.  Now it's a call center, and they actually answer

22 phone calls from the outside, give information.  Like, if

23 you're calling for a 411 information on your cell phone, they

24 could be the ones you're talking to, giving you information

25 about certain area of the country, phone directory.

*Barry Henson - Direct*

1    Q.   So, I'm calling directory assistance, I might be speaking

2    to inmate so-and-so?

3    A.   You could be, yes, sir.

4    Q.   Generally speaking, for an inmate -- well, do most of or

5    all the inmates have a job?

6    A.   The majority of inmates have an assigned job, yes.

7    Q.   Now, the call center, does that work 24 hours?

8    A.   Yes, sir.

9    Q.   For someone that has a day job, generally, what are their

10   work hours?

11   A.   Normally, they -- work call in the morning is at 7:30,

12   and they work until approximately 3:15 and 3:30 in the

13   afternoon.

14   Q.   Shall we assume that they have an opportunity to eat

15   breakfast at the food services here?

16   A.   Yes, sir.  They eat before the 7:30 work call.

17   Q.   And then they report for work?

18   A.   Yes, sir.

19   Q.   Do they have to come back to their unit during the day?

20   A.   They don't have to.  Some do for various reasons.

21   Q.   Do they get a lunch break?

22   A.   Yes, sir.

23   Q.   And go back to work?

24   A.   Yes, sir.

25   Q.   And at the end of the day, do they go back to the unit?

*Barry Henson - Direct*

1  A.  Yes.

2  Q.  Now is there a count?  In other words, they count heads

3  or count bodies at this point?

4  A.  Yes.  At 4:00.

5  Q.  4:00, everybody has to be back at their unit, more or

6  less?

7  A.  Well, they have to be someplace where we can count them

8  all, yes.

9  Q.  All right.  Are they then let out to go to dinner?

10  A.  Yes, sir.

11  Q.  And are they let out all at once or staggered so --

12  A.  They stagger them usually by unit.  They call them one at

13  a time.

14  Q.  When does the inmate have to be back at their assigned

15  unit?

16  A.  Usually the compound remains open.  They close it

17  somewhere between 9:00 to 9:30, depending on the weather,

18  darkness, to prepare for the 10:00 count.

19  Q.  Is there any -- are they, more or less, unsupervised from

20  4:30 to 9:00 or 9:30?

21  A.  There's not necessarily direct supervision on any one

22  inmate, yes.

23  Q.  That was probably a poor question.  Assuming that they

24  are doing what is approved or allowed at the institution, is

25  that pretty much their free time?

*Barry Henson - Direct*

1   A.   Yes.

2   Q.   So, they have roughly four and a half hours of free time

3   a day?

4   A.   Yes.

5   Q.   Let's back up.  As far as the morning routine, are there

6   certain inmates that are let out of their dormitories or

7   their units early for medical reasons?

8   A.   Yes.  We have a pill line in the morning.  We have the

9   diabetic line, where they go to receive insulin.  Food

10  service workers go out early.  Several groups.

11  Q.   So, if I'm a diabetic and I need my daily medication, am

12  I allowed to leave my unit earlier than say one that does

13  not -- an inmate that does not?

14  A.   You could be allowed, yes, depending on the time of day.

15  Q.   Okay.  In the morning?

16  A.   Yes.

17  Q.   Now, the pill line, I guess that's the prescription line,

18  where do they go?

19  A.   To the hospital, the front of the medical unit.

20  Q.   Right there?

21  A.   Yes.

22  Q.   And they form a line and just go up to the window?

23  A.   Yes.

24  Q.   I'm going to show you what's been marked in evidence as

25  Government's 2.  What are we looking at there?

*Barry Henson - Direct*

```
 1    A.   That's the entrance to G unit.

 2    Q.   Okay.  Which is right over here?

 3    A.   Yes, sir.

 4    Q.   Okay.  Exhibit 3, what are we looking at there?

 5    A.   That's the officer's station in G unit.

 6    Q.   Is that, more or less, the standard size office for the

 7    unit officer?

 8    A.   Depends on the unit.  Some are a little bit bigger or

 9    smaller, but it's close.

10    Q.   Is it a place where a -- does it have a door?

11    A.   Yes, sir.

12    Q.   Do the inmates have unsupervised access to these offices?

13    A.   No, sir.

14    Q.   I show you what's been marked as Exhibit 4.  What are we

15    looking at?

16    A.   That's looking down one of the ranges.

17    Q.   When you say "a range," explain.

18    A.   It's like looking down a hallway.  The inmate rooms, in

19    this particular unit, are on the left; and then behind that

20    partition, there are more beds on the right.

21    Q.   So inside there would be bunks or something?

22    A.   Yes.  They have little cubicles inside each side of those

23    openings.

24    Q.   And that would be the next one down?

25    A.   Yes, sir.
```

*Barry Henson - Direct*

1   Q.  And so on?

2   A.  Yes, sir.

3   Q.  And usually a bunk bed?

4   A.  Yes.

5   Q.  Much privacy in these hallways, in these dorms?  Is there

6   much in the way of privacy?

7   A.  No, sir.

8   Q.  What are we looking at here?

9   A.  That's one of the rooms.

10  Q.  You see a sink here on the right.  Is that common for

11  most of the areas to have their own sink?

12  A.  Only in this unit.  F unit have their own sink and

13  toilet.

14  Q.  What are we looking at here?

15  A.  That's the stairwell that leads from floor to floor.

16  Q.  Is this also in G unit?

17  A.  Yes, sir.

18  Q.  On top of that, Exhibit 7, do you recognize what that is?

19  A.  That is the grill door in the back of the unit.

20  Q.  So, you have to go through this --

21  A.  Go down that hallway.

22  Q.  This door here, and what is this door there?

23  A.  Goes into a stairwell.

24  Q.  This stairwell that we just saw?

25  A.  Yes.

*Barry Henson - Direct*

1   Q.  For an inmate to get through that gated door, through the

2   door at the base of the stairwell and into the stairwell, can

3   they do that on their own, or do they need an officer to take

4   them?

5   A.  They would need an officer to get back there.

6   Q.  Because it's locked?

7   A.  Yes, sir.

8   Q.  All right.  What's this place?

9   A.  This is the compound looking out from G unit toward food

10  service.

11          THE COURT:  That was Government's 8.  As you go

12  through these, if you would, give us the number.

13          MR. SPROWLS:  Yes, sir.  I'm sorry.  I just had

14  Government's 8, and going back to Government's 1.

15  BY MR. SPROWLS:

16  Q.  We are kind of looking this way?

17  A.  Yes, sir.

18  Q.  Government 9, do you recognize that?

19  A.  Yes, sir.  That's the entrance to C unit.

20  Q.  Okay.  This again, just to keep up -- right here?

21  A.  Yes, sir.

22  Q.  Exhibit 10?

23  A.  That's the officer's station in C unit.

24  Q.  Looks a little bit larger than the one in G.

25  A.  Yes, sir.

*Barry Henson - Direct*

 1   Q.   Is this a newer dormitory, unit?

 2   A.   They are in the inside.   They were renovated recently

 3   since the females.

