## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

*UNITED STATES OF AMERICA,*          )
                                     ) *Case No.:  4:06cr36/RH*
          *Plaintiff,*               )
                                     ) *Tallahassee, Florida*
*vs.*                                ) *October 31, 2006*
                                     ) *8:30 A.M.*
*GREGORY DIXON and ALAN MOORE,*      )
                                     )
          *Defendants.*              )
_____      )

### VOLUME II
### (Pages 128 through 396)

### TRANSCRIPT OF SECOND DAY OF TRIAL
### BEFORE THE HONORABLE ROBERT L. HINKLE,
### CHIEF UNITED STATES DISTRICT JUDGE, and a jury

<u>APPEARANCES</u>:

For the Plaintiff:        Gregory R. Miller
                          United States Attorney
                          By:  ROBERT O. DAVIS
                               P. ALAN SPROWLS
                               Assistant U.S. Attorneys
                          111 North Adams Street
                          Tallahassee, Florida 32301


For the Defendant,        Messer, Caparello & Self, P.A.
Gregory Dixon:            By:  THOMAS MARSHALL FINDLEY
                               SEAN SHAW
                               Attorneys at Law
                          215 South Monroe Street
                          Suite 701
                          Tallahassee, Florida   32301


For the Defendant,        Harper & Harper Law Firm, P.A.
Alan Moore:               By:  ROBERT AUGUSTUS HARPER
                               ROBERT AUGUSTUS HARPER, III
                               Attorneys at Law
                          325 West Park Avenue
                          Tallahassee, Florida   32301



1          <u>P R O C E E D I N G S</u>

2      (Call to Order of the Court.)

3      (Defendants present; jury not present.)

4          THE COURT:  Good morning.  Please be seated.

5          Are we ready for the jury?

6          MR. SPROWLS:  Yes, sir.

7          THE COURT:  Jury in, please.

8          Somebody brought back two decisions that one side or

9      the other had submitted.  Thank you.  I'll read those.

10         MR. DAVIS:  Your Honor, I gave copies to defense

11     counsel.  Defense counsel has identified to me the one case

12     they thought was relevant and on point, which I already had a

13     copy of, so --

14         We're just exchanging cases in anticipation of

15     everyone being able to talk about it.

16         THE COURT:  All right.  There is also a general

17     discussion of this in the supplement, the 2006 supplement to

18     Volume 22 of Wright and Miller -- actually, I guess it's

19     Wright and Graham, on criminal procedure in Section 5181.

20         MR. SHAW:  Do you have <u>United States v. Myers</u>, Your

21     Honor?  I just want to make sure that's one that you have.

22         THE COURT:  No.  I have <u>Borders</u> and <u>Faus</u>.  Do you

23     have the citation?

24         MR. SHAW:  I do.  It's 550 F.2d 1036.

25         THE COURT:  All right.  Thank you.

*Barry Henson - Cross/Findley*

1     (The jury entered the courtroom at 8:34 a.m.)

2          All right.  You may be seated.

3          Good morning, ladies and gentlemen.

4          THE JURY:  Good morning.

5          THE COURT:  Welcome back.

6          Mr. Henson, you are still under oath.

7          Mr. Findley, you may proceed.

8          MR. FINDLEY:  Thank you, Your Honor.

9     (*BARRY ALAN HENSON*, resumed the witness stand

10   and testified further as follows:)

11                       CROSS-EXAMINATION

12   BY MR. FINDLEY:

13   Q.  Good morning, Mr. Henson.  My name is Tom Findley.  I

14   represent Mr. Gregory Dixon in this case.

15       I believe yesterday afternoon you testified that there

16   was basically one guard per housing unit; is that correct?

17   A.  Normally, yes.

18   Q.  Normally.  Sometimes is there one guard for two housing

19   units?

20   A.  Sometimes during the day-watch hours, there would be one

21   covering two housing units.

22   Q.  Now, in one unit housing, such as B or C, for example,

23   there are as many as 120 inmates per range; is that correct?

24   A.  Yes, I believe so.

25   Q.  So, 240 total in one unit?

Barry Henson - Cross/Findley

1    A.   Yes.

2    Q.   And one guard?

3    A.   Yes.

4    Q.   Okay.   Now, Mr. Henson, you made several statements

5    yesterday in an attempt to define contraband.   Do you recall

6    that?

7    A.   Yes, sir.

8    Q.   You're not a lawyer?

9    A.   No, sir.

10   Q.   All right.   So, the definitions you gave where your

11   understanding of what contraband is, not the legal

12   definitions; is that correct?

13   A.   That's what the Bureau policy is.

14   Q.   Bureau policy.   Okay.   Now, from time to time do you and

15   others at the FCI receive program statements from the Bureau

16   of Prisons?

17   A.   Yes, sir.

18   Q.   And those define or make an effort to define contraband;

19   is that correct?

20   A.   Yes.

21   Q.   All right.   And it's also correct that there is at least

22   one federal regulation that defines contraband; is that

23   correct?

24   A.   I believe so, yes.

25           MR. FINDLEY:   May I approach, Your Honor?

Barry Henson - Cross/Findley

```
 1          THE COURT:  You may.
 2  BY MR. FINDLEY:
 3  Q.  I'll show you what we will have marked, this is Program
 4  Statement 3420.09.
 5      Does that appear to be a true and correct copy of a
 6  program statement from the Bureau of Prisons?
 7  A.  Yes, sir.
 8  Q.  And is that one that you recognize to be one that
 9  discusses the term "contraband"?
10  A.  I believe so, yes.
11  Q.  All right.
12          MR. FINDLEY:  At this time I would move for admission
13  of that document, Your Honor.
14          MR. SPROWLS:  May we see it please?
15          THE COURT:  Please show it to Mr. Sprowls.
16          MR. FINDLEY:  Oh, I'm sorry.  3420.09.
17          MR. SPROWLS:  It's the same one we have.  We have no
18  objection.
19          THE COURT:  All right.  Defendant's 1?
20          MR. FINDLEY:  Defendant's 1.
21          THE COURT:  Defendant's 1 is admitted.
22      (DEFENDANT DIXON EXHIBIT NO. 1:  Received in evidence.)
23          MR. HARPER:  Your Honor, on exhibits are we going to
24  distinguish between the two defendants?
25          MR. FINDLEY:  We can call it Defendant Dixon 1.
```

1          THE COURT:  We can do that, if you'd rather have them

2     marked separately.  We can also run one string of numbers.

3          MR. HARPER:  We may be editing as we go.  I was

4     thinking it might be easier to --

5          THE COURT:  So you've got yours in numbers, okay.

6     Then this is Defendant Dixon Exhibit 1.

7     BY MR. FINDLEY:

8     Q.  All right.  Mr. Henson, directing your attention, please,

9     to page 10 of the document before you on the screen, is there

10    a definition of "contraband" there?

11    A.  Yes, sir.

12          MR. FINDLEY:  Where is the focus on this?

13          THE COURT:  The zoom in and out is --

14          MR. FINDLEY:  Zoom.

15    BY MR. FINDLEY:

16    Q.  All right.  There is a paragraph 12 there on page 10.  Do

17    you see that?

18    A.  Yes, sir.

19    Q.  All right.  In the second sentence of that, it defines

20    the contraband.  It says, "Pursuant to 28 CFR 500.1(h)."  Is

21    that the regulation that you recognize as defining

22    contraband?

23    A.  I believe so.

24    Q.  Okay.  It says, "Contraband is defined as any material

25    that can reasonably be expected to cause physical injury or

*Barry Henson - Cross/Findley*

134

1   adversely affect the security, safety or good order of the

2   institution."  And then it says, "Contraband includes but is

3   not limited to the following."  Do you see that list?

4   A.  Yes, sir.

5   Q.  Is it correct that cigars are not on that list?

6   A.  They are not on this list.

7   Q.  And cigarettes are not on the list; is that correct?

8   A.  That's correct.

9   Q.  All right.  I would like you now to direct your attention

10  to page 16, Attachment A, of this document.  There is a --

11  this is a section on possible sanctions for staff, if they

12  violate particular provisions; is that correct?

13  A.  Yes, sir.

14  Q.  Take your time to look at it, if you need to.

15      I draw your attention to paragraph 49, "Trafficking

16  Contraband."  Is it correct that for a first offense that one

17  of the possible sanctions is just an official reprimand?

18  A.  Yes, sir.

19  Q.  And that depends on the -- in the explanation of this, it

20  depends on the nature of the article and the degree of

21  involvement are primary considerations in determining the

22  severity of the penalty; is that correct?

23  A.  Yes, sir.

24  Q.  So, there is some discretion that's involved in this; is

25  that correct?

1   A.   It appears so, yes, sir.

2          MR. FINDLEY:  May I approach?

3          THE COURT:  You may.

4   BY MR. FINDLEY:

5   Q.   I would also like to show you, Mr. Henson, the CFR that

6   we've been discussing, 500.1(h).  Is that the regulation that

7   we've been discussing?

8   A.   I believe so, yes.

9   Q.   Okay.  So, this is in the Code of Federal Regulations,

10  correct?

11  A.   Yes, sir.

12         MR. FINDLEY:  Your Honor, at this time I'd like to

13  move for the introduction of Defendant's Exhibit 2, which is

14  Code of Federal Regulations, 28 CFR 500.1.

15         MR. SPROWLS:  No objection, Judge.

16         THE COURT:  Defendant Dixon Exhibit 2 is admitted.

17    (**DEFENDANT DIXON EXHIBIT NO. 2**:  Received in evidence.)

18  BY MR. FINDLEY:

19  Q.   Mr. Henson, can you read the definition of contraband out

20  of the Code of Federal Regulations?

21  A.   Do you want me to read it out loud?

22  Q.   Yes, please.

23  A.   "Contraband is material prohibited by law, or by

24  regulation, or material which can reasonably be expected to

25  cause physical injury or adversely affect the security,

*Barry Henson - Cross/Findley*

1  safety, or good order of the institution."

2  Q.  All right.  And this is a Bureau of Prisons regulations?

3  A.  Yes, sir.

4  Q.  It doesn't have a list, does it?

5  A.  No, sir.

6        MR. FINDLEY:  May I approach?

7        THE COURT:  You may.

8  BY MR. FINDLEY:

9  Q.  Mr. Henson, I would like to show you another Program

10  Statement, this one is 5580.07 dated December 28, 2005.  Do

11  you recognize that as a program statement of the Bureau of

12  Prisons?

13  A.  Yes, sir.

14        MR. FINDLEY:  Your Honor, I would move for the

15  admission of Defendant's Exhibit Number 3.

16        MR. SPROWLS:  No objection.

17        THE COURT:  Defendant Dixon Exhibit 3 is admitted.

18        (**DEFENDANT DIXON EXHIBIT NO. 3:**  Received in evidence.)

19  BY MR. FINDLEY:

20  Q.  Now, Mr. Henson, the first thing I would like to do is

21  ask you, is it correct that inmates can possess property as

22  long as it's approved by staff?

23  A.  It has to be approved by the warden.

24  Q.  It's approved by staff; isn't that correct?

25  A.  Well, the warden approves what's authorized inside of the

*Barry Henson - Cross/Findley*

137

1    facility.  I don't have that authority, nor does any staff

2    member.  Ultimately, it's the warden that makes the final

3    decision.

4    Q.  That's how it happens at your institution?

5    A.  Yes, sir.

6    Q.  Okay.  I would like to show you the first page of this

7    particular document, first paragraph, first sentence.  If you

8    could, read that into the record after, "Purpose and Scope:

9    It is the policy -- " and then go ahead and read that into

10   the record?

11   A.  "It is the policy of the Bureau of Prisons that an inmate

12   may possess ordinarily only that property which the inmate is

13   authorized to retain upon admission to the institution, which

14   is issued while the inmate is in custody, which the inmate

15   purchases in the institution commissary, or which is approved

16   by staff to be mailed to or otherwise received by an inmate."

17   Q.  All right.  So, in other words, an inmate may possess

18   property which is approved by staff to be received by an

19   inmate; is that correct -- according to this Bureau of

20   Prisons' program statement?

21   A.  Yes, sir, that's what it says.

22   Q.  And "staff" is defined to include any Bureau of Prisons

23   employee; is that correct?

24   A.  I believe so, yes, sir.

25   Q.  And that's right in the regulation, 500.1.  Just to

*Barry Henson - Cross/Findley*

1    clarify, 500.1(b) says, "Staff means any employee of the

2    Bureau of Prisons or Federal Prison Industries, Inc."

3         Mr. Dixon and Mr. Moore are employees of the Bureau of

4    Prisons, are they not?

5    A.  Yes, sir.

6    Q.  Could you turn to page 11, please, of Program Statement

7    5580.07?  It says, "Staff shall consider as nuisance

8    contraband any item, other than hard contraband, which has

9    never been authorized or which may be, or which previously

10   has been authorized for possession by an inmate, but whose

11   possession is prohibited when it presents a threat to

12   security, or its condition or excessive quantities of it

13   present a health, fire or housekeeping hazard."

14        So, is it correct that under the definition, it's not

15   even nuisance contraband, unless it presents a threat to

16   security or is so excessive that it presents a health, fire

17   or housekeeping hazard; is that correct?

18   A.  Yes, sir.

19   Q.  And you would agree that these definitions from the

20   Bureau of Prison control over your personal belief as to what

21   contraband is?

22   A.  Yes, sir.

23   Q.  Did you attend a Unicor pizza party at the

24   FCI-Tallahassee?

25   A.  No, sir.

1           MR. SPROWLS:  Objection.

2   BY MR. FINDLEY:

3   Q.  You did not?

4           MR. SPROWLS:  Objection.

5           THE COURT:  Overruled.

6           MR. FINDLEY:  I have no further questions, if he

7   didn't, then.

8           THE COURT:  Redirect?

9                       REDIRECT EXAMINATION

10  BY MR. SPROWLS:

11  Q.  Mr. Henson, with regard to the last couple of questions,

12  is the warden limited to what he or she will permit in his or

13  her institution?  Is the warden limited by these program

14  statements, or can the warden make further restrictions --

15          MR. FINDLEY:  Your Honor, I would object.

16  Q.  -- as he or she sees fit?

17          MR. FINDLEY:  Your Honor, I would object to the

18  extent it calls for a legal conclusion.

19          THE COURT:  You can ask his understanding.

20  Overruled.

21          THE WITNESS:  Can you repeat it, please?

22  BY MR. SPROWLS:

23  Q.  Certainly, you were just asked to review some program

24  statements.

25  A.  Yes.

1   Q.  If you know -- let's back up for a few questions before I

2   ask you what I just went through.

3       Do you know what the purpose of program statements are?

4   A.  They outline our operating procedures.

5   Q.  Is the warden bound by that, or can the warden impose

6   more restrictive conditions at --

7           MR. FINDLEY:  Same objection.  He didn't ask his

8   understanding this time.

9           THE COURT:  Sustained.  You need to ask in terms of

10  what he understands.

11  BY MR. SPROWLS:

12  Q.  You know where we're going.  What's your understanding of

13  what the warden is -- are they bound by those program

14  statements, or do you understand that the warden can impose

15  more restrictive conditions at their institution?

16  A.  The warden can impose, it is my understanding, more

17  restrictive conditions.

18  Q.  So, it's your understanding that, if the warden has

19  determined that chewing gum is nuisance, but it's also a

20  problem in many other ways, that he or she can restrict those

21  from being on the impound?

22          MR. FINDLEY:  Your Honor, I would object and ask to

23  approach side-bar.

24          THE COURT:  All right.  I'll see you at the bench.

25      (Conference held at side-bar.)

*Barry Henson - Redirect*

1          MR. FINDLEY:  Your Honor, we object.  This is exactly

2   why we filed the motion to dismiss the superseding indictment,

3   because there was not a definition of contraband.  They

4   responded and gave us the programs that we introduced, and now

5   he's referring to other matters that haven't been disclosed in

6   discovery.

7          THE COURT:  I'll come back to that in just a minute,

8   but, first, why does it matter what's defined as contraband?

9          MR. FINDLEY:  Because it's relevant to the bribery

10  case.  If it's not contraband, then he's not in derogation of

11  his official duties.

12         THE COURT:  Suppose it's perfectly legal to have

13  cigarettes and the officer says, "I'll give you cigarettes if

14  you give me sex," do you think that's okay?

15         MR. FINDLEY:  I don't think it's bribery, because

16  he's not doing what they've alleged in this indictment -- that

17  is, not enforcing prison policy.

18         THE COURT:  Somebody comes to me and says, "I will

19  give you $10,000 if you rule in my favor," cash is perfectly

20  legal, it's not contraband.  It's not bribery?

21         MR. FINDLEY:  But the offense that's alleged is they

22  did not perform their official duty in exchange for sexual

23  favors.

24         THE COURT:  If they're giving cigarettes in exchange

25  for sex, it's bribery, and it doesn't matter whether it's

1   contraband.

2          Next question:  That definition in the program

3   statement says anything that interferes with the good order of

4   the institution.  If the warden issues an order that says you

5   can't have gum at my institution, and the inmate ignores that

6   order, doesn't that interfere with the good order of the

7   institution?

8          MR. FINDLEY:  Well, I would dispute that, and I would

9   also say --

10          THE COURT:  Well --

11          MR. FINDLEY:  I haven't mentioned, the conspiracy to

12   deprive the public of the right to intangible honest services,

13   if it's an honest service.

14          THE COURT:  It doesn't have to be relevant to every

15   charge.  It has to be relevant to any charge.

16          MR. FINDLEY:  I think they're adding surplusage, as

17   Mr. Harper maintained in his initial motion, and they're

18   trying to allege offenses that didn't occur, such as the

19   introduction of contraband, and this is getting out of

20   control.

21          THE COURT:  You can try to make this case about the

22   definition of contraband, but it's not.  And I'm not going to

23   make my ruling accepting your theory that the case is only

24   about the definition of contraband.

25          MR. FINDLEY:  That's not my only defense, Your Honor.

*Barry Henson - Redirect*

 1    I understand what you're saying.

 2         THE COURT:  I know it's not, but I'm not going to

 3    make rulings as if gum has to be contraband in order to

 4    matter.

 5         MR. FINDLEY:  And that's not what I was requesting.

 6    What I was requesting, in response to his motion to dismiss

 7    the superseding indictment, they provided a document, and the

 8    court denied the motion and said in the order, I presume that

 9    everything they are going to allege is that, to define

10    contraband for purposes of the statute is going to be provided

11    in discovery, and it's not.

12         THE COURT:  The definition of contraband is a very

13    minor sideshow, but I understand the objection.  I overrule

14    it.

15         MR. FINDLEY:  Okay.

16         THE COURT:  I can explain more why I think his

17    understanding is admissible, not very much.  We are a long way

18    from the meat of the coconut both in the cross-examination and

19    the redirect, but I think the question is proper.  So, I

20    overrule the objection.

21         MR. HARPER:  My objection, and I join with his

22    objection of Mr. Findley's, has been along the lines of the

23    pretrial motions, where this is, as it pertains to the honest

24    services as part of a floating definition and an enlargement

25    of the indictment, which I object to.

*Barry Henson - Redirect*

```
 1              THE COURT:  We can talk more at the break or over the

 2    lunch.

 3              MR. HARPER:  I just want to preserve it at this

 4    point.

 5              THE COURT:  That's correct.

 6        (End of side-bar conference.)

 7    BY MR. SPROWLS:

 8    Q.  All right.  Mr. Henson, I think my question was:

 9        From your understanding, the warden is not restricted by

10    these program statements as to what he or she can restrict in

11    the institution?

12    A.  Yes, sir.

13              MR. SPROWLS:  May I approach the witness, Judge?

14              THE COURT:  You may.

15    BY MR. SPROWLS:

16    Q.  I show you two items marked as 33(b) and 33(c) -- 33(b)

17    being an excerpt from Title 18 of the U.S. Code; 33(c) being

18    an excerpt of Title 28 of the Code of Federal Regulations.

19        Are you familiar with what is defined there, particularly

20    in Title 28, under the definition -- maybe on the second

21    page -- of prohibited object or contraband?

22    A.  Somewhat, yes, sir.

23    Q.  Okay.  And the CFR --

24    A.  Yes, sir.

25    Q.  -- are you familiar with what it defines as contraband or
```

1   prohibited object?

2   A.  Yes, sir.

3          MR. SPROWLS:  Your Honor, we move both exhibits.

4          MR. FINDLEY:  No objection.  One being the statute,

5   one being the regulation?

6          MR. SPROWLS:  One being the statute and one being the

7   Code of Federal Regulation.

8          MR. HARPER:  Objection as previously noted.

9          THE COURT:  Government's Exhibits 33(b) and (c) are

10  admitted.

11     (**GOVERNMENT EXHIBIT NOS. 33(b) AND 33(c):**  Received in

12  evidence.)

13         MR. SPROWLS:  May I approach again, Judge?

14         THE COURT:  You may.

15         MR. HARPER:  Your Honor, along these lines, I will be

16  requesting a limiting instruction at some appropriate point.

17         THE COURT:  All right.

18  BY MR. SPROWLS:

19  Q.  Mr. Henson, you were asked to read from a program

20  statement.  I'm going to ask you to read a portion of

21  Exhibit 33(b), which is part of the United States Code,

22  particularly, under definition Section D, I'm pointing it out

23  here, D, what is defined as prohibited object, would you read

24  paragraph F?

25  A.  "Any other object that threatens the order of discipline

*Barry Henson - Redirect*

1    or security of the prison, or the life, health, or safety of

2    an individual."

3    Q.   And who determines what could fit those terms?

4    A.   I'm not sure I understand.

5    Q.   Who determines what could impede or hinder the good order

6    and safety of the institution?

7    A.   The warden.

8    Q.   Okay.  I'm going to ask you to look at the Code of

9    Federal Regulations.  Do you see that that is a definition of

10   what is prohibited or what is contraband?

11              MR. FINDLEY:  I object, Your Honor.

12              MR. SPROWLS:  May I approach again, Judge?

13              THE COURT:  Overruled.

14              MR. SPROWLS:  I'll rephrase the question.

15   BY MR. SPROWLS:

16   Q.   I'm sorry.  Would you read what that provision is

17   beginning with the bold print?

18   A.   "Consent of Warden or Superintendent Required:

19        "The introduction or attempt to introduce into or upon

20   the grounds of any federal penal or correctional institution,

21   or the taking or attempt to take, rescind therefrom, anything

22   whatsoever without the knowledge and consent of the warden or

23   the superintendent of such federal or penal correctional

24   institution is prohibited."

25   Q.   Anything whatsoever; isn't that correct?

*Barry Henson - Redirect*

1  A.  Yes.

2  Q.  The warden has to approve everything that comes on that

3  piece of ground?

4  A.  Yes.

5  Q.  Can the correctional officers do it?  At the Federal

6  Correctional Institution of Tallahassee, can correctional

7  officers approve the introduction of an object without the

8  approval of the warden?

9  A.  No, sir.

10  Q.  Okay.  Some questions quickly from yesterday.

11      You mentioned that Carswell had a high security or is a

12  high-security institution.  Just to be clear, does Carswell

13  have several different sections to it?

14  A.  Yes, sir.  There's a --

15  Q.  Is one of them a medical facility?

16  A.  There's a medical facility and a correctional

17  institution.

18  Q.  That's basically low level?

19  A.  Yes, sir.

20  Q.  And there's a portion of it that is at the high level?

21  A.  Yes, sir.

22  Q.  When the inmates are on the telephone, do they have to --

23  to make a call, do the inmates have to punch in or identify

24  who they are?

25  A.  Yes.  They are issued a PIN number that they have to

*Barry Henson - Redirect*

1    enter to identify them and to access their account.

2    Q.  This is before -- this is part of the procedure of making

3    the phone call?

4    A.  Yes, sir.

5    Q.  And can they be identified through the Intruder system by

6    looking for that number?

7    A.  Yes, sir.

8    Q.  And if inmates are found to possess contraband or a

9    prohibited object, may they face a penalty?

10   A.  Yes.

11   Q.  What type of penalty?

12   A.  Our institution discipline process could be loss of

13   privilege, it could be disciplinary segregation, it could be

14   transfer, depending on the circumstances.

15           MR.  SPROWLS:  May I approach the clerk, Judge?

16           THE COURT:  You may.

17   BY MR. SPROWLS:

18   Q.  All right, sir.  Yesterday you were asked some questions

19   with regard to accessing certain areas.  I'm going to show

20   you what's -- okay.

21       Yesterday you identified Exhibit Number 9, which is the

22   front of C unit.

23   A.  Yes, sir.

24   Q.  Okay.  You also identified what's depicted in

25   Government's Exhibit 11, which is the back portion of C unit.

*Barry Henson - Redirect*

1  Do you recall that?

2  A.  Yes, sir.

3  Q.  Okay.  Now, this is Exhibit Number 12, I'm showing you

4  what is a schematic of C unit.

5      The correctional officer that serves this unit would be

6  located in the office; isn't that correct?

7  A.  Yes, sir.

8  Q.  Well, they need not be, but that's a location where they

9  could be found --

10  A.  Yes, sir.

11  Q.  -- if they are not roaming the area.

12      This is C unit.  If the unit officer for A unit,

13  different unit, comes over here, can the officer from A unit

14  get back into here with keys that he or she has?  If you

15  don't know the answer to that, say so.

16  A.  I'm really not sure it's the same key.  I believe it is,

17  but I'm not sure.

18  Q.  That's fine.

19          MR. SPROWLS:  That's all I have.  Thank you.

20          THE COURT:  Thank you, Mr. Henson.  You may step

21  down.

22          Mr. Sprowls, please call your next witness.

23          MR. SPROWLS:  Warden Rivera.

24          DEPUTY CLERK:  Please raise your right hand.

25          *MILDRED RIVERA, GOVERNMENT WITNESS, DULY SWORN*

*Mildred Rivera - Direct*

1           DEPUTY CLERK:  Be seated.

2           Please, state your full name and spell your last

3   name for the record.

4           THE WITNESS:  My name is Mildred Rivera, R-i-v-e-r-a.

5           DEPUTY CLERK:  Thank you.

6                   DIRECT EXAMINATION

7   BY MR. SPROWLS:

8   Q.  Ms. Rivera, would you tell the jury where you work?

9   A.  Good morning.  I work at the Federal Correctional

10  Institution and the Federal Detention Center here in

11  Tallahassee.

12  Q.  And your position at the FCI/FDC?

13  A.  I am the warden of that facility, both facilities.

14  Q.  Briefly, can you tell the jury what the primary duties of

15  the warden are?

16  A.  I am responsible for the care and the custody of the

17  prisoners, which are wards at our facilities.  I am

18  responsible for about approximately 1500 inmates at the FDC,

19  which is the Federal Detention Center, also the Federal

20  Correctional Institution; also am responsible for over a

21  little bit over 320 employees.

22  Q.  You may want to scoot up a little bit to that microphone

23  so we can all hear easily.

24      Ma'am, how long have you been with the Federal Bureau of

25  Prisons?

1    A.   I have been with the Bureau of Prisons for

2    approximately -- a little bit over 19 years.

3    Q.   What experience -- what positions have you worked within

4    the Bureau of Prisons?

5    A.   In 19 and a half years, I have worked at six different

6    facilities.  I started off as a unit secretary and worked my

7    way up through personnel, human resources, personnel

8    assistant, personnel management specialist, human resource

9    manager.  Worked up through positions of greater

10   responsibilities, such as the executive assistant, the

11   associate warden, and the warden.

12   Q.   And where did you serve as the associate warden?

13   A.   I served as the associate warden at two different

14   facilities, at a Federal Detention -- a large Federal

15   Detention Center and at a Butner complex, which consisted of

16   three different institutions.

17   Q.   For a person to rise through the ranks, if you will, does

18   one need to be willing to be transferred quite a bit?

19   A.   Oh, yes.  We have to transfer quite a bit; and, as you

20   progress up in your areas of responsibility, you have to --

21   you have to be extremely mobile.  And, as I indicated before,

22   this is my sixth facility that I've worked at.

23   Q.   All right.  Warden, I would like to pose some questions

24   concerning correctional officers and inmates.

25        Do you know if the Bureau of Prisons' personnel,

 1   including correctional officers, receive training on how to

 2   interact with inmates?

 3   A.   Yes, they do.  They receive a variety of different

 4   training, and that actually starts off with -- at the

 5   facility, which is the institution, what is called,

 6   "Institution Familiarization Training."  They go through

 7   about 2 weeks of Institution Familiarization Training there,

 8   and we go through a variety of different training levels,

 9   which would include training respective to the employee,

10   standards of conduct, to any training that they are going to

11   need in their requirement duties of dealing with inmates on a

12   day-to-day basis in security.

13        In addition to that, then they go to Glynco, which is at

14   Glynco, Georgia, in Georgia, which is about 3 weeks.  They go

15   through some extensive training as well, too; and, again,

16   they go over the same things; but, in addition to that, they

17   go through firearms training, and they go through

18   self-defense training, which they have to qualify for three

19   separate weapons.

20        When they come back, then, of course, every year we go

21   through some additional training, which is what we call,

22   "Annual Refresher Training," and we do that to ensure that

23   every year staff are reminded of the employee standards of

24   conduct, along with any other issues such as that's related

25   to their daily duties within the institution.

*Mildred Rivera - Direct*

153

1   Q.  At these three layers or levels of training, including

2   the annual training, what is taught -- what is -- what are

3   the correctional officers trained in concerning sexual

4   contact between themselves and the inmates?

5   A.  At these trainings -- and I'll start off with the

6   Institution Familiarization Training that I spoke of -- I

7   teach that class, and in this class it's called, "The

8   Employee Standards of Conduct and Responsibility."  It's an

9   ethical class, and it's a mandatory class.  It's something

10  that all the correctional staff, if I may, go through, not

11  just correctional officers, all of the staff.  And in that

12  class I talk about the ethics, how we as public servants and

13  Bureau of Prisons' employees we're held to higher standards.

14  And we discuss the relationship, you know, with -- not having

15  a relationship with inmates or getting involved with inmates

16  in whatever manner.

17      In addition to that -- and that class, I like to teach

18  it.  As a matter of fact, I have a class that I'm supposed to

19  teach tomorrow, and I've asked them to hold up until I get

20  there, because it's very important to me.  This is the first

21  time when they come into the Bureau, you want to ensure the

22  staff get it especially from the warden.

23      In addition to that, I also teach the annual refresher

24  training, which is the same class, but it's on an annual

25  basis, and it's regarding the ethical standards as well, too.

1      And we go through a variety of different things about how

2   an employee should deal with inmates and how they are

3   supposed to keep up to certain ethical standards.

4   Q.  All right.  With regard to interaction with inmates, what

5   do you teach -- what are they trained in with regard to

6   personal relationships, if any, with inmates?  Is that

7   encouraged, discouraged, or no comment?

8   A.  Definitely staff are not to have any interpersonal

9   relationships with inmates, or they are not supposed to show

10  any favoritism toward inmates or give the appearance of any

11  type of favoritism to any inmates.  So, they have to conduct

12  themselves in a very respectful manner and keep to the

13  standards of the Bureau of Prisons.

14  Q.  The answer to this question may be obvious to what you

15  just stated, but escalating it a little bit, what about any

16  sort of sexual contact with inmates, what is taught about

17  that?

18  A.  Well, staff are not to have any sexual contact with an

19  inmate, period.  That is not acceptable, and that is not

20  authorized.

21  Q.  And is that a -- anyone who engages in that, can they

22  receive some sanctions, some disciplinary action?

23  A.  Yes, they may.  They are not supposed to have any sexual

24  contact with any inmate, and there are consequences for that,

25  as far as the employee standards of conduct.

*Mildred Rivera - Direct*

155

1        MR. SPROWLS:  Your Honor, may I approach the witness?

2        THE COURT:  You may.

3   BY MR. SPROWLS:

4   Q.  Ma'am, I'm going to show you what is marked for

5   identification as Government's Exhibits 34, 35, 36, 37 and

6   38.

7        Do you recognize -- let's start with Exhibit 34.  Do you

8   recognize that exhibit?

9   A.  Yes, sir.

10  Q.  And how do you recognize it?

11  A.  This is the lesson plan that I teach for the Employee

12  Standards of Conduct, which is the ethical standards of

13  conduct training that I personally conduct myself.  And since

14  the 2 years that I've been here, I've conducted this class.

15  I personally take an interest in this.  I like to teach the

16  class myself.  I don't delegate this to my associate warden,

17  because it's very important to me.

18  Q.  That is the, I guess, the instructor or the lesson plan

19  or the instructor's notes that you work from?

20  A.  That's correct.  This is a guide that I use.

21  Q.  And you gave that for what year?

22  A.  This is for 2005.

23  Q.  Okay.  And the accompanying exhibits, 34 and 36, do you

24  recognize what those are?

25  A.  Yes, I do.

1  Q.   And what are those?

2  A.   These are the -- these are the sign-in sheets.  All staff

3  are -- because it's a mandatory training, all staff are

4  required to attend the class.  So, these would be the sign-in

5  sheets for the morning and afternoon sessions for all the

6  staff that attended the mandatory training.

7  Q.   And within the -- within the lesson plan or the

8  instructor notes, Exhibit 34, do you cover what you have

9  already told the jury concerning how a correctional officer

10  should conduct him or herself with regard to inmates, as far

11  as personal contact?

12 A.   Yes, I do.  And like I indicated, this is a guide that I

13 use from.  I go through all of the objectives and try to get

14 a little creative with this class as well, too, because

15 although we teach this every year, and I always emphasize,

16 you know, "This is a refresher course, I know that you know

17 how to conduct yourselves; however, it's very important, and

18 just a reminder, just to remind ourselves that we are to

19 maintain professionalism and to be very ethical, and not to

20 get involved with inmates."

21      I even give examples during my class of particular cases

22 that happen throughout the Bureau.  Very generalized.  I

23 don't discuss anything, you know, that's happened at any

24 particular institution, but just to give an idea that, "Even

25 though this is an annual refresher, folks, it does happen,

*Mildred Rivera - Direct*

1    and it continues, you know, to happen throughout the Bureau,

2    so it's very important that you take it serious."

3    Q.  Okay.  When you say, "It does happen," are you referring

4    to inappropriate personal contact or sexual contact with

5    inmates?

6    A.  Yes.  I'm referring to the inappropriate contact, sexual

7    contact, that staff would have with inmates, you know, at

8    other institutions throughout the Bureau.

9    Q.  All right.  I would ask you to look at Exhibit 37.  Are

10   you able to identify that?

11   A.  Yes.  This is the Annual Refresher Training, this is the

12   same lesson plan but for 2006.

13   Q.  And within that or during that course of instruction, do

14   you cover exactly what you've just gone over?

15   A.  This is the same lesson plan, and I pretty much conduct

16   the same thing.  As I indicated before, this is an annual

17   refresher.  So, I teach the same class every year and just go

18   over different examples every year.  If there's something

19   else that has come up, you know, throughout the year, then I

20   discuss that with the staff.

21   Q.  Okay.  And like the annual refresher in 2005, who must

22   attend?

23   A.  The Annual Refresher Training for 2005, everybody must

24   attend, because that's mandatory.  It's a mandatory training

25   for all the staff.  That's required of all staff to attend.

*Mildred Rivera - Direct*

1  Q.  Same for 2006?

2  A.  For 2006, that is correct, all staff are required to

3  attend the mandatory training.

4  Q.  Okay.  And would you look at Exhibit 38?  Do you

5  recognize that?

6  A.  This is the sign-up sheet for 2006 pertaining to the

7  Annual Refresher Training class that I taught.

8  Q.  Essentially, on those sign-in sheets, the staff member's

9  name is printed, and they are given a blank for them to sign

10 in?

11 A.  That's correct.

12       MR. SPROWLS:  Your Honor, we would move Exhibits 34

13 through 38.

14       MR. FINDLEY:  Your Honor, we would object on the

15 grounds stated in our second motion in limine.

16       THE COURT:  Government's Exhibits 34 through 38 are

17 admitted.

18   (**GOVERNMENT EXHIBIT NOS. 34, 35, 36, 37 AND 38:**  Received

19 in evidence.)

20 BY MR. SPROWLS:

21 Q.  All right.  Ma'am, I want to turn to a few questions

22 about what inmates are allowed to possess and what they are

23 not allowed to possess at the Federal Correctional

24 Institution in Tallahassee and the Federal Detention Center

25 in Tallahassee.

1    Who approves of what the inmates are allowed to have?

2  A.  Items that are approved -- that inmates are allowed to

3  have are only approved by the chief executive officer, which

4  is the warden, which is myself.

5  Q.  If an inmate possesses or has control of something that

6  you have not approved of, what does it thus become?

7  A.  That becomes a contraband.  That becomes a contraband

8  issue.

9  Q.  Do the correctional officers at FCI-Tallahassee have the

10  authority to approve the introduction or the possession of

11  something that you have not approved?

12  A.  No one has the authority to approve anything that is

13  considered contraband.  The only individual that is allowed

14  to approve that is the warden, which would be myself.

15  Q.  What about the items that are sold in the commissary?

16  Who ultimately approves what's on the shelves in the

17  commissary?

18  A.  I approve those.  I approve the items that are in the

19  commissary list.  There is a committee, and I ultimately

20  review that, and I approve that, that is on the list.

21  Q.  If, for example, this Uniball blue pen is available for

22  purchase in the commissary, would an inmate be allowed to

23  purchase it and possess it?

24  A.  If it's made available in the commissary, and it's on the

25  list, that means I have approved that list, then, yes, an

1  inmate can purchase it from the commissary list.

2  Q.  If a correctional officer walks in one morning, and their

3  duffle bag or briefcase, what have you, has the same brand

4  pen, identical brand pen, takes it out of the duffle bag and

5  hands it to an inmate, "Here you go, inmate, have a pen," may

6  that inmate possess that pen?

7  A.  No, because that would be considered contraband.

8  Anything that is brought into the facility without my

9  authorization would be considered -- I would not have

10  approved that, regardless whether it's the same identical

11  pen.  It has to be available in the commissary for inmates,

12  and they in turn have to purchase that item.

