### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

```
UNITED STATES OF AMERICA,        )
                                 ) Case No.:  4:06cr36/RH
             Plaintiff,          )
                                 ) Tallahassee, Florida
vs.                              ) November 2, 2006
                                 ) 8:30 A.M.
GREGORY DIXON and ALAN MOORE,    )
                                 )
             Defendants.         )
_____)
```

### VOLUME IV
### (Pages 722 through 991)

### TRANSCRIPT OF FOURTH DAY OF TRIAL
### BEFORE THE HONORABLE ROBERT L. HINKLE,
### CHIEF UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Gregory R. Miller |
| | United States Attorney |
| | By:  ROBERT O. DAVIS |
| |      P. ALAN SPROWLS |
| |      Assistant U.S. Attorneys |
| | 111 North Adams Street |
| | Tallahassee, Florida 32301 |
| | |
| For the Defendant,<br>Gregory Dixon: | Messer, Caparello & Self, P.A. |
| | By:  THOMAS MARSHALL FINDLEY |
| |      SEAN SHAW |
| |      Attorneys at Law |
| | 215 South Monroe Street |
| | Suite 701 |
| | Tallahassee, Florida   32301 |
| | |
| For the Defendant,<br>Alan Moore: | Harper & Harper Law Firm, P.A. |
| | By:  ROBERT AUGUSTUS HARPER |
| |      ROBERT AUGUSTUS HARPER, III |
| |      Attorneys at Law |
| | 325 West Park Avenue |
| | Tallahassee, Florida   32301 |



1                    P R O C E E D I N G S

2          (Call to Order of the Court.)

3          (Defendant present; jury not present.)

4               THE COURT:  Good morning.  Please be seated.

5               Are we ready for the jury?

6               COURT SECURITY OFFICER:  We are still missing one.

7               THE COURT:  Ah.

8               MR. DAVIS:  Your Honor, before we bring the jury in,

9    I believe there is a question about Ms. Dixon appearing as a

10   witness.

11              MR. FINDLEY:  Your Honor, we were going to call

12   Ms. Dixon to basically rebut some of the things that they

13   brought out in their case-in-chief.

14              THE COURT:  Ms. Dixon?

15              MR. FINDLEY:  She wasn't on our witness list.

16              THE COURT:  Mr. Dixon's wife?

17              MR. FINDLEY:  Yes.

18              MR. DAVIS:  And I believe she has been in the

19   courtroom.

20              MR. FINDLEY:  Once we learned that she might be

21   needed to testify, we told her not to be in the courtroom.  I

22   don't think she's going to really -- she's going to rebut the

23   STD comment, and that was the test that wasn't provided to us

24   by the government.  She's not going to really talk about

25   people's testimony so much, and it should take no more than

1  than 5 minutes.

2  MR. SPROWLS:  What is the claim that we did not

3  provide?

4  MR. FINDLEY:  You didn't provide the test that

5  Ms. Moore had STD.

6  MR. SPROWLS:  We provided the testimony that she had

7  a problem that caused her to go to the clinic and get

8  treatment and to bolster that, we had --

9  THE COURT:  We've got a witness here in the courtroom

10  now for this discussion.  I take it that is unrelated to

11  anything he's going to testify about.

12  MR. SPROWLS:  Yes, Your Honor.

13  MR. DAVIS:  Yes, Your Honor.

14  THE COURT:  All right.  You want to have Mrs. Dixon

15  say what?

16  MR. FINDLEY:  A few general things, and then that

17  there is no STD by either Mr. Dixon or Mrs. Dixon.

18  MR. SPROWLS:  How would that bear upon whether an

19  inmate contracted something possibly from him?  I mean, she

20  can't comment on what the inmate's physical condition was and

21  what was bolstered by the medical testimony.

22  MR. FINDLEY:  I believe that the question is more, is

23  there any prejudice to the fact that she has been sitting here

24  through an innocent error, and is that really prejudicial to

25  their case.

1          THE COURT:  What in general does she want to say?

2          MR. FINDLEY:  Discuss, in a very limited way, their

3     relationship.  I can proffer to the court a list of --

4          MR. SPROWLS:  And that doesn't bear on anything we

5     put on, Judge, I assume.

6          THE COURT:  It doesn't but nor is it likely that her

7     being in the courtroom has impacted any of that testimony,

8     because there's just been no testimony about it.

9          MR. SPROWLS:  I don't necessarily have a problem with

10    whatever this general stuff -- and I'm a little inquisitive

11    about that, but it's --

12         THE COURT:  I'm always curious when I ask a question

13    and I get an evasive answer.

14         MR. FINDLEY:  I can show you -- it's general.  How

15    long have they been married?  I'm sorry.

16         MR. SPROWLS:  The commentary about the condition that

17    one of the inmates testified about and what Dr. Carbonell

18    twice testified about, I don't know why a witness who sat in

19    and heard that can now comment on that.

20         MR. FINDLEY:  Dr. Carbonell also testified about

21    certain Pap smear tests that were never provided to the

22    defense.  We had no idea where the testimony was going, we had

23    no statements from Dr. Carbonell, no reports from

24    Dr. Carbonell.  And we're going to ask her about Mr. Dixon's

25    status as a retired Navy --

*Alfred Barnes - Direct*

```
 1              THE COURT:  Just a minute.

 2              COURT SECURITY OFFICER:  They are here.

 3              THE COURT:  Bring the jurors in.

 4       (The jury entered the courtroom at 8:35 a.m.)

 5              All right.  Please be seated.

 6              Mr. Davis or Mr. Sprowls, please call your next

 7   witness.

 8              MR. DAVIS:  Your Honor, the government calls Alfred

 9   Barnes.

10              DEPUTY CLERK:  Please raise your right hand.

11        ALFRED A. BARNES, GOVERNMENT WITNESS, DULY SWORN

12              DEPUTY CLERK:  Be seated.

13              Please, state your full name and spell your last

14   name for the record.

15              THE WITNESS:  Alfred A. Barnes, B-a-r-n-e-s.

16                        DIRECT EXAMINATION

17   BY MR. DAVIS:

18   Q.  Good morning, Mr. Barnes.

19   A.  Good morning.

20   Q.  Would you please tell the jury where you live?

21   A.  I was born in Thomasville, Georgia.

22   Q.  Is that where you live now?

23   A.  Yes, sir.

24   Q.  And where did you work, Mr. Barnes?

25   A.  I worked at Federal Correctional Institution here in
```

*Alfred Barnes - Direct*

727

```
 1   Tallahassee, Florida.

 2   Q.  Are you still employed there, Mr. Barnes?

 3   A.  No, sir.

 4   Q.  And when did you start working at the Federal

 5   Correctional Institution in Tallahassee?

 6   A.  I started working at the FCI in April of 1994.

 7   Q.  And prior to that, did you have any other employment,

 8   Mr. Barnes?

 9   A.  Yes, sir.

10   Q.  What was that?

11   A.  I was in the United States Air Force almost 12 years.  I

12   worked for the Georgia Department of Corrections for a year

13   and a half.

14   Q.  Mr. Barnes, are you a named defendant in this

15   prosecution?

16   A.  Yes, sir.

17   Q.  Did you plead guilty to the conspiracy charge in this

18   indictment?

19   A.  Yes, sir.

20   Q.  Did you enter into a Plea and Cooperation Agreement with

21   the government?

22   A.  Yes, sir.

23   Q.  And as part of that Plea and Cooperation Agreement, were

24   eight other counts dropped against you?

25   A.  Yes, sir.
```

*Alfred Barnes - Direct*

1  Q.  Now, do you know the seriousness of the charges to which

2  you pled, Mr. Barnes?

3  A.  Yes, sir.

4  Q.  Did you plead to the most serious charge, Mr. Barnes?

5  A.  Yes, sir.

6  Q.  Now, were you arrested on June 21st of 2006, Mr. Barnes?

7  A.  Yes, sir.

8  Q.  And at the time of your arrest were you interviewed by

9  investigators?

10  A.  Yes, sir, I was.

11  Q.  Did you make statements to those investigators concerning

12  the charges contained in this indictment?

13  A.  Yes, sir.

14  Q.  Were those statements true?

15  A.  No, sir.  I lied.

16  Q.  Did you deny your involvement?

17  A.  Yes, sir.

18  Q.  Mr. Barnes, have you in the past been questioned about

19  your improper conduct at the Federal Correctional Institution

20  in Tallahassee?

21  A.  Yes, sir, I have.

22  Q.  In past investigations?

23  A.  Yes, sir.

24  Q.  And have you denied your involvement in those improper

25  activities?

1   A.   I did deny.

2   Q.   And were those statements also not true?

3   A.   They were not true, but I lied about it.

4   Q.   Now, Mr. Barnes, when you were a correctional officer,

5   what was your understanding of your duties as a correctional

6   officer in Tallahassee?

7   A.   To make sure all of the inmates are provided a safe

8   environment to work, to make sure that they follow all rules

9   and regulations.

10  Q.   And what are those rules and regulations?

11  A.   There are different rules.   To make sure they are in the

12  right housing unit, to make sure that they are not smoking in

13  the unit, make sure they are not fighting.

14        MR. HARPER:   Objection, Your Honor, a pretrial

15  matter.

16        THE COURT:   Overruled.

17  BY MR. DAVIS:

18  Q.   So, you said your understanding is to make sure they are

19  not smoking, they're not fighting?

20  A.   Not fighting, they are in their proper housing unit.

21  Q.   Were there any regulations you're aware of concerning

22  sexual contact with inmates?

23  A.   Yes, sir.

24  Q.   And how are you aware of those?

25  A.   We had annual training once a year, and also they usually

*Alfred Barnes - Direct*

1    pass out a pamphlet explaining about sexual contact with

2    inmates, sexual abuse.

3    Q.  Did you attend that annual training, Mr. Barnes?

4    A.  Yes, sir.

5    Q.  What do you remember from that annual training?

6    A.  There were a variety of topics we went over.  They

7    emphasized -- based it a lot about the sexual contact about

8    the inmates.

9    Q.  What was the sexual contact with inmates?  What was the

10   rule?  What did you understand was the rule?

11   A.  That no staff member could have no sexual contact with

12   inmates.

13   Q.  There is no exception to that?

14   A.  Can you repeat again?

15   Q.  Is there any exception to that?

16   A.  There is no exception to that, zero tolerance.

17   Q.  What else do you remember from that training?

18   A.  They talked about past correctional officers that have

19   went over the line with inmates, and that got prosecuted in

20   the past that had sexual contact with inmates.

21   Q.  Do you remember anything about showing favoritism?

22   A.  Yes, sir.

23   Q.  What is the rule about showing favoritism?

24   A.  There is zero tolerance for favoritism with inmates.

25   Q.  How about personal relationships?

*Alfred Barnes - Direct*

1  A.  No personal relationships, sir.

2  Q.  Did they also discuss contraband?

3  A.  Yes, sir.

4  Q.  What is your understanding of the training you received

5  on contraband?

6  A.  Contraband is anything that is not authorized by the

7  Bureau of Prisons and the Federal Correctional Institution.

8  You also have to have the authorization of the warden.

9  Q.  Did you have an understanding of what you might be able

10  to give to inmates, Mr. Barnes?

11  A.  Yes, sir.  They have a manual out what correctional

12  officers could give the inmates.

13  Q.  And what can correctional officers give inmates?

14  A.  Whatever is provided to the inmates on the FCI's property

15  list.  They also have a commissary list that was provided to

16  us and also the inmates.

17  Q.  So, you were allowed to give inmates stuff from the

18  commissary?

19  A.  No, sir.  They can provide -- they can go and purchase

20  stuff from the commissary.

21  Q.  Were you allowed to give the inmates anything?

22  A.  No, sir, except for such things like toiletries in the

23  housing unit, you know --

24  Q.  Would that toilet paper?

25  A.  Toilet paper.

1    Q.   Feminine products?

2    A.   Feminine products, soap.

3    Q.   And soap?

4    A.   Yes, sir.

5    Q.   In this training you talked about, did you have any

6    instruction on what you were to do if you uncovered a

7    violation of these regulations?

8    A.   Yes, sir.

9    Q.   What were you supposed to do?

10   A.   You were supposed to bring it to the attention of the

11   inmate, you write it up on the incident report, and you

12   notify your supervisor on duty.

13   Q.   Mr. Barnes, when you were a correctional officer at FCI,

14   did you have sex with inmates?

15   A.   Yes, sir, I did.

16   Q.   Who did you have sex with?

17   A.   I had sex with Phyllis Fleming, Shonnie Daniels, Latoya

18   Brown, Sabrina Bowie.

19   Q.   Did you have sex with other inmates as well?

20   A.   Yes, sir.

21   Q.   Let's talk about Phyllis Fleming.  When did you start

22   having sex with Phyllis Fleming?

23   A.   The inmates arrived there in 1996, and I think the

24   relationship started in the end of '96, early '97.

25   Q.   When you say the inmates arrived, what do you mean by

1    that, when you said the inmates arrived in 1996?

2    A.   Yeah.   We was in a transition period at that time.   We

3    had male inmates, and we was in a transition period getting

4    male inmates out of Tallahassee and bringing in female

5    inmates.

6    Q.   So female inmates arrived in 1996?

7    A.   Yes, sir.

8    Q.   And you said by 1997, you were in a relationship with one

9    of those female inmates?

10   A.   Yes, sir.

11   Q.   What was the nature of your relationship with her?

12   A.   It was a friendly relationship that turned sexually.   I

13   used to bring her contraband.

14   Q.   What contraband did you bring her?

15   A.   I brought her Black & Milds, makeup, nail polish, weave,

16   different type of cosmetics for females.

17   Q.   Why did you bring her that contraband?

18   A.   Because we had a relationship sexually.

19   Q.   Did you bring her that contraband so she would have sex

20   with you?

21   A.   I brought the relationship because that -- since I had

22   crossed the line sexually, I knew that what she wanted, so I

23   had to bring it to her.

24   Q.   Did you give her any money as well?

25   A.   Yes, sir, I did.

*Alfred Barnes - Direct*

1  Q.  In fact, didn't you give her three $20 bills?

2  A.  Yes, sir.

3  Q.  Were those three $20 bills later recovered by

4  investigators?

5  A.  Yes, sir.

6  Q.  And were you questioned about those three $20 bills?

7  A.  Yes, sir.

8  Q.  And did you deny at that time that you gave them to her?

9  A.  Yes, sir, I did deny it.

10  Q.  Now, what happened as a result of that investigation with

11  Phyllis Fleming?

12  A.  Eventually, it came to the U.S. Attorney's Office.  I

13  don't know exactly what happened on her side, but they ended

14  up throwing the investigation out.

15  Q.  What happened to you?

16  A.  I was reassigned at that time to the Federal Detention

17  Center for almost two years, until the investigation was

18  over.  Eventually it was over, then that gave me a chance to

19  go back to the FCI where the females was.

20  Q.  So, during the pendency of the investigation, you were

21  put down with the men in the Federal Detention Center; is

22  that correct?

23  A.  Yes, sir.

24  Q.  At the end of that investigation you were allowed to

25  return to the FCI?

*Alfred Barnes - Direct*

1   A.   Yes, sir.

2   Q.   And were any charges brought against you at the end of

3   that investigation?

4   A.   No, sir.

5   Q.   What happened when you returned to the Federal

6   Correctional Institution where the women were?

7   A.   When I returned to the -- when I returned back to the

8   FCI, I was assigned to the Special Housing Unit, and I got

9   involved with another inmate in the Special Housing Unit

10  named Sherrye Booze.

11  Q.   How did that come about?

12  A.   She was an older lady in the Special Housing Unit, and I

13  was the number one officer there, and we just started

14  talking, general conversation, and we became involved by just

15  talking.

16  Q.   Did you have sex with Sherrye Booze?

17  A.   No, sir.

18  Q.   What was the nature of your relationship then?

19  A.   It was just a friendly relationship that I got to know

20  her, and she was a short-term inmate.  She wasn't going to be

21  there too long, and she wanted some hair dye, because she was

22  getting ready to depart.  So, I brought the hair dye in the

23  Special Housing Unit and gave it to her.  And I was planning

24  on getting with her once she got out.

25  Q.   So, you were planning on seeing her once she got out?

1   A.   Yes, sir.

2   Q.   Now, after your relationship with Sherrye Booze, what

3   happened?

4   A.   They reassigned me back down to the Federal Detention

5   Center.

6   Q.   Was there another investigation involving Sherrye Booze?

7   A.   Not as I know of.   Just with me, I know there was an

8   investigation.

9   Q.   What was that investigation involving you?

10   A.   It was dealing with me providing her hair dye in the

11   Special Housing Unit.

12   Q.   So, there was an investigation of the hair dye to Sherrye

13   Booze in the Special Housing Unit?

14   A.   Yes, sir.

15   Q.   And were you asked questions during that investigation?

16   A.   Yes, sir, I was.

17   Q.   And did you deny --

18   A.   Yes, sir, I did deny.

19   Q.   Were those denials false?

20   A.   Yes, sir, they were false.

21   Q.   So then you're back at the Federal Detention Center

22   again?

23   A.   Yes, sir.

24   Q.   How long were you at the Federal Detention Center this

25   time?   Do you recall?

*Alfred Barnes - Direct*

1  A.  I can't recall exactly.  I know it was anywhere from a

2  year to 18 months.

3  Q.  Can you help me with the timing of what year that would

4  be?  Do you remember when you came back to the Federal

5  Correctional Institution?

6  A.  It had to be with, the Fleming incident was early '97.

7  It was maybe 2001.

8  Q.  So, 2001 was when happened?  Were you back at the jail or

9  were you back at the Federal Correctional Institution?

10  A.  I had moved back to the FCI after the investigation with

11  Phyllis Fleming.

12  Q.  So, by 2001 the Phyllis Fleming investigation was over

13  and you were back in the FCI?

14  A.  Yes, sir.

15  Q.  And in 2001, then, you gave contraband to Sherrye Booze;

16  is that correct?

17  A.  Correct.

18  Q.  That led to a second investigation, correct?

19  A.  Yes, sir.

20  Q.  And you testified that it was a year to 18 months that

21  you were then sent back to the Federal Detention Center?

22  A.  I think that's a good estimation.

23  Q.  So 2001, a year and a half later, would be 2002 to 2003?

24  A.  Yes, sir.

25  Q.  So, did you return then to the Federal Correctional

1    Institution in 2002 to 2003?

2    A.  Yes, sir, I did.

3    Q.  What happened when you returned to the Federal

4    Correctional Institution in 2002 to 2003?

5    A.  I was assigned back to the FCI just working, and I think

6    I was assigned the morning watch post.  I was working a

7    variety of units, working the F unit, D unit in the morning

8    watch, the 12 midnight to the 8 a.m. shift.

9    Q.  I would like to ask you about those shifts.  Can you tell

10   me what the shifts run?

11   A.  You've got a variety of shifts.  You've got the number

12   one shift, which is the morning watch shift, which runs from

13   12 midnight to 8 in the morning.  Then you've got the day

14   shift that runs from really 7:45 a.m. until 4 p.m.  Then

15   you've got the evening shift, which runs from 4 p.m. to 12:00

16   midnight.

17   Q.  Did you have a preference for which shift you wanted to

18   take?

19   A.  Yes, sir.

20   Q.  What shift did you prefer?

21   A.  I preferred the morning watch shift, the number one

22   shift.

23   Q.  Now, it's called morning watch, but it's really from

24   midnight to 8?

25   A.  Yes, sir, the midnight shift.

*Alfred Barnes - Direct*

1  Q.  Why did you prefer that shift?

2  A.  For me it was, it's easier for me, when I'm off duty, to

3  do things while I'm off during the time, and plus there's not

4  too many staff members around at that time.

5  Q.  So, when you're off duty, you mean during the regular

6  workday, 9-to-5?

7  A.  Yes, sir.  I can do more thing when I get off.  Like,

8  when I work the midnight shift to 8:00, and I get off in the

9  morning and, you know, do my errands at the house and still

10 have plenty time to go to sleep and come back to work at

11 night.

12 Q.  And you said the other reason is because there's less

13 staff around from 12-to-8?

14 A.  Yes, sir.

15 Q.  Why was that important?

16 A.  Because you don't have to really worry about interacting

17 with them; and, if you was doing things like I was doing, you

18 didn't have to really worry about people walking up on you,

19 being around you.

20 Q.  Let's go back to your return to the Federal Correctional

21 Institution in 2002 and 2003.

22     You testified that you were on morning watch, which is

23 the 12:00 to the 8:00 watch; is that correct?

24 A.  Yes, sir.

25 Q.  That's your recollection?

*Alfred Barnes - Direct*

1   A.   Yes, sir.

2   Q.   Did there come a time when you met another inmate that

3   you became involved with?

4   A.   Yes, sir.

5   Q.   And who was that?

6   A.   Her name was Shonnie Daniels.

7   Q.   And how did that come about?

8   A.   I had met Shonnie previously in the Special Housing Unit

9   during the -- I think the Sherrye Booze incident, that she

10  was being transferred away from Tallahassee to Marianna, and

11  she just happened to come back at the time I got reassigned

12  back to the FCI, and I met her in the G unit on the morning

13  watch shift.

14  Q.   Did you get to know Ms. Daniels when you were in the G

15  unit in the morning watch?

16  A.   Yes, sir.

17  Q.   Now, wasn't she asleep from 12-to-8?

18  A.   She's supposed to been asleep, but during that time you

19  could have inmates running around.  They're supposed to be in

20  their quarters, but in units like that you've got three

21  levels, and it's hard to maintain all three levels at one

22  time.  As you're making your rounds, the inmates know where

23  you at.  They know you're on the first floor, they'll be

24  moving on the second and third floor.  When you go up on the

25  second and third floor to make rounds, they be moving on the

*Alfred Barnes - Direct*

1    first floor.  You know, it's just the chance you take making

2    your rounds.  You can't keep up with all of them at the same

3    time.

4    Q.  How did your relationship with Ms. Daniels develop?

5    A.  It turned personal with Shonnie, a real close

6    relationship.

7    Q.  You say real close, what happened?

8    A.  We became involved intimately.

9    Q.  Did you have sex with Ms. Daniels?

10   A.  Yes, sir, several times.

11   Q.  And did you bring her contraband?

12   A.  Yes, sir.

13   Q.  Why did you bring her contraband?

14   A.  I brought her contraband for the favors she was doing for

15   me, sexual relationship; and also, you know, just to keep

16   things quiet.

17   Q.  How did you -- how did the contraband relationship with

18   Shonnie Daniels work out?  Explain that to the jury.

19   A.  How did it work?  Well, sometimes I would go out and

20   purchase things for her and bring them in.  Sometimes she

21   will have one of her relatives send money to an address that

22   I provided to Shonnie.  She would send me money.  I cashed

23   the money order, and I go out and purchase items for her and

24   bring them back in to her.

25   Q.  Now, you say that you provided her with an address?

1    A.   Yes, sir, I did.

2    Q.   Just for the privacy of the person whose address that is,

3    can you tell me what city and state that address is located

4    in?

5    A.   It's located in Thomasville, Georgia.

6    Q.   Was that address of someone related to you?

7    A.   Yes, sir, it was.

8    Q.   Who was it?

9    A.   My mother's.

10   Q.   Did you live there at that time?

11   A.   No, sir.

12   Q.   What instructions did you give to Ms. Daniels about

13   mailing to that address?

14   A.   I would have her tell her relatives to just get the money

15   order, leave it blank, and I gave her an alias name to put on

16   it.

17   Q.   You gave her an alias name to put on -- you just told her

18   to leave the money order blank, so you gave her an alias name

19   to put on the money order or on the letter?

20   A.   Normally, they would leave the money order blank.  I

21   would fill it out.  But the address itself, I would give her

22   an alias name and the correct address.

23   Q.   I want to show you an exhibit that has been -- no, I

24   don't right now.

25        What alias name did you use?

1   A.   I used Frank Allen.   I used C. Jordan.

2   Q.   And you're not Frank Allen, are you?

3   A.   No, sir.

4   Q.   Are you C. Jordan?

5   A.   No, sir.

6   Q.   When they mailed the money to that address, what would

7   you do?

8   A.   I would get the money order, and I would -- normally,

9   when I get there to the house, my mom would tell me I have

10  mail there, I look on it, I open the envelope up.   The money

11  orders would be inside and it would be blank.   I would fill

12  it out and take it to the bank and cash it.

13  Q.   Was that money for you or was that to pay for contraband?

14  A.   It would be -- some might be for me and some would be,

15  mostly, to purchase contraband.

16  Q.   Okay.   How much was for you?   Do you remember dollar

17  amounts that you would make per --

18  A.   Normally, Shonnie, it wasn't that much.   Normally, maybe

19  a hundred dollars, and I might get half and purchase the

20  other half with contraband.

21  Q.   So, a hundred dollar check she would send you, you would

22  take $50 for yourself?

23  A.   Yes, sir.

24  Q.   And you would take $50 and buy contraband?

25  A.   Yes, sir.

*Alfred Barnes - Direct*

1   Q.   And what type of contraband did you buy for the $50?

2   A.   I would buy her Black & Milds, I would buy her makeup,

3   lipstick, gloss, sometimes cigarette lighters.

4   Q.   Were those valuable items inside the FCI compound?

5   A.   Yes, sir.

6   Q.   How much did a pack of Black & Milds cost you?

7   A.   It would cost me anywhere from $1.89 to $2.

8   Q.   Do you know how much they would be sold for on the

9   compound?

10  A.   Yes, sir.

11  Q.   How much were they sold for on the compound?

12  A.   Normally they range from $15.

13  Q.   Now, what -- you testified that Shonnie Daniels sent you

14  money at that address for contraband.

15  A.   Yes, sir.

16  Q.   Did she also give you anything else for that contraband?

17  A.   Sex.

18  Q.   Let's go back to relationships you had with inmates at

19  the Federal Correctional Institution.

20      How long did that relationship with Shonnie Daniels last?

21  A.   It lasted -- I don't know the exact date that she came

22  back, but it lasted from, I'd say, end of 2002 until 2004 --

23  I believe 2004.

24  Q.   Why did it end?

25  A.   Because I was trying to get away from her.  The pressure

1    and the stress that it came out of the relationship was

2    getting the best of me, so I was basically trying to get away

3    from her.

4    Q.  So you were ending it?

5    A.  Sir?

6    Q.  You were ending it?

7    A.  Yes, sir.  It was taking too much on me, and the

8    relationship was so open and widespread everybody knew what

9    was going on, all of the inmates and staff members, and I

10   just wanted to get away from her.

11   Q.  Did Ms. Daniels ultimately leave prison as well?

12   A.  Yes, sir.

13   Q.  I guess it ended completely when she left prison; is that

14   correct?

15   A.  Yes, sir.

16   Q.  Did you engage in a sexual relationship with any other

17   inmates at FCI-Tallahassee?

18   A.  Yes, sir.

19   Q.  And who was that?

20   A.  Sabrina Bowie.

21   Q.  Tell me about that relationship.

22   A.  It was a relationship that started out with working in

23   the G unit, the midnight shift.  I was making rounds.  I just

24   happen to come across her.  We started talking and

25   conversating, and it ended up being sexual.

*Alfred Barnes - Direct*

1  Q.  Now, you said the midnight shift that time, correct?

2  A.  Yes.

3  Q.  Is the same thing as the morning watch?

4  A.  Correct.

5  Q.  Just confusing for us to think that midnight and morning

6  are different, but it's the 12-to-8 shift.

7  A.  12 to 8 a.m. shift.

8  Q.  So, your testimony is you began talking with Sabrina

9  Bowie?

10 A.  Yes, sir.

11 Q.  How did your relationship develop?

12 A.  It developed by me just making rounds in the housing

13 unit.  They might be up on the midnight shift watching TV

14 sometimes, and I just happen to start talking to her.  She

15 started taking comfort in me, and the relationship started

16 from there.

17 Q.  After you got to be friendly, what was the next

18 development in your relationship?

19 A.  I started bringing her contraband in to her.

20 Q.  How did you give her that contraband?

21 A.  I would bring it with me when I come to work at night.  I

22 would go around to her room or she might be up, and I just

23 give it to her.

24 Q.  You would just give it to her?

25 A.  Yes, sir.

*Alfred Barnes - Direct*

1  Q.  Did there come a time when your relationship became

2  sexual?

3  A.  Yes, sir.

4  Q.  And when did that happen?

5  A.  What year did that happen?

6  Q.  Yes, if you recall.

7  A.  I can't recall a year, but I know it had to be maybe

8  2004.

9  Q.  2004?

10  A.  Yes, sir.

11  Q.  Do you remember what unit you were in?

12  A.  I was working in G unit.  I'm sorry.  That was the F

13  unit.

14  Q.  That was F unit?

15  A.  Yes, sir.

16  Q.  Do you remember where Ms. Bowie was?

17  A.  Yes, sir.

18  Q.  Where was she?

19  A.  She would have been on the west side.

20  Q.  What was the west side?

21  A.  It was the drug program unit.

22  Q.  Is that where you gave Ms. Bowie the contraband?

23  A.  Yes, sir.  Sometimes she would come to the office where I

24  would talk to her.

25  Q.  If you weren't working F?

*Alfred Barnes - Direct*

1    A.   If I wasn't working F, normally I hold it for her and

2    bring it to her.

3    Q.   Okay.  Describe the first time you had sex with

4    Ms. Bowie?

5    A.   At that time in the office, F, you couldn't turn the

6    lights off in the office area because of staff members having

7    them off during the shift, so what happened was --

8    Q.   If I can stop you.  What do you mean, you couldn't turn

9    off because the staff members --

10   A.   Yeah.  They had put a shield over the light switch in the

11   office area, because of previous conduct with inmates or

12   staff members having the lights off during the shift.  So,

13   what they did, they wanted them lights to stay on, and so

14   they put a shield over the light switch.

15   Q.   So, you met her in the office in the F unit?

16   A.   Yes, sir.  At that time, like I said about the lights,

17   you had to go into a boiler room and turn the lights off in

18   that area, and that's what I usually do.  I'd leave the main

19   office area, walk around the corridor to the right, the east

20   side, and there is a boiler room there, and there's a breaker

21   box inside of that boiler room.

22   Q.   Let me just get an exhibit and show you, and you may be

23   able to show us.

24        MR. DAVIS:  Excuse me, Your Honor.  May I approach?

25        THE COURT:  You may.

*Alfred Barnes - Direct*

1   BY MR. DAVIS:

2   Q.  I'm showing you what has been marked as Government's

3   Exhibit 19.

4       Does that look like the room you are talking about in F

5   unit?

6   A.  Yes, sir.

7   Q.  And if you can take that little pen to the side there,

8   can you show us where the breaker box is?

9   A.  (Witness complies.)

10  Q.  So, your testimony is, because they had put a plate over

11  the light switch, you had to get up out of that office and

12  walk to this room to turn off the lights?

13  A.  Yes, sir.

14  Q.  Why did you want to turn off the lights?

15  A.  I usually turned the lights off because I didn't want to

16  be seen.  Also, you're sleeping, you know, if somebody walks

17  up, they couldn't see you if you're sleeping.

18  Q.  Were you allowed to sleep on the shift?

19  A.  No, sir.

20  Q.  So, you and Ms. Bowie are in the office in F unit?

21  A.  Yes, sir.

22  Q.  And what happened next?

23  A.  Once I turned the lights off -- normally, I make rounds

24  to make sure there aren't any inmates moving, and what I do,

25  I would normally knock on her door, I would signal for her,

*Alfred Barnes - Direct*

1   she would come out of the west side, and she'd come into the

2   office area where the lights would be turned off, and I would

3   be in the office area there, and she would come there in the

4   office area, and we would have sex there.  Sometimes it would

5   be oral.  Sometimes it would be sex, intercourse.

6   Q.  Did you have any discussions with Ms. Bowie as to why you

7   were having sex?

8   A.  Yes, sir.

9   Q.  What were those discussions?

10  A.  It could be anything about me bringing her contraband for

11  sex.

12  Q.  Did you bring Ms. Bowie contraband after you had sex with

13  her?

14  A.  Yes, sir.

15  Q.  And did you bring her contraband every time after you had

16  sex with her?

17  A.  Yes, sir.

18  Q.  In addition to Ms. Bowie, you previously testified that

19  you had sex with Latoya Brown as well?

20  A.  Yes, sir.

21  Q.  Can you tell us about that?

22  A.  That was a relationship that started in G unit on the

23  morning watch shift.  And I just got to meet Ms. Brown, a

24  relationship started, we had sex several times.  From that

25  point went on, I started bringing her contraband also.

*Alfred Barnes - Direct*

1  Q.  Do you remember what year that was?

2  A.  I don't know exactly, but I know it had to be around

3  maybe 2004, also.

4  Q.  So, in 2004, you were having a relationship with Sabrina

5  Bowie?

6  A.  Sabrina Bowie --

7  Q.  And in 2004 you were also having a relationship with

8  Latoya Brown?

9  A.  Latoya Brown and Shonnie Daniels.

10  Q.  And Shonnie Daniels.  What was your relationship with

11  Latoya Brown?

12  A.  It was just a relationship that started as a friendly

13  relationship and then real personal.  She took a liking to me

14  and ended up being sexual, and me bringing her contraband.

15  Q.  You brought her in contraband.  Why did you bring her

16  contraband?

17  A.  I brought her in contraband really to be quiet about what

18  was going on between us.

19  Q.  Did you have any information that led you to consider

20  Sabrina Bowie has somebody you wanted to have sex with?

21  A.  At the present time, when initially I met her, I didn't.

22  Q.  Later on did you have information as to why she was a

23  good person to have sex with?  Let me rephrase that question.

24      How did you choose these people that you had sex with, or

25  did you choose them?

1    A.   Normally, I would choose them after I sit there for a

2    while, and I watch them and see what their demeanor is.

3    Normally, it wouldn't be something immediately.  It would be

4    after a while, like it might be a week or two, just by making

5    rounds and seeing how the individual handles themselves, do

6    they stay to themselves, do they hang out with a lot of other

7    inmates.

8    Q.   So, were you trying to evaluate whether or not it was

9    safe to approach them?

10   A.   Yes.

11   Q.   And why was that?

12   A.   Because I think that would be the same way, not to have

13   an inmate most of the time talking and being around a whole

14   bunch of inmates.  I know that a lot of times they would be

15   talking, and you really don't them to -- you really don't

16   want the inmate involved with other inmates at all, because

17   rumors get to start, and you want to keep things maybe quiet,

18   you want to keep it on the down low.

19   Q.   You say you want to keep things quiet, you want to keep

20   it on the down low?

21   A.   Yes, sir, you want keep things -- that she will keep that

22   secret between me and her.

23   Q.   What happens if she didn't keep that secret?

24   A.   Normally, once it got on the compound and once it spreads

25   over the compound with all of the rest of the inmates, other

1    inmates hear about it, some inmates might approach you about

2    it, "Oh, I heard you got a relationship with Bowie or

3    Daniels," and you don't want that, because eventually you

4    think it might get back to SIA or the SIS, and you didn't

5    want that.

6    Q.  And the SIA or the SIS were the people on the compound

7    that investigated those incidents?

8    A.  Yes, sir.

9    Q.  And were those the people who investigated your prior

10   incident with Phyllis Fleming?

11   A.  Yes, sir.

12   Q.  And your prior incident with the contraband for Shirley

13   Booze?

14   A.  Yes, sir.

15   Q.  Now, did you have a contraband relationship in addition

16   to Shonnie Daniels with anyone else?

17   A.  Yes, sir.

18   Q.  Did you have a relationship with -- well, tell me who you

19   had a relationship with, a contraband relationship.  Who else

20   did you have a contraband relationship with?

21   A.  I think with Delores Hamlet.

22   Q.  Anyone else?

23   A.  Deronda Hartline.

24   Q.  Tell me about your relationship with Deronda Hartline.

25   A.  Deronda Hartline, that started also in the F unit,

*Alfred Barnes - Direct*

754

1  morning watch shift.  And it was just one day I was making

2  rounds, and I just happened to notice her in the room, and

3  she just seen me looking at her, and one night she just came

4  up to the office and started talking, just general

5  conversation.  At first she brought up about making money.  I

6  was kind of cautious at first, because normally I don't

7  really like inmates talk to me about that.  I think it's a

8  trap or something like that.  So, I kind of shrug it off the

9  first go-around.  I think maybe a week or two later, I was

10  just be making my rounds, and she might say, again, "Are you

11  thinking about that?"  I might say, "Well, are you working

12  for the SIA or are you working for the police?  Are you

13  trying to set somebody up?" or something like that.  She

14  said, "No, I'm not.  I just want to -- you know, I heard

15  about you previous in the past."  She knew something about my

16  past history with the inmates, and thought maybe she could

17  trust me about making money.

18     So, eventually we started that I trusted her and we

19  started a relationship just financially about making some

20  money for her and me.

21  Q.  So, there was no sexual contact in this relationship with

22  Deronda Hartline?

23  A.  No, sir.

24  Q.  But she paid you money in order to bring in contraband?

25  A.  Yes, sir.

*Alfred Barnes - Direct*

1   Q.  Describe how that payment and contraband relationship

2   worked.

3   A.  Normally, sometimes she would have other inmates or other

4   relatives that she knew on the outside send me packages and

5   big boxes, which I had provided her the address with the same

6   alias name of C. Jordan.

7   Q.  Was that the same address in Thomasville, Georgia?

8   A.  Yes, sir.

9   Q.  Go ahead.  I didn't mean to interrupt.

10  A.  Yes.  She would send me boxes sometimes with all types of

11  different cosmetics in it, some underwear, Black & Milds, all

12  different types of women's cosmetics.  And sometimes in that

13  box it might contain a money order, and sometimes she'd just

14  send me a straight money order to that same address in

15  Thomasville, Georgia.  It would be a blank money order, which

16  I would fill out, and I would take to my bank and cash it.

17  Q.  Mr. Barnes, I'm going to show you what has been marked

18  for identification as Government's Exhibit 47.

19      Do you recognize what this is?

20  A.  Yes, sir.

21  Q.  Is this one of those money orders you were just talking

22  about?

