UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


UNITED STATES OF AMERICA,        )
                                 ) Case No.:  4:06cr36/RH
             Plaintiff,          )
                                 ) Tallahassee, Florida
vs.                              ) November 3, 2006
                                 ) 8 A.M.
GREGORY DIXON and ALAN MOORE,    )
                                 )
             Defendants.         )
_____)

**VOLUME V**
**(Pages 992 through 1124)**

**TRANSCRIPT OF FIFTH DAY OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**CHIEF UNITED STATES DISTRICT JUDGE, and a jury**


APPEARANCES:

For the Plaintiff:          Gregory R. Miller
                            United States Attorney
                            By:  ROBERT O. DAVIS
                                 P. ALAN SPROWLS
                                 Assistant U.S. Attorneys
                            111 North Adams Street
                            Tallahassee, Florida 32301


For the Defendant,          Messer, Caparello & Self, P.A.
Gregory Dixon:              By:  THOMAS MARSHALL FINDLEY
                                 SEAN SHAW
                                 Attorneys at Law
                            215 South Monroe Street
                            Suite 701
                            Tallahassee, Florida   32301


For the Defendant,          Harper & Harper Law Firm, P.A.
Alan Moore:                By:  ROBERT AUGUSTUS HARPER
                                 ROBERT AUGUSTUS HARPER, III
                                 Attorneys at Law
                            325 West Park Avenue
                            Tallahassee, Florida   32301



1              <u>P R O C E E D I N G S</u>

2        (Call to Order of the Court.)

3        (Defendant Dixon present; Defendant Moore not present;

4   jury not present.)

5              THE COURT:  Good morning.  Please be seated.

6              I sent you draft instructions over the CM/ECF system

7   last night.  I've worked on those further.  You've got a new

8   set on the table that has some changes, and I'll identify

9   those for you.

10             As you saw from the draft that I sent you last night,

11  I did not include an instruction on mail fraud.  My conclusion

12  is that the defense is right, there's not been evidence from

13  which a jury could convict these defendants of mail fraud.  I

14  had initially indicated I would take that under advisement and

15  reserve ruling.

16             As I told you, it's always my preference to preserve

17  parties' appellate rights; and my reserved ruling on the point

18  then, if there were a conviction and I granted the motion at

19  that point, the government would have the right to appeal.  In

20  putting together the instructions, it became clear that

21  submitting that issue would get in the way of a fair

22  presentation of the other issues.  It would be a convoluted

23  instruction.  It's very hard to write an instruction tailored

24  to these facts, because there are really no facts that support

25  that theory, and it seems to me the more prudent course is

1  simply to go ahead and make the ruling.  So, that's my ruling

2  on the mail fraud question.

3       Now, let me tell you about the changes in this

4  morning's set of instructions compared to what you have.

5       On page 6, I added --

6       MR. HARPER:  I'm sorry, Your Honor.  Page what?

7       THE COURT:  Page 6, near the bottom, and these are

8  highlighted and shaded so that you can identify the language.

9       Near the bottom I added the language, "*each separate

10 *charge is referred to as a count.*"  That's not substantive,

11 but we used the references to "count" in the following

12 definition, and I thought that might help.

13      On page 7, in defining bribery, this is not a change

14 from last night; this is a decision that's incorporated in the

15 draft that you got last night.  I defined bribery in terms of

16 a violation of duty.  Bribery doesn't always have to involve a

17 violation of duty, but in this case it clearly does.  And so

18 that was the, I thought, the best way to describe what I'm

19 dealing with.  It was easier to describe the exchange in terms

20 of violation of duty, because whatever was done in exchange

21 would be a violation of duty.

22      This morning I had added the highlighted language

23 further down on page 7:  "*It is a violation of an officer's

24 *duty to provide contraband to an inmate.  Contraband includes

25 *anything whatsoever not approved by the warden.*"

 1          That was not only the testimony, but it is my

 2     conclusion that that is the law under the governing statute

 3     and regulation.  The language "*anything whatsoever*" comes from

 4     the regulation.

 5          There were two references in the draft last night on

 6     that page to other property where I said "*or other property,*"

 7     "*contraband or other property.*"

 8          Now that I've defined contraband to include anything

 9     whatsoever, there is no need for the language "*or other*

10     *property,*" so I deleted that.

11        (Defendant Moore entered the courtroom.)

12          MR. HARPER:  Do you want our objections as we go

13     or do you want to save it --

14          THE COURT:  I'm going to tell you what I changed, and

15     then you can tell me your objections.

16          On page 9, near the bottom, I think in the second

17     element, in defining an illegal gratuity, there was language

18     "*directly or indirectly.*"  I deleted that.  I didn't have that

19     language in the bribery instruction.  I took it out of the

20     illegal gratuities instruction.

21          On pages 11 and 12, starting on 11 carrying over to

22     12, I added a paragraph that defines a federal crime.  The

23     witness tampering instruction requires that it be information

24     with respect to a federal crime, and so I added that

25     paragraph.  If you haven't read that let me just give you a

1    minute to read it.

2         (Pause.)

3         Then I meant to make a change, but I see that it's

4    not here, which concerns me a little bit, but I'll get it

5    fixed.

6         Further down on page 12, the full paragraph that

7    starts on that page, "*Count 17 is against Mr. Moore,*" and so

8    forth.  The next sentence is just a mistake.  It says,

9    "*Mr. Dixon can be found guilty.*"  It should be "*Mr. Moore.*"

10        Then over on page 16, a change of substance from last

11   night, the draft you got last night didn't have conspiracy to

12   accept illegal gratuities as a lesser-included conspiracy

13   offense.  I've added that.  I've done it with the shaded

14   language on page 16.

15        Then over on page 17, I added some language telling

16   the jurors to ignore or noting for the jurors that there are

17   other counts against other defendants, and that they are not

18   at issue in this trial, and the indictment is not evidence.

19        And then, finally, let me note something that is not

20   included in these, and primarily for the government.

21        Witness tampering as defined under Section 1512(k)

22   may not require an overt act.  There is nothing in the statute

23   that suggests an overt act is required.

24        I've drafted the instructions for all of the

25   conspiracy charges together, so that it would include an overt

1   act.  At least unless the defense talks me out of it, I would

2   be willing to rule that an overt act is not required for

3   witness tampering.  That might be an issue.  Frankly, I don't

4   think there is going to be any issue about whether there are

5   overt acts.  I think there are other parts of this that are --

6   where the battle will be, and that there's not any question

7   that overt acts were committed.  But if the government

8   insisted that I redraft these not to require an overt on that,

9   I will do it.

10        MR. DAVIS:  Your Honor, I think we feel we can prove

11   several of the overt acts in the conspiracy, and I believe

12   also it's the position of the government in the duplicity

13   motion filed by Mr. Findley that we undertook that burden to

14   avoid any difference in proof with regard to different

15   conspiracies.  So, I don't think we would ask that you take

16   that out.

17        THE COURT:  All right.

18        Now tell me your objections.

19        MR. HARPER:  Your Honor, I've been trying to preserve

20   this issue about the policies approved by the warden, and I

21   first filed before trial about those policies and the Second

22   Circuit case, Handon, and it cites another case out of the

23   Second Circuit.  Contraband, it includes anything whatsoever

24   not approved by the warden.  I think the evidence certainly

25   says that, but we would object to that on the line of those

1    cases.

2            THE COURT:  Well, the Code of Federal Regulations

3    also says that.

4            MR. HARPER:  The other thing -- the matter, the

5    instructions I requested out --

6            THE COURT:  Let me interrupt you just a second.  The

7    provision of the CFR I'm referring to is 28, Code of Federal

8    Regulations, Section 6.1:

9            "*The introduction or attempt to introduce into or*

10   *upon the grounds of any federal, penal or correctional*

11   *institution, or the taking or attempt to take or send*

12   *therefrom anything whatsoever without the knowledge and*

13   *consent of the warden or superintendent of such federal, penal*

14   *or correctional institution is prohibited.*"

15           That's a regulation that constitutes the agency's

16   interpretation of the statute, 18, USC, Section 1791, which

17   makes it a crime to provide an inmate a prohibited object, and

18   defines prohibited object to include any other object that

19   threatens the order, discipline or security of a prison or the

20   life, health or safety of an individual.

21           MR. HARPER:  I understand, Your Honor.  The argument

22   that is, as far as the sufficiency of -- the constitutional

23   sufficiency of the notice, and that line of cases seems to say

24   that Congress has addressed it in specific statutes and

25   regulations.  And what my objection would be is, when it's

1    extended and delegated to the warden to add to that list, or

2    approve it or not, then it becomes a due process issue and a

3    little bit arbitrary.

4         THE COURT:  I understand.  I note in this case that

5    it's not just a question of whether this is a crime, because

6    this is not the crime he's charged with, but what he is

7    charged with is interfering with a witness reporting the

8    crime.  Whatever one might say about the Second Circuit

9    provisions, it seems to me that interfering, threatening a

10   witness in an attempt to block the witness's communication of

11   information to the government with respect to what at least

12   arguably is a crime, doesn't present the same kind of due

13   process issues.  But, in any event, I treat your objection on

14   that as fully preserved.

15        MR. HARPER:  Your Honor, the next thing is, I asked

16   for the standard of character instruction, Pattern Number 12,

17   page 59.

18        THE COURT:  I gave a character instruction.

19        MR. HARPER:  You did.  I saw that.  It just seemed

20   like the Eleventh Circuit's a little more full and sets out

21   that character evidence itself could be evidence of --

22        THE COURT:  Do you think there's any substantive

23   difference between their instruction and mine, other than

24   theirs has the judge's thumb on the scale a little bit?

25        MR. HARPER:  I would think -- yes, that's a fair way

1    to say it.

2          THE COURT:  I try to keep my thumb off the scale.  I

3    think you can make the same argument.  It just doesn't seem to

4    me that bringing up reasonable doubt with respect to one

5    particular issue serves any purpose.

6          MR. HARPER:  Then I asked for an accomplice

7    co-defendant with a plea agreement instruction, and you have

8    some -- a lot of the impeachment instructions, which --

9          THE COURT:  I thought I gave -- I gave such an

10   instruction.  I didn't give it as fully -- the government

11   asked me to give an instruction I've given sometimes on Rule

12   35 and 5K1.

13         MR. HARPER:  The one I was talking about was 1.2 on

14   page 40.

15         THE COURT:  The language I gave is at the bottom of

16   page 5.  I didn't include the more comprehensive instruction

17   that I do sometimes about 5K and Rule 35.  That instruction

18   really doesn't fit with a number of the witnesses.  It does

19   deal with Mr. Barnes, but it seemed to me that, given the

20   variety of circumstances the witnesses were in, probably the

21   shorter, more generic instruction was sufficient.

22         MR. HARPER:  The thing it does --

23         THE COURT:  I guess that's a short way of saying,

24   Mr. Harper, if I expand this, it probably will get worse for

25   you, but --

1          MR. HARPER:  No, I don't want that.  I narrowed my

2    request to the cautionary instruction portion of it, where the

3    plea is not evidence in and of itself of the guilt of any

4    person here on trial.

5          THE COURT:  Right.  And I say, "*Also, the fact that a*

6    *witness has pled guilty to an offense is not evidence of the*

7    *guilt of any other person.*"

8          MR. HARPER:  I'm fine with that, Your Honor.

9          THE COURT:  "*A witness*" may be too limited, because

10   there are two people that pled guilty that aren't witnesses.

11   Maybe I should say, "*Also, the fact that a person has pled*

12   *guilty to an offense or a defendant --*"

13         MR. DAVIS:  A witness or co-defendant, either is

14   acceptable.

15         MR. HARPER:  And, lastly, I think --

16         THE COURT:  Okay.  "*Co-defendant,*" you like that

17   better?  "*Also, the fact that a co-defendant has pled guilty*

18   *to an offense is not evidence of guilt of any other person.*"

19         MR. HARPER:  Yes, sir, I think so, it's there.  I

20   mean, the indictment is going to go back.  They will see it.

21         THE COURT:  All right.  I'll change "*witness*" to

22   "*co-defendant*" at the bottom of page 5.

23         MR. HARPER:  And the last thing out of the patterns,

24   Your Honor, was multiple conspiracies.  I may have read these

25   things too fast and --

1    THE COURT:  I did not include a multiple conspiracies

2  instruction.  I thought that that was requested.  I didn't

3  think there were facts that would support a multiple

4  conspiracy instruction with respect to these defendants.  Tell

5  me what conspiracy you think they might be convicted of

6  that's --

7    MR. HARPER:  Well, it just seemed like the way Barnes

8  testified that his agreement was separate, anything Dixon was

9  doing was separate, and anything Moore was doing was separate.

10  In other words, they had independent acts.

11    THE COURT:  Why wouldn't that establish that there

12  was no conspiracy, not that there were multiple conspiracies?

13    MR. HARPER:  Well, because the way the indictment

14  alleges, it alleges those named in the indictment and others

15  not, and it says co-conspirators.  And, you know, the only

16  thing I've worried about all along before the trial, it

17  doesn't say "the defendants."  The original indictment says

18  "the defendants," but the superseding indictment changed it to

19  "co-conspirators."

20    So, it looked like very easily you could say that

21  Barnes and Dixon had some sort of understanding, agreement;

22  Barnes and maybe Mr. Moore had some sort of separate

23  agreement.  And it seemed like to me a fair inference from the

24  evidence very well could give rise to separate conspiracies.

25    THE COURT:  What says the government about a multiple

1    conspiracy instruction?

2         MR. DAVIS:  Your Honor, I think the government has

3    always taken the position that this is one conspiracy, a tacit

4    understanding amongst people who are essentially using their

5    position, along with others, in the prison.  The reason we

6    changed it from "the defendants" to "co-conspirator" was that

7    Mr. Hill was no longer a defendant in the case, and we wanted

8    to include him in that.

9         THE COURT:  Oh, I understand, that's the government's

10   theory.  I know that your theory is that it's all one

11   conspiracy.  Mr. Harper says, his theory is, "Oh, there's a

12   conspiracy with Mr. Dixon, and that's not the one."

13        Of course, Mr. Harper, why isn't the answer, "Look,

14   if --" well, let me back up.

15        You think there's evidence from which a jury could

16   decide that Mr. Moore conspired with Mr. Barnes, but that that

17   was separate from a conspiracy between Mr. Barnes and

18   Mr. Dixon, and so you want a separate conspiracies

19   instruction.

20        MR. HARPER:  Yes, sir.

21        MR. DAVIS:  I think we would oppose a separate

22   conspiracy instruction based on our theory of the case and the

23   facts would show that we believe they did conspire together.

24        MR. FINDLEY:  Your Honor, would you like for me to

25   address my arguments on this point right now?

1　　　　　THE COURT:  Sure.

2　　　　　MR. FINDLEY:  We would request the multiple

3　conspiracies instruction.  There was evidence that -- and I

4　know Mr. Moore contested strongly, but -- there was evidence

5　that Mr. Barnes and Mr. Moore had that agreement relating to

6　Shonnie Daniels.  I don't think that establishes anything, but

7　there is a danger of confusion.

8　　　　　Also, Mr. Barnes said that he had separate

9　agreements, separate, quote, contraband agreements, with

10　Hamlet and with Hartline.  And so there is a danger that

11　perhaps the jury could find, well, one of those -- we buy off

12　on one of those things, but we don't buy off on the other one.

13　　　　　And the multiple conspiracies instruction is very

14　clear in saying that you have to find the person guilty of the

15　conspiracy that is charged in the indictment, not some other

16　side conspiracy.

17　　　　　There's also a potential confusion for the jury in

18　terms of conspiracies between inmates and one defendant.  And

19　so I think there is a danger there.

20　　　　　THE COURT:  I'll add the multiple conspiracies

21　paragraph.  It won't be exactly the words in the standard, but

22　it will be in substance.

23　　　　　MR. HARPER:  Your Honor, on page 7 of both sets of

24　the jury instructions, the --

25　　　　　THE COURT:  Give me just a minute.

1    (Pause.)

2         Well, let me back up.

3         I don't think I am going to give a multiple

4    conspiracies instruction.  My initial thought was, does no

5    harm and you want it, it just makes the instructions longer.

6    But now that I took at it, look back at the instructions, I

7    think it's going to be confusing.  I mean, I've told them, at

8    the defense request, that the allegation of a conspiracy to

9    commit mail fraud or to commit Hobbs Act extortion is not part

10   of this case.  If I give this multiple conspiracies

11   instruction, it starts sounding like the overall conspiracy

12   charged in the indictment, the way it's referred to in the

13   multiple conspiracies instruction, involves mail fraud and

14   extortion, but I've told them to ignore those allegations.  I

15   think it just gets to be convoluted.

16        MR. FINDLEY:  I think that the multiple object

17   instruction, Pattern 13.2, would deal with that and clarify

18   that for the jury.  I think that's there -- I also note, just

19   as long as we are on the topic, that the verdict form doesn't

20   contain a specific line for the jury to conclude what was the

21   purpose of the conspiracy.

22        THE COURT:  It has separate questions.

23        MR. FINDLEY:  Oh, it does?

24        THE COURT:  I divided it into 1(a) and 1(b).

25        MR. FINDLEY:  Oh, it has a lesser --

1    THE COURT:  The new one this morning has the

2    lesser-included conspiracy, but then you've got a 1(b), which

3    has the second object.  So, I do have the objects set out

4    separately.

5         Onto the next thing.

6         MR. HARPER:  Your Honor, on page 7 on both drafts,

7    third element, "*the defendant did so corruptly,*" I read the

8    statute to say "*did so knowingly and corruptly.*"

9         THE COURT:  So you want a "*knowingly*" stuck in there?

10        MR. SPROWLS:  Judge, you have "*knowingly*" defined.

11   Well, I understand that one.

12        THE COURT:  It would be absolutely impossible for

13   something to be corruptly and not knowingly, but there is no

14   reason to use one word when two will do.  I'll add it.

15        MR. HARPER:  The last thing, Your Honor, this illegal

16   gratuity, I've had conceptional problems with it.  I'll tell

17   you what they are.

18        I understand that illegal gratuity in terms of sort

19   of getting a reward after doing something, but the added

20   language "*or omitted to take*" strikes me then as being a *quid*

21   *pro quo*; and, you know, I can't distinguish between the

22   lesser-included and the substantive major offense here with

23   the way this instruction is worded.  And I would submit that

24   this instruction is slightly confusing.  I certainly

25   understand the logic of how you can say that it --

1    THE COURT:  An officer stops a car and decides not to

2 write a ticket.  So, he fails to act.

3    MR. HARPER:  Yes, sir.

4    THE COURT:  The person writes him a thousand dollar

5 check and says, "I appreciate the fact that you didn't give me

6 a ticket; I've come into some money; here's a thousand

7 dollars."  The officer keeps it.  He has accepted an illegal

8 gratuity for failing to act.

9    MR. HARPER:  I understand that, but I don't

10 understand why that isn't bribery.

11    THE COURT:  Because it was not a *quid pro quo*.  It

12 had already acted.  That's the difference.

13    MR. HARPER:  Oh, I see.

14    THE COURT:  So, I think *"failed to act"* needs to be

15 there.

16    Anything else?

17    MR. HARPER:  No, sir.  That's it.

18    THE COURT:  Mr. Findley, anything else?

19    MR. FINDLEY:  Yes, Your Honor.  We would renew our

20 objection to the multiple conspiracies instruction.  I

21 understand the court's ruling.

22    On page 7, third element, I believe that the

23 indictment charges it differently.  I don't believe that this

24 is the pattern language, and the indictment charges it as, in

25 return for, essentially, providing contraband.  And I

1    understand the court's definition of providing contraband, it

2    violates his duty; but it's not just to violate his duty in

3    the indictment, it's the failure to enforce federal statutes

4    and BOP regulations.

5         THE COURT:  I think I say that as part of the second

6    element.