 4   Q.   Okay.   Let me show you Exhibit 11.   What are we looking

 5   at there?

 6   A.   This is a hallway in the back of the building, staff

 7   offices, conference room.

 8   Q.   Back to Exhibit 1, would that be this part right there?

 9   A.   Yes, sir.

10   Q.   Let me show you what is admitted as Government's

11   Exhibit 12.   Would this be a diagram of C unit?

12   A.   Yes, sir.

13   Q.   What is that area I just put the mark on?

14   A.   That's the main entrance into the unit.

15   Q.   Okay.   When you come in, this area in here, what would

16   that be?

17   A.   That was the officer's station.

18   Q.   So an inmate coming in would either go to that range or

19   that range; is that right?

20   A.   Yes.

21   Q.   And can these ranges be locked down?

22   A.   Yes, sir.

23   Q.   Now, describe, let's say, what's inside of one of these

24   things?

25   A.   Those are the individual living areas.

*Barry Henson - Direct*

1  Q.  What would be there?  If I were to go, what would you be

2  looking at?

3  A.  You would find the inmate, the bunk beds, inmate lockers,

4  the living area there.  It's a wall down the center of that,

5  so that's actually one on each side of the wall, is a living

6  area.

7  Q.  So, let me draw a little --

8  A.  Yes.

9  Q.  Right down there, is that an area for a bunk bed?

10  A.  Yes.

11  Q.  Housing two inmates?

12  A.  In this unit, no.  They would house four, I believe.

13  There are four.  Those cubes are bigger than the other units.

14  Q.  All right.  Do any of the walls or separations of the

15  cubicles, do any of them go to the ceiling?

16  A.  No, sir.

17  Q.  So one could stand back and look basically at the tops of

18  all of this sea of bunk beds --

19  A.  Yes.

20  Q.  -- and partitions?

21      Now, who would have access back there?

22  A.  All of the unit staff, counselors, case managers, and the

23  officer.

24  Q.  If a person was -- assuming this is C unit, if I am

25  currently serving as the A unit officer, do I have keys to go

*Barry Henson - Direct*

1    back here, or do you know?

2    A.   I don't know.  I can't tell you that.

3    Q.   Okay.  Let's go to what is admitted as Government's

4    Exhibit 13.  Do you recognize that?

5    A.   That's the entrance to F unit.

6    Q.   Okay.  And just positioning, F unit is right here, right?

7    A.   Yes, sir.

8    Q.   That's showing Exhibit 1.

9         What are we seeing here?  This is Exhibit 15.

10   A.   That's the entrance door into the office areas, the unit

11   staff and the housing unit officer's station.

12   Q.   Again, is this door locked?

13   A.   Normally, no.

14   Q.   Is it locked in the evening, when the inmates are

15   supposedly asleep?

16   A.   Normally, no.

17   Q.   All right.  You said -- let me ask it this way:

18        Do the inmates have access to this area, unsupervised

19   access?

20   A.   No.

21   Q.   They have to be with a correctional officer?

22   A.   Yes.

23   Q.   That one appears to be larger still in terms of the

24   office.

25   A.   They have a smaller cube inside that area.

*Barry Henson - Direct*

1   Q.   I'm showing you Exhibit 16.  Is that what you are

2   referring to?

3   A.   Yes, sir.

4   Q.   So this would actually be the officer's station?

5   A.   Yes.

6   Q.   Let me show you Exhibit 17.  What are we looking at

7   there?

8   A.   That's a small hallway with the unit staff office, where

9   the window is, the door back on the right, is a file room,

10  the door on the left is a restroom.

11  Q.   Okay.  I'm going to show you what is in as Exhibit 14.  I

12  think you already described that as a schematic of F unit,

13  what we're looking at.

14  A.   Yes, sir.

15  Q.   So we have seen the front door?

16  A.   Yes.

17  Q.   Seen the door to the offices?

18  A.   Yes, sir.

19  Q.   And where would the officer's station be within -- as we

20  go through that door?

21  A.   Right in front of it.

22  Q.   Right here?

23  A.   Yes.

24  Q.   And the hallway we were just looking at, is it looking

25  down this way, this hallway, Exhibit 17?

*Barry Henson - Direct*

1  A.  Let me see -- let me see the schematic.  I think you're

2  outside the --

3      No.  That's -- you're outside the range at that point, I

4  believe.

5  Q.  Okay.  Where I drew it was in the range?

6  A.  Yes, sir, on the housing unit side.

7  Q.  All right.  I'm going to show you Exhibit 18.  What's

8  that?

9  A.  That's the staff restroom.

10  Q.  In F unit?

11  A.  Yes, sir.

12  Q.  Number 19?

13  A.  Mechanical room in F unit.

14  Q.  If you would, where would the -- approximately, where

15  would the mechanical room or rooms be on this diagram?

16  A.  If you turn left, right inside the -- go down.  Right

17  there.

18  Q.  Right here, or thereabouts, or maybe a little sooner?

19  A.  Yeah, right there.

20  Q.  Okay.  Exhibit 20, what is it?

21  A.  That's the stairwell in F unit.

22  Q.  So, this is a two floor --

23  A.  Yes, sir.

24  Q.  Is that a stairwell that's locked?

25  A.  Yes.

*Barry Henson - Direct*

1   Q.   Exhibit 21, what are we looking at there?

2   A.   That's the drug abuse side.   Those are offices on the

3   top, and those are rooms around the bottom.

4   Q.   How many inmates are in, say, that room?

5   A.   Two inmates per.

6   Q.   Now, would this dormitory offer the most privacy for the

7   inmate?

8   A.   Yes, sir.

9   Q.   Because they actually have a door that they can close?

10  A.   Yes.

11  Q.   This stairwell going up, is that unlocked and accessible

12  to the inmates?

13  A.   Yes, sir.

14  Q.   Exhibit 22, what are we looking at?

15  A.   That's one of the inmates' rooms.

16  Q.   And the same, 23?

17  A.   Yes, sir.

18  Q.   Just a close-up shot.

19       Okay.   Where are we now?   This is Exhibit 24.

20  A.   Right outside F unit, the basketball court.

21  Q.   I'm going to show you Exhibit 1 again.   Are we looking

22  this way?

23  A.   Yes, sir.

24  Q.   Exhibit 25?

25  A.   Standing on the basketball court looking at the softball

*Barry Henson - Direct*

91

1    field.

2    Q.   Exhibit 26?

3    A.   That's the track.

4    Q.   Are we basically looking in this direction?

5    A.   Yes.

6    Q.   Exhibit 27?

7    A.   That's again the running track.

8    Q.   Back to Exhibit 1, are we kind of looking in this

9    direction?