13  Q.  All right.  Ma'am, I would like to ask about a few other

14  items in particular, and the question -- the overriding

15  question on all of these is, have you approved any of the

16  following to be brought into the Federal Correctional

17  Institution, Federal Detention Center, Tallahassee, by staff

18  or correctional officers:

19      Have you approved the introduction of liquor?  And by

20  that I mean, vodka, gin, whiskey, drinking liquor.

21  A.  No.

22  Q.  Bandanas or scarfs?

23  A.  No.

24  Q.  Food that's brought in by correctional officers?

25  A.  No.

*Mildred Rivera - Direct*

1  Q.   Now, why -- just so we understand.  Correctional officer

2  brings in his or her lunch, eats part of it, there's still

3  some left, "Hey, Inmate Smith, do you want half of a sub I

4  didn't finish?"  What's wrong with that?

5  A.   It doesn't matter.  Any items of food, anything that is

6  brought in by a correctional officer, by any other staff

7  member, without my consent, without my authorization, I would

8  not approve that, and I did not approve that.

9  Q.   Jewelry?

10 A.   No.

11 Q.   Currency, cash?

12 A.   No.

13 Q.   It's getting kind of cold at night.  This inmate doesn't

14 seem to have the proper clothes.  I'm going to bring in a

15 sweatshirt that I don't need to use anymore.  Clothing?

16 A.   No.

17 Q.   Why clothing?

18 A.   Inmates -- if inmates -- we provide inmates with their

19 basic necessities, the basic essentials, and we do provide

20 them with clothing.  We provide them with coats.  If, in the

21 event that they are cold for that matter -- if they are

22 required to have them, we will provide it to them as an

23 institution.

24     If it's something that we want to make it available in

25 the commissary, then I will choose to do that.  So, there is

*Mildred Rivera - Direct*

1  a way that, if it's something that's required for them to

2  have, we will provide it.

3  Q.  Candy?

4  A.  No.

5  Q.  Chewing gum?

6  A.  No.

7  Q.  So, a correctional officer can't bring in some bubble gum

8  or Wrigley, just give a stick of gum to an inmate?

9  A.  No.

10  Q.  Now, what -- I'm just trying to foster good relations

11  between myself, the correctional officer, and these 120

12  inmates in my unit or something, just trying to be friendly,

13  you know, be a nice guy.  Can I do that?

14  A.  No.

15  Q.  Now, what is -- is there a particular -- does chewing gum

16  pose a potential problem at an institution?

17  A.  Yes, it does.  And that has been my experience, if I may,

18  with my experience within the Bureau.  It doesn't matter,

19  regardless, whether it's an earring, whether it's a piece of

20  gum, clothing, whatever the case may be, as I indicated

21  before, if there is a need for the inmate to have that item,

22  it will be made available to them, to him or her.  We will

23  provide it as an institution, or it will be available at the

24  commissary.

25      But gum, for example, and it's just been my experience,

1   gum, that jeopardizes the safety and the security of the

2   institution.  Gum in my experience has been that they --

3   inmates have used gum to lodge it in a lock mechanism device,

4   which has really jammed up the locks in an officer's station,

5   which actually threatens the security, if an officer can't

6   get out of their officer station, if there is a fire.

7   There's a lot of -- it could become very serious in that

8   manner.  So, even though you mention gum, just a small item,

9   it doesn't matter, any item that jeopardizes the safety of

10  the security of the institution unless I approve that item.

11  Q.  A few other items.  Perfume that wasn't obtained at the

12  commissary?

13  A.  No.

14  Q.  Eyebrow pencils, makeup -- things like that?

15  A.  No.

16  Q.  Hair dye?

17  A.  No.

18  Q.  Ma'am, are you aware of -- let me back up.

19      Have you approved the bringing in of any food items, ice

20  cream, pizzas, what have you, that were brought in for a

21  particular unit or a particular work shift, or something, as

22  sort of a celebration or a party, something out of the

23  ordinary?  Have you ever approved of that?

24  A.  No, I have not.

25  Q.  Do you know of it ever occurring out at FCI while you

1  were affiliated with the institution?

2  A.  Yes, I have.

3  Q.  And what occurred?

4  A.  There was some pizzas that were brought into our Unicor.

5  Unicor is a 24/7 operation.  Our facility, if I may explain,

6  it's a call center for our inmates, which is part of their

7  employment.  And we just went on -- it's the first in the

8  Bureau, you know, history that went 24/7 in a month and a

9  half.  It was quite an achievement.  So, that's considered a

10  reward program, a one-time event.

11      I did not approve that; however, this was during the

12  holidays, the Christmas holidays.  And while I was out, my

13  acting, who was in the acting warden capacity, approved those

14  pizzas to come in.

15  Q.  So, it did occur, but it was not something that you,

16  while there, approved?

17  A.  That's correct.

18  Q.  Warden, when a -- if an inmate were to be transferred --

19  transfers from another institution -- let me back up.

20      Currently, are cigarettes allowed on the compound?  Are

21  they allowed at FCI/FDC?

22  A.  No.

23  Q.  They were at one time?

24  A.  That's correct.

25  Q.  That changed earlier this year?

1    A.   That change took effect with the Bureau of Prisons

2    April 1st; however, we went -- that effect took place in

3    March, a month before the Bureau went on board with

4    disallowing cigarettes into the facility.

5    Q.   And the situation where -- that was Bureau-wide?

6    A.   That was Bureau-wide.

7    Q.   Okay.  Bad example, then.

8        Let's say an inmate comes from another institution where

9    that institution allowed scarfs, just for example.  This

10   institution, FCI/FDC-Tallahassee, does not.  They arrive and

11   their duffle bag or their belongings includes scarfs.  Are

12   they allowed to retain those?

13   A.   No.  If our policy says that they can't have a scarf,

14   they would not be allowed to have a scarf.

15   Q.   Can a correctional officer say, "Oh, don't worry about

16   it, you can keep it, you are in my unit, no problem"?

17   A.   No.  We have policies for that.

18            MR. SPROWLS:  That's all I have, Judge.

19            THE COURT:  Cross-examine?

20            MR. HARPER:  May it please the court.

21                         CROSS-EXAMINATION

22   BY MR. HARPER:

23   Q.   Ms. Lopez, this training program that you do annually,

24   are you the only person that gives that training session or

25   those types of training sessions?

1    A.   The Annual Refresher Training, sir?

2    Q.   Let's start with that.

3    A.   Yes, sir, I do.

4    Q.   Okay.  Are there other types of trainings or training

5    programs that are given, for instance, integrity awareness,

6    and things like that?

7    A.   I don't understand your question.

8    Q.   All right.  Well, I'll try to make it better.

9    A.   Uh-huh.

10   Q.   Are there other types of training programs that are given

11   on a regular basis at your institution?

12   A.   There's a variety of programs.

13   Q.   And they are available for the correctional officers; is

14   that correct?

15   A.   Yes, sir.

16   Q.   Okay.  And what is the general purpose of those types of

17   training programs?

18   A.   We give a variety of different programs.  If you are

19   referring to Annual Refresher Training, if you are referring

20   to institution -- I guess I don't understand what

21   particular -- your question.

22   Q.   Why are you giving these trainings programs to officers?

23   A.   Okay.  The reason why we give it to, not only officers,

24   we give it to all staff, because it is very important during

25   Annual Refresher Training to refresh everybody's mind, just

1  as a reminder of our ethical standards in the Bureau of

2  Prisons and how we are supposed to conduct ourselves as

3  public servants and Bureau of Prisons' employees.

4  Q.  Is it a place where you encourage -- an officer would be

5  encouraged to ask questions and participate?

6  A.  Yes.

7  Q.  And do officers regularly do that?

8  A.  Yes, they do.

9  Q.  And what is the purpose to encourage officers to

10  participate in those training programs by asking questions?

11  A.  When staff asks questions, at least they can get an

12  answer and a response in case they have any questions

13  regarding any particular situation.

14  Q.  May an officer ask hypothetical questions?

15  A.  They can ask any typical question.

16  Q.  It doesn't necessarily have to be something applicable to

17  that officer; it can be basically anything on his mind or her

18  mind; is that right?

19  A.  They can ask me a question, if I'm giving a class, yes.

20  Q.  All right.  And part of the objective here is to refresh

21  staff and officers about contact with inmates --

22  inappropriate contact, I think is the way you said it.  Is

23  that right?

24  A.  Yes.

25  Q.  And inappropriate contact is sex, is one of the things,

1   right?

2   A.   Yes.

3   Q.   And that isn't something that just started this year; is

4   that right?

5   A.   No, sir.

6   Q.   It's been a long-time problem with the Bureau of Prisons;

7   is that right?

8   A.   That's correct.

9   Q.   And is it involved -- mainly, is it more of a problem

10  with female inmates, or is it more of a problem with male

11  inmates?

12  A.   With both.

13  Q.   Okay.  Is it more of a problem with male guards, or is it

14  more of a problem with female guards?

15  A.   I don't understand your question.

16  Q.   Do you have more incidence of contact with inmates when

17  you have male guards supervising, or do you have more

18  problems with inappropriate contact with inmates when you

19  have female officers in charge?

20  A.   Now, is that at my institution or the Bureau?

21  Q.   I'm first going to say with the Bureau, and then I'm

22  going to come home.

23  A.   Okay.  In regards to the Bureau, I mean, I don't know the

24  specifics, but that is an issue, the same with females and

25  with males.

*Mildred Rivera - Cross/Harper*

1  Q.  All right.  And with your institution, where you have

2  primarily females at the main facility there, is it more of a

3  problem depending on the gender of the officer -- more or

4  less of a problem, depending on the gender of the officer?

5  A.  Yes; that's correct.

6  Q.  And I'm not sure I understood the answer to my own

7  question.  My question was not well worded.

8      Do male officers at your institution seem to have more

9  inappropriate contact with your inmate population than female

10  officers at your institution have inappropriate contact?

11  A.  Since I have been there, it has been that male have had

12  more inappropriate contact with the female inmates.

13  Q.  Now, these -- this inappropriate contact is addressed in

14  a variety of ways; is that correct?

15  A.  That's correct.

16  Q.  In other words, it can be a simple matter of discipline

17  with an officer, or they could be referred to the U.S.

18  Attorney's Office; is that right?

19  A.  I don't understand your question.

20  Q.  Okay.  There have been cases where officers have been

21  simply disciplined at your institution; is that right -- for

22  inappropriate contact with inmates?

23  A.  That's correct.

24  Q.  And, obviously, now there have been officers who have

25  been referred to the U.S. Attorney's Office for inappropriate

*Mildred Rivera - Cross/Harper*

1  conduct; is that right?

2  A.  That's correct.

3  Q.  Now, this Bureau-wide problem, at one time as 19 -- let's

4  see, 2004, 2005 even, this was misdemeanor-type conduct; is

5  that correct?

6  A.  Yes; that's correct.

7  Q.  And then the Congress changed that law in 2005; is that

8  right?

9  A.  That's correct.

10  Q.  And made it more serious; is that right?

11  A.  That's correct.

12  Q.  Okay.  When these inappropriate contacts are detected and

13  dealt with, do both parties get in trouble?  Do both the

14  inmate and the officer get in trouble?

15  A.  That's correct.

16  Q.  And do the inmates try to get out of trouble when they

17  get caught doing something wrong?

18  A.  Can you -- I don't understand.

19  Q.  All right.  Do they try to help themselves and try to get

20  out of trouble when they get caught in an inappropriate

21  relationship?

22  A.  That's correct.

23  Q.  Okay.  What do they do?

24  A.  As far as -- I don't -- if you can tell me what --

25  Q.  I don't know what they do.  I'm asking what they do to

1  try to get out of trouble.  Do they come and talk to you?

2  A.  Either sometimes there's what we have the administrative

3  remedy process, they will submit, because they have a right

4  to grieve -- anytime that they feel that any staff member is

5  doing anything unjustly to them, they have the system of the

6  administrative remedy process, which they could submit a

7  cop-out or a form of a grievance.

8  Q.  And do you try to verify their complaints or their

9  reports?

10  A.  If there are allegations of misconduct, those are looked

11  into.

12  Q.  Okay.  And are they often discounted or found to be

13  false, reports of inmates?

14  A.  Sometimes.  Sometimes.

15  Q.  And, as a result of an inmate having inappropriate

16  contact, what are the disciplinary remedies for them?  What

17  are available to you as a supervisor or the ultimate

18  supervisor, I guess, as far as an appropriate disciplinary

19  remedy for an inmate?

20  A.  Inmates would go before the discipline hearing officer at

21  which they are sanctioned.  And at that point in time, they

22  could be transferred to another facility.

23  Q.  They are not charged with a new crime; is that right?

24  A.  They could be.

25  Q.  But have you ever heard of anyone being charged with a

1   new crime?

2   A.   Since I have been at the facility?

3   Q.   Yes.

4   A.   No, sir.

5   Q.   All right.   And the inmates in your facility are serious

6   felony offenders, are they not?

7   A.   That's correct.

8   Q.   Okay.   Many of them have very extensive criminal records;

9   is that right?

10   A.   That's correct.

11   Q.   And do you have allegations of -- the large majority of

12   the allegations of inappropriate contact at the facility, are

13   they consensual sex relationships?

14   A.   Repeat your question again.

15   Q.   Yes, I'm sorry.

16       The reports you hear of inappropriate contact between the

17   inmates and officers, is that by in large or a great majority

18   of those reports consensual?

19           MR. SPROWLS:   Objection.

20           THE COURT:   Sustained.

21   BY MR. HARPER:

22   Q.   Do you have reports of heterosexual and homosexual sexual

23   contact at your institution?

24   A.   Repeat your question.

25   Q.   At your institution have you had reports of both

*Mildred Rivera - Cross/Harper*

1  heterosexual and homosexual relationships with inmates and

2  officers?

3  A.  I'm not aware of that.

4  Q.  Okay.  You're not aware of both or just -- I'm sorry.

5  What are you not aware of?

6  A.  I guess I'm not understanding your question.  If you

7  could, ask it another way.  I'm not sure what you're asking.

8  Q.  Okay.  The reports of inappropriate contact between

9  officers and inmates, do they involve both homosexual

10  relationships as well as heterosexual relationships?

11  A.  What I'm aware of is the homosexual.

12  Q.  You are aware of no heterosexual relationships at your

13  institution?

14  A.  I'm aware that male staff members have been involved with

15  female inmates.

16  Q.  And what I was asking earlier is, is the great majority

17  of the reports that you receive involve male staff with

18  female inmates?

19  A.  Is that a question?

20  Q.  Yes, ma'am.

21  A.  Okay.  Yes, sir.

22  Q.  Okay.  And of those reports, is the great majority of

23  those reports consensual as opposed to forced relationships?

24          MR. SPROWLS:  Same objection.

25          THE COURT:  Sustained.

1          MR. HARPER:  I understand now, Your Honor.  I'm

2     sorry.  I wasn't trying the back door.  I just didn't

3     understand where that was coming from, and now I do.

4     BY MR. HARPER:

5     Q.  As far as the contraband, we've heard some talk, and I

6     want to make sure we're clear.  We've hard contraband and

7     soft contraband and nuisance contraband.  Is there any such

8     thing as permitted contraband?

9     A.  There is no such thing as permitted contraband.  Whether

10    it's nuisance or whatever you listed there, contraband is

11    contraband.

12    Q.  Okay.  And is there any room for discretion on how the

13    officer deals with contraband?

14    A.  Yes.

15    Q.  Okay.  And what discretion does an officer have?

16    A.  If an officer comes across any contraband, they are

17    supposed to report that and write an incident report to -- on

18    the inmate.

19          MR. HARPER:  I have nothing further at this time,

20    Your Honor.

21          THE COURT:  All right.  Mr. Findley?

22          MR. FINDLEY:  Yes, sir.

23                      CROSS-EXAMINATION

24    BY MR. FINDLEY:

25    Q.  Good morning, Warden Rivera.  My name is Tom Findley.  I

*Mildred Rivera - Cross/Findley*

1   represent Mr. Dixon in this case.

2   A.   Good morning.

3   Q.   Did you state in your background you were formally an HR

4   director?

5   A.   Human resource manager.

6   Q.   Human resource manager.  And was that at this institution

7   or another institution?

8   A.   At another institution.

9   Q.   All right.  So, you have some expertise in managing

10  staff; is that correct?

11  A.   Yes; that is correct.

12  Q.   And you pride yourself on knowing your staff out at the

13  institution?

14  A.   Yes, sir.

15  Q.   And so you are aware of the fact that Mr. Dixon was hired

16  in 1992?

17  A.   I don't know the exact dates on all of my 320 employees.

18  Q.   That's understandable.  He's been there approximately

19  14 years; is that about right?

20  A.   I have been 2 years at --

21  Q.   You've only been there 2 years.  He's been there

22  14 years, correct?  You don't know.

23  A.   I can tell you that I've been there 2 years at the

24  facility, but I know who Officer Dixon is.

25  Q.   Right.  And you understand he was formerly in the United

1    States Navy?

2    A.   I would not know that.

3    Q.   You don't know those facts?

4    A.   Specifically.

5    Q.   Okay.  Now, you know that officers are selected for

6    random drug testing; is that correct?

7    A.   That's correct.

8    Q.   And you know that Mr. Dixon has never tested positive for

9    drugs in his entire career?

10   A.   I didn't know that.

11   Q.   You know that during your tenure that he has not tested

12   positive for drugs, correct?

13   A.   That's correct.

14   Q.   All right.  You were aware of the fact that he has

15   received many promotions throughout his career?

16   A.   That's correct.

17   Q.   And, in fact, he has gotten very good reviews; isn't that

18   correct?

19   A.   That's correct.

20         MR. FINDLEY:  May I approach, Your Honor?

21         THE COURT:  You may.

22   BY MR. FINDLEY:

23   Q.   I would like to show you a series of employee evaluations

24   for Mr. Dixon.  Do you recognize those as official Bureau of

25   Prisons' employee evaluations?

*Mildred Rivera - Cross/Findley*

1    A.  Yes, I do.

2    Q.  And take your time, if you need to glance over them, but

3    these are all for Mr. Dixon for the year 2002 forward to

4    April of 2005; is that correct?

5    A.  I'm looking through these.

6    Q.  Okay.  Take your time.

7    A.  That is correct.

8    Q.  All right.

9           MR. FINDLEY:  Your Honor, at this time I would move

10   for the introduction of those as a composite exhibit, Dixon

11   Exhibit, the next number.

12          MR. SPROWLS:  May I voir dire on this?

13          THE COURT:  You may.

14                      VOIR DIRE EXAMINATION

15   BY MR. SPROWLS:

16   Q.  Warden, did you write those evaluations?  Are those your

17   opinions?  Did you author those?

18   A.  No, I did not.

19   Q.  Do those evaluations reflect your evaluation of

20   Mr. Dixon's conduct?

21   A.  No, they do not.

22   Q.  Those were authored by whom?

23   A.  This evaluation of Dixon is by the rater, who is a

24   lieutenant, who is his immediate supervisor; and the captain,

25   who is the actual reviewer, the final reviewer.

*Mildred Rivera - Cross/Findley*

1   Q.   It reflects their comments, not yours?

2   A.   That is correct.

3          MR. SPROWLS:  We object, Judge.

4          MR. FINDLEY:  Your Honor, they are not offered -- I'm

5   sorry.  Go ahead.

6          THE COURT:  Objection is overruled.  Defendant's

7   Exhibit 4 is admitted.

8      (**DEFENDANT DIXON EXHIBIT NO. 4:**  Received in evidence.)

9   Defendant good.

10   BY MR. FINDLEY:

11   Q.   Now, these evaluations, if we could just start with the

12   April '05 evaluation, Job Element Number 1.  Your

13   subordinate, I take it, is a captain that reviews these

14   evaluations; is that correct?

15   A.   That is correct.  He's the reviewer.

16   Q.   The captain?

17   A.   He is -- exactly, that's correct.

18   Q.   Okay.  And so the captain noted that Officer Dixon

19   supervises inmates fairly and impartially and accounts for

20   the inmates in his area of responsibility; is that correct?

21   A.   If you can ask that question again.

22   Q.   All right.  Job Element Number 1 -- under Job Element

23   Number 1, the captain concludes that Officer Dixon supervises

24   inmates fairly and impartially and accounts for the inmates

25   in his area of responsibility; is that correct?

1   A.  The rater is the one that actually rates him as such.

2   Q.  Okay.  So, the captain approves it.  Who is the rater?

3   A.  The rater is the immediate supervisor; that is the

4   individual who is actually evaluating him.  The captain, what

5   he does is, he reviews ultimate, he does the overall.

6   Q.  Okay.  The rater in this case --

7   A.  The rater, which -- I just want to make sure --

8   Q.  That's fine.

9   A.  -- is the lieutenant.  He is the one that's actually

10  rating and looking at the individual's -- the officer's work

11  ethics.

12  Q.  And, as of April 18th, '05, this lieutenant had concluded

13  that Mr. Dixon was exceeding his expected level of

14  performance in all categories; is that correct?

15  A.  That's what it shows.

16  Q.  All right.  And it includes the fact that Officer Dixon,

17  under Job Element Number 3, for example, shakes down in his

18  areas of responsibilities and disposes of both nuisances and

19  hard contraband properly; is that correct?

20  A.  That's what it says.

21  Q.  Okay.  Now, just running through -- the next page, there

22  are more detailed comments; is that correct?

23  A.  Yes; that's correct.

24  Q.  All right.  Let's go down to the section in which it is

25  noted that Mr. Dixon controls contraband.  Do you see that?

1    A.   That's correct.

2    Q.   It says, "Mr. Dixon conducts area pat and strip searches.

3    He identifies and disposing of items of contraband

4    accordingly with policy.  He closely monitors the units to

5    prevent unauthorized inmates introducing contraband in his

6    assigned areas.  He conducts searches of inmates effectively

7    to detect items not allowed in the institution."  That was

8    April 23, 2006; is that correct?

9    A.   That is correct.

10   Q.   Now, as you just -- I don't want to belabor these points,

11   they are in evidence, but -- if you could just look through

12   these and tell me that and confirm for me that Mr. Dixon has

13   always received exceeds performance levels or outstanding for

14   all categories that are the subject of these evaluations.

15   A.   I can confirm he has received exceeds.

16   Q.   Or outstanding?

17   A.   I can confirm that he's received exceeds in the overall

18   category.

19   Q.   Okay.  But in some categories he received outstanding,

20   correct?  For example, February '04 or, for example, most

21   recent April 18, '05, Officer Dixon conducts daily and weekly

22   fire and security inspections, he completes work request as

23   needed, outstanding.

24   A.   In one category, Job Element Number 4.

25   Q.   All right.  That's fine.  So, he always exceeds the

*Mildred Rivera - Cross/Findley*

 1  expected level of performance or outstanding in all

 2  categories; is that correct?

 3  A.  He received exceeds; that's correct.

 4  Q.  All right.  There was one particular comment, as of

 5  April 18, 2005, which is in the fourth page of this stack,

 6  it's also under Job Element Number 3, "Controls Contraband."

 7  Do you see that?

 8  A.  Yes, sir.

 9  Q.  And there's a very specific comment made by this

10  particular rating official, who I take it is a lieutenant --

11  is that a lieutenant?

12  A.  Under the rater's comments?

13  Q.  Yes.

14  A.  Yes.  That is -- I can't read the handwriting.

15  Q.  Okay.  Well, going back to Job Element Number 3, there's

16  a specific comment.  It says that Officer Dixon, quote, knows

17  the difference between nuisance and hard contraband.  Do you

18  see that?

19  A.  Let me make sure that we're on the -- you said the fourth

20  page, right?

21  Q.  The fourth page.

22  A.  Okay.  Yes, sir.

23  Q.  Okay.  Now, you mentioned that all of your staff goes

24  through your training sessions that you provide, and

25  Mr. Dixon went to those sessions; is that right?

*Mildred Rivera - Cross/Findley*

1    A.   That's correct.

2    Q.   And judging by his evaluations, would you conclude that

3    he is meeting the expectations established in your training

4    guidelines, according to the evaluations?

5    A.   The only thing that I can say to that is, he's meeting

6    the performance evaluation.

7    Q.   Okay.  Now, let me ask you a question to follow up on

8    what Mr. Harper said a little bit earlier.

9         If a prisoner violates the criminal code, is that

10   prisoner prosecuted?

11   A.   In some cases, they are.

12   Q.   Okay.  Not in all cases?

13   A.   That's correct.

14   Q.   All right.  Now, to your knowledge, have any inmates

15   involved in this case been charged with bribery, for example?

16   A.   I am not aware of that, no.

17   Q.   Would you agree with me that there is no rule that bars

18   the guard on the FCI staff from asking inmates about alleged

19   violations of prison rules?

20   A.   I don't understand your question.

21   Q.   There is no rule that prohibits a guard from asking an

22   inmate who he suspects of some wrongful activity about that

23   wrongful activity, is there?

24   A.   That's correct.

25   Q.   Okay.  Now, you testified that -- well, let me just back

1   up.

2       Are you familiar with the program statements that are

3   issued from the Bureau of Prisons?

4   A.  Yes, I am.

5   Q.  And it's your obligation to follow those program

6   statements, is it not?

7   A.  That's correct.

8   Q.  And it's your obligation to follow the Code of Federal

9   Regulations, the rules -- the regulations that are provided

10  by the Bureau of Prisons; is that correct?

11  A.  That is correct.

12  Q.  Now, you mentioned the Unicor pizza party, and you said

13  that you specifically didn't approve the pizza; is that

14  right?

15  A.  I did not authorize that; that's correct.

16  Q.  Okay.  Do you have some document that shows that the

17  acting director approved that pizza party?

18  A.  With me, I do not.

19  Q.  All right.  Is --

20  A.  And I don't recall a document.

21  Q.  All right.  So, sometimes staff can authorize things,

22  such as pizza parties for the inmates, and there is no

23  written document to so reflect?

24  A.  That is not correct.

25  Q.  Okay.  Now, when did this investigation start, this

1    investigation that has led to the indictment in this case?

2          MR. SPROWLS:  Objection.  If she knows.

3          THE COURT:  Sustained.

4    BY MR. FINDLEY:

5    Q.  Do you know when the investigation into these matters

6    began that led to this indictment?

7    A.  I don't recall.

8    Q.  All right.  Was it before you arrived at the institution?

9    A.  It could possibly.  I don't recall.

10   Q.  Okay.  Do you know whether George Williams was

11   responsible for this investigation?

12   A.  The investigation was turned over to OI.

13   Q.  By whom?

14   A.  If there is an allegation, I -- my -- George Williams is

15   my special investigative agent.  So, I submit everything

16   through him.  He does not make that call.  That is referred

17   to the Office of Internal Affairs.

18   Q.  So, George Williams does the workup, and then it's

19   referred to OIA, is it?

20   A.  The process is that any allegation that is submitted to

21   me or I'm aware of any allegation, I have a responsibility,

22   as a warden, to bump it up through my chain of command, which

23   means that, in that particular case, my special investigative

24   agent, who is George, has to do a referral, which I sign, and

25   it's based on my approval to go up through Office of Internal

*Mildred Rivera - Cross/Findley*

1  Affairs.

2  Q.  And in this particular case, George Williams did the

3  workup investigation; is that correct -- prior to it going to

4  OIA?

5  A.  I don't recall, because some cases, not all of them,

6  either could be through Office of Internal Affairs, someone

7  else submitted it, not necessarily just me.  So, I'm not -- I

8  don't recall.

9  Q.  Okay.  Do you know when the grand jury investigation

10  commenced?

11          MR. SPROWLS:  Same objection.

12          THE COURT:  Sustained.

13  BY MR. FINDLEY:

14  Q.  Do you know -- do you know when the grand jury

15  investigation commenced?

16          THE COURT:  You can ask her her earliest knowledge of

17  it.

18          MR. FINDLEY:  Pardon?

19          THE COURT:  You can ask her earliest knowledge of it.

20  BY MR. FINDLEY:

21  Q.  What is your earliest knowledge of the grand jury

22  investigation?

23  A.  Okay.  Say that again?

24  Q.  What is your earliest recollection or knowledge that a

25  grand jury investigation was going on?

1   A.   I knew there was an investigation going on here.

2   Q.   Grand jury investigation?  Do you know anything about

3   when the grand jury investigation commenced?

4   A.   No, I don't.

5   Q.   All right.

6        MR. FINDLEY:  That's all I have.

7        THE COURT:  Redirect?

8                    REDIRECT EXAMINATION

9   BY MR. SPROWLS:

10  Q.   A few questions, Warden.

11       You were asked about referrals to the U.S. Attorney's

12  Office.  Are you aware of reports or communications to the

13  U.S. Attorney's Office of inappropriate sexual contact by

14  other officers outside of this case?

15  A.   Yes.

16  Q.   So this -- to your knowledge, this is not the first time

17  that this type of conduct was reported to the U.S. Attorney?

18  A.   That is correct.

19  Q.   And, if you know, were the previous referrals of

20  inappropriate conduct by correctional officers with inmates,

21  did they also involve correctional officers with good

22  evaluations?

23  A.   That is correct.

24  Q.   A few questions with regard to, I guess, appropriate

25  conduct between inmates and correctional officers.

*Mildred Rivera - Redirect*

1     If a correctional officer tells an inmate who is walking

2  by to stop, what must that inmate do?

3  A.  That inmate must stop.

4  Q.  Say, sit, what must that inmate do?

5  A.  That inmate must sit.

6  Q.  Does the inmate have to obey all of the lawful orders of

7  the correctional officer?

8  A.  The inmates have and are required to obey all regulations

9  or all orders by all staff, to include correctional officers.

10  Q.  If an inmate were to admit a wrongdoing, having sexual

11  contact with one of the correctional officers, in terms of

12  housing, what happens to them?  Where do they go, if

13  anywhere?

14     Let's say they are in C unit, and they are interviewed

15  and they say, "Yeah, I had sexual contact with Officer

16  Smith," what happens to that inmate, if anything?

17  A.  We put them in Special Housing Unit.  We remove them from

18  the area, the living quarters where the individual is, or the

19  individual sometimes could be transferred to another

20  facility.

21  Q.  Going to the SHU, the Special Housing Unit, does that

22  involve loss of privileges, loss of freedom?

23  A.  Yes, that could.  You've got administrative and then

24  you've got special housing.

25  Q.  And transfer to another facility, is that a disciplinary

1   action -- considered to be a disciplinary action?

2   A.   It could be.

3   Q.   Is it fair to say that the Bureau of Prisons has

4   disciplinary sanctions available to it when an inmate crosses

5   the line?

6   A.   Yes, they do, absolutely.

7   Q.   So, there are things that can be done short of taking

8   them to court; is that correct?

9   A.   That is correct.

10  Q.   If an officer sees contraband, does that officer have any

11  discretion as to whether to seize it or note it or just turn

12  a blind's eye and walk away?  Do they have any discretion?

13  A.   The officers, to include all staff, have the

14  responsibility to seize the item and do an incident -- what

15  we call an incident report, write an incident, because it's

16  contraband.  It should not be in the possession of the

17  inmate, and immediately they have to retrieve it and write an

18  incident report to the inmate.

19          MR. SPROWLS:   One moment.

20  BY MR. SPROWLS:

21  Q.   Are you -- you were asked about details with regard to

22  Mr. Dixon's performance evaluations.

23      Do you know Mr. Dixon and Mr. Moore?

24  A.   Yes, I do.

25  Q.   And do you recall or do their signatures appear on the

1   sign-in sheets at both of those sessions?  Did they attend

2   the '05 and '06 annual refreshers?

3   A.  Let me look through it.

4   Q.  Yes, ma'am.

5   A.  Yes.  Yes.

6        MR. SPROWLS:  That's all I have, Judge.  Thank you.

7        THE COURT:  All right.  Thank you, Ms. Rivera.  You

8   may step down.

9        Mr. Sprowls, please call your next witness.

10        MR. SPROWLS:  Shonnie Daniels.

11        DEPUTY CLERK:  Please raise your right hand.

12   **SHONNIE YVETTE DANIELS, GOVERNMENT WITNESS, DULY SWORN**

13        DEPUTY CLERK:  Be seated.

14        Please, state your full name and spell your last

15   name for the record.

16        THE WITNESS:  Shonnie Yvette Daniels, D-a-n-i-e-l-s.

17                    DIRECT EXAMINATION

18   BY MR. SPROWLS:

19   Q.  Ms. Daniels, can you tell the jury how old you are?

20   A.  I'm 41.

21   Q.  And where is home for you?

22   A.  Quincy, Florida.

23   Q.  And how long have you lived in Quincy?

24   A.  All of my life off and on.  Once I got out of federal

25   prison about a month ago, I moved to Tallahassee, but before

1   then, I've been in Quincy, Florida.

2   Q.  Okay.  And do you have any family, any children?

3   A.  Uh-huh.  I have two sons.

4   Q.  Ages?

5   A.  Age 18 and 19.

6   Q.  Ma'am, what sort of work have you done in the past?

7   A.  I used to work for the state of Florida.

8   Q.  Doing what?

9   A.  Administrative secretary.

10  Q.  Do you recall what department or what office?

11  A.  The Department of Children and Families, Department of

12  Agriculture and Consumer Services, the Department of

13  Environmental Protection, and the Gadsden Correctional

14  Institution in Quincy.

15  Q.  Are you currently employed?

16  A.  Yes, I am.

17  Q.  What do you do?

18  A.  I'm part time with the Community and School.

19  Q.  For those of us unfamiliar with what that is, what is it?

20  A.  It's a program that works with the after-school program

21  with the Gadsden County School Board.

22  Q.  Okay.  Ms. Daniels, that microphone does work, but kind

23  of pretend it's not there and just get in close to it and

24  keep your voice up.

25  A.  Okay.

*Shonnie Daniels - Direct*

191

1   Q.  All right.  Have you been previously convicted of a

2   felony?

3   A.  Yes.

4   Q.  And what was the nature of the crime?

5   A.  Conspiracy to cocaine.

6   Q.  Drug conspiracy?

7   A.  Drug conspiracy, yes.

8   Q.  Did that conviction cause you to go to federal prison?

9   A.  Yes.

10  Q.  And how much time were you sentenced to serve?

11  A.  Ten years.

12  Q.  And have you completed that sentence?

13  A.  Yes.

14  Q.  Are you currently on any sort of supervision by any

15  probation officer?

16  A.  Yes.  I'm on federal supervised release.

17  Q.  So, somebody is monitoring what you're doing and --

18  A.  Yes.

19  Q.  -- where you're working, and stuff like that?

20      Prior to the federal drug conviction, did you have any

21  other felony; by that I mean, any crime where you could have

22  received a sentence of over a year?

23  A.  Yes, but they were adjudication withheld.

24  Q.  Okay.  You pleaded guilty or --

25  A.  I pled no contest.

*Shonnie Daniels - Direct*

1    Q.   What type of case?

2    A.   It was at TJ Maxx, grand theft; and a Liberty County

3    case, a possession charge.

4    Q.   Okay.  Ma'am, when you were in federal prison, were you

5    ever housed out at the Federal Correctional Institution here

6    in Tallahassee?

7    A.   Yes.

8    Q.   Do you recall the time period when you were first there?

9    A.   When I was first there?  Yes, in 1999.

10   Q.   And how long were you there?

11   A.   Well, actually, I was there for 2 years.  Then I went to

12   Marianna for 2 years, and then I came back to Tallahassee.

13   Q.   Okay.  When you went to Marianna, what was in Marianna?

14   A.   A camp.

15   Q.   A federal institution?

16   A.   A federal institution camp, right.

17   Q.   And you came back to Tallahassee?

18   A.   Uh-huh, in November of 2004.

19   Q.   November of 2004?

20   A.   Uh-huh.

21   Q.   Ms. Daniels, I'm going to ask you just some general

22   questions about prison life, if you will.

23        When you first arrived at Tallahassee, was that your

24   first institution that you began your --

25   A.   Yes.

*Shonnie Daniels - Direct*

1   Q.  When you arrived, were you taken -- how did you

2   physically get to the institution?

3   A.  Well, actually, I was on pretrial.  So, I was in the SHU.

4   The marshals took me there.  And once I got sentenced, I got

5   released from the SHU, and I was on the compound.

6   Q.  When you first get to the prison, what happens to the

7   clothes you're wearing?  Walk us through.

8   A.  When you get there, you go to laundry, and they issue you

9   four uniforms -- I'm not exactly sure how many pair of

10  pants -- socks, bras, and a pair of steel-toe boots.  And

11  they give you a little small bottle of soap, toothpaste,

12  until you can get your money and go to the commissary.

13  Q.  Do you have access to any telephones?

14  A.  Yes.

15  Q.  Do they cost money?

16  A.  Yes.

17  Q.  So, when you first arrived, are you able to use the

18  phones if you don't have any money?

19  A.  Yeah, because your counselor is allowed to give you one

20  phone call once you get to the institution, to let your

21  family know that you are there.

22  Q.  And are there -- can you use any phone that's at the

23  institution?

24  A.  I mean, you can use your counselor phone in the back at

25  first.  After that you have to use the inmate phone system to

*Shonnie Daniels - Direct*

1    call your family.

2    Q.  Do you have to do anything as far as dialing in any

3    numbers?

4    A.  Yes.  You have to put in your PAC number, which is

5    assigned to you before you are able to place a call.

6    Q.  And where did you -- do you recall where you first were

7    housed once you got out of the Special Housing Unit?

8    A.  When I first got incarcerated, I was housed in C unit.

9    Q.  Was there a unit officer that worked the -- a different

10   officer that worked each shift?

11   A.  Yes.  We have three different shifts and three different

12   officers for each -- for I think it's from 12-to-8, and then

13   from 8-to-4, and then from 4-to-12.

14   Q.  The unit officers, do you have to obey what they say?

15   A.  Yes, they're in control.

16   Q.  Well, what puts them in control?

17   A.  I mean, they're there to watch over us for an 8-hour

18   shift.  They have the key, if you need to go in the back.  I

19   mean, if we're not obeying their rules, they take out the TV,

20   they take our microwave, they turn off the lights and tell us

21   to go to bed.  And then, if we don't obey, they have the

22   power to call the compound officer and the lieutenant to have

23   us locked up and put in the Special Housing Unit.