23  A.  Yes, sir.

24  Q.  Is that your handwriting on the money order?

25  A.  Yes, sir.  That's my handwriting, which I --

1  Q.  This is the actual money order, is it not?

2  A.  Yes, sir, it is.

3        MR. DAVIS:  Your Honor, the government would move

4  Exhibit 47 into evidence.

5        MR. FINDLEY:  No objection.

6        THE COURT:  Government's 47 is admitted.

7  (**GOVERNMENT EXHIBIT NO. 47:**  Received in evidence.)

8  BY MR. DAVIS:

9  Q.  Mr. Barnes, can you describe to the jury what's on this

10  postal money order?

11  A.  That's the money order I received through Deronda

12  Hartline, through one of her friends, Ingrid Johnson.

13  Q.  Okay.  Now, in this case -- you said previously you like

14  to have these money orders not filled in; is that right?

15  A.  Yes, sir.

16  Q.  In this case did it come filled in?

17  A.  Yes, sir.  She had filled it in under the name, C.

18  Jordan.

19  Q.  I want to zoom in.  I want to make sure you can show

20  that.

21      Is that your handwriting "A. Barnes" on the money order?

22  A.  Yes, sir.

23  Q.  And is it possible -- can you take that pen and show

24  where the "C" and "J" for Jordan are?

25  A.  The "C" is right there where I wrote my "A" up.  The

*Alfred Barnes - Direct*

1    Jordan is up under the "B-a-r-n-e-s" -- and I wrote over it.

2    It came as C. Jordan.  I put my initial "A" over it, to try

3    to cover the "C" up, and try to cover that up.  And then I

4    put the "B" over the "J-o-r-d-a-n," with my last name Barnes.

5    Q.  I'm going to take off your markings so we can see what

6    you're talking about.

7        I see what you're saying there.  So, there's a "C"

8    underneath that "A"?

9    A.  Yes, sir.

10   Q.  And I can see a capital "J" underneath that "B"?

11   A.  Correct.

12   Q.  And you wrote it several times so that the "A. Barnes" is

13   darker than what was underneath there?

14   A.  Yes, sir.

15   Q.  Now, that money order was for $900; is that correct?

16   A.  Yes, sir.

17   Q.  It's a lot of money.

18   A.  Yes, sir.

19   Q.  What was that $900 for?

20   A.  Yes, sir.

21   Q.  Do you recall why you were getting a $900 money order?

22   A.  At that time she had gave me -- I think we split it half

23   and half, and the $450 for me to go and purchase contraband

24   with that money there, from different types of colognes and

25   perfumes and --

*Alfred Barnes - Direct*

1  Q.  Was the original arrangement with Hartline that she would

2  send you money or she would send you packages?

3  A.  It started off with packages with money orders in them.

4  Q.  And how much were those money orders supposed to be?

5  A.  It could be $200 or $150, when it initially started off.

6  Q.  Okay.  Then did they provide you money to buy the

7  contraband as well, or did they just provide the contraband?

8  A.  No, sir.  They provided me money to get contraband, also.

9  Q.  Okay.  And when you bought that contraband or received

10  that contraband, what did you do with it?

11  A.  Normally, I bring it on the midnight shift, which the 12

12  midnight to 8:00 in the morning shift.  I would bring it in

13  with me in my Florida State bag.  I used to carry a Florida

14  State -- it's like a cooler bag.  I might take me three or

15  four trips to get all of that contraband in.  So, normally, I

16  would do it over a week's period.  I might start one day,

17  skip a day, and alternate different days bringing in it.

18      And, like I say, it could be a variety of contraband

19  dealing with cologne, perfume, underwear, bras, makeup,

20  Black & Milds, all different types of women's cosmetics.

21  Q.  Now, you testified that that check came from Ingrid

22  Johnson.  Did there come a time when Inmate Hartline told you

23  that you should be in contact with somebody else besides

24  Ingrid Johnson?

25  A.  She told me it was somebody else, but I can't recall

*Alfred Barnes - Direct*

```
 1   exactly who it was.  I remember Ingrid specifically.

 2   Q.  Okay.

 3   A.  And later on she would have somebody named Hanky.

 4   Q.  She mentioned a person named Hanky?

 5   A.  Correct.

 6   Q.  Did she tell you why you had to use Hanky and not Ingrid?

 7   A.  Yes, sir.  Because she had a falling out with Ingrid.  I

 8   think she felt that Ingrid was cutting her on her money some

 9   type of way, and they had fell out, and she told me that she

10   was using --

11            MR. HARPER:  Objection to what she said, Your Honor.

12            THE COURT:  Overruled.

13   BY MR. DAVIS:

14   Q.  Did you have trouble getting money from Ingrid?

15   A.  No, sir, I didn't.  At the time I didn't.  I didn't know

16   that they had a falling out with each other until I came

17   back.

18   Q.  Did there come a time when you gave Hartline a bank

19   account as opposed to the mail address?

20   A.  Yes, sir, I did.

21   Q.  Was that to make sure that the money got to you faster?

22   A.  Yes, sir.

23   Q.  But bringing it back up to the time you are no longer

24   dealing with Ingrid but you are in touch with Hanky?

25   A.  Yes, Hanky.
```

1  Q.  Now I will ask you, did you get a letter from Hartline

2  discussing Hanky?

3  A.  Yes, sir.

4  Q.  I want to show you what has been marked as Government's

5  Exhibit 46.  Can you see that letter, Mr. Barnes?

6  A.  Yes, sir.

7  Q.  And can you recognize who that letter is from?

8  A.  Yes, sir.

9  Q.  And who is that letter from?

10  A.  It's from Deronda Hartline.

11  Q.  And did she use this name "Deb," when she wrote to you?

12  A.  Yes.

13  Q.  And did she call you "Stranger"?

14  A.  Yes, sir.

15  Q.  Now, do you see the name right in there, "Hanky"?

16  A.  Yes, sir.

17  Q.  Just a take a minute to read this letter and tell me what

18  this letter communicates to you.

19  A.  It's, "Hi, Stranger:

20      "Listen, I just want to let you know I sent two more to

21  Hanky for the attorney, but make sure when we go shopping for

22  my friend, he gets only the specific items, okay?  We have

23  one silver chain with cross, four bottles of women's cologne,

24  four bleach packets with peroxide, 30 eyeliners wild colors,

25  30 polishes, wild colors.

*Alfred Barnes - Direct*

1      "If there is more left get more polishes.  If there is

2  not enough to get the above listed items, take a few off.

3      "I'll call Hanky within the next few days to see if you

4  received this.  Once you get ready to see my --"

5      I can't see the bottom.

6  Q.  I'm sorry.

7  A.  "See my friend --"

8  Q.  Just hold one second.  I will pull it out.  I don't want

9  to make you seasick.  Can you still read that?

10  A.  Yes, sir.

11      "See my friend, call Hanky, so she'll know pretty much

12  when to expect them.  Okay?  Hopefully we'll see you soon.

13      "Sincerely, Deb."

14  Q.  When you got this letter, what did you understand

15  Hartline to be asking of you?

16  A.  She was asking me to get in contact with Hanky, and I

17  would call Hanky and give Hanky an address to send the money

18  to me.

19  Q.  Did you call Hanky?

20  A.  Yes, sir, I did.

21  Q.  And did you give Hanky an address?

22  A.  Yes, sir.

23  Q.  And did he, in fact, send you a money order?

24  A.  Yes, sir.

25  Q.  I would like to show you what has been marked for

1    identification as Government's Exhibit 48.

2        Do you see that exhibit marked for identification as

3    Number 48?

4    A.   Yes, sir.

5    Q.   And can you see that -- do you want me to go in closer on

6    that?

7    A.   I can see it.

8    Q.   Whose handwriting is on that money order?

9    A.   That's my handwriting.

10   Q.   And what amount is this money order for?

11   A.   $600.

12   Q.   And what is the date on this money order?  Can you see

13   that?

14   A.   It looks like November 18th, 2005.

15   Q.   2005.  Is this the original of the money order you

16   received?

17   A.   Yes, sir.

18       MR. DAVIS:  Your Honor, the government would move

19   Exhibit 48 into evidence.

20       MR. FINDLEY:  No objection.

21       THE COURT:  Government 48 is admitted.

22   **(GOVERNMENT EXHIBIT NO. 48:**  Received in evidence.)

23   BY MR. DAVIS:

24   Q.   Let me move in a little bit closer.

25       Now, did this, as well as you can recall, did this come

1   to you in blank?

2   A.  It was a blank money order.

3   Q.  And did you sign your name there?

4   A.  Yes, sir, I did.

5   Q.  And you signed the "from name" as well?

6   A.  Yes, sir.

7   Q.  And that's for $600; is that correct?

8   A.  Yes, sir.

9   Q.  Now, when you received this money order, what did you do?

10  A.  I filled it out, went to my bank, and I cashed it.

11  Q.  What did you do with the money?

12  A.  The money I purchased contraband from packs of

13  cigarettes, and I brought them back in.  I don't know exactly

14  when I brought them back in, but I know it was a purchase of

15  cigarettes that I brought back in to Deronda Hartline.

16  Q.  I want to show you what has been admitted as Government's

17  Exhibit 49.  Do you recognize that?

18  A.  Yes, sir.

19  Q.  What is that?

20  A.  That's 305 cigarettes, that's nail and clear polishes,

21  eyeliner pencils, we've got earrings, we've got pencil

22  sharpeners.

23  Q.  Is that the contraband that you brought in?

24  A.  Yes, sir.

25  Q.  The list mentions a cross, cologne, Black & Milds.

1   A.   That's correct.

2   Q.   I'm looking at Government's Exhibit 46.  Did you just

3   decide to buy something else?

4   A.   No.  Like I say, I didn't bring everything in at one

5   time.

6   Q.   Okay.  Thank you.

7        Now, you say you brought contraband in for Delores

8   Hamlet.  Is that true?

9   A.   Yes.

10  Q.   What did you bring in to Delores Hamlet?

11  A.   I brought her cartons of cigarettes.

12  Q.   Was this before or after cigarettes banned on the

13  compound?

14  A.   This was after they were banned.

15  Q.   Were cigarettes more available after they were banned on

16  the compound?

17  A.   Yes, sir, they were very valuable.

18  Q.   What was your arrangement with Delores Hamlet?

19  A.   My arrangement was that I would bring her cartons of

20  cigarettes, and she would pay me cash money.

21  Q.   She would pay you cash money for it?

22  A.   Yes.

23  Q.   How much did she pay you for a carton of cigarettes?

24  A.   When we first started off, I think she gave me -- I gave

25  her I think four cartons of cigarettes, and she initially

*Alfred Barnes - Direct*

1   gave me $200 in cash that she got from visitation in some

2   type of way.

3   Q.  So that's four cartons for 200.  Was that $50 a carton?

4   A.  Yes, sir, but normally they would go higher than that.

5   Q.  So normally they would go higher?

6   A.  Yes, sir.  What I was doing, basically, was like fronting

7   her, and eventually when she got more money, she would come

8   to me and give it to me.

9   Q.  So that was basically, as you say, fronting cigarettes?

10  A.  Yes, sir.

11  Q.  And she would take the cigarettes and sell them on the

12  compound?

13  A.  Yes, sir.

14  Q.  And split the money with you?

15  A.  Whatever money she could get, she would, like I said, she

16  was dealing with cash money with me, and whatever she could

17  get through visitation, whatever type of way she was getting

18  it, it normally would be cash money.

19  Q.  Okay.  Were you also selling cigarettes to Steven Brinson

20  down at the jail?

21  A.  It wasn't cigarettes.  It was the Bugle tobacco.

22  Q.  Okay.  Tobacco?

23  A.  Correct.

24  Q.  That's loose tobacco?

25  A.  Yes, sir, Bugle packs.

*Alfred Barnes - Direct*

1    Q.  With rolling papers?

2    A.  Yes, sir.

3    Q.  And how much were you selling them to him for?

4    A.  Normally, he would try to make as much as he can.  It

5    might be $600 for rolling it up, but he could make 800

6    according to how he packaged the loose tobacco up, and he

7    would have his girlfriend or wife send maybe 250, at one time

8    it might be 3.

9    Q.  Was that per pack of Bugle tobacco, or did it come in a

10   large container?

11   A.  Well, the container I brought in was the large Bugle

12   tobacco.  It's a big can.

13   Q.  Okay.

14   A.  And I don't know how much loose tobacco is in it, but it

15   also had the wrappers in it, also.  Whatever he could make

16   off of it, you know, normally he would send me half of it.

17   Q.  Now, did there come a time when you spoke with Gregory

18   Dixon about contraband?

19   A.  Yes, sir.

20   Q.  And when was that?

21   A.  I don't know exactly the year, but I know there was a

22   conversation about contraband and about making money.

23   Q.  Do you know what kind of contraband you were talking

24   about?

25   A.  Cigarettes.

*Alfred Barnes - Direct*

1   Q.   So, does -- if it was cigarettes, would it -- when were

2   cigarettes available on the compound?

3   A.   If I'm not mistaken, I think, when they were available, I

4   think they stopped in -- it might have been mid 2005.   I

5   think initially they stopped, if I'm not mistaken, they were

6   actually banned.   So, it had to be anywhere -- I think after

7   2005 or --

8   Q.   So, when you had this conversation with Mr. Dixon, what

9   did you say or what did he say?

10  A.   It was basically about how you make money off of

11  cigarettes, get with the inmates and giving them an address,

12  and they would send you money orders.   You get the money, you

13  go buy the cigarettes, and bring it back to them.

14  Q.   So, you were discussing an address.   Who said what?   What

15  did Mr. Dixon say to you?

16  A.   I think it was basically, like, you find somebody that

17  you are comfortable with, they provide them --

18  Q.   Okay.   Did Mr. Dixon say that to you?

19  A.   Yes, sir.

20  Q.   What did he say?

21  A.   It was basically, like, if you can find an inmate that

22  you comfortable with, you can have them -- you give them an

23  address, and they can send you money, and you can go out and

24  purchase cigarettes and bring them back to them, and double

25  your money.   Some type of conversation like that.

*Alfred Barnes - Direct*

768

1   Q.  Now, had you been engaged in the contraband scheme with

2   Deronda Hartline and Shonnie Daniels at this time?

3   A.  Yes, sir.  So, it wasn't knew to me what he was saying.

4   I was already involved in it.

5   Q.  So he wasn't telling you anything new?

6   A.  No, sir.

7   Q.  Did Mr. Dixon tell you anything about him bringing in

8   contraband?

9   A.  He might've mentioned vaguely or something like that.  I

10  don't know exactly what he said.

11  Q.  Do you see Mr. Dixon here in the courtroom here today?

12  A.  Yes, sir.

13  Q.  You know Mr. Dixon?

14  A.  Yes, sir.

15  Q.  Can you point him out to the court?

16  A.  Yes, sir.

17  Q.  And what is her wearing?

18  A.  He's wearing kind of like a tan suit there with a brown

19  tie.

20          MR. DAVIS:  Your Honor, if the record would reflect

21  that Mr. Barnes has identified Defendant Dixon.

22  BY MR. DAVIS:

23  Q.  Did you ever switch units with other corrections

24  officers?

25  A.  Yes, sir.

*Alfred Barnes - Direct*

769

1   Q.   And who did you switch units with?

2   A.   I switched with Officer Dixon.

3   Q.   Now, why did you want to switch units?

4   A.   I was switching to get away from the pressure of Shonnie

5   Daniels.

6   Q.   Do you remember when this was?

7   A.   Yes, sir.  I may not know exactly, but it had to be 2004.

8   It might have been early March of -- might have been the

9   first quarter of 2004, January, February, or March.  I know

10  it was the year of 2004.  That might not be exact.

11  Q.   Where were you stationed at the time?

12  A.   Well, I was in F unit.

13  Q.   Did you discuss with Mr. Dixon why you wanted to leave F

14  unit?

15  A.   Yes, we discussed it.  I was telling him that I was

16  trying to, you know, get the pressure, getting away from

17  Shonnie.

18  Q.   You told him you wanted to switch to get away from

19  Shonnie Daniels?

20  A.   Yes.  You know, I know her name was hot, it was all over

21  the compound, inmates talking, and the pressure and stress.

22  Q.   Where was Mr. Dixon at that time?

23  A.   I think he was assigned to the Federal Detention Center.

24  Q.   So, did you want to switch to the Federal Detention

25  Center to get away from the females altogether?

1    A.  Yes, sir.

2    Q.  Did Mr. Dixon tell you why he wanted to switch?

3    A.  Well, sometimes he would say he wanted to switch just to

4    come over to F unit to see Bowie, or sometimes he might say

5    that he can get his mail by being there in the morning

6    instead of coming all the way over from the detention center

7    to do it.

8    Q.  So, sometimes he had reasons like he just wanted to check

9    his mail?

10    A.  Yes, sir.

11    Q.  But did you just testify that he told you he wanted to

12    switch to F unit to see Bowie?

13    A.  Yes.

14    Q.  Would that be Sabrina Bowie?

15    A.  Correct.

16    Q.  Did he tell you anything else about Sabrina Bowie?

17    A.  I think it was a general conversation about her breasts,

18    think she had breasts augmentation, or she had a breast job.

19    Some dealings with sex, you know, to get to that, you know, I

20    want to get over there to Bowie, because I want to get me

21    some.

22    Q.  He said, "I want to get me some"?

23    A.  Yes, sir.

24    Q.  Did you ask Mr. Dixon to switch shifts or did he ask you

25    to switch shifts?

*Alfred Barnes - Direct*

1   A.   Sometimes I might ask him, but sometimes he would ask me.

2   Q.   So he would ask you and you would ask him?

3   A.   Yes, sir.

4   Q.   And when you asked him, did he agree?

5   A.   Yes, sir.

6   Q.   And when he asked you, did you agree?

7   A.   Yes, sir.

8   Q.   How often did you switch shifts?

9   A.   Around that time it could have been anywhere from

10  three weeks, maybe 15 days.  I don't know exact.  I knew it

11  was several times.

12  Q.   Was it more than one day?

13  A.   Oh, yes, sir.

14  Q.   Now, after you had a shift, did you ever see Mr. Dixon

15  after you had switched shifts?

16  A.   Yes, sir.  I might see him before work.  Sometimes before

17  work, sometimes after work in the parking lot, or sometimes

18  before we go in on the midnight shift.

19  Q.   Did Mr. Dixon say anything to you in those times?

20  A.   I don't know exactly what it was, but, like, it might

21  have been, like, do you want to switch the next day; or, you

22  know, I seen Bowie -- it was something dealing with Bowie.

23  Q.   He said I've seen Bowie?

24  A.   Or I was with Bowie last night, or I've seen her, or it

25  was dealing with Bowie, but I couldn't tell you exactly what

*Alfred Barnes - Direct*

1    it was.

2    Q.  Did he ever say he had sex with Bowie?

3    A.  Yes.  It was something like, I'm going -- not sex, but

4    I'm going to get me some tonight, or something like that, you

5    know.  He didn't exactly say "sex," but it was something that

6    I knew it was sexual.

7    Q.  You understood it to be sex?

8    A.  Yes.

9    Q.  Did Mr. Dixon tell you anything about contraband and

10   Bowie?

11   A.  He might have mentioned one or two times about contraband

12   dealing with her.  He might have said it some type of way,

13   but I can't recall exactly.

14           MR. HARPER:  Your Honor, then I move that to be

15   stricken.

16           THE COURT:  Overruled.

17           MR. DAVIS:  May I have one moment, Your Honor.

18           THE COURT:  You may.

19   BY MR. DAVIS:

20   Q.  How well did you know Mr. Dixon?

21   A.  I've been knowing Mr. Dixon since when I arrived at the

22   FCI in 1994.

23   Q.  And you say you saw him in the parking lot or when shift

24   changed and you would talk?

25   A.  Yes, sir.

*Alfred Barnes - Direct*

773

1    Q.  Did you talk with him otherwise when you were on duty?

2    A.  Yes.  We might talk about different things that he was

3    doing, like fishing and, you know, planting gardens, which he

4    liked to do a lot.  Basically, we'd talk about fishing, and,

5    you know, just talk about planting gardens.  He loves to

6    plant vegetables and loves to go fishing.

7    Q.  Did you like fishing?

8    A.  Yes, sir.

9    Q.  Did you ever go fishing with Mr. Dixon?

10   A.  No, sir.

11   Q.  Did you ever see Mr. Dixon outside of work?

12   A.  No, sir.

13   Q.  Did you ever call Mr. Dixon or speak with him over the

14   telephone when you were at work?

15   A.  Yes, sir.

16   Q.  Did there come a time when you spoke to Mr. Dixon over

17   the phone and you heard Shonnie Daniels in the background?

18   A.  Yes, sir.

19   Q.  Can you tell us about that?

20   A.  It was a conversation, if I'm not mistaken, we were

21   working the evening shift, which is the 4 p.m. to 12 midnight

22   shift.  I was assigned to the Federal Detention Center, and

23   Mr. Dixon was assigned to the FCI housing unit, and he had

24   gave me a call in reference to Shonnie Daniels.

25   Q.  And you heard his voice on the other end of the line?

*Alfred Barnes - Direct*

1    A.   Yes, sir.

2    Q.   Did you hear anything else?

3    A.   I could hear Shonnie Daniels in the background.

4    Q.   And what did Mr. Dixon say to you?

5    A.   He asked me something like, is Shonnie cool.

6    Q.   What does "cool" mean?

7    A.   For me I'm thinking that she's down, she's an old stick,

8    that she's willing to do things with.

9    Q.   What did you answer back?

10   A.   I said, yeah, she's cool, she's cool with me.

11   Q.   Now, you testified that you talked to Mr. Dixon when you

12   were at work or on shift changes and in the parking lot?

13   A.   Yes, sir.

14   Q.   Did you have a conversation with Mr. Dixon in the parking

15   lot that you recall?

16   A.   Yes, sir.

17   Q.   And what happened during that conversation?

18   A.   I don't know exactly, it was something dealing with what

19   happened in F unit the night before, or contraband.

20   Something dealing with Bowie, Sabrina, sex.

21   Q.   Was there a time when you were having sex with Shonnie

22   Daniels?

23   A.   Yes, sir.

24   Q.   Were you almost caught on one occasion?

25   A.   Yes, sir.  I was telling him about the -- it was a

1  midnight shift, and Shonnie came over to the office.  I think

2  it was F.  And one of the other inmates had crossed over

3  through the corridor, and we was having oral sex there in the

4  office, and one of the inmates like walked in on.

5  Q.  So, you were in F unit?

6  A.  Yes, sir.

7  Q.  And Shonnie Daniels came to see you in the office?

8  A.  Yes, she came from C unit.

9  Q.  And was she performing oral sex on you?

10  A.  Yes, sir.

11  Q.  And it was your testimony that another inmate was

12  crossing over and almost caught you?

13  A.  Yes, sir.  And I was telling Dixon something about it.  I

14  think that's when we got off from work, that we almost got

15  caught.

16  Q.  So, your testimony is that you told Officer Dixon that

17  you almost got caught with Shonnie Daniels having sex?

18  A.  Yes.

19  Q.  What did Officer Dixon say?

20  A.  He just said, you have to be more careful.

21  Q.  Do you know Officer Moore?

22  A.  Yes.

23  Q.  Do you see him in the courtroom here today?

24  A.  Yes, sir.

25  Q.  Can are you describe what he's wearing?

*Alfred Barnes - Direct*

1    A.   He's the African-American male there with a purple suit

2    on, purple tie, white shirt.

3            MR. DAVIS:   If the record will reflect that the

4    witness identified Defendant Moore.

5    BY MR. DAVIS:

6    Q.   Did you ever have any conversations with Officer Moore?

7    A.   Yes, sir.

8    Q.   Were you friendly with Officer Moore?

9    A.   Yes, sir.

10   Q.   What was the nature of your friendship with Officer

11   Moore?

12   A.   Just a friendship that started at the time I started

13   working there, and we talked about fishing.   We went fishing

14   I think once.

15   Q.   So you met him once outside of the office going fishing?

16   A.   I've seen him several times after work, but I know that

17   one time we went fishing together.

18   Q.   Was there an occasion when you asked Officer Moore to let

19   you see Shonnie Daniels?

20   A.   Yes.

21           MR. HARPER:   Objection to the leading form of the

22   question.

23           THE COURT:   Overruled.

24   BY MR. DAVIS:

25   Q.   Would you describe that occasion?

*Alfred Barnes - Direct*

1   A.   It was the occasion that I was working the midnight

2   shift, the 12 midnight to 8:00 shift at the FCI.  I was

3   assigned to F unit.  He was assigned to C unit.  I had

4   another Officer Evans who had switched with me, because he

5   couldn't go to the Special Housing Unit that night.  He

6   didn't want to go there, because there was another inmate

7   locked up, and he was saying to me that, do you want to go

8   count the housing unit, because there's an inmate over there

9   that they didn't want to have contact with.  So, me and him

10  switched.  I went to the housing unit to count it.

11  Q.   What was Officer Evans' assignment?

12  A.   He was working the compound.

13  Q.   Okay.  So, you were in F unit?

14  A.   Correct.

15  Q.   You switched with Officer Evans, who had compound?

16  A.   Yes, sir.

17  Q.   And that was so Officer Evans wouldn't have to go to the

18  SHU; is that correct?

19  A.   Correct.

20  Q.   And then did you do the rest of the count for the

21  compound for him?

22  A.   I don't know exactly if I did all of the housing unit

23  count.  I know I counted the SHU.

24  Q.   Okay.

25  A.   I couldn't tell you exactly if I counted all of the rest

*Alfred Barnes - Direct*

1    of the housing units.

2    Q.  Okay.  But you were still compound officer at that point?

3    A.  Yes, sir.

4    Q.  What did you do when you were compound officer at that

5    point?

6    A.  I remember going to C unit and seeing Officer Moore.

7    Q.  And what did you say to Officer Moore?

8    A.  I told him that I wanted to see Shonnie Daniels, I had

9    had something for her.

10   Q.  Is that what you recall telling him?

11   A.  Yes, sir.

12   Q.  And what happened?

13   A.  Well, we exchanged keys.  I had the compound keys that

14   opens the front door to C unit.  I got his keys, which allows

15   me access to the wing doors in the administrative area.

16   Q.  I'm going to show you a schematic so you can show us

17   where these doors are.

18       What keys do you have you say?

19   A.  It's a compound key.  It's a key that allows you access

20   to the housing units on the compound.

21   Q.  Would that permit you to open this door here?

22   A.  Yes, sir.

23   Q.  Would your compound keys permit you to open any other

24   doors in that C unit there?

25   A.  No, sir, not that I can recall.

*Alfred Barnes - Direct*

1    Q.  When you walked in the C unit, you were able to open the

2    door to get in; is that correct?

3    A.  Correct.

4    Q.  Where was Officer Moore?

5    A.  Officer Moore was in the office area.

6    Q.  Can you show us that on the diagram?

7    A.  If I'm not mistaken, it's right in front of the door as

8    you initially come in.

9    Q.  Okay.  Did you approach Officer Moore and ask him for the

10   keys?

11   A.  Yes, sir.

12   Q.  What did Officer Moore say?

13   A.  He gave me the keys.

14   Q.  He gave you the keys?

15   A.  Yes, sir.

16   Q.  Now, when you took those keys, what doors did you open?

17   Can you just touch the --

18   A.  Yes, sir.  I went to the C south side, which is there.

19          THE COURT:  Mr. Barnes, the machine gets real

20   sensitive if you drag too close to it, so you need to come in

21   more directly when you're marking on the screen.

22          THE WITNESS:  Yes, sir.

23   BY MR. DAVIS:

24   Q.  Can you show us the first door that you opened?

25   A.  (Witness complies.)

*Alfred Barnes - Direct*

1    Q.  Okay.

2    A.  That's the C south, wing door.

3    Q.  What happened after you opened that door?

4    A.  I went around to the cubicle of Shonnie Daniels.

5    Q.  So, do you know where Shonnie Daniels' cubicle was?

6    A.  Yes, sir.

7    Q.  And can you show us on this map?

8    A.  That might not be -- I might be one off there, but that's

9    the general location.

10   Q.  She was generally in that location right there?

11   A.  Yes, sir.

12   Q.  So, you walked in, walked down that aisle to see Shonnie

13   Daniels?

14   A.  Yes, sir.

15   Q.  Did you do anything more after that?

16   A.  I woke her up.

17   Q.  You woke her up?

18   A.  Yes, sir.

19   Q.  And then what did you do after you woke her up?

20   A.  I just told her to stay right there, I would come back to

21   her.  So, what I did there, she woke up and stood on the side

22   of her bed there.  And what I did then, I made a round on the

23   south side, down the aisle, through the back of the bathroom

24   areas, just to make sure there no other inmates was up moving

25   around.

*Alfred Barnes - Direct*

1  Q.  And did you find any inmates that were up and moving

2  around?

3  A.  No, sir.

4  Q.  After you found that no inmates were up and moving

5  around, what did you do?

6  A.  I went and unlocked the door first.

7  Q.  Which door did you unlock?

8  A.  The door to go back to that administrative area.

9  Q.  Can you mark that one?

10  A.  (Witness complies.)

11  Q.  Okay.  So, I just want to be clear, because there are a

12  lot of marks on this screen.

13     Is this where you're saying Shonnie Daniels's bunk was?

14  A.  Yes, sir.

15  Q.  That's marked with a zero?

16  A.  Correct.

17  Q.  And is this square where the door is?

18  A.  Yes, sir.

19  Q.  Okay.  I'm going to knock these off.  If you want to put

20  them back on, I'm just having trouble seeing it.

21     Now, after you had unlocked that door going in the back

22  area there, what did you do?

23  A.  I came back to the cube where Shonnie was.  I basically

24  just stood in the hallway.  She could see me standing right

25  there, and I gave her a signal to come towards me.

1   Q.   And what did she do?

2   A.   She came towards me.

3   Q.   And where did you go after that?

4   A.   We went back to the administrative area.

5   Q.   And what did you do when you went back there?

6   A.   We went into a staff bathroom.

7   Q.   And what did you do in that staff bathroom?

8   A.   We had sex in the staff bathroom.

9   Q.   Can you just put your pen right down and put a point

10  where that staff bathroom is?

11  A.   (Witness complies.)

12  Q.   Okay.  Was that staff bathroom locked?

13  A.   No, sir.  It was unlocked.

14  Q.   After you had sex with Ms. Daniels, what did you do?

15  A.   Well, I came out first to make sure no inmates were

16  moving around, I just let her stay where she was.  I did a

17  general walk around to make sure no inmates was moving.  Then

18  I gave her a signal through the door where she can see me

19  through the opening in the door there.  She came back out,

20  and she went back to her cube.  I locked the door where she

21  had came out of, and I left and departed.  I locked the wing

22  door back and went back to the office where Moore was.

23  Q.   What did you do with the keys that you had?

24  A.   After I have secured the wing door back, I gave him his

25  keys back.

*Alfred Barnes - Direct*

1   Q.  Did you say anything to him?

2   A.  I just told him that I talked to Shonnie, and I was okay,

3   I was going back on the compound.

4   Q.  Now, after that night, did there come a time when you

5   talked to Officer Moore again?

6   A.  Yes, sir.

7   Q.  Do you recall when that was?

8   A.  I don't know exactly.  It could have been a week after

9   that or two weeks.

10  Q.  What happened?

11  A.  He was talking about the incident that night that, I know

12  you had sex in the bathroom, because I went in there after

13  you, and I could smell the odor.

14  Q.  So, he told you that he knew that you had sex in the

15  bathroom; is that correct?

16  A.  Yes, sir.

17  Q.  And what did you say back to Mr. Moore?

18  A.  I kind of like shrugged it off and laughed.  I didn't

19  really deny it, but I didn't really confess to it, also.

20  Q.  Did you have any further discussions with Officer Moore

21  concerning this incident?

22  A.  Yes, sir.  I couldn't tell you exactly how long after

23  that first initial talk about that, it could have been

24  another month, but it was always about that incident in the

25  bathroom.  He didn't -- he talked about me putting him in a

*Alfred Barnes - Direct*

1  situation like that, that he don't appreciate me putting him

2  in a situation like that, and he hoped that nothing would

3  come out of this.

4  Q.  Did Officer Moore ever express interest in Shonnie

5  Daniels?

6  A.  He had talked about her a little bit, you know, he didn't

7  say exactly he didn't have no contact with her, but he always

8  had the mindset that he -- if he wanted some of that, he

9  could get it.

10  Q.  You say, if he wanted some of that, what does that mean?

11  A.  That means that he thought that he could get with her

12  sexually, if he really pushed the -- really pushed it.

13  Q.  Now, you say that he said he thought he might be able to

14  have a relationship with Shonnie Daniels.

15       MR. HARPER:  Object to the characterization of the

16  testimony.

17       THE COURT:  Sustained.

18  BY MR. DAVIS:

19  Q.  Did Officer Moore ever work in a unit with Shonnie

20  Daniels?

21  A.  Yes, sir.

22  Q.  Do you know of anything unusual that occurred when he

23  worked in that unit with Shonnie Daniels?

24  A.  Yes, sir.

25  Q.  What do you know about that?

*Alfred Barnes - Direct*

785

1    A.  Shonnie used to got early sometimes, go in the pill line,

2    which comes out early in the morning.  And she would

3    eventually come all the way down the compound to F unit where

4    I was.

5    Q.  So, how would Shonnie get out on the pill line?

6    A.  Officer Moore would have to let her out.

7    Q.  Do you know if Shonnie Daniels had a card for the pill

8    line?

9    A.  As I can recall, she wasn't a diabetic or anything like

10   that.

11   Q.  And Ms. Daniels would come over to see you.  Is that what

12   you testified?

13   A.  Yes, she would come over to F unit, or sometimes she

14   would come to G unit.

15   Q.  Did you ever ask Officer Moore for any other favors

16   concerning contact with inmates?

17        MR. HARPER:  Objection, Your Honor, to the form of

18   that question.

19        THE COURT:  Overruled.

20        THE WITNESS:  Can you repeat it again?

21   BY MR. DAVIS:

22   Q.  Did you ever ask Officer Moore for any other favors for

23   your contacting inmates?

24   A.  No, sir, not that I can recall.

25   Q.  Did you ever talk to Officer Moore about other inmates?

*Alfred Barnes - Direct*

1    A.   Yes, sir.

2    Q.   What other inmates?

3    A.   There was an inmate in his unit named Deborah Luna.

4    Q.   What did you discuss about Inmate Luna?

5    A.   It was dealing with -- Shonnie had told me that --

6    Q.   What did you and Mr. Moore discuss?

7    A.   We discussed about her body, about the clothing she wear,

8    and that her -- that the print around her vagina is real huge

9    and real large.

10   Q.   What is "a print"?

11   A.   When she be wearing the shorts, it's got a -- it's like a

12   print that stays in front of the female that shows her vagina

13   area, and it was very huge and very large, was the

14   conversation he was telling me about.

15   Q.   Now, who was telling whom?

16   A.   Moore was telling me about Luna.

17   Q.   So, Moore was telling you this?

18   A.   Yes, sir.

19   Q.   Did there come a time when you shared the control booth

20   with Officer Spence?

21   A.   Yes, sir.

22   Q.   Did you talk with Officer Spence?

23   A.   Yes, sir.

24   Q.   And what did you discuss with Officer Spence?

25   A.   We were having a conversation about an indictment list

*Alfred Barnes - Direct*

1    that was out dealing with several staff members that was on

2    this list.

3    Q.  Did he tell you what names he thought were on this list?

4    A.  Yes, sir.

5    Q.  And what names did he tell you?

6    A.  He mentioned he was on the list, I was on the list, Dixon

7    on the list, Hill was on the list.  He said Jimmy Knight was

8    on the list.  And I think that's all of the names I can

9    recall, sir.

10   Q.  Did you ever have a discussion with any other officers

11   concerning this list?

12   A.  Yes.

13   Q.  And who did you discuss this list with?

14   A.  Officer Dixon.

15   Q.  Do you recall what you said to Officer Dixon about this

16   list?

17   A.  Yes, sir.  It was talk basically about the same thing,

18   Spence was talking about these names that were supposedly be

19   on this indictment list, and I was basically trying to tell

20   him that in the past, dealing with me, normally the SIA, SIS,

21   they would call you in and question you about an

22   investigation dealing with females.  And I thought there was

23   no validity to the list, because I had been through

24   investigations before, and I just told him, there couldn't be

25   nothing to them, because the way the investigation went in

*Alfred Barnes - Direct*

 1   the past, if something come up on you, they normally will

 2   call you in and question you about it.  And if there's

 3   something to it, they will reassign you to the FDC.  And I

 4   was told him that, if they ain't call you in and question you

 5   about it, then there can't be no validity to it, because of

 6   my past.

 7   Q.  And who were you telling that to?

 8   A.  Officer Dixon.

 9   Q.  And did there come a time when Officer Johnson spoke to

10   you about a phone call he received?

11   A.  Yes, sir.

12   Q.  And what did that conversation involve?

13   A.  It was a phone call from Sabrina Bowie, and he wasn't

14   fully comfortable with the phone call.  He thought maybe the

15   phone was wired, and that he used one of his roommates to

16   talk to her on the telephone.

17   Q.  Do you know who that roommate was?

18   A.  I don't know exactly who it was, but it was somebody that

19   was staying with him at that time.

20          MR. DAVIS:  If I can have a moment, Your Honor?

21          THE COURT:  You may.

22   BY MR. DAVIS:

23   Q.  Did you know an inmate named Delores Hamlet?

24   A.  Yes, sir.

25   Q.  What was your relationship with Delores Hamlet?

1   A.   I come to the know Delores Hamlet through Shonnie

2   Daniels.  They have this thing on the compound, that these

3   inmate would have different inmates that their mother, and

4   she was like a mother figure for Shonnie Daniels, and Shonnie

5   had told her to come and see me.