7         MR. FINDLEY:  And I understand where you're coming

8    from, but I just don't want to waive -- this is somewhat

9    related to our second motion in limine, where we were

10   concerned that there would be -- and some of the other

11   instructions go to this, also -- where we would request an

12   instruction that, if you just violate a civil regulation or a

13   policy of the BOP, then that's not sufficient.  So, I'm just

14   pointing out -- attempting to point out that that's a danger

15   from these instructions.

16        I would also --

17        THE COURT:  I can't tell from that description

18   whether the objection is as to how I said something or

19   something substantive.  To the extent that the allegation is

20   that violating regulations or an order of the warden is not a

21   crime, then that doesn't concern me with respect to this.

22        MR. FINDLEY:  We would also object to the language

23   that "*contraband includes anything whatsoever not approved by*

24   *the warden.*"  We would object to the language.  It's not from

25   the pattern instruction, to give examples.

1    THE COURT:  No.  My practice is not to try to follow

2  the standard instructions.  If I give them the standard

3  instructions, they'd be back there scratching their head

4  wondering what the case was about.  It works much better if

5  you can tailor the instructions to a particular case.  The

6  pattern instruction wouldn't make sense in some respects in

7  this case.

8    MR. FINDLEY:  The next objection that we have would

9  be on page 8, with respect to the summaries.  I understand the

10  court's intent here is to lay out who the inmate is for Counts

11  9, 10 and 11, and the objective is to show what they received.

12  But I think there is a danger that the jury is going to

13  oversimplify and look at this that that's all they have to do,

14  because it doesn't include the words *"in exchange"* for, the

15  *quid pro quo* type of language.

16    For example, in the second paragraph, *"Count 9, as

17  against Mr. Dixon,"* et cetera, *"In order to return a guilty

18  verdict on this count, it would be sufficient if the thing of

19  value were either money or sexual favors; it need not be

20  both."*  I would suggest it should read, *"It would be

21  sufficient if the thing of value were either money or sexual

22  favors in exchange for violating an official duty,"* et cetera,

23  at that point also.

24    THE COURT:  Well, I said at least twice and probably

25  more that there has to be a *quid pro quo*, and I've explained

1  what it is.  So, I understand the request to be that I say it

2  at least three times, and I think twice is enough.  I mean,

3  I'm -- I don't want to be misleading, but I don't think it is.

4        MR. FINDLEY:  I'm just afraid they'll be confused.

5  When they get to that part, they might lean in favor of, open

6  to that page and say, "Well, this is established, and that's

7  it."  But, I mean, I understand what the court is saying, but

8  I would prefer the basic pattern; that that leads them perhaps

9  to a wrong conclusion, depending on how they deliberate.

10        THE COURT:  I think I've covered it, and I think my

11  instructions adequately express the substance of what you've

12  said.  If you want, I'll italicize the words *in exchange for*

13  on page 7.

14        MR. FINDLEY:  Well, my problem with it is on page 8,

15  not the wording on page 7.

16        THE COURT:  I understand.  Let me tell you that, if I

17  say it again and again and again, they will be asleep when I

18  get to the next instruction.  Part of the object is to say

19  this in a way where they'll stay awake and pay attention and

20  understand what I say.  So, I understand I could make these a

21  hundred pages long, and they'd probably be more precise, but

22  it wouldn't make things better.

23        MR. FINDLEY:  Okay.  I'll move on.

24        The next objection is page 10, and this goes to Your

25  Honor's objective to make them more fact precise.  The third

1    element under the witness tampering, I believe that that --

2    that the objective is to get to this specific incident on

3    March 18th, 2006, but it doesn't point out that the

4    cooperation related to Mr. Hill.

5         Mr. Dixon never had sex with Latoya Brown and didn't

6    even know her until she came that day.  He had to look her up

7    in the bed book, I believe.  And so I think there's an

8    impression there that she was going to cooperate against

9    Mr. Dixon, and the allegation in the indictment is that he

10   threatened her with -- it does say threaten her with a

11   transfer from FCI, if she cooperated with investigators.  If

12   you look at the overt act, it's the same date and person, it's

13   questioned her about cooperating with inmate -- about Inmate

14   Hill -- I mean C.O. Hill.

15        THE COURT:  You are welcome to point that out to the

16   jury, but I'm not going to include a more precise description

17   in the elements.

18        MR. FINDLEY:  Then in connection with that, also,

19   page 11 continuing on to page 12, defining federal crime, I

20   don't think that there was -- I think that those are all

21   correct statements, but I don't think there is any evidence

22   that Mr. Dixon was trying to, even from Latoya Brown, that he

23   was trying to intimidate her from not revealing the commission

24   of any offense, other than having sex with Mr. Hill.

25        And so we're combining a bunch of offenses there that

1    don't pertain to that particular count.  I think your second

2    sentence does the trick to define federal crime for a C.O. to

3    have sexual contact with an inmate, but the rest I think

4    doesn't go to these set of facts.

5              THE COURT:  All right.

6              MR. FINDLEY:  Okay.

7              THE COURT:  I think the government's theory of the

8    whole case is that the contraband is part and parcel with the

9    sex.

10             MR. FINDLEY:  But the witness tampering count relates

11   to one date/one person, and that's what we're talking about

12   here.

13             We had requested --

14             THE COURT:  That instruction, of course, also is

15   incorporated over into the count against Mr. Moore.  I think

16   I'm going to leave it as it is.

17             MR. FINDLEY:  Okay.  We had also requested an

18   instruction ourselves, where a single conspiracy may have two

19   illegal objects.  Without proof of such connection between

20   these objects, it is not a single conspiracy.  And that's a

21   direct statement out of *United States versus Chandler*, 376

22   F.3d 1303, which also cites *United States versus Atkinson*.

23             And then we requested, *"You must identify the object*

24   *of the conspiracy by unanimous verdict on the special verdict*

25   *form that the court has provided."*  I think the court has

1  asked the jury whether they are guilty of conspiracy to commit

2  bribery on 1(a), and whether they are guilty of conspiracy to

3  commit witness tampering on another page.  We would submit

4  that the question is whether they engaged in a single

5  conspiracy with two objects.  This gives them an option, which

6  compounds the problem of not instructing them on multiple

7  conspiracies; that, okay, there was this conspiracy, and there

8  was also that conspiracy.  So, we believe the verdict form

9  also would suffer from that deficiency.

10         THE COURT:  What do you want the verdict form to say?

11         MR. FINDLEY:  Is the defendant guilty of Count One of

12  the indictment, conspiracy, with the multiple objects of

13  so-and-so.  Identify the object of the conspiracy.

14         THE COURT:  Well, I thought you just told me that

15  then, if they say witness tampering but not bribery, that your

16  guy is acquitted because there weren't both objects.

17         MR. FINDLEY:  Well, if they believe that there were

18  multiple conspiracies -- see, this charge is --

19         THE COURT:  We're going around in circles.  I

20  understand.  I treat that as preserved.  They can charge a

21  conspiracy with two objects.  If the proof establishes that

22  the conspiracy that's charged did exist, but that it had only

23  one of the two objects, the defendant is still guilty.

24         MR. FINDLEY:  Moving on, we also requested a

25  different instruction on the witness tampering allegation, and

1   that was based on *Arthur Anderson*, *United States versus Arthur*

2   *Anderson*.

3            THE COURT:  *Arthur Anderson* is a different statute.

4            MR. FINDLEY:  Well, but the point of our --

5            THE COURT:  The Eleventh Circuit cases are *United*

6   *States versus Mathis*, 186 Fed Appendix 971, and *United States*

7   *versus Picklo*, P-i-c-k-l-o, 2006 West Law 2075689.  Those were

8   both decided in July of 2006 after *Arthur Anderson*, and that's

9   where the substance of these come from.  They rely on an

10  earlier case, *United States versus Veal*, 153 F.3d 1233.  I

11  read *Anderson* and I've read the three Eleventh Circuit cases,

12  and I think I've got the substance of it right.

13           MR. FINDLEY:  Our argument is, just so you know, is

14  that *Arthur Anderson*, it did deal with a different prong, but

15  it was focusing on the term "*knowingly and corruptly*

16  *persuading,*" and that's our objection.

17           That's all I have.

18           THE COURT:  *Mathis* and *Picklo* don't address *Arthur*

19  *Anderson*, but they do postdate *Arthur Anderson*, and so I'm not

20  insensitive to the argument.  I just think that the Eleventh

21  Circuit has dealt with this statute the way those cases say,

22  even after *Arthur Anderson*.

23           All right.  I'll get a clean copy of the changes.

24  There aren't very much, but I'll try to get you a clean copy.

25  Our copier is not working very well, so we'll do our best.

1          Do any of you plan to use this on the presenter or

2   anything?  Do you need a clean one before you start your

3   argument?

4          MR. DAVIS:  Well, I had plan to put it up there, Your

5   Honor, but I don't want to hold up the jury coming back on

6   time.

7          THE COURT:  I don't either.  Let's take just a couple

8   of minutes, and then I'll come back.  If I can get this

9   printed, I --

10          I didn't ask about the verdict.  Mr. Findley, you

11   object to the verdict form for the reason you said.

12          MR. FINDLEY:  Yes.

13          THE COURT:  Are there any objections to the verdict

14   form?

15          MR. HARPER:  No, Your Honor.

16          THE COURT:  All right.  I'll be back in just a couple

17   of minutes and we'll get the jury in.

18          I suppose I didn't.  I asked the two defendants for

19   objections, and I guess we didn't go through the government's

20   objections.

21          MR. DAVIS:  We have no objections, Your Honor.

22          THE COURT:  All right.  Thank you.  I'll be back in

23   just a minute.

24      (A recess was taken at 8:42 a.m.)

25      (The proceedings resumed at 8:49 a.m.)

1      (Defendants present; jury not present.)

2           THE COURT:  Please be seated.

3           Mr. Davis has a copy, since he's going to be arguing

4      first.

5           Mr. Harper and Mr. Findley, you will have them in

6      just a moment, as fast as we can nurse them out of the

7      printer.

8           Jury in, please.

9      (The jury entered the courtroom at 8:50 a.m.)

10          All right.  You may be seated.

11          Good morning, ladies and gentlemen.

12          THE JURY:  Good morning.

13          THE COURT:  And welcome back.

14          Thanks for your patience this morning.  You've done

15     an excellent job being on time throughout the trial, and I try

16     to run things right on time.  We are starting a few minutes

17     late this morning.  That's my fault, and I apologize for that.

18          As you know, the presentation of the evidence

19     concluded yesterday.  It's now time for the closing arguments

20     of the lawyers.  What I told you about their opening

21     statements is also true of their closing arguments.  What they

22     say is not evidence in the case.  You have already received

23     all of the evidence.

24          What they say does not constitute your instructions

25     on the law.  I'll give you those when they have finished.  I

```
 1    have told them the instructions that I will be giving you, and
 2    I've written them down, they will have copies, so they do know
 3    what the instructions will be.
 4            The closing arguments, even though they are not
 5    evidence and not your instructions, are intended to help
 6    you -- they are intended to help you as you go about analyzing
 7    the evidence and deciding the facts of the case; and they are
 8    designed to help you as you go about applying my instructions,
 9    the law, to the facts of the case.  So, I ask that you give
10    the lawyers your close attention as I recognize them for their
11    closing arguments.
12            There are time limits on closing arguments.  Frankly,
13    I asked them how long they would need, and I gave them all
14    they asked for.  If I stop somebody, it will be because they
15    have run longer than they said they would need.  What they
16    asked for was reasonable, and so they got what they asked for.
17            I ask that you give them your close attention.
18            Mr. Davis?
19            MR. DAVIS:  May it please the court.
20            Ladies and gentlemen of the jury:
21            As Mr. Sprowls told you in the opening, the
22    government's proof would take you inside FCI-Tallahassee.  One
23    of the first things we said we would show you was the prison,
24    and we showed you pictures of it, we showed you a schematic,
25    we showed you its layout.  We showed you the prison corridors,
```

1    the bunks, the rooms, the walls of that facility.

2          But what happened inside of those walls, and how do

3    you know?

4          We know what was supposed to happen.  Correctional

5    officers, the defendants in this case and the co-conspirators,

6    are supposed to guard the prisoners.  "To guard."  Think about

7    what that means.  To keep them safe, to keep them securely

8    confined, maintain order, to enforce the rules.

9          Is that what Defendants Moore and Dixon did?

10         We know that's what they are supposed to do, we know

11   that was their duty, and we know from the evidence that they

12   didn't do that.  They didn't guard the inmates.  They guarded

13   their own personal interests, and they violated the law in the

14   process.

15         Between March 2002 and June 21st, 2006, the

16   defendants, and others, used and misused their titles and

17   positions as correctional officers to get what they wanted.

18   Sex.  Money.  Control.  Protection from getting caught.

19         But they couldn't do that alone.  Why?  Because a

20   prison is not like any other place in the world.  It's not

21   like the world outside of those walls.  Every aspect of an

22   inmate's life is controlled inside the prison, what clothes

23   she has, what food she's fed, what she's allowed to buy from

24   the commissary, whether she can smoke.

25         Because of these restrictions, you learned a lot

1    about the prison economy.  The things that are denied them in

2    prison become extremely valuable.  Fast food.  Cigarettes.

3    Gum.

4         You heard from multiple witnesses that a box of

5    Black & Milds, five little cigars in a box, that costs between

6    2- and $3, go for as much as $15.  You heard witness after

7    witness come up here and say that that was worth $15 in the

8    prison economy.

9         Another aspect of prison life is the lack of privacy.

10   Privacy is very limited in prison, and it's because they're

11   federal inmates, and they are to be supervised 24 hours a day.

12        You saw that in some units there are no doors, only

13   cubicles.  During the day privacy is very hard to find.  You

14   have none.  Only at night, when most inmates are sleeping and

15   there are fewer staff on the compound, is it easier to find a

16   place that's private.

17        The things that people do behind locked doors cannot

18   be done easily in prison, because there's always someone -- an

19   inmate, another correctional officer -- who can stumble upon

20   you.

21        The only way to get what you want, the only way for

22   these defendants to get what they want, is with a little help

23   from their co-conspirators and the understanding that these

24   men would help and look the other way.

25        Let's talk about Defendant Dixon.

1    What did Dixon do to get what he wanted?  And who

2  helped him?  And who did he help?

3    You heard from Shonnie Daniels, Letishe Moore,

4  Delores Hamlet, Deyandra Demorais, Valerie Mills, Patrina

5  Parker.  What did you learn from those women?

6    You learned that Dixon traded contraband for sex and

7  money.

8    Demetrus Coonrod told you that she had sex with Dixon

9  in exchange for contraband, which she in turn sold to make

10  money.

11    And what did you learn from Sabrina Bowie?

12    That Bowie had sex with Dixon for contraband.  Bowie

13  told you that Dixon had given her bubble gum and brought her

14  boxes of Black & Milds, those $15 boxes of Black & Milds,

15  worth that much in prison.  Bowie told you that one night

16  Dixon told her to go in the staff bathroom where he had sex

17  with her.

18    Let's turn to Defendant Moore.

19    What did Defendant Alan Moore do to get what he

20  wanted?

21    Sabrina Bowie described exactly what he did when he

22  came into her room that night in F unit, in a room very much

23  like the room on the screen in front of you.  He came in after

24  the 12:30, 12:00 count.  He woke her up.  She swung her legs

25  over the side of the bed.  He performed oral sex on her.  She

1   got down and performed oral sex on him.  Then he bent her over

2   in that room and had vaginal intercourse with her.

3          When it was finished, he ejaculated on the floor.  He

4   left and brought cleaning supplies for Sabrina Bowie to clean

5   up the floor.

6          And how do you know that?

7          Sabrina Bowie told you that, sat there right on that

8   stand and told you those details, and she told you that she

9   did it because she expected contraband.  I asked her whether

10  she would have done it without that expectation.  She said she

11  did it for the contraband.

12         And her roommate, Shirley Blackston, witnessed the

13  whole thing.

14         And after having sex with Bowie, what did Moore do?

15         Well, he gave contraband to Blackston to keep her

16  quiet, so she wouldn't tell on what she had seen.  And you

17  know that because Shirley Blackston and Sabrina Bowie sat

18  there and told you that.

19         Bowie told you, when she came back from the halfway

20  house, she saw Blackston with Black & Milds cigars.  And at

21  first, she thought, well -- she didn't say anything the first

22  time she saw them, but when she saw Blackston with more Black

23  & Milds cigars, she said, "She's getting Black & Milds

24  somehow.  Let me go back and talk to Moore."  And she went and

25  talked to Moore.

1    The first time he denied he had been giving them to

2  her.  The second time he said, "Yeah, I've been giving Shirley

3  Blackston Black & Milds to keep her from talking about what

4  she saw."

5    We know what Dixon and Moore did.  The question is:

6  Did they do it alone?

7    We know from Alfred Barnes that they did not.  Barnes

8  is an insider.  He was a corrections officer at

9  FCI-Tallahassee; and, as he told you, he was charged in this

10  indictment and pled guilty, signed a Plea and Cooperation

11  Agreement.

12    Barnes told you how inmates and guards who are

13  engaged in this type of activity, this sex for contraband, how

14  the deals worked.  And you heard confirmation from inmates --

15  Shirley Blackston, Patrina Parker and others -- that they

16  pinned for officers, they acted as lookouts.  They took steps

17  to protect their sexual activity, their contraband activity.

18  They watched out for them.

19    Why did they do that?

20    To prevent these officers from being caught, to

21  prevent the inmates from being caught.

22    Barnes told you how he advised Dixon in a phone call

23  that Shonnie Daniels was cool with him.  Barnes told you that

24  he and Dixon switched shifts when Sabrina Bowie was in F unit

25  and Barnes was in F unit.  He told you he did it to get away

1    from Shonnie Daniels, who was always coming around to look for

2    him, and you heard testimony about that.  But he told you that

3    Dixon did it to have access to Sabrina Bowie.  He told you

4    that he heard that from Dixon; that Dixon talked about Bowie's

5    breasts, and that Dixon told him in the parking lot he was

6    going to get some.

7        You learned from Barnes that Dixon let Bowie talk to

8    Barnes over the officer's phone and asked Barnes for

9    contraband when he was taking a break from the women down at

10   the Federal Detention Center, the jail, the all-male jail.

11   That testimony showed that Dixon let Bowie get on the phone to

12   talk to Barnes, something that was not permitted.  They are

13   not supposed to use the officer's phones.  And Dixon was

14   sitting there as Bowie asked Barnes, "Could you do me a

15   favor?" which meant, bring back contraband for me, bring me

16   some contraband next time you're up.

17       You also heard from Barnes that Dixon warned him to

18   be careful, when Barnes told him that he had recently almost

19   been caught when another inmate almost walked in on him while

20   Shonnie Daniels was performing oral sex on him.

21       And Barnes also explained how Dixon outlined to him a

22   scheme where using a mail address to make money by bringing

23   cigarettes into the compound to sell to the inmates, after

24   they had been outlawed at the FCI.  I don't mean outlawed.  I

25   mean, after the cigarettes had been taken off, after a

1    no-smoking ban had been put in place.

2          But, in fact, it is outlawed; because, if the warden

3    says it can't be on the compound, it can't be on the compound.

4    It's contraband, if the warden says an inmate can't have it,

5    and the court will instruct you to that effect.

6          Let's turn to what Barnes told you about Moore.

7          Barnes told you that Moore helped him have contact

8    with Shonnie Daniels in C unit.  Do you recall this testimony?

9    Another officer couldn't do the count of the compound, because

10   of allegations that he was sexually involved with a woman who

11   was being held in the SHU.  Barnes agreed to take his compound

12   duties and go around that night and check the compound or do

13   the counts on the different units.

14         As compound officer, Barnes walked over to C unit,

15   where Moore was unit officer that night, and he told you that

16   he went in to see Moore and said, "Let me -- give me your

17   keys, let's swap keys, I need to go back to see Shonnie and

18   give her something."  Barnes told you that Moore gave him his

19   keys.  Barnes asked Moore.  Moore gave him his keys.