10   A.   Yes, sir.

11   Q.   Exhibit 28, what are we looking at?

12   A.   That's the track looking back down to the basketball

13   court.

14   Q.   Is that F unit back there?

15   A.   Yes, sir.

16   Q.   What is -- what are all these things?

17   A.   That's called "the weight pile."

18   Q.   And let me go back to Exhibit 1.  We're looking at this?

19   A.   Yes, sir.

20   Q.   Is weightlifting a popular activity when they have their

21   free time?

22   A.   Surprisingly so, yes, sir.

23   Q.   And Exhibit 30, what are we looking at?

24   A.   That's standing over by the weight pile in back of F

25   unit.

*Barry Henson - Direct*

1    Q.   F unit being right there?

2    A.   Yes, sir.

3    Q.   You mentioned -- described what Federal Detention Centers

4    are temporary or places where people are temporarily housed.

5    Is there a federal -- I'm showing Exhibit 1 on the screen.

6        Is there a Federal Detention Center nearby to what we are

7    looking at right here, FCI?

8    A.   Yes, sir.

9    Q.   And where is it located relative to this diagram?

10   A.   If you went to where the facilities and food service --

11   Q.   Yes.

12   A.   -- and kind of came caddy-corner down from that, it's set

13   outside.

14   Q.   This way?

15   A.   Yes, sir.

16   Q.   Is it the facility that's actually physically closer to

17   Capital Circle?

18   A.   Yes.  It sits right on Capital Circle.

19   Q.   Now, while the -- is the FCI -- is the warden the warden

20   over the FCI and the FDC or just the FCI?

21   A.   Of both of them.

22   Q.   So two facilities, but they are considered --

23   A.   Yes, sir.

24   Q.   -- one --

25   A.   Right.

*Barry Henson - Direct*

1    Q.   -- in some degree?

2    A.   One location.

3    Q.   The staff, let's say, the correctional officer staff that

4    works the FCI, can they also work the FDC, Federal Detention

5    Center?

6    A.   Yes, sir.

7    Q.   Okay.  Question about some of the computer systems.  Are

8    you familiar with a system known as Sentry, S-e-n-t-r-y?

9    A.   Yes, sir.

10   Q.   Okay.  What does one see when one looks let's say at --

11   well, what is it designed for?

12   A.   Sentry is actually a database inmate history.  When

13   inmates come in, it logs places they've lived, programs they

14   participated in, completed, institutions they've been to.  It

15   maintains their legal residence.  Most of the database is

16   about inmates.

17   Q.   Does it show something as minute as unit and bed

18   assignments?

19   A.   Yes, sir.

20   Q.   And who has access to Sentry?

21   A.   All of the staff.

22   Q.   Is this a system that's just at FCI/FDC, or is it

23   nationwide?

24   A.   It's Bureau-wide, yes.

25   Q.   So, a correctional officer or a staff member here could

*Barry Henson - Direct*

94

1   check on an inmate that is at Carswell, Texas, or Danbury,

2   Connecticut?

3   A.  Yes, sir.

4   Q.  Female or male?

5   A.  Yes, sir.

6   Q.  Are you familiar with the system -- the call monitoring

7   system known as "Intruder?"

8   A.  Yes, sir.

9   Q.  I may have explained what it was in my question, but tell

10  the jury what it is.

11  A.  It's a computer system that tracks and records all inmate

12  calls that are placed on a bank of inmate telephones that are

13  throughout the institution.

14  Q.  All right.  Are these calls retrievable?

15  A.  Yes, sir.

16  Q.  Now, are inmates provided a notice about the possibility

17  that their calls are being monitored?

18  A.  Yes.  They are notified when they arrive during their

19  initial intake, and then there are signs up around the phones

20  to let them know that they are being monitored.

21  Q.  Are there certain phones, specific phones that inmates

22  can use and not others?

23  A.  Yes.

24  Q.  Now, how does -- who has access to the recorded calls

25  inside Intruder?

*Barry Henson - Direct*

95

1   A.   All of the staff have access to listen to either live or

2   recorded calls.

3   Q.   "Staff" meaning, including correctional officers?

4   A.   Yes, sir.

5   Q.   Can they listen to a conversation that's taking place

6   right now, I mean, contemporaneous?

7   A.   Yes.

8   Q.   How about a recorded call?

9   A.   Yes.

10   Q.   Where can they listen to these calls?

11   A.   Their computer station, whether it be your office, the

12   officer's station, my office.  Anyplace that has a computer

13   that's hooked up to our system has the capability.

14   Q.   Can you elect to listen to a particular phone?

15   A.   Yes.

16   Q.   Can you elect to listen to calls made on a certain date

17   from a certain phone?

18   A.   Yes, sir.

19   Q.   How about calls by a certain inmate?

20   A.   You could search that and find it, yes, sir.

21   Q.   Is there any record kept of who is monitoring, who

22   listens to whose calls?

23   A.   Yes, sir.

24   Q.   So, if I were to want to listen to Inmate Jane Smith's

25   call, there would be a record that Alan Sprowls listened to

*Barry Henson - Direct*

1  it on October 30th at whatever it is?

2  A.  Yes, sir.

3  Q.  How is that record made?  How does it know it's me?

4  A.  We all have our own personal login IDs and our personal

5  passwords, and it logs that in.

6       MR. DAVIS:  Your Honor, may I approach the witness?

7       THE COURT:  You may.

8       MR. DAVIS:  May I have a moment to confer?

9       THE COURT:  You may.

10  BY MR. SPROWLS:

11  Q.  Okay.  Mr. Henson, I just wanted to make sure I had the

12  right documents.  I'm going to show you what has been marked

13  for identification as Government's Exhibit 31, 32 and 33(a).

14       MR. SPROWLS:  Your Honor, I don't believe 33(a) is on

15  the exhibit list.  It's a recent add-on.  I'll have it

16  identified.

17  BY MR. SPROWLS:

18  Q.  First of all, Mr. Henson, do you recognize those fours

19  items?

20  A.  Yes, sir.

21  Q.  Going to Item Number 33, do you recognize it?

22  A.  That's a retrieved roster of phone calls that have been

23  monitored.

24  Q.  Okay.  That is an Intruder record?

25  A.  Yes, sir.

*Barry Henson - Direct*

1          MR. SPROWLS:  Just a sample, we would move 33.

2          THE COURT:  Government's --

3          MR. FINDLEY:  No objections.

4          THE COURT:  Government's 33 is admitted.

5      (**GOVERNMENT EXHIBIT NO. 33:**  Received in evidence.)

6   BY MR. SPROWLS:

7   Q.  Let me move on to something I think you said earlier that

8   you were in charge of, and that was the deposit fund or the

9   trust accounts.