24   Q.  When you are in the Special Housing Unit, how does that

25   differ than being in, say, C unit?

*Shonnie Daniels - Direct*

1   A.   When you're in the Special Housing Unit, you only can

2   shower like three times a week; and you are in a small cell

3   by yourself, maybe one more person; and your food is brought

4   to you and given to you through like a little small tray.

5   You are confined.  And when you go out to shower, you're

6   handcuffed.  When you go out to rec, you are handcuffed.

7   Versus, if you were in C unit, then you are able to pretty

8   much go as you please, once the compound is open, and you can

9   watch TV in the unit.  In the Special Housing Unit, you can't

10  watch TV, and you are only allowed to use the phone once

11  every seven days.

12  Q.   When you say you go out to rec in handcuffs, you mean

13  recreation?

14  A.   Yes.  It's like a little cage that they put you in, but

15  they have to take you out in handcuffs.  And once you're in

16  that cage, they take the handcuffs off of you.

17  Q.   How long do you get outside?

18  A.   An hour.

19  Q.   Compared to if you are, say, in C unit, how long?

20  A.   We're out until the compound close, which is at 9:30,

21  besides going in for count.

22  Q.   Now, let's walk through, if there is such a thing, a

23  typical day.  What time would you normally get up?

24  A.   Well, the lights come on at 6:00.  You have to be up by

25  7:30 and have your bed made, and work call is at 7:30.  So,

*Shonnie Daniels - Direct*

1    for me, about 6:30.

2    Q.  Up at 6:30?

3    A.  I go to work at 7:30.

4    Q.  Can you just walk out of the unit anytime you want?

5    A.  Well, up until -- at 6:00, you can only go out if you're

6    pill line or insulin.  Once the compound opens at 7:00, then

7    you're allowed to go out.  I think it's 7:00, when the

8    compound opens.  I'm not sure.

9    Q.  Let me ask you about the pill line.  What's that?

10   A.  It's like, if you take insulin, and it opens before the

11   regular compound opens, and you're allowed to go up there and

12   get your insulin shot and come back, but you have to have a

13   card.

14   Q.  Okay.  You go up there, you go where?

15   A.  To the pill line, it's up to medical.

16   Q.  Okay.  So, you have to have a card to say, "I need to go

17   get a pill or get my shot"?

18   A.  Insulin or you're allowed to go out.

19   Q.  Okay.  Do you get an opportunity to have breakfast?

20   A.  Yes, you get an opportunity to eat breakfast.

21   Q.  All right.  Say you do that, what happens next?

22   A.  If I went to eat breakfast, I would come back, brush my

23   teeth, and then get ready for work.  And work call is at

24   7:30.

25   Q.  What type of work opportunities are out there?

1    A.   It's got different -- you can work in the rec yard.  You

2    can work for Unicor, which pays the most money.  You can work

3    in the kitchen.  You can work in laundry.  You can be a unit

4    orderly.

5    Q.   Unit orderly, what is that?

6    A.   They clean the showers, they clean the restrooms, buff

7    the floors in your unit, go in the back and clean the

8    counselors and the unit manager office.

9    Q.   Do you receive pay?

10   A.   Yes, we receive pay.

11   Q.   All right.  You said Unicor gets paid the most.  How much

12   do they get paid?

13   A.   Unicor, you can make anywhere from 150- to like $300.

14   But since prison is overcrowded, any other job, we would just

15   get maintenance pay, which was $5.35 a month.

16   Q.   Okay.  But in Unicor, if you were fortunate enough to get

17   one of those jobs, it could pay what, now?

18   A.   Anywhere from like 150- to $300 a month.  And, if you

19   worked overtime, it could pay up to 500.

20   Q.   All right.  Do you get an opportunity for a lunch break?

21   A.   Yes.

22   Q.   When is that?

23   A.   I'm not exactly sure.  Each unit, they have different

24   work calls for lunch schedule.  If you work education, the

25   rec yard, you would go at a certain time.  Then they would

*Shonnie Daniels - Direct*

1    let Unicor out at a certain time.  Then they would release

2    the units at a certain time.  It depends on the meal rotation

3    for the unit.  They would have -- executive staff would come

4    out and inspect the units, and whoever was in first place

5    would go first, and whoever win second place would go.

6    Q.  So, I take it, if you go to work for a morning session,

7    then you come back to your unit?

8    A.  No.  For lunch, wherever you work, if you're at lunch,

9    that's where -- I mean -- at work, that's where you would be

10   released from, but it was on different time schedules.

11   Q.  Okay.  Have lunch, then what do you do?

12   A.  Then you would hang out on the compound until work call,

13   and then you'd go back to work.

14   Q.  When is that?

15   A.  It varies.

16   Q.  Just depended?

17   A.  Just depended on where you worked at.

18   Q.  And if you -- unless you were working the call center on

19   a late shift, generally, when did people get off of work?

20   A.  3:30.

21   Q.  Where did you go at 3:30?

22   A.  Well, the compound would actually close, I think, around

23   3:40.  So, it would give you like 10 minutes, if you smoke,

24   to smoke or hangout with your friends before they would say

25   compound is closed.

*Shonnie Daniels - Direct*

199

1   Q.   And when the compound is closed, where do you go?

2   A.   You would go into your assigned unit for count.

3   Q.   For count?

4   A.   Uh-huh, for the 4:00 count.

5   Q.   Okay.  All accounted for, then what happens?

6   A.   Then, once the count clear, then they release early chow,

7   meaning, if you had a job that you had to go to before they

8   would release the compound, you would be on that early chow

9   list, and you would go out to eat; or, if you was

10  insulin/pill line for the evening, you would be released to

11  go to eat.  Then after that, they would release the rest of

12  the units by the meal rotation.

13  Q.   Let's say you go eat at 4:30 or 5:00, whatever it is,

14  then what happens?

15  A.   Then you got from 5:30 to 9:30, that's your leisure time.

16  You can go to rec or go out on the rec yard or you can stay

17  in the unit.

18  Q.   Unless there was something special going on, did you

19  pretty much have the ability to roam the entire grounds?

20  A.   Yes.  You can pretty much go where you wanted to.

21  Q.   Hang out with who you wanted to?

22  A.   Yes, within reason.

23  Q.   And you had to be back at the unit at what time?

24  A.   Compound closes at 9:30.

25  Q.   Is there another count that takes place?

*Shonnie Daniels - Direct*

1    A.   It would be I think a 10:00 count.

2    Q.   Did you have any idea how many inmates were out there

3    with you when you were there?

4    A.   Oh, I guess about 900, estimate.

5    Q.   Were there -- okay.

6         During those hours of free time, did you talk with other

7    inmates?

8    A.   Yes.

9    Q.   Would it be fair to say that inmates talk a lot?

10   A.   Yes.  Yes.

11   Q.   Is there much else to do?

12   A.   There's nothing else to do.  You're in this little small

13   world, and everybody knows everybody's business, you know.

14   Somebody says something happened in D unit, when the compound

15   opens, it's all over the compound.  Yes, they gossip, they

16   talk a lot.

17   Q.   Do you have much privacy?

18   A.   No.

19   Q.   Let's talk about, like, where you actually sleep.

20   A.   It's you and your bunkee on the top, and you got a bunkee

21   on the side.  It's like four of you-all in a cubicle.  But

22   there's no door.  It's like a big ol' open dorm.

23   Q.   Are you allowed to have -- where do you put your clothes?

24   A.   You have a little small locker that you would put your

25   clothes in, and you would have a laundry bag that you hang on

*Shonnie Daniels - Direct*

1    the side of your bed where you put your dirty laundry.

2    Q.  Was -- okay.  So, you were at FCI for a while; you went

3    to Marianna to the camp, and then you came back?

4    A.  Uh-huh.  Yes.

5    Q.  While you were at FCI-Tallahassee, did you meet an

6    officer by the name of Alfred Barnes?

7    A.  Yes.

8    Q.  Was that the first time you were at Tallahassee or the

9    second time?

10   A.  The first time.

11   Q.  And do you recall where you first encountered Officer

12   Barnes?

13   A.  In the Special Housing Unit, which was called the SHU.

14   Q.  And how did you meet him?

15   A.  Well, I'm assuming he had pulled up my file, and he had

16   seen where I was from Quincy.  And he came to my door and

17   asked me did I know a Gus Stasure or Penneo Matthews, which

18   is my relatives.  I told him, yeah, and we started talking

19   from there.  And he remembered being around them and coming

20   out to my house around my family members.

21   Q.  Okay.  Was there a -- other than talk of people that you

22   knew that he knew, did you develop any sort of a relationship

23   at this time?

24   A.  Yeah, at minimum.

25   Q.  Just a friendship or was it beyond that?

*Shonnie Daniels - Direct*

1   A.   Friendship, but like a flirtation kind of friendship,

2   to -- yeah, it was a little more than a friendship.

3   Q.   Was there anything more than just talk?

4   A.   At that particular time, no.

5   Q.   All right.  Did that friendship get interrupted with your

6   transfer to Marianna?

7   A.   Yes.

8   Q.   How long were -- you were gone how long?

9   A.   I left there in -- that was not in '99.  That was when I

10  got ready to go to Marianna.  That was 2001, is when I

11  encountered with him.

12  Q.   Okay.  And then you went to Marianna?

13  A.   And then I went to Marianna.  And then I came back in

14  2004.

15  Q.   Okay.  When you came back in '04, was Officer Barnes

16  still working there?

17  A.   Yes.  He was in G unit.

18  Q.   And where were you housed?

19  A.   In G unit.

20  Q.   Okay.  Did you resume talking with him?

21  A.   Yes.

22  Q.   Any -- did your relationship expand from there?

23  A.   Yes.

24  Q.   Tell the jury what happened.

25  A.   I was housed in G unit, but I was assigned to C unit.

*Shonnie Daniels - Direct*

1    And I would come down, and he and I would talk.  He worked

2    the 12-to-8 shift.  And --

3    Q.  This is -- I'm sorry.  This is 12 midnight to 8:00 in the

4    morning?

5    A.  To 8:00 in the morning, yes.

6    Q.  Okay.

7    A.  I can't recall, but I think I remember saying something

8    like, I needed some money to help -- because I didn't really

9    get a lot of money, and 'cause my mom had my kids.  And he

10   said he would help me out, and he started bringing packages

11   of contraband, Black & Milds, nail polish --

12          MR. HARPER:  Objection, Your Honor, to the statements

13   of Mr. Barnes, pursuant to the pretrial motion.

14          THE COURT:  Overruled.

15   BY MR. SPROWLS:

16   Q.  You mentioned Black & Milds.  What are those?

17   A.  Cigars.

18   Q.  Were they at one point in time popular?

19   A.  Yes.  They were on the streets for like a dollar and 95.

20   In prison I could sell them for $15 a box.

21   Q.  Okay.  So, he brought you a few things because you really

22   didn't have much?

23   A.  Yes.

24   Q.  Okay.  Did the relationship go beyond that?

25   A.  Yes.

Shonnie Daniels - Direct

1   Q.   What happened?

2   A.   Then he -- he told me one night that he was going to

3   leave the stairwell open, and that he wanted me to meet him

4   down there.  So, one night I got up, we went back to the

5   stairwell, and we started having a sexual relationship.

6           MR. SPROWLS:  May I approach the clerk, Judge?

7           THE COURT:  You may.

8   BY MR. SPROWLS:

9   Q.   Ms. Daniels, I'm showing you what is in evidence as

10  Government's Exhibit 1.  Do you recognize this overview of

11  the compound?

12  A.   Yes.

13  Q.   And G unit is over here, the bottom right?

14  A.   Yes.

15  Q.   Do you recognize this as the entrance to the G unit?

16  A.   Yes.

17  Q.   This would be similar to the housing arrangement there in

18  G unit?

19  A.   Yes.

20  Q.   Is this the back gate that he left open for you?

21  A.   Yes.

22          THE COURT:  Mr. Sprowls, if you could --

23          MR. SPROWLS:  Oh, I'm sorry.  I'm showing Exhibit 7.

24  Exhibit 5 was the room.

25          MR. FINDLEY:  Your Honor, I would ask that rather

*Shonnie Daniels - Direct*

 1   than say, "Is this the one he left open," that he would say

 2   Mr. Barnes, so the record is clear.

 3           MR. SPROWLS:  I'm sorry.

 4   BY MR. SPROWLS:

 5   Q.  Do you recognize what I'm showing you now as Exhibit 6?

 6   A.  Yes.

 7   Q.  What is that?

 8   A.  The stairs.

 9   Q.  Okay.  What happened there?

10   A.  We would go up those stairs.  Sometimes we would be on

11   the second stair or the third.  And I would lay on the

12   stairs, and we would have sexual intercourse and oral sex,

13   also.

14   Q.  I'm not asking these questions to embarrass, Ms. Daniels,

15   but why did you do that?

16   A.  Well, I was in need of money, and I knew that my family

17   wasn't sending me much, so I was trying to survive.

18   Q.  Trying to survive in what way?

19   A.  I mean, to have money on my books so I can make phone

20   calls to my kids, so I can buy my personals, and buy me food,

21   wash my clothes.

22   Q.  This happened one time or multiple times?

23   A.  It happened multiple times.

24   Q.  What sort of things did you receive?

25   A.  Vodka, Black & Milds, jewelry, perfume, chewing gum,

*Shonnie Daniels - Direct*

1   fingernail polish, bandanas, a ring, earrings.

2   Q.   These were items that you received from Officer Barnes?

3   A.   Yes.

4   Q.   And what did you do with these things?

5   A.   I would sell them to the inmates, and they would -- I

6   would give them a list, and then they would bring me food

7   from the commissary.

8   Q.   How did that work?  Is that the way the transactions

9   worked?

10  A.   I would give them the merchandise, and I would tell them

11  that this is $15 or $30, and I would give them a list of $30

12  worth of items on it.  And when they went to the store, they

13  would bring me whatever I purchased on commissary.

14  Q.   What sort of things were you looking to get out of the

15  commissary?

16  A.   Soap, deodorant, potato chips, soda, ice cream, jogging

17  pants, tennis shoes.

18  Q.   Did you ever see Mr. Barnes providing items to other

19  inmates?

20  A.   Yes.

21  Q.   Do you recall whether there was -- well, let me back up.

22       Do you recall whether or not Officer Barnes approached

23  you about mailing things?

24  A.   Yes.

25  Q.   Tell the jury what you -- what you heard.

1   A.  He was getting ready to go down to the detention center

2   where the men were, and he told me whenever I needed

3   something that I could mail him the money, and he gave me his

4   mom's address, and I would mail him the money with a letter

5   telling him what I wanted.  And at that point, he would get

6   it, and he would switch with different officers to come back

7   to give me that package.

8   Q.  So, he's working the detention center, and he would

9   switch off the shift in order to come to where you're up at

10  the --

11  A.  Yes, at the --

12  Q.  FCI?

13  A.  -- FCI, yes.

14  Q.  Do you recall what town -- did you actually -- did that

15  plan actually get put into use?

16  A.  Yes.  It was Thomasville where his mom lived.  I would

17  send the money there.

18  Q.  Ms. Daniels, did you -- do you recall, while you were at

19  FCI, meeting a Gregory Dixon?

20  A.  Yes.

21  Q.  And what was his position at the prison?

22  A.  Repeat?

23  Q.  What was his -- was he an inmate, an officer?  What was

24  he?

25  A.  A correctional officer.

*Shonnie Daniels - Direct*

1   Q.   Would you recognize him if you saw him again?

2   A.   Yes.

3   Q.   Is he in the courtroom?

4   A.   Yes.

5   Q.   Where is he seated or standing?

6   A.   He's seated right next to the gentleman right there, with

7   the blue tie on.

8   Q.   What color is Mr. Dixon's shirt?

9   A.   He has on a burgundy shirt.

10  Q.   Okay.

11          THE COURT:  Mr. Sprowls, if we're shifting gears,

12  it's about time to take a break.  Let's take the morning break

13  at this time.

14          Members of the jury, recall my instructions.  Don't

15  talk about the case.  Find something else to talk about.

16  Leave your pad right there on your chair, and we'll be back

17  with you in a few minutes.

18          Jury out, please.

19     (The jury exited the courtroom at 10:37 a.m.)

20          We'll be in recess until 10:50 by that clock, that's

21  15 minutes.

22          Ms. Daniels, if you would, be back on that witness

23  stand within 15 minutes.

24          THE WITNESS:  Okay.

25          THE COURT:  We'll be in recess.

*Shonnie Daniels - Direct*

1    (A recess was taken at 10:38 a.m.)

2    (The proceedings resumed at 10:50 a.m.)

3    (Defendants present; jury not present.)

4        THE COURT:  Please be seated.

5        Jury in, please.

6    (The jury entered the courtroom at 10:54 a.m.)

7        All right.  You may be seated.

8        Ms. Daniels, you are still under oath.

9        Mr. Sprowls, you may proceed.

10       MR. SPROWLS:  Thank you, sir.

11   BY MR. SPROWLS:

12   Q.  Do you recall how you -- the circumstances when you met

13   Officer Dixon?

14   A.  Yes.

15   Q.  Okay.  Tell us what you did that led up to meeting with

16   him.

17   A.  Well, I seen him on the compound, but how I actually met

18   up with him, one morning I went around to the F unit looking

19   for Officer Barnes, and he was there.

20   Q.  "He" who?

21   A.  Mr. Dixon.

22   Q.  Okay.  And what happened next?

23   A.  And I went there looking for Mr. Barnes, and he wasn't

24   there.  And he and I started talking, and he started putting

25   his hand in my vagina area and started playing in my private

*Shonnie Daniels - Direct*

1    part.

2    Q.   Okay.   What time of day are we talking about here?

3    A.   It was in the morning, 'cause he was working the 12-to-8

4    shift.   So, I went around there about 7:00, 7-ish, I guess.

5    I'm not exactly sure of the time.

6    Q.   Okay.   Did it stop there?

7    A.   No, it didn't.

8    Q.   What happened?

9    A.   And then he and I would talk on occasion, and I would

10   tell him that I would want him to bring me some Black &

11   Milds, and he would bring me a couple of boxes from time to

12   time.   I'm not exactly sure when, but he was the officer in

13   the C unit, and he worked the 12-to-8 shift.   And we went in

14   the back in the counselor's office on the table, and we had

15   sex.

16   Q.   Ms. Daniels, I'm going to show you Government's Exhibit

17   9.   Do you recognize that?

18   A.   Yes.   That's C unit.

19   Q.   I'm going to show you what's in evidence as Government's

20   Exhibit 11.   Do you recognize what this depicts?

21   A.   Yes.   That's in the back where the counselor's office and

22   the unit manager's office is located.

23   Q.   Is that where you and Mr. Dixon went?

24   A.   In the back, yes.

25   Q.   In one of those offices?

*Shonnie Daniels - Direct*

211

1   A.   Yes.

2   Q.   Did you do this for free, Ms. Daniels?

3   A.   No, I didn't.

4   Q.   Why did you do it?

5   A.   To receive contraband.

6   Q.   And did you get contraband from Mr. Dixon?

7   A.   Yes, I did.

8   Q.   What did you do with those items?

9   A.   I would sell them to the inmates on the compound.

10  Q.   Did you have -- did you have sexual contact with

11  Mr. Dixon just one time or other times?

12  A.   Other times.

13  Q.   Where would this occur?

14  A.   One particular time in F unit.

15  Q.   Okay.  Where there?

16  A.   Do you have F unit?

17  Q.   As a matter of fact, we do.

18       Do you recognize what that is the front of?

19  A.   Yes.  That's the front, but do you have one for the side

20  where the fence is?

21  Q.   I'm going to show you what's been admitted into evidence

22  as Government's Exhibit 14.  Does this help you?

23  A.   Is that like up on the side, up by the track field?

24  Q.   Just tap the screen with your fingernail where --

25  A.   Right where -- is that on the side of F right there?

Shonnie Daniels - Direct

1    Q.   Was it inside the building or outside the building?

2    A.   You've got F unit, and then on the side of F unit there's

3    like a fenced-in building, and you have to have a key to get

4    in that fence.

5    Q.   Is that this building there?

6    A.   I can't -- is this building right there F unit also, the

7    two sides?  I mean, I don't know.  I can't --

8    Q.   You are to provide the answers, not me.

9    A.   I know.  On the side of F unit -- put it back in the

10   front again.  Put me back to the front of F unit.

11       Okay.  Okay.  If you go out the door, on your right side

12   is a building over there, and it's got a fence around it.

13   Q.   Okay.

14   A.   And we went in there.  It's like a generator type of

15   building.

16   Q.   All right.  I'm going to show you what's in evidence as

17   Government's Exhibit 30.  Do you recognize what this depicts?

18   If you don't, you don't.

19   A.   No, I don't.

20   Q.   Okay.  Well, let's dispense with that.

21       Just tell us, there is a building on the side of F unit?

22   A.   Yes, and it's got a fence around it, and you have to have

23   a key to go in there.  We went in there one morning, and it's

24   like generators, I suppose, that was in there, and we had sex

25   in there.

*Shonnie Daniels - Direct*

1    Q.  Did you receive anything from Mr. Dixon?

2    A.  Not at that particular time, I didn't; but later on, I

3    received Black & Milds.  And then on one occasion I had him

4    go to Dillards to meet my cousin, and he was going to give

5    her a package, and he was going to bring it into me.  And he

6    charged me $50.  And I'm assuming that he was seeing this

7    inmate in D unit named Tytana Howard, because that's who he

8    had me to --

9            MR. FINDLEY:  Your Honor, I would object to the

10   speculation.

11           THE COURT:  Sustained.

12           MR. FINDLEY:  And move to strike.

13   BY MR. SPROWLS:

14   Q.  All right.  Did you -- was there another inmate involved

15   in this plan to bring in a package at a meeting in Dillards?

16   A.  Yes.

17   Q.  Did you have to provide any -- were you told to provide

18   any information to this other inmate?

19   A.  To this other inmate?  What --

20   Q.  Yes.  Without saying what somebody else said, what was

21   the plan and whose plan was it?

22           MR. FINDLEY:  Your Honor, I object, if she is just

23   going to base the answer on hearsay, which is what he is

24   asking her to do.

25           MR. SPROWLS:  I'll try to rephrase, Judge.

*Shonnie Daniels - Direct*

BY MR. SPROWLS:

Q.   Was this a plan that you came up with or a plan that someone else came up with?

A.   My sister, Stephanie George.

Q.   Is she a sister as in a sibling?

A.   A prison sister.

Q.   Okay.  It was her plan?

A.   Well, actually, it was like our plan together, 'cause we kind of like operate in like a circle.

Q.   Who is the "we"?

A.   "Us," inmates that deals with contraband and dealing with the officers that we knew were involved in getting us contraband.

Q.   Was that the circle?

A.   What --

Q.   You say "a circl."  Were those people in the circle?

A.   Yes.

Q.   So, this is a plan that several people came up with?

A.   Well, no.  I mean, we were trying to figure out that we was trying to make extra money.  So I was, like, well, my aunt work at Dillards, and I can get with Mr. Dixon to see if he would go there and pick up a package.  And then, once the package come in, you know, we would sell it, and we would get more money, 'cause he was only bringing me Black & Milds; and, if I got perfume and the lipstick and the fingernail

*Shonnie Daniels - Direct*

1    polish, I could make more money.

2    Q.   So, you wanted a different variety of things?

3    A.   Yes.

4    Q.   Before we go to the Dillards --

5    A.   Okay.

6    Q.   -- thing, did you ever see Mr. Dixon give contraband to

7    anybody besides yourself?

8    A.   Yes.

9    Q.   To who?

10   A.   Stephanie George.

11   Q.   How is it that you were -- when Mr. Dixon would hand you

12   the contraband or give it -- how would he physically get it

13   to you?

14   A.   We would go to whatever unit he was working in and get it

15   from the officer station, from him.

16   Q.   Where was it that you saw him give contraband to

17   Stephanie George?

18   A.   She was in B unit.

19   Q.   All right.  And where did the giving take place?

20   A.   Inside B unit officer station.

21   Q.   How is it that you were there to see this?

22   A.   Because he was the officer that working on duty, and he

23   would allow me to come in the unit.

24   Q.   Ms. Daniels, just so we understand, when the officer is

25   giving contraband to an inmate, isn't that trying to be done

*Shonnie Daniels - Direct*

216

1  in secret?

2  A.  Yes, it is, but, I mean, I was -- that was my prison

3  sister, per se, he trusted me being around her and him.  And,

4  I mean, he was trying to be in secret, because we was in the

5  office.  He carried sometime a little lunch bag, and it was

6  in there.  And he would bend down, get it and give it to her,

7  and she take it in the back, because she actually lived in

8  the unit.

9  Q.  In B unit?

10  A.  In B unit, yes.

11  Q.  So, tell us what you did with regard to this Dillards

12  arrangement.

13  A.  I had him to meet my cousin at Dillards.

14  Q.  Had him, "him" --

15  A.  Mr. Dixon to meet my cousin at Dillards, and I told him

16  that she was going to give him a package.  And he charged me

17  $50.  So, he met her there -- Mr. Dixon met my cousin,

18  Gekettia Harris, at Dillards.  She gave him a package.  He

19  brought in it.

20       MR. FINDLEY:  Your Honor, I object.  This is hearsay.

21       THE COURT:  Sustained.

22  BY MR. SPROWLS:

23  Q.  You don't know what happened, but --

24  A.  No, I don't, but --

25  Q.  What did you get at the receiving end?

*Shonnie Daniels - Direct*

217

```
 1   A.  I got a bag with perfume, lipstick, chewing gum,

 2   earrings, eye makeup, eyeliner.

 3   Q.  Were these the things you wanted?

 4   A.  Yes.

 5   Q.  What were these items in?

 6   A.  A brown bag.

 7   Q.  And who gave them to you?

 8   A.  Mr. Dixon.

 9   Q.  What did you do with those things?

10   A.  I sold them to the inmates on the compound.

11   Q.  While you were an inmate at FCI, did you know a

12   correctional officer by the name of Alan Moore?

13   A.  Yes.

14   Q.  And how did you know him?

15   A.  He used to work our unit, C unit; and he worked G unit

16   when I was there, also.

17   Q.  Now, you mentioned earlier that you would get up around

18   6:30?

19   A.  From 6:00 to 6:30.

20   Q.  Okay.  When Mr. Moore was working as your unit officer,

21   when was he supposed to let you out?

22   A.  When the regular compound opened.

23        MR. HARPER:  Objection, Your Honor, to the form of

24   the question.

25        THE COURT:  Overruled.
```

*Shonnie Daniels - Direct*

1    BY MR. SPROWLS:

2    Q.   When were you supposed to be let out of your unit?

3    A.   When the regular compound opened.

4    Q.   All right.  Did he let you out then?

5    A.   At times he did, but there had been times that I got out

6    with the people that had to take the insulin at 6:00.

7    Q.   The pill line?

8    A.   The pill line, yes.

9    Q.   Did you have a card to get out?

10   A.   No, I didn't.

11   Q.   How did you get out?

12   A.   I would get in line and Officer Moore would let me out.

13   Q.   Do you know why?

14   A.   To go around to the F unit to see Mr. Barnes.

15   Q.   How did -- how did you -- were you seeing Mr. Barnes at

16   this time?

17   A.   Excuse me?

18   Q.   Were you seeing Mr. Barnes at this time?

19   A.   Yes.

20   Q.   Were you engaging in the sexual acts that you told us

21   about during this time?

22   A.   Yes.

23   Q.   Were you getting contraband from Mr. Barnes at this time?

24   A.   Yes.

25   Q.   Did you say anything to Officer Moore as to where you

*Shonnie Daniels - Direct*

```
 1   were going?

 2   A.   Yes.

 3   Q.   What did you tell him?

 4   A.   That I was going around to F unit to see Mr. Barnes.

 5   Q.   You actually said words to that effect to him?

 6   A.   Yes.

 7   Q.   By the way, Mr. Moore, is he in the courtroom today?

 8   A.   Yes.

 9   Q.   Where is he seated or standing?

10   A.   He's sitting in -- the second male next to this gentleman

11   right here, with the mustache, with the glasses on.

12   Q.   Okay.  Seated in the middle?

13   A.   Right here with the bald head.

14   Q.   Okay.  So, you actually told him why you -- I mean, why

15   were you wanting to get out early in the pill line?

16   A.   To go around to F unit to see Mr. Barnes.

17   Q.   And you said as much to Mr. Moore?

18   A.   Well, yes, because I didn't have a card, so I couldn't

19   just go out.  So, I was telling him that I was going around F

20   unit to see Mr. Barnes.

21   Q.   Did this happen more than once?

22   A.   Several times.

23   Q.   Did he ever say anything to you about your going to see

24   Mr. Barnes?

25   A.   Yeah, we would talk.  He would tell me, you know, to be
```

*Shonnie Daniels - Direct*

1    careful, and that, you know, Mr. Barnes' name was ringing;

2    that he was hot; and that, you know, he wasn't going to be

3    letting me out 'cause he didn't really want to be involved.

4    Q.  He didn't want to be involved, "he," who?

5    A.  Mr. Moore didn't want to be involved.

6    Q.  And when he said he heard his name ringing?

7    A.  Yes.  That mean that Mr. Barnes was, like, when your name

8    ringing, it's like the inmates are talking to the officers

9    about Mr. Barnes bringing in contraband and sleeping with

10   other women, in reference to the OIG coming in there and

11   questioning other inmates about different officers.

12   Q.  He's suggesting that you be careful?

13   A.  Yes.

14   Q.  Did you tell Mr. Moore what you were doing with

15   Mr. Barnes?

16   A.  Yes.  He and Mr. Barnes would talk on the phone.

17   Q.  How did you know?

18   A.  'Cause I would be in the officer's station.

19   Q.  Could you tell what they were talking about?

20   A.  I mean, if I would ask Mr. Moore to call to the jail

21   whenever Mr. Barnes went up there, I could hear him ask

22   Mr. Barnes, you know, "When are you coming back up here?

23   Ms. Daniels is in the office, you know, she's asking about

24   you."

25   Q.  When you said Mr. Barnes went to the jail, the jail is

*Shonnie Daniels - Direct*

1    a --

2    A.   Where the males are, up on the hill.

3    Q.   The detention --

4    A.   The detention center.

5    Q.   Ms. Daniels, do you recall an incident where you and

6    Mr. Barnes went to C unit?

7    A.   Yes.

8    Q.   Okay.  I'm going to let this thing warm up for just a

9    moment here.

10       Do you recall what unit you were assigned to when this

11   occurred?

12   A.   C unit.

13   Q.   And this was during the time period that -- just to make

14   it clear -- you began having sexual relations with Mr. Barnes

15   when you returned from Marianna in '04?

16   A.   Yes.

17   Q.   And the events that you just discussed with regard to

18   Mr. Dixon occurred in -- do you know what year?

19   A.   It was during when I came back from Marianna.

20   Q.   Okay.  Let's talk about this incident in C unit.  What

21   time of day and where were you -- what unit were you at?

22   A.   I was in C unit, and it was from 12-to-8.  Mr. Barnes was

23   working the F unit and Officer Moore was working the C unit.

24   And Mr. Barnes came to C unit, and I think it was the 3:00

25   count -- I'm not sure, but -- anyway, he had tapped on my

1    bed, and he told me to come to the back.  And I asked him,

2    you know, how did he get in there, and he said that

3    Mr. Evans, which was another officer at FCI, he could not

4    count the SHU, because this inmate was in there named Tonya

5    Rodriguez that was under investigation in regard to Officer

6    Evans.  So, Mr. Barnes had to count the SHU for Officer

7    Evans, so Officer Evans was in F unit.  So, Mr. Barnes became

8    the compound officer, which counts the units.

9        And he came in C unit, and we went to the back in the

10   counselor's office, and we had sex.  I mean, it wasn't long,

11   'cause he had to go back over to his assigned unit.

12   Q.  All right.  Let's -- I think you have already identified

13   this exhibit.  Government's Exhibit 9 is the front of C unit,

14   correct?

15   A.  Yes.

16   Q.  And let me show you Government's Exhibit 12.  Do you

17   recognize what that's a diagram of?

18   A.  Looks like C unit, north side and south side.

19   Q.  All right.  Where did you go in C unit?

20   A.  We went in the back, where the counselor office and the

21   unit manager office is.

22   Q.  All right.  I was showing you Exhibit 12.  I'm just going

23   to jump to Exhibit 11 quickly.  Did you go to this area?

24   A.  Yes, in the back.

25   Q.  I'm showing you Exhibit 11.  Would that be back in here,

1    that corridor?

2    A.   Yes, in the back.

3    Q.   Tap the screen lightly as to what room you went in.

4    A.   I'm not sure.

5    Q.   Okay.  Do you recall approximately where your bunk was?

6    A.   Yes.  I was on the backside by the phone booth, which was

7    like about four cubicles from the door which go into the

8    counselor's and the unit manager's office.

9    Q.   Would that be maybe here?  Or if you don't know --

10   A.   Can you -- is this the -- let's see.  Maybe like right

11   here.

12   Q.   Okay.  Is this a locked door in the evening?

13   A.   In the back to the unit counselor's office?  Yes.

14   Q.   Where I just drew the yellow line?

15   A.   Yes.  It's locked.

16   Q.   How did you get through that door?

17   A.   The officer that's working that unit has the key.

18   Q.   Who had the key?

19   A.   Officer Moore.

20   Q.   So, Officer Moore let you and Mr. Barnes back there?

21   A.   Yes.

22   Q.   What time of day?

23   A.   It was during the 12-to-8 shift, and I think after the

24   3:00 count.

25   Q.   Twelve midnight to 8:00 in the morning, and there's a

*Shonnie Daniels - Direct*

1    count at 3 a.m.?

2    A.   Yes.

3    Q.   Ms. Daniels, do you recall being in the SHU, Special

4    Housing Unit, and being approached by an officer -- well, let

5    me back up.

6        Do you know an Officer Vincent Johnson?

7    A.   Yes.

8    Q.   Do you recall being in the SHU and being approached by

9    Officer Johnson?

10   A.   Yes.

11   Q.   Tell the jury why you were in the SHU at this time.

12   A.   I was there to go to court in reference to a fight that

13   happened between Officer Lieutenant Stanford and Tina Jones.

14   Q.   Now, were you -- where were you permanently being housed

15   at that time?

16   A.   Carswell, Texas.

17   Q.   So, you had been brought back to FCI-Tallahassee because

18   there is a hearing --

19   A.   Yes.

20   Q.   -- and they needed you?

21   A.   Yes.

22   Q.   So, you're in the SHU; Mr. Johnson approaches you?

23   A.   Yes.

24   Q.   Does he ask you anything?

25   A.   Yes.   He wanted to know why I was back there, because he

*Shonnie Daniels - Direct*

1  said the word was out that I was back there to testify and to

2  snitch on Officer Barnes; and that he was asking me if anyone

3  had asked me any questions about taking a DNA test.  And I

4  told him, no, I was wasn't there for that reason; I was there

5  in reference to a hearing about a fight.

6  Q.  I should've put this in a time sequence.

7      You were at FCI for a period of time, you went to

8  Marianna.

9  A.  Right.

10  Q.  You came back to FCI, and that's when you had this sexual

11  contact with Mr. Barnes and Mr. Dixon?

12  A.  Yes.

13  Q.  Did there come a point then you were transferred to

14  Carswell?

15  A.  Yes.

16  Q.  All right.  So you had left FCI-Tallahassee?

17  A.  I had left FCI-Tallahassee.

18  Q.  But, lo and behold, here you are back?

19  A.  Yes.

20  Q.  And Mr. Johnson is there to ask you why you're back?

21  A.  Yes.

22  Q.  Because word is out that you are back for another reason?

23  A.  Yes.

24  Q.  Did Mr. Johnson indicate to you -- was he there on his

25  own or was he there --

*Shonnie Daniels - Direct*

226

1   A.  Well, Barnes had sent him over -- well, he was actually

2   working the SHU, and Barnes had sent him back there to ask me

3   if anyone had asked me --

4          MR. FINDLEY:  Your Honor, I object.  That calls for

5   speculation.

6          THE WITNESS:  And he wanted --

7          THE COURT:  Wait just a minute.  Sustained.

8   BY MR. SPROWLS:

9   Q.  What did Mr. Johnson tell you?

10  A.  He said Barnes told him to ask me if I had been

11  questioned by the OG office and had anyone asked me to take a

12  DNA.

13  Q.  To give a DNA sample?

14  A.  Uh-huh.

15  Q.  And you said no?

16  A.  I said no.

17  Q.  And did you tell him why you thought you were back?

18  A.  I told him that I was there in reference to a hearing for

19  Tina Jones and Lieutenant Stanford.  And he was trying to

20  tell me that that's not what the word on the compound is;

21  that I was back to snitch, per se, on Officer Barnes.

22  Q.  And when he told you that the word was out differently,

23  what did you say to that, if anything?

24  A.  I told him that that wasn't true.  I was back in

25  reference to a hearing for Tina Jones and Lieutenant

*Shonnie Daniels - Cross/Harper*

1   Stanford.

2   Q.  And was that, in fact, true?

3   A.  Yes.

4           MR. SPROWLS:  That's all I have, Your Honor.  Thank

5   you.

6           THE COURT:  Cross-examine?

7           MR. HARPER:  Yes, sir.

8           May it please the court.

9                       CROSS-EXAMINATION

10  BY MR. HARPER:

11  Q.  Ms. Daniels, you indicated here in front of the jury that

12  Mr. Barnes and you were taken by Mr. Moore back to the unit.

13  What unit was that?

14  A.  Say what now?

15  Q.  I understood you to say that Mr. Barnes and you were

16  taken back to the unit by Mr. Moore.

17  A.  I wasn't taken back there by him, no.

18  Q.  What unit are you in?

19  A.  C unit.

20  Q.  Okay.  And this is -- you're taken to an office area and

21  keys are used to let you into that?