6           MR. HARPER:  Objection.

7           THE COURT:  Sustained.

8   BY MR. DAVIS:

9   Q.   Did you give contraband to Delores Hamlet?

10  A.   Yes, sir, I did.

11  Q.   How did you get contraband to Delores Hamlet?

12  A.   I would bring it in with me when I come to work.

13  Q.   Was she in your unit?

14  A.   No, sir.

15  Q.   How did you get in contact with her?

16  A.   Normally, the day before, she would come and holler at

17  me, and I would tell her I would bring it back the next day.

18  And she would -- if he didn't know where I was, I just told

19  her to look around the compound, in the housing unit, to find

20  me.  If you don't see me on the compound or working the

21  housing unit, you know I didn't come in that night, because,

22  if I ain't mistaken, I could've been on sick and annual, and

23  I could've been -- if I came in that night, I didn't know

24  exactly where I was assigned to.  I could've been at the

25  detention center or I could've been at the FCI.  So, I just

1    basically told her just to look and see if I'm working.

2    Q.  Did you ever contact anyone to have her sent over?

3    A.  Yes, sir.

4    Q.  And who did you contact?

5    A.  I think I called Moore one time.  I was looking for her,

6    because she wasn't -- I was -- I think the shift was coming

7    to an end, and I had something for her, and I wanted to make

8    sure I get that contraband off of me before I leave.

9    Q.  So, the something that you had for her was contraband; is

10   that correct?

11   A.  Yes.

12   Q.  Do you remember what type of contraband?

13   A.  It was cartons of cigarettes.

14        MR. DAVIS:  That's all of the questions we have at

15   this time, Your Honor.

16        THE COURT:  Cross-examine, Mr. Findley?

17        MR. FINDLEY:  Yes, sir.

18                    CROSS-EXAMINATION

19   BY MR. FINDLEY:

20   Q.  Mr. Barnes, you have admitted here today that you have

21   lied in the past; is that correct?

22   A.  Yes, sir.

23   Q.  And you have lied on numerous occasions while being

24   employed by the Bureau of Prisons; is that correct?

25   A.  Yes.

1    Q.  You've lied from 1997, when you were caught with Phyllis

2    Fleming, all the way through this year; is that correct?

3    A.  Yes, sir.

4    Q.  You lied about Phyllis Fleming?

5    A.  Yes, sir.

6    Q.  You lied about Sherrye Booze?

7    A.  Yes, sir.

8    Q.  And you lied about the inmates involved in this case; is

9    that correct?

10   A.  Yes, sir.

11   Q.  Now, you pled guilty to a mail fraud conspiracy; isn't

12   that true?

13   A.  Yes, sir.

14           MR. FINDLEY:  May I approach, Your Honor?

15           THE COURT:  You may.

16   BY MR. FINDLEY:

17   Q.  Mr. Barnes, I would like to show you what we will mark as

18   Defendant Dixon's Exhibit 15.  I will ask you if you

19   recognize that document.

20   A.  Yes, sir.

21   Q.  What is it?

22   A.  It's a Plea and Cooperation Agreement.

23   Q.  And that's with the United States Attorney's Office for

24   the Northern District of Florida; is that correct?

25   A.  Yes, sir.

*Alfred Barnes - Cross/Findley*

```
 1  Q.  All right.  And in that agreement, isn't it true that the
 2  maximum penalty that you face on the mail fraud conspiracy is
 3  a penalty of imprisonment up to 20 years?
 4  A.  That's correct.
 5  Q.  So, you've agreed to cooperate with the government,
 6  correct?
 7  A.  Yes, sir.
 8  Q.  And you are hoping to get a reduction of your sentence by
 9  cooperating?
10  A.  Yes, sir.
11  Q.  Now, in addition to the agreement with the government
12  that they may speak up for you in terms of your cooperation,
13  they also agreed to drop all of the other counts of the
14  indictment; is that correct?
15  A.  Yes, sir.
16  Q.  So, you're not pleading to any bribery counts?
17  A.  No, sir.
18  Q.  You're not pleading to any witness-tampering counts?
19  A.  No, sir.
20  Q.  You're not pleading to -- you're pleading to conspiracy
21  to commit mail fraud, correct?
22  A.  Yes, sir.
23  Q.  You are not pleading to conspiracy to commit extortion,
24  are you?
25  A.  No, sir.
```

1   Q.   And you are not pleading to conspiracy to tamper with

2   witnesses, either, are you?

3   A.   No, sir.

4   Q.   And, finally, you're not pleading with -- you're not

5   pleading guilty to conspiracy to have sex with inmates, are

6   you?

7   A.   No, sir.

8   Q.   All right.  Did the government tell you that they needed

9   your testimony?

10   A.   Yes, sir.

11   Q.   Okay.  And that, as part of that bargain, they will go to

12   bat for you at sentencing.  Is that what they told you?

13   A.   Yes, sir.

14   Q.   They will bring to the attention of the court the

15   cooperation to the extent that it's in their sole discretion

16   to do so; is that correct?

17   A.   Yes, sir.

18   Q.   And you haven't been sentenced, yet?

19   A.   No, sir.

20   Q.   And you are hoping to get some credit for this

21   cooperation at your sentencing; is that correct?

22   A.   Yes, sir.

23   Q.   And, again, only the prosecution can decide whether your

24   testimony is good enough to merit a substantial assistance

25   motion?

*Alfred Barnes - Cross/Findley*

1    A.  Yes, sir.

2    Q.  All right.  In fact, the prosecution can revoke your plea

3    agreement, if they believe you're not cooperating in a

4    sufficient way; isn't that true?

5    A.  Yes, sir.

6    Q.  All right.  And they could institute those charges again,

7    if they believe your cooperation is not sufficient; isn't

8    that true?

9    A.  Yes, sir.

10   Q.  In addition to --

11        MR. FINDLEY:  Your Honor, I would offer Defendant's

12   15 into evidence.

13        MR. DAVIS:  No objection.

14        THE COURT:  Mr. Dixon's Exhibit 15 is admitted.

15   (**DEFENDANT DIXON EXHIBIT NO. 15**:  Received in evidence.)

16   BY MR. FINDLEY:

17   Q.  Now I would like to show you Defendant's Exhibit 16,

18   which is described as -- it's a document entitled, "Factual

19   Basis For Plea," in your case, and it's dated 9/14/06.  Do

20   you recognize that document?

21   A.  Yes, sir.

22   Q.  Is that the document that states the factual basis for

23   your plea of guilty?

24   A.  Yes, sir.

25   Q.  All right.  Now, did you sign the last page of that

*Alfred Barnes - Cross/Findley*

1  document?

2  A.  Yes, sir.

3  Q.  And did you understand it when you signed it?

4  A.  Yes, sir.

5  Q.  Now, this statement of facts, this, quote, "Factual Basis

6  For Plea," end quote, does not mention Gregory Dixon, does

7  it?

8  A.  No, sir, it doesn't.

9  Q.  It identifies another co-conspirator, Mr. Johnson, but it

10  doesn't identify Mr. Dixon; is that correct?

11  A.  Yes, sir.

12  Q.  Now, there is also a specific reference in --

13          MR. FINDLEY:  Your Honor, I would move in the Factual

14  Basis For Plea, Defendant's Exhibit 16.

15          MR. DAVIS:  Object, Your Honor, relevance.

16          MR. FINDLEY:  It's impeachment.

17          THE COURT:  Overruled.  Defendant's 16 is admitted.

18      **(DEFENDANT DIXON EXHIBIT NO. 16:**  Received in evidence.)

19  BY MR. FINDLEY:

20  Q.  Now, this is a document that you signed less than

21  two months ago, September 14th.

22  A.  Yes, sir.

23  Q.  Okay.  Now, in the document, when you're describing the

24  factual basis for your plea, you mentioned at page 3 -- if

25  you could turn to page 3 --

1          MR. DAVIS:  Your Honor, it's not the defendant's

2    statement.

3          THE COURT:  That objection is sustained.

4    BY MR. FINDLEY:

5    Q.  By signing that statement, did you adopt this factual

6    basis as your statement?

7    A.  I know it wasn't the exact statement, but it was a

8    statement I did sign.

9    Q.  And in the plea agreement didn't you tell this court that

10   that was an accurate description of the facts that formed the

11   basis for your plea?

12   A.  Yes, sir.

13          MR. FINDLEY:  Your Honor, I would move it in.

14          THE COURT:  I admitted the exhibit.

15          MR. FINDLEY:  Oh, I'm sorry.  I'll continue to

16   inquire.

17   BY MR. FINDLEY:

18   Q.  Now, page 3 of this exhibit, can you turn to page 3?

19   A.  Yes, sir.

20   Q.  First paragraph -- the first full paragraph says,

21   "Defendant Barnes accepted bribes in the form of payments

22   from Inmate 15."  Is that Deronda Hartline, to your

23   knowledge?

24   A.  Yes, sir.

25   Q.  All right.  And it was in exchange for providing her with

*Alfred Barnes - Cross/Findley*

1   contraband.

2       "Inmate Number 15 would take orders from inmates who

3   would have those inmates mail money to an associate outside

4   of FCI-Tallahassee, who would then in turn use that money

5   either to purchase contraband or to provide that money to

6   Defendant Barnes to purchase contraband."

7       Done of the money -- these are the money orders that went

8   to Thomasville, Georgia, correct?

9   A.  Yes.

10  Q.  And Mr. Dixon doesn't live in Thomasville, Georgia, does

11  he?

12  A.  No, sir.

13  Q.  And none of that money went to Mr. Dixon, did it?

14  A.  No, sir.

15  Q.  The next paragraph, it says, "Defendant also accepted

16  bribes in the form of payments and sexual favors from the

17  Inmate Number 1 -- " is that Shonnie Daniels?

18  A.  Yes, sir.

19  Q.  "-- in exchange for providing her with contraband."

20      You accepted bribes?

21  A.  Yes, sir.

22  Q.  But you --

23  A.  That's what it says.

24  Q.  All right.  Those bribes that you're referring to there,

25  were in no way benefitting Mr. Dixon; is that correct?

*Alfred Barnes - Cross/Findley*

1   A.   No, sir.

2   Q.   That's correct, isn't it?

3   A.   That's correct.

4   Q.   All right.   Now, in the final paragraph, the document

5   states, "Defendant Barnes also accepted payments from an

6   individual known to him as Hanky."

7        Now that was Agent Brunner, was it not?

8   A.   I couldn't tell you exactly who it is, but I know it was

9   an agent.

10  Q.   All right.   It was an agent posing in an undercover

11  capacity as an individual that you knew as Hanky, correct?

12  A.   Yes, sir.

13  Q.   All right.   So, it was undercover agent that sent the

14  money orders through the mails to your address in -- or your

15  mother's address in Thomasville, Georgia, correct?

16  A.   I think the one -- the one for $600.

17  Q.   Right.   And, again, none of that money went to Mr. Dixon;

18  is that correct?

19  A.   No, sir.

20  Q.   That's correct, isn't it?

21  A.   That's correct.

22  Q.   All right.   Mr. Dixon lives in Quincy, Florida; is that

23  true?

24  A.   I think he stays in Quincy.

25  Q.   You don't even know?

1   A.   Well, I know he stays in the Quincy area.  I couldn't

2   tell you what specific part.

3   Q.   You've never been to his house?

4   A.   No, sir.

5   Q.   And there is absolutely no statement in this document

6   that forms the factual basis for your plea of guilt to the

7   mail fraud conspiracy that mentions Mr. Dixon; is that true?

8   A.   That's true.

9   Q.   All right.  Now, you were present at the hearing in this

10  courtroom on June 22nd, 2006, the day after your arrest.  Do

11  you recall that?

12  A.   Yes, sir.

13  Q.   And do you recall when Mr. Jansen, who was then

14  representing Mr. Dixon, asked the United States Attorney

15  whether Mr. Dixon had any involvement in the mailing, and the

16  Assistant U.S. Attorney said, no, he did not.  Do you

17  remember that?  Do you remember that?

18  A.   I can't recall exactly.

19          MR. FINDLEY:  May I approach?

20          THE COURT:  You may.

21  BY MR. FINDLEY:

22  Q.   I would like to show you a copy of the document that we

23  will mark as Exhibit 17, which is a transcript of a hearing

24  at which you were present, as you described, on June 22,

25  2006, specifically page 24, line 12:

1       "Mr. Jansen:  I have a question.  I would like the

2  government to let the court know if Mr. Dixon has --"

3          MR. DAVIS:  Objection, relevance.

4          THE COURT:  Let me see you at the bench and bring the

5  transcript, please.

6       (Conference held at side-bar.)

7          THE COURT:  Let me just say, before we get to this

8  specific one, you'll do a lot better with me if you use this

9  stuff honestly, then if you shade what this stuff is.  That

10  statement of facts -- I'm going back a minute before we get to

11  this specific one.

12          That statement of facts is written by the government.

13  It is not written by the defendant.  It frequently happens the

14  defendants tell me everything in a statement of facts is not

15  true.

16          Now, you got this man to say that everything in this

17  one was true, and maybe that's what he told me at the plea.

18  He testifies here, whatever he testifies here.

19          But when you start suggesting that that statement of

20  facts needs to be a full statement of everything that

21  happened, it doesn't.  The purpose of that statement of facts

22  is not to set out a full recitation of the government's case,

23  and it is certainly not to set out the government's case

24  against Mr. Dixon, because it is only used as a basis for the

25  plea by Mr. Barnes.

1          Now, when you start using a misleading or inaccurate

2    recitation of what a statement of facts is, or implying an

3    inaccurate view of what it is, and you're questioning, you put

4    the trial in a very awkward situation, because somebody needs

5    to tell them the truth, and it's hard for the prosecutors to

6    get up and testify to why they put that together.

7          So, you're very close to me turning to the jury and

8    explaining to them what a statement of facts is; and, if I

9    have to turn to the jury and tell them something different

10   from what you just implied, you won't like it.

11         MR. FINDLEY:  I know.

12         THE COURT:  Because your credibility with the jury is

13   going to be important before we're done.  The only message is,

14   use this stuff honestly and don't imply something that is not

15   right.

16         Now let's get to this.

17         MR. FINDLEY:  Can I say one thing for the record?

18         THE COURT:  Yeah.

19         MR. FINDLEY:  For you, really.  In the plea

20   transcript, he does say that everything in it is true, so -- I

21   know some don't --

22         THE COURT:  Sometimes they tell me that.

23         MR. FINDLEY:  I --

24         THE COURT:  Okay.  And that's fine.

25         MR. FINDLEY:  I'm concerned that the court thinks

*Alfred Barnes - Cross/Findley*

1    that --

2         THE COURT:  But he probably didn't say that's

3    everything that happened, because he wasn't, and I don't ask

4    him that.

5         MR. FINDLEY:  I didn't say that either.

6         THE COURT:  Where the privilege of advocacy stops and

7    you cross the line is clear.  I'm just saying you will do

8    better with me if you scrupulously accurate when you use this

9    stuff.

10        Let me see this here.  This is the question.  Okay.

11   What's --

12        MR. SPROWLS:  I was just wondering why an attorney's

13   out-of-court statement isn't hearsay.

14        THE COURT:  Because you're authorized to make a

15   statement on behalf of your client.  United States versus

16   Deloach, 34 F.3d 1001, a 1994 decision.

17        MR. SPROWLS:  How much of that statement --

18        THE COURT:  There's some restrictions on use of

19   government statement, but --

20        MR. SPROWLS:  The statement versus advocacy, if you

21   will, or his --

22        THE COURT:  Right.  All Mr. Davis said is not that

23   the government is aware of, that Mr. Dixon had a connection

24   with the mailing.  So, as of that point, that's what the

25   government knew.  Do you have a different position now?

1          MR. DAVIS:  No, I don't think we have any information

2    that Mr. Dixon was involved in the Deronda Hartline mailing.

3          THE COURT:  So there you go.

4          MR. FINDLEY:  So we can use it?

5          THE COURT:  You can ask him and get the answer.  He

6    was present when this was said?

7          MR. FINDLEY:  Yes.  I would also like to offer it as

8    an admission by party opponent as evidence.  He can argue that

9    it means what it --

10         THE COURT:  Okay.  Don't do it with this witness.  I

11   will let you read this later, just publish it.  I'm not going

12   to put the whole transcript in, but I'll let you read this in

13   when you get to your case, that this question was asked and

14   this was the answer given in a court proceeding, just read it

15   in.

16         In terms of -- you object to the substance, but in

17   terms of the mechanics, is that acceptable, the way to publish

18   it?

19         MR. DAVIS:  Yes.  I don't want to have the whole

20   thing in, but that --

21         THE COURT:  Right.

22         MR. DAVIS:  -- reading it is fine.  I would like to

23   correct the record as to who wrote that statement and whether

24   or not it needed to contain everything in order to have a

25   plea.

1          THE COURT:  You can do that on redirect.

2          MR. DAVIS:  Okay.  But I don't think he knows that,

3   Your Honor.  I mean, I didn't coach him on what his plea meant

4   or anything like that, that's why he --

5          THE COURT:  Oh, you can ask him who wrote it.  You

6   can say something along the lines of, did anybody suggest that

7   this was supposed to be a full statement of everything that

8   happened?  Did anybody suggest this was supposed to indicate

9   what Mr. Dixon did?  Those are leading, but that gets the

10  point out.  It counters the questions on the other side.

11  There's really not any evidence on either side.  It's all

12  lawyer questions.  That will even up the field.

13         MR. FINDLEY:  Okay.

14         THE COURT:  If you'll do that, again, scrupulously,

15  accurately.

16         MR. DAVIS:  I try, Your Honor.

17     (End of side-bar conference.)

18         MR. FINDLEY:  May I approach, Your Honor?

19         THE COURT:  You may.

20  BY MR. FINDLEY:

21  Q.  Mr. Barnes, before that break, we were discussing the

22  transcript of the hearing on June 22, 2006, in this court,

23  and you were present, and Mr. Jansen asked, on behalf of

24  Mr. Dixon, "I have a question.  I would like the government

25  to let the court know if Mr. Dixon had any involvement in the

1    mailing, in any of the mailings.  I think that's important as

2    far as the events."

3        And Mr. Davis answered:  "Not that the government is

4    aware of, Your Honor."

5        Would you agree that Mr. Dixon was not involved in the

6    mailings?

7    A.  During that hearing, there, I don't think he had anything

8    to do with it.

9    Q.  Okay.

10       Now, you mentioned in your direct testimony that there

11   were times that you had been alleged to have been involved in

12   misconduct with Ms. Fleming and with Mr. Booze, and you were

13   sent down to the FDC?

14   A.  Correct.

15   Q.  And the FDC is the male institution?

16   A.  Yes, sir.

17   Q.  And the females are housed up the Hill, so to speak, at

18   FCI-Tallahassee; is that correct?

19   A.  Yes, sir.

20   Q.  And those are the units that involve the actions in the

21   alleged conspiracy in the indictment; is that correct?

22   A.  Yes, sir.

23   Q.  FDC is not involved in any of the acts that are involved

24   in the indictment; is that true?

25   A.  That's true.

*Alfred Barnes - Cross/Findley*

1   Q.  All right.  In fact, you were in the FDC just prior to

2   the time -- to the end point of the indictment; isn't that

3   true?  You were in the FDC from, was it, for practically all

4   of 2005?

5   A.  Yes, sir.

6   Q.  All right.  Now, when you -- now, you mentioned that on

7   occasion you would switch assignments with Mr. Dixon.

8   A.  Yes, sir.

9   Q.  And oftentimes that was for innocent reasons, was it not?

10  I mean, sometimes you wanted to get three days in a row for a

11  weekend; is that correct?

12  A.  I have done it in the past.

13  Q.  All right.  Were there other innocent reasons for

14  switching assignments with other guards?

15  A.  No, sir.

16  Q.  No, sir?

17  A.  Just switching --

18  Q.  Just to switch, just to switch, I want to have this day,

19  and you can have this day.

20  A.  Oh, yes.

21  Q.  That happened?

22  A.  I have done that.

23  Q.  Okay.  Now, you talked about several contraband

24  relationships, I believe was the word the Assistant U.S.

25  Attorney Davis used.  You said you had several different

 1   contraband relationships with different inmates?

 2   A.  Yes, sir.

 3   Q.  So, you had a different contraband agreement with Shonnie

 4   Daniels, for example?

 5   A.  Yes, sir.

 6   Q.  And a different agreement with Hartline?

 7   A.  Yes, sir.

 8   Q.  And a different agreement with Hamlet?

 9   A.  Yes, sir.

10   Q.  Did you have different agreements with other inmates?

11   A.  Yes, sir.

12   Q.  And those were all separate and apart from each other; is

13   that correct?

14   A.  Yes, sir.

15   Q.  All right.  Now, let me talk about your statement that

16   you made to the agents, specifically Agents Neidert and

17   Escribano.  That's N-e-i-d-e-r-t and E-s-c-r-i-b-a-n-o.

18        MR. FINDLEY:  May I approach, Your Honor.

19        THE COURT:  You may.

20        MR. FINDLEY:  This is a 302.  I won't approach on

21   that, Your Honor, but I will ask him questions.

22   BY MR. FINDLEY:

23   Q.  Now, when you spoke to law enforcement, you told them

24   that there were no other guards that were involved in the

25   offense; isn't that true?  First of all, you said you weren't

*Alfred Barnes - Cross/Findley*

1   involved in the offense, correct?

2   A.   I did say I wasn't involved.

3   Q.   And then you told them that there were no other guards,

4   to your knowledge, that brought contraband into the

5   institution; isn't that true?  That's what you told them?

6   A.   I could have said it.  I can't recall.

7   Q.   You could have said it, you don't recall.

8        Did you deny ever covering up for other employees?

9   A.   Yes, sir.

10  Q.   Okay.  Now, you talked about a very general conversation

11  that you had with Mr. Dixon about using addresses.  Do you

12  have any knowledge of any specific address that Mr. Dixon

13  ever used?

14  A.   No, sir.

15  Q.   You don't have any knowledge that he actually used an

16  address, do you?

17  A.   He talked about an address, but no specific.

18  Q.   You don't know that he used an address?

19  A.   I don't know that he used one specifically.  I can't say.

20  Q.   You don't know that he used any at all?

21  A.   No, sir, expect for what he had stated to me.

22  Q.   He never used your Thomasville address?

23  A.   No, sir, he didn't.

24  Q.   And you can't identify any address that he might have

25  used?

1    A.  No, sir.

2    Q.  So, it would be speculation for you to state that he had

3    actually used an address?

4    A.  You can call it speculation.  I'm just going by what he

5    said to me.  I didn't know --

6    Q.  Right.  You don't know.  You don't know what he said -- I

7    mean, you don't know -- he didn't identify any address for

8    you that he used?

9    A.  No, sir.

10   Q.  All right.  Now, you mentioned also one -- getting back

11   to the switching of units.  You mentioned that sometimes you

12   would switch, and it was your idea because you wanted to get

13   away from Shonnie Daniels?

14   A.  Yes, sir.

15   Q.  And that was because you were trying to break off the

16   romantic relationship with Shonnie Daniels?

17   A.  Basically just to get away from her.

18   Q.  Get away from her.  Okay.

19       And you talked to Mr. Dixon about Shonnie Daniels on one

20   occasion and asked if she's cool?

21   A.  Yes, sir.

22   Q.  Now, couldn't that have meant that she was cool when it

23   came to contraband?

24   A.  It could've.

25   Q.  Okay.  Mr. Barnes, I realize that the government hasn't

*Alfred Barnes - Cross/Harper*

1   made any promises to you regarding your cooperation, but is

2   it your expectation that you will be able to get a 5K1 motion

3   for downward departure?  Is that why you decided to plea

4   guilty?

5   A.  I pleaded guilty because I was caught.  I was guilty.

6   Q.  And isn't it true that you would like to get a reduction

7   in your sentence by cooperating with the government?

8   A.  Yes, sir.

9           MR. FINDLEY:  That's all I have.

10          THE COURT:  Mr. Harper?

11          MR. HARPER:  Thank you, Your Honor.  May it please

12  the court.

13                          CROSS-EXAMINATION

14  BY MR. HARPER:

15  Q.  Mr. Barnes, on these statements counsel was asking you

16  about, particularly, starting with one on the June 22nd of

17  '06, do you remember that?

18  A.  Yes, sir.

19  Q.  Okay.  And some of those statements you make are true and

20  some are false, or are they all false, everything you said

21  was false?

22  A.  You're talking about the statements with the agents?

23  Q.  I'm sorry.  I couldn't understand you.

24  A.  Which statements are you talking about, sir?

25  Q.  I'm talking about the one on June 22nd to Escribano and

1    Mr. Neidert?

2    A.  I remember interviewing with them.

3    Q.  I'm sorry.  I couldn't hear you.

4    A.  I remember the interview.

5    Q.  Okay.  What I'm asking you is:

6        Do you remember some of the statements being true and

7    some of your statements being false?

8           MR. DAVIS:  Objection, Your Honor.  The defendant has

9    not seen the statements.

10          THE COURT:  Overruled.  I think he was asking about

11   what he said orally, not about any written statement.  Maybe I

12   misunderstood.

13          MR. HARPER:  No, sir, that's exactly right.

14          THE COURT:  All right.

15   BY MR. HARPER:

16   Q.  Did you understand my question?

17   A.  Can you repeat again?

18   Q.  Surely.

19          THE COURT:  Mr. Barnes, I think it will help us hear

20   better if you don't get quite as close to that -- you're doing

21   a good job of keeping your voice up, and I hesitate to speak

22   to you, because I don't want you to get quieter, but if you

23   stay just a little further away from the microphone, we will

24   hear you a little bit better.  Thanks.

25   BY MR. HARPER:

1  Q.  What I'm asking you, and apparently not too well, you

2  remember first talking to these officers or talking to two

3  officers, I guess?

4  A.  Yes, sir.

5  Q.  All right.  And in talking to them you tell some true

6  things and you tell them some false things; is that right?

7  A.  Yes, sir.

8  Q.  And is that right?  Is everything true or is everything

9  false that you told them?

10  A.  Some things could've been true, some could've been false.

11  Q.  Okay.  And have you gone through the highlighter and

12  since your revelations here and since your plea in this case

13  and tried to show everybody, show the officers, what was true

14  and what was false?

15  A.  No, sir.

16  Q.  Okay.  So, what's true and what's false, we just have to

17  take your word for it; is that right?

18  A.  Yes, sir.

19  Q.  Okay.  So, when you talked about your family and your

20  children, you're probably telling the truth about that; is

21  that right?

22  A.  Yes, sir.

23  Q.  But when they asked you about things like, why were you

24  arrested, and you said you had no idea, that was probably

25  false, right?

1   A.   I had no idea I was going to get arrested.

2   Q.   Okay.  So, when they -- were you asked if you knew why

3   you were arrested today, and did you answer by saying you had

4   no idea?

5   A.   Yes, sir, I did.

6   Q.   Okay.  And what did you mean by that answer?  First of

7   all, is that answer true or is that answer false?

8   A.   That's true.  I didn't know I was going to get arrested

9   that day when the indictment came down and they picked us up.

10  I had no idea that was coming.

11  Q.   And you had no idea you were doing anything wrong that

12  you would get arrested for?

13  A.   I know I was doing things wrong at the FCI and the FDC.

14  Q.   But you had no idea why you were being arrested that day.

15  Is what you're staying?

16  A.   It was a surprised being arrested, but even though I know

17  I was doing things wrong at the job, I had a -- I did say

18  that I didn't know, but I had an idea in my head what it was

19  in relation to.

20  Q.   The fact of the matter is, you had already been shown a

21  copy of the indictment earlier that day, hadn't you, by your

22  lawyer?

23  A.   I can't recall.  I can't recall, sir.

24  Q.   Do you remember -- did you tell the officers that the

25  indictment mentioned something about contraband?  Did you say

1    that to them?

2    A.  I can't recall.  I could've.

3    Q.  Do you remember, after being asked, if after reading the

4    indictment, you felt that the indictment was accurate, and

5    that you answered you had no idea?

6    A.  I could've made that statement.

7    Q.  You could have made that statement.  Let's say, let's ask

8    it this way:

9        If you said the statement, if you said you had no idea,

10   if the indictment was correct or not regarding contraband,

11   would that be true or false?

12   A.  Can you repeat that again?

13   Q.  Yes.  If the indictment mentions something about

14   contraband and you read it, would your answer that you had no

15   idea if the indictment was accurate, would that answer be

16   true or would that answer be false?

17   A.  If the indictment said anything about contraband, I knew

18   it was true.

19   Q.  Okay.  Why did you answer to the officers that you had no

20   idea?

21   A.  At that present moment I was lying about everything, you

22   know.

23   Q.  I thought you said you were lying about some things and

24   lying --

25   A.  Well, some things could've been true, the example like

1    you gave about my kids, you know.  There could've been some

2    statements that were true.  There could've been some

3    statements that I just lied about.

4    Q.  Okay.  Do you remember being asked about misconduct by

5    prison employees and correctional officers?

6    A.  I can't recall at this time, no.

7              MR. HARPER:  May I approach the witness, Your Honor?

8              Your Honor, I'm going to be a while, if you're

9    thinking about a break.

10             THE COURT:  Let's go ahead and take the morning

11   break.

12             Members of the jury, recall my instructions.  Don't

13   talk about the case.  We will be back with you in a few

14   minutes.

15             Jury out, please.

16       (The jury exited the courtroom at 10:29 a.m.)

17             You may be seated.

18             Thank you, Mr. Barnes.  You may step down; and, if

19   you would, be back in that chair by 10:45.

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Mr. Findley, I made a suggestion about

22   your ability to publish that portion of the transcript during

23   your case.  You went ahead and published it here, which is

24   fine.  Don't take my comment as an invitation to publish it

25   again.  Once is enough.  So, you've published that at this

1    point.

2              MR. FINDLEY:  Okay.

3              THE COURT:  Mr. Harper, I denied the motion to strike

4    when Mr. Barnes said something along the lines of this -- he

5    was asked about what Mr. Dixon had said, and he said,

6    approximately, Mr. Dixon might have said something, but I

7    don't recall it, and then you moved to strike.

8              It seems to me, if I strike that testimony, it leaves

9    nothing in the record about what Mr. Barnes knows about

10   whether Mr. Dixon said anything.  A more accurate description

11   of what Mr. Barnes knows is exactly what he said.  "I don't

12   recall it."  I thought that was accurate testimony, and the

13   gist of it, and so I wasn't going to try to parse out the part

14   where he said he might have said something.  I thought that

15   harmless, and it was better to leave the answer just like it

16   was.

17             Now, all of the questions about this document, I take

18   it that you plan to go through each of these statements.  I

19   think we're just wasting time.  I know what you want to do is

20   emphasize again and again and again and again and again and

21   again that he made an untrue statement on June 21st.  He

22   started off by admitting he denied it all on June 21st.

23             I'll let you repeat it a time or two, but I don't

24   want that repeated 25 times other 15 minutes.  And I think

25   that's where we are headed.

1          The way to use a prior inconsistent statement is,

2    first, to ask the witness here in court what happened.  Was

3    the light green or red?  And if the witness says the light was

4    green, then you really don't need to ask the question, did you

5    say six months ago that the light was green?  You can't start

6    off by saying, did you say six months that the light was

7    green?  First ask the witness here in court what happened.

8          Now, in this instance, it is going to be an

9    inconsistent statement.  When you ask him in court, he's going

10   to say something different than what he told the officers, and

11   so you can impeach him with the inconsistent statement.  But

12   you're going about it exactly the other way around.  You're

13   starting off by asking about the statement without ever asking

14   the question.

15         And, frankly, the government has already asked both

16   what happened, what color was the light, and did you make a

17   statement back on June 21st to the contrary?

18         So, you try the case the way you want to, but let's

19   don't spend 15 minutes going over that statement, when he's

20   already told you his version of what happened, and that he

21   gave an untrue statement back then.

22         If you want to go through each of the untrue things

23   he said back then, fine.  You know, that's appropriate.  He

24   gave untrue statements back then and you can go through them

25   one at a time, but let's do it more directly.  That's my

1    request.

2          MR. FINDLEY:  I have one comment I just want to

3    clarify on the record, not for purposes of putting anything

4    into evidence necessarily, but just for purposes of the

5    conversation we had at side-bar.  The plea transcript for

6    Mr. Barnes, on September 14, 2006, there is the question from

7    the court, "Is it all true?  And Mr. Barnes says, "Yes, sir."

8          THE COURT:  And you --

9          MR. FINDLEY:  I just wanted you to know that, for no

10   other reason than just you knew that.

11         THE COURT:  Well, and you told me that at side-bar,

12   and I understand.  If my comments suggested the contrary, I

13   didn't mean to.  I don't remember --

14         MR. FINDLEY:  I understand.

15         THE COURT:  I do lots of plea proceedings, most

16   recently before we started this morning, and I don't always

17   remember which witnesses say it's all true and which ones say

18   it's not.

19         My point of all that was, I don't mind the

20   interjection of some confusion.  That sometimes is a decent

21   trial -- is a trial tactic that's okay.  But you will do a lot

22   better with me if you'll just really turn square corners on

23   exactly what this establishes and what it doesn't establish.

24         When he doesn't bring up Mr. Dixon when he is talking

25   to the officers, you can argue both sides of what that proves.

1    Maybe he's just answering their questions.  But maybe, if he

2    really knew something, he should have told the officers.  So,

3    I understand the cross-examination along the lines of you had

4    an interview with the officer, and you never brought up

5    Mr. Dixon.  Fair question.

6           But when you start dealing with the statements of

7    facts that the government wrote for the specific purpose of

8    using Mr. Barnes' plea agreement, much less so.

9           The case I cited at side-bar, United States versus

10   Deloach is an Eleventh Circuit case from 1994.  It holds

11   inadmissible the statement by the prosecutor in that case, but

12   it does seem to recognize that a statement by a prosecutor can

13   be admissible if it is a statement of fact.  The suggestion

14   there is maybe it needs to be inconsistent with the

15   prosecution's position.  I'm not sure why that would be a

16   requirement.  It's a party admission, basically.  I think the

17   point of the case is, the statement by a prosecutor can be a

18   party admission just like the statement by the warden as

19   somebody acting on behalf of the government.

20          But it does impose some restrictions, and it would be

21   narrow circumstances under which that can be done.  It would

22   have to a statement of fact.

23          Your statement there was that he wasn't involved with

24   the mailing that you were aware of.  It seems to me that

25   doesn't prove very much, but what you told me at side-bar was,

1    it's still true.  You're not aware of any connection that

2    Mr. Dixon has with the actual mailing.  And so now Mr. Findley

3    has published that statement; and, hopefully, that will get

4    things a little more focused.  He knows what you will be

5    saying in closing a little better and --

6           MR. DAVIS:  Just limited to the mailing that we were

7    talking about as charged in the indictment.  I'm just being

8    very precise about what mailing we were admitting he wasn't

9    involved in.

10          THE COURT:  Was he involved in any other mailing?

11          MR. DAVIS:  Well, we have the testimony that we heard

12   today, that he discussed mails.  But I just want to be very

13   clear, Your Honor, that that statement was related to the

14   mailing that was the evidence we had about Barnes' mailing,

15   which we just put on again today through Mr. Barnes.

16          THE COURT:  Well, that would make sense.

17          MR. FINDLEY:  I know that we'll discuss this more in

18   detail when we're talking about a possible Rule 29, or at

19   least we'll argue that.  But I believe the testimony was that,

20   about an address that might be used and not mailing to that

21   address necessarily.

22          THE COURT:  Okay.

23          MR. HARPER:  Your Honor --

24          THE COURT:  And I'm sure we will talk about that at

25   that point.

1          MR. HARPER:  I certainly can tighten and turn my

2     radius around these corners, but one thing I did want to

3     develop with this witness about this statement is, he made

4     some statements that are true and some which are false, and

5     some which we would maintain are true, that none of the other

6     officers are involved.  So, that's the reason for my

7     examination was a little less perfect.

8          THE COURT:  So ask him if the other agents are

9     involved.  I mean, the government gets him to say, I made a

10    statement on June 21st, and it was all lies.  I take it you'd

11    like for the jury to decide he's not telling the truth, and

12    then you get up to cross-examine to say, "Oh, wait a minute,

13    you are not always a liar, sometimes you tell the truth."

14    What are we trying to accomplish?

15         MR. HARPER:  Well, when he says I didn't have -- none

16    of the other guards knew anything, I --

17         THE COURT:  Ask him if any of the other guards knew

18    anything.

19         MR. HARPER:  I will.  That's what I'm saying.  I'm

20    trying to get some advice.  I will be more direct.

21         THE COURT:  So, how are you going to use this

22    statement?  He says, "Oh, the other guards knew some things.

23         "Well, didn't you tell the officers they didn't know

24    anything?

25         "Yeah, I did."

*Alfred Barnes - Cross/Harper*

```
 1              That's fair cross-examination.

 2              "I was lying about that, too."

 3              But, boy, we're going at this --

 4         MR. HARPER:  I think can be sharper after we have a

 5    break.

 6         THE COURT:  All right.  Perfect.  What else do we

 7    need to discuss before we break?

 8              We'll start back in 10 minutes, 10:45 by that clock.

 9       (A recess was taken at 10:38 a.m.)

10       (The proceedings resumed at 10:48 a.m.)

11       (Defendants present; jury not present.)

12         THE COURT:  Jury in, please.

13       (The jury entered the courtroom at 10:50 a.m.)

14         All right.  You may be seated.

15         Mr. Barnes, you are still under oath.

16         Mr. Harper, you may proceed.

17         MR. HARPER:  Thank you.  May it please the court.

18    BY MR. HARPER:

19    Q.  Mr. Barnes, the statement of June the 21st or 22nd of

20    2006, I want to refer you back to that.

21       Do you remember telling the officers that you did not

22    have any knowledge of any other employees at FCI engaging in

23    any such activities as yours?

24    A.  I can't recall, but it's a possibility that I could have

25    said that.
```

1  Q.  It's true, I think you said, as far as Mr. Dixon was

2  concerned, that he was not engaged in your financial

3  dealings; is that right?

4  A.  That's right.

5  Q.  And that's also true, Mr. Moore was not engaged in your

6  financial dealings; is that right?