20         And Barnes told you he took those keys to go back

21   into the range, walk down, tap on Shonnie's bed, wake her up,

22   walk around the range, make sure it was secure, and then

23   walked to the back of the building and open a closed door, a

24   door he didn't have keys to as the compound officer, to go

25   back and have sex with Shonnie Daniels in the bathroom.

1           What did Moore know about this?

2           Well, he testified he didn't know anything about what

3   they were up to.  He did testify that he unlocked the door for

4   Barnes, but he didn't testify that he knew what they were up

5   to, and he denied what Barnes told you, which was that he told

6   him it was to see Shonnie; and that later Moore came up to him

7   and said, "I know what you did in that bathroom.  You had sex

8   with her.  I could smell it."

9           You also learned from Shonnie Daniels and Alfred

10  Barnes that Moore let Daniels out on the pill line to see

11  Barnes.  And Defendant Moore took the stand and said, "She

12  asked me, but I never let her out."

13          The testimony you heard shows that Defendants Dixon

14  and Moore did not act alone.  We showed you through these

15  witnesses, probably more than anyone needs to know, about what

16  was going on inside the walls of FCI-Tallahassee when the

17  people trusted to enforce the law, turned it for their own

18  purposes, personal gratification, personal financial

19  enrichment.

20          What does that have to do with the charges in this

21  case?

22          Well, the indictment charges the defendants with

23  conspiracy to engage in bribery and witness tampering.

24          Let me show you these instructions.  The court will

25  give you instructions on what you have to find to convict the

1   defendants of the conspiracy count.  There's four parts to the

2   conspiracy count.

3          The first one is that two or more persons, in some

4   way or manner, came to a mutual understanding to try to

5   accomplish a common and unlawful plan as charged in the

6   indictment -- that is, a plan to accept bribes or tamper with

7   witnesses.

8          A mutual understanding.

9          You heard Barnes testify that he had no agreement

10  with any of the co-defendants.  But then I asked him, "Was

11  there any understanding, an unspoken understanding?"  And he

12  said, "Yes, there was."

13         An example of the kind of mutual understanding I'm

14  thinking about in this regard might come to pass in the next

15  few weeks.  We are all getting close or anticipating

16  Thanksgiving dinner.  Some of you may sit down at your

17  Thanksgiving table with family, relatives, friends, have a big

18  meal.  At the end of that meal, some person at that table may

19  stand up and start to pick up a plate and walk toward the

20  kitchen.  Another person sees that, "Well, it's time for me to

21  pick up my plate," and goes to the kitchen, too.  They don't

22  say that, excuse me, they think that.  Pretty soon everybody

23  is picking up their plate and helping clean up the table.  No

24  one has said a word, but they are all mutually dedicated

25  toward that task of getting the Thanksgiving dinner put away,

1    so they can watch a football game.

2         The second element is that the defendant knew of the

3    unlawful purpose of the plan and willfully joined in it.

4         The third element, that one of the conspirators,

5    during the existence of the conspiracy, knowingly committed at

6    least one of the methods or overt acts as listed in the

7    indictment.

8         And the fourth element is that the overt act was

9    knowingly committed at or about the time alleged in an effort

10   to carry out or accomplish some object of the conspiracy.

11        With regard to Mr. Dixon, the government contends

12   that the evidence fully supports all of these elements.  The

13   government's contention is that these defendants were part of

14   a broad, tacit understanding amongst correctional officers who

15   were engaging in improper acts, turning their official

16   position towards their personal gratification or their

17   personal enrichment, or taking acts to keep witnesses --

18   excuse me -- inmates or anyone who would want to tell on them

19   from doing so.

20        But much like that Thanksgiving dinner, these

21   officers knew who was involved in these type of activities,

22   and tacitly agreed not to turn on them, not to rat them out,

23   and in some cases to do more than that, to actually give

24   advice on how to do it, or have their back -- certainly, you

25   have testimony of inmates that said that they did exactly

1    that.  They pinned for the guards, they watched out for them.

2         And that agreement was contrary to their legal duty

3    and contrary to the laws they were violating when they were

4    having sex with inmates or bringing contraband in for inmates

5    or telling inmates or others not to cooperate with law

6    enforcement.

7         As the court will instruct you, if the defendant has

8    a general understanding of the unlawful purpose of the

9    agreement or the understanding, and willfully joins in on one

10   occasion, that is sufficient to convict that defendant of the

11   conspiracy charge, along with the other elements, but joining

12   in on one occasion is sufficient, even though the defendant

13   did not participate before, and even though the defendant only

14   played a minor role.

15        Barnes' testimony showed that he and Dixon were part

16   of this tacit understanding, and that they helped each other

17   in their individual efforts to trade contraband for sex, for

18   money.

19        Dixon's discussion of the scheme to make money from

20   cigarettes is an example.  His request to swap shifts with

21   Barnes so that he can have access to Sabrina Bowie in F unit

22   and Barnes' agreement to do that, is another example of this

23   type of participation in that tacit understanding.

24        The testimony of Shonnie Daniels, Sabrina Bowie, and

25   Demetrus Coonrod show that Dixon engaged in sexual contact

1 with these women as alleged in the overt acts contained in

2 paragraphs 35, 46 and 47 of the conspiracy charge.  And that

3 is another element that the government has to prove, one of

4 those overt acts actually took place.

5      And the testimony of Latoya Brown showed that Dixon

6 questioned both Brown about her cooperation with law

7 enforcement against Ralph Hill, as alleged in overt act

8 contained in paragraph 69 of the indictment.

9      And further, the testimony that Barnes gave switching

10 shifts, which took place in March of 2004, supports the overt

11 acts contained in paragraph 34 of Count One.

12      Those are the overt acts.  You will see them listed

13 when you see the indictment.  That's five of the overt acts,

14 where the testimony shows that those overt acts took place.

15      Now, concerning Mr. Moore, the evidence shows -- the

16 government contends that the evidence shows and supports the

17 conviction of Alan Moore in Count One of the conspiracy charge

18 as well.

19      The same testimony and evidence that I just described

20 to you concerning Dixon, supports the existence of that tacit

21 agreement and the overt acts required to prove Elements One,

22 Three and Four of this count.

23      Further, the testimony of Sabrina Bowie and Shirley

24 Blackston support the overt acts contained in paragraphs 39

25 and 40 of Count One.

1    The testimony of Alfred Barnes and Shonnie Daniels

2  that Moore swapped keys with Barnes, permitted them to have

3  access to secured areas of C unit to exchange contraband or

4  have sex, also supports the overt act contained in paragraph

5  32.

6    These same actions of Alan Moore support the

7  conclusion that he willfully and knowingly joined in this

8  tacit understanding.

9    Moore's action in releasing Shonnie Daniels for the

10 pill line and swapping keys with Alfred Barnes to permit his

11 access to Shonnie Daniels, and further when Moore learned that

12 Barnes had had sex in that bathroom in the back of C unit, he

13 didn't report it, he went up and confronted Barnes on it, and

14 acknowledged that he knew what was going on, that further

15 demonstrates his participation in this tacit agreement.

16    Turning to the bribery counts.

17    The court's instructions state that the government

18 must prove beyond a reasonable doubt that the defendant was a

19 federal correctional officer.  There is no doubt about that

20 with regard to Officer Moore; there is no doubt about that

21 with regard to Officer Dixon.

22    That the defendant demanded, sought, received,

23 accepted or agreed to receive or accept the thing of value

24 described in the count at issue from the inmate listed in that

25 count; and, that the defendant did so knowingly and corruptly

1  and in return for violating his duty as a federal correctional

2  officer.

3      Now, under this bribery count the court will also

4  instruct you that there is a lesser-included offense of

5  accepting a gratuity.  The lesser-included offense does not

6  require what you will learn from the court is a *quid pro quo*.

7  I will not venture into that legal language.  I will let the

8  court explain that to you in its instructions, but I will just

9  say this:

10      The government contends that there's certainly

11  illegal gratuity, but more, they are guilty of the greater

12  offense, the bribery, and those elements are set out right

13  there.

14      With regard to Count Nine, Daniels testified that she

15  had sex with Dixon for contraband, and that she also provided

16  money to Dixon for contraband.  Her relative, Gekettia Harris,

17  took the stand and described how she provided that contraband

18  in a meeting at Dillards.

19      Daniels testified that her purpose for having sex was

20  to obtain contraband, and certainly the provision of money is

21  for that as well.  This testimony supports the elements on

22  Count Nine beyond a reasonable doubt.

23      Count Ten:  Bowie testified that she had sex with

24  Dixon in exchange for contraband; and Bowie confirmed that she

25  only had sex with Dixon in order to obtain contraband.  Again,

1    this testimony supports the elements of the bribery count, the

2    government contends, beyond a reasonable doubt.

3           Count 11:  Demetrus Coonrod testified that she had

4    sex with Dixon to obtain contraband; and she again confirmed

5    that her reason to have sex was to obtain contraband.  Again,

6    the government would contend that her testimony supports the

7    elements of this count beyond a reasonable doubt.

8           Count 16:  Bowie testified that she had sex with

9    Moore in anticipation of getting contraband.  That was her

10   understanding.  She had sex with Moore, as I described, in her

11   room in F unit.  She testified that she went away shortly

12   thereafter to a halfway house.  When she returned from that

13   halfway house was when she received the contraband from

14   Officer Moore.

15          Now, concerning the witness tampering counts:

16          The court will instruct you that, with regard to

17   Count 12 involving Mr. Dixon, that Mr. Dixon intimidated,

18   threatened or corruptly persuaded Latoya Brown, or attempted

19   to do so; that Mr. Dixon did so knowingly and with the intent

20   to hinder, delay or prevent the communications to a law

21   enforcement officer of information relating to the commission

22   of a federal crime; and that the manner in which Mr. Dixon did

23   this was by threatening Ms. Brown with a transfer from

24   FCI-Tallahassee, if she cooperated with investigators.

25          You remember Ms. Brown.  She was the one who

 1  testified to a lengthy sexual relationship with Correctional

 2  Officer Ralph Hill.  Her testimony is corroborated by the

 3  postal money orders that she obtained from Mr. Hill in

 4  exchange for her sex.

 5       Ms. Brown testified that, when she was in the SHU or

 6  had just gotten out of the SHU, Mr. Dixon came up to her,

 7  questioned her about cooperating on the investigation of Ralph

 8  Hill, and told her that anyone that did would be shipped.  You

 9  heard from the inmates, "shipped" means you get sent to

10  another federal facility, and there's not many of them in the

11  country, and most of them are further away from Florida than

12  this one here.  So, being shipped, you heard from the

13  witnesses' testimony, is something they didn't want to have

14  happen.

15       You also heard Brown testify that immediately after

16  that incident with Mr. Dixon, she called Officer Brunner, and

17  Officer Brunner took the stand and confirmed that he got that

18  call around the day mentioned in the indictment.

19       On Count 17, which is the tampering charge against

20  Mr. Moore, the court will instruct you that Mr. Moore

21  intimidated, threatened or corruptly persuaded Shirley

22  Blackston, or attempted to do so; and that Mr. Moore did so

23  knowingly and with the intent to hinder, delay, or prevent the

24  communication to a law enforcement officer of information

25  relating to the commission of a federal crime.

1     You remember Shirley Blackston saying that, after she

2  witnessed the sex with Mr. Moore, he came up to her and said,

3  "Don't tell anybody.  I'll give you something to keep you from

4  telling anybody."  I'm paraphrasing.  You have to remember her

5  testimony, not my paraphrase.  But she basically told you

6  that, after she witnessed the sex between Officer Moore and

7  Sabrina Bowie, Officer Moore came up to her and began to give

8  her Black & Milds, prison $15 bills, not to tell on what she

9  had seen.

10     And Sabrina Bowie's testimony corroborates what

11  Shirley Blackston said.  When she came back from the halfway

12  house, she confronted Mr. Moore, and he confirmed that he was

13  giving contraband to Blackston to keep her quiet.

14     You've heard a lot of testimony from inmates over the

15  last few days and from prison officials, and the defense has

16  made quite a point of attacking the credibility of those

17  witnesses.  The defense has pointed out that they committed

18  serious felonies, where they had entered into Plea and

19  Cooperation Agreements and had a motive to fabricate a story;

20  and that they are making up their testimony to get out of

21  jail.

22     But many of these witnesses are not in jail.  Sabrina

23  Bowie, Shirley Blackston, Shonnie Daniels have finished their

24  sentences.

25     Demetrus Coonrod testified consistent with an

1    affidavit that she gave prior to the indictment in this case.

2          Latoya Brown's testimony of contact with Ralph Hill

3    was established by those -- her testimony and the money orders

4    that she received from Ralph Hill.

5          Other inmates' testimony has been corroborated by

6    other staff, including the medical staff, and the testimony of

7    former Corrections Officer Alfred Barnes.

8          It's the government's contention that the testimony

9    you heard fits together like a roughly cut puzzle.  We brought

10   up more than a dozen witnesses from inside the prison.  They

11   told the same story time and time again that fit roughly

12   together.  All of the edges weren't perfect; but, when you

13   look at it, it paints that picture inside the prison that I

14   described in the beginning of my discussions with you.  And

15   that testimony is supported by the records that we provided to

16   you, showing that the inmates were where they said they were,

17   the guards were where the inmates said they were at the time

18   that they said they were.

19         As the court will instruct you, ultimately, it is

20   your duty to decide what is the truth and the credibility of

21   all of the witnesses that appeared in front of you.  You saw

22   each witness before you, you could observe them as they told

23   you stories that in some cases were quite embarrassing for

24   them to tell, and they told you that.

25         It's your job to evaluate the credibility of these

1  witnesses, including Defendant Moore, and the court will so

2  instruct you.

3         Now, in making this judgment on credibility, you can

4  rely on what you saw and heard the witnesses say in this

5  courtroom.  And I would remind you, again, if what I told you

6  varies from what you recollect, you are to rely on your

7  recollection.

8         And when you have looked at all of the evidence, and

9  judged the credibility of the witnesses, and considered that

10 evidence along with the court's instructions on the law, I'm

11 confident that you will return the only verdict that the

12 evidence truly supports, which is guilty for Mr. Dixon, guilty

13 for Mr. Moore on all counts.

14        Thank you.

15        THE COURT:  Mr. Harper?

16        MR. HARPER:  Thank you, Your Honor.

17        May it please the court.

18        Ladies and gentlemen.  Counsel.  Mr. Moore.

19        Today, ladies and gentlemen, you will see why America

20 is great.

21        We submit to you that Mr. Moore is falsely accused,

22 and I want to go through this and explain why we say that; and

23 I want to -- I'm not here to try the government.  I'm here to

24 defend Mr. Moore, but I want to point out to you the

25 bureaucracy and the morass that this case has labored under to

1　get to the point.

2　　　　And that is, we started out saying that the case

3　boils down to sex, and we heard pretty much 4 days of nothing

4　but.  But we get to the end of the case, and what do we hear?

5　　　　No.  This is some sophisticated conspiracy.  This is

6　some convoluted theory of bribery and some strained theory of

7　tampering with a witness.

8　　　　The court is going to tell you it's a crime for a

9　correctional officer to have sex, and we heard some evidence

10　about that, sex with an inmate.  Why don't we just get to the

11　point and charge that?  Why isn't that satisfactory to the

12　government?  And let's just get down to business; and, if it's

13　a sex case, let's try a sex case.  And if they did it, let's

14　reach the right verdict.  If they didn't do it, let's reach

15　the right verdict.

16　　　　Why does it have to be this convoluted overly

17　complicated scheme?

18　　　　And so -- and I submit to you that there are several

19　reasons.  Maybe bureaucracy, maybe people over complicated

20　things.  But it's sort of like this contraband problem out

21　there at the prison.  It looks like to me, there'd be so many

22　simple ways of dealing with contraband issue that it wouldn't

23　be such an issue.  Sort of like consulting with the old expert

24　David Letterman, top ten ways to deal with it.  Why don't we

25　make all cosmetics and all cigarettes and jewelry permitted?

1    I mean, what we've got out there is a policy that says, if you

2    come from some institutions, you can come with hoops; and, if

3    you come from another place, you have studs.  And so the ones

4    that have hoops wants studs, and the ones that have studs want

5    hoops.  Why don't we just treat everybody the same?  Why don't

6    we treat all of those women the same?

7            You don't get special privileges by being in one part

8    of the country or another part of the country.  You get all

9    treated the same.

10           Why don't we solve the problem by making more items

11   available at the commissary?  Let's sell Black & Milds at the

12   commissary.  The government makes money.  It makes things a

13   lot easier.  If you're going to have cigarettes out there,

14   what's the difference in Phillip Morris and Black & Milds?

15           Or we can ban all cosmetics.  Where are we going, to

16   a prom, out there?  We even have a spa, beauty center, weight

17   pile, track, and everything else.  If we're going to have a

18   beauty parlor out there, let's either supply the beauty parlor

19   or ban all of the cosmetics.  I mean, we've got a dance to go

20   to?  I don't know.  It's like military camp.  It would seem

21   like to me, you just sort of make do.  Why do we need

22   cosmetics out there, anyway?

23           Another solution, why don't we point the cameras in

24   instead of out?  I mean, we could see their face coming up to

25   the fence if they try to escape, instead of their jersey's as

1   they run down the road.

2           Or make it zero tolerance and everybody goes to the

3   SHU for breaking contraband rules, including the officers.

4   Immediately dealt with and everybody gets tagged.

5           Search the inmates.  Search the guards.  Search the

6   pizza delivery guy.  Good chance the pizza delivery guy is

7   bringing something not permitted by the warden.

8           But most importantly, why don't we treat all of these

9   women the same, treat all of the inmates the same?  And

10  dealing with the sex is the same thing.  Why do you put them

11  in a Special Housing Unit for reporting a sex crime, instead

12  of a special treatment facility?

13          If a civilian witness came up and a woman said, "I've

14  been abused," and you threw her in jail and took her away from

15  her community and privileges, is the reporting rate going to

16  go up or is the reporting going to go down?

17          So, is the real effort to protect the guards, or is

18  it not to protect the guards?  And why do we have to engage in

19  this convoluted theory of prosecution to get to the point?

20          Number one, why don't we have a uniform policy

21  nationwide, instead of it being prison by prison, warden by

22  warden?

23          Why don't we separate the males at night and put

24  women officers on at night?

25          There's a lot of things like that.  And separating,

1    I'm not trying to say all of these women are victims, I think

2    some of the women out there are predators, and I think we

3    heard evidence of that.

4         Maybe we can reward women for producing physical

5    evidence, like Monica Lewinsky bringing her dress in, and make

6    things happen that way.  If we really want to detect and we

7    really want to deter things, it seems like to me that, yes,

8    it's hard to get a wire, but it sure worked in this case,

9    didn't it?  Of course not on Mr. Moore, because he wasn't

10   doing anything.  But it sure worked on their target of that

11   investigation.

12        Maybe that bad word that you have to say in the

13   federal system once in a while, "work," but it sure does have

14   results.

15        The indictment, ladies and gentlemen, starts with an

16   allegation of conspiracy -- I want to end with that -- and

17   contains what's called two substantive counts, or the same

18   thing as saying two substantive offenses, as pertaining to

19   Mr. Moore.  Count One, Count 16 and Count 17.  So, you'll have

20   a copy of the indictment back there with you that you can look

21   at.  So, if you can remember, Counts 16 and 17 are the two

22   substantive counts that Mr. Moore is named in.

23        And the first count I want to talk about is Count 16,

24   which is the bribery count, also called -- I think there is a

25   lesser offense involved in this charge of illegal gratuity.

1    Bribery is a *quid pro quo*.  In other words, a give

2    and a take, you give something of valuable and you receive

3    something of valuable.  An illegal gratuity is a gift for

4    something you've done, all right?