10  A.  Yes, sir.

11  Q.  All right.  Tell the jury what sort of accounts are

12  maintained for the benefit of the inmates.

13  A.  The money is held in the treasury, and then we maintain

14  an accounting system.  We hold the money in trust in the

15  institution, and allow inmates to draw off of their accounts.

16  Q.  How do they draw on their account?

17  A.  They buy telephone time; they can have money sent out,

18  home, savings account, and they can shop in the commissary.

19  Q.  Okay.  Let me back up a little bit.  An inmate arrives at

20  the institution, do they automatically -- let's say, they

21  have no money.

22  A.  Okay.

23  Q.  Do they have an inmate trust account or an inmate

24  account?

25  A.  We will create an account, but there won't be anything in

*Barry Henson - Direct*

1    it.

2    Q.   All right.   Get on the phone and call my parents, "Can

3    you send 50 bucks, because I want to buy something in the

4    commissary?"

5    A.   Yes.

6    Q.   What happens next?

7    A.   We have a central processing center in Des Moines, Iowa.

8    They send the money there.   They actually process it in, and

9    then we read it on our accounting system that the money has

10   been deposited, and we make it available to the inmates to

11   spend.

12   Q.   Okay.   Inmates working at the call center, are they doing

13   this for free?

14   A.   No, sir.

15   Q.   Do they get paid?

16   A.   Yes.

17   Q.   Where does the pay go?

18   A.   It's the same type of -- we're allotted so much money at

19   the institution to pay the inmates.   When pay is posted, that

20   money is moved back over into the treasury account from the

21   institution account and made available to the inmates to

22   spend.

23   Q.   So, if an inmate wants to buy something in the

24   commissary, and they have enough money in their account, does

25   it work sort of like a debit card type of thing?

*Barry Henson - Direct*

1  A.  Similar, only there's not necessarily a card involved,

2  but they tell us what they want, and we scan it out just like

3  a regular grocery store, convenience store; and then they

4  sign the receipt as having received the merchandise, and we

5  deduct it from the account.

6  Q.  Okay.  Now, what items are -- if we were standing in the

7  commissary, what would we be looking at?

8  A.  The typical convenience-store-type items -- potato chips,

9  sodas, packaged meats, cookies, ice cream.

10  Q.  Who or what determines what items are there?

11  A.  There's a committee that meets.  Ultimately, the warden

12  decides what's sold there.

13  Q.  You say canned meats are sold?

14  A.  Packaged meats.

15  Q.  Packaged meats?

16  A.  Yes.

17  Q.  Now, if an inmate obtains an item of packaged meat from

18  the commissary, that's legal?

19  A.  Yes.

20  Q.  Now, I'll just take a brand, Oscar Mayer brand, okay?  If

21  you come to work one morning and in your briefcase you have

22  an identical container of Oscar Mayer packaged meat, can you

23  give that to the inmate?

24  A.  No, sir.

25  Q.  It's the same thing.

*Barry Henson - Direct*

1    A.   No, sir.

2    Q.   Why not?

3    A.   I'm not authorized to give them anything.   The warden

4    authorizes to buy it out of the commissary.   Any other method

5    is contraband.

6              MR. HARPER:   Your Honor, I object to this testimony

7    as being based on the pretrial motion.

8              THE COURT:   Overruled.

9    BY MR. SPROWLS:

10   Q.   Mr. Henson, if you would, you have a microphone there,

11   but, if you would, keep your voice up a little bit here.

12   A.   Okay.

13   Q.   Is the distinction how the inmate came into possession of

14   it?

15   A.   Yes, sir.

16   Q.   Now, just a few questions about cigarettes.   Are

17   cigarettes currently available in the commissary out there?

18   A.   No, sir.

19   Q.   Were they at some point?

20   A.   Yes, sir.

21   Q.   Approximately when did that change?

22   A.   This past April, I believe.

23   Q.   April of '06?

24   A.   I believe April 1st was the last day.

25   Q.   So, someone who is used to enjoying their cigarettes

1  during the course of a day in March, after this change, what

2  do they do?

3  A.  They're going to quit smoking.

4  Q.  Mr. Henson, a few questions about what inmates get when

5  they arrive.

6      Someone newly designated to -- they've never been in the

7  Bureau of Prisons before, or they are just beginning their

8  sentence and they show up on your door steps, in custody, of

9  course, what are among the items that they are given, if any?

10 A.  We give them bed clothes, the standard work uniform --

11 pants, shirt, shoes, socks, underwear -- temporary toiletry

12 items -- small toothbrush, toothpaste, shampoo, soap,

13 towels -- all of the necessities so you can maintain

14 sanitation.

15 Q.  All right.  The inmate who has just what you described is

16 visited by mother, father, brother, friend, who brought a

17 nice pair of Reebok's for them to wear, shoes.  Can the

18 inmate accept that?

19 A.  No, sir.

20 Q.  Why not?

21 A.  Again, it's contraband.

22 Q.  Why is it contraband?

23 A.  It wasn't authorized for them to receive it or receive it

24 in that manner.

25 Q.  Okay.  Let me change the question a little bit.

*Barry Henson - Direct*

1    You now have an inmate that just transferred from another

2  female institution, that female arrived with basically a

3  knapsack or a duffle bag of her stuff.

4  A.  Yes.

5  Q.  Well, what happens right now, when you have an inmate

6  arrive from an institution that approved, that okayed

7  smoking, still okayed smoking, and they arrived with a couple

8  of cartons of cigarettes?

9  A.  We would take them away from them and mail them home, or

10  wherever the inmate wanted them to send them, or destroy

11  them.

12  Q.  So, they really can't hold those older items or the items

13  that are approved at another institution aren't grandfathered

14  in, until they consume them?

15  A.  No.  The warden still decides.

16  Q.  Are you familiar with halfway houses?

17  A.  Yes, sir.

18  Q.  What are halfway houses?

19  A.  They are short-term reentry facilities.  Inmates who are

20  getting ready to be released to go home, they go to the

21  halfway house that have some restrictions initially.  It

22  gives them the opportunity to get work, establish their

23  community ties again, normally in the same community they're

24  from, or close.

25  Q.  A person is from Atlanta, they get let out of

*Barry Henson - Direct*

1   FCI-Tallahassee, they may go to a halfway house in Atlanta?

2   A.   Somewhere close.

3   Q.   If that inmate who's at that halfway house commits a

4   violation, do you know if it's possible that they get put

5   back into prison?

6   A.   Yes, sir.

7   Q.   Have you had inmates that got released to halfway houses

8   and they show back up later?

9   A.   Yes, sir.

10   Q.   Okay.   The other items in front of you, let's address

11   those real quickly.

12       You see what's been marked for identification as

13   Government's Exhibit 31?

14   A.   Yes, sir.

15   Q.   Do you recognize what that is?

16   A.   Yes, sir.

17   Q.   What is it?

18   A.   It's the quarterly roster, correctional staff.

19   Q.   Explain what a quarterly roster, correctional staff is.

20   A.   They put together a roster that usually lasts one

21   quarter, 3 months, where the officers are intended to work or

22   where they have asked to work for that period of time.