22  A.  Yes.

23  Q.  And that is -- what? -- a staff member's office?

24  A.  In the unit team office, in the back, yes.

25  Q.  Okay.  And you're saying Mr. Moore had a key to that

```
1    office.  Is that what you are saying?

2    A.  He has a key to the back door that goes back there, to

3    the counselor's office, yes.

4    Q.  And who had the key to the counselor's office?

5    Mr. Moore?

6    A.  Yes.  He was the officer over that unit.

7    Q.  All right.  That's not true, though, is it, Ms. Daniels?

8    A.  Yes.

9    Q.  It's not true, either, that you've only got two felony

10   convictions, is it?

11   A.  I have felony convictions for my drug case; I have the

12   one from the Liberty County case, and I have one for the TJ

13   Maxx case, which the Liberty case and the TJ Maxx case was

14   adjudication withheld.

15   Q.  Well, you have -- I don't know about TJ Maxx, but you

16   have a felony conviction for grand theft from a retail

17   merchant in Leon County in 1997.

18   A.  That's correct; that's the TJ Maxx case.

19   Q.  Okay.  And you have a forgery conviction in 1997 for

20   Count Two, Count Three, and Count Four.  That's three more

21   felony convictions, isn't it?

22   A.  That was the TJ Maxx case.

23   Q.  Okay.  So that's four felony convictions right there,

24   isn't it -- in Leon County?

25   A.  That was just the one case.
```

*Shonnie Daniels - Cross/Harper*

1   Q.   But it ended up with actually -- Count One, Count Two,

2   Count Three, Count Four -- four felony convictions; is that

3   right?

4   A.   That was the TJ Maxx case.

5   Q.   Yes or no, Ms. Daniels; that conduct ended up with four,

6   not one, four felony convictions; is that correct?

7          MR. SPROWLS:   I object.

8          THE COURT:   I'll sustain the objection.

9          MR. HARPER:   Your Honor, may I approach the witness?

10  May I offer the judgment and sentence on the case?

11         THE COURT:   Is she adjudicated guilty?

12         MR. HARPER:   Yes, sir.

13         THE COURT:   You may.

14         MR. SPROWLS:   Judge, we would object to this at this

15  point.

16         THE COURT:   You can ask one more question about what

17  she was convicted of at that time, and then let's move on.

18         MR. HARPER:   May I introduce the exhibit?

19         THE COURT:   Depends on the answer.

20         MR. HARPER:   All right.

21  BY MR. HARPER:

22  Q.   Ms. Moore -- I mean -- Ms. Moore? -- Ms. Daniels, were

23  you convicted of grand theft from retail merchant, forgery,

24  Count Two, Count Three, Count Four, on a violation of

25  probation, Case Number 1997-CF-003520 in Leon County on or

1    about April the 12th, 2006?

2    A.   In 2006 I was -- I'm confused.   You're saying 2006.   I

3    was incarcerated.   I was at the federal halfway house.   On

4    April 12th, I came back to -- I'm not sure what you're

5    saying.

6              MR. HARPER:   Offer Defendant's Exhibit Number 3 at

7    this time, Your Honor.

8              MR. SPROWLS:   We object.

9              THE COURT:   I'll sustain the objection.

10             MR. HARPER:   May we be heard later?

11             THE COURT:   Yes, you may.

12   BY MR. HARPER:

13   Q.   Ms. Daniels, is your name Shonnie M. Daniels, ////////

14   ////////, Quincy, Florida?

15             MR. SPROWLS:   Object.   Move to strike that.

16             THE COURT:   The objection is sustained.

17   BY MR. HARPER:

18   Q.   Is your name Shonnie M. Daniels?

19   A.   As I stated earlier, Shonnie Yvette Daniels.   "M" stands

20   for Marshall, which is my maiden name.

21   Q.   Are you the same Shonnie M. Daniels that was convicted on

22   the 12th of April 2006, violation of probation, for the

23   offense of possession of cocaine, resulted in a felony

24   conviction in the Second Judicial Circuit, Liberty County,

25   Florida?

*Shonnie Daniels - Cross/Harper*

1  A.  When I came back here to court on the VOP for the TJ Maxx

2  case and the Liberty County case, Judge Judy -- I can't think

3  of her last name.

4  Q.  Kathleen Dekker?

5  A.  Yeah, Judge Dekker.  She dropped the charges because she

6  said I had done enough time that would have been more than on

7  those charges that adjudication was withheld on.

8  Q.  Okay.  The charges were dropped, you were not adjudicated

9  guilty of a felony on that charge?

10  A.  When I came back 2006?

11  Q.  Yes.

12  A.  From my understanding, the charges was dropped.

13       MR. HARPER:  I would offer Defendant's Exhibit 4 at

14  this time, Your Honor.

15       MR. SPROWLS:  Same objection.

16       THE COURT:  Sustained.

17  BY MR. HARPER:

18  Q.  Ms. Daniels, you did indicate that you had a case in

19  federal court here in the Northern District of Florida; is

20  that right?

21  A.  I indicated -- what?

22  Q.  That you had a federal conviction for cocaine in the

23  Northern District of Florida; is that right?

24  A.  Yes.

25  Q.  And that conviction, that's a felony conviction, too,

*Shonnie Daniels - Cross/Harper*

1   isn't it?

2   A.   Yes.

3   Q.   And, as a part of that conviction, you agreed to

4   cooperate with the government, did you not?

5   A.   On my drug case?

6   Q.   Yes.

7   A.   Yes.

8   Q.   All right.  And you did that; is that right?

9   A.   Yes.

10  Q.   And you have done that for a long time; is that correct?

11  A.   No.

12  Q.   How long did you cooperate with the government?

13  A.   I don't recall.

14  Q.   Are you cooperating now?

15  A.   No.

16  Q.   Do you recall that you cooperated immediately after you

17  were arrested on the case in federal court?

18  A.   I don't recall.

19  Q.   Do you recall that you were facing a life sentence?

20  A.   No.

21  Q.   Do you recall an enhancement motion filed by the

22  government under 21, U.S. Code, Section 851(a), that exposed

23  you to a life sentence for that offense?

24  A.   What is an "enhancement"?

25  Q.   Do you know that the maximum possible penalty in your

*Shonnie Daniels - Cross/Harper*

1   case was life, by virtue of a motion filed by the government?

2   A.   No, I don't recall.

3   Q.   What did you think was the penalty that you were facing?

4   A.   I know conspiracy starts off at 10 years.

5   Q.   All right.   And you were in a conspiracy with your

6   husband; is that right?

7   A.   Yes.

8   Q.   All right.   How much cocaine was involved in that case?

9   A.   I don't recall.

10   Q.   All right.   Kilos and kilos; is that right?

11   A.   I don't recall.

12   Q.   Ms. Daniels, your cooperation with the government even

13   back then was not truthful, was it?

14   A.   Yes, it was.

15   Q.   Do you know that the -- you were first released on bail

16   and your bail was revoked?

17   A.   Yes.

18   Q.   And that's because you weren't being truthful with the

19   government, wasn't it?

20   A.   That's not correct.

21   Q.   Why was your bail revoked?

22   A.   Because my husband called me to go meet him, and I

23   should've called the agents first.   Instead, I went first,

24   and the agents followed me.

25   Q.   Did it have anything to do with you failing a urinalysis?

1    A.   Them revoking my bond?  No.

2    Q.   You did fail a urinalysis, right?

3    A.   I don't recall.

4         MR. HARPER:  May I approach the witness, Your Honor?

5         THE COURT:  You may.

6         THE WITNESS:  Okay.

7    BY MR. HARPER:

8    Q.   Could you read that back, that last paragraph there,

9    Ms. Daniels?

10        MR. SPROWLS:  Objection.

11        THE COURT:  Sustained.

12        MR. HARPER:  What I was going to ask, does it refresh

13   her memory?

14        THE COURT:  Just ask her.  She can't read it out

15   loud.

16        MR. HARPER:  No, I was going to ask her.  I was just

17   going to ask her if it refreshes her memory.  May I?

18        THE COURT:  Very well.

19        THE WITNESS:  Okay.

20   BY MR. HARPER:

21   Q.   Do you remember now that one of the reasons that your

22   bail was revoked was because you flunked a drug test?

23   A.   No.  My bail was revoked because I went to my husband and

24   the agents came and arrested me on that very day.  That's

25   when they revoked my bond, on the day that they followed me

1    to the location where my husband was.

2    Q.   Okay.  And they followed you to your husband.  You were

3    cooperating with the government at that time; is that right?

4    A.   Right.

5    Q.   And you had already been arrested, right?

6    A.   Yes.

7    Q.   And you were charged again the second time when you met

8    with your husband, right?

9    A.   No, I wasn't.

10   Q.   You weren't charged with a second offense?

11   A.   I had a drug conspiracy charge.

12   Q.   With your husband, right?

13   A.   Yes.

14   Q.   Okay.  And you were charged with another one because

15   there were drugs there at the house; is that right?

16   A.   Drugs at what house?

17   Q.   When you met with your husband.

18   A.   I don't recall any drugs being there.

19   Q.   You don't recall y'all hiding stuff?

20   A.   No, I don't.

21          MR. HARPER:  May I approach the witness, Your Honor?

22          THE COURT:  You may.  Show it to Mr. Sprowls.

23          MR. HARPER:  Sir?

24          THE COURT:  Show it to Mr. Sprowls.

25          MR. HARPER:  I'm just retrieving this document.

1          May I approach, Your Honor?

2          THE COURT:  You may.

3     BY MR. HARPER:

4     Q.  Ms. Daniels, again, I'm showing you Defendant's

5     Exhibit -- Defendant Moore Exhibit 16, and I'm asking you if

6     this document refreshes your recollection, not to read from

7     it, but it says in there that you were visiting your husband,

8     and you don't disclose to the government that drugs are

9     present on the premises.  Is that true?

10          MR. SPROWLS:  Your Honor, I would --

11          THE WITNESS:  I wasn't --

12          THE COURT:  Wait, wait, Ms. Daniels.

13          I sustain the objection.

14     BY MR. HARPER:

15     Q.  Does that refresh your recollection?

16     A.  No, because that wasn't my residence.

17     Q.  Okay.  Does it refresh your recollection that part of

18     your revocation was based on associating with drugs and still

19     being involved with drugs after you were cooperating with the

20     government?

21     A.  My bond revoked were when I went to my husband's location

22     and the agents followed me there.  That's when they revoked

23     my bond.

24     Q.  And you're saying it had nothing to do with drugs, a

25     separate related drug event?

1  A.  No.  Because they was looking for him, and I didn't know

2  where his whereabouts was.  And when he called me to come to

3  where he was, instead of calling the agents first, I went

4  there first.  That's when they revoked my bond.

5          MR. HARPER:  May I approach the witness, Your Honor?

6          THE COURT:  You may.

7  BY MR. HARPER:

8  Q.  Ms. Daniels, did you actually receive a motion for

9  reduction of your sentence that you were facing?

10  A.  Yes.

11  Q.  What sentence did you actually receive to begin with?

12  A.  A hundred and twenty months.

13  Q.  To start off with?

14  A.  Yes.

15  Q.  Okay.  So you got the low end to begin with?

16  A.  I'm not sure.

17  Q.  All right.  What did you end up with?

18  A.  Nine and a half years, after I got a 6-month reduction.

19  Q.  Did you also get other charges dismissed as part of your

20  cooperation with the government?

21  A.  I don't recall.

22          MR. HARPER:  May I approach the witness, Your Honor?

23          THE COURT:  You may.

24  BY MR. HARPER:

25  Q.  I've shown you Defendant's Exhibit 21.  Does that refresh

 1  your recollection?

 2  A.  Yes, but what does this say?

 3  Q.  Do you see where it says counts are dismissed?

 4  A.  No, I don't.

 5          MR. HARPER:  May I, Your Honor?

 6          THE COURT:  You may.

 7          THE WITNESS:  Oh, okay.

 8  BY MR. HARPER:

 9  Q.  How many counts were dismissed?

10  A.  According to this sheet, nine.

11  Q.  I'm sorry?

12  A.  According to this sheet, nine.

13  Q.  Okay.  Nine other charges were made in the indictment by

14  the grand jury, but they were dismissed because you were

15  cooperating with the government; is that right?

16  A.  Well, I had an attorney, and I really didn't do much of

17  the talking.  He did all of the talk for me.  I wasn't even

18  aware of these other counts.  So, I'm not sure.

19  Q.  Well, you filed motions in court on your own behalf,

20  though, didn't you?

21  A.  I don't recall.

22          MR. HARPER:  May I approach?

23          THE COURT:  You may.

24  BY MR. HARPER:

25  Q.  I show you what has been marked as Defendant's

Shonnie Daniels - Cross/Harper

1    Exhibit 19.  Do you recognize that pleading?

2    A.  Yes.

3    Q.  And that is signed by whom?

4    A.  Me.

5    Q.  And you filed that in federal court; is that right?

6    A.  Yes.

7    Q.  And you filed that here in this federal courthouse or

8    caused it to be filed here, right?

9    A.  Yes.

10   Q.  In your case?

11   A.  Yes.

12   Q.  And what were you trying to do?

13   A.  I was trying to get an additional sentence reduction.

14   Q.  And that's not the only motion you filed on your behalf,

15   is it?

16   A.  I don't recall.

17          MR. HARPER:  May I approach the witness?

18          THE COURT:  You may.

19          MR. HARPER:  I'm handing the witness Exhibit 20.

20   BY MR. HARPER:

21   Q.  Do you recognize that document, Ms. Daniels?

22   A.  Yes.

23   Q.  Signed by you, isn't it?

24   A.  I don't see my signature on here.

25          MR. HARPER:  May I approach the witness, Your Honor?

Shonnie Daniels - Cross/Harper

```
 1              THE COURT:  You may.
 2              MR. HARPER:  I'll come back to this one.  I've got
 3    the wrong copy.
 4    BY MR. HARPER:
 5    Q.  Ms. Daniels, you were saying, though, as far as your Plea
 6    and Cooperation Agreement, that was handled by your lawyer,
 7    and you didn't know what you were doing.  Is that what you
 8    said a minute ago?
 9    A.  No.  You were asking me about the counts.  I told you
10    that that was handled by my lawyer.
11    Q.  All right.  But you understood by the plea agreement that
12    you're supposed to cooperate with the government; is that
13    right?
14    A.  I don't understand you.  I did cooperate with the
15    government.
16    Q.  Okay.  And that you're supposed to do that; that's what
17    you are supposed to do; is that right?
18    A.  I had a choice.
19    Q.  Okay.  And if you don't cooperate with the government,
20    what happens?
21    A.  I didn't choose not to do that, so I don't know.
22    Q.  I'm sorry.  I couldn't hear you.
23    A.  I didn't choose not to cooperate, so I don't know what
24    would have happened.
25    Q.  Well, what did the agreement you entered into with the
```

*Shonnie Daniels - Cross/Harper*

1  government provide, if you do not cooperate?

2  A.  I don't recall.

3  Q.  Okay.  Do you recall having a Plea and Cooperation

4  Agreement, one that you signed?

5  A.  Repeat that?

6  Q.  Do you recall having a plea agreement, one which you

7  signed?

8  A.  I recall signing a plea agreement.

9          MR. HARPER:  May I, Your Honor?

10          THE COURT:  You may.

11  BY MR. HARPER:

12  Q.  I show you what has been marked as Defendant Moore

13  Exhibit 7.  Do you recognize that document?

14  A.  Yes.

15  Q.  And what do you recognize that document to be?

16  A.  It says, "Plea and Cooperation Agreement."

17  Q.  Does it bear your signature?

18  A.  I don't see my signature on here.

19          MR. HARPER:  Your Honor, I'm sorry.  I gave her the

20  wrong last page.

21  BY MR. HARPER:

22  Q.  You entered into a Plea and Cooperation Agreement,

23  Ms. Daniels.  It says that you and your attorney and the

24  government, then represented by Mr. Mike Simpson, entered

25  into an agreement; is that right?

1          MR. SPROWLS:  Objection.

2          THE COURT:  Overruled.

3   BY MR. HARPER:

4   Q.  Is that correct?  Do you understand my question?

5   A.  Repeat?

6   Q.  Yeah.  You and your attorney, Clyde Taylor, you and

7   Mr. Taylor and Mr. Moore -- Mr. Moore? -- you, Mr. Taylor and

8   Mr. Simpson, Michael Simpson, entered into an agreement, and

9   it disposed of your case; is that right?

10  A.  I'm not sure.

11  Q.  Okay.  Do you recognize this document I handed you, even

12  though it did not bear your signature?  Is this a copy of

13  your Plea and Cooperation Agreement without your signature?

14  A.  I'm not sure.  I recognize the Plea and Cooperation

15  Agreement, because I had one in my PSI.

16  Q.  Do you recognize this to be the same one, or do you want

17  to look at it?

18  A.  I don't know if it is or not.  I mean, I don't remember.

19  Q.  Okay.  Did you in open court go over a plea agreement

20  with the judge?

21  A.  Yes.

22  Q.  And the judge asked you if this plea agreement was your

23  free and voluntary act?

24  A.  Yes.

25  Q.  And did the judge ask you if you agree with everything

1  that was said in the courtroom?

2  A.  Yes.

3  Q.  Okay.  And part of the plea agreement provided that you

4  be exposed to a guideline sentence of 20 years to a life

5  sentence; is that right?

6  A.  I'm not sure.

7  Q.  All right.  Do you remember whether or not the plea

8  agreement provided that, if, in the government's discretion,

9  you failed to cooperate, the government could move to revoke

10  the plea agreement?

11  A.  I don't recall what was in there.

12  Q.  Do you remember that in the plea agreement it provided

13  that the government would ask the judge to dismiss the

14  counts, the remaining counts against you?

15  A.  I don't recall.

16  Q.  Do you recall that the government agreed, as part of the

17  plea agreement, that, if you would cooperate, they would not

18  charge you with anything else?

19  A.  I don't remember.

20  Q.  Do you know what would happen to you if you didn't

21  provide substantial assistance to the government, if you

22  didn't cooperate with the government?

23  A.  No.

24  Q.  Do you remember that the plea agreement provided that the

25  government in its sole discretion could decide whether or not

1    to file a motion for reduction of sentence?

2    A.  I don't recall.

3    Q.  How did your sentence get reduced?

4    A.  I cooperated with the government.

5    Q.  Okay.  And they filed a motion; is that right?

6    A.  Yes.

7    Q.  And it wasn't a motion you filed that got granted; it's

8    the one that the government filed; is that right?

9    A.  Yes.

10        MR. HARPER:  May I approach the witness, Your Honor?

11        THE COURT:  You may.

12   BY MR. HARPER:

13   Q.  I'm going to show you the same exhibit, Number 7, page 6.

14   Do you see your signature there that looks like "Shonnie

15   Daniels"?

16   A.  Yes.

17   Q.  Is that your signature?

18   A.  Yes.

19   Q.  Is that the signature of your attorney?

20   A.  That's my signature and Mr. Taylor's signature on top.

21   Q.  And is that the same plea agreement that you entered into

22   in your case in federal court that we've been talking about?

23   A.  Is this my signature?

24   Q.  No.  Is that your plea agreement?

25   A.  Yes.

 1          MR. HARPER:  I would offer Exhibit 7, Your Honor.

 2          MR. SPROWLS:  No objection, Judge.

 3          THE COURT:  Mr. Moore's Exhibit 7 is admitted.

 4      **(DEFENDANT MOORE EXHIBIT NO. 7:**  Received in evidence.)

 5  BY MR. HARPER:

 6  Q.  Ms. Daniels, a minute ago I was asking you about a second

 7  motion for downward departure, and I showed you a document

 8  which did not bear your signature.

 9          MR. HARPER:  I request leave of court to approach the

10  witness again with that one.

11          THE COURT:  You may.

12  BY MR. HARPER:

13  Q.  I tender to you Defendant Moore Exhibit 20 and ask the

14  same questions I tried to before.  Did you actually file a

15  second motion --

16  A.  Yes.

17  Q.  -- trying to get a reduction of sentence?

18  A.  Yes.

19  Q.  And was that granted?

20  A.  No.

21  Q.  Ms. Daniels, did you -- do you know that part of your

22  penalty in this case, this case where you were convicted here

23  in federal court, called for fines up to $4 million?

24  A.  No, I didn't.

25  Q.  The first you ever heard of it?

*Shonnie Daniels - Cross/Harper*

1  A.  I don't recall.

2  Q.  You don't remember the judge telling you that when the

3  court accepted your plea?

4  A.  No, I don't.

5  Q.  Do you remember the charges that were dismissed as a

6  result of your plea agreement with the government?

7  A.  I don't recall the counts.

8  Q.  Do you remember the charges, though, not necessarily the

9  counts?

10  A.  No, I don't.  I had possession with conspiracy.

11  Q.  Okay.  But do you remember the other counts that -- or

12  other charges of sale that were dismissed?

13  A.  No, I don't, because they were my husband's.

14  Q.  But you were part of the conspiracy?

15  A.  Okay.  I don't remember.

16  Q.  Okay.  Do you remember a sale by Kenneth Daniels of

17  27 grams of cocaine on March the 3rd of 1999?

18  A.  No, I don't.

19  Q.  Do you remember a sale by Kenneth Daniels of 27.2 grams

20  of crack cocaine on March the 10th of '99?

21  A.  No, I don't.

22  Q.  Your conspiracy involved powder cocaine and crack

23  cocaine, didn't it?

24  A.  Yes.

25  Q.  Okay.  Do you remember a sale of crack cocaine on

Shonnie Daniels - Cross/Harper

1    March 23rd by Kenneth Daniels?

2              MR. SPROWLS:  Judge, I'll object.

3              THE COURT:  I'll sustain the objection.

4    BY MR. HARPER:

5    Q.  Do you remember, Ms. Daniels, that you flew with Wanda

6    Smith from Tallahassee as part of the --

7              THE COURT:  Sustained.

8    BY MR. HARPER:

9    Q.  Ms. Daniels, when you were cooperating, did you always

10   provide truthful testimony to the government?

11   A.  Repeat the question?

12   Q.  Yes, ma'am.

13        Ms. Daniels, when you were cooperating with the

14   government, did you always provide truthful information to

15   the government?

16   A.  To the best of my knowledge.

17   Q.  Did you ever knowingly provide false information to the

18   government?

19   A.  Not to the best of my knowledge.

20   Q.  Did you truthfully tell the government where your husband

21   was during the time he was a fugitive?

22   A.  When he was a fugitive, I gave them the information that

23   I thought to the location where he would be at.

24   Q.  Isn't it true that you had contact with your husband

25   during the time he was a fugitive and didn't tell the

1  government?

2  A.   No.   When he called me that particular morning to come

3  where he was, I went there, instead of calling the agents

4  first.

5  Q.   Did you understate your responsibility to the government

6  as far as your involvement in the cocaine case?

7  A.   I don't understand that question.

8  Q.   Did you tell the government exactly what you did in your

9  own case, or did you downplay it or minimize your own

10  conduct?

11  A.   No.   I told them to the best of my knowledge.

12  Q.   Ms. Daniels, how many times have you been talked to by

13  the government officials regarding this case -- this case

14  involving Mr. Moore, in particular?

15  A.   I don't recall.

16  Q.   Do you remember talking to the government officials on or

17  about January the 6th, 2005?

18  A.   I don't recall.

19  Q.   Do you remember specifically talking with Special Agent

20  Reed Haney of the Bureau of Prisons, a Special Agent George

21  Williams on that date?

22  A.   I don't recall the date.

23  Q.   Do you know why you would not have told them about Alan

24  Moore on that date?

25  A.   I don't recall.

*Shonnie Daniels - Cross/Harper*

1    Q.  Do you recall meeting with agents of the Bureau of

2    Prisons and other agents on or about the 21st of March of

3    2005?

4    A.  I don't remember the dates.

5    Q.  Do you know why you would not have told the officers on

6    that date about Alan Moore?

7    A.  I don't recall.

8    Q.  Do you remember meeting with the agents on or about the

9    17th of November, 2005?

10   A.  What agents?

11   Q.  What agents?

12   A.  Yes.

13   Q.  FBI Agent Sanford and Special Agent Jeffrey Brunner.

14   A.  On what date?

15   Q.  17 November 2005.

16   A.  I don't recall.

17   Q.  Okay.  Do you recall talking about Alan Moore on that

18   date?

19   A.  I don't remember.

20   Q.  Do you recall meeting with the agents on or about the 6th

21   of December of 2005?

22   A.  I don't remember the dates.

23   Q.  Do you remember why you would not have talked about Alan

24   Moore on that date?

25   A.  I don't remember the dates.

1   Q.  Do you remember talking to agents on or about the 9th of

2   January, 2006?

3   A.  I don't recall the dates.

4   Q.  Do you know why you would not have talked about Alan

5   Moore on that date?

6   A.  I don't recall.

7   Q.  Do you remember talking to agents on or about the 11th of

8   January, 2006?

9   A.  I don't recall the dates.  I don't remember.

10  Q.  Do you know why you would not have talked about Alan

11  Moore on that date?

12  A.  I don't recall.

13  Q.  Do you remember talking to agents on or about the 25th of

14  January, 2006?

15  A.  I don't remember the dates.

16  Q.  Do you know why you would not have talked about Alan

17  Moore on that date?

18  A.  I don't recall.

19  Q.  Do you remember testifying in front of the grand jury?

20  A.  In regards?

21  Q.  In regards to this case.

22  A.  Yes.

23  Q.  Do you remember having to tell the grand jury you lied to

24  them before, you lied about the case?

25  A.  In regards?

*Shonnie Daniels - Cross/Harper*

1   Q.  I don't know what it was in regards to.  Did you tell

2   them about lying to them, you're sorry you lied to them?

3   A.  No.  I remember talking to one of the agents in reference

4   to a statement that I made.

5   Q.  Okay.  A lie that you told the agent?

6   A.  It wasn't a lie.  It was just a false statement.

7   Q.  It was just a false statement?  I'm sorry.  I didn't hear

8   what you said.

9   A.  I said I give them a false statement.

10  Q.  A false statement to a federal agent, that's a crime,

11  right?

12  A.  I wasn't under oath.

13  Q.  So, you weren't under oath, okay.

14      When was that false statement to the agent?

15  A.  I don't recall.

16  Q.  After you were cooperating with the government, right?

17  A.  I don't recall.

18  Q.  That agent was Special Agent Patrick Sanford of the

19  Federal Bureau of Investigation, wasn't it?

20  A.  That's who I interviewed with.

21  Q.  I'm sorry?

22  A.  That's who I interviewed with.

23  Q.  Okay.  That's this man sitting back here on my left with

24  the gray suit and looks like an Escher tie.  I'm not sure

25  that it is.

1   A.   Yes.

2   Q.   Okay.  And you falsely reported to him about conduct on

3   the prison ground; is that right?

4   A.   Repeat that?

5   Q.   You falsely reported to him, Mr. Sanford, Special Agent

6   Sanford, about conduct on the prison grounds?

7   A.   I didn't give him the correct information.

8        MR. HARPER:  I tender the witness, Your Honor.

9        THE COURT:  Mr. Findley?

10       MR. FINDLEY:  Yes, sir.

11                      CROSS-EXAMINATION

12  BY MR. FINDLEY:

13  Q.   Ms. Daniels, do you have your plea agreement up there in

14  front of you?

15  A.   Yes.  No, I don't.

16  Q.   I'll show you what has been marked as Defendant Moore's

17  Exhibit 7, which is your -- let me get the correct copy.

18  Excuse me.

19       MR. FINDLEY:  I tender what I will mark as Defendant

20  Dixon's Exhibit Number 5, just to be clear for the record.

21  BY MR. FINDLEY:

22  Q.   Is this your plea agreement in your federal crack cocaine

23  conspiracy?

24  A.   Yes.

25  Q.   And, Ms. Daniels, isn't it correct that you were facing a

1  minimum term of 20 years for that offense, according to your

2  plea agreement, paragraph 2(a), "Shonnie Daniels will plead

3  guilty to Count One of the indictment and faces a mandatory

4  minimum term of 20 years' imprisonment"?

5  A.  That's what the document says.

6  Q.  Minimum of 20 years.  Did you get 20 years?

7  A.  No, I didn't.

8  Q.  Maximum penalty of life.  What was your original

9  sentence?  It was a minimum of 20 years that you pled to, so

10 you had to get at least 20 years; isn't that correct?

11 A.  According to this document.

12 Q.  Right.  And that's a document by which you pled guilty,

13 correct?

14 A.  Yes.

15 Q.  And your signature is at page 6 of that document; isn't

16 that correct?

17 A.  Yes.

18 Q.  And you're out now.  Twenty years from 1999 would have

19 been the year 2019.  Isn't that the correct math?

20 A.  Yes.

21 Q.  But you're out now, because you cooperated; isn't that

22 correct?

23 A.  Yes.

24 Q.  Now, you are still bound by this plea agreement; isn't

25 that true?

```
 1              MR. SPROWLS:  Objection.

 2              THE COURT:  You can ask her her understanding.

 3              MR. FINDLEY:  All right.

 4  BY MR. FINDLEY:

 5  Q.  Please turn to paragraph 3 of this document, which is at

 6  page 4, entitled, "Revocation."

 7       Isn't it correct that, if you do not cooperate as

 8  required by the government, that this plea agreement can

 9  still be revoked?  Do you understand that?

10  A.  That's on my case for my conspiracy, right?

11  Q.  Right.  This plea agreement could be revoked, if you

12  don't continue to cooperate; isn't that true?

13  A.  If I don't continue?

14  Q.  To cooperate?

15  A.  I don't understand.

16  Q.  You're still cooperating with the government as you sit

17  here today, are you not?

18  A.  By choice.

19  Q.  And you understand that, if you don't cooperate, they

20  could revoke this plea agreement and sentence you to as much

21  as life in prison?

22  A.  No.

23  Q.  You don't understand that?

24  A.  No.

25  Q.  Even though you signed that document saying so?
```

1  A.  Right.

2  Q.  All right.  And the government can still re-file the

3  other nine counts that they dismissed.  Do you understand

4  that?

5          MR. SPROWLS:  Objection.

6          THE COURT:  The -- let me see the lawyers at the

7  bench.

8       (Conference held at side-bar.)

9          THE COURT:  If she has an understanding that she has

10  to do something in connection with this trial, you are welcome

11  to ask about it.  We've wasted way too much time, and we're

12  getting very close to me turning to the jury and telling them

13  the truth.  How many counts got dismissed made absolutely no

14  difference.  There is absolutely no chance that she will ever

15  be sentenced again on the drug conspiracy charge.  If she

16  doesn't cooperate on this case that we're here on, it cannot

17  lead to revocation of her plea agreement in the drug case.

18  She has been sentenced and has served her sentence.  The

19  United States Constitution would not allow her to be sentenced

20  again.

21          MR. FINDLEY:  I didn't understand that, and I won't

22  ask another question about it.

23          THE COURT:  If she misunderstands, that's okay,

24  because the reason for the cross-examination is her

25  motivation.  So, if she doesn't understand, that's a fair

1    question.  But let's get to the nub of it.  We've wasted way

2    too much time, and my patience is not infinite.  There will

3    come a time when I turn to the jury and comment on the

4    evidence.

5            Now, over the break you need to read Rule 609, and we

6    need to do this properly.  We've spent an hour this morning on

7    improper questions that shouldn't have been asked, and we're

8    just wasting time and spinning wheels.

9            MR. FINDLEY:  Your Honor, I just started, and I'm not

10    going to dwell on this.

11            THE COURT:  You had the misfortune to be the one

12    asking the questions when I had enough.  You didn't cause the

13    problem, but I thought it was time to convey the message.

14            MR. FINDLEY:  Yes, sir.

15            THE COURT:  I don't want to cut you off, spend all

16    the time you need, but do it on the merits.  There is plenty

17    on the merits to cross-examine this witness with.  We don't

18    need to deal with stuff that doesn't matter.

19        (End of side-bar conference.)

20    BY MR. FINDLEY:

21    Q.  Ms. Daniels, is it correct that in the past the U.S.

22    Attorney's Office, represented by this table here, stated

23    that you were not being truthful?

24            THE COURT:  Sustained.

25            MR. SPROWLS:  Objection.

```
 1              MR. FINDLEY:  All right.

 2    BY MR. FINDLEY:

 3    Q.  Ms. Daniels, do you recall -- I believe you testified

 4    about a 2255, which you filed where you submitted that the

 5    United States Government had broken their promise to you.  Do

 6    you recall that?

 7    A.  No, I don't.

 8    Q.  All right.

 9              MR. FINDLEY:  Let me approach.

10    BY MR. FINDLEY:

11    Q.  I show you what we will mark as Defendant Dixon next

12    exhibit.  It's a petition under 28 USC 2255 to vacate, to set

13    aside, a sentence by a person in federal custody.

14        Now, at page 3 of that -- page 5 of that document, you

15    accused the government of breaching the plea agreement; is

16    that correct?

17    A.  Yes.

18    Q.  And that is your signature on the final page of this

19    document; is that correct?

20    A.  Yes.

21    Q.  And what you were attempting to do by filing this is to

22    get a lower sentence; is that correct?

23    A.  Yes.

24    Q.  All right.  Now, you also -- you were denied in this

25    attempt; is that correct?
```

*Shonnie Daniels - Cross/Findley*

1   A.   Yes.

2   Q.   And you were denied on two occasions by this court for

3   your request to get downward departures; is that true?

4   A.   Yes.

5   Q.   And those occurred in March of 2002 and July of 2003; is

6   that correct -- sequentially?  I don't think you will find it

7   on that, but I can tender the next two exhibits.

8       These are orders from the court denying motion for

9   downward departure that's March 2, 2002; your request for a

10  downward departure was denied, correct?

11  A.   Yes.

12  Q.   And then July 11th, 2003, your request for downward

13  departure was denied; is that correct?

14  A.   Yes.

15  Q.   All right.  So, July 2003, your third request for a

16  downward departure has been denied, and it's after that,

17  after that last one in July of 2003, you come back to FCI in

18  2004, correct?

19  A.   I came back November 2004, yes.

20  Q.   All right.  So just to lay out the time record, you've

21  had several motions for downward adjustments denied; you've

22  been attempting to cooperate, but they are not granting you

23  downward adjustments, correct?

24  A.   I've been attempting to cooperate?

25  Q.   Right.

1    A.    I've already cooperated.

2    Q.    I'm sorry.  And the court has denied motions for downward

3    departure March 2, 2002, July 2003, and then you come back to

4    FCI 2004, still trying to cooperate, correct?

5    A.    That's not correct.

6    Q.    All right.  Now, you did go to the government in this

7    case; you brought this case to the government, did you not?

8    A.    I don't recall.

9    Q.    Do you recall writing a letter to Agent Brunner that

10   said, "I brought this case to y'all, I came to y'all"?

11   A.    I don't recall.

12   Q.    All right.  I'll show you a letter that is to "Dear

13   Mr. Brunner."  Is that your handwriting?

14   A.    Yes.

15   Q.    And that's a letter that you authored to Agent Brunner;

16   is that correct?

17   A.    Yes.

18          MR. FINDLEY:  I would mark that as government -- as

19   Defendant Dixon's next exhibit, and I will keep these in order

20   and get them marked at the break, if that's okay with the

21   court.

22          THE COURT:  Well, we need to use the numbers as we go

23   through them.  I think that will be 6, is it not?

24          MR. FINDLEY:  All right.  I will make a note in the

25   upper-right-hand corner.  I've got them.

*Shonnie Daniels - Cross/Findley*

1          Your Honor, I marked it as Dixon's 6, and I would

2  offer it into the evidence.

3          MR. SPROWLS:  Relevance.

4          THE COURT:  The objection is overruled.

5  Defendant's 6 is admitted.

6      (**DEFENDANT DIXON EXHIBIT NO. 6:**  Received in evidence.)

7  BY MR. FINDLEY:

8  Q.  Now, in this letter, Ms. Daniels, don't you say in the

9  last sentence, "I've been very cooperative, and I came to

10  y'all"?

11  A.  Yes.

12  Q.  So, basically, you came to them with this information;

13  they didn't come to you; is that right?

14  A.  In this letter I said that.

15  Q.  And right from the beginning -- well, it was true, you

16  wrote it to an agent of the Office of Inspector General.  You

17  don't make -- was it a correct statement?

18  A.  It says -- what I wrote true?  Yes.

19  Q.  And did you state the truth in that letter?

20  A.  I've been cooperative, I came to y'all.

21  Q.  Right; is that true?

22  A.  Yes.  But they approached me; and, when they wanted to

23  talk, I didn't talk, because I was afraid.

24  Q.  All right.  Now, you became very frustrated as you

25  started to cooperate in this investigation; isn't that

*Shonnie Daniels - Cross/Findley*

1   correct?

2   A.   According to this document, yes.

3   Q.   According to this document, in fact, it starts out

4   saying, "I'm really getting frustrated with this whole

5   situation."

6   A.   That's correct.

7   Q.   And you say, "I don't know -- I know you wasn't in this

8   from the beginning," to Agent Brunner, "This whole situation

9   was screwed up from the beginning."

10      Were you referring to the investigation by George

11  Williams that was screwed up?

12  A.   I don't recall.

13  Q.   What was screwed up?  The investigation, I guess.

14  A.   I don't recall.

15  Q.   All right.  So, you don't recall details about what's in

16  this letter or why it's in there?

17  A.   No, I don't.  I could have been talking about the

18  situation with me dealing with the officers.  I'm not exactly

19  sure.

20  Q.   All right.  Now, in this you also say that you want to

21  get into a halfway house; is that right?

22  A.   Yes.

23  Q.   And that's your motive, that's been your motive all along

24  for trying to bring this case to the government; isn't that

25  true?

Shonnie Daniels - Cross/Findley

1   A.   No.

2   Q.   That's what you say in the letter?  You want to get to

3   the halfway house, you're getting frustrated with this whole

4   situation, you want to get to the halfway house, you're not

5   getting credit for your cooperation.  Isn't that what you're

6   saying?