7  A.  That's right.

8  Q.  And when I say financial dealings, I mean use of the

9  mail, they didn't know you were using the mail; is that

10  right?

11  A.  No, sir.

12  Q.  And that's not something you shared with everybody out

13  there at the compound, is it?

14  A.  No, sir.  Generally, you wouldn't.

15  Q.  I couldn't hear you.

16  A.  No, sir, you wouldn't.

17  Q.  And there is an obvious reason, you'd get caught, right?

18  A.  Yes, sir.

19  Q.  Okay.  Mr. Moore is known as an honest cop out there, an

20  honest C.O.?

21  A.  Yes, sir.

22  Q.  As far as your plea agreement in the case, when

23  Mr. Findley was talking to you about the factual basis that

24  you gave in court, you didn't have an agreement with

25  Mr. Dixon as far as using the mail or as far as your

1   activities, did you?

2   A.   No, sir.

3   Q.   And you didn't have an agreement with Mr. Moore as far as

4   your using the mail or your activities; is that right?

5   A.   No, sir.

6   Q.   And there is no agreement that you and any of the

7   officers would -- were working together as a big conspiracy

8   out there, was there?

9   A.   No, sir.

10  Q.   Okay.  And so y'all just worked at the same place.  Y'all

11  weren't in some kind of a gang, were you?

12  A.   No, sir.

13  Q.   And by that, your acts and activities, you wanted to --

14  you didn't wanted everybody to know, including the officers;

15  is that right?

16  A.   That's correct.

17  Q.   Okay.  And you succeeded or tried to succeed in that,

18  didn't you?

19  A.   Yes, sir.

20  Q.   In other words, your acts and activities were your own

21  independent acts, not a concert of action.  Is that fair to

22  say?

23  A.   That's fair to say.

24  Q.   And did you have some kind of a wink and nod or signal or

25  code that you used with the other officers?

*Alfred Barnes - Cross/Harper*

1   A.  No, sir.

2   Q.  And so when you switched places at times, would you say

3   to the officers, look, I need to switch, because I've

4   contraband for Shonnie, or I've contraband for Ingrid, or

5   I've got contraband for any inmate?  Would you tell them

6   that?

7   A.  No, sir.

8   Q.  And when you -- as a matter of fact, when you got keys

9   from Mr. Moore, you told him you were going to go to the

10   bathroom, didn't you?

11   A.  No, sir.  I told him I was going to talk to Inmate

12   Daniels, I had something for her.

13   Q.  Did you go to -- did you, in fact, go to the counselor's

14   office?

15   A.  No, I did not go to the counselor's office.

16   Q.  And there is a reason you didn't go to the counselor's

17   office, isn't there?

18   A.  No specific reason that I know of.

19   Q.  There is not a key on that ring to go to the counselor's

20   office, is there?

21   A.  I can't recall.  Not as I know of, sir.

22   Q.  Okay.  Correctional officers don't have keys to the

23   counselor's office, do they?

24   A.  Normally they don't.

25   Q.  Okay.  Unit officers, the guy in charge of the unit,

 1  doesn't have a key to the counselor's office; is that right?

 2  A.  No, sir, but it's according to what unit you're in.

 3  Sometimes some of the counselor's office might be accessible,

 4  like one of the units up there, like A.

 5  Q.  What about F or what about C?

 6  A.  No, sir.

 7  Q.  Is there any kind of an agreement or -- I guess "an

 8  agreement" is as good a word as any -- that we have a plan

 9  for Alfred Barnes to get rich out here, so we're going to

10  help him?  Is there any kind of agreement with the officers

11  for that to happen?

12  A.  No, sir.

13  Q.  Was there any kind of an agreement that we are going to

14  help Mr. Dixon or Mr. Moore to get rich?

15  A.  No, sir.

16  Q.  Is there any kind of an agreement that we're going to,

17  you know, do our best to disrupt the institution and violate

18  the rules and regulations?  Is there any kind of an agreement

19  or understanding that you were involved in to do that?

20  A.  No, sir.

21  Q.  This was just your only little private game or private

22  plan?

23  A.  Yes, sir.

24  Q.  Did you ever tell Mr. Moore, don't tell on me, brother,

25  don't tell on me, anything like that?

1   A.  No, sir.

2   Q.  Now, this transaction that you had with Hanky, which

3   later turned out to be an undercover operation, you, of

4   course, I assume did not know it was an undercover operation;

5   is that right?

6   A.  No, sir, I didn't.

7   Q.  Okay.  You fell into that trap; is that right?

8   A.  Yes.

9   Q.  Okay.  They succeeded in that operation; is that right?

10  A.  Yes, sir.

11  Q.  Do you know whether you were ever tape-recorded by an

12  inmate?

13  A.  Yes, sir.

14  Q.  How do you know that?

15  A.  I listened to it with my attorney.

16  Q.  So, you found out after the fact, right?

17  A.  Yes, sir.

18  Q.  You didn't know it was happening when it happened?

19  A.  No, sir.

20  Q.  Nobody came up and told you; is that right?

21  A.  No, sir.

22  Q.  You don't do a strip-search on the inmates and say, wait

23  a minute, are you wired or hot, or anything like that, did

24  you?

25  A.  No, sir.

Alfred Barnes - Cross/Harper

1   Q.   Is there video surveillance out there on the premises?

2   A.   Not on the premises as I can recall, none in the housing

3   unit.

4   Q.   What about on the compound?

5   A.   No, sir.  They got cameras around the perimeter, but I

6   don't believe, as I recall, any being on the main compound.

7   Q.   So, they are pointed out, not pointed in.  Is that fair

8   to say, the cameras?

9   A.   Yes, sir.

10  Q.   Okay.  And there is no cameras aiming down the hallway in

11  the housing unit, certainly not any in the bathrooms?

12  A.   No, sir.

13  Q.   There's no cameras in the hallway?

14  A.   No, sir.

15  Q.   No cameras in the inmates' rooms?

16  A.   No, sir.

17  Q.   No cameras in the officers' offices?

18  A.   No, sir.

19  Q.   No cameras in the lobby area out there of the unit?

20  A.   No, sir.

21  Q.   And, similarly, Mr. Barnes, there are no recording

22  devices, to your knowledge, of that nature in those places

23  either, is there?

24  A.   No, sir.

25  Q.   Was there any kind of an agreement or understanding

*Alfred Barnes - Cross/Harper*

1    between you and any of these officers that you would get a

2    lot of sex out there?

3    A.  There was no agreement between us.

4    Q.  I'm sorry.  I didn't hear you.

5    A.  No, sir, no agreement.

6    Q.  Was there any kind of wink or nod or silent understanding

7    that you were going to be the grand stallion of FCI, and

8    everybody is going to help you get as much sex as you wanted

9    or could get?

10   A.  No, sir.

11   Q.  Was there any kind of understanding or agreement with

12   anybody that that was happening with you?

13   A.  No, sir.

14   Q.  And did you have an agreement with anybody else that you

15   would help them get sex as much as they could?

16   A.  No, sir.

17   Q.  Similarly, Mr. Barnes, did you have any type of agreement

18   or understanding with these officers -- and when I say "these

19   officers," I'm talking about Mr. Moore or Mr. Dixon -- about

20   helping them bring in contraband or letting them bring in

21   contraband?

22   A.  No, sir.

23   Q.  Did they have any agreement or did y'all have any

24   agreement so you could bring contraband in?

25   A.  No, sir.

1  Q.  As far as you -- well, I'll withdraw that.

2      How about -- we heard some testimony about, I think you

3  talked about the computers or the monitoring systems there.

4  Do you know about those?

5  A.  Yes, sir.

6  Q.  Okay.  Did you have any agreement with the officers here

7  on trial to use the monitoring system to intimidate or

8  threaten inmates?

9  A.  No, sir.

10  Q.  Did you have any kind of an agreement or understanding

11  with these officers here that your misconduct would not be

12  reported?

13  A.  No, sir.

14  Q.  Okay.  Did you have any agreement with these officers

15  that you wouldn't report their misconduct if you found out

16  about it?

17  A.  No, sir, no agreement with them.

18  Q.  So, when you talk to Mr. Moore, you don't tell him you

19  have contraband or anything else, when you want to see

20  Shonnie Daniels or anybody?

21  A.  No, sir.

22  Q.  When you switched units with Mr. Dixon, you don't tell

23  him, do you, that you're trying to get closer to somebody

24  that you want to have sex with, do you?

25  A.  No, sir.

1  Q.  When you talked to Mr. Moore, he was upset with you about

2  putting him in a situation; is that right?

3  A.  He wasn't upset.

4  Q.  Well, he said you put him in a bad situation; is that

5  right?

6  A.  It was just a general conversation, you know, it wasn't

7  like he was upset or anything like that.  He was just

8  smiling.

9  Q.  Was he happy -- was he happy that you put him --

10  A.  Well, I wouldn't say he was happy, you know, but there

11  was a concern there.

12  Q.  Okay.  But, in any event, it wasn't part of an agreement

13  so you could go and have sex with Shonnie Daniels; is that

14  right?

15  A.  No, sir.

16  Q.  You say, no, are you saying, it was -- no, it was not

17  part of an agreement?

18  A.  No, it was not part of an agreement.

19  Q.  When you said Shonnie would come out on the pill watch,

20  do you know what she was representing to Mr. Moore?

21  A.  No, sir, I don't.

22  Q.  Do you know -- was it always on Mr. Moore's shift when

23  you saw her out on the pill watch?

24  A.  No, sir, I can't say it was on his shift, but normally

25  it's going to be on the morning watch shift.  I can't say

*Alfred Barnes - Cross/Harper*

1  it's going to be another shift, evening watch.  It's only

2  concerning the morning watch shift.

3  Q.  Do you know whether Ms. Daniels could or did obtain a

4  pass or prescription to be in that line legally?

5  A.  No, sir, I don't.

6  Q.  Do you know whether Ms. Daniels obtained or could obtain

7  a pass to be in that line illegitimately?

8  A.  No, sir.

9  Q.  Is that line just for people with insulin, or is that

10  line for other people?

11  A.  For other people also.  I don't think it's get -- it

12  could diabetics, it could be other medical problems, or -- I

13  don't know specifics.

14  Q.  It's a pill line for people that need medications; is

15  that correct?

16  A.  Correct.

17  Q.  And it could be for any kind of medication; is that

18  right?

19  A.  Yes, sir.

20  Q.  It could be for pain medication; isn't that right?

21  A.  It could.

22  Q.  It could be pain medication that inmates could resell; is

23  that right?

24  A.  I don't know about selling, but it could.

25  Q.  The last thing is, I understand that your sentencing has

1  been put off until after the trial; is that right?

2  A.  Yes, sir.

3  Q.  And the date of that sentencing is when?

4  A.  December the 14th.

5        MR. HARPER:  Your Honor, I had a piece of paper, I

6  apparently left at my desk.  Can I retrieve that?  I think I'm

7  through.

8        THE COURT:  Surely.

9        MR. HARPER:  Your Honor, I think that's everything I

10  wanted to cover.  Thank you.

11        THE COURT:  All right.  Redirect?

12        MR. DAVIS:  Your Honor, may I approach?

13        THE COURT:  You may.

14                    REDIRECT EXAMINATION

15  BY MR. DAVIS:

16  Q.  Mr. Barnes, Mr. Findley asked you a series of questions

17  about whether or not you had lied in past statements to

18  investigators.

19  A.  Yes, sir.

20  Q.  And you said that you had given false information.

21  A.  Yes, sir.

22  Q.  In all of those past statements, isn't it true that you

23  had denied conduct?

24  A.  Yes, sir.

25  Q.  And in this statement you are admitting conduct?

1   A.  Yes, sir.

2   Q.  Mr. Findley asked you about your plea agreement, and you

3   indicated that you had pled to a mail fraud conspiracy.

4        Is it your understanding that that is the most serious

5   charge that was lodged against you in that indictment?

6   A.  Yes, sir.

7   Q.  And when you read that indictment on that morning in

8   June, how many legal documents had you read prior to that?

9   A.  None.

10  Q.  Was that a long indictment?

11  A.  Yes, sir.

12  Q.  Do you remember what it said?  Can you tell me what the

13  first paragraph of that indictment said?

14  A.  I know my name was on the top.  There was a list of names

15  and --

16  Q.  That's the style of the case, correct?

17  A.  Yes, sir.

18  Q.  But do you remember what was said in there?

19  A.  I don't know the specifics.

20  Q.  Mr. Findley also cross-examined you on a statement that

21  was written by the FBI; is that correct?

22  A.  Yes, sir.

23  Q.  Have you ever seen that statement before?

24  A.  No, sir.

25  Q.  Was that your statement?

*Alfred Barnes - Redirect*

835

1  A.  I made an oral statement to them, but I never seen

2  nothing written.

3  Q.  So, whatever those agents wrote down that day, they might

4  have gotten it right or wrong?

5  A.  Possibility, yes, sir.  I said oral.  I didn't see

6  nothing in writing.

7  Q.  Now, Mr. Findley showed you Defendant Dixon Exhibit

8  Number 15.

9        MR. DAVIS:  Your Honor, may I approach?

10        THE COURT:  You may.

11  BY MR. DAVIS:

12  Q.  Can you read this paragraph G, first sentence?

13  A.  Yes, sir.  It says, "Alfred Barnes agrees to cooperate

14  fully and truthfully with the United States Attorney and its

15  designated representatives."

16  Q.  Is that word "truthfully"?

17  A.  Yes, sir.

18  Q.  Mr. Barnes, Mr. Findley said that you could have this

19  agreement revoked and have all of the other charges imposed,

20  if you didn't comply with this agreement?

21  A.  He did say so.

22  Q.  Does this agreement require you to testify truthfully?

23  A.  No, sir.  If I want -- it says it's truthful, and that's

24  what I'm doing, truthfully.

25  Q.  I misunderstood you.  If you lie right now on the stand,

1    can the government revoke this agreement?

2    A.  No, sir.

3    Q.  Mr. Barnes --

4            MR. DAVIS:  May I approach, again, Your Honor?

5            THE COURT:  You may.

6    BY MR. DAVIS:

7    Q.  Would you read all of paragraph G for me, again?

8    A.  All of G?

9    Q.  Yes.

10   A.  "Alfred Barnes agrees to cooperate fully and truthfully

11   with the United States Attorney and his designated

12   representatives and with agencies identified by the United

13   States Attorney.  Such cooperation shall include, but is not

14   limited to, providing complete and truthful debriefings and

15   testimony at grand jury, trial, and at otherwise questioned

16   involving any matter under investigation."

17   Q.  Does that not say that you have to testify truthfully

18   here at trial?

19   A.  Yes, sir.

20   Q.  And what happens if you don't testify truthfully here at

21   trial?

22   A.  You could perjure yourself.

23   Q.  Would you please read under, "Revocation," paragraph A.2?

24   A.  "Defendant's statement or testimony has been untruthful

25   or incomplete."

*Alfred Barnes - Redirect*

1  Q.  And that's under the paragraph that says -- what does

2  that say there?

3  A.  It says, "The parties agree that the United States

4  Attorney may revoke this agreement upon showing --"

5  Q.  Does that indicate to you, if you lie on the stand, that

6  the government can revoke this agreement?

7  A.  Yes, sir.

8  Q.  So, in addition to requiring your cooperation, isn't it

9  true that this agreement requires you to testify truthfully?

10  A.  Yes, sir.

11  Q.  And what happens to you if you don't testify truthfully?

12  A.  They can invoke it.

13  Q.  Now, with regard to the Defendant's Exhibit Dixon Number

14  16, did anyone ever tell you that this had to be a complete

15  statement of the facts concerning your case?

16  A.  No, sir.

17  Q.  Did anyone ever tell you that this had to include

18  evidence that bore on other defendants?

19          MR. FINDLEY:  Leading.

20          THE COURT:  Overruled.

21          THE WITNESS:  No, sir.

22  BY MR. DAVIS:

23  Q.  Isn't it true that this does not have to include anything

24  concerning Defendant Dixon?

25  A.  No, sir.

1  Q.  Mr. Barnes, does this have to include anything concerning

2  Defendant Dixon, not you?

3  A.  I'm sorry.  Yes, sir.

4  Q.  So, isn't it true that this doesn't have to include

5  anything concerning Defendant Dixon?

6  A.  Yes, sir.

7  Q.  For that matter, for any other defendant; is that true?

8  A.  Yes, sir.

9  Q.  This is just for your case; is that correct?

10  A.  Yes, sir.

11  Q.  Mr. Findley also asked you, when you spoke with Mr. Dixon

12  and he asked you whether or not Shonnie Daniels was cool --

13  A.  Yes, sir, he asked me.

14  Q.  -- he asked you whether or not "cool" could just have

15  meant contraband?

16  A.  Yes, sir, he did.

17  Q.  Could "cool" mean more than contraband?

18  A.  Yes, sir.

19  Q.  Could "cool" mean that you wouldn't snitch?

20  A.  Wouldn't snitch --

21       MR. FINDLEY:  Your Honor, I object.  Calls for

22  speculation.

23       THE COURT:  You can ask him his understanding of the

24  conversation.

25  BY MR. DAVIS:

1  Q.  What was your understanding of what "cool" meant?

2  A.  My understanding of the situation was that he had some

3  type of connection with Ms. Daniels, and that he felt

4  comfortable with her for whatever they was engaging in.

5  Q.  So that's your understanding?

6  A.  Yes, sir.

7  Q.  And you were talking with Dixon, you never really said,

8  look, I'm having sex with her and sharing contraband, but we

9  have this understanding, she's cool, right?

10  A.  Yes, sir.

11  Q.  Did you have discussions like that with other officers on

12  the compound?

13  A.  No, sir.

14  Q.  Did you ever talk to any other officers that you thought

15  were cool?

16  A.  No, sir.

17  Q.  Were there any other officers that were on the compound

18  that were cool?

19  A.  They could have been with other individuals, not with me.

20  Q.  How did you know or did you know that other officers were

21  engaged in activities on the compound?

22  A.  When you're working in that type of environment, the

23  inmates, they basically know everything what's going on.

24  Inmates will come up to you and have a conversation, talk

25  about other officers and what they're engaging in.

*Alfred Barnes - Redirect*

1  Q.  So, you heard from inmates that other officers were

2  engaged in other activities?

3  A.  Yes, sir.

4  Q.  Was it in your interest to go up to that officer and say,

5  hey, I'm doing the same thing, let's talk about it?

6  A.  No, sir.

7  Q.  Why is that?

8  A.  Because I didn't want them to know what I was doing, and

9  I'm sure that he didn't want me to know what was going on

10  with him.

11  Q.  When you heard from inmates that another officer was

12  engaged in activities, what was your reaction to that?

13  A.  I just -- I just listened and keep it to myself.

14  Q.  Did it influence how you acted with that officer?

15  A.  No, sir, it didn't.  I know that, if he was engaging with

16  other inmates, and I know I was doing the same thing that

17  it's a possibility that I could feel comfortable talking with

18  him.

19  Q.  Weren't you required to report that, if you heard that?

20  A.  Yes, sir, I was.

21  Q.  But you didn't report it?

22  A.  No, sir, I didn't.

23  Q.  Did you have concerns that that other officer would

24  report it if he heard it on you?

25  A.  Yes, sir.

1    Q.   What if he was cool?

2             MR. FINDLEY:   Objection.   Calls for speculation,

3    unclear.

4             THE COURT:   Sustained.

5    BY MR. DAVIS:

6    Q.   Mr. Barnes --

7    A.   If he was cool --

8             THE COURT:   Wait.   He's going to ask you another

9    question.

10            THE WITNESS:   Okay.

11   BY MR. DAVIS:

12   Q.   You said that you had to get off of the compound, or you

13   couldn't deal with contraband with certain inmates because

14   you were hot?

15   A.   Yes, sir.

16   Q.   What does "hot" mean?

17   A.   That mean that my name was circulating a lot around the

18   compound.

19   Q.   So, other officers were hearing about your --

20   A.   I'm sure they was, and inmates.

21   Q.   Did any of those other officers turn you in?

22   A.   No, sir, they didn't.

23   Q.   And you know that because you weren't investigated?

24   A.   No, sir, I wasn't -- I didn't know I was being

25   investigated.

1   Q.  Was Officer Dixon involved in bringing in contraband?

2   A.  Yes, sir.

3   Q.  Were you aware of that?

4   A.  Yes, sir.

5   Q.  Did you turn him in?

6   A.  No, sir.

7   Q.  Didn't Officer Dixon talk to you about a mail scheme,

8   about cigarettes and inmates --

9          MR. FINDLEY:  Objection.  Leading.  He's leading.

10  It's asked and answered as well.

11         THE COURT:  If it kept going, it was going to get

12  leading.  I'll sustain the objection.  You can identify the

13  subject, but then don't lead him.

14  BY MR. DAVIS:

15  Q.  You testified earlier that you spoke with Dixon about --

16  Dixon spoke with you about using the mail address; is that

17  true?

18  A.  Yes, sir.

19  Q.  Did you report that when he told you about that mail

20  plan?

21  A.  No, sir.

22  Q.  Did Dixon tell you not to report that when he told you

23  that?

24  A.  No, sir.

25  Q.  Did you have an agreement with Mr. Dixon not to report

*Alfred Barnes - Redirect*

1    that mail plan?

2    A.   No, sir.

3    Q.   Then why didn't you report it?

4    A.   Because, like I said, the conversation on the compound

5    dealing with Mr. Dixon and me, my own self, I was already

6    doing the same thing, that I just wouldn't report it, because

7    I was doing wrong my own self.

8    Q.   Was there an understanding?

9    A.   It was no agreement.  It was kind of like a mutual

10   understanding, something like, I know I was doing wrong and

11   he was doing wrong, so what's the use of me turning him in, I

12   know I was doing the same thing?

13   Q.   You just said there was a mutual understanding?

14   A.   Yeah.  It was like, I knew that he was doing it, not from

15   him just telling me at that point there, but maybe later on,

16   but I know I was doing wrong, and that's the reason why I

17   didn't report it.

18   Q.   Was it an unspoken understanding?

19   A.   Repeat again?

20   Q.   Was it an unspoken understanding?

21   A.   Yes, sir.

22   Q.   Did you have that same understanding with any other

23   officers?

24   A.   No, sir.

25   Q.   How about with Officer Moore?

1    A.   Me and Moore, not too much about the contraband.

2    Q.   Let me ask you this:

3         When you asked Officer Moore for the key to go to the

4    back of C range, what did he say?

5    A.   He gave me the key.

6    Q.   And you told him that you had something for Shonnie

7    Daniels; is that correct?

8    A.   Yes, sir.

9    Q.   Was this at night?

10   A.   Yes, sir.

11   Q.   Now, you previously testified, as a correctional officer,

12   you weren't to give inmates anything except toilet paper and

13   feminine products; is that correct?

14   A.   That's correct, sir.

15   Q.   What legitimate item did you have to give Shonnie Daniels

16   at that time of night?

17   A.   Nothing legitimate, sir.

18   Q.   So, if it's not legitimate, what is it?

19   A.   It's contraband.

20   Q.   Now, did Officer Moore report you?

21   A.   No, sir.

22   Q.   You testified that a few days or a few weeks later,

23   Officer Moore came up to you and said that he knew you had

24   sex in that room, he could smell it, correct?

25   A.   That's correct.

1    Q.  Did Officer Moore report you?

2    A.  No, sir.

3    Q.  Now, you testified that you didn't have an agreement with

4    Officer Moore; is that correct?

5    A.  That's correct.

6    Q.  Did you have that mutual unstated understanding that you

7    wouldn't turn him in and he wouldn't turn you in?

8    A.  Yes, sir.

9    Q.  You also stated in response to questions from counsel

10   that there was no big agreement to have sex?

11   A.  That's correct.

12   Q.  But you testified, when I was asking you, that for -- I

13   think you said a week and a half or at least a multi-day

14   period, you switch assignments with Officer Dixon; is that

15   correct?

16   A.  That's correct.

17   Q.  And let me get your testimony correct.  Didn't you

18   testify that you told Officer Dixon that you needed to get

19   away from Shonnie Daniels?

20   A.  Yes, sir.

21   Q.  And didn't you testify that Officer Dixon told you he

22   wanted to come down and see Sabrina Bowie?

23   A.  That's correct.

24   Q.  Now, when you agreed to shift assignments, was that an

25   agreement?

1   A.   That's an agreement between him and me.

2   Q.   I don't mean a written agreement.

3   A.   It wasn't a written.

4   Q.   Just an understanding?

5   A.   Just an understanding that we talked about.

6   Q.   Did that understanding involve your knowledge that he

7   wanted to come down and see Sabrina Bowie, and his knowledge

8   that you wanted to get away from somebody you were in

9   contraband agreement with?

10  A.   Yes, sir.

11  Q.   Is that another one of those mutual unstated

12  understandings?

13  A.   Yes, sir.

14  Q.   Mr. Harper made another statement.  I believe he said

15  your sentencing was put off until December.  Isn't it true

16  that your sentencing was only set one time?

17  A.   That's correct.

18  Q.   So, your sentencing has not been put off?

19  A.   No, sir.

20       MR. DAVIS:  Your Honor, may I have a moment?

21       THE COURT:  You may.

22       MR. DAVIS:  No further questions, Your Honor.

23       THE COURT:  Thank you, Mr. Barnes.  You may step

24  down.

25       Mr. Davis, please call your next witness.

1          MR. DAVIS:  Your Honor, the government calls agent

2   Jeff Brunner.

3          DEPUTY CLERK:  Please raise your right hand.

4   ***JEFFREY BRUNNER, GOVERNMENT WITNESS, DULY SWORN***

5          DEPUTY CLERK:  Be seated.

6          Please, state your full name and spell your last

7   name for the record.

8          THE WITNESS:  Jeffrey Brunner, B-r-u-n-n-e-r.

9                    DIRECT EXAMINATION

10  BY MR. DAVIS:

11  Q.  Good morning, Mr. Brunner.

12      Mr. Brunner, would you please tell the jury where you're

13  employed?

14  A.  I work for the Department of Justice, Office of Inspector

15  General.

16  Q.  And what are your responsibilities there in the Office of

17  Inspector General?

18  A.  I'm involved in investigations of misconduct of employees

19  of the Department of Justice.

20  Q.  Are you -- you said the Department of Justice, Office of

21  Inspector General; is that correct?

22  A.  That's correct.

23  Q.  So you, yourself, are an employee of the Department of

24  Justice; is that correct?

25  A.  That's correct.

*Jeffrey Brunner - Direct*

1    Q.   Now, prior to coming to the Department of Justice, do you

2    have other investigative experience?

3    A.   Yes.  I was a police officer for 7 years and an agent

4    with the Drug Enforcement Administration for about 18 years.

5    Q.   So that's 25 years of law enforcement experience?

6    A.   Approximately, correct.

7    Q.   Now, in your current assignment with the Office of

8    Inspector General, are you, in fact, a sworn law enforcement

9    officer?

10   A.   Yes, I am.

11   Q.   Now, did you -- did there come a time when you became

12   involved in an investigation at the Federal Correctional

13   Institution?

14   A.   Yes, sir.

15   Q.   And with whom did you work on that investigation?

16   A.   I became employed in about July of 2005, and I was

17   assigned to Tallahassee.  It's a single-man office, so you're

18   required to work with other law enforcement officers to

19   conduct your investigations.

20        So, I began working with Special Investigative Agent

21   George Williams and FBI Special Agent Patrick Sanford.

22   Q.   They are also law enforcement officers?

23   A.   That's correct.

24   Q.   Now, did there come a time when you presented evidence to

25   a grand jury in this case?

*Jeffrey Brunner - Direct*

849

```
 1   A.  Yes.

 2   Q.  I want to show you what has been marked for

 3   identification as Exhibit 51.

 4           MR. DAVIS:  Your Honor, may I approach the witness?

 5           THE COURT:  You may.

 6   BY MR. DAVIS:

 7   Q.  Do you recognize that?

 8   A.  Yes, I do.

 9   Q.  Can you tell the court what this is?

10   A.  Yes.  During the course of the drafting of the

11   indictment, because of the sexual nature of the

12   investigation, inmate numbers were put down on the

13   indictment.

14   Q.  Does this document compare the inmate numbers with the

15   true names of the inmates?

16   A.  Yes, it does.

17           MR. DAVIS:  Your Honor, I would move to admit

18   Exhibit 51.

19           MR. FINDLEY:  No objection from Defendant Dixon.

20           THE COURT:  Government's 51 is admitted.

21       (GOVERNMENT EXHIBIT NO. 51:  Received in evidence.)

22   BY MR. DAVIS:

23   Q.  Mr. Brunner, what type of techniques did you use in your

24   investigation at the Federal Correctional Institution?

25   A.  I used basically the same experiences I had with all the
```

*Jeffrey Brunner - Direct*

1    law enforcement agencies, which would be interviews of

2    witnesses, attempts to use transmitters, recorders to record

3    conversations; specific to this more, not more to the DEA,

4    but the collection of DNA evidence when available.  Just

5    general investigative techniques like that.

6    Q.   Did you use wires in this case?

7    A.   And we attempted to use wires in this case.

8    Q.   And you did successfully use wires in this case?

9    A.   Yes.

10   Q.   And were there wires that were not successful?

11   A.   We were limited in even having the ability to do so.  We

12   only, I believe, in this investigation were able to attempt

13   two.

14   Q.   Why is that?

15   A.   Well, there's a lot of reasons, but that -- wiring up

16   someone requires a significant approval from the Department

17   of Justice.  The approval process is quite lengthy.  There

18   are safety issues involved.  There's even issues of me

19   getting into the institution surreptitiously to meet with

20   inmates even to put the wires on them.

21        There's issues relating to where the inmates are

22   assigned, if they actually have the ability to meet with

23   correctional officers.  There are issues about how

24   correctional officers are assigned.  I can't dictate where

25   they go.  I can't put them in a position with inmates.  It's

1   very difficult to put inmates in position with correctional

2   officers.

3       I have -- for the safety of the inmate, I have to

4   physically be able to protect them in case the wire is

5   discovered.  So, I have to be somewhat close to them.  That's

6   an institution that's very difficult to hide your presence,

7   especially as an agent from the Office of Inspector General.

8       So, there's -- that's a brief explanation of the myriad

9   of issues when I consider using that investigative technique.

10  Q.  Did you attempt to collect DNA in this case as well?

11  A.  Yes, I did.

12  Q.  Were there difficulties with that?

13  A.  Yes.  First of all, collecting DNA is very difficult.  I

14  tried it.  It requires approval to even attempt to get it,

15  because it's so disruptive to the institution.  When an

16  investigative team walks through the compound to go to a

17  unit, then corners it off, then begins to do the analysis, it

18  creates huge problems for my investigation in attempting to,

19  number one, keep it as quiet as I can so I can be successful;

20  number two, it scares my potential witnesses, which are, in

21  this case, a lot of them were inmates at the FCI; and because

22  of the cleaning products that are used there, those places

23  are cleaned so often, the ability to even collect DNA

24  evidence that's still present even a short time after the act

25  is very difficult.

*Jeffrey Brunner - Direct*

1   Q.   And how available was video out at FCI-Tallahassee?

2   A.   Well, the places where the video currently were placed

3   weren't really places that, into my investigation, were

4   locations where these acts would occur to start with.  And I

5   discussed with Agent Sanford about the possibility of even

6   placing cameras in the institution surreptitiously.  I

7   discussed that with my bosses.  I learned that that was

8   attempted once and was soon discovered that it was there, and

9   that technique was exposed throughout the institution.

10      After all of those discussions and the requirement to

11  even get approval to do that, we both agreed that that was a

12  technique that would not be useful.

13  Q.   How about the techniques of record reviews?

14  A.   Well, that was something that was a little bit easier for

15  me to do, because the records were held there.  I didn't have

16  to get a whole lot of approvals to go through them.  So, in

17  that respect, I was able to go and look through records to

18  assist me in my investigation.

19  Q.   Now, in fact, did you review records that relate to the

20  counts charged in this indictment?

21  A.   Yes, I did.

22          MR. DAVIS:  Your Honor, I would like to show the

23  witness what has been marked for identification as

24  Government's Exhibit Number 52, a composite exhibit.

25          THE COURT:  The jurors' screen are off at this point.

*Jeffrey Brunner - Direct*

1    Is this something that he needs to go through authenticating,

2    or is it going to come in?

3            MR. FINDLEY:  We have no objection to the

4    introduction of these types of documents.

5            THE COURT:  All right.  Government's 52 is admitted

6    and the jurors' screens are on.

7        (**GOVERNMENT EXHIBIT NOS. 52:**  Received in evidence.)

8            MR. DAVIS:  I would also like then to move four other

9    additional types of exhibits that I've previously shown to

10   defense counsel, Exhibits 53, 54, 55 and 56.

11           MR. FINDLEY:  No objection.

12           MR. HARPER:  No objection.

13           THE COURT:  All right.  Those are all admitted.

14       (**GOVERNMENT EXHIBIT NOS. 53, 54, 55 AND 56:**  Received in

15   evidence.)

16   BY MR. DAVIS:

17   Q.  Mr. Brunner, look at Exhibit 52, can you tell the jury

18   what that is?

19   A.  It's says, "Department of Justice, Assignment History

20   Report," the top page, for Sabrina Bowie.

21   Q.  Now, I want to zoom in, but I don't want to be too close

22   so no one can see this.  I'm turning to the fifth page of

23   this exhibit.

24       Can you tell the jury what this represents?

25   A.  It's the section of that report that shows the quarters

*Jeffrey Brunner - Direct*

1    or basically the location where the inmates were housed.

2    Q.   Where does this show Inmate Sabrina Bowie was housed?

3    A.   This particular document, as you read it from the left,

4    that shows the institution.  As you move forward, while it

5    uses the term "house," we commonly use that as unit.  And

6    then it goes to range, which is kind of an indication of

7    which side of the unit.  Then it moves on to the actual bed

8    location.  And then, as you go all the way over to the start

9    date, time, stop date, that is the dates that they were in

10   those locations.

11       In this particular record, it shows that Sabrina Bowie

12   was in Unit F on Range 3 in a bed that is marked as 22, in

13   the upper bunk of that bed, from the periods September 3rd,

14   2003, to June 30th, 2004.

15   Q.   Now, did you -- you pulled this document after looking at

16   the indictment; is that correct?

17   A.   I pulled those documents during the course of my

18   investigation.

19   Q.   But I wanted to correlate it to a particular indictment.

20   Have you compared this to the indictment?

21   A.   Yes.

22   Q.   And does this correlate with Count 10, the bribery charge

23   involving Gregory Dixon and Sabrina Bowie?

24   A.   In terms of correlation, the dates I believe in that

25   count are included within that time period.

*Jeffrey Brunner - Direct*

1   Q.  Let me show you another part of this exhibit.

2       Can you tell the jury what this is?

3   A.  Yes.  That's the FCI-Tallahassee Daily Assignment Roster

4   for the date of Sunday, December 14th, 2003.

5   Q.  And what does that say at the arrow there?  Can you see

6   the arrow?

7   A.  Yes.  Can you move the document a little bit over?  Thank

8   you.

9       So that I can explain this in an understanding form, what

10  it shows to the left is the unit assignment, and it generally

11  starts from the first officer assigned as morning watch, then

12  generally the second person is day watch, and then generally

13  the third person is the evening watch.

14     This particular document shows that in Unit F on that

15  date Mr. Dixon was assigned to that post.

16  Q.  And what is the date again?

17  A.  I believe the -- move the document over a little bit.

18     December 14, 2003, and it shows he was the morning watch

19  unit officer.

20  Q.  Let me show you the same record for February 7, 2004.

21  A.  It is also another Daily Assignment Roster.

22  Q.  I'm sorry.  Let me turn you to the appropriate page.

23     What does that show again?

24  A.  Well, the first page that you showed showed that he was

25  the morning watch officer at the unit, but there were some

*Jeffrey Brunner - Direct*

1  asterisk there; and it is my understanding anytime there is

2  an asterisk there, it shows the assignment of correctional

3  personnel that were normally not assigned to that location.

4  And then it attempts -- what this document helps to show is

5  what the change was.  And the page you're showing now shows

6  that in F unit there was an assignment swap between Mr. Dixon

7  and Mr. Barnes.

8  Q.  Do you want me to go back to that page?  I'm sorry I

9  moved away so quickly.  Do you want to explain the asterisk?

10 Can you see it now, Mr. Brunner?

11 A.  Yes.  All the way over to the left, you will see F unit,

12 and then you will see two asterisks, then a one, standing for

13 morning watch, and then the name Dixon.

14 Q.  And this is February 7, 2004; is that correct?

15 A.  Yes, sir.

16 Q.  Let me take you to March 4, 2004.  Is that this document?

17 A.  Yes, sir.  That's another Daily Assignment Roster, and

18 the date of this daily assignment is March 4, 2004.

19 Q.  And do you see Mr. Dixon listed on this document?

20 A.  Yes, sir, even though it's a little bit off of my

21 screen --

22 Q.  I'm sorry.

23 A.  -- and a little bit cut off on the xerox, that is F unit

24 morning watch, and that has Mr. Dixon's name there.

25 Q.  And is there an assignment swap recorded here?

1    A.  Could you move it over a little bit, so the tab -- there

2    you go.

3        Toward the bottom it shows F unit assignment swap between

4    Mr. Barnes and Mr. Dixon.

5    Q.  Let me show you March 11, 2004.

6    A.  That again is a record showing a morning watch assignment

7    in F unit.  There are two asterisks there.  There is number

8    one for morning watch and Mr. Dixon's name.

9    Q.  And is that the assignment swap right there?

10   A.  Yes, at the bottom of this screen.

11   Q.  I'm sorry.

12   A.  That is an indication of an assignment swap between

13   Mr. Dixon and Mr. Barnes.

14   Q.  One last day, Thursday March 18th, can you tell me who

15   was in F unit that day?

16   A.  Yes.  That's an indication that at the F unit line that

17   there is a double asterisks one showing for the morning watch

18   and Mr. Dixon's name.