5    And the charge is, of course, that Mr. Moore is the

6    culprit, not that Sabrina Bowie is the culprit; that Mr. Moore

7    allegedly received something of value, sexual favors, from

8    Sabrina Bowie; and in return did things, either brought in

9    contraband or failed to enforce violations of law.  So, it's a

10    give and a take, is what's charged.

11    What did the government's case say about that?  What

12    did Ms. Bowie have to say about that?

13    I specifically asked her those questions.  Was there

14    a give and a take?  Was there a *quid pro quo*?  I used those

15    words, and she's sophisticated enough by being such an

16    experienced criminal that she knows those words.  And what did

17    she say?  "No, it was not like that.  No, it was not like

18    that."

19    So, what does that say to you as far as the evidence?

20    What I would suggest it says to you, ladies and

21    gentlemen, is on your verdict form, Count 16, check "not

22    guilty."  On the government's own case, that's not even

23    considering Mr. Moore's testimony, that's not considering

24    anything but just the government's star witness.

25    There's no proof of any corruption on Mr. Moore's

1   part.  His reputation even today is good for honest services

2   and honest dealings.  His reputation at the prison is still

3   good.  He's scarry to the inmates.  He's the kind of guard

4   that enforces the law, scares those women out there, and the

5   kind of guard that makes them tow the line and the kind of

6   guard they don't like.

7          He's not like Johnson who stays in touch with the

8   girls when they go home on a purely platonic relationship.

9   They give their cell phone number after they leave.  There is

10  no evidence of that against Mr. Moore.

11         What does he do in his spare time?  He helps kids.

12  Teaches at church.  Raises a good son, who, by the way, was in

13  high school two years ago, not like Ms. Blackston said, in

14  college, which is one of those interesting things.

15         I was thinking about it, how to put it to y'all in an

16  appropriate way, but it's sort of like me trying to say, okay,

17  the jury is conspired to reach a verdict, and you can tell

18  that because they come and go together.  You know, I know they

19  were here October 30, October 31, the 1st, the 2nd, the 3rd.

20  I can prove that, I've got records.  I can go to the clerk's

21  office, and they were here every day, and they came and went,

22  they broke for lunch and they broke in groups.  And they

23  talked, and they talked and they talked and they talked.

24         And, you know, after work one day on the way to the

25  parking lot, one of them runs into Sabrina Bowie and Shirley

1   Blackston.  And, fortunately, didn't get beaten up and ripped

2   off, but had a conversation and said to Sabrina that, "We've

3   already reached a verdict," contrary to law, contrary to the

4   judge's instruction.

5           "Well, Sabrina, what was that juror wearing?  What

6   color jacket?

7           "Oh, the jacket is green.

8           "Shirley, what color was the jacket?

9           "The jacket was red.

10          "What color pants?

11          "Blue jeans," Sabrina.

12          "Shirley, what color were the pants?

13          "Khaki color."

14      There isn't much you can do to dispute that; but,

15  when you can dispute it with everything we had, how many times

16  did Mr. Moore come in the room?  Once, says Sabrina.  Three

17  times in one night, says Shirley.  One time only in that room,

18  says Sabrina.  Fifteen times, says Shirley.

19          So, there's only so much you can do with those type

20  of witnesses who are collaborating.

21          "Where did the pregnancy test come from?  Mr. Moore?

22          "No.

23          "Did you have help with this, Sabrina?

24          "No."

25          Shirley says, "I helped."

1        I mean, how hard is it to keep your story straight?

2        And, ladies and gentlemen, you're instructed to rely

3   on this evidence in the most important of your own affairs.

4   Tell me one of you who would give your check, your paycheck to

5   either one of those women and say, "Run over to Capital City

6   and cash it for me"?

7        You wouldn't do that.  Do you think Mr. Moore out

8   there, an experienced officer, is going to pull down his pants

9   in front of one of those kind of women with a witness there?

10  It's crazy.  Does he strike you as crazy?

11       These crack heads, I don't know what to tell you

12  about them, except they will lie.  Just like Sabrina said --

13       THE COURT:  You really should use surnames.

14       MR. HARPER:  Sir?

15       THE COURT:  Surnames.  The last names.

16       MR. HARPER:  I'm sorry?

17       THE COURT:  Last names.

18       MR. HARPER:  Yes, sir.  Okay.

19       THE COURT:  I'm sorry.  I didn't mean to interrupt,

20  but Ms. Bowie, not Sabrina.

21       MR. HARPER:  Yes, sir.

22       But the things we can catch them on, I mean, we catch

23  them on with the government's own witnesses.  Shonnie says,

24  "We go to the counselor's office."  Mr. Henson, he doesn't

25  even know about any of this stuff, says, "You know, a

1    correctional officer doesn't have a key to the counselor's

2    office."  Even Mr. Barnes says, "You don't have a key to the

3    counselor's office."  Well, Mr. Barnes says, "We go to the

4    bathroom."

5         I mean, that's the reliability factors of these

6    inmates.  The simple little thing, it's a simply little thing,

7    the truth.  And where is it?  You gotta search for it, or you

8    have to find some convoluted theory of an implied agreement in

9    the face of an officer who says, "I'm guilty, but he didn't do

10   that."  That's evidence.  You have to draw some kind of an

11   inference or some kind of a conclusion, this may be, probably,

12   might have happened in the way the government is alleging?

13        Ladies and gentlemen, I think you have to say, as a

14   matter of your oath, as to the conspiracy count, not guilty.

15   Or else you're going to have to rely on somebody like Sabrina

16   Bowie or like somebody like Shirley Blackston, who are nothing

17   but prostitutes, if you want to even go that far.  What are

18   they doing?  They're saying, "We have sex with anybody who

19   will bring us in -- who will bring us in contraband."  That

20   will lie on the director of an institution, directly lie on

21   the institution.  That's Ms. Bowie talking about her director

22   in Atlanta, who she threatens, who she subsequently is, as

23   late as 2006, has had drug problems.  Coke and marijuana.

24        And what does she do the first chance she gets?  Is

25   she cleaning up her act, or doing something different with her

1  life, trying to improve it, trying to counsel children, trying

2  to go to church?  No.  She's caught associating with other

3  known felons and gets in trouble for it, and then what does

4  she do?  Lies on her reports, three times.

5        So, that's what you have to rely on in Count 16.

6  That's the kind of women you have to rely on.

7        And who is her sister?  S.B., Shirley Blackston;

8  S.B., Sabrina Bowie.

9        I would submit Sabrina Bowie, Ms. Bowie, lied to you.

10  Shirley Blackston, Ms. Blackston lied to you about her

11  relationship with Johnson, just like Ms. Blackston lied about

12  the towel being up.

13        What difference does it make about the towel being up

14  or being down?  The only difference it makes is, one said it's

15  up and the other says it's down, and they live in the same

16  room, and they can't get their story straight on something

17  that doesn't even matter.

18        I get on to the pregnancy test, where does it come

19  from?  It doesn't come from Mr. Moore.  Who destroys it?  They

20  can't get their story straight.  You know, allegedly, if

21  Mr. Moore has such a vested interest in it, why didn't he

22  bring something like that?

23        And these sisters carry over to the witness

24  tampering, where Mr. Moore is charged with corruptly,

25  knowingly trying to persuade Ms. Blackston by providing her

1   with contraband basically not to tell on him.  Of course,

2   Ms. Blackston has this reputation of -- what? -- blackmail.

3        Oh, Mr. Moore asked a question in class, "What do you

4   do if you get blackmailed, these inmates gang up and blackmail

5   you?"  Well, why didn't she testified she did that?  I asked

6   her if she did that.  No.  It would still be a crime, if

7   Mr. Moore brought the contraband in, even if he's being

8   blackmailed.  So, what difference does it make?  It doesn't

9   make any difference, except it's not any evidence -- you can't

10  draw any inference of guilt.  It's a perfectly innocent

11  question in a class where you are encouraged to ask those

12  types of questions.  And, if it were true, that she was

13  blackmailing him, why didn't she tell the truth?  Because

14  she's a liar.

15       Just like she knows 2 years before that Mr. Moore's

16  son, I'm sure he's very proud of, is, quote, in college, close

17  quote.

18       And Ms. Bowie is impeached by her own sister.  I

19  mean, Ms. Blackston -- boy, I keep getting these confused --

20  Ms. Blackston is impeached by her own sister so many times,

21  you know, you could count and list them here, but it's just an

22  unbelievable number of times in such a short story.  And then

23  the -- but the big thing is, the false or incorrect, or we

24  want to vouch for Mr. Sanford as much as we can, but her story

25  she tells falsely or incorrectly or fabricated or inflated to

1    Mr. Brunner and Mr. Sanford.

2         That's Counts 16 and 17.  If you want to rely on

3    Ms. Blackston in the most important of the affairs in your

4    ordinary life, you certainly have that prerogative.  I suggest

5    to you, you shouldn't do it.  I suggest to you that she is not

6    trustworthy and not believable, and I suggest to you that the

7    appropriate verdict as to Count 17 is not guilty.

8         I want to say a few more words about the indictment

9    and the allegations of the conspiracy, and then I'm going to

10   close down within my time limits.

11        But a conspiracy is, essentially, an agreement to

12   break the law.  And so everybody who is involved in a crime

13   anytime, anyplace, you can't commit by accident.  You can't

14   commit a crime by mistake.  The thing about the crime is the

15   intent.  You want to break the law.  You intend to break the

16   law.  So, you have to intend to join the conspiracy, because

17   you are knowingly violating the law in concert with other

18   people.

19        In this case the conspiracy alleged is among

20   correctional officers, not the correctional officers and the

21   inmates.  It sounded like to me, and I submit to you, that the

22   evidence was from Mr. Barnes there was no such conspiracy, no

23   such agreement, no such concert of action with Mr. Moore.

24        At best, it sounded to me that Mr. Barnes, and I

25   submit to you that this is what the evidence was, Mr. Barnes

1    was saying his conduct was his own independent act and not in

2    concert with anybody else.  He wasn't sharing the proceeds of

3    his crimes.  He wasn't letting anybody else know.  And we know

4    why he wasn't letting Mr. Moore know.  He wasn't letting

5    Mr. Moore involved, because Mr. Moore is not corrupt like he

6    is.  And so he's keeping that quiet.  Just like Mr. Johnson

7    kept it quiet.  Just like Mr. Spence kept it quiet.  They are

8    engaged in their separate conspiracies with themselves and

9    inmates.

10          But that's not what's charged in the indictment.  So,

11   you've got to stick with this indictment, you've got to stick

12   with the way the government brought it.  You've got to run

13   what you brung.

14          So, under your oath and under the instructions to be

15   given to you by the court, this conspiracy that's charged is

16   not what happened.  Bring it another day, bring it as sex,

17   bring it as something that happened.  But this conspiracy

18   among this group of officers named just simply didn't happen.

19          You can't join a conspiracy by honest compliance.  In

20   other words, Mr. Moore -- unless Mr. Moore knew and was

21   involved in this conspiracy, his giving Barnes the key is not

22   furthering the conspiracy.  So, you have to find that he knew

23   that Barnes was doing this stuff; he knew what Barnes was up

24   to, and he willingly, willfully participated in that.  And

25   that's not what the evidence shows.  I'm not sure the evidence

1     even -- I would submit, the evidence doesn't even show that it

2     happened, due to the conflict between Barnes and Daniels.

3              So, ladies and gentlemen, we get down to the

4     exhibits.  Look at the exhibits and look for letters to

5     Mr. Moore, look for money orders to Mr. Moore, look for

6     Mr. Moore's involvement.  And the only thing you're going to

7     find is, he was at his duty stations where he was supposed to

8     be; and, according to Mr. Henson, you can't really depend on

9     these records to say that's where they were, because they are

10    still switching, and part of it is due to annual leave.  When

11    you're on sick and annual, you sort of fill in for somebody

12    who's on sick and annual.

13             So, there's switching.  That's done lawfully and

14    legally and every night, every day, simply to cover for people

15    who reports sick.  Somebody has got to do their job.  And

16    there is an officer that's on sick and annual assignment, you

17    fill in that day.  It's not conspiratorial; it's just like the

18    jurors coming in and going to lunch.  It is just the way it's

19    done.

20             And, lastly, I would say to you, ladies and

21    gentlemen, as far as this agreement is concerned, there's got

22    to be some unity here.  There's got to be some coordination,

23    some coordinated kind of plan to do this.  It's not just that

24    somebody -- it's not that somebody falls into a conspiracy.

25    You've got to intend to, you've got to want to, you've got to

1    try to.

2          Now, you can certainly say there is an implication

3    that somebody has done that by virtue of things.  That's what

4    this government is trying to argue to you.

5          So, what did you hear?  Why would Barnes say to you

6    that, "I had no such agreement with Mr. Moore"?  What does he

7    got to gain by saying that?  That's the government's witness,

8    not my witness.  He sounded like my witness.  But that's the

9    government's case.  And now we're saying, well, we don't have

10   direct evidence, let's imply some evidence.  Don't go there.

11   Don't go there.  If you didn't agree, you should go free.

12         Thank you.

13         THE COURT:  Let's do this.  You'd be sitting in that

14   chair too long before we finish this process, so I think this

15   is probably the best time to take a break.  You've got all of

16   the evidence, and you got part of the closings.  It's still

17   not time to talk about the case.  Wait until you have heard

18   the rest of the closings and my instructions on the law.

19         Jury out, please.

20      (The jury exited the courtroom at 10:05 a.m.)

21         Anybody need anything before we break?

22         Let's start back at 10:15 by that clock.

23      (A recess was taken at 10:05 a.m.)

24      (The proceedings resumed at 10:17 a.m.)

25      (Defendants present; jury not present.)

1    THE COURT:  Please be seated.

2         There is a note on the version of the superseding

3    indictment, the redacted version, getting back to me saying

4    that you thought that the redacted version had deleted the --

5         MR. HARPER:  That's my note.

6         THE COURT:  -- mail fraud counts.  I didn't intend to

7    take them out.  I was going to leave the indictment just the

8    way it was.  I've explained it in the instructions.

9         MR. HARPER:  I understand that, but I didn't object

10   or make any noise, because I just -- when I got that redacted

11   version, I assumed that it had been already done, and I didn't

12   appreciate or understand what you're saying.  But it looks

13   like to me that there is a possibility the jury could take the

14   unredacted indictment and return a verdict based on that

15   portion of the indictment, which you already granted Rule 29

16   on.

17        THE COURT:  I guess there's always a remote

18   possibility that the jury will disregard everything I tell

19   them and do as they choose.  But if they listen to my

20   instructions at all, they won't do that.

21        My experience is jurors listen very carefully to the

22   instructions.  So, I think they will be okay.

23        Anything else before we bring the jury back?

24        Jury in, please.

25        That follows a little bit the same reasoning leaving

1  in other counts against other defendants that aren't charged

2  here, and that was the defense request actually.  It seems to

3  me that they can see the whole indictment, and they're going

4  to sort out which allegations deal with these defendants and

5  which don't.

6          MR. HARPER:  Will you treat that as an objection,

7  Your Honor?

8          THE COURT:  I do.

9          MR. HARPER:  Thank you.

10         THE COURT:  Dealing with objections, also, I can tell

11  you, also, that I thought Mr. Harper was able to deal very

12  effectively with the question of whether the charged

13  conspiracy is indeed what the evidence shows without that

14  instruction.

15     (The jury entered the courtroom at 10:20 a.m.)

16         All right.  You may be seated.

17         Mr. Findley?

18         MR. FINDLEY:  May it please the court.  Counsel.

19         Good morning.

20         I know as I come up to speak with you today on behalf

21  of Mr. Dixon that some of you may have already made judgments

22  about Mr. Dixon's morals.

23         Again, we emphasize that it is not contested that

24  Mr. Dixon did have some consensual sex with inmates over the

25  years, and he provided some inmates with gum, cigarettes and

1   cigars, the great majority of which he never had sex with.

2          I'm sure that none of you are pleased with him on

3   this point.  However, the question is not whether you are

4   pleased with him, but whether the government has proven the

5   specific charges in the indictment beyond all reasonable

6   doubt.  You're duty bound to do this.  Just as we don't want

7   judges who inject their personal opinions in reading the law,

8   we don't in our system want jurors who interject their

9   personal feelings about somebody, when they are reading an

10  indictment and doing the technical job of applying the

11  credible evidence in the case to the charges that are found in

12  the indictment.

13         Again, as I did in opening, I want to start with

14  what's not charged in the indictment.

15         This indictment does not charge Mr. Dixon with the

16  offense of having sex with an inmate.  This indictment does

17  not charge Mr. Dixon with the crime of introducing contraband

18  into the institution.  The indictment does not charge that

19  Mr. Dixon conspired with others to have sex with inmates.

20  And, finally, the indictment does not charge that Mr. Dixon

21  conspired with others to bring contraband into the

22  institution.

23         In other words, you're not being called upon to

24  decide those questions.  So, let's go through what is charged.

25         I would like to show you, first of all, with respect

1    to the conspiracy count, I would submit that the government's

2    focus in its presentation on one of the parts of the

3    instruction did not tell you the whole story about what it is,

4    what it really means legally for there to be a conspiracy.

5    So, I'll show you the first paragraph of that instruction,

6    which is right in the middle paragraph.

7          Title 18, United States Code, Section 371, is the

8    conspiracy statute.  It says, *Under this law a conspiracy is

9    an agreement or a kind of partnership in criminal purposes in

10   which each member of the conspiracy becomes the agent or

11   partner of every other member.*

12         It's not some subtle understanding, as the government

13   suggests.  It's an agreement to commit criminal offenses.  It

14   doesn't have to be written, but it has to be an agreement,

15   more like a partnership, per the instructions.

16         There are two purposes now for you to consider in

17   connection with the conspiracy count.

18         One, it's alleged that the defendants, including the

19   co-defendants who are not here, engaged in a joint venture,

20   criminal conspiracy, to solicit bribes.  There has to be an

21   agreement that you heard about between the co-defendants to do

22   that.  It's not enough if one was operating on his own.  It's

23   not enough if one was doing it on his own and said to the

24   other guy, "Hey, you know you could do this," and the other

25   guy did it.  That's not a conspiracy.  Two parallel crimes are

1    not a conspiracy.  A conspiracy is an agreement between them

2    to do it.

3         There was no evidence of any conspiracy or joint

4    venture or criminal partnership to engage in a scheme to

5    solicit bribes.

6         There was also no -- the second purpose of the

7    alleged conspiracy is that there was a joint venture to tamper

8    with witnesses.  Not one witness got up there and testified

9    that there was an agreement among the co-defendants to go out

10   and tamper with any witnesses.  That just wasn't a fact that

11   was presented in this case.

12        Here, there was no evidence that these defendants

13   even socialized, much less engaged in a joint criminal

14   venture.

15        The evidence was that one guard watched the housing

16   unit with hundreds of inmates.  Why would a guard want to

17   involve another guard that would jeopardize that guard's

18   position?  And that's exactly what Mr. Barnes said.  Barnes

19   did this, Barnes did that.  Remember, he spoke in the third

20   person about his conduct to the inmates?

21        It was Barnes that was going alone.  If there was

22   another person going alone, that's not a conspiracy.  In fact,

23   it would be detrimental to have others involved in these types

24   of -- this type of misconduct, if it existed.

25        Mr. Barnes admitted, when he came in and testified

1    under, the cross-examination of Mr. Harper that there was no

2    agreement with Dixon.   No agreement between Barnes and Dixon.

3    There was no agreement with anyone to tamper with witnesses,

4    and there was no agreement with anyone to engage in the

5    solicitation of bribes.   That was a government witness who was

6    trying to help the government to get a reduced sentence, yet

7    even he admitted that there was no agreement, which is the

8    word on the instruction.   No criminal partnership.   Barnes

9    went alone.

10        That was a government witness that was not

11   contradicted, and there was no other witness that said there

12   was a conspiracy.   There was no witness that said that there

13   was a conspiracy.