23   Q.   So, each quarter the staff -- say I want to work FDC

24   control room, that's my first bid or first selection.

25   A.   Yes, sir.

*Barry Henson - Direct*

1  Q.  Does that mean that I'm going to get it?

2  A.  No, sir.

3  Q.  How is it -- how are the assignments made?

4  A.  Basically, seniority plays a big part now in what

5  assignment you get, where you are in the order of things.

6  Q.  So, new staff often work the worst shifts?

7  A.  Not necessarily.  There's staff that like -- everybody

8  likes their own.  Some people like working mornings, some

9  people like working evenings.

10  Q.  What are the shifts as far as the hours?

11  A.  Normally, the normal 8-to-4, 4-to-12, 12-to-8 shifts.

12  Q.  People working midnight to 8:00, are they paid the same

13  as the folks working 8:00 in the morning to 4:00 in the

14  afternoon?

15  A.  No, sir.  They get a premium pay for working outside of

16  the hours of 6 p.m. to 6 a.m.  They draw premium pay.

17  Q.  So, any shift that goes into that period of time, you get

18  paid more?

19  A.  Yes.

20  Q.  How much more is the pay, if you know?

21  A.  It's 10-percent, I believe.

22  Q.  So, the quarterly assignment roster is composed after

23  everybody has put their selection in, or at least wish list,

24  and then the assignments are actually posted on this

25  document?

*Barry Henson - Direct*

1   A.  Yes, sir.

2   Q.  Based upon seniority?

3   A.  Yes.

4   Q.  All right.  And Exhibit 32, do you recognize it?

5   A.  That's the daily roster report.

6   Q.  What does it report?

7   A.  Where the staff worked on a particular day.

8   Q.  Well, isn't that already said on the quarterly report?

9   A.  Well, you know, if you're on annual leave, for example,

10  it shows that you were on leave and somebody filled your

11  spot.  In one way it would show staff who were working and

12  changed shift, for example, they needed to -- somebody had

13  business and traded with somebody else, called in sick, and

14  who covered your post while you were out.

15  Q.  Do you know if those changes, say, last -- "Will you take

16  my shift, I'll take yours, we'll change locations," if you're

17  working at a place I want to work, is that change always

18  noted?

19  A.  I don't think it's always put down, no.

20  Q.  But it's required?

21  A.  It's supposed to be.

22  Q.  The better practice is to note it?

23  A.  Yes.

24  Q.  But it's not always?

25  A.  No.

*Barry Henson - Direct*

1   Q.  And 33(a), what is that?

2   A.  That's one of the Sentry printouts, one of the profile

3   forms.

4   Q.  Okay.  And you have already explained that?

5   A.  Yes, sir.

6   Q.  Okay.  And these are genuine records from your

7   institution?

8   A.  They appear to be, yes, sir.

9   Q.  And these have been pulled basically as examples; is that

10  right?

11  A.  Yes, sir.

12        MR. SPROWLS:  Your Honor, we would move the remaining

13  documents, 31, 32 and 33(a).

14        MR. FINDLEY:  No objection.

15        MR. HARPER:  No objection.

16        THE COURT:  Government's 31, 32 and 33(a) are

17  admitted.

18    **(GOVERNMENT EXHIBIT NOS. 31, 32 AND 33(a):**  Received in

19  evidence.)

20  BY MR. SPROWLS:

21  Q.  Lastly, just a few questions with regard to Mr. Dixon and

22  Mr. Moore.

23        Do you know Gregory Dixon?

24  A.  Yes, I know Mr. Dixon.

25  Q.  Okay.  What was his title at the Federal Correctional

*Barry Henson - Direct*

1    Institution?

2    A.  Correctional officer.

3    Q.  Is he a Bureau of Prisons' employee?

4    A.  Yes.

5    Q.  Do you know if he had particular assignments; such as, a

6    shift lieutenant or a compound officer or unit officer; or

7    did that vary according to the quarterly assignments?

8    A.  Right.

9    Q.  Same questions for Mr. Moore.  Do you know him?

10   A.  Yes, sir.

11   Q.  You looked to your left.  Is that Mr. Moore seated over

12   there?

13   A.  Yes.

14   Q.  Mr. Dixon behind me?

15   A.  Yes, sir.

16   Q.  And what is Mr. Moore's title?

17   A.  Correctional officer.

18   Q.  I'm sorry?

19   A.  Correctional officer.

20   Q.  And is he likewise an employee of the Bureau of Prisons?

21   A.  Yes, sir.

22           MR. SPROWLS:  May I have one moment?

23           THE COURT:  You may.

24           MR. SPROWLS:  Okay.  A few questions here.

25   BY MR. SPROWLS:

*Barry Henson - Direct*

1    Q.   The shift from 8 a.m. to 4 p.m. in the afternoon, does

2    that have a name to it, a term?

3    A.   Day watch.

4    Q.   Okay.  Four in the afternoon to midnight, does that have

5    a term?

6    A.   Evening watch.

7    Q.   Midnight to 8 a.m.?

8    A.   Morning watch.

9    Q.   An officer who is assigned on a quarterly basis to be the

10   A unit, let's say, A unit officer, are there more than one A

11   unit -- let me drop the A -- are there more than one unit

12   officers on duty during the same shift?

13   A.   No, sir.

14   Q.   So, these are single-officer shifts?

15   A.   Yes, sir.

16   Q.   So going back, if I'm an A unit officer for day watch,

17   it's just me?

18   A.   You would be the only officer, yes.

19   Q.   So, you have one officer in each unit on each shift.  Do

20   you have -- on any given shift is there an officer who is

21   assigned to the compound, to the outside area, not the units?

22   A.   Yes, sir.

23   Q.   Is there more than one -- are they known as the compound

24   officer?

25   A.   There could be.  There could be one, two, three.

*Barry Henson - Cross/Harper*

1    Q.   What --

2    A.   Depends on the number of staff on the shift.  Normally,

3    there would always be one, but there could be more if you had

4    extras on the shift.

5    Q.   Okay.  How many correctional officers and staff -- and

6    don't answer if this would compromise any sort of security

7    out there, but -- how many are on staff during the morning

8    watch, midnight to 8?

9    A.   Probably one per unit, and a lieutenant and one compound

10   officer.  So that would -- in the housing units in the FCI,

11   it could be nine.

12   Q.   Nine officers for 1300 inmates?

13   A.   In FCI, yes, sir, it could be nine, ten.

14   Q.   So the administrative staff, assuming they are not

15   working late, and the hierarchy are generally home or off

16   shift?

17   A.   Yes, sir.

18        MR. SPROWLS:  That's all I have of Mr. Henson at this

19   time, Judge.