7   A.   That's not what I say in there.

8   Q.   All right.  I'm going to show you three additional

9   letters that you sent to other members of the Office of

10  Inspector General.

11       Do you know Mr. Reed Haney?

12  A.   I recall him.

13  Q.   You wrote him letters?

14  A.   Yes, I did.

15  Q.   I'm going to show you what we are marking as Defendants

16  7, 8, and 9.  And when you wrote Agent Haney, it was about

17  this case, wasn't it?

18  A.   Which case?

19  Q.   This case that we're here talking about that involves

20  Mr. Dixon, Mr. Moore, and Mr. Barnes.

21  A.   I need to see the letter.

22  Q.   All right.  I show you first Defendant's Exhibit 7.  Do

23  you recognize that?

24  A.   Yes.

25  Q.   Is that your handwriting?

*Shonnie Daniels - Cross/Findley*

1   A.  Yes.

2   Q.  Is that a letter that you wrote to Reed Haney of the

3   Office of Inspector General?

4   A.  Yes.

5   Q.  And in that letter you say, "I'm writing on behalf of my

6   cooperation," first sentence.

7   A.  Yes.

8   Q.  Okay.  And you're also telling Mr. Reed Haney at this

9   point, "I didn't hold anything back"; isn't that correct?

10  A.  Yes.

11  Q.  You're saying, "Please assist me or help me go to the

12  halfway house," aren't you?

13  A.  Yes.

14  Q.  You're also saying, "I don't know what's the status of

15  the investigation with Officer Barnes, but he needs to be

16  stopped.  He's abusing the system."  You say that, correct?

17  A.  Yes.

18  Q.  And you don't mention Mr. Dixon anywhere in this letter;

19  isn't that true?

20  A.  No, I don't.

21  Q.  Even though you didn't hold anything back?

22  A.  I was writing -- I mean, yes, I said it, holding anything

23  back.  It would be impossible for me to put everything I know

24  of that institution in one letter.

25  Q.  But the only one that you identified here is Officer

Shonnie Daniels - Cross/Findley

1    Barnes?

2    A.   In this particular letter.

3    Q.   And you say you didn't hold anything back?

4    A.   In reference to Officer Barnes.

5    Q.   Okay.  It says what it says.

6           MR. FINDLEY:  I would offer Exhibit 7 into evidence.

7           MR. SPROWLS:  No objection, Your Honor.

8           THE COURT:  Defendant Dixon's Exhibit 7 is admitted.

9        (**DEFENDANT DIXON EXHIBIT NO. 7:**  Received in evidence.)

10   BY MR. FINDLEY:

11   Q.   I will now show you what has been marked as Defendant's

12   Exhibit 8.  Is that a second letter that you wrote to Agent

13   Haney?

14   A.   Yes.

15   Q.   All right.  Now, in this letter, you say at the very

16   bottom --

17           MR. FINDLEY:  First of all, I move Defendant's 8 into

18   evidence.

19           MR. SPROWLS:  No objection.

20           THE COURT:  Defendant's 8 is admitted.

21       (**DEFENDANT DIXON EXHIBIT NO. 8:**  Received in evidence.)

22   BY MR. FINDLEY:

23   Q.   At the bottom of this you discussed -- now, in the prior

24   letter you mentioned Mr. Barnes, and in this letter you

25   mention Mr. Evans, correct?

1    A.   Yes.

2    Q.   And at the very bottom of it you say, "In May of 2005,

3    Mr. Evans, who is under investigation because of Inmate Tonya

4    Rodriguez --" first of all, what do you mean by that?  What

5    was your understanding of Mr. Evans' involvement with

6    Ms. Rodriguez?

7    A.   Repeat?

8    Q.   What was your understanding of Mr. Evans' involvement

9    with Ms. Rodriguez?

10   A.   I understand that they had a relationship.

11   Q.   Okay.  Did you know that to be a fact?

12   A.   No.

13   Q.   Okay.  But, yet, you write to the Office of Inspector

14   General with things that you don't know to be fact and say

15   that Mr. Evans -- give them information about Mr. Evans,

16   correct?

17   A.   Yes.

18   Q.   Okay.  And, again --

19   A.   To my knowledge.

20   Q.   Now, this letter must be after May 2005, correct?

21   A.   I don't recall.  I don't see it -- yeah.

22   Q.   Okay.  So, again, you mentioned nothing about Mr. Dixon;

23   is that correct?

24   A.   Not in this letter.

25   Q.   All right.  So, you've written two letters to Mr. Haney

1   now, none of which mention Mr. Dixon and we are beyond May of

2   2005; is that true?

3   A.  Yes.

4          MR. FINDLEY:  May I approach?

5          THE COURT:  You may.

6   BY MR. FINDLEY:

7   Q.  I show you what has been marked as Defendant's Exhibit

8   Number 9.  Is that also your handwriting?

9   A.  Yes.

10  Q.  Is that a third letter to Agent Reed Haney of the Office

11  of Inspector General?

12  A.  Yes.

13  Q.  And in it you start out by saying, "This is my third

14  request in writing on behalf of my cooperation"; is that

15  correct?

16  A.  Yes.

17  Q.  So, you are begging and pleading to have them recognize

18  your cooperation, are you not?  That's the purpose of these

19  letters.

20  A.  It wasn't that.  I was writing them in regards to me

21  cooperating.

22  Q.  You're getting very frustrated that they are not giving

23  you anything, despite your cooperation; isn't that true?

24  A.  I was getting frustrated because I wasn't hearing back

25  from them.

Shonnie Daniels - Cross/Findley

```
 1   Q.  Right.  About your cooperation.

 2       Now, in this letter, if you look halfway down the page,

 3   it says, "I've done all that was asked of me."  In the prior

 4   letter you say, "I didn't hold anything back."

 5       Isn't it true that in not one of these letters to Agent

 6   Haney you mentioned Mr. Dixon?

 7   A.  I didn't go into details about everything that I did at

 8   FCI.

 9   Q.  The letters speak for themselves.

10           MR. SPROWLS:  Objection.

11           THE COURT:  Sustained.

12   BY MR. FINDLEY:

13   Q.  And then you turn to Agent Brunner after that fact;

14   that's when you wrote this letter that we previously marked,

15   correct?

16   A.  Do I have the letter?

17   Q.  Yes.

18   A.  Okay.

19   Q.  I'm saying this letter was after you had written the

20   three letters to Agent Haney; is that correct?

21   A.  Yes, because Agent Haney wasn't there anymore.

22   Q.  Right.  Okay.

23       Now, in your testimony you described a situation where

24   you went to see Officer Barnes, but Officer Barnes wasn't

25   there and Mr. Dixon was there instead.
```

1  A.  Yes.

2  Q.  So, obviously, you didn't have any prearranged plan with

3  Mr. Dixon at that time; is that correct?

4  A.  That's correct.

5  Q.  Ms. Daniels, you've lied about guards before, haven't

6  you?

7  A.  Repeat?

8  Q.  You've lied -- you've told lies about guards at FCI

9  before, have you not?

10  A.  Not to my knowledge.

11        MR. FINDLEY:  May I approach?

12        THE COURT:  You may.

13        MR. FINDLEY:  I want to refer the witness to

14  testimony from the grand jury before the Northern District of

15  Florida, on the 6th day of December, 2005.

16  BY MR. FINDLEY:

17  Q.  Do you recall testifying before that grand jury,

18  Ms. Daniels?

19  A.  Yes.

20  Q.  All right.  Please, refer to page 7 of that transcript.

21  A.  Yes.

22  Q.  All right.  Line 23.

23        MR. FINDLEY:  Does this take time to warm up?

24        THE COURT:  It takes just a second.

25  BY MR. FINDLEY:

1   Q.  All right.  Okay.  Line 23, you're discussing an incident

2   where you spoke to Patrick Sanford about another case, Tina

3   fighting, correct?

4   A.  Yes.

5   Q.  All right.  And the question is asked by the Assistant

6   U.S. Attorney, while you are under oath, "What did you tell

7   him back in November?

8       The answer that you gave was:  "I told him that I

9   remember Tina fighting him and him fighting Tina back and him

10  kicking Tina."

11      Do you see that?

12  A.  I wasn't under oath when I gave that statement to

13  Mr. Sanford.

14  Q.  You were on alcohol?

15  A.  No, I wasn't.

16  Q.  What did you say?

17  A.  I wasn't under oath when I interviewed with Mr. -- FBI

18  Sanford.

19  Q.  Okay.  All right.  So, page 8, let's turn the page, and

20  the question is asked:

21      "Are we -- basically you're talking about Lieutenant

22  Stanford.

23      "Answer:  Uh-huh.

24      "Question:  And is that true?

25      You answered:  "No, it's not true.

*Shonnie Daniels - Cross/Findley*

1    It wasn't true when you told Agent Sanford what you told

2  him, was it?

3  A.  No.

4  Q.  Okay.  So, the question is asked:

5    "Well, why you did say that?

6    "Answer:  Well, I was upset with Lieutenant Stanford.

7    "Question:  So, you sort of, by being upset, you did not

8  tell the truth?

9    "Exactly," you say, "I was being ornery.  I wasn't

10  telling the truth."

11    So, there have been occasions where you have not told the

12  truth about guards for no other reason than because you're

13  ornery; is that correct?

14  A.  No.  I had a reason.

15  Q.  Well, the reason that you gave here was that you just

16  were ornery and weren't telling the truth; isn't that

17  correct?

18  A.  I said I was upset.

19  Q.  And it was because you were upset with the guard; isn't

20  that true?

21  A.  I was upset with Lieutenant Stanford.

22    MR. FINDLEY:  Your Honor, I would like to mark that

23  as my final exhibit, and then I'll rest on this witness,

24  tender the witness.

25    THE COURT:  Any objection to Defense Mr. Dixon

*Shonnie Daniels - Redirect*

1   Exhibit 10?

2          MR. SPROWLS:  No, Your Honor.

3          THE COURT:  It is admitted without objection.

4      **(DEFENDANT DIXON EXHIBIT NO. 10:**  Received in evidence.)

5          THE COURT:  Redirect?

6                       REDIRECT EXAMINATION

7   BY MR. SPROWLS:

8   Q.  You were in custody back when you were interviewed by

9   Lieutenant Stanford?

10  A.  Yes.

11  Q.  Are you in custody now?

12  A.  No.

13  Q.  Are you upset with Mr. Dixon now?

14  A.  No.

15  Q.  Are you proud of what you did with Mr. Dixon?

16  A.  No.

17  Q.  Are you upset with Mr. Moore now today?

18  A.  No.

19  Q.  Are you proud of what you did?

20  A.  No, I'm not.

21  Q.  Did you volunteer to come here today?

22  A.  Yes, I did.

23  Q.  Well, didn't you have a subpoena that required you to be

24  here?

25  A.  Yes.  Yeah, I was subpoenaed.

1  Q.  So, did you have a choice?

2  A.  No.

3  Q.  When you were interviewed on a number of occasions by FBI

4  or the inspector general agents, who did the questioning, who

5  posed the questions, you or them?

6  A.  What do you mean?

7  Q.  When they interviewed you, who asked the questions?

8  A.  They asked me the questions.

9  Q.  So, if they did not ask you about Officer Moore --

10 A.  No.  I mean, I was basically telling them what form I

11 played in the prison with different officers.

12 Q.  And did you mention Mr. Moore's name right up front?

13 A.  No.

14 Q.  Any reason why you didn't?

15 A.  I mean, I had more involvement with Mr. Barnes than

16 Officer Moore.

17 Q.  Did you -- do you recall if you mentioned Officer Dixon's

18 name right up front?

19 A.  I don't recall.

20 Q.  Did you have more contact with Officer Dixon than with

21 Mr. Moore?

22 A.  Yes.

23 Q.  Do you have any sort of an agreement in this case?

24 A.  No, I don't.

25 Q.  The plea agreement that they took some time to go over,

*Shonnie Daniels - Redirect*

1  that was for a drug crime back in 199 --

2  A.   -- 9.

3  Q.   And, to your knowledge, that agreement pertained to that

4  case?

5  A.   Yes, to my drug case.

6  Q.   Those motions that you filed that you didn't recognize or

7  appear to recognize right up front, Moore's Exhibit 19 and

8  Moore's Exhibit 20, those pro se things, who writes those up

9  in prison?

10 A.   Inmates.

11 Q.   And who files those things?

12 A.   Inmates.

13 Q.   They do it all of the time, don't they?

14 A.   Yes.

15 Q.   You just sign it and -- how much does it cost for you to

16 do that?

17 A.   It doesn't cost me anything.  They had motions at the

18 library.

19 Q.   So, what the heck, you know, just file a motion?

20 A.   Yes.  I mean, what do you have to lose?

21 Q.   Speaking of not having much to lose or anything to lose,

22 in your mind right now, do you have something to lose if you

23 come into this court and knowingly lie?

24 A.   Yes.

25 Q.   What do you have to lose?

1  A.  My freedom.

2          MR. SPROWLS:  That's it, Judge.

3          THE COURT:  Thank you, Ms. Daniels.  You may step

4  down.

5          Mr. Sprowls, please call your next witness.

6          MR. SPROWLS:  Gekettia Harris.

7          MR. FINDLEY:  May I approach briefly about this next

8  witness?

9          THE COURT:  You may.

10     (Conference held at side-bar.)

11          MR. FINDLEY:  Your Honor, this is Ms. Gekettia

12  Harris, and we didn't get any plea agreements or a criminal

13  history or anything like that, and I don't know if there is

14  any, but I wanted to make sure before we got started.

15          MR. SPROWLS:  She's not an inmate.

16          MR. FINDLEY:  Okay.  All right.  I'm sorry.

17     (End of side-bar conference.)

18          DEPUTY CLERK:  Please raise your right hand.

19          **GEKETTIA HARRIS, GOVERNMENT WITNESS, DULY SWORN**

20          DEPUTY CLERK:  Be seated.

21          Please, state your full name and spell your last

22  name for the record.

23          THE WITNESS:  Gekettia Talaure Harris, H-a-r-r-i-s.

24                    DIRECT EXAMINATION

25  BY MR. SPROWLS:

1    Q.  All right.  Ms. Harris, I'm going to ask you to get as

2    close to that microphone as you can.  It works, but you've

3    got to get close.

4         Would you please tell the jury where you live?  We don't

5    need a street address, just a town would be fine.

6    A.  Quincy.

7    Q.  And how old are you, ma'am?

8    A.  Twenty-six.

9    Q.  Okay.  Do you have any family and children?

10   A.  Yes.  I have a son.

11   Q.  Are you related in any way to Shonnie Daniels?

12   A.  Yes.

13   Q.  How so?

14   A.  She's my cousin.

15   Q.  Okay.  Do you recall a time where you understood that she

16   was in prison?

17   A.  Yes.

18   Q.  Do you recall being asked to do anything to try to get

19   some items to someone for her?

20   A.  Yes.

21   Q.  Tell me what you understood what you were to do.

22   A.  I was supposed to meet Mr. Dixon at Dillards.

23           MR. HARPER:  Objection, Your Honor.  It's hearsay.

24           THE COURT:  Overruled.

25   BY MR. SPROWLS:

1  Q.  You have to speak up a little bit.

2  A.  I was supposed to meet Mr. Dixon at Dillards and give him

3  a brown gag.

4  Q.  Did you do that?

5  A.  Yes.

6  Q.  Do you know what was in the brown bag?

7  A.  I don't remember.

8  Q.  Was it books?

9  A.  It was like girly stuff, like lipstick, perfume, I think

10  Black & Milds -- stuff like that.

11  Q.  Did you know Mr. Dixon before you met with him?  I'm

12  saying, at the time did you know who he was before you gave

13  the bag to him?

14  A.  Not personally, no.

15  Q.  Okay.  Had you ever seen him before that day?

16  A.  I think I seen him at the prison.  I think.  I don't --

17  Q.  Let me just try to phrase it this way:

18      Where was the meeting?  Where did you have the meeting

19  where you gave him the bag?

20  A.  Dillards.

21  Q.  At Dillards.  Before you got to Dillards, did you know in

22  your mind who you were going to meet with?

23  A.  Yes.

24  Q.  So, did you know this fellow Dixon before you got to

25  Dillards?  I mean, would you -- did you know him to recognize

1   who he was?

2   A.   Yes.   Shonnie told me how he would look.

3              MR. FINDLEY:   Object.   Hearsay.

4              THE COURT:   Overruled.

5   BY MR. SPROWLS:

6   Q.   You were given a description of who to look for?

7   A.   Yes.

8   Q.   But you didn't already know who was going to be there?

9   A.   Oh, no.

10  Q.   You know, by saying, "Oh, there he is, I recognize him"?

11  A.   Oh, no.

12  Q.   You were given a description?

13  A.   (Nods head.)

14  Q.   Was the person, more or less, matching that description

15  at the place where they were supposed to be?

16  A.   Yes.

17  Q.   And where within Dillards was that meeting place, if you

18  remember?

19  A.   I don't remember exactly where.

20  Q.   Okay.   But it did occur?

21  A.   Yes.

22             MR. SPROWLS:   That's all I have, Judge.

23             THE COURT:   Cross-examine?

24             MR. FINDLEY:   I'll go ahead.

25                         CROSS-EXAMINATION

1    BY MR. FINDLEY:

2    Q.  Ms. Harris, you say you are a cousin of Shonnie's?

3    A.  Yes.

4    Q.  All right.  And you don't remember where you were in

5    Dillards when you met -- supposedly met Mr. Dixon?

6    A.  Not exactly.

7    Q.  All right.  And you didn't know exactly what Mr. Dixon

8    looked like, either, because you had never seen him before;

9    isn't that true?

10   A.  Yeah.

11   Q.  Okay.  Do they sell Black & Milds at Dillards?

12   A.  No.

13   Q.  Have you ever been convicted of a crime?

14   A.  No.

15           MR. FINDLEY:  Okay.  That's all of the questions I

16   have.

17           THE COURT:  Mr. Harper?

18           MR. HARPER:  No questions, Your Honor.

19           MR. SPROWLS:  No redirect.

20           THE COURT:  All right.  Thank you, Ms. Harris.  You

21   may step down.

22           Mr. Sprowls, we will do one more, if you've got one

23   that's not going to be long.

24           MR. SPROWLS:  I don't think I have a quick, quick

25   one.  I can get started on one.

```
 1              THE COURT:  Well, let's do that.

 2              MR. SPROWLS:  Letishe Moore.

 3              DEPUTY CLERK:  Please raise your right hand.

 4     LETISHE MOORE, GOVERNMENT WITNESS, DULY SWORN

 5              DEPUTY CLERK:  Be seated.

 6         Please, state your full name and spell your last

 7     name for the record.

 8              THE WITNESS:  My name is Letishe Moore, M-o-o-r-e.

 9                      DIRECT EXAMINATION

10     BY MR. SPROWLS:

11     Q.  All right.  Ms. Moore, can you tell the jury where you

12     live, where home is for you?

13     A.  Birmingham, Alabama.

14     Q.  Okay.  Ms. Moore, if you would, we've been asking the

15     witnesses to kind of scoot in a little closer to the

16     microphone.  It does work, but you have to get kind of close

17     to it.

18         How long -- is Birmingham pretty much your home?

19     A.  Yes, sir.

20     Q.  Life-long home?

21     A.  Yes, sir.

22     Q.  And how old are you, ma'am?

23     A.  Thirty-three.

24     Q.  And do you have any family and children?

25     A.  I have one child, two siblings, and my mother and father
```

1    are still living.

2    Q.  All right, ma'am.  Ms. Moore, I'm going to ask you if you

3    were convicted of any crimes that caused you to go into

4    federal custody.

5    A.  Yes, sir.

6    Q.  And what was that?

7    A.  Facilitated communication with intent --

8            COURT REPORTER:  I'm sorry.  I can't hear her.

9    BY MR. SPROWLS:

10   Q.  If you could, scoot in a little closer.

11   A.  Facilitated communication with intent to distribute

12   cocaine.

13   Q.  Was this a --

14   A.  It's a telephone count.

15   Q.  Okay.  Related to drugs?

16   A.  Yes, sir.

17   Q.  Okay.  And do you recall what sentence you received for

18   that?

19   A.  Forty-eight months.

20   Q.  Was that in the Northern District, Alabama; was that in

21   Birmingham?

22   A.  No, sir.  That was Atlanta, Georgia.

23   Q.  Atlanta.  Okay.

24       Prior to that did you have any other felony convictions?

25   A.  No, sir.

1    Q.  Is that it?

2    A.  Yes, sir.

3    Q.  And did you plead guilty or go to trial?

4    A.  I pled guilty.

5    Q.  Do you recall where you first were housed when you went

6    into the federal system?

7    A.  Marianna, camp.

8    Q.  Camp.  And did you eventually get transferred to the

9    Federal Correctional Institution here in Tallahassee?

10    A.  Yes, sir.

11    Q.  And approximately do you know when you arrived, about?

12    A.  To Tallahassee?

13    Q.  Yes.

14    A.  December 28th, 2002.

15    Q.  A day you will not forget, I take it.

16    A.  No, never.

17    Q.  All right.  When you first came to FCI-Tallahassee, do

18    you recall where you were housed?

19    A.  Yes.  Put in the SHU, which is the hole, the Special

20    Housing Unit.

21    Q.  All right.  Was that because you had done something wrong

22    or because you just newly arrived to the institution?

23    A.  It was something -- it wasn't wrong.  They made up a

24    charge on me.

25    Q.  Okay.  Did you eventually receive any disciplinary action

1   on that?

2   A.   Yes.   I was in the hole 90 days for that.

3   Q.   Okay.   So that 90 days, you would have been released

4   sometime in March?

5   A.   March, yes, sir.

6   Q.   Okay.   Do you recall what unit you were assigned to?

7   A.   When I got to Tallahassee or Marianna, or which?

8   Q.   When you got out of the SHU in Tallahassee.

9   A.   I was in G unit.

10   Q.   Okay.   Did you come in contact, when you were in G unit,

11   ever come in contact with an Officer Gregory Dixon?

12   A.   I seen him around, but he wasn't there.   I came in

13   contact with him in F unit.

14   Q.   You moved from --

15   A.   I moved from G to D, from D to A, from A to F, because I

16   was originally assigned to A unit, but there wasn't any room.

17   And A and D unit, they pretty much work together.   The same

18   counselor was over both.

19   Q.   Okay.   Just curious.   Is it -- was it common for an

20   inmate to be moved that often, or is it just --

21   A.   It depends on the space.

22   Q.   Okay.

23   A.   Availability.

24   Q.   All right.   So, when you moved to F unit, did you come in

25   contact with Officer Dixon because he was the unit officer?

```
 1   A.  Yes, sir.

 2   Q.  Okay.  Do you recall what shifts or shift he was working?

 3   A.  Night.

 4   Q.  Which would be what to what?

 5   A.  Sometime -- wait --

 6   Q.  I ask that because there's --

 7   A.  I'm trying to get it correct.  I know the night shift.  I

 8   don't know the time.  I think it's after the 4:00 count.  I'm

 9   trying to be accurate on it.

10   Q.  Okay.  What sort of contact did you have with Mr. Dixon

11   at first?

12   A.  At first it was just an officer that ran the unit, and he

13   did count, passed out mail.  Basically, that was it at that

14   point.

15   Q.  After did there come a time that he gave you things?

16   A.  Yes, but it was after the incident.

17   Q.  All right.  Let's go to the incident.  Describe what

18   happened and about when it happened.

19   A.  Okay.  It was approximately 3:00 in the morning.

20   Q.  Okay.  I'm sorry.  I hate to interrupt the question I

21   gave to you, but -- are we talking about March '03 or just

22   later '03?

23               MR. FINDLEY:  Objection to the leading.

24               THE COURT:  Overruled.

25               THE WITNESS:  Later in '03.
```

```
 1   BY MR. SPROWLS:

 2   Q.  Okay.  Do you know approximately what time of year?  Do

 3   you remember what the temperature was like, or anything that

 4   might help you?

 5   A.  I want to be a little accurate.  I think it was the end

 6   of '03, the beginning of '04.  I'm not correct on my dates.

 7   Q.  Okay.  All right.  So, what happened at the end of '03,

 8   the beginning of '04?

 9   A.  He came in.  I was asleep.  He knocked on the door, and

10   he said, "Moore, to the office."  After then, I got up,

11   brushed my teeth, went to the office.  He leaned back in the

12   chair -- excuse me.

13   Q.  Yes, ma'am.

14        THE WITNESS:  Your Honor, can I say it verbatim what

15   was said?

16        THE COURT:  You may.

17        THE WITNESS:  He said, "Suck my dick."

18        After then, I stood there in ah, and he said it

19   again, "Suck my dick."  Excuse me, court.

20        And I did what he asked in the room of the office.

21   After he had gotten himself hard, he then took me around to

22   that bathroom, when he bent me over and had sex with me,

23   and --

24   BY MR. SPROWLS:

25   Q.  Yes, ma'am.  Let me give you a little breather here and
```

1   ask you if you can identify some items.

2       I'm going to show you Exhibit 13.  Do you recognize that?

3   A.  It looks like F unit.

4   Q.  All right.  Exhibit 15, do you recognize that?

5   A.  The officer's station.

6   Q.  Was it -- okay.  Exhibit 16?

7   A.  That's where he told me to suck his penis.

8   Q.  Was it a chair similar to what we're looking at?

9   A.  Yes, sir.  And he leaned towards the door and leaned back

10  in order for me to --

11  Q.  All right.  You may have already said.  I apologize.

12  About what time of day or night did this occur?

13  A.  It was before the 4:00 count, 4:00 to 5:00, when they

14  come around in the middle of the night counting again.  I'm

15  not sure, but it was before that hour.

16  Q.  Okay.  You said you were sleeping, but pretty much most

17  of the inmates were asleep?

18  A.  Yes, sir.

19  Q.  And I'm going to show you what's in evidence as

20  Exhibit 17.  Do you recognize that area?

21  A.  Right before the bathroom.

22  Q.  Exhibit 18?

23  A.  Yes, sir.

24  Q.  Is that the bathroom you're talking about?

25  A.  Yes, sir.

1    Q.  Okay.  Did he come to you at a later time?

2    A.  Yes, sir.

3    Q.  What happened?  What did he say, if anything, at that

4    point?

5    A.  He didn't say anything at that point.  He was giving

6    fried chicken or Wendy burgers and stuff, but I didn't need

7    that, I had my own money.  But later on he had sex with me

8    again.

9    Q.  Where?

10   A.  In the area where they were building.  They were doing

11   new construction.

12   Q.  Is this within the officer's station area?

13   A.  Yes.  But they tore down the wall, and they had plastic

14   up.  And later on the FBI came through there looking for

15   semen or something.

16   Q.  How do you know that?

17   A.  Because I was scared.  I thought they was going to put me

18   back in the hole, like they did before on the bogus charge.

19   That's why I never spoke on it.

20   Q.  If you would speak on it, as you say, you say, "I'm

21   having sexual contact with an officer," what happens to you

22   as an inmate?

23   A.  They put you in the hole.

24           MR. HARPER:  Objection.  Speculation.

25           THE COURT:  The objection is overruled.

*Letishe Moore - Direct*

```
 1            THE WITNESS:  You get punished.
 2    BY MR. SPROWLS:
 3    Q.  You may answer.
 4    A.  You get put in the hole, you get a bath three times a
 5    week, they feed you less, and you have to stay there and
 6    hopefully you'll get out.  But you come out, you're smelly,
 7    you lost a lot of pounds, and you're scared, because you were
 8    in a hole with a small glass window.  They feed you through a
 9    slot.  They only let you bathe three times a day.  So, it's
10    best that you don't say nothing; because, if you do, you're
11    going to be in big trouble and you may be in there for 90 to
12    180 days.  Who wants to be in that hole that long?  So, it's
13    best that you keep quiet.
14    Q.  Okay.  Now, just -- so, you had an encounter in late '03,
15    early '04, that we showed you pictures of that you
16    identified.  And when was the next encounter?
17    A.  Only thing, like I told Pat Sanford, if he can pull up
18    when Juanita Stewart went to the SHU, that was during the
19    exact time that happened.
20    Q.  All right.  Well, from the first incident, how many days,
21    weeks, or months later would you guess?
22    A.  Maybe 2 months, if that long.
23    Q.  And how did that conduct get initiated?  Did he call you
24    down to an office like he did?
25    A.  He said, "Let me see you in the office," and everybody
```

1  was getting ready for count.  And he said he had to hurry,

2  and he did his business.  And I got in there, and I got ready

3  for count, for the 9:00 count.

4  Q.  All right.  Between those two events, did you receive

5  anything from him?

6  A.  Nothing but the regular food that he would bring for

7  everybody else, and I guess that was to pacify me or so I

8  wouldn't say something or feel uncomfortable.

9  Q.  When you say "the regular food," what do you mean?

10  A.  KFC, Wendy's, or Black & Milds, or -- you know, things

11  that they would trade off for sex.

12  Q.  I may have not heard you correctly, but did you say

13  things that he was bringing in for others?

14  A.  Yes, sir.

15  Q.  How do you know he was bringing things in for others?

16  A.  He asked me once to go and get Stephanie George.  He had

17  something for her.  So, I went and found her.  And she told

18  me she was going to get the Black & Milds.

19          MR. HARPER:  Objection.

20          THE COURT:  Sustained.

21  BY MR. SPROWLS:

22  Q.  Don't go into what she says, just you went and got her.

23  A.  Yes.

24  Q.  And did you take her someplace or did you tell her to go

25  someplace?

1   A.  I told her Officer Dixon wanted her.  That was it.

2   Q.  Did you have a third encounter with Mr. Dixon?

3   A.  No, sir.  After that had happened, I had a big huge lump

4   on my lip, and from there, I went to the doctor before I was

5   released.  I had a STD, trichomonas.

6   Q.  Is that a --

7   A.  Sexually-transmitted disease.

8   Q.  So you had an infection?

9   A.  Yes, sir.

10  Q.  In all, how many sexual encounters did you have with --

11  A.  Two.

12  Q.  Did you feel like you had a choice when he asked for sex?

13  A.  No, sir.

14  Q.  And the items that he brought in for you, did you consume

15  them or did you turn around and sell them?

16  A.  No.  He never brought me Black.  He only gave me food,

17  which was Wendy's, KFC, whatever.  Sometimes he had some

18  extras, you know.  The big thing was KFC, chicken.

19  Q.  Did you do what you did out of fear or in the hope of

20  getting something?

21  A.  Fear.  I had my own money the whole time, four figures.

22  Q.  Do you recall an inmate by the name of Sabrina Bowie?

23  A.  Yes, sir.

24  Q.  Did you have any relationship with her?  I mean, were you

25  friends or anything like that?

*Letishe Moore - Direct*

1   A.   I knew her from the camp; yes, sir.

2   Q.   Did you say anything to her about Dixon?

3   A.   Yes, I did.

4   Q.   What did you tell her?

5   A.   That he came on to me, and she said, "Oh, that's Dixon.

6   He does that to everybody."

7           MR. HARPER:  Objection.

8           THE COURT:  Sustained.

9   BY MR. SPROWLS:

10  Q.   Did you specifically say what you and Dixon did?

11  A.   I told her that he had sex with me.  Yes, I told her.

12          MR. SPROWLS:  That's all I have, Judge.

13          THE COURT:  We need to break for lunch along in here

14  somewhere.  I suspect you'll be more than just a moment.

15          MR. FINDLEY:  More than just a moment.  We can wait

16  or -- it's up to the court.  We are available to do whatever

17  the court --

18          THE COURT:  I'm looking for an estimate how long you

19  think you might be.

20          MR. FINDLEY:  Probably no more than 10 minutes.

21          MR. HARPER:  I will have no questions.

22          THE COURT:  All right.  Let's go ahead.

23          MR. FINDLEY:  All right.

24                          CROSS-EXAMINATION

25  BY MR. FINDLEY:

1   Q.   Ms. Moore, you mentioned that you were also in

2   FCI-Marianna; is that correct?

3   A.   Yes, sir.

4          THE COURT:   I guess before I say let's go ahead,

5   everybody okay over here?   You're okay for a minute?

6          All right.   Go ahead.

7   BY MR. FINDLEY:

8   Q.   You were in FCI-Marianna before you came to

9   FCI-Tallahassee; is that correct?

10  A.   Yes, sir.

11  Q.   When you were at FCI-Marianna, you made a complaint

12  against another C.O. over there; is that true?

13  A.   Yes.

14  Q.   And that person's name was C.O. Jannis?

15  A.   Michael Jannis.

16  Q.   Michael Jannis, J-a-n-n-i-s, correct?   You don't know?

17  Okay.

18     You made a complaint against him, and you did it through

19  the appropriate channels; is that correct?

20  A.   Yes, sir.

21  Q.   And the complaint that you made against Officer Jannis

22  was that he had caressed your face and told you that you were

23  pretty?

24  A.   Yes, sir.

25  Q.   Okay.   So, you took it through the appropriate channels?

1    A.   Yes, sir.

2    Q.   And the result was that Officer Jannis had to come and

3    apologize to you; is that correct?

4    A.   Yes.  Well, no.  That was before the results were

5    resolved.  The administrator, Ms. Sadd and Dr. Peistro,

6    because I was having outbreaks, crying.  Every time he get

7    near me, I would cry.  And Dr. Willis, which was the

8    psychiatrist, and Dr. Peistro, at the same time, when he

9    apologized to me -- when he made that apology, it was before

10   them writing me up.

11   Q.   Okay.

12   A.   And when that took place, the only thing happened was,

13   when they took me into that office and he made the apology, I

14   was crying, and I got real nervous and upset.  And when I

15   wrote my eight and a half, I never did receive any answer

16   back from anybody.  That was another reason why I didn't

17   speak on Officer Dixon.  After that happened, they threw me

18   in that hole, the dungeon, for 90 days.

19   Q.   You took it through the administrative process; and,

20   ultimately, C.O. Jannis did issue some sort of apology.

21   That's what you told Agent Sanford.

22   A.   Exactly, correct.

23   Q.   So, you say that the incident with Mr. Dixon occurred

24   late 2003, beginning of 2004; is that correct?

25   A.   Yes.  And I'm not sure that exact date or the time.  I

1   tried to pinpoint it.  It was, to my understanding, late

2   December, early '04.

3   Q.  Okay.  After that the investigators came around and did

4   the ultraviolet-light test?

5   A.  When they did that ultraviolet-light test, it wasn't even

6   a week.  That's how I can kind of pinpoint the times and

7   date, due to the fact that when they came around there with

8   the ultraviolet light, I was scared because I thought maybe

9   something had been left in there of mine, and I thought I was

10  going back to the hole again.

11  Q.  Uh-huh.  And they didn't find anything?

12  A.  No, sir.

13  Q.  Okay.  Now, if you didn't want to have sex with a guard,

14  you knew that you didn't have to have sex with the guard;

15  isn't that true?

16  A.  That is true.

17  Q.  Because there was a situation with Mr. Barnes where

18  Mr. Barnes approached you, correct?

19  A.  That was after Mr. Dixon.

20  Q.  Okay.  And you told him, "No, I don't want to have sex

21  with you"?

22  A.  I didn't tell him, no.  What I told him is, "Okay, I'm

23  coming," and I never did come, go to the office, like he

24  knocked at my door and asked for me to come in, same as

25  Mr. Dixon.  Yes, sir.

1  Q.  So, when you talked to Agent Sanford, you told him that

2  you never went to his office, because you did not want to

3  have sex with C.O. Barnes?

4  A.  I didn't want to have sex with him or Mr. Dixon.

5  Q.  Okay.  Well, I'm talking about Mr. Barnes right now.

6  A.  Yes, sir.

7  Q.  You didn't go to Mr. Barnes's office, because you didn't

8  want to have sex with him?

9  A.  Uh-huh.  But I never did tell Mr. Barnes anything.

10 Q.  All right.  Now, you mentioned that you had pled guilty

11 to what you called a telephone count.

12 A.  Yes.

13 Q.  That's related to a crack cocaine conspiracy, is it not?

14 A.  Yes, sir.

15 Q.  All right.

16          MR. FINDLEY:  I would like to approach, Your Honor.

17          THE COURT:  You may.

18 BY MR. FINDLEY:

19 Q.  I will show you what has been marked as Defendant's

20 Exhibit 11, and I'll ask you, Ms. Moore, if that's your

21 signature right there.

22 A.  Yes, sir.

23 Q.  And is that your plea agreement from that case?  Take

24 your time.  You don't have to read it word-for-word, if you

25 recognize it as your plea agreement.  You can, if you want

1    to.

2    A.  I suspect that, before I can answer any questions, I

3    would like to be accurate and accurately tell the truth, sir.

4    Q.  Yes, ma'am.

5    A.  Yes, sir.

6    Q.  I would like to direct your attention first of all to

7    paragraph 5; that you understood by signing this agreement

8    that, in exchange for your cooperation, the government agreed

9    to dismiss certain counts of the charge.  Is that correct?

10   A.  Yes, sir.

11   Q.  All right.

12         MR. FINDLEY:  I would offer this as Defendant's

13   Exhibit 11.

14         MR. SPROWLS:  No objection, Judge.

15         THE COURT:  Mr. Dixon's Exhibit 11 is admitted.

16   **(DEFENDANT DIXON EXHIBIT NO. 11:**  Received in evidence.)

17   BY MR. FINDLEY:

18   Q.  Have you ever gone by any other alias, Ms. Moore?

19   A.  Shawnee.

20   Q.  How about Stone?  Did you ever go by Stone?

21   A.  Yes, I was married at that time.

22   Q.  You were married.  Is it correct that you were convicted

23   of another conspiracy, a cocaine conspiracy, under the name

24   of Letishe Lashun Stone?

25   A.  No, sir.

1   Q.   That would be the same one, then?

2   A.   Yes, sir.

3   Q.   Okay.

4        MR. FINDLEY:  I have nothing further, Your Honor.

5        THE COURT:  Mr. Harper, no questions?

6        MR. HARPER:  No questions.

7        THE COURT:  Redirect?

8        MR. SPROWLS:  Just a few.

9                    REDIRECT EXAMINATION

10  BY MR. SPROWLS:

11  Q.   I just want to get the sequence right here.

12       Ms. Moore, you had a brief encounter with this Officer

13  Jannis at Marianna?

14  A.   When I first entered Marianna.

15  Q.   Okay.  And what event happened next?  Did you file a

16  complaint or did he apologize to you?