19   Q.  And is the swap reflected there?

20   A.  Yes.  It shows assignment swap roster adjustment, showing

21   a swap between Mr. Barnes and Mr. Dixon.

22   Q.  That's all of the documents in composite Exhibit

23   Number 52, and those relate to Count 10; is that correct?

24   A.  Correct.

25            MR. DAVIS:  Your Honor, let me do this with

 1   Exhibit 53.  Your Honor, I only have three others after this.

 2   BY MR. DAVIS:

 3   Q.  Can you tell me whose record this is?

 4   A.  Yes.  This is a separate inmate history just for the

 5   quarters for Inmate Demetrus Coonrod.

 6   Q.  And can you tell me where Inmate Demetrus Coonrod was

 7   located?

 8   A.  Yes.  On this particular document between November 16,

 9   2004, and January 10, 2005, it shows her unit -- I'm sorry.

10   I have to correct myself.

11       From November 16, 2004, to January 2, 2005, it shows she

12   was housed in G unit.  Then from January 2, 2005, to

13   March 14, 2005, it shows that she was in B unit.

14   Q.  And this record is the Daily Assignment Roster --

15   A.  Yes, sir.

16   Q.  -- for December 28th; is that correct?

17   A.  Correct.

18   Q.  And where does that show --

19   A.  That record --

20   Q.  I'm sorry.

21   A.  That record shows, at the indication of G unit, there is

22   an indication that Mr. Dixon worked the morning watch, and I

23   believe the "OT" stands for an overtime as a reason.

24   Q.  And the date of this record is?

25   A.  March 4, 2005.

1  Q.  And I don't know if you can see that little mark right

2  there.

3  A.  This is an indication that Mr. Dixon worked the morning

4  watch in F unit.

5  Q.  Does that record reflect a swap?

6  A.  Yes, it does, between Mr. Barnes and Mr. Dixon.

7  Q.  And these records were pulled by you in connection with

8  Demetrus Coonrod and Count 11?

9  A.  That's correct.

10  Q.  And that was Exhibit Number 53?

11  A.  Correct.

12  Q.  Let me show you Exhibit Number 54.  Who is this an

13  assignment history for?

14  A.  Latoya Brown.

15  Q.  And did you pull these records in connection with Count

16  12?

17  A.  Correct.

18  Q.  And what does this record show about Ms. Brown?

19  A.  It is an older record, but at the date of the record,

20  when it was pulled, it showed that Ms. Brown was housed at

21  the Tallahassee FCI in G unit, starting on the date of

22  January 1st, 2009.  It has current to the date of that

23  record.

24  Q.  Did you say 2009 or 2006?

25  A.  I'm sorry.  2006.

*Jeffrey Brunner - Direct*

860

```
 1   Q.  And this is what type of record?

 2   A.  It's a Daily Assignment Roster for the date of Saturday,

 3   March 18th, 2006.

 4   Q.  And can you show us who was assigned to G unit right

 5   there?

 6   A.  Yes.  That would have been Mr. Dixon assigned to the

 7   evening watch.

 8   Q.  And these two records in 54 were pulled in reference to

 9   Count 12?

10   A.  Correct.

11   Q.  I'm going to show you Government's Exhibit 55.  Can you

12   tell me whose assignment record this is?

13   A.  That is the same assignment record for Sabrina Bowie.

14   Q.  And did you mark the same portion of this?  Can I skip

15   over or do you need to see those?

16   A.  The dates indicating when she was in F unit.

17   Q.  The same dates?

18   A.  Yes.

19   Q.  Can you tell me what this record is?

20   A.  It's the Daily Assignment Report for April 5th, 2004.

21   Q.  And can you tell me who was in G unit on that day?

22   A.  It's actually F unit.

23   Q.  I beg your pardon.

24   A.  That shows that Mr. Moore worked the morning watch in F

25   unit.
```

*Jeffrey Brunner - Direct*

1   Q.   Is that on the right?

2   A.   Now it is, yes.

3   Q.   Thank you.

4        And can you tell me what date this is for?

5   A.   Tuesday, April 6th, 2004.

6   Q.   Can you tell me who worked the F unit that day?

7   A.   There's a notation that Mr. Moore worked the morning

8   watch.

9   Q.   And these documents in Government's Exhibit 55 you pulled

10  in connection with Count 16, involving Defendant Moore and

11  Sabrina Bowie; is that correct?

12  A.   Correct.

13  Q.   Finally, Government's Exhibit 56, can you tell me whose

14  assignment record this is?

15  A.   Shirley Blackston.

16  Q.   Can you tell me where Shirley Blackston was between

17  February 3, 2004 and November 29, 2004?

18  A.   Housed in F unit, Range 3, Bed 22, and "L" stands for the

19  lower bunk.

20  Q.   Can you tell me what this record is?

21  A.   Yes.  It's the Daily Assignment Roster.  I believe --

22  it's tough for me to see if that's April 5th or April 6th on

23  the screen.

24  Q.   I will zoom in on it for you.

25  A.   That's April 5th.

1  Q.  April 5th.  I'm sorry it's so hard to see.

2     Can you tell me who -- I have to move it out a little bit

3  more, so you can see the whole thing.

4  A.  There is an indication that Mr. Moore worked the morning

5  watch in that unit on that date.

6  Q.  Now, what record is this for?

7  A.  It's for the next day, April 6, 2004.

8  Q.  And can you tell me who worked F unit that day?

9  A.  The record reflects that Mr. Moore worked the morning

10  watch on that date.

11  Q.  Those three documents, that's what Exhibit 56 consists

12  of, and you pulled those in connection with Count 17; is that

13  correct?

14  A.  Correct.

15  Q.  Did you review other records, Mr. Brunner?

16  A.  Yes, I did.

17  Q.  And what did those records show in general?

18  A.  Generally, when an inmate said that they were in a

19  particular unit, that the records reflected that they were

20  actually in those units; and, generally, when the inmates

21  indicated contact with correctional officers, the Daily

22  Assignment Rosters reflected that those correctional officers

23  were working those units.

24  Q.  One last clarification, Mr. Brunner.

25     You said that you and George Williams were law

1    enforcement officers.

2    A.   Correct.

3    Q.   Is it your understanding that correctional officers on

4    the compound at FCI are sworn law enforcement officers as

5    well?

6    A.   That's correct.

7           MR. DAVIS:   No further questions.

8           THE COURT:   Cross-examine?

9           MR. HARPER:   Yes, sir.   Your Honor, may I consult

10   with opposing counsel for a second?

11          THE COURT:   You may.

12     (Pause.)

13          MR. HARPER:   May it please the court.

14                        CROSS-EXAMINATION

15   BY MR. HARPER:

16   Q.   Mr. Brunner, when you say you are a law enforcement

17   officer, you are a special agent; is that right?

18   A.   That's correct.

19   Q.   And these correctional officers are not special agents,

20   are they?

21   A.   No, they are not.

22   Q.   What's a special agent versus a correctional officer?

23   A.   Well, in federal law enforcement, they designate us by

24   different series, like you could be -- I'm a park ranger and

25   be a law enforcement officer, but you're not a special agent.

 1   And it's a title that I think individual agencies designate

 2   based upon certain duties.

 3   Q.   Based on --

 4   A.   Certain duties and job descriptions.

 5   Q.   Including the authority to make arrests and carry

 6   firearms?

 7   A.   That's one of the factors that goes into it, yes.

 8   Q.   And, as a special agent, you're a law enforcement

 9   officer; whereas, when a person makes a false statement to

10   you, it's actually a crime; is that right?

11   A.   That's correct; making a false statement under

12   circumstances can be prosecuted as a crime.

13   Q.   And whether the person is under oath or not under oath?

14   A.   Quite frankly, as a DEA agent, I didn't do that much, and

15   I haven't done it as an OIG agent, so I'd be sort of

16   speculating on the law.

17   Q.   Do you remember having an interview as a special agent,

18   along with Special Agent FBI Patrick Sanford, of Ms. Shonnie

19   Blackston -- Shirley Blackston on or about the 2nd of

20   February -- 22nd of February, 2006?

21   A.   I have done a lot interviews.  So, I can't go by the

22   date, but my independent recollection is traveling to

23   Pensacola and meeting with her with Special Agent Sanford.

24         MR. HARPER:  May I approach the witness, Your Honor?

25         THE COURT:  You may.

BY MR. HARPER:

Q.  Mr. Brunner, I'm showing you a report that has a date on it.  Does that date refresh your recollection?

A.  That's a report of Mr. Sanford's, and it refreshes my recollection that I was interviewing her; that's correct.

Q.  All I was trying to do was refresh your recollection, but that date was February 22nd, when you were present?

A.  Quite frankly, we do our own reports to refresh our own recollection.  This one was done by him, so I can only assume that he got the date right.

Q.  You're not vouching for Mr. Sanford?

A.  Well, if you understand how many reports we do and how many interviews we do, then you'll understand why we adopt our own reports.

Q.  All right.  But you remember the interview?

A.  I do remember the interview.

Q.  Do you remember her telling you that Mr. Moore allegedly came to the room on a particular night and had sex with Ms. Bowie at least three times that night?

A.  I remember circumstances about a number of times.  The exact amount of times, I do not recall.

Q.  Would you look at that report there?

After further reviewing that report, does it refresh your recollection?

A.  It refreshes my recollection that we had a conversation

*Jeffrey Brunner - Cross/Harper*

 1   about him coming to have sex with Sabrina Bowie, but that's

 2   Mr. Sanford's report.

 3   Q.  You don't remember still after looking at that?

 4   A.  No, I can't recall if that's accurate in his notes from

 5   him writing the report how many times.

 6   Q.  Do you recall Ms. Blackston telling y'all during that

 7   interview that allegedly Mr. Moore had sex in that room in

 8   her in -- let me rephrase it.

 9       Do you recall that Ms. Moore -- try again.

10       Do you recall, Mr. Brunner, from that interview that

11   Shirley Blackston told you and Mr. Sanford that allegedly

12   Mr. Moore came into their room -- their room, being Shirley

13   Blackston and Sabrina Bowie -- at least 15 times and had sex

14   with Ms. Bowie?

15   A.  I recall there being talk about there being a lot of sex

16   between Ms. Bowie and correctional officers, not the amount

17   of times and where it occurred.

18   Q.  Moving on.

19       You indicated with your examination with Mr. Davis here

20   that DNA was a difficult process during the course of this

21   investigation; is that right?

22   A.  That was my experience, yes.

23   Q.  But you were able to succeed in obtaining DNA samples

24   which you matched up to certain individuals; is that right?

25   A.  Yes, I was able to get one sample.

*Jeffrey Brunner - Cross/Harper*

1  Q.  And that sample did not match Mr. Moore nor Mr. Dixon,

2  did it?

3  A.  It did not.

4  Q.  And it was a semen sample; is that right?

5  A.  That's correct.

6  Q.  But you went and did an elaborate, not only a blood-type

7  analysis of it, but you go so far and to do a full-blown DNA

8  polymer chain reaction kind of specific test; is that

9  right -- or caused that to happen?

10  A.  Caused to happen might be a little more accurate.  I send

11  them away.  I'm not really an expert in that field.

12  Q.  All right.  And you indicated that using video

13  surveillance out there is difficult and problematic as a tool

14  to further your investigation; is that right?

15  A.  Yes, sir.

16  Q.  Would you agree or disagree that it may have some

17  deterrent effect?

18  A.  I would disagree.

19  Q.  You'd say that video surveillance out there would have no

20  deterrence on the activities of either inmates or guards who

21  are doing wrong illegal activities?

22  A.  Based on my experience.  I can explain it, if you would

23  like.

24  Q.  Well, they can do it on theirs.

25      As far as using the telephone, that type of a wire,

1   monitoring telephones out there at that facility, would that

2   be an easy or a hard thing to do in terms of investigation?

3   A.  Well, if you're talking about monitoring the telephone

4   and you're talking about, without the permission of the

5   people engaged in the conversation, that would be extremely

6   difficult, if not impossible.

7   Q.  And using the records that you used today, I think you

8   said was relatively easy; is that right?

9   A.  Yes, sir.  Well, it's easy to look at.  It's voluminous

10  in the amount.

11  Q.  All right.  Would you agree or disagree with Mr. Henson

12  from the Federal Detention Center that it was impossible to

13  keep up and know whether the officer was present at that

14  shift or not?

15  A.  I would disagree with that.

16          MR. HARPER:  I have nothing further of the witness,

17  Your Honor.

18          THE COURT:  Mr. Findley?

19          MR. HARPER:  May I retrieve my --

20          THE COURT:  You may.

21          MR. FINDLEY:  Yes, sir.

22                       CROSS-EXAMINATION

23  BY MR. FINDLEY:

24  Q.  Good morning, Agent Brunner.

25  A.  Good morning.

1   Q.  Now, Agent Brunner, you mentioned that you were

2   successfully able to use the wire in the FCI-Tallahassee.

3   A.  On two occasions, I was.

4   Q.  On two occasions, you were never -- you never obtained a

5   recording of any statement by Mr. Dixon; is that correct?

6   A.  No, I did not.

7   Q.  You never obtained any DNA from Mr. Dixon; is that

8   correct?

9   A.  No, I did not.

10  Q.  You never obtained any videos from the perimeter of

11  Mr. Dixon bringing in any duffle bags or shopping bags or

12  anything like that into the compound; is that correct?

13  A.  I did not get any videos.

14  Q.  You didn't obtain any of Mr. Dixon's fingerprints on any

15  contraband or anything else; is that correct?

16  A.  That's correct.

17  Q.  And you did not obtain any mailings that Mr. Dixon sent

18  to anyone in connection with this investigation; is that

19  correct?

20  A.  That's correct.

21  Q.  And you never obtained any money order from Mr. Dixon or

22  to Mr. Dixon as part of this investigation; is that correct?

23  A.  That's correct.

24  Q.  Now, you had wired up Latoya Brown on one occasion to

25  talk to C.O. Johnson; is that correct?

1    A.   Yes, that is correct.

2    Q.   So, you were able to obtain an approval for Latoya Brown

3    to wear a wire; is that correct?

4    A.   On that occasion I was, yes.

5    Q.   Right.  But despite that, you did not attempt to wire up

6    Latoya Brown to talk to Mr. Dixon about Count 12, the

7    allegation of Count 12 of the indictment; is that correct?

8    A.   That opportunity never came.

9    Q.   Well, you didn't do it; is that true?

10   A.   That's correct.

11   Q.   Now, you described the process to obtain -- let's step

12   back to the video monitoring for a second.

13       I think Mr. Harper's questions may have been directed at

14   maybe putting a camera in the hall.

15       Isn't it correct that, when you were a DEA agent in

16   Tampa, there were occasions where you were able to perhaps

17   put a little video camera on a briefcase and set it in a

18   room, something like that?

19   A.   I didn't do it, but I was aware that video cameras were

20   used.

21   Q.   You're aware of the technology of providing very small

22   cameras that can't be seen and engaging in -- and taking

23   surveillance?

24   A.   That's correct, that technology.

25   Q.   You didn't do that in this case?

1   A.  The opportunity did not come about.

2   Q.  It was too cumbersome, I believe is what you said on your

3   direct testimony, correct?

4   A.  No, sir.

5   Q.  Now, the Department of Justice is your employer; is that

6   correct?

7   A.  Yes, sir.

8   Q.  All right.  All of the U.S. Attorney's Offices throughout

9   the nation are part of the Department of Justice; is that

10  correct?

11  A.  Yes, sir.

12  Q.  All right.  You came here in July of 2005.  Did you

13  immediately start working on this investigation, or were

14  there other things that you were working on, or did you jump

15  right into this one?

16  A.  I was hired on in July, but I really didn't -- I lived in

17  a different city.

18  Q.  Where did you live?

19  A.  I lived in the Tampa Bay area.

20  Q.  And then when did you move here?

21  A.  I began coming here TDY in about August to September to

22  begin an introduction to the area and the job.

23  Q.  When you say "TDI," you mean --

24  A.  TDY, temporary duty.  That's a term we use in the

25  government.

*Jeffrey Brunner - Cross/Findley*

1  Q.  And tell me -- tell the jury what it means.

2  A.  That means that I don't have a house here; it means that

3  I come here, and I have a temporary lodging.

4  Q.  And you were TDY from August through September, and then

5  did you start on the --

6  A.  Oh, no.  I was working while I was TDY here.  I started

7  this --

8  Q.  On this case?

9  A.  Yes.  In around late August, early September.

10  Q.  All right.  Did the U.S. Attorney -- were you working

11  with the U.S. Attorney's Office at that point?

12  A.  I don't remember talking directly to them about this case

13  at that point, no.

14  Q.  All right.  Now, part of the -- in part, you relied on

15  Shonnie Daniels at some point for part of your investigation;

16  is that correct?

17  A.  Yes, I interviewed her.

18  Q.  Was she the first inmate that you interviewed out there?

19  A.  I don't think so, no.

20  Q.  She is the only one that testified in the grand jury; is

21  that correct?

22  A.  To my knowledge, yes.

23  Q.  All right.  Now, did the U.S. Attorney's Office at any

24  point advise you that they had filed documents with this

25  court stating that Shonnie Daniels could not be relied upon

1  to maintain law-abiding behavior?

2  A.  I didn't have discussions with them about her during the

3  beginning of my contact with Shonnie.  I think in the

4  discovery process, those documents you have.

5  Q.  You said in the discovery process you saw that?

6  A.  Yes.  I believe I became aware -- to explain this, it's

7  not a simple yes or no, because this was a long

8  investigation.  I spoke to her many times.

9  Q.  But at some point you became advised by the U.S.

10  Attorney's Office that they had taken the position that she

11  was not to be relied upon to maintain law-abiding behavior.

12  Is that what they said?

13  A.  I was aware that there was some issues about her

14  truthfulness.

15  Q.  And those issues about her truthfulness, did the U.S.

16  Attorney's Office advise you that she had repeatedly provided

17  false information to law enforcement?

18  A.  No, U.S. Attorney's Office did not advise me of that.

19  Q.  Did anyone advise you of that?

20  A.  Again, I became aware of issues through different

21  situations; such as, I was aware through Patrick Sanford that

22  she provided a statement about a fight that she saw that was

23  not truthful.  So that's the easiest way for me to answer

24  that question.  I can't answer it --

25  Q.  Prior to the false grand jury testimony that you're

1    referring to, did they make you aware of any document, from

2    the U.S. Attorney's Office's position, that she had

3    repeatedly provided false information in investigations?

4    A.   Not the words to that effect, no.

5    Q.   They didn't tell you that?

6    A.   No.

7    Q.   And did they tell you -- did the U.S. Attorney's Office

8    tell you that there was false information that significantly

9    obstructed and impeded the prosecution of another case?

10   A.   No, I don't --

11   Q.   Did they tell you that she had engaged in conduct that

12   substantially devalued investigative efforts made using

13   Shonnie Daniels in a undercover capacity?

14          THE COURT:   Sustained.

15   BY MR. FINDLEY:

16   Q.   Did you say she was the first inmate that you talked to

17   out there?

18   A.   No.

19   Q.   Who was the first inmate that you talked to?

20   A.   Without actually looking at the first report I wrote, I

21   can just give an indication of the progress of the

22   investigation.  She was not the first one I talked to.  As a

23   matter of fact, she wasn't even there when I started the

24   investigation.

25   Q.   Did you ever arrest Ms. Daniels for bribery?

*Jeffrey Brunner - Cross/Findley*

1    A.  No, I did not.

2    Q.  In fact, you don't arrest inmates for criminal conduct;

3    is that correct?

4    A.  I don't make arrest decisions like that.

5    Q.  You don't -- okay.

6       If a correctional officer asked an inmate about an

7    improper relationship between an inmate and another guard,

8    that by itself wouldn't violate any particular BOP rule,

9    would it?

10          MR. DAVIS:  Outside the scope.

11          THE COURT:  Sustained.

12   BY MR. FINDLEY:

13   Q.  Did you ever interview an Ashley Cartrette?

14   A.  Yes, I did.

15   Q.  When was that?

16   A.  I'd have to look at my report for the date.

17   Q.  Was it in the last month, or was it prior to the time

18   period of the indictment, or when approximately was it?

19   A.  It wasn't recently.  It was a little while back, maybe a

20   month, 2 months ago, 3 months ago.

21   Q.  Now, you were working with George Williams -- is it

22   SIA? -- out at the Bureau of Prisons?

23   A.  Yes, special investigative agent.

24   Q.  Did he ever mention Ashley Cartrette to you?

25   A.  Yes.  That was the way I even got to interview her, was,

1  my recollection, an inmate had made a complaint about a

2  party-type situation that was going on, and her name was

3  mentioned.

4  Q.  That was Beauchamp who came in and testified, correct?

5  A.  Yes.

6  Q.  The blonde woman?

7  A.  Yes.

8  Q.  Okay.  And is it correct that Ashley Cartrette was placed

9  in the SHU because she wouldn't incriminate Dixon?

10          MR. DAVIS:  Objection.

11          THE COURT:  Sustained.

12  BY MR. FINDLEY:

13  Q.  Do you know whether Ashley Cartrette was placed in the

14  SHU because -- for any reason?

15          MR. DAVIS:  Objection, again, Your Honor.

16          THE COURT:  The question now, was she placed in the

17  SHU?

18  BY MR. FINDLEY:

19  Q.  Do you know if she was placed in the SHU?

20  A.  I know she was placed in the SHU.

21  Q.  And wasn't it because she wouldn't incriminate Dixon?

22  A.  I don't make the decisions on putting people in the SHU.

23  I don't know why she --

24  Q.  Do you know why she was --

25  A.  I don't know.

1    Q.   You don't know?

2        Did you know that there was a test that they had accused

3    her of using marijuana with Mr. Dixon?

4            MR. DAVIS:  Objection.

5            THE COURT:  Sustained.  It assumes facts.

6    BY MR. FINDLEY:

7    Q.   Did you ever obtain any negative reports that showed that

8    any inmate involved with Mr. Dixon had not done what they had

9    been accused of?

10           MR. DAVIS:  Objection.  I can't understand the

11   question.

12           THE WITNESS:  Neither can I.

13   BY MR. FINDLEY:

14   Q.   Did you ever obtain any marijuana tests from any inmates

15   as part of this investigation?

16   A.   I did not.

17   Q.   So, if there were a negative test, you didn't receive

18   them; is that correct?

19   A.   If there was a negative -- I didn't get any tests related

20   to drug screens of inmates.

21   Q.   Now, you reviewed bank records in this case; is that

22   correct?

23   A.   Yes, I did.

24   Q.   You looked at Hill's, correct?

25   A.   Yes, I did.

*Jeffrey Brunner - Cross/Findley*

878

1    Q.  You looked at Barnes' bank records?

2    A.  That's correct.

3    Q.  You didn't look at Dixon's bank records?

4    A.  Yes, I did.

5    Q.  There was nothing incriminating in Dixon's records to

6    bring forth to this court; is that correct?

7    A.  That's correct.

8    Q.  All right.  You also concluded, I believe, that Hill had

9    improperly monitored call reports, correct?

10   A.  That was a conclusion that I had.

11   Q.  And Barnes had improperly monitored call-monitor reports

12   by your judgment?

13   A.  That's correct.

14   Q.  But you did not so conclude for Mr. Dixon; is that

15   correct?

16   A.  That's correct.

17   Q.  Isn't it true that Mr. Dixon had no involvement in any

18   specific mailing referenced in this indictment?

19   A.  If you can give me more of a specific --

20   Q.  Well, you testified in the grand jury about the mailings;

21   isn't that true?

22   A.  Correct.

23   Q.  All right.  And you did testify in the grand jury on

24   several occasions?

25   A.  Yes.  On two occasions.

1  Q.  And you told the grand jury about individuals that had

2  participated in the mail fraud; is that correct?

3  A.  Yes.

4  Q.  And you did not mention Mr. Dixon; is that correct?

5  A.  That's correct.

6  Q.  And you also stated that the mail-fraud scheme that

7  Mr. Barnes had engaged in with Ms. Hartline was separate and

8  apart from the mail-fraud scheme that he engaged in -- that

9  Barnes engaged in with Ms. Daniels; is that correct?

10  A.  I'd have to take a look at the grand jury testimony to

11  see what I stated so I can be accurate.

12        MR. FINDLEY:  May I approach, Your Honor?

13        THE COURT:  You may.  You may just want to ask him

14  the facts before you ask him about the statement.

15  BY MR. FINDLEY:

16  Q.  Mr. Dixon wasn't involved in any of the mailings, was he?

17  A.  If you're asking me about Mr. Barnes' mailing, I had no

18  information of him having involvement in Mr. Barnes'

19  mailings.

20  Q.  Mr. Dixon had no involvement in Mr. Barnes' mailing?

21  A.  That's correct.

22  Q.  All right.

23        MR. FINDLEY:  That's all I have.  Thank you, agent.

24        THE COURT:  Redirect?

25                      REDIRECT EXAMINATION

*Jeffrey Brunner - Redirect*

1  BY MR. DAVIS:

2  Q.  Mr. Brunner, Mr. Harper asked you a question, and I

3  believe you confirmed his question that there was a semen

4  sample taken that did not match Mr. Moore or Mr. Dixon.

5  A.  That's correct.

6  Q.  Was that semen sample taken with the expectation that it

7  was for Mr. Moore or Mr. Dixon?

8  A.  No, it wasn't.

9  Q.  Was that semen sample obtained and thought to be

10  identical with another defendant in this case?

11  A.  Yes.

12  Q.  And was that semen sample analyzed?

13  A.  Yes, it was.

14  Q.  And do you know the results of that analysis?

15  A.  There was a positive match for the defendant that I

16  thought it was.

17  Q.  Mr. Harper also asked you about -- I believe he said it

18  was easy to look at the records; is that correct?

19  A.  My response was that it's easy to look at a record, but

20  the records are voluminous.

21  Q.  Can you estimate how voluminous the records were in this

22  case?

23  A.  Considering all of the daily activity reports that I

24  looked through going back for 2 years and there's nine pages

25  per report multiplied times 2 years' worth of records, there

 1   were thousands of records, just that record of daily activity

 2   reports.

 3   Q.  Mr. Findley asked you why you didn't wire Latoya Brown to

 4   go after Mr. Dixon, and you said the opportunity didn't

 5   arise.

 6   A.  That's correct.

 7   Q.  Can you explain that?

 8   A.  Well, to explain that, when I sought authorization to use

 9   Latoya Brown, it took me a month to get the authorization.

10   Then we had to test the wire.  Then we had to know that

11   Mr. Johnson, who it was used for, was actually going to be

12   assigned to a shift, and then we also had to know that we

13   could reasonably put Inmate Brown next to him where he

14   wouldn't be suspicious.  Those circumstances never came close

15   with Mr. Dixon.

16   Q.  Did the circumstances change after you ran one wire?  Did

17   the environment become more suspicious?

18   A.  I thought about the opportunity after she called me on

19   the telephone on March 20th to report this contact with

20   Mr. Dixon, but that was days before the change of shift, and

21   the next shift assignment did not provide an opportunity to

22   know where he was going to be so that I knew that I could get

23   her in close proximity to him to even attempt to do something

24   like that.

25   Q.  So, the conversation took place first, correct?

1  A.  That's generally how it worked.

2  Q.  No, no.  I'm talking about this particular conversation

3  you just talked about, the conversation between Dixon and

4  Latoya Brown.

5  A.  Was reported to me over the telephone by Latoya Brown.

6  Q.  And when was that reported?

7  A.  That was reported to me on the 20th, and she told me

8  about the conversation that occurred on the 18th.

9  Q.  Thereafter, people were in different places; is that your

10  testimony?

11  A.  Yeah, the shift changed, and I have no authority to

12  dictate where correctional officers work or where inmates are

13  housed.

14  Q.  Mr. Brunner, Mr. Findley brought up a plea agreement in

15  another district.  What's your understanding about whether or

16  not a plea agreement in another district is binding in this

17  district or vice versa?

18          MR. FINDLEY:  Objection.

19          THE COURT:  Sustained.

20  BY MR. DAVIS:

21  Q.  Mr. Brunner, do you -- what's your understanding of how

22  the U.S. Attorney's Offices are districted across the United

23  States?

24  A.  The United States is divided into federal districts

25  depending on the size of the state and the population, and

*Jeffrey Brunner - Redirect*

1    Congress determines how the division is made.

2    Q.  And who heads up the U.S. Attorney's Office in a

3    particular district?

4    A.  The U.S. Attorney.

5    Q.  And who is he appointed by?

6    A.  The President.

7    Q.  And are there separate individuals for each district?

8    A.  Yes.

9    Q.  And is a decision made in one district binding on

10   another?

11   A.  Not to my knowledge, no.

12        MR. DAVIS:  One second, Your Honor.

13   BY MR. DAVIS:

14   Q.  One more question about DNA and how long that's

15   available.

16       When you've got witnesses that were testifying to sexual

17   activities with corrections officers, in general, were they

18   talking about events that happened recently or in the

19   historic past?

20   A.  Historic past.

21   Q.  And if they hadn't obtained the DNA at the time, what was

22   the likelihood of getting it after the fact?

23   A.  I was unsuccessful in an attempt that was weeks after the

24   event that I believe took place.  So I had no expectation,

25   based in that institution based upon the cleaning, that I

1   would ever find DNA evidence.

2   Q.   In response to a question by Mr. Findley, you stated or

3   you agreed with his question that Dixon had no involvement in

4   any of Mr. Barnes' mailings.

5   A.   That's correct.

6   Q.   What did you mean by that?

7   A.   I meant that the interviews that I did with Deronda

8   Hartline, who was involved in the mailings, she did not

9   mention Mr. Dixon's name during that interview.

10       The interview I did with Shonnie Daniels concerning the

11   mailings that she had to Mr. Barnes' house, she did not

12   mention Mr. Dixon's name during that conversation.

13   Q.   So that wasn't a legal conclusion on your part?

14   A.   No.

15   Q.   Would it be more accurate to say that you did not obtain

16   evidence of Mr. Dixon's involvement in those mailings?

17   A.   That's correct.

18   Q.   One last point.

19       Were those interviews conducted before Mr. Barnes pled

20   guilty and cooperated with the United States Government?

21   A.   Yes.

22          MR. DAVIS:   No further questions, Your Honor.

23          THE COURT:   Thank you, Mr. Brunner.  You may step

24   down and return to counsel table.

25          Mr. Davis or Mr. Sprowls, please call your next

1    witness.

2            MR. SPROWLS:  Your Honor, we're kind of at that point

3    I think.  We would appreciate the opportunity to confer among

4    ourselves to see if we have -- want to go on or possibly pull

5    the plug.

6            THE COURT:  Surely.  You would like to do that right

7    now while we are here.

8            MR. SPROWLS:  Or if the court still wanted to break

9    at 1:00.

10           THE COURT:  Well, if you're considering resting, I

11   would like to do it before we break for lunch.  But, I mean, I

12   don't want to keep you from talking to each other about that.

13   Do I infer correctly that that's what you're thinking about?

14           MR. SPROWLS:  If we can have a moment?

15           THE COURT:  Surely.

16      (Pause.)

17           MR. SPROWLS:  At this time, Your Honor, the

18   government would announce rest.

19           THE COURT:  All right.

20           Members of the jury, what that means is that you have

21   gotten all of the evidence in the government's case-in-chief.

22   As I told you at the beginning of the trial, the sequence is

23   that the government goes first.  When the government rests, as

24   the government has just done, the defendants then each

25   individually have an opportunity to call witnesses or present

1    evidence during the defense case.  The defendants don't have

2    to present evidence, but this is the time in which they would

3    do that, if they chose.

4         Then after each of the defendants has presented any

5    evidence that the defendant chooses to present and announces

6    rest, the government then will have another opportunity within

7    limits to present evidence responding to the defense case in

8    what's called the rebuttal phase of the case.

9         The fact that the government rested makes this a

10   convenient point to break for lunch.  Let's take a lunch until

11   1:30 by that clock.  That's an hour and 7 minutes.  We've got

12   to shift gears here, and that will give you a couple of extra

13   minutes, and we will start back at 1:30.

14        Jury out, please.

15     (The jury exited the courtroom at 12:25 p.m.)

16        You may be seated.

17        Mr. Findley, I sustained the objection to your

18   question to Mr. Brunner about whether the government told him

19   that the government had filed a document saying that Shonnie

20   Daniels can't be trusted.  First, whether the government told

21   him that or not doesn't make any difference.  So, the question

22   was objectionable just on the basis of the question of whether

23   the -- what the government told him.

24        Aside from that, the statement that she can't be

25   trusted is not a statement of fact within the meaning of the

 1   *United States versus Deloach* case.  It's an advocacy position

 2   in an unrelated case in an unrelated circumstance.  I thought

 3   it was not a party admission that should be admitted under

 4   that standard.  So, under two separate grounds, I sustained

 5   that question.

 6           MR. FINDLEY:  Just to explain, the purpose was to

 7   question the validity of the investigation in relying on some

 8   sources and alternatively admission by a party opponent.

 9           THE COURT:  Right.  The quality and manner of the

10   investigation is irrelevant.  The question is what the

11   evidence presented here in the courtroom establishes, not how

12   well the officers did their job, but --

13           Now what else?  The government has rested.

14           MR. FINDLEY:  Your Honor, at this time Defendant

15   Dixon would move for a judgment of acquittal under Rule 29

16   with respect to all of the counts that he is charged with.

17           Do you want to hear argument now?

18           THE COURT:  Yes, I do.

19           MR. FINDLEY:  Okay.

20           THE COURT:  Give me just a minute, Mr. Findley.

21           All right.  Go ahead.

22           MR. FINDLEY:  Your Honor, with respect to the Count

23   One, first, Mr. Dixon is alleged to have been involved in a

24   conspiracy that had multiple purposes.  First of all, we

25   believe that the government has not provided any evidence of

1   an agreement to commit --

2          THE COURT:  Go ahead.

3          MR. FINDLEY:  We contend that the government has not

4   proven any evidence of an agreement to commit -- of an

5   agreement that involved Mr. Dixon with any of the enumerated

6   purposes in the indictment.

7          The four purposes are, one, to have an agreement to

8   engage in a conspiracy to corruptly seek something of value in

9   exchange for being induced to do an act or provide contraband.

10         We would submit that there is no evidence of any

11  agreement between Mr. Dixon and anybody else to engage in a

12  joint venture to do that.  I think it was clear from

13  Mr. Barnes' testimony that there was no such agreement, but I

14  don't want to get into arguing weighing the facts.  I don't

15  think there is any evidence of an agreement involving

16  Mr. Dixon to do that -- to engage in a joint venture.

17         THE COURT:  Well, if I understand, there is evidence

18  that they swapped shifts; that that facilitated having sex

19  with inmates; that that was done in exchange for contraband;

20  and, if I understood what Mr. Barnes said, they didn't have an

21  agreement, but they had a mutual understanding.

22         Now, why couldn't a juror infer, it was a little more

23  than Mr. Barnes said, he's still holding back a little bit,

24  when they get these records that they are trading off shifts,

25  and then there is testimony about the sex in exchange for

1   contraband, why couldn't a jury find that Mr. Barnes and

2   Mr. Dixon were in this together, and they were trading sex for

3   contraband?

4       MR. FINDLEY:  That wouldn't be enough, because the

5   allegation is that there was a conspiracy to engage in the

6   scheme of accepting bribes, not a scheme to engage in having

7   sex with inmates.

8       THE COURT:  But if it was done in exchange for

9   contraband, that would be a bribe.

10      MR. FINDLEY:  But there is absolutely no evidence

11  that the agreement, even a mutual understanding, went to the

12  extent of a mutual understanding that sex was going to be

13  swapped for contraband.  There may be some scintilla of

14  evidence of a mutual understanding to swap in order to have

15  sex, but not to swap in order to commit the crime of bribery.

16      THE COURT:  All right.

17      MR. FINDLEY:  The second purpose of the conspiracy,

18  alleged purpose, is to engage in a joint venture to

19  fraudulently deprive another of the intangible right of honest

20  services; and, for the purposes of executing such scheme, to

21  cause matters to be delivered by the U.S. Postal Service.

22      In this case, there is an overt act that was alleged

23  to have been accomplished by Mr. Barnes on November 18th,

24  2005, to send a money order to the address in Georgia.

25      Both Mr. Barnes and Agent Brunner admitted that there

1    is no connection to Mr. Dixon in connection with this mailing;

2    and, in addition, there are three other mailings identified in

3    the mail fraud count, which does pertain only to Alfred

4    Barnes, but he is not alleged to have any connection to those

5    mailings.

6         Furthermore, there is no allegation of any joint

7    venture to engage in any type of mail fraud.  I believe the

8    closest the government has come is this generalized discussion

9    about whether someone would use an address.  But I don't think

10   that that puts them in a joint venture for their common

11   venture.  If anything, that describes separate conspiracies,

12   one which has been perhaps proven against Mr. Barnes, but

13   nothing that was even commenced by Mr. Dixon involving a

14   speculative unknown address to which there's proof that any

15   mailings were ever made.

16        So, I believe that that purpose suffers and should be

17   the subject of a Rule 29 acquittal as well.

18        Thirdly, the third purpose of Count One of the

19   conspiracy is to engage in the joint venture to knowingly

20   intimidate, threaten and corruptly persuade another person

21   with intent to hinder, delay and prevent the communications to

22   a law enforcement officer of information relating to the

23   commission of a federal offense.

24        The term "corruptly" has been defined very carefully

25   by the United States Supreme Court in the *Arthur Anderson* case

1   that recently came out, which dealt with Section 1512 and

2   which dealt with the terms of "corruptly persuade."  And in

3   that case, the Supreme Court determined that, when Arthur

4   Anderson destroyed documents, knowing that there was an

5   investigation of Enron coming, but did so pursuant to their

6   lawful right, that's not an inherently corrupt act.  So, if

7   it's not an inherently wrongful act; therefore, it's not

8   corrupt.