14        The warden didn't testify to that.   The warden is in

15   charge of the whole institution.   The mysterious George

16   Williams, who was the investigator, whose office was right in

17   the SHU, didn't come in and tell you that there was a

18   conspiracy.   Not one Bureau of Prisons' person told you that

19   there was a conspiracy.

20        It's just a theory based on the testimony pieced

21   together by inmates, and I will get to the credibility of

22   those inmates in just a second.

23        Some of the inmates testified that there wasn't a

24   conspiracy.   In fact, Ms. Coonrod testified that, when

25   Mr. Dixon thought another guard might find out about that

1    affair, they quickly returned to the unit to escape detection

2    by another guard.  There was no conspiracy with any other

3    guard.  There was the fear that you might get caught by

4    another guard, and Ms. Coonrod stated that.

5         Not once did the government produce a recorded phone

6    call between any of the two defendants or between Mr. Dixon

7    and anybody.  Not once did the government produce an email, a

8    letter, a note, or any tangible evidence of any communication

9    between any of the named defendants with respect to Mr. Dixon.

10   There was no mailing, no money order, no check, no shopping

11   receipt, no credit card bill, no phone records, no bank

12   records.  You know that all of these are within the subpoena

13   power of the United States Government to obtain.  The United

14   States Government could subpoena Western Union.  They could

15   subpoena the local phone company.  They can get cellular phone

16   records, land-line phone records, Dillards' receipts, credit

17   card receipts -- any documents that they wanted to get.  But

18   there is not one document in any of those stacks that shows

19   anything connected to Mr. Dixon.  No evidence of any

20   communication between any of the named defendants.

21        None of these materials were presented in this case,

22   because they don't exist, and there is nothing to support the

23   conspiracy charge brought by the government.

24        The comments about the video, we all know that the

25   government has the capacity to put small videos on a tie or a

 1   briefcase and get a video to corroborate a story; and when you

 2   are -- any investigator knows, as I'm sure Agent Brunner

 3   knows, that when you have a witness that is not credible,

 4   let's get some corroboration, let's get a video, let's have

 5   the person wear a wire, let's corroborate it.  Here, there is

 6   none of that.

 7        We know that the government tried to get some of

 8   these things.  They wired inmates, including Latoya Brown, to

 9   get recorded statements.  They went undercover to try to

10   infiltrate the organization through the efforts of Hanky --

11   Agent Brunner.  They came with ultraviolet equipment to look

12   for evidence.  They came in with a forensic suitcase on

13   occasions.  Yet, there is not one piece of physical evidence

14   against Mr. Dixon to support the charges in the indictment.

15        When the conventional methods in proving cases, such

16   as wires, undercovers, subpoenas of documents, hidden video

17   and basic forensics, all failed, they turned to the inmates in

18   the institution, many of which jumped on board only after the

19   charges were brought, which should lead you to doubt severely

20   their credibility.

21        There is no worse source of information than these

22   inmates.  The evidence presented was blatantly false in many

23   instances.  I think you will recall that Demetrus Coonrod

24   testified she never heard of Deyandra Demorais.  She said it

25   very clearly.  There was follow-up questions by the

```
 1    government, "Don't you remember her?  Don't you remember her?
 2    She had a nickname.  Don't you remember that?
 3            "No."
 4            Demetrus Coonrod testified that she never heard of
 5    Deyandra Demorais.
 6            Yet, Deyandra Demorais came in here, the convicted
 7    murderer from the District of Columbia, she came in and
 8    testified that, "Demetrus Coonrod told me that she had sex
 9    with Dixon."
10            Well, somebody is lying, and I would submit that
11    Deyandra was lying, because her attempt to jump on the
12    sentence reduction bus came -- that she was attempting to jump
13    on the bus to get her sentence reduced, or was attempting to
14    roll with the people, as Patrina Parker admitted was the case,
15    when the inmates tried to start to cooperate in order to get
16    credit to get out of jail.  Demetrus Coonrod didn't even know
17    her.
18            In any event, many of these witnesses admitted lying
19    to the investigators before the case came to fruition.
20    Deyandra admitted to lying to these agents.  Anyway, so I
21    don't think you want to trust that testimony.
22            Now, it's also very interesting, let's take the
23    sequence.  Deyandra came in and said --
24            THE COURT:  Mr. Findley, surnames.
25            MR. FINDLEY:  I'm sorry.
```

1          Ms. Demorais says she never had sex with Mr. Dixon.

2     Well, the very next witness, Ms. Parker, who is a

3     multi-convicted felon, comes in and testifies under oath that

4     she knows that Ms. Demorais is having sex with Mr. Dixon.

5     Well, these allegations are getting ridiculous at this point.

6     We know that that's not true, because Ms. Demorais just said,

7     the witness before her, that that didn't happen.

8          So, we know that there are false allegations,

9     blatantly false information, completely inconsistent

10    information flowing around this courtroom that was brought

11    forward as the government's case-in-chief.

12         Other inmates admitted that Mr. Dixon was not part of

13    any conspiracy.  I don't know if you remember Valerie Mills,

14    her nickname was Tiger.  She said she didn't know of any

15    connections between these officers.  She also shot down the

16    government's theory that there was pressure to do whatever the

17    guards asked.  Remember, Ms. Mills said, not that's it true,

18    but she said, "Mr. Dixon propositioned me.  I said no.  I even

19    cursed a colorful streak at him.  Then I went back to my bunk,

20    and that was the end of the story."  She didn't go to the SHU.

21    She didn't say she went to the SHU.

22         Blackston, same thing, "Dixon propositioned me."  She

23    declined.  That was the end of it.  Never went to the SHU.

24         Why would a guard send an inmate that they are

25    worried about to the SHU anyway?  Isn't that where the

supposedly feared George Williams is?  You heard the testimony

of C.O. Gilbert who said that George Williams' office is in

the SHU.  So, why would you send an inmate there, if you

wanted to conceal something from the investigator?  That's

ridiculous.

Hartline story, Deronda Hartline, Ms. Hartline, her

story about the mailings to Mr. Barnes, the money orders that

went to Mr. Barnes was purely about Mr. Barnes until Barnes

pled guilty.  Then she came in shortly before trial and said,

"Oh, by the way, I had something with Dixon, too."  She

admitted she changed her story on the stand.  I called that

into question.  I think you should weigh that when you are

judging these inmates' credibility.

She also said Dixon propositioned her, she refused,

she never went to the SHU.  Same old story.

Mr. Barnes got up there trying to help the

government, trying to get a sentence reduction, yet admitted

that Dixon had nothing to do with the mailings of the money

orders that are sitting over there.  Mr. Dixon got nothing out

of that.  Those mailings went to Thomasville, Georgia, to

Mr. Barnes' mother's address.  Mr. Dixon lives in Quincy,

Florida.  Mr. Barnes admitted that Mr. Dixon had nothing to do

with that.  He even said -- Mr. Barnes even said, "Why should

I tell him about my dealings?  It only makes me more likely to

get caught."  That shows that he was going it alone, and there

1    was no conspiracy.

2         Even Agent Brunner candidly admitted that Mr. Dixon

3    had nothing to do with those money orders that were mailed to

4    Mr. Barnes for Mr. Barnes' sole benefit.

5         In fact, Hartline also admitted that she tried to

6    pull Dixon into this scheme.  She said, "Give me a phone

7    number."  Dixon said, "No."  She said, "Give me an address."

8    Dixon said, "No."  So, I think her testimony is also suspect,

9    but it proves, in any event, that these -- any conspiracy or

10   any illegal activities that Mr. Barnes was engaging in were on

11   his own and not part of a conspiracy.

12        There were many other inmates that didn't come

13   forward until the news came out about the arrests and the

14   indictments.  St. Anne Narcisse, the Haitian woman, she didn't

15   come forward until after the indictments were issued.

16   Ms. Demorais, Ms. Hamlet, Ms. Stanley, all jumping on the bus

17   after the indictment came down.

18        And Ms. Parker, the information peddler, who said

19   they were rolling with the people, it was like a wave of

20   information peddlers running to the government to try to help

21   them so they could get out of jail.

22        In truth and in fact, the government shouldn't be in

23   the business of buying such information from these peddlers.

24        You talk about reasonable doubt.  Is it reasonable to

25   doubt Shonnie Daniels, who has admitted lying about guards?

 1   Is it reasonable to doubt the uncorroborated word of a

 2   convicted murderer?  Is it reasonable to doubt those who are

 3   fighting for their freedom through plea bargains?

 4          I say, no, and I say that reasonable doubt requires

 5   much more than what the government described as a "roughly cut

 6   puzzle."  That's not proof beyond a reasonable doubt to

 7   present a case that's a roughly cut puzzle.

 8          I would like to show you the -- what -- how the

 9   jury -- how the judge will instruct you on reasonable doubt.

10          As Mr. Harper mentioned, "*Proof beyond a reasonable*

11   *doubt, therefore, is proof of such a convincing character that*

12   *you would be willing to rely and act upon it without*

13   *reservation in the most important of your own affairs.*"

14          "*In the most important of your affairs,*" and I think

15   Mr. Harper very clearly pointed out the import of that.  If

16   you have any reservation, you must acquit.  That's what the

17   reasonable doubt standard is.

18          Would you rely on Shonnie Daniels in the most

19   important of your own affairs to watch your kids, to watch

20   your financial nest egg?  Would you rely on a convicted

21   murderer to watch your kids?  That's what the instruction

22   says.  I mean, everybody probably has different things that

23   are the most important for them, but you decide in your own

24   heart what's the most important thing for you, and then you

25   decide would you rely on these inmates to do those things for

1    you.

2         The bribery counts, something of value in a *quid pro*

3    *quo* exchange for contraband or a failure to enforce federal

4    statutes and BOP regulations.  Let's don't take that lightly.

5    What we're talking about here is proof beyond a reasonable

6    doubt that there was an agreed-upon exchange.  This,

7    specifically for that.  This, these cartons of cigarettes, I

8    want to trade with you for sex, okay?  That's what we are

9    talking about in the bribery counts.

10        There is a lesser-included offense that you will be

11   instructed on called "an illegal gratuity," which is a lower

12   offense, which would apply, if cigarettes or sexual favors

13   were given to a guard because of his official position or the

14   acts taken by that official, that's something for you to

15   consider.

16        But we would suggest that you cannot convict on any

17   of these counts, none of the bribery counts or none of the

18   gratuity counts, because the proof was that Mr. Dixon gave out

19   stuff to lots of people.  There was no *quid pro quo* exchange.

20   In the language of the statute, he wasn't induced into giving

21   the contraband by the act of sex.  You didn't have to have sex

22   with Mr. Dixon to get gum or cigars from him, and many inmates

23   admitted that.

24        Ms. Greathouse, she never had sex with Mr. Dixon, but

25   he gave her cigarettes.  She testified to that.  The

1    cigarettes were really in exchange for nothing.  The nonsense

2    about pinning for him, she admitted on cross-examination that

3    that was her own understanding, and that Mr. Dixon didn't even

4    say that.

5         So, my point in discussing these inmates who got

6    contraband without having sex with Mr. Dixon goes to whether

7    there was a *quid pro quo* exchange in those counts where he is

8    charged.  Because why would you make such an exchange of sex

9    for contraband, when you can get the contraband anyway?  You

10   can get it through the visitation.  There were many other

11   ways.  Contraband was all over the place.  You didn't need to

12   trade sex to get contraband in that institution.

13        Ms. Parker also said that.  She said that her

14   relationship with Mr. Dixon was purely social, but he gave her

15   stuff, too.

16        Ms. Delores Hamlet, Shonnie Daniels' prison mother,

17   said that Mr. Dixon gave her stuff, but there was certainly no

18   allegation, no testimony of any exchange for sex in that case.

19        So, Count Nine, first of the bribery counts, relates

20   to Shonnie Daniels.  And with Shonnie Daniels, I think we

21   should be able to stop right now and say that she is walking

22   and talking a reasonable doubt.  She simply has no credibility

23   left.

24        Remember her comments to the OIG?  First letter,

25   "When I asked to cooperate, I gave all I had.  I didn't hold

1    anything back.  I don't know what's the status of this

2    investigation with Officer Barnes, but he needs to be

3    stopped."

4           Nothing about Dixon.  Shonnie Daniels admitted it.

5           The next letter to the OIG -- these are in

6    evidence -- Shonnie Daniels refers directly to Correctional

7    Officer Evans by name.  And note, very importantly in this

8    second letter, there is a reference to an event, even though

9    the letters are not dated, there is a reference to an event in

10   May of 2005.  So, we know these letters that I'm discussing

11   are after the time period for which Mr. Dixon is accused of

12   soliciting bribes from Ms. Daniels.

13          So, in that second letter, they talk about C.O.

14   Evans, but they don't again talk about Mr. Dixon.  In fact,

15   none of the letters talk about Mr. Dixon.

16          The third letter to the OIG, the Office of Inspector

17   General, quote, by Shonnie Daniels, I've done all that was

18   asked of me, end quote, as she begs to get into the halfway

19   house.  In saying she told them anything, she mentioned only

20   Mr. Barnes and Mr. Evans, not a word about Mr. Dixon, until

21   she knew she wasn't getting what she wanted.  And, again,

22   remember the time frame for that second letter, May of 2005.

23          I would like to show you Count Nine.  The time frame

24   on Count Nine, December '04 until March 2005.  All of these

25   letters from Shonnie Daniels where she says, "I told you

1    everything I know," and nothing about Dixon, even though the

2    allegation that the government brings forward is that Shonnie

3    Daniels engaged, and Mr. Dixon corruptly demanded, accepted

4    and agreed to receive something of valuable from Shonnie

5    Daniels before that time.  That's not credible.  That's

6    reasonable doubt.

7           Let me pause right there and emphasize to you why I'm

8    spending a little more time on Shonnie Daniels.

9           She is Inmate Number One.  She said in her letter to

10   Agent Brunner that she brought them the case.  She said, "I

11   came to y'all."  So, that, I think, in my mind, is the genesis

12   of this entire mess.

13          Notice how many of her relatives -- her prison

14   mother, her cousins -- all have come in to jump into the case.

15   There is a lot of connection between all of the others.  There

16   is one central point in this case, and that is Shonnie

17   Daniels, Inmate Number One.  So, I want to spend a little more

18   time on her.

19          In fact, she testified herself that she had a little

20   contraband ring going inside the institution.  She was so bad

21   that even C.O. Barnes wanted to get away from her in the end.

22          And I think it's very important, I know that you

23   heard this loud and clear when Shonnie Daniels was on the

24   stand, but I'm going to say it again, that she admitted to you

25   that she lied on occasions to get back at guards.  When asked

1  why she lied, she said she was upset with the lieutenant.  She

2  lied.  She admitted she lied to Agent Sanford.  She said that

3  the guard had kicked an inmate, and then in her grand jury

4  testimony she said, "I was lying."  They said, "Why did you

5  lie?

6          "I was upset with the lieutenant."

7          And then she said, quote, I was being ornery, I

8  wasn't telling the truth, end quote.

9          So, Shonnie Daniels does much more than kill Count

10  Nine.  She kills the whole investigation.  She taints the

11  whole investigation.

12          Now, let's recount her history coming up to the

13  indictments in this case.

14          Tried to get sentence reductions from this court,

15  denied, March 2002.  Tries again saying, she'll file anything,

16  what the heck, she doesn't care about the truth.  She admitted

17  that from questioning from the government.  July 2003, again

18  denied by this court.  July 2003, coming right into the time

19  period.

20          So, what's next?  What would Shonnie Daniels do?  She

21  couldn't get anybody on the outside.  She couldn't cooperate

22  against anybody on the outside.  There is nobody to get.

23  She's in the institution.  So who is there?  The guards.

24  She's an attractive woman, I suppose.  She's about as

25  desperate as anybody could be to get a reduction in her

1  sentence.  And so she strikes up this relationship with

2  Mr. Barnes, and the rest is history.

3        Her attempt to manufacture a story about money being

4  sent to her trust account in the prison falls flat.  The

5  witness who came in who was her relative, Gekettia Harris,

6  didn't identify Mr. Dixon in court.  She said she got a bag of

7  Black & Milds at Dillards, which doesn't sell them, and she

8  couldn't even remember where anybody was in the store.  That's

9  not credible.  Again, it's Shonnie Daniels' relative.

10        And where is supposedly the critical person in this

11  track?  Remember the name Stephanie George came up as the

12  person who received the contraband?  Well, where is she?  She

13  didn't come in and testify, and I submit to you that it's

14  because it didn't happen.  She is as absent as the Dillards

15  records, the Western Union records, and the phone records.

16  She just didn't come in to tell the story because it wasn't

17  true.

18        Count Ten relating to Ms. Bowie, Ms. Bowie was

19  perhaps the most polite of the inmate witnesses, yet she is no

20  angel.  If you acquit Mr. Moore, which I think you must, you

21  must therefore also doubt Ms. Bowie's testimony in connection

22  Mr. Dixon.  She was a convicted crack cocaine dealer, and she

23  admitted that she had recently falsified reports to her

24  probation officer.  She's not out walking the streets.  She

25  testified she's in the halfway house.  She was in the halfway

1    house before, violated their policies, allegedly, by lying to

2    the staff, and ended up at the FCI.  That's how she came back.

3    And now she's in the halfway house again, and just this month,

4    she's violated her conditions twice again.

5            So, she may have made a fine impression sitting up

6    there without shackles and without the prison clothes, but dig

7    a little deeper, and you'll see that her credibility is

8    lacking.  She breached her trust with the court to the extent

9    that the court is the one that imposes the conditions of

10   supervised release, which she breached.  And I submit that you

11   can't trust her.

12           In any event, however, even Ms. Bowie stated that she

13   never talked about sex with Mr. Dixon.  Although, she says

14   they had it.  And when asked did she ever talk about getting

15   contraband from Mr. Dixon, she said, "Not really talk about

16   it."  So, is there a *quid pro quo* there, or is this somebody

17   that perhaps likes to have sex?  I mean, that is a

18   possibility.  It could be that some of these inmates like to

19   have sex.

20           If you believe that that is true, then you must

21   acquit on the bribery counts.  If you believe that the inmates

22   decided, "I like to have sex because I like sex," then you

23   have -- that's not a *quid pro quo* for the contraband.

24           Which brings us to Count 11, Demetrus Coonrod, and I

25   think the *quid pro quo*, high level of proof beyond a

1  reasonable doubt, falls flat on its face in the case of

2  Demetrus Coonrod, because she says she went out, had sex with

3  Mr. Dixon, came back.  He woke her up at 3:00 in the morning

4  and threw a couple of packs of gum on the bed.  That's

5  manufactured evidence.

6          Why would somebody who can get cartons of cigarettes

7  through visitation and sell them for $200 a box engage in sex

8  in exchange for two packs of gum?  That is ridiculous.  You

9  use your common sense in judging that count.

10          Don't forget, either, that Ms. Coonrod advertised

11  herself on the internet under pamperedprisoner.com, and is out

12  for sex, male or female.  So, I submit to you that perhaps she

13  did like to have sex, and that was her motivation for having

14  sex on that evening.

15          Ms. Coonrod also admitted that there was no

16  conspiracy.  I asked her flat out, and she admitted that she

17  had no evidence that her experience with Mr. Dixon had

18  anything to do with any other guard or any conspiratorial

19  activity.  To the contrary, she said that Mr. Dixon feared

20  being caught by the guards on that evening.

21          Now, another woman came in and testified, Ms. Letishe

22  Moore, and the government didn't charge that count as bribery,

23  so set that one aside.  You shouldn't consider it.

24          In any event, the claim of a STD casts severe doubt

25  on her testimony.  It's uncontested that neither Mr. Dixon nor

1  Mrs. Dixon ever had STD.  So, you should reject this effort to

2  smear Mr. Dixon on an event that is not even charged as a

3  separate count in the indictment.

4          Count 12, the so-called witness tampering.  One date,

5  you consider one date on Count 12.  March 18th, 2006.  One

6  brief conversation.  That's it.  That's what we're talking

7  about in Count 12.