20        THE COURT:  Cross-examine?

21        MR. HARPER:  Yes, sir, Your Honor.  May it please the

22   court.

23                    CROSS-EXAMINATION

24   BY MR. HARPER:

25   Q.   Mr. Henson, this facility, FCI-Tallahassee, is all

*Barry Henson - Cross/Harper*

 1   females, I understand; is that right?

 2   A.   In the FCI part, yes, sir.

 3   Q.   Okay.  And that's the one that has 1300 inmates?

 4   A.   Yes, about that.

 5   Q.   Now, the range of security there for those inmates, I

 6   understood you to say runs from low to medium; is that right?

 7   A.   Could be, yes.

 8   Q.   All right.  And then the Special Housing Unit is a higher

 9   designation security; is that right, sir?

10   A.   No.  Our inmates are all -- if they are in the FCI, are

11   normally low-security females.  Inmates inside the Special

12   Housing Unit could be higher security level, depending on the

13   reason they are there.

14   Q.   All right.  So, as far as the inmates that you have that

15   are regularly designated to FCI, then, they are all low or

16   most of them are low-security designated?

17   A.   They would all carry a low-security designation to be

18   there.

19   Q.   And is that based on the nature of the crime?

20   A.   Quite a bit.  There's a lot of criteria.  Nature of the

21   crime, past history, some priors, you know.

22   Q.   Escape risk?

23   A.   Could be.

24   Q.   Mental health?

25   A.   Yes, sir.

1    Q.   Physical health, I guess.

2    A.   Absolutely.

3    Q.   All right.  If a woman is cooperating, does she cooperate

4    and get rewarded by being in a low-security facility?

5    A.   Actually, all of our female facilities are low-security

6    facilities.

7    Q.   So, when you were talking about the prisons, the federal

8    prisons, those are all male facilities, aren't they?

9    A.   Yes, sir.  We have -- we do have one high-security female

10   area.

11   Q.   And that's where?

12   A.   In Carswell, Texas.

13   Q.   But the one in Colorado and Lewisburg and -- where was

14   the other place you mentioned?

15   A.   Terre Haute, Indiana.

16   Q.   Yes, sir.

17   A.   Yes.

18   Q.   Those are male facilities?

19   A.   Yes, sir.

20   Q.   Okay.  And so you have low facilities or you have camps

21   for women, primarily, except for the one high security?

22   A.   Yes, sir.

23   Q.   And how many of these FCIs are there?

24   A.   I don't know the count for the FCIs really.  We have

25   about 110-ish facilities.  The majority of those will all be

*Barry Henson - Cross/Harper*

1  FCIs or camps.

2  Q.  All right.  And then the range of crimes for the women

3  that are housed in your facility vary from what -- murder,

4  down to fraud?

5  A.  Could be, yes, sir.

6  Q.  Do you know that to be so?

7  A.  I think we've had some that murder was in their crime.  I

8  don't know the exact conviction terminology, but there was

9  murder involved; yes, sir.

10  Q.  And all of these women are convicted felons, or they

11  wouldn't be there; is that right?

12  A.  Yes, sir.

13  Q.  And most of them multiple convictions; is that right?

14  A.  Quite possible, yes, sir.

15  Q.  These are not probationers who made a mistake and tested

16  positive, are they?

17  A.  No, sir.

18  Q.  These are bad women?

19  A.  Well, you know, if you're on probation and test positive,

20  and they revoke your probation, we would get you, too, so --

21  Q.  So it could be that?

22  A.  Yes, could be.

23  Q.  But, by and large, they are in there for serious crimes;

24  is that right?

25  A.  Well, yes, sir.

*Barry Henson - Cross/Harper*

1    Q.   Major drug offenses?

2    A.   Drug offenses, not necessarily major, but some part in a

3    drug offense, yes, sir.

4    Q.   Some serious quantity to qualify as a federal drug

5    offense as opposed to a state offense, right?

6    A.   Not necessarily, but --

7    Q.   So there are people out there on state sentences?

8    A.   No, sir, but --

9    Q.   They are all for federal violations; is that right?

10   A.   Yes, sir.

11   Q.   Now, the facility you were going through there, you were

12   talking about a track, a weight pile.  Is there -- there is a

13   recreational area?

14   A.   Yes, sir.

15   Q.   Softball?

16   A.   Yes.

17   Q.   Is there a beauty parlor?

18   A.   It's actually cosmetology.  It's a VT program.

19   Q.   All right.  And a sauna?

20   A.   No, sir.

21   Q.   No sauna, no whirlpool?

22   A.   No, sir.

23   Q.   You don't go that far out there with that facility?

24   A.   No, sir.

25   Q.   You said there is no direct supervision for four to four

1   and a half hour period.  What time of the day was that,

2   please?

3   A.  When they come out after the 4:00 count.  So, depending

4   on what time their unit comes out to eat dinner, they are not

5   directly supervised, but the compound remains open and the

6   inmates have the freedom to move around the compound.

7   Q.  All 1300?

8   A.  Well, Special Housing Unit inmates, plus we have inmates

9   who would work during those hours as well.  So, they would be

10  on the job.

11  Q.  So, how many would be out on the compound during that

12  time period, 1200?

13  A.  No, there wouldn't be that many.  But you could probably

14  have, you know, a thousand inmates, if they were all out.

15  Q.  And nine officers?

16  A.  No, sir.  That's the nine officers are after midnight.

17  Q.  How many officers are out there during that time?

18  A.  We have quite a few staff during that time.  Unit staff

19  are still available.

20  Q.  I'm talking about correctional officers, not staff.

21  A.  You could -- normally, one per unit.  Then, however many

22  compound officers you have that night, the lieutenant,

23  perimeter officers.

24  Q.  But when you -- but how many it is, 9, 10, 12?

25  A.  No.  As a rule, you would have more staff there prior to

*Barry Henson - Cross/Harper*

1    the midnight than you would after 12:00, when inmates are

2    locked away.

3    Q.  What range are we talking about?

4    A.  I just don't know.  If I could venture a guess, maybe you

5    could have 15.

6    Q.  Okay.  These inmates, what I was getting around to, this

7    is largely their free time, and they are not directly

8    supervised anyway, regardless of how many are there, right?

9    A.  Yes.

10   Q.  Okay.  And they are free to, I guess, mingle with each

11   other; is that right?

12   A.  Yes, sir, in the recreational area and the inner

13   compound.

14   Q.  And they are free to talk to each other?

15   A.  Yes, sir.

16   Q.  And they are free to engage in other activities which may

17   or may not be permitted, but they have the opportunity to do

18   that, right?

19   A.  I suppose so, yes, sir.

20   Q.  And certainly they do take advantage and talk?

21   A.  Yes, sir.

22   Q.  These are things that you've seen with your own eyes and

23   you know as an experienced officer happen?