17  A.   I filed a complaint, and I had told Ms. Sadd over there,

18  and the only thing happened was he apologized for rubbing me

19  down my face, telling me how beautiful I was.  And they had a

20  no-touch policy on the inmates, whether death or not, you do

21  not touch or rub the inmate in any uncomfortable manner.

22  Q.   What caused you to go in the hole?

23  A.   My family was calling everybody to try to get me some

24  help.  I was uncomfortable.  I feared Mr. Jannis.  Every time

25  I came around him, I got nervous, I wouldn't even eat.

1          MR. HARPER:  Your Honor, I object.  This is not part

2     of the indicted conduct.

3          THE COURT:  The objection is overruled.

4     BY MR. SPROWLS:

5     Q.  Was there an allegation or something -- what caused you

6     to be in the hole?

7     A.  Because of the simple fact my family was making a whole

8     bunch of noise.  They were calling, trying to get help.

9     Understanding, why would he -- would they allow him to do

10     that and leave me on the camp with them.  Not only did that

11     happen, while I was in the hole, they let him team me alone

12     in a room after I made that report.

13     Q.  Okay.  Well, to go with Mr. Findley's question here

14     about, you made a report against an officer, and it ended up

15     with him having to apologize to you.

16     A.  Yes, sir.

17     Q.  That would appear to be a fairly pleasant way of

18     resolving it.

19     A.  Uh-huh.

20     Q.  Why didn't you make the same report against Mr. Dixon?

21     A.  Because they were going to throw me in that hole again.

22     I was scared.  And you in that hole, you can only make one

23     phone call.  They don't let you bathe.  You can only see out

24     of a window this small.  They feed you through a slot and

25     you're sleeping on a hard mattress about this long, about

1    this thick, twin size is the length, and they give you a hard

2    pillow and two pieces of covering.  And I didn't want to be

3    in that hole again.

4       I didn't even plan to come here.  I didn't speak out

5    about this.  If I hadn't gotten a subpoena, I wouldn't be

6    here, because I'm trying to live.  Right now I have to seek

7    counseling, because my sex life is not the same.  I'm going

8    through a lot --

9              MR. HARPER:  Objection, Your Honor.  Nonresponsive.

10             THE COURT:  Overruled.

11   BY MR. SPROWLS:

12   Q.  You can finish, ma'am.

13   A.  I break out crying.  I'm trying to find myself.  I'm

14   trying to get past this.  I wouldn't be here, if I hadn't

15   gotten a subpoena.  They had to find me to give me a

16   subpoena.  I didn't plan to come here, period.

17             MR. SPROWLS:  I understand.  Thank you.  That's all I

18   have, Judge.

19             THE COURT:  All right.  Members of the jury, let's

20   take the lunch break.  We will take an hour break.  Actually,

21   we'll round it off to 2:10 by that clock.  If you would, make

22   sure you are back in that jury room so I can get you in the

23   courtroom right at 2:10.  We'll start in at that point.  Leave

24   your pad right there on your chair, and recall my earlier

25   instructions.  Don't talk about the case.

1          Jury out, please.

2       (The jury exited the courtroom at 1:09 p.m.)

3          You may be seated.

4          Thank you, Ms. Moore.  You may step down.

5          Anybody need anything from me before we break?

6          I overruled the objections at the end because I

7    thought they were a fair response to the cross-examination.

8          I do think that we need to maintain focus, and this

9    goes back to prior rulings, not the last one.  Anything that

10   goes to witness's motivation is certainly fair game, and

11   questions about the witness's understanding of consequences of

12   testimony, either that they can be sent back to jail or that

13   they can have terms reduced, or whatever, that's fair game.

14          Separate from that, under Rule 609, you can ask about

15   convictions.  There's law in the circuit that an adjudication

16   withheld is not a conviction under that rule.  Frankly, I

17   think that law in the circuit is probably wrong; and, in an

18   appropriate case, I suspect the circuit might revisit the

19   question.  Nobody objected here on that basis and so it came

20   in.

21          But once you establish the conviction and the witness

22   admits it and what they were convicted for, then the

23   underlying facts, unless they affect motivation here and have

24   something to do with cooperating, there is no reason to go

25   more into those.  I really thought at times during that

1    cross-examination, and we came to side-bar during

2    Mr. Findley's cross-examination, but it was really

3    Mr. Harper's examination, I thought at times we lost focus on

4    which case we were trying.  Many of the questions would have

5    been appropriate questions, if we were trying the drug case,

6    if she was testifying in the drug case against a

7    co-conspirator in the drug case.  But she wasn't.  And she was

8    out of prison already.

9         So, just my only request is, maintain focus.

10   Anything that goes to motivation, by all means, I want you to

11   be able to cross-examine as extensively as you want, but let's

12   recall which case we're trying, and the motivation to testify

13   here today is what is the appropriate basis.

14        And then on the questions about the convictions, I

15   stopped you at one point on four convictions, because you were

16   just -- the two of you were just disagreeing over how you

17   count the number of convictions.  She admitted everything you

18   asked, what counts she pled to and the adjudication was

19   withheld.  So, whether you count that as one felony or four,

20   really doesn't make any difference.  I know you count it as

21   four.  She said it was all the same case.  After I heard that

22   three or four times, I didn't need to hear that anymore.  So,

23   just keep focus.

24        MR. FINDLEY:  Can I just say on thing for the record

25   about that?

1          THE COURT:  Sure.

2          MR. FINDLEY:  Although I didn't get to this, there is

3   an adjudication of guilt on Counts One through Four, and I

4   think that was part of what he was trying to get to.

5          THE COURT:  I understood from some of the questions,

6   and that's why I would have -- I mean, I overruled the -- I

7   sustained the objection to putting the documents in.  If she

8   admits the conviction, there is no reason to have the

9   document.  Often the documents have additional extraneous,

10  prejudicial material in the documents.  So, if she's admitted

11  the conviction and you proved everything you need to, the

12  document itself is cumulative.  And, as I say, there are parts

13  of it that, under Rule 403, probably shouldn't come in.

14         When she says adjudication was withheld, and you want

15  to prove that she was convicted, that's fine.  Frankly, that

16  might make a difference on the admissibility question; but,

17  since it had already been admitted without objection, it

18  obviously doesn't make much difference on the admissibility

19  question.  Beyond that, the difference on the credibility of

20  the witness between having admitted committing a crime and

21  having an adjudication withheld, or admitted committing a

22  crime and being adjudicated guilty is none.  I mean, the

23  difference in the effects on credibility is really trivial and

24  probably none.

25         We lawyers may think it's something, although I think

1   most lawyers would say that doesn't make any difference in the

2   Florida system.  The chance that any of the jurors think that

3   makes a difference is probably very, very small.

4            MR. HARPER:  My only point, Your Honor, was that I

5   felt like I was entitled, as a matter of law, to bring out not

6   only the nature of the convictions, but the number of

7   convictions.  And she had, I felt like, misled here in terms

8   of how many convictions, and there's not just two, not just

9   five, there's almost nine different convictions here, felony

10  convictions, where she was adjudicated, plus the one she was

11  not adjudicated.

12           THE COURT:  I didn't hear her deny a single

13  conviction you asked her about.  I heard her admit every

14  single thing you asked.  But you were arguing with each other

15  whether four convictions on the TJ Maxx --

16           MR. HARPER:  True with that one.

17           THE COURT:  -- was that four or one.  And, you know,

18  we can argue about that all day --

19           MR. HARPER:  Yes, sir.

20           THE COURT:  -- and it would accomplish not very much.

21           MR. HARPER:  I understand.  Lesson learned.

22           THE COURT:  Anything else we need to do before we

23  break?

24           MR. FINDLEY:  What time are we back?

25           THE COURT:  I think I said ten after 2:00 by that

1    clock.

2        (A luncheon recess was taken at 1:15 p.m.)

3                       **AFTERNOON SESSION**
                          (2:12 P.M.)

4

5        (Defendants present; jury not present.)

6             THE COURT:  Please be seated.

7             Are we ready for the jury?

8             MR. FINDLEY:  Yes, Your Honor.

9             MR. SPROWLS:  I think so.

10            THE COURT:  Jury in, please.

11            Mr. Sprowls, if you have the next witness, we can --

12            MR. DAVIS:  The marshals are fetching her as we

13   speak.

14            THE COURT:  All right.  Perfect.

15        (The jury entered the courtroom at 2:13 p.m.)

16            All right.  You may be seated.

17            Mr. Sprowls, please call your next witness.

18            MR. SPROWLS:  Demetrus Coonrod.

19            DEPUTY CLERK:  Please raise your right hand.

20        ***DEMETRUS COONROD, GOVERNMENT WITNESS, DULY SWORN***

21            DEPUTY CLERK:  Be seated.

22        Please, state your full name and spell your last

23   name for the record.

24            THE WITNESS:  Demetrus Coonrod, C-o-o-n-r-o-d.

25                       DIRECT EXAMINATION

*Demetrus Coonrod - Direct*

 1    BY MR. SPROWLS:

 2    Q.  All right.  Ms. Coonrod, the microphone does work, but we

 3    need you to scoot in a little closer to it so the jury can

 4    hear you.

 5        Would you tell the jury how old you are?

 6    A.  Thirty-one.

 7    Q.  And where do you consider home?

 8    A.  Chattanooga, Tennessee.

 9    Q.  Do you have any brothers or sisters?

10    A.  Yes, sir.

11    Q.  They live pretty much back there?

12    A.  Yes.

13    Q.  Ms. Coonrod, what sort of work have you done in the past?

14    A.  Phlebotomy.

15    Q.  You're going to have to speak up just a tad more and tell

16    me what that is.

17    A.  We draw blood and do urinalysis.

18    Q.  You are the ones that put the --

19            MR. HARPER:  Excuse me, Your Honor.  I can't hear.

20            THE COURT:  All right.  Ms. Coonrod, it will help us

21    if you'd speak to the microphone; but, if you would speak up

22    loudly enough that, even if there was no microphone there,

23    someone against the back wall would be able to hear you, that

24    would be perfect.

25            Thank you.  Mr. Harper may not have heard.  Say again

```
 1   what you do, or what you did in the past?
 2           THE WITNESS:  I'm a phlebotomist.  I draw blood and
 3   do urinalysis.
 4   BY MR. SPROWLS:
 5   Q.  That's excellent.  Thank you.
 6       Now, Ms. Coonrod, where are you presently being housed?
 7   A.  Carswell, Texas.
 8   Q.  Okay.  Now, does Carswell have several different places
 9   there?  They have a medical center?
10   A.  Yes, sir.
11   Q.  Are you at the medical center?
12   A.  No, sir.  The FCI.
13   Q.  And you were brought over to Tallahassee for this trial?
14   A.  Yes, sir.
15   Q.  And you're temporarily being housed where?
16   A.  At Wakulla County.
17   Q.  Okay.  Ms. Coonrod, what were you convicted of that
18   brought you into the Bureau of Prisons?
19   A.  Conspiracy to robbery, aggravated.  I'll say robbery.
20   Q.  Okay.  And where did that occur?
21   A.  In Chattanooga, Tennessee.
22   Q.  Do you have any other felony convictions besides that
23   one?
24   A.  No, sir.
25   Q.  And how much time did you receive for that?
```

*Demetrus Coonrod - Direct*

1   A.   Eighty-four months.

2   Q.   And approximately when did you get sentenced?

3   A.   September '03.

4   Q.   Did you go to trial or did you enter a plea?

5   A.   I entered a plea.

6   Q.   Do you recall at that pleading guilty, was there a piece

7   of paper -- did you have any sort of a plea agreement with

8   the U.S. Attorney's Office that your attorney worked up for

9   you, or do you recall?

10  A.   I don't recall.

11  Q.   Okay.  Prior to being at FCI-Carswell, were you housed at

12  FCI-Tallahassee?

13  A.   Yes, sir.

14  Q.   Okay.  And while at FCI-Tallahassee, did you come to know

15  an Officer Gregory Dixon?

16  A.   Yes, sir.

17  Q.   Okay.  If you saw Mr. Dixon again, do you think you could

18  recognize him?

19  A.   Yes, sir.

20  Q.   Is he in the courtroom today?

21  A.   Yes, sir.

22  Q.   Just tell me where he is seated or standing.

23  A.   He's seated.

24  Q.   Okay.  What's he wearing?

25  A.   The black suit, sitting in the middle.

1   Q.  This gentleman right here?

2   A.  Yes, sir.

3   Q.  Okay.  Do you recall what unit you were assigned to --

4   housing unit, that is -- out at FCI-Tallahassee when you met

5   Mr. Dixon?

6   A.  I was assigned to B unit, but I was living in G unit at

7   the time.

8   Q.  Is G unit a unit that some new people live in, transfers

9   and things like that?

10  A.  Yes.  And it also houses people once you're coming out

11  the SHU.

12  Q.  All right.  Okay.  Do you recall a time where he walked

13  up to you or approached you?

14  A.  He was more so in the office, yes.

15  Q.  Okay.  We weren't there.  So, tell the jury, tell us.

16  Did he ask you to come to the unit office, or were you just

17  passing by?  What occurred?

18  A.  I was passing by.

19  Q.  And did he say something to you?

20  A.  Yes.

21  Q.  What was that?

22  A.  "Come to the office."

23  Q.  All right.  Did you have to do what he said?

24  A.  I went to the office.

25  Q.  Okay.  Don't let your voice trail off.  You have to keep

*Demetrus Coonrod - Direct*

1    that voice up.

2        Did he ask you anything?

3    A.  We conversated, yes.

4    Q.  Okay.  Speak up.

5    A.  Yes.

6    Q.  What did he say?

7    A.  He asked my name, where I was from.  Just basic

8    conversation.

9    Q.  Okay.  Did he make any offers to you?

10   A.  Yeah.  He -- he offered me some gum at first, the first

11   conversation.

12   Q.  Okay.  Did anything happen during that first

13   conversation?

14   A.  He had asked if I would pull my pants down on the first

15   encounter.

16   Q.  Okay.  And what did you do?

17   A.  I did.

18   Q.  All right.  Now, is the door to the office open or

19   closed?

20   A.  It was open.  It was open.

21   Q.  So, could any inmate walking by see what was going on?

22   A.  There wasn't much movement at that time of the morning.

23   Q.  What time in the morning was it?

24   A.  About 6:30, 6:45.

25   Q.  So, you had just gotten up or were you getting off a

Demetrus Coonrod - Direct

1   shift, or what?

2   A.   I just kind of woke up and was getting ready to go eat

3   breakfast.

4   Q.   Ms. Coonrod, I'm going to show you Government's Exhibit

5   Number 2.  Do you recognize that building?

6   A.   Yes, sir.

7   Q.   That building is the outside of G unit?

8   A.   Yes, sir.

9   Q.   Okay.  I'm going to show you what's in evidence as

10  Government's Exhibit 3.  Do you recognize that room?

11  A.   Yes, sir.

12  Q.   Is that the room you were in?

13  A.   Yes, sir.

14  Q.   So, about 6:30 in the morning, there's not much movement,

15  he asked you to pull your pants down, and you do that, right?

16  A.   Yes, sir.

17  Q.   And what happens next?

18  A.   He just kind of touched on the outside area of my vagina.

19  Q.   All right.  Did he make any -- did he say anything

20  further to you?

21  A.   If I would be willing to have sex for contraband.

22  Q.   And what did you say to that?

23  A.   Yup.

24  Q.   Okay.  Why would you want contraband?  And please keep

25  your voice up, don't trail off.

1    A.   To have it, to sell.

2    Q.   So you could make some money?

3    A.   Yes.

4    Q.   So, you could make money or have to be able to buy things

5    from the commissary?

6    A.   Just to have extra things, stuff they have on the

7    commissary.

8    Q.   Did anything else, other than he touching you at this

9    point, did anything else happen in the officer's station that

10   morning?

11   A.   No.  I just got the gum and left to the compound.  It was

12   time for the compound to open.

13   Q.   Okay.  Was there a time that you had further contact with

14   Mr. Dixon?

15   A.   Yes.

16   Q.   And, Ms. Coonrod, so you're clear, I'm talking about

17   sexual contact or contact of a sexual nature.  All right?

18       Did you have further sexual contact with Mr. Dixon?

19   A.   Yes.

20   Q.   And do you know when that was?

21   A.   Yes.

22   Q.   When?

23   A.   It was in December.

24   Q.   Of what year?

25   A.   '04.

1    Q.   Okay.   What happened in December of '04?

2    A.   It was before Christmas, before my birthday.   He came

3    and -- well, he worked the midnight shift in G unit, and he

4    came and woke me up.   I slept on the third floor range,

5    across from Ms. Bennett.   And he woke me up, and I thought he

6    was saying, "Come to the restrooms," which was at the end of

7    the range.   When I got up and went to the restroom, which is

8    like open, but it's closed by a curtain, he wasn't in the

9    restroom, but I used the restroom anyway.

10       The back of G unit, there is a stairwell, which you have

11   to go through a gate.   And he was back there, the stairwell.

12   You open up the door in the stairwell, and he was down there

13   on the second -- you go down the steps, but he was on the

14   second floor, right there.

15   Q.   Okay.   Let me just stop you right there for a minute.

16       I show you what's in evidence as Government's Exhibit 6.

17   Did the stairwell look something like this?

18   A.   Yes, sir.

19   Q.   And to get to the stairwell, did you have to go through a

20   gate and then through another door, much like this in

21   Exhibit 7?

22   A.   But it was already open.

23   Q.   Okay.   The gate is open and he's down on the second

24   landing?

25   A.   Yup.

1  Q.   And what happens next?

2  A.   He took -- unbuttoned my shirt and proceeded to touch my

3  breasts, and we had -- I gave him oral sex, and he gave me

4  oral sex.   And I got -- he unbuttoned his pants, and I got on

5  top of him.   He was complaining about his knees were bad.

6  And we went from there.   And then he was starting to

7  ejaculate.   He started to come, and he said he had to pull

8  out.   And he started masturbating into a napkin.   And then he

9  wanted to do it again, continue to have sex, and I was like,

10  no, I didn't want to.

11      And then he was like, "Well, you got to go anyway,

12  because the lieutenant was fixing to come to make rounds."   I

13  don't know which lieutenant it was.   So, I was starting to

14  put my clothes on, anyway.

15      So, he went downstairs onto the first floor and went out,

16  and I went upstairs, back upstairs to the third floor to the

17  range that I was on, and got up in my bed.   And then he came

18  back around, like around 3:00, 3:30, and woke me up again.

19  He was like, "Come downstairs to the office."

20      And I got up, and I went down there.   And he was like,

21  "This is for you," some gum and stuff.   And we talked for a

22  few minutes.   And then he had -- he said he had to go wake up

23  the kitchen workers to get ready for work.

24      So, I went up to the second floor and woke my girlfriend

25  up, which was Sabrina Hall.   I woke her up and was like,

1   "Mr. Dixon gave me this, and we talked just about --" I

2   didn't tell her what had happened.  I just woke her up.  And

3   then, when he shined the light from the back, I got off of

4   her bed and went up and went around and back upstairs to my

5   room.

6   Q.  Okay.  You didn't tell your friend what you did to get

7   the chewing gum, did you?

8   A.  No.

9   Q.  Just that Officer Dixon gave it to you?

10  A.  Yeah.

11  Q.  Was there another time where you met with Officer Dixon,

12  an incident that may have involved another officer telling

13  you to go pick up some mail?

14  A.  Yeah.  He had called to B unit.  I had moved to B unit

15  from G unit.  And he had called.  It was Officer Whaley, who

16  had told me to -- he had called -- he didn't say --

17  Q.  Okay.  The "he" that called, at least what's being

18  related to you, is who?

19  A.  Right.  He didn't say the name.  He was just like,

20  Coonrod, which my unit officer at the time was Officer

21  Whaley, and he had worked the 12-to-8 shift once again.  And

22  he was just like, "Inmate Coonrod, you need to go to the F

23  unit and pick up some mail."  And I was saying, "Why would I

24  need to go pick up mail from the F unit?"

25      By the time I had got around there, there was another

*Demetrus Coonrod - Direct*

1    inmate named Trina Parker already around there.  She was

2    talking to Mr. Dixon when I got there, but he had told her

3    that she needed to leave so he could talk to me.

4        And I went in there, which we had -- I had heard that his

5    mom had passed.  So, when I first went in there, I hugged him

6    and I was like, "I'm sorry to hear that your mom had passed."

7    And we talked about that.  And he knew that I wasn't working

8    in Unicor anymore; that I was working on rec yard.  So, he

9    said, "I figure that you would need this," and he pulled out

10   the brown bag, and it was like contraband stuff, like Black &

11   Milds, cigarette lighters, gum, different little stuff.

12   Q.  And this was at the officer's station in --

13   A.  In F unit.

14   Q.  Okay.

15   A.  And so he just kind of hugged me and patted me on my

16   butt, or whatever.  And I was like, "Well, when do you think

17   you'll be back?"  He said, "Well, I can't tell you that."

18   And then I left.  We conversated a few minutes, and then I

19   left out.

20   Q.  Do you recall another incident with Mr. Dixon in G unit?

21   A.  Not that I remember.

22   Q.  Okay.  Maybe near in time when you went to the SHU?

23   A.  That's when I had sex -- I had --

24   Q.  Okay.  Speak up now.  Was this another occasion?

25   A.  No.  I had gone to the SHU in November, and then we

1    had those two incidents --

2           MR. HARPER:  I'm sorry, Your Honor.  I can't hear

3    her.

4    BY MR. SPROWLS:

5    Q.  You need to speak up a little bit.

6    A.  When I went to the SHU in November, that was the first

7    initial -- first two incidents that happened, when he had

8    touched me, and then --

9    Q.  Okay.

10   A.  We had sex.  That was November, December.

11   Q.  All right.  Ms. Coonrod, do you recall swearing out an

12   affidavit concerning the conduct that you're talking about?

13   A.  Yes, sir.

14   Q.  And initialling each paragraph and signing it at the end?

15   A.  Yes, sir.

16   Q.  Was the affidavit accurate at the time that you made it?

17   A.  Yes, sir.

18          MR. SPROWLS:  May I approach the witness?

19          THE COURT:  You may.

20   BY MR. SPROWLS:

21   Q.  I'm going to show you what I have marked as Exhibit 50

22   for identification purposes and ask you to look that over for

23   a moment.

24      Does that appear to be a copy of the affidavit that you

25   swore out or swore to?

*Demetrus Coonrod - Direct*

1   A.   Uh-huh.

2   Q.   All right.  I want you to look, if you would, at page 3

3   at the top, paragraph number 9.  Do you see that?

4   A.   Yes.  This was before I went to the SHU, the second time

5   before I went to the SHU.

6        MR. FINDLEY:  Your Honor, I object to a prior

7   consistent statement, unless he's trying to impeach his own

8   witness, which would be fine.

9        THE COURT:  Objection is overruled.

10       Ms. Coonrod, it will help us, if you speak up as

11  loudly as you can.  Continue, if you would, to speak as if you

12  are speaking to the officer against the back wall back there.

13  BY MR. SPROWLS:

14  Q.   The first sexual encounter you had with Mr. Dixon was

15  where?

16  A.   In G unit.

17  Q.   In G unit on the stairwell?

18  A.   Right.

19  Q.   Okay.  And when was the next contact you had of a sexual

20  nature with him?

21  A.   He wanted to again, but he couldn't because there was too

22  many people.

23  Q.   Approximately when was this?

24  A.   This was -- he worked -- he was supposed to work my unit,

25  B unit, but he had switched units with Mr. Chamberlin and

*Demetrus Coonrod - Direct*

317

```
 1    worked G unit from 4-to-12, and he had told me to come inside
 2    the unit.  He clocked in.  He said come in for a few seconds
 3    after he go in, and I did.  And there were too many people
 4    coming in, too many inmates walking.  So, I had pulled my
 5    pants down, and he was like, "Why did you shave?"  Because he
 6    liked a lot of hair to be down there, and I had shaved.  And
 7    he touched me, or whatever, he didn't try to penetrate me or
 8    anything, with his fingers, or whatever, but he was going to
 9    try to have oral sex, or whatever, but there were too many
10    people walking past.  So, I ended up -- left.
11    Q.  Okay.
12    A.  And then I went into the SHU like 2 days after that.
13    Q.  All right.  Does the beginning of paragraph 9 refresh
14    your memory as to when the incident you just talked about
15    occurred?
16    A.  Yeah.
17    Q.  When did that incident that you just now discussed occur?
18    A.  March the 12th.
19    Q.  March 12th?
20    A.  I went to the SHU -- I went to the SHU on the 14th.
21    Q.  All right.  That's March 12th of 2005?
22    A.  Yes.
23    Q.  Okay.  You went to the SHU --
24    A.  I went to the SHU for a fight.
25    Q.  For a fight.  When you came out, did he ask you anything?
```

*Demetrus Coonrod - Direct*

1  A.  He asked me if I had told on him.

2  Q.  And what did you say?

3  A.  I said no.

4  Q.  Now, what did you understand -- what was your

5  understanding of the question, whether you told on me?

6  A.  Meaning, had I told anything to George Williams about me

7  and him, and I told him no.

8  Q.  Okay.  And where did this occur?

9  A.  This was D unit.

10  Q.  Okay.  And did he ask you to do anything at that time?

11  A.  We had -- we went in the office, and he just wanted to

12  touch.

13  Q.  And where was that?

14  A.  In D unit.

15  Q.  Where did he touch you?

16  A.  He wanted me to pull my pants down, just look, touch my

17  private areas -- stuff like that.

18  Q.  Ms. Coonrod, I understand that this may be difficult to

19  testify about this stuff, but we do need to hear you loud and

20  clear.  Okay?

21      Were you allowing this type of contact with Officer Dixon

22  because you wanted to or because you wanted the contraband?

23  A.  I wanted the contraband.

24          MR. FINDLEY:  Object to the form of the question.

25          THE COURT:  Sustained.

```
 1    BY MR. SPROWLS:

 2    Q.  Why did you do it?

 3    A.  I wanted the contraband.

 4    Q.  Why?

 5    A.  To sell it, the money, to have it, items, because it

 6    wasn't available in the commissary, and he offered it to me,

 7    and I took it.

 8    Q.  Do you recall an incident in F unit concerning getting

 9    contraband?

10    A.  From Mr. Dixon?

11    Q.  Yes.

12    A.  Yes.

13    Q.  Explain what happened, please.

14    A.  He had --

15    Q.  You're going to have to speak up, Ms. Coonrod.  If we

16    can't hear you, it's like you're not here.

17    A.  He had -- he told an inmate by the name of Lametra

18    Johnson to tell me to come to F unit.  So, I walked around

19    there.

20        At first there were too many inmates coming in and out.

21    He kept telling me to wait and wait, until finally he told me

22    that he had left something in a tree.  To go around there and

23    look in the tree, he left something there for me.

24        So, I go around there and look in the trees.  So, he had

25    gum and cigarette lighters in the tree.  So, I got it and I
```

*Demetrus Coonrod - Direct*

1    said thank you.  So, he said, "I figured that you might need

2    it," and I was like, "Okay, thank you."

3        And that was it.  And I think that was the last time I

4    had talked to him.

5    Q.  All right.  Did you tell any other fellow inmates that

6    you were having sexual contact with Officer Dixon?

7    A.  No.

8    Q.  Do you know an inmate by the name of Deyandra Demorais?

9    A.  No.

10   Q.  You don't recognize that name?

11   A.  (Shakes head.)

12   Q.  Let me ask you this:

13       When you're in custody, do people often adopt a nickname

14   or a name other than their true name?

15   A.  Yes.

16   Q.  Is it possible you may know her or another inmate by

17   their nickname?

18           MR. FINDLEY:  Objection.  Calls for speculation.

19           THE COURT:  Overruled.

20           THE WITNESS:  I've never heard of that name.

21   BY MR. SPROWLS:

22   Q.  Okay.  What's your nickname when you were in?

23   A.  When I'm in?

24   Q.  Yes.  Right now you're Demetrus Coonrod.  We don't know a

25   nickname.  What's your nickname?

*Demetrus Coonrod - Cross/Findley*

1   A.   Meechie.

2          MR. SPROWLS:   That's all I have, Judge.

3          THE COURT:   Cross-examine?   Mr. Findley?

4          MR. FINDLEY:   Yes, sir.

5                       CROSS-EXAMINATION

6   BY MR. FINDLEY:

7   Q.   Good afternoon, Mr. Coonrod.   My name is Tom Findley.   I

8   represent Mr. Dixon in this case.

9        You mentioned your prior conviction for conspiracy to

10  commit armed robbery.   Is that what you pled to?

11  A.   No.

12  Q.   What was it that you pled to?

13  A.   Conspiracy to robbery and interstate robbery.

14  Q.   To interstate robbery under the federal statute; is that

15  correct?

16  A.   Yes.

17  Q.   Okay.

18         MR. FINDLEY:   May I approach?

19         THE COURT:   You may.

20  BY MR. FINDLEY:

21  Q.   Ms. Coonrod, I'll show you what appears to be a plea

22  agreement in the United States District Court, Eastern

23  District of Tennessee at Chattanooga; and, first of all, I

24  will turn to the last page and ask if that's your signature.

25  A.   Yes.

*Demetrus Coonrod - Cross/Findley*

1  Q.  And does this appear to be the plea agreement that you

2  executed in connection with that offense?

3  A.  Yes, it does.

4  Q.  Is it correct that the United States Government dropped

5  certain charges as a part of this plea agreement?

6  A.  Not that I'm aware of.  I was only charged with three

7  charges.

8       MR. FINDLEY:  Your Honor, I would move this into

9  admission as Defendant's Dixon.  I guess we're on -- is it 10?

10 Oh, no.  I'm sorry, 12.

11      THE COURT:  Okay.  Defendant Dixon Exhibit 12.

12      MR. SPROWLS:  Relevance, if she -- relevance at this

13 point, Judge.

14      THE COURT:  Do you have questions about this?

15      MR. FINDLEY:  Yes, I can continue to ask questions.

16 BY MR. FINDLEY:

17 Q.  Was it your understanding that you were required to

18 cooperate as part of this agreement?

19 A.  Cooperate with what?  With --

20 Q.  Cooperate with other investigations including your own?

21 A.  No.

22 Q.  Let me show you paragraph 8 of this agreement.  Does it

23 not say that the defendant further agrees to be fully and

24 completely truthful with any and other law enforcements

25 including personnel of the U.S. Attorney's Office?

1   A.  Yes, but I never even read it --

2   Q.  All right.

3   A.  -- to the full extent.

4       MR. FINDLEY:  I'll tender the exhibit.

5       THE COURT:  All right.  Objection is overruled.

6   Defendant's Dixon Exhibit 12 is admitted.

7       (<u>**DEFENDANT DIXON EXHIBIT NO. 12:**</u>  Received in evidence.)

8   BY MR. FINDLEY:

9   Q.  Ms. Coonrod, that's not the only conviction that you have

10  on your record, is it?

11  A.  No, sir.

12  Q.  There are additional convictions from the state of

13  Tennessee; is that correct?

14  A.  Yes, but that's my only felony.

15  Q.  Okay.  There are other convictions of acts relating to

16  dishonesty or theft, though, are there not?

17      MR. SPROWLS:  Object.

18      THE COURT:  Sustained.

19  BY MR. FINDLEY:

20  Q.  Is it correct that you have been convicted of passing

21  worthless checks?

22      MR. SPROWLS:  Object.

23      THE COURT:  Sustained.

24  BY MR. FINDLEY:

25  Q.  Is it correct that you have been convicted of theft?

```
 1              MR. SPROWLS:  Object.

 2              THE COURT:  Sustained.

 3   BY MR. FINDLEY:

 4   Q.  As a part of your agreement with the government in your

 5   case in the Eastern District of Tennessee, did the government

 6   file a motion for downward departure?

 7   A.  On my case?

 8   Q.  Yes.

 9   A.  Not as I know of.

10              MR. FINDLEY:  May I approach?

11              THE COURT:  You may.

12   BY MR. FINDLEY:

13   Q.  Ms. Coonrod, I'll show you what is Government's Motion

14   For Downward Departure Pursuant to Section 5K1 of the Federal

15   Sentencing Guidelines, and I will ask you if you recognize

16   that.

17   A.  This is the first that I've seen this.

18   Q.  Have you ever gotten a reduction of your sentence because

19   of cooperation?

20   A.  No, sir.

21   Q.  Do you anticipate that you may get one?

22   A.  No, not that I'm aware of.

23   Q.  In connection with your affidavit -- do you have that

24   affidavit before you?

25   A.  This one?
```

1   Q.  Yes, the one that Mr. Sprowls handed you.  I would like

2   to ask you a couple of questions about that.

3        First of all, you said that you had a sexual encounter

4   with Officer Dixon the end of November, beginning of

5   December, between 6:30 and 7 a.m.  Is that what your

6   testimony was?

7   A.  No.  The sexual encounter was in December before

8   Christmas, before or -- before my birthday.  I don't recall

9   the exact date.  And then it was before -- it was between the

10  hours of 2:00 and 3:30 in the morning.

11  Q.  Uh-huh.  There is nothing in this affidavit about sex in

12  the stairwell, is there, at least that I've seen?  Do you

13  know of any reference in this affidavit to sex in the

14  stairwell?

15  A.  It's right here.

16  Q.  Where?

17  A.  First page, starting the paragraph 2.

18  Q.  Paragraph 2 speaks about going to the back of the

19  range -- the range being the unit; is that correct?

20  A.  Right.  He woke me up and go and have oral sex --

21  Q.  Okay.

22  A.  -- on the --

23  Q.  Got you.  Okay.

24       Now, nowhere in this affidavit do you mention anything

25  about any other guard; is that correct?

1   A.   The lieutenant?

2   Q.   Any other guard, other than Officer Dixon.

3   A.   About which guard?

4   Q.   About any guard.  Is there anything about any other guard

5   in this affidavit?

6   A.   In six, I'm saying that the lieutenant was the one be

7   making rounds.

8   Q.   Okay.  There is nothing to suggest in this affidavit that

9   Mr. Dixon was working with any other guard to enable him to

10  have the relationship with you; is that correct?

11  A.   I didn't mention anything about the guards.

12  Q.   So, there is nothing in there about that, right?

13  A.   It just says that the lieutenant was about to make his

14  rounds.

15  Q.   Right.  And that was the lieutenant that Mr. Dixon was

16  afraid would detect him having a relationship with you,

17  correct?

18  A.   I'm not aware of him being afraid or not.

19  Q.   You didn't have the second sexual encounter because

20  Mr. Dixon was concerned that the lieutenant might be coming,

21  correct?

22  A.   We didn't have sex the second time 'cause I didn't want

23  to.

24  Q.   Okay.

25  A.   And then he said, "Well, the lieutenant is about to make

1   his rounds."

2   Q.  Right.  So, he wanted to get away so that he wouldn't be

3   detected by that lieutenant.  Is that what you understood?

4   A.  No.  I understood because I didn't want to, the second

5   time.

6   Q.  Okay.  But it wasn't as if he was -- there's nothing in

7   here to suggest that he was working or conspiring with any

8   other guard in order to be able to meet with you; is that

9   correct?

10  A.  I have no idea, sir.

11  Q.  You have no idea.

12          MR. FINDLEY:  May I approach?

13          THE COURT:  You may.

14  BY MR. FINDLEY:

15  Q.  Are you familiar with the pamperedprisoner.com?

16  A.  Yes, I am.

17  Q.  And do you have a website on pamperedprisoner.com?

18  A.  Yes, I do.

19  Q.  Do you recognize the document that I just handed you?

20  A.  Yes.

21  Q.  Is that a true and correct copy of the pages from your

22  website?

23  A.  Yes.

24  Q.  And in it you say, "I'm looking for that special someone

25  to stimulate my mind, my body, my soul, seeking

*Demetrus Coonrod - Cross/Findley*

1  correspondence with men and women"; is that correct?

2  A.  Yes, uh-huh.

3      MR. FINDLEY:  Your Honor, I would offer this as the

4  next Defendant Dixon exhibit.

5      MR. SPROWLS:  Objection.

6      THE COURT:  Sustained.

7  BY MR. FINDLEY:

8  Q.  That is your website?

9  A.  Yes, it is.

10     MR. FINDLEY:  I have nothing further.

11     THE COURT:  Mr. Harper?

12     MR. HARPER:  I have a couple of questions.  May we

13 get a clarification at side-bar on an issue?

14     THE COURT:  All right.  I'll see you at the bench.

15     (Conference held at side-bar.)

16     MR. HARPER:  Your Honor, we have some evidence that

17 this witness has been convicted of crimes involving moral

18 turpitude.

19     THE COURT:  What crime?

20     MR. HARPER:  Passing worthless bank check, theft of

21 property, passing worthless bank check.