9           In this case, the worst that the evidence has shown

10  is that there was a conversation where Mr. Dixon suggested

11  that an inmate could be shipped if she cooperated.  That's a

12  true statement.  There is nothing corrupt or nothing that

13  shows his intent to -- in that conversation on March 18,

14  2006 -- persuade, corruptly persuade, someone not to

15  cooperate.  And that's the basis of our Rule 29 motion on

16  that.

17          THE COURT:  Well, it would be the case if he was

18  providing her accurate information about what could happen for

19  somebody to cooperate, then he didn't act corruptly.  But if

20  what he was trying to do was not provide accurate information,

21  but basically to threaten her, that is to say, "I can get you

22  shipped, if you do this," then it would be corrupt.  Yes?

23          MR. FINDLEY:  I would disagree, and I would disagree

24  based on the facts that were reviewed in the _Arthur Anderson_

25  case, because Arthur Anderson knew that there was an

```
 1    investigation of their client, Enron, yet they destroyed the
 2    documents, anyway.  They knew that that was -- that their
 3    objective was to get rid of that.
 4         THE COURT:  So, your position is, if a correctional
 5    officer goes do a witness and says, "Law enforcement officers
 6    are about to come talk to you, and I just want you to know
 7    that, if you talk with the law enforcement officers and tell
 8    them what I have done, I'm going to have you shipped, and I'm
 9    going to do it in retaliation for your talking to law
10    enforcement officers, and I'm going to see that you get as far
11    away from your family as I can get you, and you can count on
12    it," you're telling me that's okay, the Supreme Court in
13    Arthur Anderson said that's okay?
14         MR. FINDLEY:  I didn't say that.  I'm comparing the
15    facts of Arthur Anderson to our case, and I don't think that
16    the case that you stated was the case that the government has
17    proven against Mr. Dixon.
18         THE COURT:  Well, right.  Then we get back, not to
19    the legal point, but what can one reasonably infer from this
20    evidence.
21         MR. FINDLEY:  Right.
22         THE COURT:  Okay.  I'm with you.
23         MR. FINDLEY:  Purpose number four, I don't know if
24    they're intending to pursue that one, but there is an
25    allegation that one of the purposes of the conspiracy was to
```

1    knowingly travel in interstate commerce and use the mail and a

2    facility in interstate commerce with the intent to basically

3    engage in extortion.

4          THE COURT:  I will give them a chance to respond, and

5    we'll find out what part of that happened, exactly what their

6    theory is.

7          All right.  That's Count One.  You have other counts?

8          MR. FINDLEY:  Yes, I do.  I thought you meant right

9    now you wanted them to respond.

10          With respect to the remaining counts of the

11    indictment against Mr. Dixon, there's Counts 9, 10 and 11,

12    that allege the crime of bribery.  We would suggest that the

13    evidence does not show a *quid pro quo* exchange.  There may

14    have been evidence of sex going one way and contraband going

15    the other way, but not evidence of a *quid pro quo*.  And so we

16    would move for Rule 29 acquittal on that.

17          With respect to Count 12, we would move for a

18    judgment of acquittal on the same basis that I just stated,

19    essentially on the *Arthur Anderson* case.

20          So, we move for a judgment of acquittal on all

21    counts.

22          Thank you.

23          THE COURT:  All right.

24          Mr. Harper?

25          MR. HARPER:  Thank you, Your Honor.

1          I would adopt all of the arguments made by

2    co-counsel, Your Honor.  And, further, if I may, I would like

3    to start with Substantive Count Number 16, the bribery count,

4    the substantive bribery count.  Mr. Moore's name is in two

5    substantive counts, Count 16 and 17.

6          Count 16 is based on the testimony of Sabrina Bowie,

7    who is Inmate Number 5.  It was specifically asked during her

8    cross-examination if her relationship, as she alleged, was in

9    any manner reimbursed or paid for, did she receive or accept

10   something in value in some sort of *quid pro quo*, were the

11   words I used, and I tried to say it as many different ways as

12   I could.  And she denied that there was any such *quid pro quo*.

13         We would submit a bribery, as a matter of law,

14   requires an exchange, not only as alleged, but receive

15   something, give something, an acceptance in return, and that

16   that was not proven as a matter of -- this case as pertaining

17   to that count.

18         THE COURT:  Well, and she did say on your

19   cross-examination that the sex she had with Mr. Moore was not

20   given to -- not a give or take for contraband.  It wasn't in

21   exchange.  Then on redirect, either Mr. Sprowls or

22   Mr. Davis -- I don't recall which -- said, "Well, why did you

23   have sex with him, with the officers?"  And she said, "So they

24   would bring me contraband.  It was understood.  The more you

25   done, the more you got."

1          She wouldn't have had sex if she didn't think she

2     would get contraband.

3          MR. HARPER:  But as pertains to this particular

4     officer, she said that was not the motive, Your Honor.  This

5     isn't the only man she had sex with.  I understand what you're

6     about to say about the inference, but --

7          THE COURT:  Ah, I think it's a -- well, I understand.

8     If it had stopped at the end of the cross, you'd have a much

9     stronger argument.  He kind of rehabilitated that part of the

10    case on the redirect, I think.

11         MR. HARPER:  All right.

12         THE COURT:  Which to credit how to resolve the

13    apparent inconsistent is probably up to the jury, but I

14    understand the position on that.

15         MR. HARPER:  All right.  As to Count 17, Your Honor,

16    the -- as a lawyer, I have a hard time saying there's no

17    evidence, and probably it's the sufficiency and credibility of

18    it that's the real guts of the issue.  But I would still say,

19    as a matter of law and fact, there was no evidence that an

20    attempt was made to knowingly and corruptly persuade Shirley

21    Blackston in a manner contemplated under 18, United States

22    Code, Section 1512.

23          In particular, the gifts she allegedly received were

24    well at least several weeks, 2 weeks, after the fact and not

25    within any type of proximity to infer that it was some sort of

1     an attempt to obstruct.  She was never threatened.  She was

2     never told that that's what it was.  And her conclusion is not

3     sufficient to allow the case to go to the jury.

4              THE COURT:  All right.  That one, again -- and I

5     should say, of course, the test at this point is not whether I

6     believe the evidence or how I'd rule based on the evidence

7     that's been presented.  The test for me is whether the

8     evidence as presented is enough evidence that, if believed and

9     credited fully by the jury and supported by all reasonable

10    inferences, the jury could draw in the government's favor.

11             Looking at the record in that respect, could a jury

12    find beyond a reasonable doubt that the defendant is guilty of

13    the charge?

14             Ms. Blackston testified that a couple of weeks -- I'm

15    sorry -- about a week after the sex between Mr. Moore and

16    Ms. Bowie, Mr. Moore called her to his unit, said he didn't

17    know what got into him, if she needed anything to let him

18    know.  He brought her about five boxes of the cigars.

19    Afterwards, he always had something for her.

20             Then she testified that later Mr. Barnes said that he

21    thought she was working with SIS, and he said he put something

22    in her locker and -- or maybe he said, if he thought or an

23    officer thought she was working with SIS, something would be

24    put in her locker, and she would be shaken down.

25             It seems to me, if I view that evidence in the light

1  most favorable to the government and draw the inferences,

2  that's both a payment, cigars; and it's a threat to have

3  something planted in your locker to get shaken down and

4  punished for it.

5          MR. HARPER:  Threat by Barnes?

6          THE COURT:  Well, it was a threat communicated by

7  Mr. Moore.  I'm sorry.  You're right.  That was Mr. Barnes.

8  All right.

9          So, what you have with Mr. Moore is that he brought

10  her the cigars.

11          MR. HARPER:  Yes.

12          THE COURT:  And then whatever inferences one chooses

13  to draw about any cooperation, okay.  All right.

14          MR. HARPER:  And, finally, Your Honor, the arguments

15  as to the conspiracy, I think, are a little bit different than

16  those raised by Mr. Dixon, because there's actually no

17  evidence at all connecting Mr. Moore to a mailing of any sort.

18          So, to the actual mail-fraud count or mail-fraud

19  charge, it seems particularly compelling, and Mr. Barnes, take

20  him or leave him, and none of the inmates connect Mr. Moore to

21  any type of allegation of mailing or any type of knowledge to

22  any mailing or any type of involvement in any mailing.

23          We would say that, toward that end, the mail-fraud

24  charge has not been proven to the requisite standard required

25  of law.

1        The overall conspiracy I can say and argue in good

2   faith, and do, that there's certain things that -- there's

3   some law I tried to understand and track, and drafted this

4   massive memo in terms of honest services, and I haven't filed

5   it, because I'm not sure I still understand all of the issues

6   involved.

7        Part of it is, at this point in the case whether a

8   motion to strike is a proper procedure, a motion to dismiss is

9   proper procedure or a motion for judgment of acquittal, when

10  part of the case needs to be whacked off, at least in my mind.

11  And the points that I have, as far as whacking off -- and

12  maybe I should think about that more carefully before I speak,

13  but -- cutting off allegations of the indictment or striking

14  them is what I did with my first motion, and I've seen

15  appellate law that says a motion to strike, if it dismisses a

16  count, is the same thing as a motion to dismiss, and at this

17  stage may be treated as a motion for judgment.

18        THE COURT:  Let's talk about the substance of it.  I

19  don't care what we call it.

20        MR. HARPER:  The point I was trying to ramble to is

21  that there is no allegation about marijuana by any of these

22  men here.  I haven't heard anything that I recall of any

23  contraband being brought in of that nature.  I know there's

24  some pregnancy tests, and that I objected to pretrial and

25  renew the objection about BOP regulations as issued by the

1    warden having the substance of law to be part of the

2    indictment here.  There's some case law out of the Second

3    Circuit on that.  The Second Circuit has specifically said

4    that is not constitutionally -- not a constitutional

5    sufficient allegation, violation of the prison regulations.

6    And there's a case called --

7            THE COURT:  We are a long way.  I need you to move.

8    Frankly, we are using up your time to prepare for your case,

9    so --

10           MR. HARPER:  I appreciate that, but I feel like I

11   need to make the record here where we are.

12           The allegation as far as Mr. Moore misusing official

13   information on page 3 of the indictment, we would submit has

14   not been sufficiently proven to allow it to the jury, and we

15   move that that be struck.  And part of subparagraph 4 of

16   paragraph 3 on page 3 that goes to honest services, we would

17   renew that motion to strike.

18           Overall, we would say that the proof of an agreement,

19   an overall agreement that Mr. Moore knowingly participated in

20   has not been shown to the requisite standards to allow it to

21   go to the jury.

22           THE COURT:  All right.  Thank you.

23           MR. FINDLEY:  Can I make one quick point?

24           THE COURT:  Okay.

25           MR. FINDLEY:  First of all, I would like to join in

1    the motion to strike and any motions related to multiple

2    conspiracies and surpluses, et cetera.

3            Secondly, I would like to cite some mail-fraud cases

4    real quickly.  There's Kann versus United States, 323 U.S. 88,

5    that says that the federal mail statute is not put forth to

6    reach all frauds, but only limited to instances in which the

7    use of the mails is part of the execution of the fraud,

8    leaving all other cases to be dealt with under state law.

9            Also, Schmuck versus United States, 489 U.S. 705,

10   that also says that the mailing has to be part of the

11   execution of the fraud.

12           In addition, there are binding cases that say that

13   the scheme, in the Eleventh Circuit and former Fifth Circuit,

14   must be dependent in some way upon information and documents

15   passed through the mail.  That's U.S. versus Downs, 870 F.2d

16   613; U.S. versus Kent, K-e-n-t, 608 F.2d 542; and, finally,

17   Henderson versus U.S., 425 F.2d 134.

18           Thank you.

19           THE COURT:  Mr. Davis or Mr. Sprowls?

20           MR. SPROWLS:  With regards to --

21           THE COURT:  Let me say on some of this, I'll use the

22   lunch hour to go back through my notes.  I've got pretty

23   detailed notes on who said what, so I can sort out some of the

24   facts, but if there are particular facts you want to call my

25   attention to.  Then I really need to make sure I understand

1   the conspiracy theories better than I may.

2          MR. SPROWLS:  Well, candidly, Judge, what you have

3   questioned the defense about is right on track of what our

4   theory is on the, let's say, with regard to the bribery.

5          Something of value, I guess that would be the sex and

6   then the contraband, which is of value to the inmate, if only

7   for them to sell and get the things they want and make life

8   better for them.

9          THE COURT:  That part I got.

10         MR. SPROWLS:  Okay.

11         THE COURT:  On the witness tampering part of this,

12  what do you say the federal crime was?  I mean, this is one

13  area where Mr. Harper's assertions about -- and

14  Mr. Findley's -- about whether it's a crime to do something

15  contrary to what the warden said makes a difference.  Because,

16  as I understand the witness tampering statute, it's not

17  witness tampering to induce a witness not to report a

18  violation of a prison rule, unless that's a crime.  Right?

19  Witness tampering requires interfering with a witness wanting

20  to report a crime.

21         MR. SPROWLS:  Having sex in the prison.

22         THE COURT:  That's a crime, I understand.  I mean,

23  that's what I'm asking you.  What's the crime -- and partly I

24  ask this because I'm putting together a jury instruction.  So,

25  I need to know what crimes we're talking about.  Sex with an

1    inmate is a crime.  Bringing in some contraband is certainly a

2    crime.  Maybe not everything.

3              MR. SPROWLS:  Correct.  Well, alcohol, bringing in

4    that is statutorily a crime.  I think that's in Title 18.

5              THE COURT:  I have to go back to my notes.  Did that

6    happen?

7              MR. SPROWLS:  I believe one of the witnesses

8    testified yesterday that they --

9              THE COURT:  Vodka.

10             MR. SPROWLS:  -- got Vodka, yeah.  The one point,

11   actually --

12             THE COURT:  So -- but those are the crimes we're

13   talking about -- sex, contraband, both of those.

14             MR. SPROWLS:  Yes, sir.

15             THE COURT:  And not anything else?

16             MR. SPROWLS:  Correct.

17             THE COURT:  All right.

18             MR. SPROWLS:  As far as the fourth element or

19   objective in the conspiracy, I guess we would have to concede,

20   we really didn't touch on that point.  I'm candidly a little

21   bit at a loss as to what we had in support of that.  Like, how

22   did it get in there?  But there it was.  I think there may

23   have been some thought about Mr. Barnes's travels to Georgia

24   to retrieve -- I mean, he lives there, admittedly, but that is

25   where he was having the mailings go to.  And I think that's

1    where our theory was.

2        THE COURT:  So, with these two defendants, you don't

3    claim that the fourth object is any longer at play.

4        MR. SPROWLS:  Conspiratorially, I would think it's

5    probably a stretch.

6        THE COURT:  You stand by the other three.

7        MR. SPROWLS:  Yes, we do.

8        THE COURT:  Tell me the connection between these

9    defendants and any mailing.

10        MR. SPROWLS:  And any --

11        THE COURT:  Mailing.

12        MR. SPROWLS:  Judge, as far as the mail-fraud

13    conspiracy, it's our position that to some extent the mailings

14    have to be essential or it can't be incidental.  Clearly, the

15    mailings here were on Barnes' part, but don't forget Mr. Dixon

16    explained the process and Barnes is hearing it, what Dixon is

17    doing.

18        THE COURT:  "Here's what you could do.  You could

19    have somebody mail something."  I mean, that was the gist of

20    what he's saying, right?  And, of course, Barnes has already

21    got it going on.

22        MR. SPROWLS:  He's got it going on.  Now, it wasn't

23    clear today from Mr. Barnes's testimony that he knew that

24    Dixon was actively engaging in that same process.  It didn't

25    come across that way, I understand.  But he at least knows

1   that the idea of bringing in contraband, getting money from

2   the inmates, "Hey, let's do it this way," especially when they

3   are selling the cigarettes.

4           THE COURT:  Here's my concern:

5           I don't think there was any evidence that Dixon did

6   it that way, is there?  I mean, he said, "Here's what you

7   could do."  Is there any evidence that Dixon actually was

8   involved in the mailing?

9           MR. SPROWLS:  I'm saying today, I have interviewed

10  Mr. Barnes a number of times, and I will candidly say I was

11  sorrily disappointed.

12          THE COURT:  Witnesses can mess up more good cases

13  than any other cause.

14          MR. SPROWLS:  I don't think he said that, but I guess

15  what I'm trying to say is that Mr. Dixon, at least, was aware

16  that mailings could be a pivotal point to this type of crime,

17  and it would be definitely foreseeable.  I mean, he's

18  foreseeing it to the point he's talking about.

19          THE COURT:  Here's the question:

20          The testimony that we do have about this seems to me

21  more probative that there was not a conspiracy than there was

22  in this sense:

23          Dixon goes to Barnes and says, "You know, you could

24  run a contraband scheme by having stuff mailed to an address

25  outside."

1            Well, now, if they are in it together, Dixon wouldn't
2    be telling Barnes this, because Barnes is already doing it.
3    So, it seems to me it suggests that Mr. Dixon doesn't know
4    what Mr. Barnes is up to.
5            MR. SPROWLS:  No, not insofar as --
6            THE COURT:  If it's a conspiracy, you would think
7    that Mr. Barnes would say, "Yeah, you can, and I've got, you
8    know, I'm already doing it."  Instead, Mr. Barnes keeps his
9    own counsel.
10           MR. SPROWLS:  Isn't a conspiracy an unlawful
11   agreement?  Now, whether or not they agreed to do it, and one
12   guy is talking to other, "Hey, let's further this illegal
13   activity, you know, hey, give some thought to that."
14           THE COURT:  Yeah, but that's not quite what he said.
15   But, even if he did, the way Mr. Barnes reacted was not to
16   say, "Oh, yes, let's do this together."  What Mr. Barnes did
17   was keep his mouth shut and not even tell Mr. Dixon that he
18   was, in fact, doing it solo.  It seems to me that's a hurdle.
19           MR. SPROWLS:  I understand that it is what it is, I
20   guess, but we would -- our position is that --
21           THE COURT:  That's the mailing, the mailing that
22   actually went on was Mr. Barnes in Thomasville with two
23   different inmates.
24           MR. SPROWLS:  Yes, at least that.  At least two.  I
25   don't know how many there were.

1          THE COURT:  Sure.  Perhaps more, but it's Barnes and

2     the Thomasville -- his mother's address in Thomasville.  You

3     don't have any other mailings going on somewhere.  So,

4     basically, what there is is two things:

5          There's the Thomasville address that Mr. Barnes is

6     using with at least two inmates; and then there is the

7     conversation between Mr. Dixon and Mr. Barnes, where Mr. Dixon

8     says, "You can do this by mailing."

9          MR. SPROWLS:  Right.  I mean, if we -- if there was

10    an agreement, you know, a tacit, albeit very -- an

11    understanding of, "I won't tell on you, you don't tell on me,"

12    and I mean -- and I'm not saying that there isn't, but I

13    think, if we get past that, then we would argue that the

14    mailing -- mailing, use of the mails is reasonably foreseeable

15    here.  We've got one guy doing it, and we have another one

16    talking about it.

17         THE COURT:  So it's *Pinkerton*?

18         MR. SPROWLS:  Yes.

19         MR. FINDLEY:  Not to engage in a criminal act?

20         THE COURT:  All right.  Here's what I need to do.

21    I'm not sure that any of that calls for any rebuttal.  Was

22    there something that was said by the government that you

23    really need to respond to?

24         MR. FINDLEY:  I think the court understands.

25         THE COURT:  I need to read back through my notes and

1    give this some thought.  So, I will tell you what I'm going to

2    do with it when we come back.  I don't know that I can tell

3    you anything that will help you with your preparation.  You

4    are going to have about 35 minutes for lunch, not very long,

5    but let me tell you, I try to err on the side of preserving

6    people's appellate rights.  So, understand, I grant this

7    motion at this stage, if I'm certain I've got it right.  But

8    there is also something to be said, at least sometimes, for

9    having the count in there so that the government either loses;

10   or, if I granted the motion later, they could go appeal.

11        I do try to keep the parties' appellate right

12   whenever possible.  If I grant a motion at this stage of the

13   case, the government loses its appellate right.

14        But at least the fourth object will come out of this,

15   and I'll work hard on the others.  I think you should expect

16   me not to grant the motion all the way across the board.

17   Probably, the bribery and tampering substantive counts will

18   stay in, and probably the conspiracy count, at least with

19   those two objects, will stay in.

20        You should take all of that with a grain of salt

21   because I've got to go look at this more carefully, but I want

22   you to have as much notice as you can to prepare as best you

23   can.  So, I'll get you a ruling when we come back in at 1:30.

24        Mr. Harper, you're going to be ready to go at that

25   point?

1          MR. HARPER:  Yes, sir.

2          THE COURT:  And, Mr. Findley, you have somebody ready

3   when Mr. Harper announces rest?

4          MR. FINDLEY:  Yes.  Is Ms. Dixon okay to testify?

5          THE COURT:  On the subjects that you came up with,

6   yes.

7          MR. FINDLEY:  And do you want me to proffer the

8   questions for the court to make sure we are clear?  I don't

9   want to go into an area where I'm not supposed to.

10          THE COURT:  I think we're okay.  It does seem to me

11   that, under Rule 16, the test probably was discoverable.  The

12   testimony the government put on about the pregnancy test, I

13   think that's a discovery item under Rule 16.  I'm not sure my

14   ruling here would be any different, anyway, because it seems

15   to me the fact that Ms. Dixon was in the room, it's a

16   violation of the rule, but it doesn't seem to me it has caused

17   any prejudice.  I understand Mr. Findley's explanation of why

18   he didn't expect her to be a witness.

19          I would worry more about a witness's name not being

20   given to the jury, except she's the wife of Mr. Dixon, and her

21   name is Dixon.  So, presumably, if the jurors knew her --

22          MR. FINDLEY:  Would it be proper to ask her some

23   general information about her family situation as well?  I

24   have no more -- I can show the court.

25          THE COURT:  Briefly.

1           MR. FINDLEY:  Okay.  All right.  Just let me know if

2    I --

3           THE COURT:  Mr. Harper?

4           MR. HARPER:  Jury instruction, I just want to give

5    you a working copy.

6           THE COURT:  All right.  Thank you.

7           Anything else we need to do before we break?

8           MR. SPROWLS:  No, Your Honor.

9           THE COURT:  We'll be back at 1:30.

10      (A recess was taken at 1:02 p.m.)

11
                         **AFTERNOON SESSION**
12                          (1:31 P.M.)

13      (Defendant present; jury not present.)

14         THE COURT:  You may be seated.  I may be early and we

15   are missing the prosecutors.

16         MR. FINDLEY:  And defense counsel.

17         THE COURT:  And defendant counsel.

18         MR. FINDLEY:  Do you want me to run and see --

19      (Pause.)

20         THE COURT:  All right.  Are we all set?

21         I am going to exercise the option of Federal Criminal

22   Procedure 29(b) to reserve ruling on the defense motions,

23   except with respect to the fourth object which the government

24   concedes.

25         MR. SPROWLS:  Judge, just briefly, when I was back in

1   my office talking about the mail-fraud objective, no, I

2   haven't done anything more about it, but one of my colleagues

3   mentioned a trial involving a Mark Wilson, may have been the

4   Tallahassee --

5           THE COURT:  The Fleet Division case?

6           MR. SPROWLS:  Yes.  The comment was that Mark Wilson

7   didn't know anything about any mailings.  I wasn't here, so --

8   and he stayed in it, so what's the problem?  And I said, "Hey,

9   you know, we made our pitch."  That's not a legal argument,

10  but I just --

11          THE COURT:  No.  It's fair enough.  I don't think --

12          MR. SPROWLS:  And that's a disadvantage to these guys

13  here, because they weren't in the case.

14          THE COURT:  Well, the principle is not anything that

15  puts them at a disadvantage.

16          A particular defendant doesn't need to know that

17  there has been or will be a mailing, but it has to be a

18  reasonably foreseeable part of the conspiracy that the

19  defendant was involved with.

20          So the question here, essentially, is:  Is there

21  evidence from which one could infer that the Thomasville

22  mailing episodes were part of a conspiracy that Mr. Dixon

23  belonged to or Mr. Moore belonged to?

24          In the Tallahassee case, it is different where there

25  clearly is a conspiracy and things were happening in

1    connection with the conspiracy; and, as a foreseeable part of

2    it, the mails get used.

3              MR. SPROWLS:  Yes, sir.  Thank you.

4              MR. DAVIS:  In the plea agreements in other

5    co-defendants' cases, we articulated a tacit agreement amongst

6    case officers not to tell on each other so that they could all

7    benefit in improper ways with their position at

8    FCI-Tallahassee.  We articulated that the issue of mailings

9    would be just reasonably foreseeable, not because of Barnes'

10   mailings, but because of other mailings as well.  We did try

11   to introduce evidence through the witnesses today of other

12   people asking for mailings and addresses.

13             THE COURT:  And one with Mr. Dixon with the Quincy

14   address.  I understand.  Bottom line is, I'm taking the

15   motions -- I'm reserving rulings as specifically authorized by

16   Rule 29(b).

17             Jury in, please.

18             Mr. Harper, do you have a witness?

19             MR. HARPER:  Yes, Your Honor.  I will call

20   Mr. Sanford first.

21             THE COURT:  I'll let you announce him when the jury

22   is here.

23        (The jury entered the courtroom at 1:37 p.m.)

24             All right.  You may be seated.

25             Members of the jury, as you know, the government

1    rested.  It's now time for Mr. Moore to present any case he

2    chooses to present.

3         Mr. Harper?

4         MR. HARPER:  Thank you, Your Honor.  May it please

5    the court.

6         The first witness we'd call is Special Agent Patrick

7    Sanford.

8         DEPUTY CLERK:  Please raise your right hand.

9    **PATRICK SANFORD, DEFENDANT MOORE'S WITNESS, DULY SWORN**

10        DEPUTY CLERK:  Be seated.

11        Please, state your full name and spell your last

12   name for the record.

13        THE WITNESS:  Patrick N. Sanford, S-a-n-f-o-r-d.

14                    DIRECT EXAMINATION

15   BY MR. HARPER:

16   Q.  Mr. Sanford, you're a special agent with the Federal

17   Bureau of Investigation?

18   A.  That's correct.

19   Q.  And how long have you been in that capacity, please?

20   A.  Over 7 years.

21   Q.  Were you so employed on or about the 22nd day of

22   February, 2006?

23   A.  That's correct.

24   Q.  In your official capacity, did you participate in an

25   interview with Mr. Jeffrey Brunner of one Shirley Blackston?

 1   A.   That's correct.

 2              MR. HARPER:   May I approach the witness, Your Honor?

 3              THE COURT:   You may.

 4   BY MR. HARPER:

 5   Q.   I tender a document to you, which purports to be a

 6   report.   Does that bear your signature?

 7   A.   Not my signature.   It has my name on it.

 8   Q.   Is that your report?

 9   A.   Yes, it is.

10   Q.   And did you, in fact, participate in an interview with

11   Shirley Blackston on the date that I indicated?

12   A.   That's correct.

13   Q.   All right.   And, during the course of that interview, did

14   Ms. Blackston say to you that she witnessed Mr. Moore come

15   into the room and have sex with Sabrina Bowie three times in

16   one night?

17              MR. SPROWLS:   Objection.

18              THE COURT:   Overruled.

19              THE WITNESS:   Are you asking for my recollection or

20   this report?

21   BY MR. HARPER:

22   Q.   Well, are they different?

23   A.   I know what my report says.

24   Q.   What does your report say?

25   A.   My report says that she came in -- that he came in three

```
 1  times, correct.

 2  Q.  And --

 3  A.  He came in the first time, and then came back at least

 4  two more times.

 5  Q.  All right.  So a total of three times in one night?

 6  A.  That is what I put in my report, correct.

 7  Q.  Okay.  And then does your report also reflect that

 8  Ms. Blackston told y'all that she witnessed Mr. Moore have

 9  sex with Sabrina Bowie at least 15 times in that room?

10  A.  That is what is in my report from the initial interview,

11  correct.

12          MR. HARPER:  Nothing further of the witness, Your

13  Honor.

14          THE COURT:  Mr. Findley?

15          MR. FINDLEY:  No, sir.

16          THE COURT:  Cross-examine?

17                      CROSS-EXAMINATION

18  BY MR. SPROWLS:

19  Q.  Mr. Sanford, do you know if your report is accurate as to

20  what was said at the time?

21  A.  In subsequent interviews of her, I realized that I was

22  misunderstood about the three times.  She said that it was

23  twice, and I thought that she meant twice after that initial

24  visit, but apparently it was twice total, and I was mistaken

25  and put that in my report as a mistake.
```

*Patrick Sanford - Redirect/Harper*

1  Q.  Do you know if the entry with regard to the 15 times, do

2  you know if that's correct?

3  A.  That was what my recollection was.  When I do an

4  interview, I take the best notes I can.  Especially when

5  we're traveling, it's a later date that we actually type up

6  the report.  From my notes, that was the best of my

7  recollection of what I had in my notes.  And that's what I

8  did, my report based on.

9  Q.  Were there any subsequent interviews where you found out

10  it was more or less times?

11  A.  I believe so.  I believe on a subsequent interview she

12  did state that it was -- she didn't witness any -- she didn't

13  witness those 15 times or didn't witness the number of times

14  that it occurred.

15          MR. SPROWLS:  That's all.

16          THE COURT:  Redirect?

17          MR. HARPER:  Briefly, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. HARPER:

20  Q.  Special Agent Sanford, of course, you've never been

21  convicted of a crime or felony, have you?

22  A.  No, sir.

23          MR. HARPER:  Nothing further, Your Honor.

24          THE COURT:  Thank you, Mr. Sanford.  You may step

25  down and return to counsel table.

```
1              Mr. Harper, please call your next witness.

2              MR. HARPER:  We call Mr. Vernon Barnes, Your Honor.

3              THE COURT:  Vernon March?

4              MR. HARPER:  Barnes.

5              THE COURT:  Barnes.

6              DEPUTY CLERK:  Please raise your right hand.

7   LEONARD N. BARNES, SR., DEFENDANT MOORE'S WITNESS, DULY SWORN

8              DEPUTY CLERK:  Be seated.

9              Please, state your full name and spell your last

10  name for the record.

11             THE WITNESS:  My full name is Leonard N. Barnes, Sr.

12  My last name is spelled B-a-r-n-e-s.

13                          DIRECT EXAMINATION

14  BY MR. HARPER:

15  Q.  Mr. Barnes, I said Vernon.  I couldn't read my writing

16  for Leonard.  But you, in fact, are -- you go by -- what name

17  do you go by?

18  A.  I go by Leonard, and family members call me by Nathaniel.

19  Q.  All right.  Mr. Barnes, where do you live?  I don't need

20  an address, but what area do you live in?

21  A.  Tallahassee, Florida, south part of town.

22  Q.  How long have you lived in Tallahassee on the south side

23  of town?

24  A.  I've lived in the south side of town for about 35 years.

25  Q.  And you're not -- are you related to Defendant Alfred
```

1   Barnes?

2   A.   No, I'm not.

3   Q.   Do you know him?

4   A.   No.

5   Q.   Do you know Mr. Alan Moore?

6   A.   Yes.

7   Q.   How long have you known him?

8   A.   I've been knowing Mr. Moore about at least about -- about

9   22 years.

10  Q.   And how do you know him?

11  A.   He married my niece and also through the church.

12  Q.   You go to the same church?

13  A.   We used to.

14  Q.   Do you know Mr. Alan Moore's reputation for honesty and

15  honest dealing in the community?

16  A.   In the community, I --

17  Q.   I need you to just say yes or no to that particular

18  question.

19  A.   Yes.

20  Q.   All right.  And is his reputation good or is it bad?

21  A.   It's good.

22          MR. HARPER:  That's all I have, Your Honor.

23          THE COURT:  Mr. Findley?

24          MR. FINDLEY:  No questions.

25          THE COURT:  Mr. Sprowls?

```
 1                    CROSS-EXAMINATION

 2   BY MR. SPROWLS:

 3   Q.  Mr. Barnes, do you know what sort of work he does?

 4   A.  Yes, sir.  He's a guard at the federal prison.

 5   Q.  All right.  Are you -- do you work out at the prison?

 6   A.  No.

 7   Q.  Are you able to observe his actions while he's at the

 8   prison?

 9   A.  No.

10          MR. SPROWLS:  That's all I have.

11          THE COURT:  Redirect?

12          MR. HARPER:  No, Your Honor.  Nothing further.

13          THE COURT:  Thank you, Mr. Barnes.  You may step

14   down.

15          Mr. Harper, please call your next witness.

16          MR. HARPER:  I'd call Geraldine Harris.

17          DEPUTY CLERK:  Please raise your right hand.

18     *GERALDINE HARRIS, DEFENDANT MOORE'S WITNESS, DULY SWORN*

19          DEPUTY CLERK:  Be seated.

20          Please, state your full name and spell your last

21   name for the record.

22          THE WITNESS:  Geraldine Harris, H-a-r-r-i-s.

23                   DIRECT EXAMINATION

24   BY MR. HARPER:

25   Q.  Ms. Harris, where do you live?  I don't need an address,
```

1    but what area do you live in, community?

2    A.   Southeast of Tallahassee.

3    Q.   How long have you lived there?

4    A.   About 18 years.

5    Q.   Do you know Alan F. Moore here in the courtroom?

6    A.   Yes, I do.

7    Q.   Do you recognize him sitting over here in the maroon

8    suit?

9    A.   Yes, I do.

10   Q.   How long have you known him?

11   A.   About 15 years, I think.

12   Q.   Do you know his family?

13   A.   Yes, I do.

14   Q.   And how long have you known -- let me put it this way:

15        What kind of relationship do y'all have, you and Alan

16   Moore?

17   A.   I know him from -- first, from both our sons played

18   football together.  I knew him as a father figure being there

19   not only with his son, but to my grandson, also, and being

20   that father figure for my grandson, who had an absent father.

21        I know him also from the church as a minister and being

22   upright in the community.

23   Q.   All right.  Do you know -- you said you know Mr. Moore's

24   son from playing football.  Is he playing football now,

25   Mr. Moore's son?

1    A.   Yes.

2    Q.   Where is he playing football?

3    A.   At FAMU.

4    Q.   At the university?

5    A.   The university.

6    Q.   What year is he?

7    A.   First year.

8    Q.   Okay.  And in 2004, 2 years ago, do you know where

9    Mr. Moore's son was playing football?

10   A.   At Lincoln.

11   Q.   Lincoln High School?

12   A.   Lincoln High School, yes.

13   Q.   Here in Tallahassee, Leon County; is that right?

14   A.   Yes.

15   Q.   Do you have an opinion as to Mr. Moore's honesty and

16   honest dealings?

17   A.   Honesty and what was the last one?

18   Q.   Honesty and honest dealings?

19   A.   Yes, I do.

20   Q.   Is it good or bad?

21   A.   Good.

22           MR. HARPER:  Tender the witness, Your Honor.

23           THE COURT:  Mr. Findley?

24           MR. FINDLEY:  No questions.

25           THE COURT:  Mr. Sprowls?

*Vernon Gilbert - Direct/Harper*

```
 1                    CROSS-EXAMINATION

 2   BY MR. SPROWLS:

 3   Q.  Ms. Harris, have you ever been out to the Federal

 4   Correctional Institution here in Tallahassee?

 5   A.  No, I haven't.

 6   Q.  You haven't been out there administering to Bible studies

 7   or something like this to the inmates?

 8   A.  No, I haven't.

 9   Q.  Do you know where Mr. Moore works?

10   A.  Yes, I do.

11   Q.  Where is that?

12   A.  At the federal, yes.

13   Q.  He works there.

14       Are you able to observe his actions, his conduct while

15   he's working out there?

16   A.  No, I could not observe it.  I'm not there.

17   Q.  You're not there.

18            MR. SPROWLS:  That's all I have.

19            THE COURT:  Redirect?

20            MR. HARPER:  No questions.

21            THE COURT:  Thank you, Ms. Harris.  You may step

22   down.

23            MR. HARPER:  Call Mr. Jack Gilbert, Your Honor.

24            DEPUTY CLERK:  Please raise your right hand.

25       VERNON GILBERT, DEFENDANT MOORE'S WITNESS, DULY SWORN
```

1          DEPUTY CLERK:  Be seated.

2          Please, state your full name and spell your last

3   name for the record.

4          THE WITNESS:  Vernon Gilbert.

5          DEPUTY CLERK:  Could you spell your last name,

6   please?

7          THE WITNESS:  G-i-l-b-e-r-t.

8          THE COURT:  Mr. Gilbert, you can scoot that chair

9   closer to that microphone, that will help us.  Thank you.

10                  DIRECT EXAMINATION

11  BY MR. HARPER:

12  Q.  Mr. Gilbert, I would like to know, please, sir, where you

13  live.  I don't need the street address, but the area of town.

14  A.  //////////, Road.

15  Q.  I don't need your street address.  We're just trying

16  to -- just sort of tell us where about you live.  Do you live

17  in Tallahassee?

18  A.  Yes, sir, I live in Tallahassee.

19  Q.  What area of town do you live in?

20  A.  South side.

21  Q.  Okay.  And how long have you lived there, please?

22  A.  Since 1982.

23  Q.  And are you employed right now?

24  A.  I recently retired.

25  Q.  And you retired from where?

1  A.   The Federal Correctional Institution, Tallahassee.

2  Q.   The federal prison, the women's prison, out here on

3  Capital Circle?

4  A.   Men and women prison.

5  Q.   All right.  That's right.  There's a -- it's was a

6  women's prison -- it's a women's prison, and then before it

7  was a men's prison, and then there's also the FDC out there;

8  is that correct?

9  A.   That's correct.

10  Q.   And is that where you worked?

11  A.   That's where I worked.

12  Q.   Yes.

13  A.   Yes.

14  Q.   During the course -- how long did you work out there?

15  A.   Since May 2nd of 1982.

16  Q.   Until when?

17  A.   January 3rd, 2006.

18  Q.   During the course of working out there, did you come to

19  know Alan F. Moore?

20  A.   Yes, sir.  I knew him before.

21  Q.   And -- excuse me.  I didn't mean to cut you off.

22  A.   Well, I knew him when he was a kid.

23  Q.   And is that same Alan Moore sitting over here to my right

24  in the maroon suit?