8          The one alleged witness is convicted murderer Latoya

9  Brown.  She forthrightly agreed with the government's

10  characterization in Overt Act 69 of the indictment that all

11  Mr. Dixon did was question her about her cooperation against

12  Defendant Hill, not Defendant Dixon.

13          This is the overt act charged in the conspiracy:

14          "On or about March 18, 2006, Gregory Dixon questioned

15  Inmate Number Two about her cooperation with law enforcement

16  against co-conspirator Ralph Hill."

17          I asked her if that was a good characterization of

18  what had happened, and she said yes.

19          I would submit to you that that is not corruptly

20  persuading with intent to hinder a person from speaking with

21  law enforcement.  He made a true statement that, if she

22  cooperated against Mr. Hill, she might be shipped.  That is a

23  true statement.

24          I would like to show you what's required in order for

25  you to find that someone engaged in something corruptly.

1     "A person does not act corruptly if he merely advises

2     a witness of the witness's rights or merely advises the

3     witness of the burden, inconvenience or other consequences

4     ordinarily suffered by a witness."

5          Okay?  If she cooperated against Mr. Hill, she would

6     be shipped.  That was true.  She admitted that they joked

7     afterwards.  She admitted that he never bothered her about

8     anything like that after that brief conversation on March 18,

9     2006.

10         Agent Brunner admitted that Latoya Brown was already

11    cooperating, and that she had already received the go ahead to

12    wear a wire in conversations with other guards, including C.O.

13    Johnson.  But they never tried that or tried anything else to

14    corroborate the alleged witness tampering against Latoya

15    Brown.

16         Ms. Brown admitted that she never had sex with

17    Mr. Dixon.  There was no evidence whatsoever that Dixon had

18    anything to do with the money orders that were sent to Hill.

19    So, although Mr. Davis throws on those money orders, the truth

20    of the matter is those money orders went to Mr. Hill; and,

21    again, there was no connection between those money orders and

22    Mr. Dixon.  Okay?

23         So, Mr. Dixon had no reason to be afraid of her

24    testimony.  No motivation whatsoever to hinder or delay her

25    from speaking to a law enforcement officer about anything, and

1    he didn't do it.

2            I suppose if the government's theory of the threat is

3    based on the comment, "If I told you, I'd have to kill you,"

4    that that has to be shot right out of the water, because

5    Ms. Latoya Brown admitted that there was no doubt in her mind

6    that Mr. Dixon was joking, and he never talked to her again

7    about it.  That's a far cry from corruptly persuading a

8    witness with intent to hinder, delay and prevent communication

9    to a law enforcement officer.  That count also demands an

10   acquittal.

11           Now, one suggestion for the testimony that comes from

12   sources that lack credibility in your mind is simply to throw

13   it out entirely.  Forget about it in your deliberations, if it

14   doesn't come from a credible source.  I would like to use an

15   analogy to a roach that crawls into a cereal box.

16           You see a roach that crawls into a cereal box, you

17   don't try to pick out the pieces individually and separate

18   them from the rest of the box.  You throw out the whole box.

19   And I suggest to you that, if you have a doubt about someone's

20   credibility in this case, such as the inmates, I would suggest

21   that you throw it out entirely and don't consider it at all.

22           Having said that, I would like to spend some time

23   comparing what was purely inmate testimony for the government

24   to our side of the story.

25           We would rely on Agent Brunner's testimony that there

1  was no connection between Mr. Dixon and any of the money

2  orders that were sent to Barnes; therefore, no conspiracy.

3        We rely on Corrections Officer Moore and Corrections

4  Officer Gilbert, who have no ax to grind with anybody, to

5  verify that they had never observed Mr. Dixon committing any

6  offense or acting unprofessionally towards inmates.

7        Even Mr. Barnes would not go so far as to accept the

8  grand theory of conspiracy offered by the government in this

9  case.  To the contrary, he rejected the idea that there was

10 any agreement between any of the guards to engage in any

11 criminal act.

12       In other words, not one person from the BOP testified

13 that there was a conspiracy.  The warden didn't say it.  The

14 other gentlemen from the BOP didn't say it.  George Williams

15 didn't say it.  C.O. Barnes didn't say it.  C.O. Moore didn't

16 say it.  C.O. Gilbert didn't say it.

17       To the contrary, the BOP officials who knew Mr. Dixon

18 best said he was honorable and respectful and professional.

19 His superiors said that just this year in April 2006, and his

20 evaluations are in the record for your consideration.  As of

21 April 2006, he was exceeding performance levels or outstanding

22 in all areas.

23       Instead of relying on inmates, let's rely on what his

24 superiors out there at the institution said.  They said,

25 quote, Officer Dixon supervises inmates fairly and impartially

1    and accounts for the inmates, end quote.

2         Quote, Officer Dixon conducts shake-downs in his area

3    of responsibility and disposes of both nuisance and hard

4    contraband properly, end quote.

5         The BOP comments, the testimony of Agent Brunner, the

6    testimonies of C.O. Moore and Corrections Officer Gilbert

7    greatly overwhelm the information peddlers that the government

8    presented in this case.

9         Mr. Dixon is not guilty of any offense that is

10   alleged in this indictment, and I request that you find him

11   not guilty on all counts.

12        THE COURT:  Mr. Davis?

13        MR. DAVIS:  I can't ignore one comment that

14   Mr. Findley made during his closing.  I just have to start

15   with it.

16        Which is, we know from the testimony that Mr. Dixon

17   signed in on those annual refresher course sheets, yet

18   Mr. Findley just announced that everything he was taught in

19   those refresher courses he ignored because he had sex with

20   inmates out there.

21        Mr. Findley also says, treat this testimony like it's

22   a roach in a cereal box and throw the whole thing out; yet, he

23   doesn't do that himself.

24        Sabrina Bowie is telling a lie when the information

25   damages him; yet, when she admits as to whether or not it's an

1    agreement and says she doesn't think it was an agreement, then

2    of course her testimony is credible.

3         Excuse me, Your Honor.

4         The instruction on what an agreement is in the

5    conspiracy is longer than what Mr. Findley just told you.

6    I'll put that on the -- start on page 13:

7         "*It's not necessary for the government to prove that*

8    *the members of the scheme had entered into any formal type of*

9    *an agreement.  The necessary agreement or understanding can be*

10   *formal or informal, actually spoken or merely understood.*"

11        A lot of defense counsel's challenges to the quality

12   of the proof go to that issue and try to take you away from

13   that picture that we painted for you inside the prison walls

14   where not everything is spoken.  And there is good reason, as

15   Mr. Findley pointed out.  There's good reasons why not

16   everything is spoken.  It's a subtle environment where, if you

17   admit to certain things, you increase your risk of being

18   caught and getting in trouble.

19        And prisoners work that way in the prison economy.

20   They go up -- Mr. Barnes told you, if they go up to Mr. Barnes

21   and say, "Hey, I'm going to deal contraband with you," it's

22   his testimony, "I push somebody like that away, because I

23   would be suspicious that I was going to get caught."  So,

24   there's a subtlety to the type of understanding.

25        But when Sabrina Bowie was asked, would she have had

1  sex with those guards but for the expectation of getting

2  contraband, she said, "No, I wouldn't."  We asked those

3  witnesses that question.

4        They lived in an environment where rumor abounded.

5  That was the means of communication.  And rumor informed them,

6  if you had sex with a guard, you could get contraband.  That

7  was their understanding going into those transactions.

8        To make them live up to the standard of having to

9  write a car contract with a guard in order to have a *quid pro*

10  *quo* is unrealistic in terms of the environment in which they

11  lived.

12        Defense counsel attacked the government's case that

13  we didn't get DNA, we didn't get video.  Why are they doing

14  that?  It's to take you away from what you heard in here.  The

15  evidence that's in front of you is the witnesses you heard.

16  And, yes, some of those witnesses are felons.  But the

17  witnesses that he focused on, Bowie -- I'm trying to remember

18  the others who are not in jail right now -- Valerie Mills,

19  Shirley Blackston, Shonnie Daniels, they are all out of jail.

20  They have a greater risk, if they come in here and lie, than

21  any benefit they will get for coming in with a story that is

22  not true.

23        And St. Anne Narcisse, you saw her sitting there on

24  the stand.  She came forward.  We brought in another

25  psychologist to say that she previously made a statement about

1  this and was extremely upset about it, and Alfred Barnes also
2  corroborated her story.  If you remember, St. Anne Narcisse
3  said, "I had a relationship with -- well, I had sex one time
4  with Mr. Moore."  And then he stopped seeing her and started
5  spending time with another inmate, Luna.

6       And Alfred Barnes said, "Well, you know, I talked to
7  Moore and Moore was telling me that he made a comment to me
8  about Luna's print.  And I asked him what was a print.  He
9  said, 'Well, that's the shape the woman's vagina made through
10  the tight clothes that she wore.'"

11       Defense counsel makes the point that it's -- well,
12  they suggested that you throw out all of the witness's
13  testimony.  I believe the court will instruct you that it is
14  your job to determine the credibility of this testimony that
15  you heard here in court, and it's a difficult job.

16       The defendants have argued that the government
17  essentially build its case on incredible witnesses.  They are
18  incredible because, one, they are felons in jail; or, two,
19  they are incredible because they're correctional officers who
20  are dirty and have decided to admit to their crime and are now
21  cooperating.  It doesn't leave many people inside of a federal
22  facility, prison facility, who could be witnesses to the
23  crimes that we are trying to uncover here.

24       When you investigate and prosecute a crime inside of
25  a federal facility, those are the people who are there.  Those

 1  are the people who are going to be witnesses to the events

 2  that take place there.

 3        Defense suggest that somehow we chose these

 4  witnesses.  But we didn't choose these witnesses.  The

 5  defendants chose these witnesses, when they chose to have sex

 6  with them, when they chose to barter sex and money for

 7  contraband.

 8        The defendants also chose these witnesses because

 9  it's predictable that their word is not going to be as

10  credible as that of a law enforcement officer.  That's one

11  reason they're good victims.  You heard testimony also that

12  certain of the officers would go up to these witnesses and

13  say, "Are you getting support from your family?"  This is all

14  part of the grooming process to see if they would be an

15  appropriate person in which to engage in either contraband or

16  sex.

17        Mr. Harper started out by suggesting that we

18  restructure the entire Federal Bureau of Prisons.  I'm not

19  sure I -- I might agree with him.  But that's not your job and

20  that's not my job.

21        Your job is to take the very difficult -- to do the

22  very difficult job of trying to winnow the credibility out of

23  the very complexed story that you heard presented to you here

24  today -- over the past 4 days, and see if those facts prove

25  beyond a reasonable doubt the charges contained in this

1  indictment.

2       Mr. Harper suggested that Sabrina Bowie and Shirley

3  Blackston are prostitutes.  I suggest to you that they are

4  women who have made a mistake and earned their own ticket in

5  the original case to go to FCI for a period of time.  But they

6  did their time, and they're out.  They didn't want to be here

7  to testify.  You heard that from Sabrina Bowie.  She wants to

8  put this all behind her.  Is that a motive to lie?

9       There's other discrepancies.  I tried to keep notes

10  as we went through, where they said that Daniels said that

11  the -- couldn't get into the counselor's office.  I recall the

12  testimony differently.  I recall Daniels saying they went back

13  into the area of the counselor's office.  I don't believe

14  there was any discrepancy as to whether or not they went to

15  the counselor's office or to a bathroom area that was unlocked

16  in that counselor's office area.

17       The point I'm making about this is, it's your job to

18  recall from your memory what was said, despite the fact that

19  defense counsel and I have a different recollection as to

20  individual facts like that.

21       I don't want to belabor this for you anymore.  I

22  think you've heard the arguments.  You've heard the evidence.

23  You know the different positions.  I want to ask you to use

24  your common sense.  This case calls for your common sense and

25  experience.  I believe Mr. Findley said at the beginning,

1  that's not to be checked at the door when you come into the

2  jury box.

3       The government has put on evidence that shows that

4  these defendants used their position, a position of trust, at

5  the FCI to obtain sexual benefits and financial benefits and

6  to keep defendants or keep witnesses from telling the police.

7       They preyed on vulnerable inmates whose word of

8  inmates were supposedly not to be believed, and who were

9  retaliated against if they did speak up.

10       The evidence presented shows that the defendants

11  entered into an unspoken agreement to use the prison for their

12  own purposes and to shut up anyone who would tell on them.

13       When you look past the misdirections of defense

14  counsel and focus on the evidence, I'm confident you will

15  return a verdict of guilty on all counts.

16       Thank you.

17       THE COURT:  All right.  Members of the jury, it's now

18  my duty to instruct you on the rules of law which you must

19  follow and apply in reaching your decision.  When I finish,

20  you will go to the jury room to begin your deliberations.

21       I've written my instructions, and I'll provide you a

22  copy for reference during your deliberations.  You, therefore,

23  don't need to try to take notes or memorize the instructions.

24  Please, just pay close attention as I go through the

25  instructions with you.

1    I'm going to start with some general instructions

2  about the nature of your job and standards and procedures

3  applicable in any criminal case.  Then I'm going to instruct

4  you on the specific charges in this case and the law

5  applicable to those charges.  Then I'll conclude with general

6  instructions on such things as how you will go about returning

7  your verdict.

8    It will be your duty to decide whether the government

9  has proved beyond a reasonable doubt the specific facts

10  necessary to find each of the individual defendants guilty of

11  the crimes charged in the indictment.

12    You must make your decision based only on the

13  testimony and other evidence presented here during the trial,

14  and you must not be influenced in any way by either sympathy

15  or by prejudice for or against the defendants, the government,

16  or anyone.

17    You must follow the law as I explain it to you,

18  whether you agree with that law or not; and you must follow

19  all of my instructions as a whole.  You may not single out or

20  disregard any of the court's instructions on the law.

21    The indictment or formal charge against the defendant

22  is not evidence of guilt.  Indeed, the defendants are presumed

23  by the law to be innocent.  The law does not require a

24  defendant to prove his innocence or to produce any evidence at

25  all.  And if a defendant elects not to testify, you may not

1    consider that in any way in reaching your decision.

2          The government has the burden of proving a defendant

3    guilty beyond a reasonable doubt; and, if it fails to do so,

4    you must find the defendant not guilty.

5          Thus, the government's burden of proof is a strict or

6    heavy burden, it is not necessary, however, that a defendant's

7    guilt be proved beyond all possible doubt.  It is only

8    required that the government's proof exclude any reasonable

9    doubt concerning a defendant's guilt.

10         A reasonable doubt is a real doubt based upon reason

11   and common sense after careful and impartial consideration of

12   all of the evidence in the case.

13         "Proof beyond a reasonable doubt," therefore, is

14   proof of such a convincing character that you would be willing

15   to rely and act upon it without reservation in the most

16   important of your own affairs.  If you are convinced that a

17   defendant has been proved guilty beyond a reasonable doubt,

18   say so.  If you are not convinced, say so.

19         The term "evidence" includes the testimony of the

20   witnesses and the exhibits admitted in the record.  Remember,

21   that anything the lawyers say is not evidence in the case.  It

22   is your own recollection and interpretation of the evidence

23   that controls.  Also, you should not assume from anything I

24   may have said or done that I have any opinion concerning any

25   of the issues in the case favoring one side or the other.

1    In considering the evidence, you may make deductions

2  and reach conclusions that reason and common sense lead you to

3  make, and you should not be concerned about whether the

4  evidence is direct or circumstantial.

5    "Direct evidence" is the testimony of one who asserts

6  actual knowledge of a fact, such as an eyewitness.

7  "Circumstantial evidence" is proof of a chain of facts and

8  circumstances tending to prove or disprove any fact in

9  dispute.  The law makes no distinction between the weight that

10  you may give to either direct or circumstantial evidence.

11    Now, in saying that you must consider all of the

12  evidence, I do not mean that you must accept all of the

13  evidence as true or accurate.  You should decide whether you

14  believe what each witness had to say and how important that

15  testimony was.  In making that decision, you may believe or

16  disbelieve any witness in whole or in part.

17    Also, the number of witnesses testifying concerning

18  any particular dispute is not controlling.

19    In determining the believability of any witness and

20  the weight to be given his or her testimony, you may properly

21  consider how the witness acted as well as what the witness

22  said.  Some things you should consider are:

23    First, did the witness have an adequate opportunity

24  to see and know the things about which the witness testified?

25    Second, did the witness seem to have a good memory?

1    Third, was the witness honest and straightforward in

2    answering the attorneys' questions?

3    Fourth, did the witness have an interest in the

4    outcome of the case?

5    Fifth, did the witness's testimony seem reasonable

6    considered in the light of all of the evidence in the case and

7    in the light of your own experience and common sense?

8    And, sixth, did the witness do or say something at

9    some other time inconsistent with the testimony the witness

10   gave before you?

11   A witness who hopes to gain more favorable treatment

12   in his or her own case may have a reason to make a false

13   statement, because the witness wants to strike a good bargain

14   with the government.  So, while a witness of that kind may be

15   entirely truthful when testifying, you should consider that

16   testimony with more caution than the testimony of other

17   witnesses.

18   Also, the fact that a co-defendant has pled guilty to

19   an offense is not evidence of the guilt of any other person.

20   If a witness has been convicted of a felony offense,

21   that is another factor you may consider in deciding whether

22   you believe the witness's testimony.

23   A defendant has a right not to testify.  If a

24   defendant does testify, however, you should decide in the same

25   way as for any other witness whether you believe the

 1   defendant's testimony.

 2          You may consider evidence of a defendant's good

 3   character or reputation, along with all of the other evidence,

 4   in deciding whether the government has proved beyond a

 5   reasonable doubt that the defendant committed the crimes with

 6   which he is charged.

 7          Now let me turn to the charges in this case.  I will

 8   not read the indictment to you verbatim, because you will be

 9   given a copy of the indictment for reference during your

10   deliberations.

11          In summary, the indictment charges each defendant

12   with conspiracy, bribery and witness tampering.  Each separate

13   charge is referred to as a "count."  Although, the first

14   charge set forth in the indictment is conspiracy, it will be

15   easier for me to discuss the other charges first, and then

16   come back to the conspiracy charge.  So, I start with bribery.

17          Mr. Dixon is charged with three counts of bribery and

18   Mr. Moore is charged with one.

19          A defendant can be found guilty on a bribery count

20   if, and only if, all of the following facts are proved beyond

21   a reasonable doubt:

22          First, that the defendant was a federal correctional

23   officer;

24          Second, that the defendant demanded, sought, received

25   accepted or agreed to receive or accept the thing of value

1   described in the count at issue from the inmate listed in the

2   count at issue; and,

3          Third, that the defendant did so knowingly and

4   corruptly, and in return for violating his duty as a federal

5   correctional officer.

6          An officer acts corruptly, as that word is used in

7   this instruction, only if there is a *quid pro quo* -- that is,

8   only if the officer intends to receive something of value in

9   exchange for violating his duty.

10          It is a violation of an officer's duty to provide

11   contraband to an inmate.  "Contraband" includes anything

12   whatsoever not approved by the warden.

13          Thus, for example, it is bribery for a correctional

14   officer to trade contraband for sex, but it is not bribery for

15   an officer to provide an inmate contraband without receiving

16   sex or any other form of payment in exchange.  Nor is it

17   bribery for an officer to have sex with an inmate if the

18   officer does nothing in exchange.

19          So that you can apply the instructions I just gave to

20   each of the separate bribery counts, I will now list for each

21   bribery count the thing of value described in the count at

22   issue and the inmate listed in the count at issue.

23          Count Nine -- and you'll notice these don't run in

24   sequence.  You'll see that when you get the indictment.  Some

25   of the counts that are skipped are because they are against

1    other defendants not involved here.

2            Count Nine is against Mr. Dixon and charges that he

3    demanded, sought, received, accepted or agreed to receive or

4    accept, money and sexual favors from Shonnie Daniels.

5            In order to return a guilty verdict on this count, it

6    would be sufficient if the thing of value were either money or

7    sexual favors.  It need not be both.