24   A.  What?

25   Q.  These things about them being out there on the compound,

*Barry Henson - Cross/Harper*

1  talking and being together, you have seen?

2  A.  Yes.

3  Q.  You know it happens from your own experience, and you

4  have seen it happen?

5  A.  Yes, sir.

6  Q.  Do correctional officers have keys to the unit offices?

7  A.  Depends on the housing unit.  The newer units, they do

8  not have keys to get into the unit staff offices.

9  Q.  Okay.  So, an officer in F -- that's one of the newer

10 units, isn't it?

11 A.  Yes.

12 Q.  -- he -- or I guess you have females officers, also?

13 A.  Yes.

14 Q.  Okay.  He or she would not, as the unit officer, would

15 not have a key to every single office in that unit.  Is that

16 what I'm understanding?

17 A.  Yes.

18 Q.  Okay.  So that area back there, where you looked at

19 Government's Exhibit 12, is not an area -- let's see -- no.

20 Government's Exhibits 16 and 17, where it was the hallway

21 unit to the staff offices, the unit officer wouldn't

22 necessarily have a key to all of those doors?

23 A.  No.

24 Q.  Now, you were talking about the Intruder system,

25 Mr. Henson, and indicated that the ability to

*Barry Henson - Cross/Harper*

1    contemporaneously monitor an inmate's phone call is there; is

2    that right?

3    A.  Yes, sir.

4    Q.  But there are practical problems with that, aren't there?

5    A.  Such as?

6    Q.  Such as a line of women waiting to use a telephone?

7    A.  I'm not --

8    Q.  If you want to listen to an inmate -- I mean, when

9    inmates make a phone call, don't they line up to make a phone

10   call or get in a line?

11   A.  Sometimes.  But, you know, they kind of keep track of

12   whose next themselves, so --

13   Q.  Okay.  But while it may not be a line visibly, but there

14   is a waiting line, so to speak.

15   A.  Right.

16   Q.  Is that right; is that what you are telling us?

17   A.  Yes.

18   Q.  Okay, sir.  They don't sign a list, like you do when you

19   go in a restaurant, do they?

20   A.  No.

21   Q.  Okay.  So, as far as watching and waiting for an inmate,

22   how would an officer know which inmate is next and which one

23   is third and which one is going to come up in an hour and

24   which one is going to come up next?

25   A.  You're right.  If you were trying to listen to live phone

1    calls, you would have to know who is on the phone call.  But

2    if you pull up and just look at live phone calls, it runs --

3    as the inmate change, so does the call numbers and who is on

4    the phone.

5    Q.  So, you would have to check on the Intruder system in and

6    out, in and out, in and out to see who is on?

7    A.  If you're looking for live calls.

8    Q.  So, you would have a record of that, if that happened,

9    right?

10   A.  Yes, sir.

11          THE COURT:  Mr. Harper, tell me how much more you

12   anticipate?

13          MR. HARPER:  I don't want to keep everybody and be

14   the bad guy, Your Honor, but I'm right close to finishing.

15          THE COURT:  All right.  One thing I tell jurors at

16   every trial, who is asking the questions near the end of the

17   trial day will flip back and forth, it will be one side or the

18   other, and I am the one that decides how long we run.  So,

19   don't hold it against the lawyers, hold it against me.

20   BY MR. HARPER:

21   Q.  Mr. Henson, the commissary items you indicated were like

22   convenience-store items.

23   A.  Yes.

24   Q.  Okay.  Is that referred to as, when it comes in not

25   through the authorized system, is that referred to as "soft

*Barry Henson - Cross/Harper*

1  contraband"?

2  A.  That would be "nuisance contraband," yes.

3  Q.  "Nuisance contraband"?

4  A.  Yes, sir.

5  Q.  Okay.  And is it referred to as "soft contraband," too?

6  A.  Yeah, depending on who you talk to, yes, sir.

7  Q.  And what is considered "hard contraband"?

8  A.  Typically, weapons, escape paraphernalia -- anything that

9  could do damage to property or people.

10  Q.  All right.  Things that cause a direct threat to the

11  security of the institution are called "hard contraband"?

12  A.  Yes, sir.

13  Q.  And the things that are other than that are "soft

14  contraband" or "nuisance contraband"; is that right?

15  A.  Yes, sir.

16  Q.  Would fingernail polish and lipstick and eyebrow pencils

17  and cosmetic items like that be considered "soft contraband"?

18  A.  Yes, sir.  If you found it in an inmate's possession, you

19  would treat it that way, yes.

20  Q.  If it didn't come through the regular channels, it would

21  be treated that way?

22  A.  Yes.

23  Q.  Okay.  Who decides whether it comes through the regular

24  channels or not?

25  A.  When items are confiscated, the inmate is first given the

1  opportunity to prove ownership; and, if they prove that they

2  bought it or brought it with them, then we determine -- if

3  it's contraband at that point, we would send it home, or they

4  could opt to destroy it, or --

5  Q.  So, there could be such contraband that is sort of thrown

6  away and nobody cares about?

7  A.  Well, we allow the inmate the opportunity to dispose of

8  it; but, if we find it, and -- but it's documented that it

9  was disposed of.

10  Q.  I understand.  What kind of items fit that category that

11  are just disposed of, documented and deposed of?

12  A.  You know, it could be an extra sweatshirt.  It could be

13  an extra pair of socks.  It could be you have too much --

14  you're allow to have ten lipsticks and you have 15, and then

15  five would be contraband.  But that would be, if the inmate

16  proves ownership, that would be normally their decision, if

17  we were going to dispose of it, if they proved ownership.

18  Q.  Are there any items, like chewing gum or something like

19  that, that is permitted or tolerated, but doesn't come

20  through regular channels?

21  A.  No, sir.  That's -- chewing gum would be contraband no

22  matter where it comes from.

23  Q.  Even if -- it doesn't come through the commissary, does

24  it?

25  A.  No.

1   Q.   Okay.   The last thing I have, Mr. Henson, when you were

2   saying changes are not always put in, what were you talking

3   about, when officers change jobs?

4   A.   Yeah.   That's -- you know, the lieutenant maintains that

5   daily roster, which is, you know, our accountability system

6   for the staff and where they are, making sure everybody is

7   there.   Sometimes, you know, if they are busy, they know the

8   staff is there, but they may not make a note of it that they

9   changed locations, but they know that they are at the

10  institution.

11  Q.   Is it the lieutenant's responsibility to make that entry,

12  or is it the individual officer's responsibility?

13  A.   The lieutenant makes the -- on the roster, the daily

14  roster, the lieutenant makes that notation.

15  Q.   And does he do that through the computer system?

16  A.   Yes, sir.   Now it's --

17  Q.   Sir?

18  A.   It's computerized now.

19  Q.   When was it first computerized?

20  A.   It hasn't been very long.   I think a few months; but, I

21  mean, they did it on a computer, but it wasn't a computer

22  program.   It was just like a --

23  Q.   A data-entry-type management?

24  A.   Yes.

25  Q.   Could the officer make a change and change it on the

*Barry Henson - Cross/Harper*

1    computer system without the lieutenant being involved in the

2    change?