22     THE COURT:  The law of the circuit is that none of

23 those are crimes of moral turpitude, the kinds of dishonesty

24 of the types that can be admitted when misdemeanors.  If it's

25 a felony, you can ask it.  If it's not a felony, you cannot

*Demetrus Coonrod - Cross/Harper*

```
 1   ask about it.

 2          MR. HARPER:  I'll be bound by that.  I disagree, but

 3   I'll --

 4          THE COURT:  I'll give you the cite of the case from

 5   the circuit at the next break.

 6          MR. HARPER:  I've got some counterargument, but I

 7   understand.

 8          THE COURT:  All right.

 9      (End of side-bar conference.)

10                      CROSS-EXAMINATION

11    BY MR. HARPER:

12   Q.  Ms. Coonrod, you indicated that regarding this March 12th

13   event that you were told about officer switching.  Do you

14   remember that?

15   A.  Yes.

16   Q.  And what -- and the reason that you were told that there

17   was a switch was because allegedly Mr. Dixon didn't like the

18   unit officer's station and its setup?

19   A.  Yes, sir.

20   Q.  Is that what you were told?

21   A.  Yes.  That's what he told me.  I asked him why he didn't

22   work my unit, because he was scheduled to work it from

23   4-to-12, and he told me he didn't like the way the setup was,

24   so he switched with Mr. Chamberlin.

25          MR. HARPER:  That's all I have, Your Honor.
```

```
 1              THE COURT:  Redirect?

 2              MR. SPROWLS:  May I approach the witness, Judge?

 3              THE COURT:  You may.

 4                     REDIRECT EXAMINATION

 5  BY MR. SPROWLS:

 6  Q.  Ms. Coonrod, if you can answer this question, go ahead;

 7  but, if not -- if you would, take a look at the first

 8  paragraph of Defendant's Exhibit 12, which was your plea

 9  agreement, I think you identified that.

10      Is this agreement between Demetrus Coonrod a/k/a Meechie

11  and her attorney, David Barrow, and the U.S. Attorney for the

12  Eastern District of Tennessee?  That's the parties to this

13  agreement?

14  A.  Yes, sir.

15  Q.  You have no agreements with the U.S. Attorney, Northern

16  District of Florida, do you?

17  A.  No, sir.

18  Q.  Have you been promised anything with regard to your

19  testimony here today?

20  A.  No, sir.

21  Q.  Did you enjoy the trip from Carswell to Tallahassee?

22  A.  No, sir.

23  Q.  Why?  Tell the jury why those type of trips aren't

24  enjoyable.

25              MR. FINDLEY:  I would object on relevance.
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  It's very uncomfortable.  I'd rather be
 3   in Texas still.
 4   BY MR. SPROWLS:
 5   Q.  Do you come straight from Carswell or -- where is
 6   that? -- Fort Worth to here?
 7   A.  No.  You stop in Oklahoma City, and then I stayed there
 8   for a week.  Then I left there and got dropped off in some
 9   part of Florida, and then went to Wakulla County, and it's
10   not a pleasant place to be.
11              MR. SPROWLS:  That's all I have.  Thank you.
12              THE COURT:  Thank you, Ms. Coonrod.  You may step
13   down.
14              Please call your next witness.
15              MR. SPROWLS:  Delores Hamlet.  Oh, I'm sorry.
16   Dr. Carbonell.
17              DEPUTY CLERK:  Please raise your right hand.
18         *EFRAIM CARBONELL, GOVERNMENT WITNESS, DULY SWORN*
19              DEPUTY CLERK:  Be seated.
20              Please, state your full name and spell your last
21   name for the record.
22              THE WITNESS:  Efraim Carbonell, C-a-r-b-o-n-e-l-l.
23                        DIRECT EXAMINATION
24   BY MR. SPROWLS:
25   Q.  Sir, where do you -- where do you work?
```

*Efraim Carbonell - Direct*

1    A.   At the Federal Correctional Institution in Tallahassee,

2    Florida.

3    Q.   And what's your position there?

4    A.   I'm the clinical director.

5    Q.   Okay.  As such, you are one of the doctors that serves

6    there, or you're ahead of the --

7    A.   The head.

8    Q.   Okay.  But you do see patients?

9    A.   Yes, sir.

10   Q.   Did you have the opportunity to review the medical file

11   of Inmate Letishe Moore?

12   A.   I did.

13   Q.   Okay.  Did you note whether there were any entries of a

14   diagnosis of a particular disease that is sexually

15   transmitted?

16   A.   Yes, sir.

17   Q.   All right.  Normally, do the inmates come to the clinic?

18   A.   Normally, do they come to the clinic?

19   Q.   As opposed to the doctors routinely checking the inmates?

20   A.   Both way.  They normally come to, the procedure we call,

21   sick call, or they come for the care clinic visits.

22   Q.   Okay.  Did you make a mental note as to approximately

23   what month or year she came and this ailment, for lack of a

24   better word, was diagnosed?

25   A.   I believe it was August of 2006.

1   Q.   Okay.   And what was noted in the medical records?

2   A.   That she was treated for trichomonas, vaginalis

3   trichomonas.

4   Q.   That's a big word, you're going to have to break it down

5   here.

6   A.   Trichomonas, vaginalis.

7   Q.   Okay.   And what -- essentially what is that condition?

8   A.   That is a sexually-transmitted disease, normally

9   asymptomatic on females, that could be also in a male, but

10  it's totally asymptomatic in a male.   And at given time, the

11  female will start having symptoms.

12  Q.   Okay.   Is this a condition that manifests itself near in

13  time of the contraction or of the, whatever is the thing, or

14  does it have to incubate for some time?

15  A.   Yeah.   It's hard to predict, because it could be

16  asymptomatic for any given time, and then start giving

17  symptoms suddenly.

18  Q.   What are those symptoms, doctor?

19  A.   On the female, it could be one which is most of the time

20  that the person come to seek -- for medical attention is

21  discharge, vaginal discharge.

22  Q.   Dr. Carbonell, you indicated -- I know you are going on

23  memory, but -- the notation was August of this year?

24  A.   As far as I can recollect, yes, August this year.

25  Q.   Okay.

*Efraim Carbonell - Cross/Findley*

1          MR. SPROWLS:  That's all I have.

2          THE COURT:  Cross-examine?

3                         CROSS-EXAMINATION

4    BY MR. FINDLEY:

5    Q.  Good afternoon, doctor.

6    A.  Good afternoon.

7    Q.  My name is Tom Findley.  I represent Mr. Dixon in this

8    case.

9          What is your specialty?

10   A.  I'm a general physician and also pediatrician.

11   Q.  Okay.  You stated I believe that you said that this STD

12   can manifest itself at any given time after the sexual

13   contact?

14   A.  That's correct.

15   Q.  So, as far as you know for Ms. Moore, it could have been

16   a sexual contact before she was ever incarcerated, is that

17   correct -- it's possible?

18   A.  It could be possible.

19   Q.  All right.  Now, it was not detected until August of '06.

20   And were you aware of the fact that the alleged sexual

21   contact was back in 2003?

22   A.  No, sir, I didn't know.

23   Q.  Okay.  But it is possible that it could have been

24   transmitted prior to her incarceration?

25   A.  Could be.

1        MR. FINDLEY:  Thank you.

2        THE COURT:  Mr. Harper?

3        MR. HARPER:  No questions, Your Honor.

4        THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6   BY MR. SPROWLS:

7   Q.  Just on that last question from defense counsel, a lot of

8   things are possible.  What is likely?  Was this a condition

9   that was -- that was transmitted prior to -- is it more

10  likely that it was a condition that was transmitted prior to

11  her incarceration, or is it more likely that it was since

12  she's been in?

13        MR. FINDLEY:  Your Honor, I would object to the form

14  of the question, to the extent I believe he should ask whether

15  there is a degree of medical certainty, if that's the case.

16        THE COURT:  Overruled.

17  BY MR. SPROWLS:

18  Q.  You said it's possible, explain your answer.

19  A.  Well, basically, when a female comes to our institution,

20  we do Pap smear.  That's mandatory.  On a Pap smear, we will

21  know if that patient has been infected with any

22  sexually-transmitted diseases.

23  Q.  All right.  So, if Ms. Moore went through the standard

24  orientation and examination, that would have been done?

25  A.  As I review the chart, if I'm not mistaken, one Pap smear

*Delores Hamlet - Direct*

336

1  previous to the one that was showing trichomonas was negative

2  and the other one was positive.

3  Q.  Okay.  And these tests were run while she was

4  incarcerated?

5  A.  Yes, sir.

6          MR. SPROWLS:  That's all I have, Judge.

7          THE COURT:  Thank you, Dr. Carbonell.  You may step

8  down.

9          Mr. Sprowls, please call your next witness.

10         MR. SPROWLS:  Delores Hamlet.

11         DEPUTY CLERK:  Please raise your right hand.

12  **DELORES HAMLET, GOVERNMENT WITNESS, DULY SWORN**

13         DEPUTY CLERK:  Be seated.

14      Please, state your full name and spell your last

15  name for the record.

16         THE WITNESS:  Delores Hamlet, H-a-m-l-e-t.

17                    DIRECT EXAMINATION

18  BY MR. SPROWLS:

19  Q.  Good afternoon, Ms. Hamlet.

20  A.  Good afternoon.

21  Q.  Ms. Hamlet, could you tell the jury where is home for

22  you?

23  A.  North Carolina.

24  Q.  Any particular town in North Carolina?

25  A.  Raleigh.

1  Q.  The Raleigh area.  And do you have any family or any

2  children?

3  A.  Yes, sir.

4  Q.  Tell us.

5  A.  I have eight children.

6  Q.  Eight children.  Where do they live?

7  A.  In North Carolina.

8  Q.  And what's the range of their ages?

9  A.  From 19 to about 36.

10  Q.  Ms. Hamlet, what sort of work have you done in the past?

11  A.  Working in restaurants and ITT Telecommunications,

12  clothing stores.

13  Q.  All right.

14  A.  Head cashier.

15  Q.  Ms. Hamlet, where are you currently being housed?

16  A.  Wakulla County Jail.

17  Q.  Is Wakulla County Jail your permanent place of residency

18  right now?

19  A.  No, sir.

20  Q.  Where are you designated?

21  A.  To Miami-FDC.

22  Q.  And where were you prior to going to FDC-Miami?

23  A.  Tallahassee-FCI.

24  Q.  Ma'am, what were you convicted of that brought you into

25  the Bureau of Prisons?

1    A.   A drug conspiracy.

2    Q.   Conspiracy to do what?

3    A.   Possess and sell drugs, distribute drugs.

4    Q.   Do you recall if you have any other felony convictions

5    besides that one?

6    A.   Yes, sir, I have a few other felony convictions.

7    Q.   Out with it, go ahead.

8    A.   Drug convictions and an accessory after the fact of

9    murder, for knowing something and not telling them.

10   Q.   You knew something about the murder but you didn't tell

11   it?

12   A.   Yes, sir.

13   Q.   Or at least that's what you were convicted of?

14   A.   Yes, sir.

15   Q.   All right.  Anything else?

16   A.   No, sir.

17   Q.   Okay.  When you were in FCI-Tallahassee, did you come to

18   know an inmate by the name of Shonnie Daniels?

19   A.   Yes, sir.

20   Q.   Did you become friends with her or friendly with her?

21   A.   Yes, sir.  She was like a daughter to me.

22   Q.   Did you do any, for lack of a better word, any favors for

23   Ms. Daniels?

24   A.   Yes, sir.  I used to hold contraband for her.

25   Q.   Why would you hold contraband for another inmate?

1  A.  Because they were always shaking her down, and she was

2  like so hot, like -- is what we call it, hot -- and they were

3  always shaking you down, thinking that you were doing

4  something.

5  Q.  Did she have a lot of stuff?

6  A.  Yes, sir, a lot of contraband.

7  Q.  And hear the question here:

8      Do you know where she got the contraband?

9  A.  From officers, sir.

10 Q.  All right.  How do you know that?

11 A.  I accompanied her one time when she went to one officer

12 and got a package from him.  And then she told me that she

13 was dealing with other officers, named some other officers

14 that she was dealing with.

15 Q.  All right.  Let's go back to what you just said.

16     Did you walk with her to a location to where an officer

17 was?

18 A.  Yes, sir.  I walked with her to a unit, Unit D.

19 Q.  All right.  And where did you go in Unit D?

20 A.  I went inside and stood outside the office when she got

21 the package.

22 Q.  Where did she go?

23 A.  She went inside the office.

24 Q.  Who was in the office?

25 A.  Mr. Dixon.

1  Q.  How can you tell it was Mr. Dixon in the office?

2  A.  I saw him.

3  Q.  Were there any other officers in the office?

4  A.  No, sir.

5  Q.  Did you take a good look at Ms. Daniels before she went

6  in?

7  A.  Yes, sir, I was with her.

8  Q.  Did she have a bag?

9  A.  No, sir.

10  Q.  Did she have anything when she came out?

11  A.  Yes, sir.

12  Q.  What did she have?

13  A.  She had a paper bag when she came out.

14  Q.  Did you see what was inside?

15  A.  Bandanas, eyebrow pencils, bleach for your hair, to dye

16  your hair blonde, chewing gum -- stuff like that, items.

17  Q.  Is that stuff valuable in the compound?

18  A.  Yes, sir.

19  Q.  After you saw that event, what did you decide to do?

20  A.  I decided to approach Mr. Dixon and ask him would he

21  bring me some contraband in, too.

22  Q.  Is there a word for that, asking an officer to bring in

23  contraband?

24  A.  Yes, sir.  I can't think of it, but there is, sir.  I

25  decided to --

1    Q.  Did you previously, during an interview, use the word

2    "cracking"?

3    A.  Yes, sir.  Just crack on him, yes, sir.

4    Q.  Are you trying to make the officer crack?  Is that where

5    that word comes from?

6    A.  Yes, sir.  I crack on him, meaning proposition him.

7    Q.  Okay.  How did Mr. Dixon react at first?

8    A.  At first he was kind of like panting.  "Like panting,"

9    what I mean, he was, like, reluctant a little bit, you know,

10   because I had -- I was new or something, coming to him to ask

11   him.  So, he was kind of reluctant.  But I asked him a couple

12   more times, and he went -- he relented and said okay.

13   Q.  When you were asking him -- cracking on him to get some

14   contraband, were you doing that because somebody with the

15   government said, "Hey, Ms. Hamlet, see if you can go get some

16   contraband from Gregory Dixon"?

17   A.  No, sir.

18   Q.  Whose decision was it to try to get contraband from this

19   officer?

20   A.  My decision.

21   Q.  What did he -- did he bring in something?

22   A.  Yes, sir.  He brought in some scarfs and some bandanas,

23   some chewing gum, some Black & Milds, some eyebrow pencils.

24   Q.  And what did you do with these?

25   A.  Sold them to inmates for money or for commissary.

*Delores Hamlet - Direct*

1   Q.  And tell the jury how you sell stuff within

2   FCI-Tallahassee?

3   A.  You just give the inmates a commissary list, and they

4   will get it, or they will give you money that they got in

5   through visitation or from another officer, or something like

6   that.  That's how it happened.

7   Q.  So, you give them the item, say, an eyebrow pencil.  Do

8   you agree upon how much that thing is worth?

9   A.  Yes, sir.  Yes, sir.

10  Q.  And if it's worth $5, then --

11  A.  $15.

12  Q.  $15?

13  A.  Yes, sir.

14  Q.  And now that persons owes you $15.  So, you say, "Well,

15  go get this $15 worth of this stuff from the commissary"?

16  A.  Yes, sir.  Or if it's more than that, then it might have

17  a bill or something, a 50 or a 20 or a hundred dollar bill,

18  or something, and they just wanted one eyebrow pencil.

19  Q.  You mentioned inmates getting money from visitation.  Do

20  you know how that's done?

21  A.  Yes, sir, the family or friends come in, and they would

22  get the money, and they would conceal the money and bring it

23  to visitation.

24  Q.  Now, the visitation area at FCI, does it -- does the

25  visitor and the inmate get to --

1    A.   Yes, sir.   It's contact visits.

2    Q.   Contact visits?

3    A.   Yes, sir.

4    Q.   So, there's no screens or barriers, or anything?

5    A.   Or glass or anything.   You hug and kiss and touch,

6    whatever.

7    Q.   And in doing something like that, just pass the money?

8    A.   Yes, sir.

9    Q.   Any other way people get money?

10   A.   You have inmates that work outside the gate, and their

11   friends, their family will come, and they're drop it off

12   somewhere where the inmates tell them that they are working,

13   cleaning up or something, and they'll drop it off.   And one

14   of the other inmates outside the gate will bring it in to

15   them -- pick it up and bring it in for them.

16   Q.   Isn't there a -- is there a fence that goes all the way

17   around the exterior of the perimeter of the FCI?

18   A.   Yes, sir.

19   Q.   How do they get past that, the friends or the family,

20   whoever is doing the dropping off?

21   A.   Well, they can drive around.   There's a park back there

22   and everything, sir.   And the inmates work outside of the

23   fence, cleaning up the ditches and around by the armory and

24   the dog pound and stuff.   So, it's very easy to do it.

25   Q.   What, if anything, did Mr. Dixon get out of his

1  arrangement with you?

2  A.   Money.

3  Q.   Well, is there a set amount for a given item?

4  A.   No, sir.  We just give him a list and give him a hundred

5  dollar bill, whatever he charges, a hundred dollar bill,

6  $200, or something like that, and give him the list and he

7  bring it.

8  Q.   How are you getting your money?

9  A.   Through visitation.

10 Q.   How often did you get items from Mr. Dixon all total?

11 A.   How often?

12 Q.   How many times?  Let me ask -- I'm sorry I didn't ask

13 that right.

14 A.   Several times, sir.  Over six times.

15 Q.   Did Mr. Dixon always get you what you wanted?

16 A.   No, sir.  He ripped me off a couple of times, took my

17 money and say he was going to bring something, and he didn't

18 bring it.

19 Q.   Did he always bring in all of what you asked for?

20 A.   No, sir.

21 Q.   Did you talk to him about getting less than what you

22 ordered?

23 A.   Yes, sir.  I always kind of like told him that he ripped

24 me off, or something like that and -- something like that,

25 make statements to him of that sort.

*Delores Hamlet - Direct*

1  Q.  Would he respond to you?

2  A.  He would say, "How did I do that?" or "What are you

3  talking about?"  Something like that.

4  Q.  Did you notice if the officers would change assignments

5  periodically?

6  A.  Yes, sir, they changed quarterly.

7  Q.  Do you recall a time where -- when Mr. Dixon wanted to

8  stop this arrangement with you?

9  A.  I think he might have stopped with me, and a couple of

10 other girls, some other girls he probably kept on with.  He

11 had his choices, his picks that he dealt with.

12 Q.  All right.  Did he say anything to you as to why he had

13 wanted to stop with you?

14 A.  He told me a couple of times that it was kind of hot, too

15 much talk was going around.

16 Q.  That it was kind of what now?

17 A.  Hot, people talking too much, I guess.

18 Q.  People talking, who's the people talking?

19 A.  He never mentioned who the people were, but I guess he

20 meant the inmates.  He might have meant officers, too, but I

21 know he meant some of the inmates.

22 Q.  Did there come a time where cigarettes were no longer

23 sold in the commissary?

24 A.  Yes, sir.

25 Q.  Do you recall approximately when that was?

*Delores Hamlet - Direct*

1  A.   No, sir.  It was like -- it was in the summertime, but I

2  can't recall when it was, sir.

3  Q.   This year or last year?

4  A.   This year.

5  Q.   Did that have any impact on the price of cigarettes?

6  A.   Yes, sir.  The price of cigarettes went up.

7  Q.   Were you able -- were you and other inmates able to get

8  cigarettes after they were banned?

9  A.   Yes, sir.

10  Q.   How so?

11  A.   We got them from the officers.

12  Q.   Are you familiar with an Officer Alfred Barnes?

13  A.   Yes, sir.

14  Q.   Did you get any contraband from him?

15  A.   Lots of contraband from Mr. Barnes, sir.

16  Q.   Did you get any cigarettes -- you mentioned that he said

17  that it was getting too hot and he wanted to stop dealing

18  with you, too much talking.

19      Did there come a time where he started dealing with you

20  again in cigarettes?

21  A.   Yes, sir.

22  Q.   How much -- what was the going rate for a pack or a

23  single one?

24  A.   A pack would go for 50-, $75.

25  Q.   Now, is that how much he was being paid or how much you

1    were getting?

2         THE COURT:  Mr. Sprowls, you may have lost me with

3    the "he."

4         MR. SPROWLS:  I'm sorry.  Let me back up.

5    BY MR. SPROWLS:

6    Q.  Did there come a time that you started getting cigarettes

7    from Mr. Dixon?

8    A.  Yes, sir.

9    Q.  How much did Mr. Dixon charge for a pack of cigarettes?

10   A.  He would charge like from a hundred to $200 for a carton

11   of cigarettes.

12   Q.  A hundred to 200 for a carton?

13   A.  Yes, sir.

14   Q.  Why the wide range?

15   A.  I don't know, sir.  I guess, when the officers started

16   hearing about how much we were selling them for and how much

17   we were getting, then they went up on their prices, too, sir.

18   Q.  Now, were you a smoker or were you a seller?

19   A.  I was a seller, sir.

20   Q.  And how much would a single cigarette after they were

21   banned, how much would it go for in the compound?

22   A.  Eight to $10 for one cigarette.

23   Q.  How much for a pack?

24   A.  Some people sold them for 25, some people sold them for

25   50.

1  Q.  Do you recall stating at one time that they sold for more

2  than that?  I'm talking about a pack.

3  A.  A pack?  Yes, sir.  Some people were getting $75 for

4  them, a hundred dollars for them, for a pack.

5  Q.  Did it depend on the type of cigarette?

6  A.  Yes, sir.  If they were Kools or Newports, sir, you got

7  more; but, if they were generic brands, you got less.

8  Q.  So, officers would sell them to you for a hundred to 200

9  a carton?

10  A.  Yes, sir.

11  Q.  The inmate would turn around, break out the carton and

12  sell the packs for the range you just mentioned?

13  A.  Yes, sir.

14  Q.  With regard to Officer Alfred Barnes, were you -- did he

15  have a process or a plan in place to -- where you could mail

16  things?

17  A.  Yes, sir.  He gave us address and everything, his address

18  in Thomasville on ///// Street, and we'd go mail it.  He

19  wanted a cashier's check or something like that.  And we

20  could mail it to his family's house or his house.  I think it

21  was his brother's or his mom's, or somebody's house.

22  Q.  All right.  Where would you get a cashier's check?

23  A.  You would get it from the post office or somewhere.

24  Q.  So, you can get a cashier's check there at FCI?

25  A.  You would probably have to get it from your family, sir.

*Delores Hamlet - Direct*

1    I don't know.  Your family would get it, to do it for you, or

2    something.

3    Q.  Are you familiar with a person by the name of Alan Moore?

4    A.  Yes, sir.

5    Q.  And would you be able to identify Alan Moore if you saw

6    him again?

7    A.  Yes, sir.

8    Q.  Is he in the courtroom?

9    A.  Yes, sir.

10   Q.  And where is he seated or standing?

11   A.  He's seated over to your left, over there by the

12   gentleman with the grayish hair.

13   Q.  All right.  Let me go back and ask you, would you be able

14   to identify Gregory Dixon, if you saw him again?

15   A.  Yes, sir.

16   Q.  Where is he seated or standing?

17   A.  He's seated by that gentleman right there, between those

18   two gentlemen, sir.

19   Q.  Do you recall a time where you were working the call

20   center -- where you were working in the call center?

21   A.  Yes, sir.

22   Q.  And what do you do in the call center?

23   A.  I was a 411 operator.

24   Q.  All right.  If someone calls up and says, "I want the

25   number for whatever," how do you go about finding that

1  number?

2  A.  We have a computer in front of us, sir, and we have the

3  keyboard, and we just type it in, sir, and it pops up, the

4  location pops up.  And we have headsets on where you speak

5  directly to the headset.

6  Q.  The call center works 24 hours a day?

7  A.  Yes, sir.

8  Q.  Do you recall a time working on the midnight to eight

9  shift?

10  A.  Yes, sir.

11  Q.  And during that time, do you remember what unit you were

12  in?

13  A.  I was in A unit, sir.

14  Q.  Do you recall Officer Moore coming up to you after you

15  got off of your shift one morning?

16  A.  Yes, sir.

17  Q.  And did he say something to you?

18  A.  He told me that Mr. Barnes wanted me to come and get a

19  radio that he had that belonged to me, and he didn't want me

20  to get into any kind of trouble about it.  So, come on and

21  get the radio.

22  Q.  All right.  When Mr. Moore said this to you, what did you

23  think?

24  A.  I knew that it was a signal for me to come and pick up

25  something from Mr. Barnes.

1   Q.   Why did you know that?

2   A.   Because he didn't have a radio.   Nobody had a radio that

3   belonged to me.

4   Q.   Did you have a radio?

5   A.   Yes, sir, I had one.

6   Q.   And did you know where it was?

7   A.   Yes, sir.   It was in my possession.

8   Q.   So, after Mr. Moore said, "Mr. Barnes wants you to come

9   to him and pick up a radio," what did you do?

10  A.   I went out -- I went down to D unit, where Mr. Barnes was

11  working, and picked up a package -- a package that he had for

12  me.

13  Q.   Now, you just got off of your shift.   Do you remember

14  what the weather was like then?

15  A.   It was raining, raining real hard.

16  Q.   And what did you get from Mr. Barnes?

17  A.   I got some cigarettes from Mr. Barnes, a couple of

18  cartons.

19  Q.   Did you have to pay him right then?

20  A.   Yes, sir.

21  Q.   Did you?

22  A.   Yes, sir.

23  Q.   Did you have the money on you?

24  A.   I had the money -- I went and got the money.

25  Q.   Do you recall what brand?

1   A.   Pardon?

2   Q.   What brand of cigarettes?

3   A.   Yes, sir.  It was Newports.

4          MR. SPROWLS:  That's all we have, Your Honor.

5          THE COURT:  Cross-examine?

6          MR. HARPER:  May it please the court.

7                        CROSS-EXAMINATION

8    BY MR. HARPER:

9   Q.   Ms. Hamlet, this event that you're talking about with

10  Mr. Moore, I want to direct your attention to.

11       You worked at the call center?

12  A.   Yes, sir.

13  Q.   Okay.  Does that take 411 calls from all over the place

14  or just from inside?

15  A.   From all over the place.

16  Q.   So, I here on the street could be calling 411 and

17  actually talking to somebody inside of FCI?

18  A.   Yes, sir.

19  Q.   Do you know how that gets transferred to FCI as opposed

20  to someplace else?

21  A.   I don't understand you.

22  Q.   Do you know how it comes about that a 411 call might go

23  to FCI instead of a call center someplace else?

24  A.   No, sir, I don't know.

25  Q.   All right.  But this day, do you remember the day of the

1  week or the day of the month or a birthday or anything around

2  this period of time?

3  A.  No, sir.

4  Q.  Do you remember a year?

5  A.  It was in 2006.

6  Q.  2006?

7  A.  Yes, sir.

8  Q.  Was it in the spring or summer or what?

9  A.  It was probably in the fall.

10  Q.  Fall of 2006?

11  A.  No, sir.  It was probably in -- before July 3rd, so it

12  was summertime, sir.

13  Q.  What did you say about July the 3rd?

14  A.  That's when they moved us from FCI-Tallahassee to Miami

15  FDC, July 3rd.

16  Q.  Okay.  So, you are no longer at FCI-Tallahassee, and that

17  date, July the 3rd, is the day you moved?

18  A.  Yes, sir.  That's the day they shipped us out.

19  Q.  So it was sometime in that period of time?

20  A.  Yes, sir, in that period of time before July 3rd, sir.

21  Q.  Just before July 3rd?

22  A.  Maybe not just before.  It was probably a month or

23  something like that, some weeks, sir.

24        MR. HARPER:  Your Honor, I'd move to strike this

25  testimony being outside the time period of the indictment.

```
 1              THE COURT:  Overruled.
 2    BY MR. HARPER:
 3    Q.  When Mr. Moore talked to you about going to see
 4    Mr. Barnes, he didn't say Mr. Barnes has you a package, did
 5    he?
 6    A.  No, sir.
 7    Q.  He didn't say Mr. Barnes has your Newports, did he?
 8    A.  No, sir.
 9    Q.  He didn't say Mr. Barnes has your cigarettes, did he?
10    A.  No, sir.
11    Q.  He said Mr. Barnes has your radio; is that right?
12    A.  Yes, sir.
13    Q.  A radio is not contraband, is it?
14    A.  No, sir, not unless it's not yours.
15    Q.  Okay.  And you have a radio; is that right?
16    A.  Yes, sir.
17    Q.  You didn't say to Mr. Moore, "That isn't my radio," did
18    you?
19    A.  No, sir.
20    Q.  You didn't tell Mr. Moore you were buying contraband from
21    Mr. Barnes, did you?
22    A.  No, sir.
23              MR. HARPER:  I don't have anything else, Your Honor.
24              THE COURT:  Mr. Findley?
25              MR. FINDLEY:  Yes, sir.
```

```
 1                       CROSS-EXAMINATION

 2    BY MR. FINDLEY:

 3    Q.  Ms. Hamlet --

 4    A.  Yes, sir.

 5    Q.  -- my name is Tom Findley.  I represent Gregory Dixon.

 6    A.  Good afternoon.

 7    Q.  Now, you've been convicted of a crack cocaine conspiracy

 8    in the Eastern District of North Carolina; is that correct?

 9    A.  Yes, sir.

10    Q.  And prior to that you had a separate drug conviction; is

11    that right?

12    A.  Yes, sir.

13    Q.  And then separate from that, you were an accessory after

14    the fact of murder; is that correct?

15    A.  Yes, sir.

16    Q.  All right.  I want to show you your plea agreement from

17    the Eastern District of North Carolina, and I'll ask you if

18    you recognize your signature on the last page of that

19    agreement.

20    A.  Yes, sir.

21    Q.  That's it?

22    A.  Uh-huh.

23    Q.  Okay.  Now, in this agreement you agreed to cooperate

24    with the government; is that correct?  Or to testify whenever

25    called upon to do so by the government; is that correct?
```

1   A.   I suppose so, if the government says so.

2   Q.   Well, the agreement says so.

3   A.   Okay.

4   Q.   Doesn't it?

5   A.   I don't know.

6   Q.   Oh.  I'm sorry.

7   A.   Okay.  Would you show me where?

8   Q.   Yes.  You testify whenever called upon to do so by the

9   government?

10   A.   Uh-huh.

11   Q.   Okay?

12   A.   Okay.

13   Q.   And you are hopeful that you can get a Rule 35 from this,

14   are you not?

15   A.   No, I haven't thought about it, sir.

16   Q.   Well, the government -- you haven't even thought about

17   it?

18   A.   No, sir.

19   Q.   Have you ever discussed it with Shonnie Daniels that you

20   might get a Rule 35?

21   A.   No, sir.

22   Q.   All right.  The agreement does provide that the

23   government will make known the full extent of your

24   cooperation, doesn't it?

25   A.   That's back then?

*Delores Hamlet - Cross/Findley*

1   Q.   Yes.

2   A.   Like 7 years ago?

3   Q.   Yeah.

4   A.   Okay.

5   Q.   Okay.

6          MR. FINDLEY:  I would move in the next Defendant's

7   Exhibit, I guess 12.

8          THE COURT:  I think it's going to be at least 13.

9          MR. FINDLEY:  Thirteen, I'm sorry.

10         MR. SPROWLS:  Your Honor, can I confer just a second?

11         THE COURT:  You may.

12         MR. SPROWLS:  No objection, Judge.

13         THE COURT:  Defendant Dixon 13 is admitted.

14     **(DEFENDANT DIXON EXHIBIT NO. 13:**  Received in evidence.)

15  BY MR. FINDLEY:

16  Q.   Now, Ms. Hamlet, you said you were good friends with

17  Shonnie Daniels?

18  A.   Yes, sir.

19  Q.   She was like a daughter?

20  A.   Yes, sir.

21  Q.   You find her very trustworthy?

22  A.   She was okay.

23  Q.   She's okay, as far as you're concerned?

24  A.   Yes, sir.

25  Q.   Now, I think you said the guards would continuously shake

1   down Ms. Daniels.  Was she running some sort of a contraband

2   operation in there?

3   A.  Yes, sir, they would shake her down to see if they could

4   find any contraband.

5   Q.  Right.

6   A.  Yes, sir.

7   Q.  And what would happen if they found contraband?

8   A.  Then she would probably go to the SHU, or something like

9   that, get written up or something like that.

10  Q.  And you said this happened often?

11  A.  Yes, sir.

12  Q.  Okay.  Now, would you describe her as the ring leader of

13  the contraband operation inside the prison?

14  A.  Well, she knew a lot, and she dealt in a lot of

15  contraband, yes, sir.

16  Q.  And you were part of that ring as well?

17  A.  I wouldn't say I was part of a ring, sir, but --

18  Q.  Now, a lot of the contraband that -- you described some

19  contraband as coming in through the visitation facility; is

20  that correct?

21  A.  Money, sir.

22  Q.  All right.  Money coming in?

23  A.  Yes, sir.

24  Q.  Money would be contraband, would it not?

25  A.  Yes, sir.

*Delores Hamlet - Cross/Findley*

1    Q.  Cash?

2    A.  Uh-huh.

3    Q.  And some came in through the rear gate?

4    A.  Yes, sir.

5    Q.  All right.  And that didn't involve Mr. Moore or

6    Mr. Dixon, did it?

7    A.  I have no idea, sir.

8    Q.  Now, the indictments in this case came out first in June

9    of 2006.  Isn't it correct, Ms. Hamlet, that you didn't talk

10   to any law enforcement officer until after the indictments

11   were issued?

12   A.  Before, sir; and after, sir.

13   Q.  Well, I have a memorandum of an interview with Jeffrey

14   Brunner that occurred September 15, 2006.  Do you remember

15   talking to him then?

16   A.  Yes, sir, I remember talking to him.  I don't know

17   exactly what date it was.

18   Q.  A couple of weeks ago?

19   A.  Okay.

20   Q.  All right.  And there's another one from July of 2006.

21   Do you remember that, with Mr. Sanford?

22   A.  Yes, sir.  I remember talking to Mr. Sanford, but I don't

23   know what day it was, sir.

24   Q.  How many times did you talk to him?

25   A.  I only spoke with Mr. Sanford once.

1    Q.   And those were both after the indictment was rendered;

2    isn't that true?

3    A.   I have no idea, sir.  I don't know when the indictment

4    was rendered.

5              MR. FINDLEY:  That's all I have.

6              THE COURT:  Redirect?

7              MR. SPROWLS:  May I approach the witness, Judge?

8              THE COURT:  You may.

9                        REDIRECT EXAMINATION

10   BY MR. SPROWLS:

11   Q.   Mr. Hamlet, you were shown this document just a few

12   minutes ago, it's Defendant's Exhibit 13.  It's a memorandum

13   of plea agreement, right?

14   A.   Yes, sir.

15   Q.   And you identified that as your plea agreement.  I don't

16   want to put words in your mouth.

17   A.   From 1999, sir?

18   Q.   In 1999.  Is that your signature there on --

19   A.   Yes, sir.

20   Q.   All right.  Now, this agreement, isn't it true that it is

21   between you and the United States Attorney's Office for the

22   Eastern District of North Carolina -- isn't that correct --

23   and the defendant, which would be you?

24   A.   Yes, sir.

25   Q.   That's who's making this agreement, right?

*Delores Hamlet - Redirect*

1   A.   Yes.

2   Q.   You and the U.S. Attorney in the Eastern District of

3   North Carolina?

4   A.   I pled out from my own -- for the sentence that I've got

5   now.

6   Q.   Right.  Did you have any agreement with the U.S. Attorney

7   in this district?

8   A.   I didn't know them.

9   Q.   Didn't know them, did you?

10  A.   No, sir.

11  Q.   Do you have any agreement to testify today?

12  A.   No, sir.

13  Q.   Did you have any desire to come up from Miami up here and

14  camp out at Wakulla Jail to testify?

15  A.   No, sir.

16  Q.   What were you told to tell this jury when you were asked

17  questions?

18  A.   Tell the truth, and that's what I've been doing.

19  Q.   One last question, Ms. Hamlet:

20      When Mr. Moore told you on that rainy morning that Barnes

21  says to come over there, whatever he said, did he mention any

22  other officer or anything that made it appear urgent for you

23  to do this sooner rather than later?

24  A.   Well, I knew they were getting off around about 8:00

25  and --

1           MR. HARPER:  Objection, Your Honor.  Nonresponsive.

2   A.  -- they were getting off probably around 8:00, so --

3           THE COURT:  Overruled.

4   A.  -- I had to rush it, because I got off at 7:00 for my

5   job, 7-to-7 is my job at Unicor.  And when I got off, it was

6   probably about 7:30, because we go to breakfast.  So, I had

7   to rush on down there and see Mr. Barnes to get my

8   cigarettes, my package.  And that's what I did.

9       I went out in the rain and went down to A unit and got my

10  package from Mr. Barnes.  I knew that's what he meant when

11  Mr. Moore came and told me that, because it was just a signal

12  for me to come down there.  That's how it was.

13          MR. SPROWLS:  Nothing further, Judge.

14          THE COURT:  Thank you, Ms. Hamlet.  You may step

15  down.

16          Mr. Sprowls, please call your next witness.

17          MR. SPROWLS:  If I may relinquish to Mr. Davis, I

18  think I have run out.

19          THE COURT:  All right.  Mr. Davis?

20          MR. DAVIS:  Your Honor, the government would call

21  Cecile Greathouse.

22          DEPUTY CLERK:  Please raise your right hand.

23          *CECILE GREATHOUSE, GOVERNMENT WITNESS, DULY SWORN*

24          DEPUTY CLERK:  Be seated.

25          Please, state your full name and spell your last

*Cecile Greathouse - Direct*

1    name for the record.

2         THE WITNESS:  Cecile Greathouse, G-r-e-a-t-h-o-u-s-e.

3                    DIRECT EXAMINATION

4    BY MR. DAVIS:

5    Q.  Good afternoon, Ms. Greathouse?

6    A.  Hello.

7    Q.  Would you please tell the jury where you were born?

8    A.  Stockton, California.

9    Q.  Is that where you live now?

10   A.  No, sir.

11   Q.  Where do you live now?

12   A.  Fresno, California.

13   Q.  And where are you in Fresno, California?

14   A.  In a halfway house.

15   Q.  Okay.  So, you're in a halfway house now.  Were you

16   previously in federal custody?

17   A.  Yes, sir.

18   Q.  And what led you to be in federal custody?

19   A.  Conspiracy charges.

20   Q.  Was that a conviction in 1998 for federal drug

21   conspiracy?

22   A.  Yes, sir.

23   Q.  And do you have three prior felony convictions?

24   A.  Yes, sir.

25   Q.  Is that in 1992 for receiving stolen property?

*Cecile Greathouse - Direct*

1  A.  Yes, sir.

2  Q.  And another one in 1992 for possessing and selling crack?

3  A.  Yes, sir.

4  Q.  And another one in 1994 for selling crack cocaine?

5  A.  Yes, sir.

6  Q.  Now, on the 1998 federal drug conspiracy conviction, did

7  you enter into a plea and cooperation agreement with the

8  federal government?