25  A.   Yes, sir.

1   Q.   Do you know Mr. Moore's -- or do you have occasion to

2   know Mr. Moore's reputation for honesty and honest dealings?

3   A.   Yes, sir.

4   Q.   And did you have occasion to know Mr. Moore's reputation

5   for honesty and honest dealings in the prison community there

6   where he works or worked?

7   A.   Yes, sir.

8   Q.   Is his reputation good or bad?

9   A.   Well, a prison has lots of rumors, good and bad from the

10   warden down to inmates.  But my personal opinion --

11   Q.   What's your personal opinion of Mr. Moore?

12   A.   It's good.

13   Q.   As far as his honest dealings?

14   A.   Yes, sir.  Honest.

15   Q.   Is your opinion good or bad?

16   A.   My opinion is good.

17        MR. HARPER:  Tender the witness, Your Honor.

18        THE COURT:  Mr. Findley?

19        MR. FINDLEY:  Your Honor, Mr. Gilbert is also on

20   Mr. Dixon's witness list.  With the court's permission, I'll

21   just go ahead and do --

22        THE COURT:  Please.  Thank you.

23     (**VERNON GILBERT**, called as a witness on behalf of

24   Defendant Dixon.)

25                    DIRECT EXAMINATION

1  BY MR. FINDLEY:

2  Q.  Good afternoon, Mr. Gilbert.

3  A.  Good afternoon.

4  Q.  My name is Tom Findley.  We met briefly.  I represent

5  Mr. Dixon.

6      What years were you at the FCI facility?  When did you

7  start at the FCI?

8  A.  May 2nd of 1982.

9  Q.  And you're now retired?

10  A.  Yes, sir.

11  Q.  Did you work all of the housing units out there?

12  A.  Yes, sir.

13  Q.  All right.  And, generally, there was one guard per

14  housing unit; is that correct?

15  A.  That's correct, unless there was an emergency situation.

16  Q.  Okay.  Now, could you tell me where George Williams'

17  office is out there at the facility?

18  A.  It's in the Special Housing Unit.

19  Q.  And that's otherwise known as "SHU"?

20  A.  If nothing has changed, correct.

21  Q.  All right.  When you left -- when did you leave?

22  A.  January 3rd, 2006.

23  Q.  January 3rd.  So, as of January 3rd, 2006, George

24  Williams, the investigators' office was in the SHU?

25  A.  Yes, sir.

1   Q.   Did you ever work with Officer Dixon?

2   A.   Yes, sir, over the years at various times.

3   Q.   And did you ever know him to be unprofessional in any

4   way?

5   A.   No, sir.

6   Q.   He was always a professional officer?

7   A.   In my opinion.

8   Q.   Did you ever know him to violate any BOP's policies or

9   procedures?

10  A.   No, sir, not personally.

11  Q.   Did you ever see him threaten an inmate?

12  A.   No, sir.

13  Q.   Did you ever -- did you perceive him to be an honest

14  officer?

15  A.   Yes, sir.

16  Q.   Do you believe he enforced discipline among the inmates?

17  A.   Yes, sir.

18  Q.   In your interactions with Mr. Dixon, did you ever know

19  him to use any crude language around inmates?

20  A.   Sir, I would be hard-pressed to say I never heard anyone

21  out there using crude language.

22  Q.   What's that again?

23  A.   Crude language as in profanity?

24  Q.   Yes.

25  A.   I can't say I have, but I -- it wouldn't be out of the

1    ordinary.

2    Q.  Okay.  Did he treat the inmates respectfully?

3    A.  The times that we worked together, which was limited, I

4    mostly relieved him, but I never had any reason to think

5    otherwise.

6    Q.  Okay.  To your knowledge, did Mr. Dixon ever bring a

7    duffle bag to work, or did he have some other thing that he

8    brought his stuff to work in?

9    A.  A duffle bag?

10   Q.  Yes.

11   A.  A military --

12   Q.  Well, what you would consider to be a duffle bag?

13   A.  I've never witnessed him bring a duffle bag.

14   Q.  Did he just bring a lunch bag to work, basically?

15   A.  Yes.

16          MR. FINDLEY:  That's all of the questions I have.

17          THE COURT:  Cross-examine?

18                      CROSS-EXAMINATION

19   BY MR. SPROWLS:

20   Q.  Good afternoon, Mr. Gilbert.

21   A.  Good afternoon.

22   Q.  Mr. Gilbert, my name is Alan Sprowls.  I'm an Assistant

23   U.S. Attorney.  I'm one of the two prosecutors in this case.

24       You were asked some questions concerning following

25   policies and procedures.  Does the warden conduct an annual

*Vernon Gilbert - Cross/Sprowls*

1   refresher training each year for all staff?

2   A.   Yes, sir, unless things have changed.

3   Q.   You told us already.   When did you leave the prison?

4   What month and year?   It was this year?

5   A.   January 3rd, 2006.

6   Q.   Well, during your time there, was there annual refresher

7   training each year required for all people, all staff?

8   A.   Yes, sir.

9   Q.   And would it be fair to say that this is sort of a

10  repetitive thing each year, same topics are covered --

11  ethics, such as how to treat the inmates, how to act around

12  the inmates, and things like that?

13  A.   Pretty much.

14  Q.   And if a correctional officer or staff member were to

15  hear of another correctional officer or staff member engaging

16  in something they shouldn't do, something that is against the

17  prison rules, what should you do if you hear that?

18  A.   Could you give an example?

19  Q.   Let's say that Officer Smith is bringing in contraband

20  and giving it to the inmates.

21  A.   You're required to report it.

22  Q.   Officer Smith is having sex with inmates.

23  A.   You're required to report it.

24  Q.   And, if you don't report it, you're part of the problem,

25  aren't you?

```
 1   A.  You could be.  Mr. Sprowls -- Mr. Sprowls?

 2   Q.  Sir, just to let you know, I can't answer any questions.

 3   A.  There is no question.  Just in addition to my response.

 4   Q.  Uh-huh.

 5   A.  In the nature of this business, there is a time when the

 6   place is full -- it's a rumor mill pretty much.  And I've

 7   come to the point, when I was working there, there were two

 8   words that I would use to myself or to others when I hear

 9   rumors.  One would be appear and one would be alleged, until

10   you get the facts, because rumors from the top down, you hear

11   rumors on everyone.

12   Q.  The inmates do talk a lot, do they not?

13   A.  People.

14   Q.  It's almost a recreational sport out there to talk about

15   what's going on.

16   A.  Mr. Sprowls, I'll say this much, it's not a natural

17   environment for eight hours.

18   Q.  I understand.  Let me ask you this:

19       If you were aware or had reason to believe that a

20   correctional officer took an inmate into a bathroom and had

21   sex with that inmate, and you had reason to believe it

22   because you told that other officer, "I know what you did,"

23   do you have a duty to report that or not?

24           MR. HARPER:  Object to the opinion testimony from

25   this witness, Your Honor.
```

```
 1              THE COURT:  Overruled.

 2    BY MR. SPROWLS:

 3    Q.  Do you have a duty to report that or not?

 4    A.  To make sure I understand your question, can you repeat

 5    it?

 6    Q.  Sure.

 7         You have reason to believe that Officer Smith took an

 8    inmate into a bathroom and had sex with that inmate.  You

 9    have reason believe so much such so that, when you go into

10    the bathroom, you can tell that they had sex.  Do you have a

11    duty to report it?

12    A.  That's the question?

13    Q.  That's the question.

14    A.  Perception is everything.

15    Q.  No, I don't want perception.  I want to know what you

16    would do in that situation.  You have reason to believe that

17    one of your colleagues took an inmate into a bathroom and had

18    sex, because you went into the bathroom right afterwards.

19    A.  And --

20    Q.  Do you have a duty to report that?

21    A.  Yes, you do.

22              MR. SPROWLS:  That's all I have.

23              THE COURT:  Redirect?

24              MR. HARPER:  No questions, Your Honor.

25              MR. FINDLEY:  No questions.
```

```
 1              THE COURT:  Thank you, Mr. Gilbert.  You may step

 2   down.

 3              Mr. Harper, please call your next witness.

 4              MR. HARPER:  Sonya Lindsey.

 5              DEPUTY CLERK:  Please raise your right hand.

 6       SONYA LINDSEY, DEFENDANT MOORE'S WITNESS, DULY SWORN

 7              DEPUTY CLERK:  Be seated.

 8              Please, state your full name and spell your last

 9   name for the record.

10              THE WITNESS:  Sonya Lindsey, L-i-n-d-s-e-y.

11                          DIRECT EXAMINATION

12   BY MR. HARPER:

13   Q.  Ms. Lindsey, what area of the town do you live in,

14   please, ma'am?

15   A.  I live out in Norshire now.

16              THE COURT:  Ms. Lindsey, it will help us if you'll

17   get right up next to that microphone.  Thank you.

18   BY MR. HARPER:

19   Q.  And what is your occupation?

20   A.  I'm a retired registered nurse.

21   Q.  And are you married?

22   A.  No.

23   Q.  Do you know Mr. Alan F. Moore?

24   A.  Yes, I do.

25   Q.  How long have you known Mr. Moore?
```

1   A.   More than 10 years.

2   Q.   And how do you know him?

3   A.   We used to live in the same community, and we are in the

4   same church.

5   Q.   How long ago was it that you lived in the same community?

6   A.   I guess about 5 or 6 years ago.

7   Q.   And what area of town was that?

8   A.   Out the Parkway in --

9   Q.   I'm having trouble hearing you.

10  A.   Out Apalachee Parkway and Meadows Woodland.

11  Q.   And how long did you live in the same neighborhood as

12  Mr. Moore?

13  A.   For years.

14  Q.   Did you have occasion to come to know the reputation of

15  Mr. Moore in the community for honesty and honest dealings?

16  A.   Yes.

17  Q.   And was it good or bad?

18  A.   It was impeccable.

19          MR. HARPER:  Tender the witness, Your Honor.

20          THE COURT:  Mr. Findley?

21          MR. FINDLEY:  No questions.

22          THE COURT:  Mr. Sprowls?

23                      CROSS-EXAMINATION

24  BY MR. SPROWLS:

25  Q.  Ms. Lindsey, did you know what Mr. Moore -- where he

1   worked?

2   A.   Yes.

3   Q.   Did you ever observe him at work?

4   A.   No.

5           MR. SPROWLS:  That's all I have.

6           THE COURT:  Redirect?

7           MR. HARPER:  No questions.

8           THE COURT:  Thank you, Ms. Lindsey.  You may step

9   down.

10          Mr. Harper, please call your next witness.

11          MR. HARPER:  Theodore Beckwith.

12          DEPUTY CLERK:  Please raise your right hand.

13   **THEODORE BECKWITH, DEFENDANT MOORE'S WITNESS, DULY SWORN**

14          DEPUTY CLERK:  Be seated.

15          Please, state your full name and spell your last

16   name for the record.

17          THE WITNESS:  Theodore Beckwith, B-e-c-k-w-i-t-h.

18   Beckwith.

19                   DIRECT EXAMINATION

20   BY MR. HARPER:

21   Q.   Mr. Beckwith, what is your occupation, please, sir?

22   A.   Pastor.

23   Q.   And what church?

24   A.   Church of Christ.

25   Q.   And where is that church located?

```
 1   A.   In Tallahassee, Florida.

 2   Q.   What area of town?

 3   A.   12th Avenue and Springhill.

 4   Q.   How long have you been the pastor there?

 5   A.   Forty-one years.

 6   Q.   Have you come to know Alan F. Moore?

 7   A.   Yes.

 8   Q.   How did you meet him?

 9   A.   I met him, he joined our church about 10 years ago, but I

10   met him about 15 years ago.

11   Q.   Does he participate in church activities?

12   A.   Yes, sir.

13   Q.   How?

14   A.   Well, he mentors for the young men and also helps the

15   church for the outreach department.

16   Q.   Does he ever deliver services?

17   A.   Yes.

18   Q.   Do you know or do you have an -- know of Mr. Moore's

19   reputation in the church or do you have an opinion as to

20   Mr. Moore's honesty or honest dealings?

21   A.   Yes.  I know he's honest.

22             MR. HARPER:  I tender the witness, Your Honor.

23             MR. FINDLEY:  No questions.

24                          CROSS-EXAMINATION

25   BY MR. SPROWLS:
```

1   Q.  Reverend Beckwith, do you minister inside the Federal

2   Correctional Institution here in Tallahassee?

3   A.  No, sir.

4           MR. SPROWLS:  No questions.

5           THE COURT:  Redirect?

6           MR. HARPER:  No questions.

7           THE COURT:  Thank you, Mr. Beckwith.  You may step

8   down.

9           Mr. Harper, please call your next witness.

10          MR. HARPER:  Call Alan F. Moore.

11          DEPUTY CLERK:  Please raise your right hand.

12          ***ALAN F. MOORE, THE DEFENDANT, DULY SWORN***

13          DEPUTY CLERK:  Be seated.

14          Please, state your full name and spell your last

15   name for the record.

16          THE WITNESS:  Alan F. Moore, M-o-o-r-e.

17                          DIRECT EXAMINATION

18   BY MR. HARPER:

19   Q.  Mr. Moore, you reside here in Tallahassee?

20   A.  Yes, sir, I do.

21   Q.  How long have you been a resident of Tallahassee?

22   A.  Since 1969.

23   Q.  And what have been your various occupations, please, sir?

24   A.  I started out working when I first came in the Democrat

25   to '85, two weeks; and I went from there to Olin's Power

1    Operations in St. Marks for about three and a half years.  I

2    left there in '88, and I went to the sheriff's department,

3    worked there for 6 years.  And from there I went to the

4    Federal Correctional Institution, Tallahassee, for presently

5    12 years.

6    Q.  Have you been in the military?

7    A.  Yes, sir.  I spent about six and a half years in the

8    military.

9    Q.  What branch of the service?

10   A.  Army.

11   Q.  And were you in combat?

12   A.  I was a combat engineer and a demolitions specialist, but

13   no combat activity.

14   Q.  Were you honorably discharged?

15   A.  Two honorable discharges.

16   Q.  What, you were discharged and went back?

17   A.  I re-enlisted overseas, and I did two tours overseas, and

18   I went to Fort Stewart to 24th Mechanized Division, and I was

19   there for about 26 months.

20   Q.  Have you ever been convicted of a felony?

21   A.  No, sir.

22   Q.  Have you ever been convicted of any crime?

23   A.  No, sir.

24   Q.  You have a son?

25   A.  Yes, sir, I do.

1   Q.   Only child?

2   A.   Yes, sir.

3   Q.   How old is he now?

4   A.   He's 18 years old.

5   Q.   And what's he doing?

6   A.   He's currently a freshman at Florida A&M University, and

7   he plays football over there.

8   Q.   And in 2004, what was he doing?

9   A.   He was currently residing at Lincoln High School, running

10  track and playing football and academically.

11  Q.   So he wasn't in college 2 years ago?

12  A.   No, sir, he was not.

13  Q.   Mr. Moore, you've been over this indictment; is that

14  right?

15  A.   Yes, sir.

16  Q.   And spent some amount of time with me going over these

17  allegations and these charges; is that right?

18  A.   Correct.

19  Q.   Okay.  I want to talk to you about some of these

20  allegations, and one of the things I want to talk about is:

21       Between September of 2003 and June of 2005, did you allow

22  Shonnie Daniels to leave her unit, leave her place of

23  confinement or her assigned housing area, in violation of BOP

24  regulations, for the purposes of engaging in sexual contact

25  with Alfred Barnes?

1   A.   No, sir, I did not.

2   Q.   Okay.  You heard some testimony about her being in line

3   or being let out, did you or did you not?

4   A.   I did not.  She questioned me twice and asked me to let

5   her out.  I told her, "No, you're not going out.  You're not

6   authorized to be out there, and I'm not going to let you

7   out."  And that was the end of it.

8   Q.   Did she have any other conversations with you?  You said

9   she did it twice.  Was it during this time period?

10  A.   It was on two separate occasions within a close proximity

11  of so many weeks, maybe.

12  Q.   Did you make a note of it?

13  A.   I kept a note in my mind mentally, that I knew who she

14  was, and that she wasn't supposed to be out.

15  Q.   Did you write it down?

16  A.   No, sir.

17  Q.   Did you make a report and send it upstairs?

18  A.   No, sir.  I had no reason to make a report.

19  Q.   Okay.  That's not required, is it?

20  A.   No, sir.

21  Q.   And you didn't do it?

22  A.   I did not do it.  I did not let her out of the unit, not

23  one time, not anytime, not never.

24  Q.   How about between September of 2003 and June of 2005, did

25  you let Shonnie Daniels enter a secured area of

1    FCI-Tallahassee for the purpose of permitting her to engage

2    in sex with Alfred Barnes?

3    A.   No, sir, I did not.

4    Q.   You heard Alfred Barnes talk about an incident today, did

5    you or did you not?

6    A.   Yes, sir.

7    Q.   Is that true?

8    A.   No, sir.

9    Q.   Does an officer, unit officer -- let me ask it this way:

10       What's your job as a correctional officer?

11   A.   My job as a correctional officer is to provide care,

12   custody and control of inmates.

13   Q.   Do you have a key ring?

14   A.   Yes, sir.

15   Q.   And do you have a key to the counselor's office out

16   there?

17   A.   No, sir.

18   Q.   Is that ever given to a correctional officer?

19   A.   No, sir.

20   Q.   How do -- how do you get into the counselor's office if

21   you need to?

22   A.   The only way you're going to be able to get into a

23   counselor's office is -- you have to have a restricted key

24   form filled out by the lieutenant, signed, coming from --

25   submitted from the control center to the compound officer to

1    wherever that designated location is.  And it states on there

2    your signature, lieutenant's signature, the purpose of you

3    entering that area, and why you're trying to get in there.

4    Q.  Did you ever do that to get a key to get into the

5    counselor's office?  Did you ever do that?

6    A.  No, sir.  I had no reason to.

7    Q.  Okay.  And, in particular, did you hear Shonnie Daniels

8    say that you opened the key -- opened the -- used your keys

9    to open the door to let her and Barnes into the counselor's

10   office?

11   A.  No, sir.

12   Q.  Well, what I was asking you, did you hear that?

13   A.  Did I hear -- repeat the question.

14   Q.  Did you hear her say that?

15   A.  No, sir.

16   Q.  Did you do that?

17   A.  No, sir, I did not.

18   Q.  Okay.  And if you wanted to, could you do it?

19   A.  No, sir.  I had no access to the area.  So how could I

20   let her in, if I have no keys to the area?

21   Q.  Barnes is saying that you let him have the keys to go

22   back and give contraband to Shonnie Daniels.  Did you do

23   that?

24   A.  No, sir.

25   Q.  Do you know what he's talking about?

*Alan F. Moore - Direct/Harper*

1  A.  When Mr. Barnes entered my unit from the compound, he

2  stated to me -- we had a brief conversation, talking about

3  something, it might have been a football game or something,

4  for maybe 3, 4 or 5 minutes, and he said he had to use the

5  bathroom.  And I said, "Okay.  You want me to walk you back

6  there, or I give you the keys?"  He said, "Let me have the

7  keys."  I said, "Okay."

8      I gave him the keys.  He went back to the back, and I was

9  in my office.  I didn't follow him to the bathroom.  I just

10  gave him my keys.

11  Q.  Did you walk back there and see where he had been?

12  A.  No, sir, I did not.

13  Q.  Okay.  Did you have this conversation with him about

14  smelling sex?

15  A.  No, sir.  I never had a conversation with him about

16  smelling anything.

17  Q.  Did you have any conversation with him about him going to

18  give contraband to Shonnie Daniels?

19  A.  No, sir.  Because if he came to my unit and told me he

20  had contraband, I would have, first of all, reported it and

21  told him to get out of my unit.  Because I felt like, if I

22  did that, I'm a problem and I'm trying to cover up and

23  conceal stuff.  I have nothing to hide, nothing to conceal,

24  nothing to cover up.

25  Q.  The indictment says between April of 2004 and May of

Alan F. Moore - Direct/Harper

1    2005, you provided contraband to Inmate Number 6, who we now

2    know to be Shirley Blackston.   Did you?

3    A.   Excuse me, sir?

4    Q.   Did you do that?

5    A.   No, sir, I did not.

6    Q.   Do you remember Shirley Blackston?

7    A.   Yes, sir.

8    Q.   You heard her up here testifying?

9    A.   Yes, I did.

10   Q.   She said you brought her Black & Milds.

11   A.   I did not give her anything, nothing.

12   Q.   Are you -- did you go into the room where Shirley

13   Blackston and Sabrina Bowie were and tap on the bed for

14   Sabrina Bowie?

15   A.   No, sir.

16   Q.   Did you go into the room where Sabrina Bowie and Shirley

17   Blackston lived and engage in sex talk with Sabrina Bowie?

18   A.   No, sir, I did not.

19   Q.   Did you go into the room where Shirley Blackston and

20   Sabrina Bowie lived and engage in sex?

21   A.   No, sir, I did not.

22   Q.   Why would an officer engage in sex in front of another

23   inmate?   In other words, why would an officer create a

24   witness?   Does that make sense?

25   A.   It doesn't make any sense.   I mean, it's numerous places

1  to go have sex, if you want to have sex with an inmate.

2  You've got the TV rooms, you've got storage closets, you've

3  got offices.  Why would I stand up and have sex with an

4  inmate while another inmate is in the room?

5  Q.  So, did you?

6  A.  No, sir, I did not.  Not one time, not anytime, not

7  never.

8  Q.  Did Sabrina Bowie swing her legs over and you engage in

9  oral sex with her?

10  A.  No, sir, I did not.

11  Q.  Did Sabrina Bowie get off the bed and engage in oral sex

12  with you?

13  A.  No, sir.

14  Q.  Did you and Sabrina Bowie engage in sex on the floor?

15  A.  No, sir.

16  Q.  Did you and Sabrina Bowie engage in sex three times in

17  one night?

18  A.  No, sir.

19  Q.  Did you and Sabrina Bowie engage in sex ever?

20  A.  Never, ever, not one time, period.

21  Q.  Did you ever bring contraband into the prison?

22  A.  No, sir.

23  Q.  Ever?

24  A.  I have no reason to bring contraband in.  I have nothing

25  to hide.

1    Q.  Did you ever bring any contraband in?  I mean, not just

2    guns or firearms; I mean, perfume or cigarettes or cosmetics

3    or eyebrow pencil, anything like that, that wasn't on the

4    authorized list?

5    A.  No, sir, never.

6    Q.  Ever?

7    A.  Never, ever, not one time.

8    Q.  Did you pay for silence or try to keep Shirley Blackston

9    quiet?

10   A.  No, sir.

11   Q.  Did you give her money?

12   A.  No, sir.

13   Q.  Did you threaten her?

14   A.  No, sir.

15   Q.  Did you tell her you were going to ship her out?

16   A.  No, sir.

17   Q.  Did you tell her that you were going to put her in the

18   SHU?

19   A.  No, sir.

20   Q.  Did you ever give her anything to hush her up?

21   A.  No, sir.

22   Q.  Were you worried about Shirley Blackston saying anything

23   on you?

24   A.  No, sir.  I didn't do anything wrong, so why should I be

25   worried?

1  Q.  Did you have any agreement with Alfred Barnes to use the

2  mail to make money?

3  A.  No, sir.

4  Q.  Did you have any kind of an agreement with Alfred Barnes

5  to have sex?

6  A.  No, sir.

7  Q.  Did you have any agreement with Gregory Dixon to have

8  sex?

9  A.  No, sir.

10  Q.  How about with Vincent Johnson?

11  A.  No, sir.

12  Q.  How about E. Lavon Spence?

13  A.  No, sir.

14  Q.  Did you have any agreement with anybody to engage in sex

15  with any inmate?

16  A.  None, any.

17  Q.  Ever?

18  A.  Ever.

19  Q.  Never?

20  A.  Never.

21  Q.  Did you have any kind of implied agreement, any kind of

22  nod, any kind of wink, any kind of secret code with

23  correctional officers to bring contraband in, to get money

24  in, to get money out, to have sex -- anything like that?

25  A.  No, sir, I did not.

1    Q.   Is Barnes your friend?

2    A.   No, he's not.

3    Q.   Is he your fishing buddy?

4    A.   No, he's not.

5    Q.   Have y'all been fishing?

6    A.   No, we have never been fishing before.  We have discussed

7    fishing routinely, but we've never been fishing before.

8    Q.   Has he ever been to your house?

9    A.   No, sir.

10   Q.   Have you ever been to his house?

11   A.   No, sir.

12   Q.   Have you ever been to Mr. Dixon's house?

13   A.   No.

14   Q.   Has he ever been to your house?

15   A.   No, sir, he hasn't.

16   Q.   Have you been to Mr. Johnson's house?

17   A.   No, sir.

18   Q.   Has he ever been to your house?

19   A.   No, sir.

20   Q.   Have you ever been to Lavon Spence's house?

21   A.   No, sir.

22   Q.   Has he ever been to your house?

23   A.   No, sir.

24   Q.   Have y'all ever socialize or been together, any one of

25   you officers there, outside of work?

Alan F. Moore - Direct/Harper

1   A.   No, sir, never.

2   Q.   Did you with anybody, any of these officers, have any

3   kind of agreement or understanding together that y'all would

4   not enforce your responsibilities as an officer if you could

5   get something back from these inmates?

6   A.   No, sir, I did not.

7   Q.   Did you ever do that outside of an agreement?

8   A.   No, sir.

9   Q.   Okay.  But this charge here in the indictment is I think

10  commonly called "bribery."  Did you ever have any kind of

11  agreement or deal where you would sort of *quid pro quo*, you

12  would look the other way, and Barnes or Spence or Johnson

13  could come and go and, you know, run wild and have sex or do

14  whatever they wanted to do out there?  Did you have any

15  agreement that you would not look?

16  A.   No, sir, never.

17  Q.   Do you have any agreement that you wouldn't report them?

18  A.   No, sir.

19  Q.   Was there ever any kind of an agreement or understanding

20  among you officers that you would not, as far as you

21  participated in, that you would not enforce your code of

22  responsibility, your duties as defined by law?

23  A.   No, sir, I wouldn't do that.

24  Q.   Did you ever engage in any kind of an agreement with any

25  officer to try to threaten, intimidate or persuade any of the

1    inmates not to tell the truth?

2    A.   No, sir.

3    Q.   Never?

4    A.   Never.

5    Q.   So are you saying that you're not guilty?

6    A.   That is correct.

7    Q.   You're saying you're innocent of these charges?

8    A.   Yes, I am.   Clearly.

9    Q.   Do you have any kind of a plea and cooperation agreement?

10   A.   No, sir.

11   Q.   Do you have any desire to please the government?

12   A.   No, sir, I do not.

13   Q.   Did you tell Barnes that he put you in the situation or

14   put you in a trick bag?

15   A.   Repeat that question, please, sir?

16   Q.   Did you tell Mr. Barnes that he put you in a situation or

17   put you in a trick bag?

18   A.   Did I tell him that?

19   Q.   Yes.

20   A.   No, sir.

21   Q.   Did you feel like he did?

22   A.   No, sir.

23   Q.   Did you know he had sex back there?

24   A.   No, sir, I did not.

25   Q.   Did you think he had sex back there?

Alan F. Moore - Direct/Harper

1   A.   No, sir.

2   Q.   He fooled you?

3   A.   Yeah.  He wasn't back there that long.

4   Q.   How long was he back there?

5   A.   Maybe 5, 6, 7 minutes.

6   Q.   Do you remember Delores Hamlet testifying?

7   A.   Yes, sir.

8   Q.   Do you remember her being like Shonnie's mother, Shonnie

9   is like her daughter?

10  A.   I don't know their interactions, how they communicate.

11  Q.   Do you remember an incident where Barnes wanted her to

12  come and get a radio and send a message through you?  Do you

13  remember that?

14  A.   I do recall that, sir.

15  Q.   Okay.  What do you recall happening?

16  A.   Mr. Barnes called me one morning.  It was close for the

17  time for me to depart, to go home, because I was working the

18  morning watch shift from 12-to-8; and, during that time, he

19  simply said to me, "Tell Delores Hamlet to come down to the

20  unit and pick her radio up."  And then I said, "Okay, because

21  I'm fixing to get out of here."

22      So, she was coming from Unicor, somewhere, she worked in

23  Unicor, I guess, switchboard operator, or whatever it was,

24  and briefly told her what Mr. Barnes said, and that was the

25  end of it.

1   Q.  Did you know that was a code?

2   A.  Did I know what, sir?

3   Q.  That was a code?

4   A.  No.

5   Q.  Are radios there on the units?

6   A.  Excuse me?

7   Q.  Are radios on the unit?

8   A.  Yes.  They issue radios.

9   Q.  "They" issue radios.  Who is "they"?

10  A.  The commissary.

11  Q.  All right.  So, it's an authorized item through the

12  Bureau of Prisons?

13  A.  Yes, it is.

14  Q.  And that wasn't any code with you and Barnes; is that

15  right?

16  A.  No, sir.  I don't deal with codes.

17  Q.  Were you here -- were you able to hear the testimony

18  about the pregnancy test?

19  A.  Yes, sir.

20  Q.  Do you know what that's about?

21  A.  No, sir, I do not.

22  Q.  Were you involved in that?

23  A.  No, sir, I was not.

24  Q.  Do you know if there was a pregnancy test?

25  A.  No, sir, I have no knowledge or recollection of it

Alan F. Moore - Direct/Harper

```
 1   whatsoever.

 2   Q.  When's the first you heard about any kind of a pregnancy

 3   test?

 4   A.  When I actually looked at that memo that we have --

 5   Q.  Discovery?

 6   A.  -- where Blackston states that I brought one in, which I

 7   did not.

 8   Q.  The first you heard about it was in discovery after you

 9   were arrested?

10   A.  Right.

11   Q.  Okay.  After we got together and started preparing for

12   trial?

13   A.  Yes, sir.

14   Q.  So, at the time did you know -- do you know if it

15   happened, even?

16   A.  Do I know if it happened?

17   Q.  Yes.

18   A.  If it was brought in or not?

19   Q.  Yes.

20   A.  No, sir, I have no knowledge of it.

21   Q.  You heard the testimony of Valerie Mills.

22   A.  Yes, sir, I did.

23   Q.  Did you hear her say that you made rude comments to her?

24   A.  Yes, I did.

25   Q.  Do you know what she's talking about?
```

Alan F. Moore - Direct/Harper

1   A.   No, sir.  I never made rude comments to her, never.

2   Q.   Have you groped her?

3   A.   No.

4   Q.   Did you grab her breasts?

5   A.   No, sir.  I never touched her not one time, never.

6   Q.   What about grabbing her rear end?

7   A.   No, sir, I did not.

8   Q.   Did you know that she was Sabrina Bowie's drug program

9   sister?

10  A.   No, sir.

11  Q.   Do you know St. Anne Narcisse?

12  A.   Yes, I do.

13  Q.   How do you know her?

14  A.   She was an inmate in C unit when I was working over there

15  off and on.

16  Q.   She's a convicted felon under your custody and control;

17  is that right?

18  A.   That's correct.

19  Q.   Was she a problem for you at all?

20  A.   I never had any problems out of her.

21  Q.   Did you hear her testimony that you had made a comment

22  about her breasts?

23  A.   Yes, I did hear it.

24  Q.   Is that true or not?

25  A.   No, sir, it is not true.

1  Q.  Do you know what she's talking about?

2  A.  I have no idea.

3  Q.  She said that you grabbed and held her.  Did you do that?

4  A.  No, sir.  I never touched her.

5  Q.  She said -- I think she said you grabbed her boobs.  Did

6  you do that?

7  A.  No, sir, I did not.

8  Q.  She said that you touched her all over and stuck your

9  finger inside of her vagina.  Did you do that?

10  A.  No, sir, I did not.

11  Q.  Did you say to her that you had to go repent yourself?

12  A.  No, sir.

13  Q.  Do you know what she's talking about?

14  A.  No, sir, I do not.

15  Q.  She said you unzipped your pants, and you had sex, and an

16  officer was coming, and you had to leave.  Is that true?

17  A.  No, sir.  I never had sex with her.  I never had sex with

18  any inmate out there.

19  Q.  The last thing:

20      Do you know Delores Hamlet?

21  A.  Yes, I do.

22  Q.  Do you remember a time where Barnes called you to have

23  her sent over because he had something for her?

24  A.  I remember -- I recall him calling me asking me to send

25  her over to pick up her radio.

```
1   Q.   Okay.  Did he say he had contraband for her?

2   A.   No, he did not.

3   Q.   Is this the same event we were talking about?

4   A.   Yes, it is, sir.

5   Q.   Did you have any understanding or agreement that mails

6   were likely to be used for --

7   A.   No, sir.

8   Q.   Let me make a better question.

9        Did you have any idea or any knowledge that, because of

10  your conduct, anything that you did with these officers that

11  mail would be involved?

12  A.   No, sir.

13  Q.   Did you have any knowledge or information that money

14  would be mailed back and forth to Barnes?

15  A.   No, sir, I did not.

16  Q.   Did you have any knowledge or information that money was

17  being mailed to any other officer?

18  A.   No, sir, I did not.

19  Q.   How about Mr. Hill?  Did you ever hear anything about

20  that?

21  A.   No, sir.

22  Q.   You did not have sex with Sabrina Bowie?

23  A.   No, sir, I did not.

24  Q.   You did not have sex with St. Anne Narcisse?

25  A.   No, sir, I did not.  I didn't have sex with any of those
```

1    inmates.

2    Q.  Did you ever have sex with any other inmates?

3    A.  No, sir, I did not.

4          MR. HARPER:  I tender the witness, Your Honor.

5          THE COURT:  Mr. Findley?

6          MR. FINDLEY:  Two questions.

7                         CROSS-EXAMINATION

8    BY MR. FINDLEY:

9    Q.  Mr. Moore, did you ever conspire with Mr. Dixon in any

10   way to commit any criminal offense?

11   A.  No, sir, I did not.

12   Q.  Mr. Moore, did you ever observe Mr. Dixon commit a

13   criminal offense?

14   A.  No, sir.

15          MR. FINDLEY:  Thank you.

16          THE COURT:  Cross-examine?

17                         CROSS-EXAMINATION

18   BY MR. SPROWLS:

19   Q.  Mr. Moore, does the care, custody and control of inmates,

20   insofar as your doing that, does that include ministering to

21   the inmates as well?

22   A.  No, sir.

23   Q.  Well, didn't you do that?

24   A.  Yes, I have ministered to inmates before.

25   Q.  Okay.  Tell us what you do.

1   A.   Well, sometimes inmates come to me with problems and

2   things that they might be going through, and they might ask

3   for my opinion or guidance or something in the Bible or

4   scripture, or something like that.

5   Q.   So they come to you?

6   A.   They have came to me.

7   Q.   You're telling this jury that Shonnie Daniels asked to

8   get out early, and you told her, no, and that was it?

9   A.   That's correct, sir.

10  Q.   You were able to tell Shonnie Daniels, no, one time and

11  she obeyed?

12  A.   She asked me more than one time.  She asked me at least

13  two times.

14  Q.   We're talking about Shonnie Daniels now?

15  A.   Yes.

16  Q.   She's a pretty persistent gal, wouldn't you say?

17          MR. HARPER:  Objection.  Argumentative.

18          THE COURT:  Overruled.

19  BY MR. SPROWLS:

20  Q.   Wouldn't you say?

21  A.   I don't know her that well.

22  Q.   Did you know where she was going?

23  A.   No, sir.

24  Q.   You said, asked a question to yourself, I guess, why

25  would I have sex with an inmate in a room?  I think, if I

Alan F. Moore - Cross/Sprowls

1    recall the testimony, it was supposed to be at nighttime and

2    a sheet was down to prevent the roommate, Ms. Blackston, from

3    seeing you.  But you also told the jury that there's plenty

4    of places to have sex.  Feel free to tell us.  Where are

5    those places?

6    A.  What I was saying was, there's other places for an

7    officer to go, if they want to have sex with an inmate,

8    instead of standing up in front of another inmate in the

9    room.

10   Q.  Tell us where those places are.

11   A.  Such as the TV room, the storage closet, or in the office

12   or in the bathroom.

13   Q.  You heard the comment or the testimony that you put your

14   face so close to a sleeping inmate's genital area that you

15   weren't able to properly operate the remote on the

16   television.  Do you get close to inmates?

17   A.  No, sir.

18   Q.  You don't -- so you dispute the testimony that you would

19   stare at the inmates' genitals when you had the opportunity?

20   A.  Yes, sir, I do dispute that testimony.

21   Q.  So the inmate is lying?

22   A.  Yes, sir, she's lying.

23   Q.  No.  They're lying?

24   A.  They are lying.

25   Q.  What sort of radios was -- or radio was Barnes asking you

1  to tell Hamlet to come and retrieve?

2  A.  He didn't give me a description of the radio.  He just

3  said that he had her radio over there and for her to come and

4  get it.

5  Q.  Well, you said they issue radios there.

6  A.  Yes, they do.

7  Q.  Who issues them?

8  A.  Through the commissary, they can purchase them.

9  Q.  Well, Ms. Hamlet didn't live where Mr. Barnes was

10  located, did she?

11  A.  No, sir.

12  Q.  So, how did her radio get with Mr. Barnes at another

13  location?

14  A.  I have no idea, sir.

15  Q.  But you told her exactly as Barnes asked you, right?

16  A.  Yes, I did, exactly.

17  Q.  So, Mr. Barnes is telling the truth on that score?

18  A.  Excuse me?

19  Q.  Mr. Barnes is telling the truth on that point?

20  A.  What do you mean he's telling the truth?

21  Q.  That he called you and asked you to tell Hamlet that he

22  had a radio for her.

23  A.  Yeah, that's what he said to me.

24  Q.  And that's what you did?

25  A.  Exactly.

1  Q.  I want to show you what's in evidence as Government's

2  Exhibit 12.

3      Do you recognize the general layout here as being similar

4  to C unit?