8            Count Ten is against Mr. Dixon and charges that he

9    demanded, sought, received, accepted or agreed to receive or

10   accept sexual favors from Shirley Blackston.

11           Count 11 is against Mr. Dixon and charges that he

12   demanded, sought, received, accepted or agreed to receive or

13   accept sexual favors from Demetrus Coonrod.

14           Count 16 is against Mr. Moore and charges that he

15   demanded, sought, received, accepted or agreed to receive or

16   accept sexual favors from Sabrina Bowie.

17           Now, let me turn to a lesser-included offense

18   included within the charge of bribery.

19           When a law that a defendant is charged with breaking

20   actually covers two separate crimes, the less serious of the

21   crimes is generally called a "lesser-included offense."

22   Accepting an illegal gratuity is a lesser-included offense of

23   bribery.

24           If you should unanimously find a defendant not guilty

25   on one of the bribery counts, you must then determine whether

1  the defendant is guilty of the lesser-included offense of

2  accepting an illegal gratuity.  The difference in the two

3  crimes is this:

4       Bribery requires a *quid pro quo* -- that is, an

5  officer's intended receipt of something of value in exchange

6  for violating his duty.

7       An illegal gratuity, on the other hand, does not

8  require a *quid pro quo* or violation of duty.  It can be any

9  illegal payment to a public employee on account of his

10  performance of his job.

11       A defendant can be found guilty of accepting an

12  illegal gratuity if, and only if, all of the following facts

13  are proved beyond a reasonable doubt:

14       First, that the defendant was a federal correctional

15  officer;

16       Second, that the defendant demanded, sought,

17  received, accepted or agreed to accept something of value for

18  or because of one or more actions he took or omitted to take

19  as a federal correctional officer; and,

20       Third, that the defendant did so otherwise than as

21  provided by law for the proper discharge of official duty.

22       Now let me turn to witness tampering.

23       Each defendant is charged with one count of witness

24  tampering.  The specific allegations against each defendant

25  are somewhat different, and so I will address the witness

1    tampering count against each defendant separately.

2            Count 12 is against Mr. Dixon and charges tampering

3    with witness Latoya Brown.  Mr. Dixon can be found guilty of

4    this count if, and only if, all of the following facts are

5    proved beyond a reasonable doubt:

6            First, that Mr. Dixon intimidated, threatened or

7    corruptly persuaded Latoya Brown, or attempted to do so;

8            Second, that Mr. Dixon did so knowingly and with the

9    intent to hinder, delay, or prevent the communication to a law

10   enforcement officer of information relating to the commission

11   of a federal crime; and,

12           Third, that the manner in which Mr. Dixon did this

13   was by threatening Ms. Brown with transfer from

14   FCI-Tallahassee, if she cooperated with investigators.

15           To intimidate or threaten a witness means to make

16   statements or engage in acts that would cause a witness of

17   ordinary sensibilities to fear that he or she will suffer

18   substantial adverse consequences over and above the burden,

19   inconvenience or other consequences ordinarily suffered by a

20   witness.

21           A person who persuades a witness does so corruptly

22   only if the person acts knowingly and dishonestly for the very

23   purpose of preventing the disclosure of a specific federal

24   crime.  A person does not act corruptly if he merely advises

25   the witness of the witness's rights or merely advises the

1    witness of the burden, inconvenience or other consequences

2    ordinarily suffered by a witness.

3            The term "law enforcement officer," as used in this

4    instruction, includes any employee of the federal government

5    authorized to investigate criminal offenses.

6            The government need not establish that a witness

7    actually intended or was likely to communicate information to

8    a law enforcement officer.  It is sufficient if the defendant

9    acted with the intent to hinder, delay or prevent the

10   communication of information to a law enforcement officer

11   whether or not the witness actually intended or was likely to

12   make such a communication.

13           Also, the information must relate to a federal crime.

14   It is a federal crime for a correctional officer knowingly to

15   engage in a sexual act with an inmate with or without the

16   inmate's consent.  It is a federal crime for a correctional

17   officer knowingly to provide a prohibited object to an inmate

18   or attempt to do so.  A prohibited object is anything

19   whatsoever not approved by the warden.

20           Note, however, that the defendant is not charged in

21   this count, or any other count, with the crimes of engaging in

22   a sexual act with an inmate or providing a prohibited object

23   to an inmate.  He is charged in this count with tampering with

24   the witness to these alleged crimes, and he is charged in

25   other counts with bribery and conspiracy.

1   Count 17 is against Mr. Moore and charges tampering

2   with witness Shirley Blackston.  Mr. Moore can be found guilty

3   on this count if, and only if, all of the following facts are

4   proved beyond a reasonable doubt:

5   First, that Mr. Moore intimidated, threatened or

6   corruptly persuaded Shirley Blackston, or attempted to do so;

7   and,

8   Second, that Mr. Moore did so knowingly and with the

9   intent to hinder, delay or prevent the communication to a law

10  enforcement officer of information relating to the commission

11  of a federal crime.

12  The terms "intimidate, threaten, corruptly persuade,

13  law enforcement officer, and federal crime" have the same

14  meanings here as in the earlier witness tampering count, Count

15  12, that I just went through.

16  Now let me turn to Count One, the conspiracy count.

17  Conspiracy is an agreement or understanding between

18  two or more people to do something the law forbids.

19  In this case, the defendants are charged with

20  conspiring to commit the offenses of bribery and witness

21  tampering.  You'll note that the defendants are not charged in

22  Count One with actually accepting bribes or tampering with

23  witnesses, rather they are charged with having conspired to do

24  so.

25  Title 18, United States Code, Section 371, makes it a

1    separate federal crime to conspire or agree with someone else

2    to do something that, if actually carried out, would amount to

3    another federal crime.

4         So, under this law, a conspiracy is an agreement or

5    kind of partnership in criminal purposes in which each member

6    of the conspiracy becomes the agent or partner of every other

7    member.

8         In order to establish a conspiracy offense, it is not

9    necessary for the government to prove that all of the people

10   referred to in the indictment were members of the scheme, or

11   that the members had planned together all of the details of

12   the scheme or the overt acts that the indictment charges would

13   be carried out in an effort to commit the crimes.

14        And it is not necessary for the government to prove

15   that the members of the scheme had entered into any formal

16   type of an agreement.  The necessary agreement or

17   understanding can be formal or informal, actually spoken or

18   merely understood, so long as there is, in fact, an agreement

19   or understanding.

20        Also, because the essence of a conspiracy offense is

21   the making of the agreement itself, it is not necessary for

22   the government to prove that the conspirators actually

23   succeeded in accomplishing their unlawful plan.

24        What is essential is that there was an agreement or

25   understanding, not that the agreement or understanding was

1    actually carried out.

2         I'm going to have to stop and get you out of the sun.

3    Just a moment.

4         A defendant can be found guilty on Count One if, and

5    only if, all of the following facts are proved beyond a

6    reasonable doubt:

7         First, that two or more persons in some way or manner

8    came to a mutual understanding to try to accomplish a common

9    and unlawful plan as charged in the indictment -- that is, a

10   plan to accept bribes or tamper with witnesses;

11        Second, that the defendant knew the unlawful purpose

12   of the plan and willfully joined in it;

13        Third, that one of the conspirators during the

14   existence of the conspiracy knowingly committed at least one

15   of the methods or overt acts described in the indictment; and,

16        Fourth, that such overt act was knowingly committed

17   at or about the time alleged in an effort to carry out or

18   accomplish some object of the conspiracy.

19        An "overt act" is any transaction or event, even one

20   which may be entirely innocent when considered alone, that is

21   knowingly committed by a conspirator in an effort to

22   accomplish some object of the conspiracy.

23        A person may become a member of a conspiracy without

24   knowing all of the details of the unlawful scheme and without

25   knowing who all of the other members are.  So, if a defendant

1  has a general understanding of the unlawful purpose of the

2  plan, and knowingly and willfully joins in that plan on one

3  occasion, that is sufficient to convict the defendant for

4  conspiracy, even though the defendant did not participate

5  before, and even though the defendant played only a

6  minor part.

7         Of course, mere presence at the scene of a

8  transaction or event, or the mere fact that the defendant may

9  have associated with one or more persons involved in a

10  conspiracy, does not necessarily establish the defendant's

11  involvement in the conspiracy.

12         A person who has no knowledge of a conspiracy, but

13  who happens to act in a way that advances some purpose of one,

14  does not thereby become a conspirator.

15         In order to prevail on Count One, the government need

16  not show that the object of the conspiracy was both bribery

17  and witness tampering.  Either one alone would be sufficient.

18  But in order to return a guilty verdict, you must unanimously

19  agree that a defendant conspired to commit an offense.  It

20  would not be sufficient for some of you to conclude that the

21  defendant conspired to accept bribes, while others concluded

22  only that the defendant conspired to tamper with witnesses.

23  You, thus, will be required to decide separately whether a

24  defendant is guilty of conspiring to accept bribes and/or to

25  tamper with witnesses.

1        Also, if you determine that a defendant is not guilty

2   of conspiracy to accept bribes, you will determine whether

3   that defendant is guilty of the lesser-included offense of

4   conspiracy to accept illegal gratuities.

5        In order to determine whether a defendant conspired

6   to commit the offenses of accepting bribes or illegal

7   gratuities or witness tampering, you, of course, must know the

8   definition of those offenses.  The offenses have the same

9   meaning for purposes of the conspiracy count, Count One, as in

10  the counts I discussed with you earlier -- that is, Counts

11  Nine, Ten, 11, 12, 16 and 17 -- with this exception:

12       In Count One, the charges are not limited to the

13  specific inmates and specific transactions charged in the

14  other counts.

15       I should tell you one more thing about the conspiracy

16  charge.

17       The indictment actually charges that the objects of

18  the conspiracy included not only bribery and witness

19  tampering, but also two additional objects -- mail fraud and

20  interference with interstate commerce.  These allegations

21  dealt primarily with other defendants not on trial here, and

22  you should ignore them.  You should treat the case as if, from

23  the outset, the indictment charged Mr. Dixon and Mr. Moore

24  with conspiring to commit only the offenses of bribery and

25  witness tampering.

1    Also, there are separate counts in the indictment

2  that are against other defendants not on trial here, including

3  Counts Two through Eight, Counts 13 through 15, and Counts 18

4  through 21.  Those counts are not at issue in this trial, and

5  you should not address them.

6    And, as I told you before, the indictment itself is

7  not evidence.

8    That concludes my discussion of the charges against

9  these defendants.  Now let me address some general principles

10  and definitions applicable to all of the counts.

11    The guilt of a defendant in a criminal case may be

12  proved without evidence that the defendant personally did

13  every act involved in the commission of the crime charged.

14  The law recognizes that, ordinarily, anything a person can do

15  for oneself may also be accomplished through direction of

16  another person as an agent or by acting together with or under

17  the direction of another person or persons in a joint effort.

18    So, if the acts or conduct of an agent, employee or

19  other associate of the defendant are willfully directed or

20  authorized by the defendant, or if the defendant aids and

21  abets another person by willfully joining together with that

22  person in the commission of a crime, then the law holds the

23  defendant responsible for the conduct of that other person

24  just as though the defendant had personally engaged in such

25  conduct.

1        However, before a defendant can be held criminally

2    responsible for the conduct of others, it is necessary that

3    the defendant willfully associate in some way with the crime

4    and willfully participate in it.  Mere presence at the scene

5    of a crime, and even knowledge that a crime is being

6    committed, are not sufficient to establish that a defendant

7    either directed or aided and abetted the crime.  You must find

8    beyond a reasonable doubt that the defendant was a willful

9    participant and not merely a knowing spectator.

10        The word "knowingly" means that an act was done

11   voluntarily and intentionally and not because of mistake or

12   accident.

13        The word "willfully" means that an act was committed

14   voluntarily and purposely, with the specific intent to do

15   something the law forbids -- that is, with bad purpose either

16   to disobey or disregard the law.

17        You will note that the indictment charges that the

18   offenses were committed in or about or on or about certain

19   dates or periods.  The government does not have to prove with

20   certainty the exact date of an alleged offense.  It is

21   sufficient if the government proves beyond a reasonable doubt

22   that the offense was committed on a date reasonably near the

23   date or period alleged.

24        As I've told you before, you must make your decision

25   based only on the evidence presented in this case.  I

1    emphasize to you that you are here to determine whether the

2    government has proved beyond a reasonable doubt that the

3    defendant is guilty of the specific offenses charged in the

4    indictment.  You are not here to determine any other issues.

5            The question of punishment should never be considered

6    by the jury in any way in deciding the case.  If a defendant

7    is convicted, the matter of punishment is for the judge alone

8    to determine later.

9            Any verdict you reach in the jury room, whether it's

10   guilty or not guilty, must be unanimous.  In other words, in

11   order to return a verdict, you must all agree.

12           Your deliberations will be secret.  You will never

13   have to explain your verdict to anyone.

14           It is your duty as jurors to discuss the case with

15   one another in an effort to reach agreement, if you can do so.

16   Each of you must decide the case for yourself, but only after

17   full consideration of the evidence with the other members of

18   the jury.

19           While you are discussing the case, do not hesitate to

20   reexamine your own opinion and change your mind, if you become

21   convinced that you were wrong, but do not give up your honest

22   beliefs solely because the others think differently or merely

23   to get the case over with.

24           Remember, that in a very real way you are judges --

25   judges of the facts.  Your only interest is to seek the truth

1     from the evidence in the case.

2          When you go to the jury room, you should first select

3     one of your members to act as your foreperson.  The foreperson

4     will preside over your deliberations and will speak for you

5     here in the courtroom.

6          A verdict form has been prepared for your

7     convenience.  Actually, two verdict forms, one for each of the

8     defendants.  The one that happened to be on the top that I

9     picked up is Mr. Moore's.  It starts with the name of the

10    case, United States versus Alan Moore.  That's how you know

11    that this is his verdict, his name is up in the case style.

12    It has the case number.

13         Then it says, "We, the jury, unanimously return the

14    following verdict," because, as I told, your verdict must be

15    unanimous.

16         Then it has questions that are numbered to correspond

17    with the numbers of the counts in the indictment, and you will

18    be able to identify the specific allegations in the indictment

19    because you will have a copy of it.

20         This one starts:

21         "1(a).  As to the first offense charged in Count One,

22    conspiracy to commit the offense of bribery, we find the

23    defendant, Alan Moore --" there is a box for "guilty" or "not

24    guilty."

25         And then there is an instruction, because this is one

```
 1   of the offenses that has a lesser-included offense.  So, in
 2   italics after that it says, "If your answer to Question 1(a)
 3   is guilty, please skip 1(b)."  Obviously, if you find him
 4   guilty on the bribery charge, then you don't get to the
 5   lesser-included offense of conspiracy to accept illegal
 6   gratuity.
 7             The instruction goes on:
 8             "If your answer to Question 1(a) is not guilty,
 9   please answer Question 1(b).
10             "Question 1(b):  As to the lesser-included offense
11   under Count One, conspiracy to accept illegal gratuities, we
12   find the defendant, Alan Moore --" again a block for "guilty"
13   or "not guilty."  Then the instruction says, "Please proceed
14   to Question 1(c)."
15             You answer 1(c) no matter what you did with 1(a) and
16   1(b).
17             "1(c):  As to the second offense charged in Count
18   One, conspiracy to commit the offense of witness tampering, we
19   find the defendant, Alan Moore --" again, a block for "guilty"
20   or "not guilty."  And an instruction, "Please proceed to
21   Question 16."
22             I should clarify here the reason for these questions,
23   the conspiracy that is charged in the indictment is all in
24   Count One.  That's the one conspiracy that's charged, and you
25   would only convict a defendant if you found that he was guilty
```

1   of the conspiracy charged in the indictment.  Because you have

2   to unanimously agree on any object, I have split this into

3   two, so that you have the question about the object being

4   bribery, lesser-included illegal gratuity, and the separate

5   question of whether there was a conspiracy to commit the

6   offense of witness tampering.

7           To understand the conspiracy that's charged, though,

8   you look back at Count One, that's the conspiracy.  You would

9   only convict the defendant if you found that he was guilty of

10  the indictment that's described there.  Then you answer the

11  question with respect to each of the separate objects.

12          "Question 16:  As to the offense charged in Count 16,

13  bribery related to Inmate Sabrina Bowie, we find the

14  defendant, Alan Moore --" "guilty" or "not guilty."

15          Again, there is an instruction that basically tells

16  you to skip 16(a), the illegal gratuity question if you

17  convicted him of bribery.  If you acquitted him of bribery,

18  you answer that question.

19          "Question 17:  As to the offense charged in Count 17,

20  tampering with witness Shirley Blackston, we find the

21  defendant, Alan Moore --" "guilty" or "not guilty."

22          Then it ends up by saying, "So say we all this,

23  blank, day of November 2006, in Tallahassee, Florida," and

24  there's a signature line for the foreperson.

25          Mr. Dixon's verdict form is identical, except that

1    the bribery counts have different numbers and different

2    inmates involved.  Those are described in the form.  The same

3    with witness tampering.  It gives you the name of the inmate.

4    I described those for you in my instructions when I was

5    describing those counts.

6         You'll have in the jury room the verdict forms that I

7    just described with you.  I'm going to send one of each of

8    these back there.  If you decide that it will be helpful to

9    have 12 copies, if you just give a note to the court security

10   officer, he'll bring it to me, and we'll get you 12 copies.

11   The only thing I tell you about that is, it's kind of like

12   checks, I only want one signed.  So, you can have the others

13   to look at, but there's only one that is the actual verdict.

14   So, just fill out the one and have the foreperson sign that

15   one and bring it back when you've reached unanimous agreement.

16   Don't have more than one for each defendant, so actually

17   two -- one for Mr. Dixon and one for Mr. Moore.

18        You also will have a copy of the indictment, you'll

19   have all of the exhibits that have been admitted into

20   evidence, and you'll have a copy of these instructions that I

21   have been through with you.

22        When you have reached unanimous agreement, have your

23   foreperson fill in, sign and date the verdict form, and tell

24   the court security officer that you have reached a verdict.

25   Don't give him the verdict forms.  Your foreperson will bring

1   those back when you are brought back into the courtroom, and

2   we will receive the verdict from you right here in open court.

3          If you should desire to communicate with me at any

4   time, please, write down your message or question and pass it

5   to the court security officer.  He will bring it to my

6   attention, and I will respond to you as promptly as possible,

7   either in writing or by having you return to the courtroom so

8   that I may address you orally.

9          I caution you, however, with regard to any message or

10  question you might send that you should not tell me your

11  numerical division at the time.

12         At this point, of course, you may take your pads with

13  you.  And then, if you counted, you may have noticed there are

14  14 of you.  The jury actually consists of 12.  The two of you

15  on the back row on the far left, you're the alternates.  So,

16  if you would, just stay right there.

17         The other 12, ladies and gentlemen, you may now

18  retire to deliberate your verdict.

19     (The jury exited the courtroom at 11:42 a.m.)

20         You may be seated.  I'm going to talk to the

21  alternates in just a second.  Bear with me for a second.

22         Are there any objections to the instructions other

23  than those already set forth on the record?

24         MR. FINDLEY:  No, Your Honor.

25         MR. HARPER:  No, Your Honor.

1    MR. SPROWLS:  No, sir.

2    THE COURT:  I would ask the attorneys for each party

3 to review the exhibits as compiled by the courtroom deputy

4 clerk to make sure that everything is there that should be and

5 nothing is there that should not be.  If you will go ahead and

6 start that, I'll talk with the alternates.

7    I always find myself apologizing to alternates.  You

8 have put in five good days of work, or four and a half good

9 days of work.  I do watch you as you watch the trial.  I know

10 how closely you paid attention.  You do all of this good work;

11 and, then when it's time to make a decision, you don't get to

12 go back, and that's unfortunate.