3    A.  He should not be able to.

4    Q.  All right.

5            MR. HARPER:  Nothing further.  Thank you.

6            THE COURT:  Mr. Findley, I'm going to break unless

7    you --

8            MR. FINDLEY:  I would imagine I would take a few

9    minutes, at least.

10           THE COURT:  Okay.  Let's break for the afternoon.

11           Members of the jury, recall my instructions.  Don't

12   talk about the case with anybody.  Don't let anybody talk

13   about it in your presence.  If you didn't check in over the

14   lunch break at home or at the office and you do over night,

15   the same instruction applies -- don't get into a discussion

16   even what kind of case it is or which case it is.  You can

17   tell somebody who inquires that you will talk with them about

18   it when the case is over, or respond however you choose, but

19   not by talking about the case at all.

20           Have a safe and pleasant trip home.  Leave your pad

21   right there on your chair.  We will start at 8:30 in the

22   morning.  I don't tell jurors to be here at 8:00 or 8:15, or

23   any specific time ahead of time, but we will plan to get you

24   into the courtroom right promptly at 8:30.  So, if you will,

25   make sure you're in that jury room before 8:30.  Some great

1    American, I think it was Yogi Barra, once said, to be on time,

2    you have to arrive early.  So, I don't tell you how much

3    early, but make sure you're back there before 8:30, and we try

4    to respect your time and get you in the courtroom right at

5    8:30.

6            Jury out, please.

7        (The jury exited the courtroom at 4:21 p.m.)

8            You may be seated.

9            Mr. Henson, if you would, make sure you are sitting

10   on the witness stand by 8:30 in the morning.

11           For the lawyers, is there anything you need from me

12   before we conclude?

13           MR. FINDLEY:  No, Your Honor.

14           THE COURT:  I would ask the lawyers always to be here

15   at least 15 minutes --

16           MR. FINDLEY:  Your Honor, we understand from a note

17   from Assistant U.S. Attorney Davis that there is a witness

18   sitting in the back of the courtroom who needs to be

19   instructed.  Mr. Jackson, Derrick Jackson.

20           MR. DAVIS:  I believe he's left, Your Honor.  He was

21   individually placed on our list as an unindicted

22   co-conspirator.

23           MR. FINDLEY:  And he came in during the trial.

24           MR. DAVIS:  Apparently, I didn't recognize him.

25           MR. FINDLEY:  It's a little late now, but --

1          THE COURT:  I don't think there has been a word said

2     that I would worry about a witness having heard.  This is all

3     very general background.  I don't think anybody said anything

4     about the facts of the case.

5          MR. FINDLEY:  I agree with that.  I would agree with

6     that, but I just wanted him to be instructed -- Mr. Jackson to

7     be instructed so that he knows not to do it again.

8          THE COURT:  Not to come back in, yes.  If you will

9     make sure that Mr. Jackson knows he can't come back in the

10    courtroom.

11         Mr. Harper, do you want anything else done about

12    that?

13         MR. HARPER:  No, sir.

14         THE COURT:  All right.  Thank you.  I would ask that

15    the attorneys be here at least 15 minutes early every day so

16    that, if there is an issue, I can come in and deal with it.  I

17    really do want to get the jury in at 8:30.  You probably all

18    heard my speech about this before.  It's not that I'm trying

19    to be overly compulsive about running on time.  It is,

20    however, that I think that, if we respect the jurors' time,

21    then they appreciate that, they sit up a little straighter,

22    lean a little more forward, and pay a little better attention.

23    The quality of the trial is better, which is good for all

24    concerned.  And so I don't want to make a habit of getting

25    them in 5 minutes late.  I'd rather be able to bring them in

1     the room by 8:30.

2            That means, if you have an issue with me, let the

3     courtroom deputy know ahead of time.  I'll come in the

4     courtroom, we'll get it dealt with, and we'll have the jury in

5     the room at 8:30.

6            We will be in recess until 8:30 tomorrow morning.

7         (The proceedings adjourned at 4:24 p.m.)

8                         *  *  *  *  *  *  *  *  *

9

10

11    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.  Any
12    redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
13    transcript.

14

15

16    s/Judy A. Nolton                         04/16/2007
      Judy A. Nolton, RPR                         Date
17    Official U.S. Court Reporter

18

19

20

21

22

23

24

25

INDEX

                                                                PAGE

ATTORNEY CONFERENCE                                             2
JURY DULY SWORN                                                39
OPENING STATEMENT BY MR. SPROWLS                               47
OPENING STATEMENT BY MR. HARPER                                53
OPENING STATEMENT BY MR. FINDLEY                               58


WITNESS FOR THE GOVERNMENT:                                    PAGE


**BARRY ALAN HENSON**
        DIRECT EXAMINATION BY MR. SPROWLS                      70
        CROSS-EXAMINATION BY MR. HARPER                       109


                    *   *   *   *   *   *   *   *


                       GOVERNMENT'S EXHIBITS


NO.:      DESCRIPTION                                          PAGE

  1       Aerial picture of FCI-Tallahassee                   75
  2       Photograph - G unit outside                         75
  3       Photograph - G unit officer station                 75
  4       Photograph - G unit range                           75
  5       Photograph - G unit cubicle                         75
  6       Photograph - G unit stairwell                       75
  7       Photograph - G unit stairwell door and gates        75
  8       Photograph - Compound                               75
  9       Photograph - C unit front door                      75
 10       Photograph - C unit officer station                 75
 11       Photograph - C unit hallway, conference room        75
 12       Photograph - Diagram of C unit                      75
 13       Photograph - F unit front door                      75
 14       Photograph - Diagram of F unit                      75
 15       Photograph - F unit entry of officer station        75
 16       Photograph - F unit officer station                 75
 17       Photograph - F unit bathroom area                   75
 18       Photograph - F unit bathroom                        75
 19       Photograph - F unit mechanical room                 75

```
 1   20      Photograph - F unit stairwell            75
     21      Photograph - F unit drug wing            75
 2   22      Photograph - F unit room, drug wing      75
     23      Photograph - F unit room close-up        75
 3   24      Photograph - F unit outside              75
     25      Photograph - Ball field                  75
 4   26      Photograph - Trash can near track        75
     27      Photograph - Track                       75
 5   28      Photograph - Overlooking ball field, F unit  75
     29      Photograph - Weight pile                 75
 6   30      Photograph - Ball field from weight pile 75
     33      Call monitoring record                   97
 7   31      Quarterly assignment roster              106
     32      Daily activity report                    106
 8   33(a)   Inmate assignment history report, Sentry 106

 9

10                  *   *   *   *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```