9  A.  Yes, sir.

10  Q.  By the terms of that plea and cooperation agreement, were

11  you bound to cooperate with the federal government in the

12  Eastern District of California?

13  A.  Yes, sir.

14  Q.  And have you done that?

15  A.  Yes, sir.

16  Q.  As a result of that plea and cooperation agreement, isn't

17  it true that the government decided not to enhance your drug

18  conviction and give you the bottom of the range?

19  A.  Yes, sir.

20  Q.  And what was your range?

21  A.  Ten years, I was -- it was reduced to 10 years.

22  Q.  Reduced to 10 years.  Do you remember what it was

23  originally?

24  A.  I believe it was 16.

25  Q.  I don't have that written down in years.  Do you know how

*Cecile Greathouse - Direct*

1   many months that is?

2   A.  No, sir, I'm sorry, I don't.

3   Q.  So you were 16 years.  Your first reduction was to

4   16 years; is that correct?

5   A.  Yes, sir.

6   Q.  So, your original sentence was higher than 16 years?

7   A.  Yes, sir.

8   Q.  And you got a first reduction for your cooperation down

9   to 16 years; is that correct?

10  A.  Yes, sir.

11  Q.  And then you got a further reduction down to 10 years; is

12  that correct?

13  A.  Yes, sir.

14  Q.  And is it true that there has been a motion under 5K1 and

15  Rule 35 to achieve those two reductions?

16  A.  Yes, sir.

17  Q.  And those are under seal right now in California?

18  A.  Yes, sir.

19  Q.  Why are they under seal?

20  A.  I don't know, sir.

21  Q.  Are you out of prison now?

22  A.  Yes, sir.

23  Q.  And where are you?  You said you are in a halfway house?

24  A.  Yes, sir, Fresno, California.

25  Q.  Let's take you back to when you arrived at

1    FCI-Tallahassee.

2         Do you remember when you arrived there?

3    A.  It was 2002.

4    Q.  Do you remember if it was spring or fall or summer or

5    winter?

6    A.  I believe it was March or April.

7    Q.  March or April of 2002.  When you arrived there, did you

8    meet an officer named Alfred Barnes?

9    A.  Yes, sir.

10   Q.  How did you know Mr. Barnes?

11   A.  Through Shonnie Daniels.

12   Q.  Who is Shonnie Daniels?

13   A.  She's an inmate at the prison.

14   Q.  What was your relationship with Shonnie Daniels?

15   A.  She was a close friend.

16   Q.  And what was your relationship with Mr. Barnes?

17   A.  At the time it was just cordial.  I just met him.

18   Q.  Did you observe anything about the relationship between

19   Shonnie Daniels and Mr. Barnes?

20   A.  Yes.  I noticed that they were unusually close.

21   Q.  Did you -- how did you notice that they were unusually

22   close?

23   A.  She was always talking to him in the office; and,

24   whenever somebody else was talking to him, she would

25   interrupt and, not physically pull them away, but pull them

*Cecile Greathouse - Direct*

1    away and talk to him alone.  They were always closed off, you

2    know, talking.

3    Q.  What was the nature of their relationship, if you know?

4    A.  I don't know for sure, sir.

5    Q.  Did Ms. Daniels tell you anything about the nature of

6    their relationship?

7    A.  She said he was a --

8              MR. HARPER:  Object, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. DAVIS:

11   Q.  Did you obtain any contraband during this time?

12   A.  Yes, sir.

13   Q.  And where did you get that contraband?

14   A.  From Shonnie.

15   Q.  Do you know where she got the contraband?

16   A.  She told me she got it from Mr. Barnes.

17             MR. FINDLEY:  Objection.

18             MR. HARPER:  Objection.

19             THE COURT:  Sustained.

20   BY MR. DAVIS:

21   Q.  What type of contraband did you get?

22   A.  Teeth whitener, alcohol, Black & Mild cigars, bubble gum,

23   cologne -- stuff like that.

24   Q.  What did you do with the contraband that you got?

25   A.  It was for myself.  I used it on myself.

*Cecile Greathouse - Direct*

1    Q.   So, you smoked the Black & Mild cigars?

2    A.   Yes.

3    Q.   And used the teeth whitener?

4    A.   Yes, sir.

5    Q.   And drank the alcohol?

6    A.   Yes, sir.

7    Q.   Did there come a time when you dealt directly with anyone

8    else besides Shonnie Daniels to get contraband?

9    A.   No, sir.

10   Q.   Did you ever approach Officer Barnes about contraband?

11   A.   Yes, sir.

12   Q.   How did that occur?

13   A.   Just walked up to him one day and started talking to him,

14   and I asked him would he bring me something, because I didn't

15   have any money and I needed to make some money, and he told

16   me okay.

17   Q.   What did Barnes do after he agreed to get contraband?

18   A.   He brought it to me.

19   Q.   How did you go about implementing that plan?

20   A.   About receiving it?

21   Q.   Just the whole plan as you understood it.

22   A.   Well, he just gave it direct to me, and I just came one

23   day -- he told me the day he was going to bring it, and I met

24   him at the officer's station at 35 when the inmates were

25   asleep, which is after midnight, we're supposed to be in our

1  rooms, and I got it from him then.

2  Q.  Did you give Mr. Barnes any money or anything for the

3  contraband?

4  A.  At that time, no, sir.

5  Q.  Did there come a time when you did give him money for

6  contraband?

7  A.  Yes, sir.

8  Q.  And when was that?

9  A.  It was later about -- I'm sorry.  I'm not real specific

10  with the month.

11  Q.  But after he had given you some contraband?

12  A.  Yes, sir.

13  Q.  And how did that come about?  What did he say to you?

14  A.  I actually asked him could he bring me some cigarettes,

15  and he told me I had to pay for them.

16  Q.  Okay.  And how were you going to pay for them?

17  A.  With a money order.

18  Q.  And where was the money order going to go?

19  A.  To an address that he gave me.

20  Q.  And where was that address?

21  A.  In Thomasville, Georgia.

22  Q.  Did you send money to that address in Thomasville,

23  Georgia?

24  A.  I had a friend of mine that sent it.

25  Q.  And how much money did they send?

*Cecile Greathouse - Direct*

1   A.  Two hundred dollars.

2   Q.  How much -- what did $200 buy you?

3   A.  Two packs of cigarettes.

4   Q.  That's two single packs or two cartons?

5   A.  No, sir.  Two packs.

6   Q.  Two packs of cigarettes.  It was a hundred dollars a pack

7   of cigarettes then?

8   A.  Yes.

9   Q.  And you smoked those cigarettes?

10  A.  I sold a few of them.  I smoked most of them, though.

11  Q.  How much could you sell them for?

12  A.  Fifteen to $20 apiece.

13  Q.  That's 15- to $20 per cigarette?

14  A.  Yes, sir.

15  Q.  Now, did you ever see Mr. Barnes give anyone else

16  contraband?

17  A.  I wouldn't actually see them hand it to him; no, sir.

18  Q.  Well, you didn't actually see them hand it to him, but

19  can you -- was there any circumstance in which you saw

20  Mr. Barnes and contraband was involved?

21       MR. FINDLEY:  I object to the form of the question.

22  It's ambiguous, and he's calling for speculation.

23       THE COURT:  The question is what she saw.

24       MR. FINDLEY:  That's fine.

25       THE COURT:  I understood it that way.  The objection

*Cecile Greathouse - Direct*

371

```
 1    is overruled.

 2             THE WITNESS:  I saw several different inmates at

 3    several different times coming into the unit that I lived in,

 4    or the unit I was housed in, and they weren't housed in that

 5    unit, and go in the officer station and close the door, and

 6    then come back out concealing something.  I couldn't see what

 7    it was.  I could see them, like, hiding it.

 8    BY MR. DAVIS:

 9    Q.  Do you remember an incident that took place on the night

10    of the arrest?

11    A.  Yes, sir.

12    Q.  And what was that incident?

13    A.  Mr. Barnes was the compound officer, and Mr. Dixon was

14    the unit officer, and someone came -- Mr. Barnes --

15    Q.  What unit are you talking about?

16    A.  G unit.

17    Q.  Is that where you were stationed at that time?

18    A.  Yes, sir.

19    Q.  Please continue.

20    A.  And someone in the unit asked me would I go talk to an

21    officer to keep him busy, while Mr. Barnes came in and

22    brought her something.

23    Q.  You said someone in the unit.  Was that an inmate?

24    A.  Yes, sir.

25    Q.  Do you remember what time this was in the day?
```

*Cecile Greathouse - Direct*

1    A.   This was at night, after midnight, sir.

2    Q.   Okay.  So, did you go and talk to Mr. -- you were

3    supposed to speak to Mr. Dixon or Mr. Barnes?

4    A.   Mr. Dixon.

5    Q.   Mr. Dixon, okay.  Did you go and talk to Mr. Dixon?

6    A.   Yes, sir.

7    Q.   What happened after that?

8    A.   While I was talking to him, I just heard some motion and

9    movement towards where the door area was.  I was inside the

10   office.  And it sounded like a plastic bag rustling.  And

11   when the door opened -- I'm sorry.  Before I heard the

12   rustling, I heard the door open to the unit.

13   Q.   Did you look out to see who came in the door?

14   A.   Yes, sir.

15   Q.   And who was it?

16   A.   It was Mr. Barnes.

17   Q.   Did you say anything to Mr. Dixon?

18   A.   No.  He asked me who was that, because it was after the

19   compound being closed, and I peeked out.  Like I said, it was

20   Mr. Barnes.  And I was talking to him, and I heard the

21   rustling.

22        And then after a while, I heard the door close again, and

23   I saw the inmate go upstairs and Mr. Barnes -- I'm not sure

24   if he left out at that time or if he went to the office,

25   because I went upstairs, too.

*Cecile Greathouse - Direct*

1   Q.  And this inmate who asked you to speak to Dixon, did you

2   see anything that she had?

3   A.  No, sir.

4   Q.  How about the next day?  Did you see anything?

5   A.  Cigarettes.

6   Q.  And this is after cigarettes were totally banned on the

7   compound?

8   A.  Yes, sir.

9   Q.  You say you went upstairs.  Did you ever come back

10  downstairs that night?

11  A.  Yes, sir, I came back downstairs.

12  Q.  And what did you see?

13  A.  Mr. Barnes and Mr. Dixon in the officer's station.  I

14  spoke with Mr. Barnes.

15  Q.  What were they doing in the officer's station?

16  A.  Just talking.

17  Q.  Did you hear what they were talking about?

18  A.  No, sir.

19  Q.  Now, you were just talking that you knew Mr. Dixon at

20  FCI; is that correct?

21  A.  Yes, sir.

22  Q.  And how did you know him?

23  A.  He worked my unit a lot.

24  Q.  Were you friends?

25  A.  We were okay.  I mean, I talked to him from time to time.

1  Q.  Okay.  What did you talk about?

2  A.  Girls.

3  Q.  You talked about girls?

4  A.  Girls and stuff that was going on around the compound.

5  Q.  What was the nature of your conversation about girls?

6  A.  About different girls, ugly, or some in the compound, and

7  we just, you know, who was sexy or whatever.

8  Q.  Now, did there come a time when you offered to watch out

9  for Mr. Dixon?

10  A.  Yes, sir.

11  Q.  And what is that called?

12  A.  Pinning.

13  Q.  It's called pinning for someone?

14  A.  Yes.

15  Q.  So, there was a time that you offered to pin for

16  Mr. Dixon?

17  A.  Yes, sir.

18  Q.  What happened when you offered to pin for Mr. Dixon?

19  A.  I asked him did he want me to pin for him; and he told

20  me, no, he was okay.

21  Q.  So, you didn't pin for Mr. Dixon?

22  A.  No.  There was another time I asked him did he want me to

23  look out for him, and he told me to come back around 2:00,

24  but I never came back because I was asleep.

25  Q.  You fell asleep?

1  A.  Yes, sir.

2  Q.  Now, in addition to offering to pin for Mr. Dixon, did

3  you give Mr. Dixon information?

4  A.  I would tell him different things I heard on the compound

5  about who was what, what was going on.

6  Q.  And did Mr. Dixon give you anything in return?

7  A.  He gave me some cigarettes.  That's all.

8  Q.  You said you and Dixon talked about girls.  Did Mr. Dixon

9  mention any girls in particular?  Do you recall?

10  A.  Well, we had a conversation one time about some girls

11  liking him, and I remember asking him -- I don't know the

12  words -- asking him was he trying to see her tonight, and he

13  said, "No, she wants me to, but I'm going to do something

14  else."

15  Q.  Let me just ask you right now, do you see Mr. Dixon here

16  the courtroom here today?

17  A.  Yes, sir.

18  Q.  Can you point him out to me?

19  A.  (Indicating.)

20  Q.  And can you describe him to me?  What is he wearing?

21  A.  A maroon shirt, black-and-white tie.

22  Q.  Now, you said you offered to pin for Mr. Dixon, but he

23  either said no the first time and the second time you fell

24  asleep; is that correct?

25  A.  Yes, sir.

*Cecile Greathouse - Direct*

1    Q.   Did you ever pin for anyone else?

2    A.   I looked out for another officer one time.

3    Q.   Which officer was that?

4    A.   Spence.

5    Q.   Tell me about that.

6    A.   It was just a night that a friend of mine -- she wasn't

7    really a friend -- her first name was Amy.  I'm having

8    trouble recalling her last name, but --

9    Q.   You remember her first name as Amy?

10   A.   Yes, sir.

11   Q.   What did you see Spence and Amy doing?

12   A.   Just talking in the lobby, and I knew that she wanted to

13   try to score on him, because she told me.  And she kind of

14   gave me a look like this, and he looked at me, and I said,

15   "Go ahead, I got you."  And they went in the back bathroom,

16   which is right in the front of the unit.  When you come in

17   the unit, it's right in the lobby area.

18   Q.   So, they both gave you a look?

19   A.   Yes, sir.

20   Q.   And you said, "Go ahead, I got you"?

21   A.   Yes, sir.

22   Q.   What does that mean, "I got you"?

23   A.   I'll look out for you.

24   Q.   You'll look out for them.  And why did you do that?

25   A.   Because I thought if I did, he might bring me something

*Cecile Greathouse - Direct*

1    later.

2    Q.   And by that "something," you mean contraband?

3    A.   Yes, sir.

4    Q.   After you acted -- after you pinned for Officer Spence,

5    did you ask him for contraband?

6    A.   Yes, sir.

7    Q.   How did that happen?

8    A.   I just asked him.  I told him I could make a hundred

9    dollars off of a bottle of nail polish remover.

10   Q.   And what did he say after you said that?

11   A.   How was he going to get his money.

12   Q.   What did you tell Spence?

13   A.   To give me an address.

14   Q.   Is that a mail address?

15   A.   Yes, sir.

16   Q.   What did Spence say after you said, "Give me a mail

17   address"?

18   A.   He told me, after he came back from having the surgery.

19   Q.   After he came back from the surgery, what would he do?

20   A.   He would give me the address, because he was about to

21   leave to go on medical leave, or something like that.

22   Q.   Did you ever get an address from Mr. Spence?

23   A.   No, sir.

24   Q.   Did you ever see guards use the computers to look up

25   inmates?

*Cecile Greathouse - Direct*

1   A.   Yes, sir.

2   Q.   When did you see that?

3   A.   All of the time.

4   Q.   How did that work?

5   A.   If you're an inmate there, and you want to know -- say,

6   for instance, if I'm in Florida, and somebody I know is in

7   California, and they're going to get transferred, and I want

8   to find out where they're going, or if they left prison, I

9   want to find out where they went, I'll go ask certain

10  officers, could they check for me to see if they're coming or

11  where they're at.

12  Q.   Why would you only ask certain officers?

13  A.   Because all of them won't do it.

14  Q.   Is it permitted to give the kind of information you were

15  asking for?

16  A.   No, sir.  I asked another officer before, and he told me

17  it wasn't permitted.

18  Q.   So, which were those certain officers that you would ask?

19  A.   Mr. Johnson, Mr. Barnes, Mr. Dixon, Mr. Spence.  There

20  were others.  I really can't recall the names.  It was a long

21  time ago.

22          MR. DAVIS:  Thank you.

23          THE COURT:  Cross-examine?

24          MR. HARPER:  No questions.

25          MR. FINDLEY:  Just a few, Your Honor.

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. FINDLEY: |
| 3 | Q.  Ms. Greathouse, my name is Tom Findley.  I represent |
| 4 | Gregory Dixon. |
| 5 | You gave a statement to Agent Sanford, did you not? |
| 6 | A.  I talked to him before. |
| 7 | Q.  And was that in July of this year? |
| 8 | A.  I believe so. |
| 9 | Q.  And that was after the indictment came down; is that |
| 10 | correct? |
| 11 | A.  I'm not sure what month the indictment came down. |
| 12 | Q.  Well, do you remember the shooting? |
| 13 | A.  Yes, sir. |
| 14 | Q.  And it was after that? |
| 15 | A.  Okay. |
| 16 | Q.  Was it?  Do you recall? |
| 17 | A.  Yes, sir, it was after. |
| 18 | Q.  Was everything that you said to Agent Sanford true and |
| 19 | correct? |
| 20 | A.  Yes, sir. |
| 21 | Q.  All right.  Now, in that statement, it's Mr. Barnes -- |
| 22 | you said that it was Mr. Barnes that brought you the |
| 23 | Hydro-Xtra Cut, Black & Mild cigars, and gin, correct? |
| 24 | A.  Yes, sir. |
| 25 | Q.  And it was Barnes that thereafter brought you a carton of |

1  cigarettes; is that correct?

2  A.  No, sir.

3  Q.  A carton of cigarettes, you didn't say that?

4  A.  No, sir.

5  Q.  So, Agent Sanford would have that wrong, if he's got that

6  in his 302?

7  A.  Yes, sir.

8  Q.  All right.

9       MR. FINDLEY:  May I impeach the witness with the 302?

10       THE COURT:  Unless it's hers.

11       MR. FINDLEY:  It's Agent Sanford's.

12       THE COURT:  If she signed it and read it, you can ask

13  her about it, but --

14       MR. FINDLEY:  Okay.

15  BY MR. FINDLEY:

16  Q.  You spoke of one incident when Mr. Dixon was in the

17  office in the G unit the night before the arrests.  Do you

18  recall talking about that?

19  A.  Yes, sir.

20  Q.  You didn't see anybody give anybody else what you could

21  define as contraband at that time; is that correct?

22  A.  Yes, sir.

23  Q.  And you didn't hear any conversation between Officer

24  Dixon and Officer Barnes on that occasion; is that correct?

25  A.  I just heard them talking.  I don't know what --

1  Q.  You don't know what they said?

2  A.  No.

3  Q.  All right.  Now, when -- you say a few weeks prior to the

4  arrest, this is what you told Agent Sanford, Dixon gave you a

5  pack of Newport cigarettes, and that was in your direct

6  testimony.  Do you recall saying that?

7  A.  Yes, sir.

8  Q.  You didn't tell Agent Sanford that it was in exchange for

9  pinning or in exchange for anything else.  You just said

10  Mr. Dixon gave you a pack of cigarettes; isn't that correct?

11  A.  When he asked me why, I told him it was because I looked

12  out for him, and I told him that I would feed him sometimes

13  things -- tell him things that's going on, and he just give

14  them to me.  I told him I figured that's what it was for.

15  Q.  You figured that?

16  A.  But it wasn't a -- when he handed them to me, he said,

17  this is for this, this is for that, he never said that.

18  Q.  He never said that; you figured that's what it was for?

19  A.  Yes, sir.

20  Q.  Okay.

21          MR. FINDLEY:  That's all.

22          THE COURT:  Redirect?

23                      REDIRECT EXAMINATION

24  BY MR. DAVIS:

25  Q.  Defense counsel points out that you didn't actually see

1   the passage of contraband.

2   A.  No, sir.

3   Q.  Did you conclude that contraband was passed, in any

4   event?

5   A.  Yes, sir.

6          MR. FINDLEY:  Objection, Your Honor.  Calls for

7   speculation.

8          THE COURT:  Sustained.

9   BY MR. DAVIS:

10  Q.  Were there facts and circumstances that led you to

11  believe that contraband had been passed to --

12         MR. FINDLEY:  Same objection.  Same question.

13         THE COURT:  You can ask the facts and circumstances,

14  not what conclusion she drew.

15         THE WITNESS:  I'm sorry.  Can you ask the question

16  again?

17  BY MR. DAVIS:

18  Q.  Well, I'm just asking, what facts and circumstances took

19  place that night that would support the passage of contraband

20  to that inmate.

21         MR. FINDLEY:  I object to the form of the question.

22         THE COURT:  Overruled.

23         THE WITNESS:  Because the inmate asked me would I go

24  in the office and talk to the other office while she got

25  something from the other.  She asked me would I talk to

1   Mr. Dixon while she got something from Mr. Barnes.

2   BY MR. DAVIS:

3   Q.  And did Mr. Barnes come in the building?

4   A.  Yes, sir.

5   Q.  And the next morning did she have cigarettes?

6   A.  Yes, sir.

7           MR. DAVIS:  Thank you.

8           THE COURT:  Thank you, Mr. Greathouse.  You may step

9   down.

10          We have about 5 minutes before quitting time.  If you

11  have a witness that will be that brief, we'll put him or her

12  on.

13          MR. DAVIS:  Your Honor, I'm sorry to say, I don't

14  have a witness that will be that brief.

15          THE COURT:  That's all right.  We will break for the

16  afternoon.  We will start again promptly at 8:30 in the

17  morning.

18          Two of you had medical appointments at some point

19  during the course of the trial that I said it wasn't a reason

20  for you to not get on the jury, and you got there.  If you

21  will wait in the jury room for just a minute, I will get the

22  courtroom deputy to come out and find out if there's anything

23  I can do to help with the scheduling of that.  Sometimes

24  doctors accommodate rescheduling requests if they come from

25  me.  Sometimes they don't.  But I may be able to help with

1   that.   So, I think there were two of you in that situation, if

2   you wait just a minute, the courtroom deputy will come and

3   talk to you, and I will try to help you, if I can.

4          Otherwise, recall my earlier instructions.   Don't

5   talk about the case with anyone.   Don't let anybody talk about

6   it in your presence.   Make sure you don't see media coverage

7   or read anything in the newspaper.   It's probably a good week

8   to watch CNN instead of the local news.

9          Have a safe and pleasant trip home and back in the

10  morning.   We will start with you promptly at 8:30.

11         Jury out, please.

12    (The jury exited the courtroom at 3:59 p.m.)

13         You may all be seated.

14         Let me give you a couple of notes on the basis of

15  rulings.

16         Going back as far as yesterday, there was one

17  question and I sustained the objection.   Mr. Sprowls objected.

18         Mr. Harper, when you asked the witness for an

19  address, I think it was Shonnie Daniels, the reason for that

20  is that witness's addresses in criminal cases are subject to

21  the redaction requirement, and it's just a whole lot more

22  trouble than just not asking the address.   You're just trying

23  to find out if she's the same person, but -- and if you have

24  to do it with an address, you can; but, if you can keep the

25  addresses of witnesses in criminal cases out of the record,

1     it's much better.

2            I sustained a couple objections that you asked about

3     whether there was more often a problem at the FCI with males

4     and females or what; and, frankly, I would sustain an

5     objection to any more questions about what goes on in the

6     Bureau of Prisons or what's more common.  It doesn't matter

7     what's common or -- it certainly doesn't matter what goes on

8     in the Bureau of Prisons nationwide; and, for that matter, it

9     doesn't matter what goes on in the facility in Tallahassee.

10    What matters is what happened in this case.

11           So, it wouldn't make any difference if 98-percent of

12    the time a coin got flipped, and it came out heads, if the

13    question is, would it have come out this time, it only matters

14    how it came out this time.

15           So, if you've got witnesses that say it came out

16    heads or tails this time, put it on.  But the questions about

17    what most often happens aren't relevant in general.

18           Mr. Findley, I overruled an objection you had today,

19    suggesting that the doctor needed to give testimony in terms

20    of medical certainty, reasonable medical certainty.  Lawyers,

21    particularly in personal injury cases, like to ask questions

22    about a reasonable degree of medical probability or reasonable

23    degree of engineering probability.  There is no requirement in

24    the rules that people testify in those terms.  The doctor says

25    it's more likely this than that, it's within his area of

1    expertise, so that's appropriate testimony.

2           There was a discussion at the side-bar about theft is

3    a crime of dishonesty.  Mr. Harper, you said you had

4    additional authority on that.  Cases I keep in my trial

5    notebook are these:

6           *United States versus Sellers*, 906 F.2d 597 at 603,

7    it's an Eleventh Circuit case from 1990, held that a

8    misdemeanor theft was not a crime of dishonesty or false

9    statement so it didn't have to be admitted under 609(a)(2);

10   and it cites, looks like, three old Fifth Circuit cases that

11   are binding.  So, I think it's well established that theft is

12   not.

13          A worthless check, it seems to me, is even less --

14   even a poorer candidate for classification as a crime of

15   dishonesty or false statement than is theft.

16          The counterintuitive to theft is not being a crime of

17   dishonesty, but that's the meaning of the term as used in the

18   Rule 609.

19          MR. HARPER:  Your Honor, my case, one is an old Fifth

20   Circuit case, it's part of the Eleventh Circuit panel, of

21   course, *United States versus Toney*, 615 F.2d 277, binding

22   under *Barn versus City of Prichard, Alabama*.

23          THE COURT:  615 F.2d --

24          MR. FINDLEY:  615 F.2d 277.

25          THE COURT:  277?

1          MR. HARPER:  Yes, sir.  And then there's an Eleventh

2     Circuit case, Judge Tjoflat is on both panels, 159 F.3d 1328,

3     1998.  And my position was those two cases says the district

4     court judge has no discretion in refusing to allow a -- a

5     cross-examiner has an absolute right to introduce a conviction

6     for -- and I'm not a latin student -- ci -- c-r-i-m-e-n, first

7     word; second word, f-a-l-s-i.

8          THE COURT:  *Crimen falsi*, yes, that's a crime of

9     dishonesty or false statement; that's right, that's what

10    Congress decided, when it changed this provision in the rules

11    of evidence when they were originally adopted.  If it is a

12    crime of dishonesty or false statement, a cross-examiner has

13    an absolute right to ask about it.

14         That doesn't speak to the question of whether theft

15    is a crime of dishonesty or false statement.  The law of the

16    circuit is, it is not.  So, that's where I part company, not

17    on the assertion that you have the right to ask about such

18    crimes.  I mean, crimes of dishonesty or false statement, you

19    do have an absolute right to ask about those, even if they are

20    just misdemeanors, but that doesn't make theft a crime of

21    dishonesty or false statement.

22         MR. HARPER:  I understand.

23         THE COURT:  I denied the motion to strike with

24    respect to the testimony of the witness, she said it was a

25    month or so before July 3rd when she was transferred to Miami.

 1    I think the indictment charges a closing date of June 21,

 2    2006, which is less than a month before July the 3rd.  But the

 3    witness also said a month or so and didn't purport to have an

 4    exact date when it occurred.

 5         Then I overruled the objection about the movement of

 6    the witness from Fort Worth to Tallahassee.  I thought it

 7    appropriate to ask questions going to the witness's motivation

 8    that had been asked on cross-examination, and so the

 9    government is entitled, I think, to ask on redirect things

10    that would lead the witness not to want to testify.

11         Now, what that means is, if at the time the witness

12    is deciding to testify or to give information, the witness is

13    in Fort Worth and knows that she will have to transfer to

14    Tallahassee; and, if she knows how difficult it is to get

15    moved within the Bureau of Prisons, then it is certainly

16    appropriate.  If this were a witness who had never been

17    transferred before and didn't know what was involved in a

18    transfer, then it wouldn't have anything to do with the

19    motivation.  How much trouble it really was after the fact

20    doesn't matter; it's what the witness reasonably could

21    anticipate.

22         But most people in the Bureau of Prisons, at least my

23    understanding from having been told this at quite a number of

24    sentencings and other procedures, that it is difficult to be

25    transferred and they generally know it's not good to be

1    transferred.  And so, I would allow it for that purpose.  But,

2    if there are objections targeted toward that part of the

3    issue, I certainly hold the government to only being able to

4    show what motivation was evident to the witness at the time

5    that the witness either first came forward or decided to

6    continue to testify.

7            That goes back to what I said earlier.  Anything that

8    affects the witness's motivation I think is fair game, at

9    least it's fair game on cross-examination for the defense.

10   And, if the defense goes into it, then it's certainly open to

11   the government to show mitigating circumstances or other

12   reasons why a witness would not want to testify.

13           That's all of my notes about rulings.  If there's

14   anything else that I've done that you've got questions about,

15   I will be happy to try to explain it.

16           It does occur to me that the indictment uses inmate

17   numbers.  Perhaps you're going to have one of the agents

18   testify or at some point give us -- give a way to tie the

19   numbers to the names.  It seems to me, if the jury is going to

20   have the indictment and try to make sense of it with the

21   testimony, that they probably at some point need the code.

22           MR. DAVIS:  Absolutely, Your Honor.  We are prepared

23   to provide it.  We have already provided it to the defense in

24   discovery and the court as well.  We thought this would come

25   up during the course of discussions of how you might treat the

1    indictment or actually giving it to the jury, whether or not

2    you would remove counts for those defendants that have already

3    pled -- that type of thing.

4         THE COURT:  Well, I'm open to what -- sometimes

5    defendants want things removed and sometimes they don't.

6    Sometimes they want to show what was charged with the others,

7    since the other defendants may be witnesses in the case.

8         MR. FINDLEY:  We may want to confer on that a little

9    bit.  That's a decision we can make later on down the road?

10        THE COURT:  Sure.  We do need to talk about that at

11   some point; and, as much advance notice as you can give me,

12   it -- the forfeiture provisions at least will be redacted out.

13   The jury doesn't need those in the initial deliberations.  So,

14   those won't be there; but, if there are other things that need

15   to be dealt with in that way, we can deal with it.

16        MR. FINDLEY:  Okay.

17        MR. DAVIS:  Fine, Your Honor.  We can provide the

18   court with another list, or would you prefer for us to try to

19   insert the names?  We just didn't want to take the liberty --

20        MR. FINDLEY:  We will tell you tomorrow morning.  I

21   just want to be able to confer.

22        THE COURT:  He was back on the subject of the code of

23   the witness numbers and names.

24        MR. FINDLEY:  Oh.

25        THE COURT:  The easiest way to deal with it may be

1    just to have an exhibit --

2             MR. DAVIS:  Okay.

3             THE COURT:  -- that ties it together.  I don't know

4    if the defense wants that -- if there's an objection to that;

5    but, if you can work out a way to do it to get that

6    information to the jury, it seems to me it's a better way to

7    go.

8             MR. DAVIS:  Thank you, Your Honor.

9             MR. FINDLEY:  Okay.

10            THE COURT:  Anything else?  All right.

11            MR. SPROWLS:  One thing, Judge.

12            THE COURT:  Mr. Sprowls?

13            MR. SPROWLS:  My colleague here was very liberal with

14   the discovery, insofar as it seems like every report that

15   Agent Brunner penned and Agent Sanford penned, went over, even

16   though it may not -- one may not testify at all.  That's fine.

17   But I guess what I'm --

18            My complaint is that we're at times using this report

19   of this agent as that person's previous statement in trying to

20   impeach, which the court did not allow, but there's been some

21   of that showing, the statement to the witness, and I

22   just don't think that is a correct use of the prior

23   statements.

24            MR. FINDLEY:  I don't think I did that.  I offered to

25   do that, that's the only time, and I tried to ask, is that

 1   what you told Agent Sanford or --

 2         THE COURT:  Sure.  And it certainly is an appropriate

 3   question, did you tell Agent Sanford that it was Mr. Barnes

 4   not Mr. Dixon who provided the carton of cigarettes.  And when

 5   you seem to be reading from something, well, you know, at some

 6   point that's the lawyer's art, but at some point it gets over

 7   to suggesting to the jury that I've got Mr. Sanford's report

 8   here, and the jury really is not entitled to know at that

 9   point what Mr. Sanford's report says.

10         Now, if he testifies, then, if he says, no, she told

11   me that it was Mr. Barnes that provided the cigarettes, then

12   you have no use for the report.  But if he says, she told me

13   Barnes, and then you can say, well, didn't you say in your

14   report that it was Dixon?  The other way around.

15         MR. SPROWLS:  Likewise, Judge, and I'm not trying to

16   jump on Mr. Findley here, but -- when the question is asked,

17   and the answer comes back and the answer is not consistent,

18   but let's say, well, Barnes did it and Barnes is not

19   mentioned, and then the comment or question, well, if Barnes's

20   name is not in the report, then Agent Sanford got it wrong.

21         THE COURT:  That's right.  That's an improper

22   question.

23         MR. FINDLEY:  Okay.  I don't recall doing that, but

24   maybe I did.

25         THE COURT:  It was a pretty accurate description of

1    how it happened.  But I -- and there's been a time or two,

2    repeating answers.  But I don't have any great complaints.

3    The case is being well tried, I think, by all of the lawyers.

4    You heard my earlier comments, stay focused, and I would

5    appreciate that.  But I don't think anybody has done anything

6    untoward here that's affected anything.  But the government is

7    right, you need to keep it within bounds of how you ask those

8    questions.

9            Anything else?

10            We'll be in recess until 8:30, unless somebody gets

11    here at 8:15 with an issue, then we will come in and deal with

12    it then.

13        (The proceedings adjourned at 4:13 p.m.)

14                    *   *   *   *   *   *   *   *

15

16

17

18    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.  Any
19    redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
20    transcript.

21

22

23    s/Judy A. Nolton                        04/16/2007
      Judy A. Nolton, RPR                       Date
24    Official U.S. Court Reporter

25

```
 1                          INDEX

 2

 3   WITNESSES FOR THE GOVERNMENT:                    PAGE

 4

 5   BARRY ALAN HENSON
          CROSS-EXAMINATION BY MR. FINDLEY       130
          REDIRECT EXAMINATION BY MR. SPROWLS    139
 6
 7   MILDRED RIVERA
          DIRECT EXAMINATION BY MR. SPROWLS      150
          CROSS-EXAMINATION BY MR. HARPER        165
 8        CROSS-EXAMINATION BY MR. FINDLEY       174
          REDIRECT EXAMINATION BY MR. SPROWLS    186
 9
10   SHONNIE YVETTE DANIELS
          DIRECT EXAMINATION BY MR. SPROWLS      189
          CROSS-EXAMINATION BY MR. HARPER        227
11        CROSS-EXAMINATION BY MR. FINDLEY       252
          REDIRECT EXAMINATION BY MR. SPROWLS    271
12
13   GEKETTIA HARRIS
          DIRECT EXAMINATION BY MR. SPROWLS      274
          CROSS-EXAMINATION BY MR. FINDLEY       277
14
15   LETISHE MOORE
          DIRECT EXAMINATION BY MR. SPROWLS      279
          CROSS-EXAMINATION BY MR. FINDLEY       290
16        REDIRECT EXAMINATION BY MR. SPROWLS    296
17   DEMETRUS COONROD
          DIRECT EXAMINATION BY MR. SPROWLS      303
18        CROSS-EXAMINATION BY MR. FINDLEY       321
          CROSS-EXAMINATION BY MR. HARPER        329
19        REDIRECT EXAMINATION                   330
          BY MR. SPROWLS
20
21   EFRAIM CARBONELL
          DIRECT EXAMINATION BY MR. SPROWLS      331
          CROSS-EXAMINATION BY MR. FINDLEY       334
22        REDIRECT EXAMINATION BY MR. SPROWLS    335
23   DELORES HAMLET
          DIRECT EXAMINATION BY MR. SPROWLS      336
24        CROSS-EXAMINATION BY MR. HARPER        352
          CROSS-EXAMINATION BY MR. FINDLEY       355
25        REDIRECT EXAMINATION BY MR. SPROWLS    360
```

*CECILE GREATHOUSE*

        DIRECT EXAMINATION BY MR. DAVIS          363
        CROSS-EXAMINATION BY MR. FINDLEY         379
        REDIRECT EXAMINATION BY MR. DAVIS        381


                    *  *  *  *  *  *  *  *


                    GOVERNMENT'S EXHIBITS


<u>NO.</u>:                <u>DESCRIPTION</u>                       <u>PAGE</u>

  33(b)    Excerpt of Title 18, U.S. Code           145
  33(c)    Excerpt of Title 28 of CFR               145
  34       Annual training lesson plan for 2005     158
  35       Attendance sign-in sheet, 1/18-21/05     158
  36       Attendance sign-in sheets, 1/8-11/05     158
  37       Annual training lesson plan for 2006     158
  38       Attendance sign-in sheet, 2/21-23/06     158


                    *  *  *  *  *  *  *  *


                    **DEFENDANT DIXON EXHIBITS**



<u>NO.</u>:                <u>DESCRIPTION</u>                       <u>PAGE</u>

  1        Program Statement 3420.09                132

  2        Code of Federal Regulation, 28 CFR 500.1  135

  3        Program statement 5580.07                136

  4        Employee Evaluations for Mr. Dixon       178


  6        Letter to Agent Brunner from Shonnie Daniels   260

  7        Letter to Reed Haney, OIG, from Shonnie   264
           Daniels

  8        Letter to Reed Haney, OIG, from Shonnie   264
           Daniels

1    10         Grand jury testimony of Shonnie Daniels    271

2    11         Plea Agreement of Letishe Moore           295

3    12         Plea Agreement of Demetrus Coonrod        323

4    13         Plea and Cooperation Agreement of Delores  357
               Hamlet

5                    *   *   *   *   *   *   *   *   *

6

7                    **DEFENDANT MOORE EXHIBIT**

8
     <u>NO.</u>:              <u>DESCRIPTION</u>                          <u>PAGE</u>
9
10   7         Plea and Cooperation Agreement of Shonnie   245
               Daniels

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25