5  A.  Yeah, I recognize it somewhat.

6  Q.  Okay.  So, was it one morning, one day or one evening

7  that Mr. Barnes came to you?

8  A.  This was on morning watch.

9  Q.  It was on morning.  About what time of day?

10  A.  It was after 12:00, after count.

11  Q.  So, why don't you use that object that's Velcro'd to the

12  screen and put a dot where you were the minute he walked in?

13  A.  Well, the office isn't on here.  That's where I was.

14  Q.  You just tell me where you were.

15  A.  I was in the office, wherever the office is on here, sir.

16  Q.  Can you see it?

17  A.  I'm not sure where the office is.  I see it now.

18  Q.  I'm sorry.  I didn't move it on you.  Good timing.

19  A.  Right.

20  Q.  I will leave it right there.

21      So, you're seated in there?

22  A.  Yes, sir.

23  Q.  And are you sure it wasn't at night?

24  A.  This was on morning watch shift, 12-to-8.

25  Q.  Okay.

Alan F. Moore - Cross/Sprowls

1   A.   12-to-8 shift is morning watch, sir.

2   Q.   All right.  What time of day?

3   A.   I don't know the exact time, but I know it was after the

4   first count.

5   Q.   Were the inmates asleep?

6   A.   Some of them were and some of them weren't.

7   Q.   So your testimony is, he came in and said, "Hey, I need

8   to use the bathroom"?

9   A.   It wasn't that quick.  He came in.  We had a brief

10  conversation talking football or something for so many

11  minutes, and then he said he had to use the restroom.

12  Q.   So, you swapped keys?

13  A.   We didn't swap.  I just gave him my keys.  He asked me

14  for my keys to use the bathroom, and I gave them to him.

15  Q.   All right.  If the lieutenant followed in 10 seconds

16  later, and you don't have your keys, that's not a good thing,

17  is it?

18  A.   It wouldn't be a bad thing neither, because my keys are

19  still in the unit.  It's not like he left the unit with my

20  keys.

21  Q.   You gave up your keys, they are issued to you for this

22  shift, and you gave them to another officer.  You are without

23  your keys.  You cannot respond to an emergency, can you?

24  A.   Yes, I could.  He's still in the unit.

25  Q.   He could be on the head in the toilet.

1   A.  He's still in the unit, sir.  He did not exit my unit

2   with my keys.

3   Q.  All right.  So, for him to go -- did he go through this

4   door here?

5   A.  He went through the south side door, which would be --

6   that would be the first exit door right to the left, over

7   here on this side, somewhere, wherever this door is.  When

8   you come in, the left of my office, which is the south side.

9   Q.  Well, use your pen then.

10  A.  If this is the door, it would be right here, the south

11  side.

12  Q.  All right.  Where is the bathroom that he went to?

13  A.  The bathroom is way back here in the back-left-hand

14  corner of the unit, which is back here, where it says "staff

15  toilet."

16  Q.  To get back there, did he have to go through a door right

17  where I drew that horizontal line?

18  A.  Yes, sir, he would.

19  Q.  That's why he needed your keys, right?

20  A.  Yes, sir.

21  Q.  So, you do admit giving him the keys and being without

22  your keys for at least 5 minutes, is what you're saying?

23  A.  Yes, sir.

24  Q.  But you're denying later telling Mr. Barnes, "I know what

25  you did, you had sex that night, and I'm concerned about it"?

1   A.   I never told Mr. Barnes that, sir.

2   Q.   What's wrong with telling him that?

3   A.   I never told him that.

4   Q.   So, you're telling the jury or you're trying to make the

5   jury believe that St. Anne Narcisse, the Haitian lady who we

6   had difficulty hearing, lied when she said that you touched

7   her?

8   A.   Yes, she's a big liar.

9   Q.   She looked fairly small to me.

10  A.   But she's a big liar.

11        MR. HARPER:   Objection.

12        THE COURT:   Sustained.

13  BY MR. SPROWLS:

14  Q.   And she said that she had sex with you one time?

15  A.   It never happened, sir.   Never.

16  Q.   She's lying?

17  A.   She's lying, sir.

18  Q.   She's lying to try to help herself, right?

19  A.   I don't know what she's trying to do, but she's lying, I

20  know that.

21  Q.   Well, Mr. Barnes -- Mr. Moore, if you don't answer, I

22  don't want -- you heard the questions directed at her that

23  she was -- from the defense counsel, indicating or implying

24  that she would lie to get her sentence reduced or to get out

25  of it.   Do you recall that?

1  A.  Repeat that, sir?

2  Q.  Do you recall the questions directed at her, as well as

3  the other inmates, asking if they wanted to get out early?

4  A.  I heard something about it being said during the

5  testimony.

6  Q.  Implying that they may lie up a story to get a break from

7  the government, pointing at us.  Do you recall those

8  questions?

9  A.  Some of them.

10  Q.  Well, wouldn't it -- let me ask you:

11     Wouldn't it make sense, if a person is going to lie, as

12  you claim they are, that they would say they had sex with you

13  50 times?

14  A.  Repeat the question, sir.

15  Q.  If they are going to lie and please the government, so to

16  speak, as your counsel is implying, wouldn't it make more

17  sense that they would say they had sex with you 50 times as

18  opposed to just once?

19  A.  No, sir.

20  Q.  Well, if you're going to lie, lie big, right?

21  A.  That's your perception.

22  Q.  And Valerie Mills, you never propositioned her?

23  A.  Never.

24  Q.  Again, if she was going to lie to get a break from us,

25  why didn't she say she did have sex with you 50 times?

1   A.   I have no idea, sir.   I never touched any of those

2   inmates.   None of them.

3   Q.   And Ms. Bowie lied, correct?

4   A.   Correct.

5   Q.   She's out, Mr. Moore.   Did you notice that?

6   A.   Yeah, I know she's out.

7   Q.   Ms. Blackston, she lied?

8   A.   Yes, he lied.

9   Q.   She's out.

10  A.   So.   That doesn't mean she can't lie.

11  Q.   Mr. Moore, do you recall attending a training seminar or

12  training class back in February of this year?

13  A.   Yes, sir, I do.

14  Q.   Do you recall asking a question of the instructor, "What

15  do you do if inmates get together and make up a story on

16  you"?

17  A.   I recall asking a question maybe similar to that.

18  Q.   All right.   Were you trying to be funny?

19  A.   No, sir, I was not.

20  Q.   What were you concerned about?

21  A.   I wasn't concerned about anything.

22  Q.   What was the purpose of the question?

23  A.   The purpose of the question was, we were asked and told

24  that we can ask questions if we have questions.   It's annual

25  training, people ask questions like that all day, and it's

1   not an unusual question.

2   Q.   Were you concerned that inmates were talking about you?

3   A.   No, sir, I was not.

4   Q.   This was just a question that somehow popped in your

5   mind?

6   A.   Yes, sir, it did.

7   Q.   "What do you do if inmates get together and make up a

8   story on you?"  That just came to your mind that day?

9   A.   It was just a question that came to my mind, and I simply

10  asked Mr. Brunner.  There were other people in there asking

11  questions as well.  That is not an unusual question for

12  anybody to ask in annual training.  As a matter of fact, we

13  are told to ask questions, if we have questions, and that's

14  the point in time to ask them.

15  Q.   Okay.  But it's the type of question, I guess I'm trying

16  to ask you about.

17  A.   Uh-huh.

18  Q.   What was going through your mind?  What were you worried

19  about, as far as inmates getting together and making

20  something up on you?

21  A.   I wasn't worried about anything, sir.

22  Q.   But you asked the question anyway?

23  A.   Yes, I did.

24  Q.   You're not going to tell us what was bothering you then?

25  A.   There wasn't anything bothering me, sir.

1          MR. SPROWLS:  That's all I have, Judge.

2          THE COURT:  Redirect?

3          MR. HARPER:  Briefly, Your Honor.

4                    REDIRECT EXAMINATION

5     BY MR. HARPER:

6     Q.  Mr. Sprowls was asking you about big lies, the inmates

7     would say 50 times.  Inmates would say 15 times if it was a

8     big lie, too, wouldn't she?

9     A.  Yes, sir.

10    Q.  Sort of like what we heard from Shirley Blackston?

11    A.  Pretty much so, sir.

12         MR. HARPER:  Nothing further, Your Honor.

13         THE COURT:  Thank you, Mr. Moore.  You may step down

14    and return to counsel table.

15         Mr. Harper, please call your next witness.

16         MR. HARPER:  We rest.

17         MR. FINDLEY:  May I approach, Your Honor?

18         THE COURT:  You may.

19       (Conference held at side-bar.)

20         MR. FINDLEY:  Your Honor, I just wanted to notify the

21    court that Mr. Dixon would not be testifying, and I didn't

22    know whether you wanted to go through your discussion with

23    him.

24         THE COURT:  I'll do that at the end of the day.

25         MR. FINDLEY:  At the end of the day?

1          THE COURT:  Yeah.

2          MR. FINDLEY:  Then the only witness we're going to

3     have is Wanda Dixon, because Mr. Gilbert was on our list, and

4     he's already testified.

5          THE COURT:  Okay.  Go ahead and call her.

6          MR. SPROWLS:  To that end, this is going a little

7     faster than we thought, also.  I don't know that we are quite

8     prepared to close.

9          THE COURT:  You don't have to make your closing

10    argument today.

11         MR. SPROWLS:  Okay.

12         THE COURT:  No.  We've got work to do.  We will

13    finish all of the evidence today, and then we'll break.

14         MR. SPROWLS:  Okay.

15         MR. FINDLEY:  This won't take long.

16         THE COURT:  Okay.

17    (End of side-bar conference.)

18         THE COURT:  If any of you need water or want it, just

19    signal, we will get you some.  You don't have to cough.

20         Mr. Findley, please call your first witness.

21         MR. FINDLEY:  We would call Wanda Dixon.

22         DEPUTY CLERK:  Please raise your right hand.

23         **WANDA DIXON, DEFENDANT DIXON'S WITNESS, DULY SWORN**

24         DEPUTY CLERK:  Be seated.

25         Please, state your full name and spell your last

 1   name for the record.

 2           THE WITNESS:  Wanda Dixon, D-i-x-o-n.

 3                     DIRECT EXAMINATION

 4   BY MR. FINDLEY:

 5   Q.  Good afternoon, Ms. Dixon.

 6   A.  Good afternoon.

 7   Q.  Ms. Dixon, are you married to Mr. Gregory Dixon?

 8   A.  Yes, sir.

 9   Q.  How long have you been married to him?

10   A.  Thirteen years.

11   Q.  Has it been a good marriage?

12   A.  Yes, sir.

13   Q.  All right.  How many children do you have?

14   A.  Three.

15   Q.  What are their names?

16   A.  We have Gabriel, he's 23; we have Sharanda and Michael.

17   Q.  Okay.  And how old are the two younger ones?

18   A.  Sharanda is -- Gabriel is 23.  That's my stepson.

19   Sharanda is 23, and Michael is the baby is 18.

20   Q.  Okay.  Now, I'm going to ask you some personal questions

21   and I apologize, but I think it may be necessary.

22       Have you always had a good sexual relationship with your

23   husband?

24   A.  Yes.

25   Q.  Have you ever had any sexually-transmitted disease?

1   A.   No, sir.

2   Q.   To your knowledge, has your husband ever had any

3   sexually-transmitted disease?

4   A.   No, sir.

5   Q.   All right.   The two of you continue to have sex up until

6   the present?

7   A.   Yes, sir.

8   Q.   And you always have throughout your marriage?

9   A.   Yes, sir.

10  Q.   Okay.   Now, your husband is a veteran of the United

11  States Navy; is that right?

12  A.   That's correct.

13  Q.   And he received an honorable discharge?

14  A.   Yes, he did.

15  Q.   Do you know when Mr. Dixon's mother passed away?

16  A.   It was January the 27th of '05.

17  Q.   And did you experience any financial difficulty as a

18  family during that time?

19  A.   No, we did not.

20          MR. FINDLEY:   That's all I have, Your Honor.

21          THE COURT:   Mr. Harper?

22          MR. HARPER:   No questions.

23          THE COURT:   Mr. Sprowls?

24          MR. SPROWLS:   No questions.

25          THE COURT:   Thank you, Ms. Dixon.   You may step down.

1    Mr. Findley, please call your next witness.

2    MR. FINDLEY:  We rest.

3    THE COURT:  All right.  Members of the jury, what

4  that means is you've heard all of the defense evidence in the

5  case.  Now, as I told you, the government has an opportunity,

6  if it chooses, to present evidence just in response to the

7  evidence that the defense put on.

8    Mr. Sprowls, is there a rebuttal case for the

9  government?

10   MR. SPROWLS:  We have at least one witness.

11   THE COURT:  All right.  Please call your first

12  witness.

13   MR. SPROWLS:  Jeffrey Brunner.

14   THE COURT:  Mr. Brunner, you may be seated.  You are

15  still under oath.

16   Mr. Sprowls, you may proceed.

17   (**JEFFREY BRUNNER,** having been previously duly sworn, was

18  recalled by the government in its rebuttal case.)

19                    DIRECT EXAMINATION

20  BY MR. SPROWLS:

21  Q.  Special Agent Brunner, back in -- early this year, in

22  February, February 21st, do you recall providing a briefing

23  to staff members at FCI?

24  A.  Yes, I do.

25  Q.  And what was the topic, if you recall?

*Jeffrey Brunner - Direct*

 1   A.   Part of my duties are to give briefings called "Integrity

 2   Awareness Briefings," and they can range from a half an hour

 3   to an hour long.   And, generally, what I try to do is try to

 4   explain what the Office of Inspector General does, how we get

 5   complaints, the intake process, the investigative process,

 6   how we delineate what OIG does, as far as investigations,

 7   when we keep them, when we turn them back to the BOP for

 8   investigation.

 9   Q.   Is this --

10   A.   That's the general topic.

11   Q.   Is this an annual or a periodic-type briefing?

12   A.   Well, it's annual briefing for Bureau of Prisons;

13   however, I am tasked, according to what my agency wants me to

14   do, meaning, that I may do one in Marianna, someone else may

15   cover another one.   There's no structure as far as OIG agents

16   go as to when they give them and who they give them to.

17   Q.   Have you given these at other institutions?

18   A.   Yes, I have.

19   Q.   Okay.   I guess at any training session, questions are

20   encouraged from the attendees?

21   A.   That's my general experience with training questions.

22   Q.   And was Mr. Moore in attendance at this?

23   A.   I specifically remember, yes.

24   Q.   All right.   During or following your briefing, were there

25   questions from the audience, if you will?

1    A.  There was this one question during my particular part of

2    the briefing, and it came from Mr. Moore.

3    Q.  And what do you recall that question to be?

4    A.  Generally, during the course of my briefing, he asked

5    what do you do when a group of inmates get together and

6    falsely accuse you.

7    Q.  Your presentation, did it touch upon anything like that?

8    A.  Well, it was about the investigation process.

9    Q.  But as far as inmates getting together and making up

10   stuff?

11   A.  No, I did not bring that part up.

12   Q.  Did the question surprise you?

13   A.  It --

14        MR. HARPER:  Object.  I didn't hear the question.

15   I'm sorry.

16        THE COURT:  I'll sustain the objection.

17        THE WITNESS:  Um --

18        THE COURT:  He's going to ask you another question.

19        THE WITNESS:  I'm sorry.

20   BY MR. SPROWLS:

21   Q.  Did the question -- was it one that you expected?

22        MR. HARPER:  Objection.  Irrelevant, Your Honor.

23        THE COURT:  Sustained.

24   BY MR. SPROWLS:

25   Q.  Did the question seem to address the subject --

 1          MR. HARPER:  Leading.

 2          THE COURT:  Overruled.

 3   BY MR. SPROWLS:

 4   Q.  Did it seem to address the topic that you were

 5   instructing on?

 6   A.  At the time I was not covering false allegations by

 7   inmates and what we do with those.

 8   Q.  Did you respond to the question?

 9   A.  Yes, I did.

10   Q.  Was there any questions on that topic other than from

11   Mr. Moore?

12   A.  Not that I recall.

13          MR. SPROWLS:  That's all I have.

14          THE COURT:  Cross-examine?

15                    CROSS-EXAMINATION

16   BY MR. HARPER:

17   Q.  How did you respond?

18   A.  I'm sorry.  I didn't hear you.

19   Q.  How did you respond?  What did you tell him?

20   A.  I responded, as an investigator, I find it highly

21   unlikely that that would happen based upon my skills.

22   Q.  That an inmate would make a false report against an

23   officer?

24   A.  No.  That that would move forward to an arrest or a

25   successful investigation.

1          MR. HARPER:  Nothing further, Your Honor.

2          THE COURT:  Mr. Findley?

3          MR. FINDLEY:  No questions.

4          THE COURT:  Redirect?

5          MR. SPROWLS:  No further questions.

6          THE COURT:  Thank you, Mr. Brunner.  You may step

7   down and return to counsel table.

8          MR. SPROWLS:  That's all we have, Judge.

9          THE COURT:  All right.

10         Members of the jury, what that means is you have

11  gotten all of the evidence on both sides of the case.  It also

12  means you're going to get to leave an hour early.  We've got a

13  little bit of housekeeping to do, and then what happens from

14  here is that the lawyers make their closing arguments, and

15  I'll give you your instructions on the law.  It doesn't make

16  sense to start that process at 3:00, frankly.  It makes more

17  sense to start it at the beginning of the day.  So, we're

18  going to break for the afternoon and start back again at 8:30

19  tomorrow morning.

20         You'll get the closing arguments of the lawyers and

21  my instructions, and then you'll have the case to begin your

22  deliberations.

23         Even though you have now heard all of the evidence on

24  both sides of the case, it's still not time to start talking

25  about the case.  Wait until you've heard the closing arguments

1    of the lawyers and my instructions and begin your

2    deliberations at that point.

3            Recall my earlier instructions.  Don't let anybody

4    talk about the case with you or in your presence.  Make sure

5    you don't see anything in the media or the newspaper about the

6    case.  Have a pleasant afternoon and safe trip home and back

7    in the morning, and we will see you at 8:30.

8        (The jury exited the courtroom at 3:03 p.m.)

9            You may be seated.

10           Mr. Dixon, Mr. Findley advised me at side-bar that

11   you had decided not to testify.  Of course, I knew that when

12   he didn't call you as a witness.  But I do need to confirm

13   with you on the record.  As I told you, I think it was

14   yesterday, it's your decision whether to testify or not.  You

15   should consider Mr. Findley's advice, but then the decision is

16   yours.

17           Have you made the decision not to testify in the

18   case?

19           DEFENDANT DIXON:  Right, sir.

20           THE COURT:  All right.

21           Now, I need to finish working on instructions, and

22   I'm not -- I haven't done that.  I think what I propose to do

23   is to post a draft of the instructions.  The easiest way for

24   me to get them to you is through the CM/ECF system.  So, I'll

25   get a draft done and I'll post it sometime this afternoon, or

1    as quickly as I can.

2         MR. FINDLEY:  We do have a modification, at the

3    appropriate time.  I can tell you now.

4         THE COURT:  You have a --

5         MR. FINDLEY:  A modification to our proposed

6    instructions.

7         THE COURT:  Okay.  Tell me about that.

8         MR. FINDLEY:  We would like to add a lesser-included

9    offense to the conspiracy count and to the bribery counts for

10   having sex with an inmate.  Under the statute, 18, United

11   States Code, I think it is 2243(b), which was a misdemeanor at

12   the time of this offense.

13        THE COURT:  Mr. Harper, tell me your position about a

14   lesser-included.

15        MR. HARPER:  I'm not thrilled at all with that, Your

16   Honor.  I know it was a misdemeanor at the time, but I haven't

17   done any research enough to intelligently make a request.  I

18   didn't request it, and I don't request it.

19        THE COURT:  Your preference is that there not be such

20   an instruction?

21        MR. HARPER:  Yes, sir.

22        THE COURT:  What says the government?

23        MR. SPROWLS:  Judge, I'm just not exactly sure

24   that -- I understand what Mr. Findley is asking for.  I'm not

25   sure that the elements that that fall under are truly a

1   lesser-included as to what we have charged.

2          MR. FINDLEY:  Your Honor, I would submit that they

3   are, because the allegations are that Mr. Dixon received

4   sexual favors from inmates, and those are the elements of the

5   violation of 2243(b).

6          THE COURT:  Your theory is that, if there was sex and

7   it wasn't in exchange for anything, it's a lesser-included to

8   having sex in exchange.

9          MR. FINDLEY:  That's correct.

10          THE COURT:  All right.  I understand the theory.

11  I'll work on it.

12          MR. SPROWLS:  Judge, can I -- because of the -- there

13  was a lot of thought put into this indictment, despite what it

14  may appear.  I would like to confer with some of my superiors

15  as to what our position in the office would be.  I don't feel

16  comfortable making that call right this second.  I can

17  probably file something electronically real soon saying --

18          THE COURT:  Or we can get back and either have a

19  hearing or even do it over the telephone.  Let me tell you, we

20  have some work to do, at least work to do on the instructions,

21  I have some work to do.  I could tell you, it went faster than

22  what I expected, but both sides have already used up that

23  excuse, so it's harder.  But I do need to finish the

24  instructions.  Then I need to give them to you and give you a

25  chance to comment.  I would like to do that in a way that

1   interferes as little as possible with what you need to do,

2   because you've got final argument to prepare.  So, I don't

3   want to get in your way.

4          Maybe I can get you on the telephone at 4:30.  That

5   will give you an hour and a half to work on the issue and give

6   me a chance to look at the issue a little bit, also to work on

7   instructions.  I don't know that I will have my instructions

8   finished by then, but I'll work on them.

9          Does that work?  I can do it back here, if you want

10  to do it back here.

11         MR. FINDLEY:  I would prefer to do it by telephone.

12  We can go to our office, which is no longer downtown.

13         THE COURT:  Well, I thought you would be working and

14  you would just as soon not have to go back and forth.

15         Let's just have a phone call at 4:30.  Oh, I have a

16  sentencing at 4:15.

17         MR. FINDLEY:  What about 8:00 in the morning?  Do you

18  think that would give us enough time?

19         THE COURT:  You probably want to know before that

20  whether there is going to be a lesser-included.  We can do

21  instructions at 8:00 in the morning.  But don't you want to

22  know?  I mean, you're working on your closings.  I assume you

23  want to know if there is a lesser-included.

24         MR. FINDLEY:  Yes, I would.  4:30 is fine.

25         THE COURT:  We will call you soon after 4:30 as we

1   can.  I have a 4:15 sentencing.  It may be a 15-minute

2   sentencing, but sometimes I walk in to what I think is quick

3   and it takes an hour.  So, somebody will be in touch.  If you

4   will be available at your offices at 4:30, we will try to

5   connect.  Then I will hear if you have any input at that point

6   whether this is a lesser-included.  I will look at it some and

7   we'll make a determination on that.

8           MR. FINDLEY:  Yes, sir.

9           THE COURT:  All right.

10      (A recess was taken at 3:09 p.m.)

11      (The proceeding resumed at 4:30 p.m. via telephone

12   conference.)

13                          **IN CHAMBERS**

14           THE COURT:  Good afternoon.  This is Judge Hinkle.

15           Mr. Davis, are you there?

16           MR. DAVIS:  I am, Judge Hinkle.  With me is

17   Mr. Sprowls.

18           THE COURT:  And Mr. Findley?

19           MR. FINDLEY:  Yes, sir.

20           THE COURT:  And Mr. Harper?

21           MR. HARPER:  Yes, sir.

22           THE COURT:  Mr. Findley, your request is to have this

23   treated as a lesser-included.  The case I'm coming up with is

24   *Schmuck versus United States*, 489 U.S. 705, a 1989 decision,

25   which I think stands for the proposition that, in determining

1   whether something is a lesser-included, you look at the

2   elements of the offense.

3        MR. FINDLEY:  I see that, and I think I can -- I

4   mean, I agree with that.  I am looking at that case right now.

5        THE COURT:  Okay.  On that analysis, sex with an

6   inmate is not a lesser-included in this case, right?

7        MR. FINDLEY:  I would agree with that.  But I have an

8   alternative.  The illegal gratuity statute I believe is, and

9   there are a number of cases, including one where Your Honor

10   instructed on the lesser-included of a gratuity.

11        THE COURT:  And I think the defendant may have been

12   convicted of the gratuity in that case.

13        MR. FINDLEY:  Correct.  And it was affirmed on

14   appeal, although that wasn't the specific issue, but that's

15   what happened.

16        But there are other cases that say that a gratuity is

17   a -- an illegal gratuity is a lesser-included.  And we would

18   request that both with respect to the conspiracy to commit a

19   gratuity or -- however you phrase it -- and illegal gratuity

20   on the bribery count.  And I have not had an opportunity to

21   draft those up, yet, that way.  I apologize.

22        THE COURT:  Well, that's not a problem.  I'm going to

23   rewrite all of y'all's stuff anyway.

24        Mr. Sprowls or Mr. Davis?

25        MR. DAVIS:  Your Honor, we're aware that the gratuity

1    is a lesser-included offense on the bribery, but we would just

2    point out that, in most of those illegal gratuity cases, that

3    the -- the one thing that was obtained from the person

4    providing the -- one of the *quid pro quo's*, whatever you want

5    to call it, was something that could be legally provided.  We

6    would just point out that what was provided in this case by

7    the guards was not legal for them to provide.

8         THE COURT:  Well, the gratuity, I take it, would be

9    what the inmate gave the guards.  So, either sex or on one of

10   the counts money.

11        MR. DAVIS:  Right.  But in return for that, the guard

12   wouldn't -- most of the gratuity cases I've read, Your Honor,

13   the Congress and -- or whatever -- would have been doing

14   something that would have otherwise been a legal activity for

15   them to undertake.  What we are saying is the giving of

16   contraband or the ignoring of responsibility is not a legal

17   permissible action for them to take.

18        MR. FINDLEY:  But I think we go to the elements test,

19   then the gratuity -- the elements of the gratuity offense are

20   clearly a subset of the elements of the bribery offense.

21        THE COURT:  Why wouldn't it be a gratuity if the --

22   well, okay.  There has to be something that the guard does,

23   and so --

24        MR. DAVIS:  If the guard then, you know, lets them

25   out for dinner, it's early, that might be a gratuity.  At

1    least that's my reading of the gratuity cases, Your Honor.  I

2    do agree that the case law would support the gratuity being a

3    lesser-included offense of bribery.

4         THE COURT:  All right.  But you don't want me to give

5    a lesser-included on a gratuity.

6         MR. SPROWLS:  We talked about -- so, we had a little

7    round-robin -- this is Alan Sprowls -- of the first proposal

8    from Mr. Findley.  And to take a shot, a very generic, if it's

9    properly a lesser-included, we didn't have any basis for an

10   objection.  In other words, we thought it might be otherwise a

11   way to do it, if it's proper.

12        MR. DAVIS:  We were, in fact, thinking of that in the

13   context of sex with the inmates being a lesser-included for --

14        THE COURT:  Right.  Okay.  I think I'm left with the

15   impression, Mr. Davis or Mr. Sprowls, that you half-heartily

16   object to the lesser-included on a gratuity.  Is that a fair

17   reading of where we stand?

18        MR. SPROWLS:  I don't think we -- I mean, if it is

19   genuinely a lesser-included, we don't think we really have a

20   legal basis to object.

21        THE COURT:  Okay.

22        MR. SPROWLS:  I mean, it's almost -- it was the

23   thought by our criminal supervisor here that, if it's a

24   lesser-included and it's proper, the defense gets it.

25        THE COURT:  Okay.  I understand Mr. Davis's

1   distinction between legal and not legal.  I'll think about it

2   a little bit.  But I suspect that I will give the

3   lesser-included gratuity instruction.

4        And then I still have some work to do on these

5   instructions.  I'll get them posted as quickly as I can.

6   Let's plan to start at 8:00 in the morning.

7        MR. FINDLEY:  Okay.

8        MR. DAVIS:  Very good, Your Honor.

9        MR. FINDLEY:  We do object -- we just got a new

10  government instruction on the mail fraud statute that we

11  just -- I will just say, we object for the record to the

12  instruction that was used in the recent case.  I don't know

13  the name of it.

14       MR. DAVIS:  The Mark Wilson case.

15       THE COURT:  Okay.

16       MR. DAVIS:  And it basically says reasonable

17  foreseeability for a piece of the mail.

18       MR. FINDLEY:  But the pattern also says reasonable

19  foreseeability, and I think what they are just doing is adding

20  words to the pattern, and the pattern is based on very clear

21  Eleventh Circuit case law, from what I understand.

22       THE COURT:  Well, it may be, but I can tell you that,

23  if it's an instruction that was given in the Mark Wilson case,

24  I probably wrote it.  And I often try to tailor the standard

25  instructions to the particular case, because the quality of

1    the trial is better if the instructions are tailored to the

2    particular case.  I'm going to do that here.

3           So, I'll get you a set of instructions as quickly as

4    I can, but it will be into the evening a little bit.  And then

5    let's get together at 8:00, and we'll talk about them and go

6    from there.

7           Tell me how long you want for closing.

8           MR. DAVIS:  Twenty minutes, Your Honor.

9           MR. FINDLEY:  I think I'm going to be longer than

10   that.  I think a half hour, at least.

11          MR. HARPER:  Your Honor, this is Bob Harper.  I was

12   thinking, in reality, I'd say about 30, but I would ask for

13   40 minutes.

14          THE COURT:  All right.  I'll give you a time -- well,

15   I won't cut a defendant off before 45 minutes.  That's longer

16   than either one of you have asked for, which gives the

17   government an hour and a half.

18          My only hesitation about that, frankly, I don't want

19   to cut you off.  I'd like to give you all of the time that you

20   need or want.  Let me tell you my experience.

21          If you don't have a time limit, lawyers sometimes

22   just start rambling, and you are much less effective.  So, I

23   won't cut you off before 45 minutes.  I don't think that's an

24   unreasonable request by any means, but don't talk longer than

25   you need to.  You will do better if you are well prepared and

```
 1   focused.

 2           MR. HARPER:  Yes, sir.

 3           MR. FINDLEY:  Yes, sir.

 4           THE COURT:  All right.  I'll see you at 8:00 in the

 5   morning.

 6           MR. FINDLEY:  One more comment --

 7           THE COURT:  Okay.

 8           MR. FINDLEY:  -- just to make sure the record is

 9   clear.  I want to make sure all of our Rule 29 motions are

10   preserved and that's the case, because you held it under --

11   reserved judgment on it.

12           THE COURT:  Yes.  But now I treat the motions also as

13   renewed based on the full record, as opposed just to the

14   record that was compiled at the close of the government's

15   case.

16           So, to the extent it makes any difference, I treat

17   now as there having been timely motions made both at the close

18   of the government's case and at the close of all of the

19   evidence, and I take them all under advisement.

20           MR. FINDLEY:  Okay.

21           THE COURT:  The indictment, I'm going to redact out

22   the forfeiture clause.  There have been some references to the

23   actual count numbers.  I think I propose to leave all of the

24   counts in, so that the jury can have the other counts.  Now,

25   if someone --
```

 1          MR. FINDLEY:  No objection from Dixon.

 2          MR. HARPER:  I don't have any objection that I can

 3   think of.  Are either Barnes or any of the defendants who pled

 4   separately named?  I can't even remember.  I haven't even paid

 5   that much attention to the rest of the indictment.

 6          THE COURT:  Well, they are.  There are counts that

 7   are only against the other defendants.

 8          MR. FINDLEY:  That's okay with us.

 9          THE COURT:  Mr. Harper, is that okay with you?

10          MR. HARPER:  Well, I'm not trying to create extra

11   work, but I just -- I hadn't thought about it enough.  I kind

12   of like the idea of redacting everything, except just us

13   that -- just those of us who are on trial in the conspiracy

14   count.

15          THE COURT:  Well, that means that the counts that

16   were dropped against Mr. Barnes aren't going to be in there.

17   It's okay with me, I don't care, and I can get it redacted.

18   It's not a question of work.  It's a question of whether you

19   want the counts in or not.

20          MR. HARPER:  Tom, are you objecting or not?

21          MR. FINDLEY:  No, I'm not objecting.  I prefer it

22   that way.

23          MR. HARPER:  Well, I'll go with that, then, Your

24   Honor.

25          THE COURT:  All right.  Is that all right with the

 1   government?

 2         MR. DAVIS:  It's okay with us, Your Honor.

 3         THE COURT:  Okay.  We'll leave it as it is with only

 4   the forfeiture count redacted.

 5         Anything else?

 6         MR. HARPER:  Yes, sir.  I've got one -- I've got a

 7   question that I don't know the answer to, but it might be

 8   something to look at.  I made a general request about

 9   materiality, and it's based on a case that I haven't studied

10   enough, but I'll give you the cite, and maybe somebody else

11   can figure it out better, but it's *United States versus*

12   *Jokisch*, J-o-k-i-s-c-h.  It's an unpublished Eleventh Circuit

13   case, but it has some -- where the defendant requested a

14   materiality instruction.

15         I'm not sure the nature of the fraud, whether it

16   was -- but the language in the indictment is very similar, and

17   I know there are two different types of ways to commit fraud,

18   so I'm not sure what this means.  But it seems to say there is

19   some issue as far as materiality.  And this case is Number

20   04-14723, and it's -- I've got 159 Fed Appendix 145, and it's

21   a December 2005 case.  I'm sorry I'm not better prepared on

22   it, but I --

23         THE COURT:  That's all right.  We'll look at it.

24         MR. HARPER:  All right.  Thank you, sir.

25         THE COURT:  Anything else?

1           MR. FINDLEY:  No, Your Honor.

2           MR. DAVIS:  Nothing from us.

3           THE COURT:  All right.  Thanks.  Bye.

4      (The proceedings adjourned at 4:51 p.m.)

5                   *  *  *  *  *  *  *  *  *

6

7   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.  Any
8   redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
9   transcript.

10

11

12  s/Judy A. Nolton                        04/16/2007
    Judy A. Nolton, RPR                        Date
13  Official U.S. Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

*INDEX*


WITNESSES FOR THE GOVERNMENT:                          PAGE


  **ALFRED A. BARNES,**
        DIRECT EXAMINATION BY MR. DAVIS                 726
        CROSS-EXAMINATION BY MR. FINDLEY                790
        CROSS-EXAMINATION BY MR. HARPER                 810
        REDIRECT EXAMINATION BY MR. DAVIS               833

  **JEFFREY BRUNNER**
        DIRECT EXAMINATION BY MR. DAVIS                 847
        CROSS-EXAMINATION BY MR. HARPER                 863
        CROSS-EXAMINATION BY MR. FINDLEY                868
        REDIRECT EXAMINATION BY MR. DAVIS               879

  **JEFFREY BRUNNER**
        DIRECT EXAMINATION BY MR. SPROWLS               970
        CROSS-EXAMINATION BY MR. HARPER                 973


                    *   *   *   *   *   *   *


WITNESSES FOR THE DEFENDANT MOORE:                     PAGE


  **PATRICK SANFORD**
        DIRECT EXAMINATION BY MR. HARPER                912
        CROSS-EXAMINATION BY MR. SPROWLS                914
        REDIRECT EXAMINATION BY MR. HARPER              915

  **LEONARD N. BARNES, SR.,**
        DIRECT EXAMINATION BY MR. HARPER                916
        CROSS-EXAMINATION BY MR. SPROWLS                917

  **GERALDINE HARRIS**
        DIRECT EXAMINATION BY MR. HARPER                918
        CROSS-EXAMINATION BY MR. SPROWLS                921

  **VERNON GILBERT**
        DIRECT EXAMINATION BY MR. HARPER                922

1   *VERNON GILBERT (Called on Behalf of Defendant Dixon)*
          DIRECT EXAMINATION BY MR. FINDLEY          924
2         CROSS-EXAMINATION BY MR. SPROWLS           927

3   *SONYA LINDSEY*
          DIRECT EXAMINATION BY MR. HARPER           931
4         CROSS-EXAMINATION BY MR. SPROWLS           932

5   *THEODORE BECKWITH*
          DIRECT EXAMINATION BY MR. HARPER           933
6         CROSS-EXAMINATION BY MR. SPROWLS           934

7   *ALAN F. MOORE*
          DIRECT EXAMINATION BY MR. HARPER           935
8         CROSS-EXAMINATION BY MR. FINDLEY           955
          CROSS-EXAMINATION BY MR. SPROWLS           955
9         REDIRECT EXAMINATION BY MR. HARPER         966

10

WITNESS FOR DEFENDANT DIXON:
11

*WANDA DIXON*
12        DIRECT EXAMINATION BY MR. FINDLEY          968

13
                    *  *  *  *  *  *  *  *
14

15                                                   PAGE

16  GOVERNMENT RESTS                                 885

17  RULE 29 MOTION BY MR. FINDLEY                    887

18  RULE 29 MOTION BY MR. HARPER                     894

19  DEFENDANT MOORE RESTS                            966

20  DEFENDANT DIXON RESTS                            970

21  GOVERNMENT RESTS ITS REBUTTAL CASE              974

22

23

24

25

1        GOVERNMENT'S EXHIBITS

2

3    NO.:              DESCRIPTION                        PAGE

4    47      Money Order                                   756
     48      Money Order dated 11/18/05                    762
5    51      Listing of inmate numbers with corresponding  849
             names
6    52      Composite exhibit consisting of Assignment    853
             History Reports
7    53      Composite exhibit consisting of Inmate        853
             History Quarters
8    54      Composite exhibit consisting of Assignment    853
             History Report
9    55      Composite exhibit consisting of Assignment    853
             History Reports
10   56      Composite exhibit consisting of Assignment    853
             History Reports

11

12                  *   *   *   *   *   *   *   *

13

                    DDEFENDANT DIXON'S EXHIBITS
14

15
     NO.:              DESCRIPTION                        PAGE
16

17    15      Alfred Barnes' Plea and Cooperation          794
              Agreement
18    16      Document entitled, "Factual Basis for Plea"  795

19

20

21

22

23

24

25