13    I hope you understand why it is we have to have

14 alternates.  Jurors get sick, family members get sick,

15 emergencies come up.  If something came up during the trial

16 and we didn't have 12 jurors to go forward, we would have to

17 start over.  That would not be a good thing for a lot of

18 reasons.  Trials are expensive, and I don't mean in money,

19 although they are expensive in money, too, but they're

20 expensive in time, effort and mental anguish for all

21 concerned.  It's much better if we don't have to start all

22 over.  It's also better, frankly, if witnesses come and

23 testify at one trial.  If you wind up doing it again, then

24 they've been through it, and it's just not as spontaneous,

25 it's not as good.

1    You may have noticed we are fairly close in time to

2  when these events occurred.  The case was brought in June, and

3  here we are trying the case.  Part of the reason we are able

4  to keep up is we don't have too many times where we have to

5  start over.  So, there's a lot of reasons why it's just best

6  not to have to start over.

7    That means we have to inconvenience people to serve

8  as alternates, and that's what you have done here.  I have had

9  cases where the alternates went back and deliberated and

10  decided the case, because something came up with other jurors.

11  So, it's something that we have to do.  I very much appreciate

12  your good service.

13    You won't be called again for federal jury duty until

14  our next two-year cycle.  We operate two years at a time.  The

15  two years are tied to the federal government fiscal year.  The

16  the next -- we're about halfway through this two-year period.

17  You won't be called before October 1st of 2007.  You had

18  exactly the same chance as every other registered voter in

19  this eight-county area to get on our master jury wheel for

20  this 2-year period.  That will be true for the next 2 years,

21  too.  The fact that you were on this jury has nothing to do

22  with it.  It will be random all over again.

23    That's the federal system, not the state system.  You

24  could have a state jury summons in the mailbox when you get

25  home.  If you are summoned in the state system or if you're

 1    summoned in any future 2-year period in federal court, I hope

 2    you again will respond as conscientiously as you did this

 3    time.  You have rendered an important public service.

 4         Finally, let me say something to you about people

 5    contacting you about the case.  You never have to talk with

 6    anybody about your experiences as a juror.  I have asked you,

 7    told you, instructed you, not to talk about the case while you

 8    are serving on the jury.

 9         Once there has been a verdict returned in the case,

10    that instruction will no longer apply.  At that point you are

11    free to talk with people, if you want to.  You never have to.

12    I would ask that you continue not to talk with anybody about

13    the case until you find out that a verdict has been returned.

14    For a lot of reasons, it's much better if you don't talk to

15    anybody.  So, please, continue to abide by the instruction not

16    to talk to anybody until you find out that a verdict has been

17    returned.

18         The courtroom deputy clerk will give you a phone

19    number where you're welcome to call the clerk's office to find

20    out.  In this case, the verdict will be reported in the media,

21    so you'll know that way when a verdict has been returned, and

22    at that point the instructions don't apply any longer.

23         Finally, if there is anything we could have done to

24    make your experience better -- I know it's a burden to call

25    that number and not to know what day you're coming in.  I

1    haven't been able to solve that problem, because I don't know

2    how many cases are going to trial when.  But if you can think

3    of a way to solve that problem, or if there's anything we

4    could have done to treat you better, please call me.  I would

5    be happy to hear from you, and we will try to do this the best

6    we can.

7             And with that, I won't keep you longer, but let me

8    get the courtroom deputy to give you that phone number.

9             Have the attorneys reviewed the exhibits?  Do you

10   agree that everything is there that should be and nothing is

11   there that should not be?

12           MR. FINDLEY:  Yes Your Honor.

13           MR. HARPER:  Yes, Your Honor.

14           MR. SPROWLS:  Getting there.

15           THE COURT:  Still working on it.  Okay.

16     (Pause.)

17           MR. SPROWLS:  It appears to be correct, Judge.

18           THE COURT:  All right.  With all sides having signed

19   off on the compilation of the exhibits, those will go back.

20   Also will go back, the instructions, the indictment, redacted

21   only to remove the forfeiture count, and the verdict forms.

22           MR. HARPER:  Your Honor, if it please.  We talked

23   earlier in the trial about a possible Deluna issue.  I wanted

24   to be sure the record reflected that Mr. Moore and I discussed

25   this at some length, and felt we could adequately defend the

1    case without getting to that point of possible creating or

2    inducing a mistrial, and that we waive that knowingly and

3    together.

4            THE COURT:  All right.  Thank you.

5            What else, if anything, do we need to do?

6            MR. SPROWLS:  Not aware of anything further, Judge.

7            MR. HARPER:  Nothing on behalf of Mr. Moore, Your

8    Honor.

9            THE COURT:  All right.  We will be in recess until we

10   hear from the jury.

11           Let me say this to the attorneys:

12           My rule basically is you need to be within

13   10 minutes.  So, if you will give a cell number to the

14   courtroom deputy clerk, I don't insist that you stay in the

15   courthouse, but if we get a note from the jury or a verdict,

16   you ought to be where you can be here in 10 minutes.

17       (A recess was taken at 11:51 a.m.)

18       (The proceedings resumed at 2:20 p.m. in the Judges'

19   Conference Room.)

20       (Defendants not present.)

21           THE COURT:  Keep your seats.

22           We have a note from the jury:

23           "Judge, do we have to be unanimous for not guilty?

24   Does the verdict have to be 100 percent guilty or 100 percent

25   not guilty for each question?"

1        And then it says, "If we don't agree --" which seems

2    to be just kind of floating, so I'm not sure what that thought

3    is.

4        I drafted a response.  (Handing.)

5        MR. SPROWLS:  They had a little difficulty spelling

6    "unanimous" here.

7        MR. HARPER:  I have that problem myself.  Thank

8    goodness for spell check.

9        MR. SPROWLS:  No problem.

10        MR. FINDLEY:  I saw that.  I have no problem with

11    that.

12        MR. HARPER:  Can I see it?

13        MR. FINDLEY:  Oh, sorry.

14        I think this is an appropriate response.

15        THE COURT:  Is an appropriate response?

16        MR. FINDLEY:  Yes, it is.

17        MR. HARPER:  I have no objection.

18        THE COURT:  Okay.  Then, with everybody's consent,

19    I'm going to send back a note that says:

20        "Any verdict on any count must be unanimous.  So, you

21    must all agree in order to return a guilty verdict on any

22    count, and you must all agree in order to return a not guilty

23    verdict on any count."

24        I've signed that.  It will go back to the jury,

25    together with their note, and we will wait to hear from them

1    further.

2            MR. FINDLEY:  Thank you.

3            MR. SPROWLS:  Thank you.

4       (A recess was taken at 2:20 p.m.)

5       (The proceedings resumed at 6:15 p.m.)

6       (Defendants present; jury not present.)

7            THE COURT:  Please be seated.

8            I'm told we have a verdict.  I did not deliver to the

9    jury the note about schedule being up to them.  Before I did

10   that, I was told there was a verdict.

11           Are we ready for the jury?

12           MR. HARPER:  Yes, Your Honor.

13           THE COURT:  Jury in, please.

14           Let me make this announcement for everybody in the

15   courtroom as I try always to remember to do in every case.

16           When the verdict is announced, there should be no

17   outward reaction, no audible or visual reaction, from anyone

18   here.

19           If you don't think you can receive the verdict with

20   the decorum expected in the United States District Court, the

21   time to leave is now.  If you stay, I'll expect everybody to

22   abide by that instruction.

23       (The jury entered the courtroom at 6:17 p.m.)

24           All right.  You may be seated.

25           Will the foreperson please stand?

1       I understand you have reached a verdict; is that

2   correct?

3       THE FOREPERSON:  Yes, we have.

4       THE COURT:  Please provide it to the court security

5   officer, and you may be seated.  Thank you.

6       All right.  This is the verdict in United States of

7   America versus Gregory Dixon:

8       "We, the jury, unanimously return the following

9   verdict:

10      "Question 1(a):  As to the first offense charged in

11  Count One, conspiracy to commit the offense of bribery, we

12  find the defendant, Gregory Dixon, not guilty.

13      "1(b):  As to the lesser-included offense under Count

14  One, conspiracy to accept illegal gratuities, we find the

15  defendant, Gregory Dixon, guilty.

16      "1(c):  As to the second offense charged in Count

17  One, conspiracy to commit the offense of witness tampering, we

18  find the defendant, Gregory Dixon, not guilty.

19      "Number 9:  As to the offense charged in Count Nine,

20  bribery related to Inmate Shonnie Daniels, we find the

21  defendant, Gregory Dixon, guilty."

22      In accordance with the instructions of the court,

23  Question 9(a) is not answered.

24      "Question 10:  As to the offense charged in Count

25  Ten, bribery related to Inmate Sabrina Bowie, we find the

1    defendant, Gregory Dixon, guilty."

2          In accordance with the instructions, Question 10(a)

3    is not answered.

4          "Question 11:  As to the offense charged in Count 11,

5    bribery related to Inmate Demetrus Coonrod, we find the

6    defendant, Gregory Dixon, guilty."

7          In accordance with the instructions, Question 11(a)

8    is not answered.

9          "Question 12:  As to the offense charged in Count 12,

10   tampering with witness Latoya Brown, we find the defendant,

11   Gregory Dixon, not guilty.

12         "So, say we all this 3rd day of November, 2006, in

13   Tallahassee, Florida."

14         The verdict is signed by the foreperson.

15         Now, this is the verdict in United States of America

16   versus Alan Moore:

17         "We, the jury, unanimously return the following

18   verdict:

19         "As to the first offense charged in Count One,

20   conspiracy to commit the offense of bribery, we find the

21   defendant, Alan Moore, not guilty.

22         "1(b):  As to the offense --"

23         I'm sorry.

24         "Question 1(b):  As to the lesser-included offense

25   under Count One, conspiracy to accept illegal gratuities, we

```
 1   find the defendant, Alan Moore, guilty.

 2           "1(c):  As to the second offense charged in Count

 3   One, conspiracy to commit the offense of witness tampering, we

 4   find the defendant, Alan Moore, not guilty.

 5           "16:  As to the offense charged in Count 16, bribery

 6   related to Inmate Sabrina Bowie, we find the defendant, Alan

 7   Moore, not guilty.

 8           "Question 16(a):  As to the lesser-included offense

 9   under Count 16, accepting an illegal gratuity from Inmate

10   Sabrina Bowie, we find the defendant, Alan Moore, guilty.

11           "17:  As to the offense charged in Count 17,

12   tampering with witness Shirley Blackston, we find the

13   defendant, Alan Moore, guilty.

14           "So say we all this 3rd day of November, 2006, in

15   Tallahassee, Florida."

16           The verdict is signed by the foreperson.

17           Members of the jury, in accordance with the standard

18   procedure followed in this court, the clerk is now going to

19   the poll the jury -- that is, to ask each of you individually

20   if these are your verdicts.

21           We've -- you had other numbers for other purposes

22   earlier in the process.  For this purpose you're going to get

23   a new number.  It's just going to be 1 through 6 across the

24   front row and 7 through 12 across the back row, going left to

25   right each time.
```

1    The clerk will please poll the jury.

2    DEPUTY CLERK:  Juror Number 1, is this your verdict?

3    JUROR NUMBER 2:  Yes.

4    DEPUTY CLERK:  Juror Number 2, is this your verdict?

5    JUROR NUMBER 2:  Yes.

6    DEPUTY CLERK:  Juror Number 3, is this your verdict?

7    JUROR NUMBER 3:  Yes.

8    DEPUTY CLERK:  Juror Number 4, is this your verdict?

9    JUROR NUMBER 4:  Yes.

10    DEPUTY CLERK:  Juror Number 5, is this your verdict?

11    JUROR NUMBER 5:  Yes.

12    DEPUTY CLERK:  Juror Number 6, is this your verdict?

13    JUROR NUMBER 6:  Yes.

14    DEPUTY CLERK:  Juror Number 7, is this your verdict?

15    JUROR NUMBER 7:  Yes.

16    DEPUTY CLERK:  Juror Number 8, is this your verdict?

17    JUROR NUMBER 8:  It is.

18    DEPUTY CLERK:  Juror Number 9, is this your verdict?

19    JUROR NUMBER 9:  Yes.

20    DEPUTY CLERK:  Juror Number 10, is this your verdict?

21    JUROR NUMBER 10:  Yes.

22    DEPUTY CLERK:  Juror Number 11, is this your verdict?

23    JUROR NUMBER 11:  Yes.

24    DEPUTY CLERK:  Juror Number 12, is this your verdict?

25    JUROR NUMBER 12:  Yes.

1          THE COURT:  Members of the jury, I want to end with

2    you where I started at the beginning of the day Monday

3    morning -- it seems like a long time ago now, I'm sure -- and

4    that's by saying, again, thank you very much for being here.

5    I do watch you as you watch the trial.  I know how closely you

6    paid attention.  And one can tell from the verdict and the

7    time you've spent on it that you took it very seriously,

8    worked at it, looked through each of the counts, and looked at

9    them individually, exactly as you were supposed to do.

10          I very much appreciate your good hard work and your

11   conscientious effort in doing this.

12          You heard my comments about the jury system at the

13   beginning of the jury-selection process.  I won't repeat those

14   for you, but I did mean what I said about 12 heads being

15   better than one, and you having a better ability than I would,

16   particularly in a case like this.  I think there is no

17   question in my mind that I trust the collective wisdom and the

18   ability of the 12 of you to get through this evidence and make

19   a decision, more than I would trust my own.  So, I very much

20   appreciate your good hard work and willingness to do that.

21          Let me tell you one thing about any future federal

22   jury service.

23          You got here, picked completely at random.  We work

24   on a 2-year cycle.  At the beginning of the 2 years, we

25   decided we might need -- how many jurors we might need in all

1   of the cases that will go to trial.  I think it was one out of

2   every ten registered voters.  You got chosen at random to get

3   on what we call our master jury wheel, and then you came in

4   for that jury-selection process.

5           You will not be asked to come back again during this

6   2-year period.  You have completed your service.

7           In the next 2-year period and every 2 years after

8   that, it will again be a completely random process.  The fact

9   that you were on this jury will not have anything to do with

10  it.

11          If you again are called in some further 2-year

12  period, or if you are called over in the state system, where

13  they have a completely separate system, I hope you will,

14  again, will respond as conscientiously as you did this time.

15  You have rendered an important public service.

16          If you have any comments about anything we could have

17  done to treat you better -- there is a certain burden that

18  goes with this, I couldn't change that, but -- if there is

19  something we could do in this process to make your service

20  easier or better for you, please call me and let me know.  I

21  would be happy to hear from you.

22          Then, finally, my instruction to you not to talk

23  about the case ends at this point.  So, you are no longer

24  under the instruction not to talk about the case.  You never

25  have to talk about the case with anybody.  In Florida the

1   rules that govern lawyers provide that they cannot contact

2   you.  That's a rule put in to keep you from being burdened

3   further.  You have done enough at this point.  So, if -- and

4   this case has been in the press and in the media.  So, you may

5   be asked about it, if people find out that you were on this

6   jury.  You are always welcome to respond that you don't want

7   to talk about it or you can.  It's entirely up to you.

8        And the same goes, if you should be contacted by

9   anybody from the press or media, you can talk, but you

10  certainly don't have to.

11       I should tell you that the questionnaires that you

12  filled out and so forth, those don't become public records.

13  Those are used just in the jury-selection process.  And, in

14  fact, we don't disclose the names of jurors who have served on

15  cases.  So nobody can come down Monday and find out who the

16  jurors were in the case.  If they were in the courtroom, of

17  course, we used your names, and they know who you were.  But

18  it doesn't become part of the record.

19       Again, thanks very much for your service.  I won't

20  keep you further.  You have put in a good, long day's work.  I

21  know it's inconvenient for a couple of you that had travel

22  arrangements and child arrangements.  I appreciate you

23  rearranging things to be here and provide this service.

24       Thank you very much.

25       Jury out, please.

1    (The jury exited the courtroom at 6:26 p.m.)

2         You may all be seated.

3         I adjudicate Mr. Dixon guilty of the lesser-included

4    offense on Count One, guilty on Counts Nine, Ten, and 11, not

5    guilty on Count 12.

6         I adjudicate Mr. Moore guilty of the lesser-included

7    offense on Count One, guilty on the lesser-included offense on

8    Count 16, and guilty on Count 17, all in accordance with the

9    jury's verdict.

10        Sentencing is set for Wednesday, January 10th, at

11   12:45.  I'm not sure I have a probation officer here.  That's

12   68 days.  The process takes 70.  Because of calendering

13   issues, it works better for me 68.  If the probation

14   department tells me that's an issue, it may be that this date

15   gets rescheduled.  But unless there is a separate order,

16   sentencing will be January the 10th at 12:45.

17        Mr. Dixon and Mr. Moore, the process that will go

18   forward at this point is this:

19        The probation officer will prepare a presentence

20   report.  That report is the first way I get information to

21   consider in connection with your sentencing.  If there is

22   information you would like me to have, tell it to the

23   probation officer so that she may consider including it in the

24   report.  If there are people you would like her to talk to,

25   tell her who they are and how to get in touch with them, so

1    she may consider doing that.

2           You've exercised your right to trial, and you will

3    have a right to appeal after the sentence is imposed.   You are

4    not required to talk about any of the facts of the case with

5    the probation officer at all.   But there will be some

6    questions about personal background and so forth -- things

7    that go into sentencing considerations -- that don't have

8    anything to do with the facts of the case.   You should

9    cooperate fully with the probation officer during that part of

10   the process.

11          You have the right to have your lawyer present when

12   you talk to the probation officer.   You don't have to do that,

13   it's entirely up to you, but it's a right that you do have.

14          When the report comes out, you should read it very

15   carefully.   If there is anything about that report that is not

16   completely true or if anything is left out, you need to let

17   your lawyer know that right away.   The court's rules have

18   strict time limits within which any objections to the

19   presentence report have to be made.   So, it's important for

20   you to read that report promptly and let your lawyer know of

21   any errors.

22          If there are objections, the lawyers for both sides

23   and the probation officer will try to sort out the situation.

24   If everybody is not able to agree, then I will resolve the

25   disputes at the time of the sentencing hearing.

1        Mr. Dixon and Mr. Moore have been on release.  What

2    says the government regarding continuation of release?

3        MR. DAVIS:  We have no objection to them being

4    released on the same terms and conditions.

5        THE COURT:  All right.

6        Mr. Dixon and Mr. Moore, you will continue on release

7    subject to the same conditions that you have been subject to

8    up until this point.  One of those conditions is that you be

9    present in court for any proceeding requiring your attendance.

10   The sentencing hearing I just set is one of those.

11       In addition, it would be a separate federal crime to

12   fail to appear for sentencing.  So, you make sure you are back

13   here January 10th at 12:45.

14       What else, if anything, do we need to do this

15   evening?

16       MR. SPROWLS:  I don't believe there is anything

17   further, Judge.

18       THE COURT:  Thank you all.  I thought the case was

19   extremely well tried by all of the lawyers.  So, thank you for

20   your good efforts.

21       We will be in recess.

22     (The proceedings adjourned at 6:31 p.m.)

23                 *   *   *   *   *   *   *   *

24

25

1  I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.  Any
2  redaction of personal data identifiers pursuant to the
Judicial Conference Policy on Privacy are noted within the
3  transcript.

4

5

6  s/Judy A. Nolton                          04/17/2007
Judy A. Nolton, RPR                          Date
7  Official U.S. Court Reporter

8

9

10

11                              INDEX

12                                                      PAGE

13  JURY CHARGE CONFERENCE                             993
CLOSING ARGUMENT BY MR. DAVIS                      1017
14  CLOSING ARGUMENT BY MR. HARPER                     1036
CLOSING ARGUMENT BY MR. FINDLEY                    1053
15  REBUTTAL ARGUMENT BY MR. DAVIS                     1077
JURY INSTRUCTIONS BY THE COURT                     1083
16  QUESTION FROM THE JURY                             1111
VERDICT                                            1113

17

18

19

20

21

22

23

24

25