### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION


UNITED STATES OF AMERICA,        )
                                 ) Case No.:  4:06cr36/RH
            Plaintiff,           )
                                 ) Tallahassee, Florida
vs.                              ) January 10, 2007
                                 ) 12:47 P.M.
GREGORY DIXON and ALAN MOORE,    )
                                 )
            Defendants.          )
_____ )



### TRANSCRIPT OF MOTION FOR NEW TRIAL AND SENTENCING PROCEEDINGS
### BEFORE THE HONORABLE ROBERT L. HINKLE,
### CHIEF UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:          Gregory R. Miller
                            United States Attorney
                            By:  ROBERT O. DAVIS
                                 P. ALAN SPROWLS
                                 Assistant U.S. Attorneys
                            111 North Adams Street
                            Tallahassee, Florida 32301


For the Defendant,          Messer, Caparello & Self, P.A.
Gregory Dixon:              By:  THOMAS MARSHALL FINDLEY
                                 SEAN SHAW
                                 Attorneys at Law
                            215 South Monroe Street
                            Suite 701
                            Tallahassee, Florida   32301


For the Defendant,          Harper & Harper Law Firm, P.A.
Alan Moore:                 By:  ROBERT AUGUSTUS HARPER
                                 ROBERT AUGUSTUS HARPER, III
                                 Attorneys at Law
                            325 West Park Avenue
                            Tallahassee, Florida   32301



1                    <u>P R O C E E D I N G S</u>

2        (Call to Order of the Court.)

3        (Defendants present.)

4            THE COURT:  Good afternoon.  Please be seated.

5            This is United States versus Alan Moore and Gregory

6    Dixon.  We're here for sentencing.  There is also pending a

7    motion from each defendant for new trial.

8            Is the government ready to proceed?

9            MR. DAVIS:  Yes, Your Honor.

10           THE COURT:  Is the defense ready to proceed?

11           MR. HARPER:  Yes, sir.

12           MR. FINDLEY:  Yes.

13           THE COURT:  Let's start with the motion.  I, of

14   course, read the motions and looked at them with some care.  I

15   will hear from you briefly, if you would like to be heard, in

16   argument on those motions.

17           MR. HARPER:  Your Honor, do you have any order or

18   sequence?

19           THE COURT:  It matters not to me.  You can go in

20   either order you choose.

21           MR. HARPER:  All right.  If it please, Your Honor, we

22   renew our motion for acquittal.

23           THE COURT:  Let me interrupt you for a second.

24       (Pause.)

25           All right.  Go ahead.

1           MR. HARPER:  Thank you, Your Honor.

2           Your Honor, we renewed our motions for judgment of

3    acquittal at the conclusion of the trial; and, if it please,

4    we would like to begin with those to begin with.

5           The first argument that I sort of roughly briefed out

6    was the fact that the gratuity count --

7           THE COURT:  Let me get you to use the microphone.  It

8    would be easier for me and the court reporter and everybody

9    else.

10          MR. HARPER:  Your Honor, I argued first that the

11   gratuity counts, in effect, resulted in a constructive

12   amendment to the charges, but in reviewing the law and

13   supplement, the research as we went along, it seems that the

14   United States Supreme Court has cases we cited that is pretty

15   definite as far as the strict construction to which this

16   theory of prosecution is subject.  And under the strict

17   scrutiny test, we would submit, I believe it's the *SunTrust*

18   case --

19          THE COURT:  *Sun Diamond*.

20          MR. HARPER:  -- *United States versus Sun Diamond*

21   *Growers*, 526 U.S. 398, that the government's responsibility

22   here has not been satisfied as far as the prosecution in this

23   case.

24          The thrust of what I think is the gravamen of the

25   case is that we argued first about value.  We argued secondly

1   that there is no official act here to be influenced.  That the

2   theory, as you very correctly explained during the course of

3   the trial, was that it's a reward theory for, and it seems

4   that the cases say, for an official work and not a reward for

5   an unofficial act, because that would take it into the

6   bribery, because there would be a *quid pro quo*.

7        And so under the *Sun Diamond* theory, we would submit

8   that the judgment of acquittal is well taken both as the

9   conspiracy count and to the gratuity count, 16, which

10  Mr. Moore was convicted of the lesser-included charge of

11  bribery.

12       THE COURT:  All right.

13       MR. HARPER:  If I can take it in segments, that would

14  be the first segment to the argument.

15       The second segment is on the judgment of the

16  acquittal as to Count 17, the tampering charge.  And I

17  incorrectly in the memo cited that it was in the redirect of

18  Ms. Shirley Blackston that she said it was for keeping her

19  mouth shut, but it was the direct testimony.  And when I

20  reviewed that and tried to get prepared today, I still did not

21  see the corrupt intent proven by the government; and, frankly,

22  I would say the government proved in that case the

23  lesser-included offense was to try to harass or try to

24  influence, not corruptly intimidate as set forth in the

25  indictment; and if anything was proven beyond a reasonable

1    doubt, it's a lesser-included offense under that statute.

2         THE COURT:  Well, Ms. Blackston testified that

3    Mr. Moore said to her, "This is for you not telling," and

4    provided her some cigars.

5         MR. HARPER:  She said, as I recall in the

6    government's case, Your Honor, and I believe that was on the

7    cross-examination --

8         THE COURT:  Well, evidence is evidence, so I don't

9    care whether it came on direct or cross.  That was her

10   testimony, was it not?

11        MR. HARPER:  I'm slightly disagreeing in this

12   respect:

13        She said that on direct -- I think she said that he

14   said, "If there's anything you want, just ask."

15        THE COURT:  Right.

16        MR. HARPER:  So, when I was asking the question, I

17   told you that he said "this," and that isn't what she said.

18   So, I don't submit that's what she testified to.  I understand

19   what you are saying.

20        THE COURT:  A fair understanding of her testimony was

21   that she said Mr. Moore told her, "this," indicating cigars,

22   is for you not telling.  And, if that's true, then that's

23   witness tampering.  Yes?

24        MR. HARPER:  If it's witness tampering and it's not

25   directly charged in the indictment, would be because there is

1   no corrupt intent shown.  It was 2 weeks after the alleged sex

2   conduct or more.

3         THE COURT:  I don't understand why there was not

4   corrupt intent.  You go to a witness and say, "Here's a

5   hundred dollars, don't testify."  Isn't that witness

6   tampering?  I mean, that's witness tampering, isn't it?

7         MR. HARPER:  Your Honor, I'm trying to say, maybe not

8   very well, but under the statute, looks like 1512, it looks to

9   me there is a degree of this offense; and, when you do it with

10  corrupt intent than just an intent to persuade, it is a lesser

11  degree, a one-year misdemeanor charge.  That's what I'm

12  saying.  If the government proved anything, it's nothing more

13  than a misdemeanor.

14        THE COURT:  All right.

15        MR. HARPER:  I think that's all I have on that

16  motion, Your Honor.

17        THE COURT:  All right.

18        Mr. Findley?

19        MR. FINDLEY:  Yes, sir.

20        Mr. Dixon also filed a renewal of motion for

21  judgment of acquittal or in the alternative motion for new

22  trial.

23        The first point that we intended to make in our

24  motion was that there was insufficient evidence of a single

25  conspiracy that was alleged in the indictment.  The single

1   conspiracy --

2         THE COURT:  Tell me, and this is to both sides, both

3   defendants have raised this question about the multiple

4   conspiracy instruction.  Identify for me the other conspiracy

5   supported by the evidence in this record.

6         MR. FINDLEY:  Well, at a minimum, Mr. Barnes got up

7   and testified to separate conspiracies that he had with

8   Ms. Hamlet, Ms. Daniels and Ms. Hartline.  So, potentially,

9   there are --

10         THE COURT:  Was Mr. Dixon involved in that?

11         MR. FINDLEY:  He was acquitted of the mail fraud

12   conviction that related to two of those, so he was not.  And

13   Mr. Barnes, from my recollection, did not put him in that.

14         THE COURT:  So, how could he have been convicted of

15   that?

16         MR. FINDLEY:  Well, their theory was that Barnes had

17   conspired with Dixon, and then there was just a landscape of

18   evidence that was thrown out there, and so the jury may not

19   have been able to see that; they may have felt he was involved

20   in some conspiracy, but not the conspiracy charged in the

21   indictment, and that's what the multiple conspiracy

22   instructions would have shown, hopefully.

23         THE COURT:  Not quite.  What the multiple

24   conspiracies instruction is intended to get at is this:

25         If the defendant participated in some other

1    conspiracy, not the one charged in the indictment, then the

2    defendant ought not be convicted on this indictment.

3         So, the multiple conspiracy instruction tells the

4    jury, look, if you find from this evidence that the defendant

5    was involved in some other conspiracy, not the one charged in

6    the indictment, you have to acquit the defendant.  Well,

7    that's certainly true.  So, my question to you is:

8         What was the evidence in this record from which the

9    jury could have convicted Mr. Dixon of some other conspiracy?

10   What conspiracy was Mr. Dixon involved in, according to this

11   evidence, that he might have improperly been convicted on?

12        MR. FINDLEY:  Our position is that there was no

13   evidence of any criminal conspiracy that Mr. Dixon was

14   involved in.  However, that argument of the government, he was

15   involved in that conspiracy, and that I think the court will

16   recall, they argued heavily that he was involved in this

17   so-called mail fraud conspiracy, of which he was acquitted by

18   the court.

19        So I think there is a danger, when the jury is

20   sitting there, they don't understand that it has to be this

21   conspiracy, and not potentially some other conspiracy.  There

22   is still that danger, although I understand what you are

23   saying about, there has to be proof of some other conspiracy.

24   I think, you know, we don't concede there is evidence of any

25   criminal conspiracy.

1          THE COURT:  Absolutely, and I understand that, and

2     that's the issue we put to the jury, basically, did he do it.

3     The government said yes, the defense said no, and that was the

4     issue in the case.

5          But on this multiple conspiracy instruction, I think

6     the law is, if there is no evidence of which the jury could

7     convict him of the conspiracy, there is no need to give a

8     multiple conspiracy instruction.  The reason I didn't give it

9     is because it adds a layer of confusion and complexity that

10    just doesn't belong.

11         MR. FINDLEY:  If the court didn't give that

12    instruction because the court found that there was no evidence

13    of no other conspiracy, then that's one thing.  But I think,

14    when the government has alleged in the superseding indictment

15    this single conspiracy involving these four multiple objects,

16    and then the evidence is sort of all over the place, it

17    operates to confuse the jury.  And that's our problem, and I

18    think that's the problem the Eleventh Circuit had in the *U.S.*

19    *versus Atkinson* case.  I think that's another case where they

20    talk about the government roaming the evidentiary landscape,

21    and the jury couldn't ferret out what conspiracy they were

22    talking about.

23         THE COURT:  Okay.

24         MR. FINDLEY:  That's our position on the conspiracy

25    counts.

1    With respect to the bribery counts, we would still

2  submit that there was no evidence of a *quid pro quo* exchange,

3  and I think that's -- it's a difficult distinction to make,

4  from my point of view, between the bribery statute and the

5  gratuity statute.  And I think in this case the jury's verdict

6  shows they struggled with it as well.

7    Coming back to the conspiracy with the accept illegal

8  gratuity, but then they have the substantive counts of

9  bribery, I think the proof has to be more clear, where there

10  was evidence of sex with the inmate and then evidence of gum

11  or cigars going, but not evidence of a direct *quid pro quo*

12  agreement.

13    THE COURT:  Let me ask about those.  With Ms. Coonrod

14  at least, what she said, Mr. Dixon asked her if she would be

15  willing to have sex for contraband, and then she had sex with

16  Mr. Dixon because she wanted contraband.  That's a *quid pro*

17  *quo*, isn't it, if you believe that testimony?

18    MR. FINDLEY:  If you believe that testimony, it's

19  possible, but I don't think that's enough.  I think that's

20  more in the nature, she did it because she -- because of his

21  official act, which is an illegal gratuity rather than an

22  illegal bribe.

23    THE COURT:  All right.  And then the other two

24  weren't quite as -- the testimony wasn't quite as clear as in

25  Ms. Coonrod's case, but the same kind of thing.  That's why

1    they said they had it, to get contraband.

2         MR. FINDLEY:  The other evidence, they had sex and

3    then they got contraband without any -- without any of those

4    type of expressions that Ms. Coonrod made.

5         The other issue we had on the bribery relates to our

6    motion for new trial would be that the indictment's allegation

7    was slightly different than the instruction, description of

8    the bribery.  In the indictment the allegation was that

9    Mr. Dixon was induced to, quote, provide contraband or a

10   failure to enforce federal statutes and Bureau of Prisons

11   regulations, end quote, in exchange for sex.  And then the

12   instruction, it simply says he was violating his duty as a

13   federal correctional officer.

14        THE COURT:  I have two questions about that.  You're

15   right.

16        MR. FINDLEY:  Can I state my theory?

17        THE COURT:  Sure.

18        MR. FINDLEY:  The problem we have with it is, if he

19   had sex with an inmate, that by itself violates his duty as a

20   federal correctional officer, and I don't think that that is a

21   situation where it's all in the same act that could be

22   sufficient for bribery.

23        THE COURT:  I think that's right, and I also -- that

24   is that, if that's all there was to it, if there is just sex

25   and nothing else, that's not bribery.  It has to be exchanged

 1   for something else.  That's certainly, it seems to me, to be

 2   right.

 3           The indictment is a little narrower, and I am almost

 4   certain that this issue was never raised with me.  I would

 5   have been more than happy to add a couple of words to the

 6   instructions, and I suspect the government would have said

 7   fine.  I don't think it would have made any difference to

 8   them.  Isn't just this a phrasing thing that you didn't bring

 9   up?

10           MR. FINDLEY:  We objected to the bribery instruction

11   and requested that the court employ the standard Eleventh

12   Circuit instruction.  I can't recall --

13           THE COURT:  Which by the way --

14           MR. FINDLEY:  -- how much detail we went into this

15   objection.

16           THE COURT:  In this respect, the standard instruction

17   would have had the same defect you're complaining about now,

18   right?  In this respect, my instruction was the same, a thing

19   of value, where you wanted it to be narrow to match this

20   particular indictment.

21           MR. FINDLEY:  To the indictment.

22           THE COURT:  But you don't disagree with my

23   recollection, this specific point wasn't ever made at the

24   trial.

25           MR. FINDLEY:  I don't have the transcript of the

1    charge conference, but I can recall objecting to the bribery

2    instruction, requesting a pattern, and I can say I disagree

3    with your recollection, but I don't have the transcript.

4           THE COURT:  It strikes me now that I would have

5    happily have changed it.  As I say, I don't know of any reason

6    why the government would disagree.  They are the ones that

7    wrote the indictment.  I doubt that they would have objected

8    to that language being included.

9           Let me go to the next step, and maybe you already

10   answered this.  My question was going to be:

11          What thing of value could there have been other

12   than -- or what violation of duty could it have been other

13   than bringing in contraband?  That was the government's whole

14   theory, and that's the way it was presented to the jury.  You

15   say the jury could have gotten confused and just having sex

16   was the violation of the duty, and that was a trade all by

17   itself.

18          MR. FINDLEY:  That's what the jury could be thinking.

19   Also --

20          THE COURT:  If the jury thought that, why did they

21   bring back an acquittal on the conspiracy to accept bribes?

22   If the jury accepted that theory, then the verdict on Count

23   One doesn't make any sense, does it?

24          MR. FINDLEY:  I can't follow that.  It seems to me

25   that, if they concluded that he exchanged -- that sex was

1    exchanged for a violation of a duty, I think that could

2    constitute either a conspiracy to accept gratuities or a

3    conspiracy to accept bribes or -- I'm not sure I follow your

4    line of argument there.

5         THE COURT:  If I understood your position, the

6    violation of duty -- let me back up and make sure I understand

7    the argument and put it in context.

8         It's a bribe to give an official something of value

9    in exchange for a violation of duty.  The indictment

10   identifies the violation of duty in this case as either

11   providing contraband or failing to enforce statutes and

12   regulations.  The instructions just refer to violations of

13   duty.  You say the instruction should have been more specific

14   to say that it couldn't be any violation of the duty, it had

15   to be provision of contraband or a failure to enforce statutes

16   or regulations.

17        So, the question is:

18        Okay.  How could the jury have convicted him?  What

19   violation of duty could they have found other than provision

20   of contraband?

21        That was the government's whole theory.  And you say,

22   well, the violation of the duty could be the act of having sex

23   because that's illegal, and I told the jury that was illegal.

24   So, the very fact that they had sex could automatically,

25   without more, could be a bribe, because they had sex and that

1   was a violation of duty.

2        Well, if the jury believed that, the single act of

3   having sex is always a bribe, because the officer has always

4   violated the duty, then the jury would have to return a

5   conviction on Count One, where they didn't.  So, obviously,

6   they didn't believe, every time you have sex, it is in

7   exchange for the duty -- of the duty not to have sex.

8        MR. FINDLEY:  There are additional potential

9   regulatory violations, other than having sex with the inmate,

10  that the jury could be confused about.

11       THE COURT:  What are those?

12       MR. FINDLEY:  They -- we objected when the government

13  put in all of the documents that had all of the regulatory

14  duties of the guards.

15       THE COURT:  Let's --

16       MR. FINDLEY:  That was one of the reasons we

17  objected.

18       THE COURT:  Let's don't go over the evidence, whether

19  the evidence was admitted or not admitted.  That's not what I

20  want to talk about.  I want to find out what is it that you

21  say the jury could have found that Mr. Dixon traded for sex.

22  You found the *quid pro quo*, that he traded a violation of duty

23  for sex.  That's what the jury found.  And you say, but it

24  might not have been the violation of duty alleged in the

25  indictment.

1          MR. FINDLEY:  Right.

2          THE COURT:  What violation of duty was it?  You say

3    maybe just having sex.

4          MR. FINDLEY:  I don't know what the jury is thinking.

5    There is no way I could possibly know that.  I know they

6    deliberated a long time.

7          THE COURT:  What could be --

8          MR. FINDLEY:  But -- and they had before them a

9    number of regulatory provisions that were to the -- I don't

10   know.  I can't --

11         THE COURT:  I'm not asking you to get in their minds.

12   On this evidence, what could they have found that was

13   violation of the duty that was not covered by the indictment?

14         MR. FINDLEY:  Allowing them to have contraband,

15   perhaps.

16         THE COURT:  Wasn't -- the indictment would cover

17   that.  That's a failure to enforce a statute or regulation.

18         MR. FINDLEY:  I can't, as I stand here, I cannot

19   pinpoint a violation that actually was committed by Mr. Dixon

20   that they could have concluded was an exchange.

21         THE COURT:  All right.

22         MR. FINDLEY:  The last thing, I think this is a

23   separate issue, but it does relate to the concept of a thing

24   of value.  I understand that there are decisions that say sex

25   can be a thing of value, but there is also case law that says

1  whether an intangible thing is a thing of value is based on

2  the donee's subjective intent, and I wanted to preserve that

3  argument, that there was no direct evidence of that.

4       THE COURT:  I did want to ask one question about

5  that.  This, again, is something there are cases that say,

6  basically, intangibles can be a thing of value and sex is a

7  thing of value.  Part of your argument is, it can be, but it

8  needs to go to the jury.

9       MR. FINDLEY:  Right.

10      THE COURT:  Which is different from Mr. Harper's

11  argument for Mr. Moore.  Mr. Harper says, it's not an issue

12  for the jury.  Sex isn't a thing of value.  As I understand

13  your position, you say I should have given it to the jury.  My

14  question of you is:

15      Did you raise that issue?  That's another one that I

16  doubt if the government would have cared.

17      MR. FINDLEY:  We objected to the instruction.  I

18  don't recall specifically raising that as an issue, but we did

19  object to the instruction and requested a pattern.

20      THE COURT:  All right.

21      MR. FINDLEY:  That's all I have.

22      THE COURT:  Mr. Davis or Mr. Sprowls, I think what I

23  need you to address is the gratuity conviction for Mr. Moore.

24      MR. DAVIS:  Your Honor, with regard to the gratuity

25  conviction for Mr. Moore, I believe the facts testified by

1    Sabrina Bowie indicated that she had sex with Mr. Moore.

2    There was no discussion at the time about any explicit *quid*

3    *pro quo*, but there was testimony during her redirect that she

4    would not have engaged in that sexual encounter had she had no

5    expectation of receiving contraband in return.  The testimony

6    developed at trial --

7            THE COURT:  She hoped that she would get something,

8    and she may have said she expected to get something.  Wasn't

9    the testimony also, that she never did get anything?

10           MR. DAVIS:  The testimony was she ultimately received

11   Black & Milds when she returned from the halfway house, as

12   part of the payment to be given to Shirley Blackston, to keep

13   her quiet.

14           Quote, I had sex with these men so they would bring

15   me contraband.  They never said no, or there was not a written

16   agreement or anything, but you don't have to explain.  It was

17   understood.  And that's over on 73 of the transcript.

18           THE COURT:  So, if I understand the issue, first, it

19   seems to me the issue is, you have a donor who gives something

20   to an official, hoping and expecting it will bear fruit, that

21   the donor will get something.  But the donor never does get

22   anything, and the donee never says, "I'm going to give you

23   something for this," the donee never does anything to

24   understand that the gift has had anything to do with any act

25   or failure to act.  That's what we have, isn't it?  Is that a

1   violation of the gratuity statute?

2        MR. DAVIS:  Except, Your Honor, the context in which

3   these transactions took place, and there was a lot of

4   testimony to this effect, and I think Shirley Blackston

5   testified to this.  Of course, it was understood, the more you

6   gave, the more you get back, and I believe that is a quote

7   from her testimony.

8        So, I think that the understanding that the court

9   recited has to be taken in the context of they engaged in the

10  illicit practice of having sex with the guards in order to get

11  contraband.  So, I think there is an explicit understanding,

12  it worked out that the contraband was given well after the

13  fact.  And I believe, as the court talked about, and the jury

14  looked closely at that, and that's why they convicted

15  Mr. Moore of the lesser-included offense of gratuity.

16       THE COURT:  And you say the testimony is that he gave

17  her cigars after -- candidly, I haven't gone back to read the

18  transcript.  I don't know how much of it is transcribed.  I've

19  got pretty detailed notes.  I've been back through those with

20  some care.

21       MR. DAVIS:  Your Honor, I believe the testimony is

22  that she had sex with Mr. Moore.  She didn't get anything from

23  Mr. Moore at that time.  She left and went to a halfway house.

24  When she returned from the halfway house was when she got the

25  contraband from Mr. Moore, and I can try to find the page

1   where she talked about it, but I think it was four or five

2   boxes of Black & Milds cigars, which she then --

3           THE COURT:  My notes say five or six, five or six

4   boxes.  But the same -- and she gave those to Ms. Bowie.  I

5   mean, to Ms. -- well, my notes say to Bowie.  It must have

6   been to Blackston.

7           MR. DAVIS:  Moore gave them to Bowie, and then

8   Bowie -- I believe her testimony is that she and another woman

9   taped them up underneath her bed and then --

10           THE COURT:  Abdula, she gave them to Abdula?

11           MR. DAVIS:  I believe so, yes.

12           THE COURT:  But you said something about

13   Ms. Blackston.  Was that connected with Ms. Blackston in some

14   way?

15           MR. DAVIS:  My understanding was that it came up in

16   the context of her confronting Mr. Moore about, "Is

17   Ms. Blackston blackmailing you?  Was she obtaining contraband

18   from you to keep quiet about our sexual liaison?"  And it was

19   during that conversation that Mr. Moore said, "Yeah, I didn't

20   want to tell you anything the first time, but, here, you take

21   these, I don't want to have anything to do with her."  My

22   recollection, Your Honor, I can try to go back and try to find

23   the actual citations for you.

24           THE COURT:  Okay.  But that sounds like it's even a

25   little further removed from the sex.

1          MR. DAVIS:  Well, I think there was a pretty rapid

2    intervening event where she left and went to the halfway

3    house, which disrupted the normal sequence of events in

4    prison, Your Honor.  But that certainly was her intent as she

5    testified.

6          THE COURT:  All right.

7          MR. DAVIS:  Otherwise, Your Honor, we would rely on

8    our pleadings and previous points that were made.

9          THE COURT:  All right.  Any rebuttal?

10         MR. HARPER:  Briefly, Your Honor.

11         Your Honor, on this separate multiple conspiracy

12   thing, there seems to be one fundamental problem that was

13   addressed early on in the case, and we came to the bench, as I

14   recall, and you said, to the effect, this indictment charges

15   an agreement among the officers, not the officers and the

16   inmates; and the government said something to the effect,

17   that's the way the indictment reads, Your Honor.

18         When you read the superseding indictment against the

19   original indictment, the biggest change has been consistently

20   in every paragraph there's a change from "the defendants" to

21   "conspirators."  And the predicate language of the indictment

22   on page 6 has the standard thing, "the defendants and others."

23   And I say that to get to the point of multiple conspiracies of

24   what conspiracies are multiple in my mind --

25         THE COURT:  Okay.  It seems clear to me that the

1   reason for that change in the language is that one of the

2   original defendants was a conspirator, but he died, and so he

3   wasn't here for the trial.  So, they don't refer any more to

4   "defendants," because that would have excluded Mr. Hill.  And

5   so the reference to "conspirators" includes Mr. Hill.

6          MR. DAVIS:  That is the case, Your Honor.

7          MR. HARPER:  But his name is taken out, and the jury

8   is left with an indictment and testimony from Barnes, which

9   said --

10          THE COURT:  Look.  Thank you, but this is rebuttal.

11   And I didn't ask -- they didn't say one word about multiple

12   conspiracies.  So, if you've got rebuttal, I want to hear it;

13   but, otherwise, I have read your stuff with care and I've got

14   your position.

15          MR. HARPER:  Okay.  And I'll certainly abide by what

16   you say, but the point I was simply trying to make is that it

17   looks like we're confusing conspiracy among the inmates as

18   opposed to the guards and inmates with a conspiracy among the

19   guards, and that was all I was going to say.

20          As far as this point here about the expectations and

21   hope, the five boxes, that came out in Blackston's testimony,

22   not in Ms. Bowie's testimony, and so the --

23          THE COURT:  Ms. Bowie talked about it, too.

24          MR. HARPER:  But she got hers from Ms. Blackston not

25   from -- and where Ms. Blackston -- I mean, yeah --

1   Ms. Blackston, and that doesn't say that she got it from

2   Mr. Moore; it doesn't say it was any give and take or any

3   exchange or any *quid pro quo*.

4           THE COURT:  All right.

5           MR. HARPER:  Thank you.

6           THE COURT:  Mr. Findley, any rebuttal?

7           MR. FINDLEY:  No rebuttal.

8           THE COURT:  I deny the defense motions in all

9   respects, except with respect to the substantive gratuities

10  count against Mr. Moore, Count 16 -- I believe that's Count

11  16.

12          MR. HARPER:  Yes, sir.

13          THE COURT:  I grant judgment of acquittal on that

14  count.  The *Sun Diamond* case does make clear that, under the

15  bribery statute, illegal gratuity statute, I should say, the

16  gratuity has to be given on an account of a specific act or

17  omission, not just by virtue of the officer's position.

18          This case is not as strong for the defense as the *Sun*

19  *Diamond* case.  It is different from *Sun Diamond*.

20          My conclusion, however, is the government's evidence

21  is not sufficient with respect to the relationship between

22  Ms. Bowie and Mr. Moore to constitute the giving of an illegal

23  gratuity.

24          The evidence was, and the jury was entitled to find,

25  that there was sex between them.

1    My conclusion is that there is insufficient evidence

2  that the sex was on account of any past act -- it clearly was

3  not -- and also not sufficient evidence that it was on account

4  of any future act.  Ms. Bowie hoped that she would get

5  contraband at some indefinite future time, but she never did.

6    The analysis is a little more complicated with an

7  omission than it is with an act.  It is a little more

8  complicated with a future omission than with a past omission.

9  The fact that it never happened is not controlling.  It can be

10 an illegal gratuity even if it never comes to pass.  The fact

11 that it's an omission, of course, doesn't matter because the

12 statute covers omissions.

13    Here, though, there is no evidence that Mr. Moore

14 engaged in this sex, accepted this gift, for or on account of

15 any act or omission.

16    Now, while I go through the rest of these, the

17 probation officer can make sure, when we get to the

18 sentencing, that that doesn't make any difference.  I'm not

19 sure -- I don't think that's going to make any difference in

20 the guidelines.

21    PROBATION OFFICER:  The quick analysis, it wouldn't.

22 The only thing that I can see that would change would be the

23 monetary assessment.

24    THE COURT:  The hundred dollar assessment for that

25 count, right.  Thank you.

1          Now, let me explain the ruling on the other motions.

2          First, there is some challenge to the inclusion of

3     the illegal gratuities conspiracy lesser-included instruction.

4     Mr. Dixon specifically asked for that, and Mr. Moore agreed

5     that that should be given.  I think the law is that it should

6     have been given.  An illegal gratuity is a lesser-included

7     offense of the bribery charge.

8          The analysis is a little complicated, more

9     complicated when it is a conspiracy situation, but my

10    conclusion is that a conspiracy to accept illegal gratuities

11    is a lesser-included offense of the charge of conspiracy to

12    accept bribes.  So, I think it was correct to give the

13    instruction.

14         I also think that, if it were deemed erroneous, it

15    would be an invited error, because it was specifically asked

16    for.  That's an important strategic decision in any case

17    whether to ask for a lesser-included instruction.  The

18    defendants made that decision here, one can't know whether

19    wisely or unwisely.  When the jury comes back on the

20    lesser-included, you don't know whether without it, he would

21    have been convicted of bribery or acquitted.  But my

22    conclusion is that it was right; and, in any event, it was

23    invited.

24         Mr. Moore also says there was insufficient evidence

25    of witness tampering with respect to Ms. Blackston.  I reject

1    that argument.  According to the evidence, Mr. Moore told

2    Ms. Blackston, if she ever needed anything, to let him know.

3    Then he brought her cigars.  She said he always had something

4    for her.  And she said that he said to her on one occasion,

5    when he was giving her something -- I think cigars -- that,

6    quote, this is for you not telling, end quote.

7           My conclusion is that that's sufficient to constitute

8    the offense of witness tampering, in accordance with the

9    jury's verdict.

10          Mr. Moore says more specifically there was no

11   evidence of any intent to delay an investigation, there was no

12   evidence that Mr. Moore knew he was under investigation, and

13   Mr. Moore says sex does not have value within the meaning of

14   the applicable statute.

15          I'll come back to that in connection with Mr. Dixon's

16   motion, but the law is that sex does have value, is a thing of

17   value within the meaning of the statute.  It is not required

18   that a defendant specifically know that he is under

19   investigation.  If a defendant threatens, intimidates or

20   corruptly persuades a person not to provide information to a

21   law enforcement officer, that constitutes the offense, even

22   when no investigation has started.  Indeed, the purpose of the

23   offense often is to prevent the initiation of an

24   investigation.

25          There was evidence from which the jury could find

1   here that the purpose -- that Mr. Moore's purpose was to

2   obstruct any investigation of the sexual relationship he had

3   had with Ms. Bowie.

4          I suggest in the questioning, the reason for

5   rejecting the motion for new trial based on the failure to

6   give a multiple conspiracies instruction, I don't think there

7   was evidence here from which the jury could have found that

8   there was a different conspiracy, not the one charged in the

9   indictment.

10          It is, of course, not required that the government

11   prove every detail of the conspiracy it charged.  The crux of

12   this trial is -- was whether there was the conspiracy charged

13   in the indictment, whether these officers cooperated,

14   implicitly agreed with one another to have sex with inmates,

15   to provide them with contraband in exchange.  There is no

16   chance that the reason for the verdict was that the jury found

17   that there was some other conspiracy.  The reason for this

18   verdict on Count One, the conspiracy count, is the jury

19   clearly found that there was an agreement, a mutual

20   understanding among these officers, just as charged in the

21   indictment.

22          Mr. Moore's motion also addresses the question of

23   whether the indictment should have gone to the jury.  The

24   instructions were very clear that the indictment was the --

25   was not evidence in the case.  I told them that the mail fraud

1    allegations related primarily to other defendants; that they

2    should not take those into account as part of the charge

3    against Mr. Moore.  There is no chance that the sending of the

4    indictment to the jury affected this verdict.

5         In some respects it's helpful to the defense.  It

6    shows the additional part of the charge that, as I told them,

7    was against the other defendants.  So they knew what

8    Mr. Barnes, for example, was charged with.  He was impeached

9    on the basis of what he been charged with, and what he was

10   trying to avoid as part of his testimony.

11        Mr. Dixon's motion asserts insufficient evidence of a

12   conspiracy.  I do think there was sufficient evidence from

13   which the jury could have found an agreement among the

14   officers to engage in this pattern of conduct in which inmates

15   had sex with officers, officers provided contraband.  That was

16   the charge, and the evidence of that was sufficient to go to

17   the jury.

18        The question for me, of course, on a motion for a

19   judgment of acquittal, is not whether it's the verdict I would

20   have reached, but whether a reasonable jury could have reached

21   this verdict on this evidence.

22        On the motion for new trial, the standard is, first,

23   that a new trial should be sparingly granted; that only when

24   the evidence will not support the -- or the weight of the

25   evidence is against the jury's verdict.  Only in those

1   circumstances should a new trial be granted.

2          I reject Mr. Dixon's argument that there was

3   insufficient evidence of bribery, specifically that there was

4   no *quid pro quo*.  As I indicated in my questioning,

5   Ms. Coonrod specifically said that Mr. Dixon asked her whether

6   she would be willing to have sex for contraband, and that she

7   said yes.  That's an explicit agreement for bribe.  She said

8   that she had sex with Mr. Dixon because she wanted contraband.

9   Ms. Daniels and Ms. Bowie each said when asked why they had

10  sex with Mr. Dixon, that they did it in order to receive the

11  contraband.  Ms. Daniels said it was to receive the

12  contraband, and she said she got it.  Ms. Bowie said she had

13  sex with Mr. Dixon because he brought her stuff; and she said

14  that she would not have had sex with him, if she did not think

15  she would get contraband as a result.

16         Mr. Dixon objects to the instruction on bribery as

17  not being limited to the purposes set forth in the indictment.

18  That relates not to Count One, where the indictment is as

19  broad as the statute, but to Counts, Nine, Ten and 11, where

20  the indictment says that the purpose was to induce Mr. Dixon

21  to provide contraband or to induce him to omit to enforce

22  statutes and Bureau of Prisons' regulations.

23         I would have given such an instruction had it been

24  asked -- had it been asked for.  I'm fairly certain that

25  Mr. Findley did not ask for such an instruction.  And I think

1   the reason why, when a very good lawyer doesn't ask for

2   something, it's generally because it doesn't make a

3   difference.  I think that's the case here.  I think had this

4   couple of words made any difference of substance, Mr. Findley

5   would have been on it immediately.

6          More general parts of the instruction did -- let me

7   back up.

8          So, the first point is the instruction wasn't asked

9   for, and there wasn't any objection to the phrasing as I gave

10  it.

11         Second, I clearly don't think it made any difference.

12  The only violation of duty asserted by the government or

13  supported by the evidence was providing the contraband.  So,

14  the failure to limit the violation to duty in the instruction

15  to providing contraband didn't make a difference.

16         Then Mr. Dixon also objects to the failure to give

17  the jury the issue of whether sex is a thing of value.  The

18  bribery statute refers to anything of value, and then later in

19  the same statute refers to a thing of value.  A thing of value

20  is an expression used by Congress in quite a number of

21  statutes.  The Eleventh Circuit has said that that has become

22  a term of art to the Congress.  The Eleventh Circuit said that

23  in *United States versus Nilsen*, N-i-l-s-e-n, 967 F.2d 539 at

24  page 542.

25         The Second Circuit has said that a thing of value,

1    when used in the criminal statutes, includes intangibles,

2    quote, such as amusement, sexual intercourse, a promise to

3    reinstate an employee and information, end quote.  That's in

4    *United States versus Girard*, 601 F.2d 69, at page 716.  *Girard*

5    didn't involve sex, that's dicta in that respect, but that's a

6    description of what the Second Circuit said.

7         The Eleventh Circuit also has made clear that

8    intangibles are covered by the phrase.

9         The only real question is whether sex is always a

10   thing of value as a matter of law or whether that question

11   should have been submitted to the jury.

12        Mr. Dixon didn't ask that the question be

13   specifically submitted to the jury; again, perhaps because it

14   didn't matter.  The instructions did indicate that there had

15   to be a trade, and the instructions very clearly required a

16   *quid pro quo*.  That was the point of the sentence that was

17   seized on by the defense, was to emphasize that there had to

18   be a *quid pro quo*.  That is the issue raised by the defense

19   and the crux of the case on the bribery charge.  The

20   instructions well presented that real issue.

21        I can't tell you what would have happened had this

22   been raised, but I suspect I simply would have given the

23   instruction, and I doubt the government would have objected.

24   The chance that the jury would have returned an acquittal had

25   I said, "In order to convict, you have to find that sex was a

1    thing of value, and that Mr. Dixon viewed it as a thing of

2    value," the chance that they would have acquitted on that

3    instruction based on that theory is zero.

4         Mr. Dixon risked his career and his freedom to have

5    sex with these women.  It would not make sense to find that it

6    had no value to him.

7         So, my conclusion is this wasn't requested, there was

8    no objection to the instructions as given, and that any error

9    in this respect was harmless.

10        Other cases supporting the conclusion that sex is a

11   thing of value within the meaning of the statute include

12   _McDonald versus State_, 57 Alabama Appellate 529.  It's a 1975

13   case where the court held that sexual intercourse or the

14   promise of sexual intercourse is a thing of value under the

15   state bribery statute.  And _Scott versus State_, 141 Northeast

16   19, a 1923 case from Ohio, to the same effect.

17        I don't know of any case to the contrary.

18        Anybody have anything else in these motions that they

19   want me to address specifically?

20        I think I've covered it; but, if there is something

21   else you want me to address specifically, please let me know.

22        All right.  Let's turn to sentencing.

23        The first thing I need to do on sentencing is to ask

24   both Mr. Dixon and Mr. Moore this:

25        Have you read your presentence report and the

1    addendum to it and discussed those with your lawyer?

2         Mr. Dixon, have you done that?

3         DEFENDANT DIXON:  Yes, sir.

4         THE COURT:  And Mr. Moore?

5         DEFENDANT MOORE:  Yes, sir.

6         THE COURT:  The presentence report makes a

7    calculation differently for each defendant, because they were

8    convicted of different offenses and different specific offense

9    characteristics would apply, but they come out to the same

10   place.  For each defendant, the Total Offense Level is 18, the

11   Criminal History Category is I.  That would produce a

12   guidelines range of 27 to 33 months.

13        There are objections to calculation of the guidelines

14   range.

15        In Mr. Moore's case, there is an objection to use of

16   the current guidelines manual.

17        There is an objection to using Section 2J1.2 for the

18   base offense level rather than 2J1.9.

19        There is an objection to the two-level increase for

20   obstruction under Section 3C1.1.

21        There is an objection to the increase in the offense

22   level based on vulnerable victim under Section 3A1.1(b); and,

23   more specifically, Mr. Moore says that that is somehow a

24   violation of the decision in *Blakely*.

25        And then Mr. Moore objects to the presentence

1    report's indication that the maximum penalty on Count One is

2    5 years rather than 2.

3            In Mr. Dixon's case, he objects to the failure to

4    give a reduction for acceptance of responsibility, and also

5    objects to the vulnerable victim provision.

6            Those are all of the objections that I know of.

7            Are there any objections to calculation of the

8    guidelines range other than those?

9            MR. FINDLEY:  No, Your Honor.

10           MR. HARPER:  No, Your Honor.

11           MR. DAVIS:  None from the government, Your Honor.

12           THE COURT:  All right.  I, of course, have the trial

13   record available.  Does any party have additional evidence to

14   offer on any of these?

15           MR. FINDLEY:  No additional evidence from Mr. Dixon.

16           MR. HARPER:  No evidence, Your Honor.

17           MR. DAVIS:  No evidence from the government.

18           THE COURT:  All right.  They are the defense

19   objections.  I will let you argue first and last.  You can

20   start with either one.  Mr. Harper?

21           First tell me about the guidelines manual.  I can't

22   tell if it makes any difference.  Is the 2004 manual more

23   favorable to the defense?

24           MR. HARPER:  Your Honor, I can't say that it is.  It

25   looked to me like it was the same.  The only difference that I

1   saw was that it referred me directly to the -- I tried to

2   spell it out here -- to 2X1.1, and I came on that through the

3   old guideline manual.

4           THE COURT:  All right.  That's next on the list

5   anyway.  So, let's figure it out.  You want me to use the

6   November 5th, 2003, book, the gray one?

7           MR. HARPER:  I think I have a brown one.  I'm not

8   sure.  Your Honor, as I look at the cover, it should be the

9   2003, because the cover says it starts with November 1st.  So,

10  yes, sir, it is the gray one.

11          THE COURT:  All right.

12          MR. HARPER:  The point I was trying to make there in

13  paragraph 40 was tracing the -- I tried to do the same thing

14  the probation officer did in calculating these guidelines;

15  and, as I used that manual, it took me off into accessory

16  after the fact and the underlying offense was payment to a

17  witness.  And when I tried to do that with the current

18  guidelines, I went pretty much the same way as Ms. Wilson did,

19  and so I --

20          THE COURT:  Don't you take the one that is greater?

21          MR. HARPER:  Sir?

22          THE COURT:  Don't you take the one that's greater?

23          MR. HARPER:  Take the one that's greater?

24          THE COURT:  Right.

25          MR. HARPER:  I thought you took the one that is

1   lesser.  In this respect, the one that is in effect at the

2   time of the offense, his offense conduct --

3       THE COURT:  Oh, I'm sorry.  I asked my question

4   poorly.  As between the two guidelines -- I mean, I think it's

5   going to be the same in either book, as far as I could tell,

6   it was the same in either book, but we'll use your book and

7   see if it comes out any better.  But I think that, when you're

8   back in 2X1.1, you use that if it would be higher, but not

9   otherwise.

10      MR. HARPER:  I see what you're saying.  When I went

11  to the tracing table, the Appendix A or the first appendix

12  there, that's where it looked like to me under the offense

13  conduct that the -- it referred me to 2X, and that's where I

14  went off.  Because it looked like to me that the original

15  presentence report didn't correctly capture the subparagraph

16  that was charged in Count 17 of the indictment.  You know, I

17  may have made a mistake, but I looked at it pretty hard.

18      THE COURT:  Walk me through what you want me to do.

19      MR. HARPER:  Sir?

20      THE COURT:  Walk me through what you want me to do.

21      MR. HARPER:  I would like you to use 2X3.1, and refer

22  then to Guideline 1J1.9, payment to the witness, and the base

23  offense level would be a Level 6.  The adjusted offense level

24  for nonacceptance of responsibility would be 8.

25      I'd take off two points for not vulnerable victims

1    for the reasons stated --

2           THE COURT:  Wait a minute.

3           MR. HARPER:  Okay.

4           THE COURT:  I may not have followed your argument.

5    You are giving me different numbers now than I had in the

6    written material, which is okay.  I just want to follow

7    through.

8           MR. HARPER:  I was trying to read from paragraph 40

9    from my objections to the presentence investigation report.

10   And one thing I see that is wrong is the page number I cited

11   there in paragraph 40 of the presentence investigation report.

12          THE COURT:  All right.  Look for me at 2J1.2.  That's

13   what applies to the obstruction of justice, which includes

14   this statute, right?  The statutory provisions include 1512?

15          MR. HARPER:  Yes, sir.

16          THE COURT:  All right.  And so, it says the base

17   offense level is 14.

18          MR. HARPER:  Yes, sir.

19          THE COURT:  Then down under C1, it says that the

20   offense involved obstructing the investigation or prosecution

21   of a criminal offense, this one does, apply 2X3.1, accessory

22   after the fact in respect to that criminal offense.  That's

23   what you want me to do.  Then it says, if the resulting

24   offense level is greater than that determined above, but it's

25   not.

1          MR. HARPER:  I see.

2          THE COURT:  So --

3          MR. HARPER:  I was --

4          THE COURT:  You lose either way.

5          MR. HARPER:  I was seeing the backside of that.

6          THE COURT:  Right.

7          MR. HARPER:  Okay.  I see.  Yes, sir.

8          THE COURT:  All right.  So that one I think the Base

9    Offense Level is 14, just as the presentence report has it.

10   And I was reading there from the November 2003 guidelines

11   manual, but I think it's exactly the same in the current one.

12   So, I think the presentence report is correct that the current

13   manual applies, because it doesn't make any difference.

14          All right.  Then 3C1.1, obstruction.

15          MR. HARPER:  Go there, is that what you are saying?

16          THE COURT:  Yes.  That's your next objection, right?

17          MR. HARPER:  Yes, sir.

18          THE COURT:  And you say it's being double counted

19   essentially.

20          MR. HARPER:  Your Honor, the -- I've made this

21   argument before, which you've considered and ruled against me.

22          The point there is that I'm saying that part of the

23   offense conduct is his -- Mr. Moore's alleged obstruction of

24   justice, and the fact that he defended himself, he should not

25   be punished by going to trial, and that it's already taken

1    into consideration by the nature of the conduct involved here.

2         THE COURT:   Okay.   I overrule that objection, also.

3    It's true that the charge, tampering with the witness is an

4    obstruction offense, and he wouldn't get the two-level

5    increase just because of that.

6         The two-level increase comes because of the testimony

7    he gave at the trial.   He, of course, is entitled to testify

8    or not testify, and he can't have his offense level increased

9    just because he went to trial or just because he testified.

10        My finding, though, is that he gave false testimony.

11   If the jury's verdict is correct, and I've upheld it as within

12   its sphere based on the evidence, then parts of Mr. Moore's

13   testimony were necessarily false.   It is true, of course, that

14   false testimony doesn't always constitute obstruction.   As the

15   commentary to the guidelines makes clear, defendants sometimes

16   can give testimony that is false for a variety of reasons --

17   confusion, mistake, faulty memory -- but, if a defendant

18   intentionally gives false testimony, then it does constitute

19   obstruction.

20        Mr. Moore testified that he never gave any contraband

21   to Ms. Blackston; that he never brought in contraband; that he

22   had no sex with anybody at the facility.   The jury convicted

23   him of the tampering charge.   Mr. Moore said he didn't do it.

24   I find that he intentionally gave false testimony.

25        MR. HARPER:   I understand.

1          Lastly, Your Honor, we objected to the vulnerable

2   victim, and it seems to me -- the one thing about the *Blakely*

3   issue, I don't rely on that very heavily, but it was raised by

4   the court, the Eleventh Circuit, in the *Sims* case, that there

5   was no special verdict; and that, of course, is an unreported

6   case.  And so that's the only reason I really even raised it

7   there in the last paragraph.

8          THE COURT:  Well, if that's so, then one of two

9   things must have been true of that case.  And I confess I

10  haven't gone back and read that case.  It either dealt with

11  the statutory maximum, so it's a drug case where it's an

12  amount, that was one of the amounts that increases the

13  statutory maximum, or it came out before *Booker*.  It has to be

14  one or the other.

15         Since *Booker*, it's clear that facts that affect the

16  guidelines but don't affect the maximum under the

17  congressionally-adopted statute don't have to go to the jury.

18         MR. HARPER:  It was one of -- it was a 2006 case.  It

19  didn't have any effect on the case, I don't think, but the

20  court just in passing noted that there was no special verdict

21  on the issue of vulnerable victim.

22         But the point that I feel like does have some merit

23  here is that this prosecution did not indicate at all that any

24  of these women or any of these alleged victims were any other

25  than a typical type of inmate, a typical type person, like a

1  bank employee that the Eleventh Circuit has specifically

2  addressed; and that the -- there's no indication that any one

3  of these women are particularly vulnerable or susceptible than

4  any other ordinary person.  And so -- or any other inmate or

5  any other person at the Federal Correctional Institution.

6          As indicated by the court, the provision 3A1.1 was

7  intended to apply when special vulnerability of the victim

8  makes the offender more culpable; and this is, in effect, if

9  you will, a run-of-the-mill case of alleged misconduct between

10  guards and inmates.  And even the cases in the Eleventh

11  Circuit, where there have been cases where guards and inmates

12  have been charged as co-conspirators, there was never any kind

13  of indication other than they just being ordinary victims.

14          So, we would say there has been a failure in showing

15  that there are any particular unique characteristics to set

16  these inmates apart to qualify for the vulnerable victim

17  consideration of 3A1.1.

18          THE COURT:  All right.  Mr. Findley?

19          MR. FINDLEY:  Yes, sir.

20          On behalf of Mr. Dixon, we have objected to paragraph

21  36, regarding acceptance of responsibility, credit was not

22  given.  I realize that it's only in rare instances in which

23  someone can actually go to trial and receive credit for

24  acceptance of responsibility, but it is within the discretion

25  of the court to make that judgment.

1          THE COURT:  Let me ask this, though, and you're

2    right, and I understand that a defendant can go to trial and

3    get acceptance of responsibility, when, for example, he admits

4    the facts, and just challenges the application of the statute

5    to those facts.  But here, one of the facts is whether he

6    traded sex for contraband, and I've never heard him admit

7    that.

8          MR. FINDLEY:  Well, here's our position on that:

9          What he did admit, I don't think is contested, he

10   admitted that he had sex with inmates, he admitted he provided

11   contraband.  You're right, he did not admit that he did it in

12   exchange.

13         THE COURT:  And, in fact, he denies that, and he's

14   going to appeal, and he's going to challenge the jury's

15   verdict on that on appeal, right?

16         MR. FINDLEY:  Could be.  We haven't made that

17   determination yet.

18         THE COURT:  Fair enough.

19         MR. FINDLEY:  But we are maintaining consistent

20   positions there, that he does contest that there was

21   sufficient evidence of a *quid pro quo* transaction.  But my

22   point, in terms of the acceptance of responsibility argument,

23   is that he should be entitled to credit because he admitted

24   significant facts that were enough for the jury to reach its

25   determination, and whether it's phrased in terms of a *Booker*

1    variance or a departure, or something toward the low end of

2    the guidelines, he did things that fulfilled the policy behind

3    giving someone credit for acceptance of responsibility.

4         He came in, despite there being no physical evidence

5    of sex with inmates, and he admitted that.  He admitted that

6    he had provided contraband.

7         The jurists have struggled long and hard over whether

8    something might be bribery, *quid pro quo*, or whether it might

9    be just an illegal gratuity.  When he was facing -- when he

10   came before the court for the first time, there were no

11   charges of illegal gratuity, just the charges of the multiple

12   object conspiracies, the bribery, and he admitted facts that

13   one could argue for long periods of time constituted illegal

14   gratuity or an illegal bribe.  And the jury deliberated for 7

15   hours, approximately, and found that he had committed three

16   substantive counts of bribery.

17        I would submit to the court that we don't have to

18   hold defendants to the standard of understanding completely

19   the application of these complexed statutes when we sometimes

20   debate them on and on, and the Supreme Court debates them,

21   such as in the Sun Diamond case, about how this is supposed to

22   apply in the complex maze of official actors.

23        And so I think that Mr. Dixon did admit substantially

24   all of the pertinent facts in this case, and we can't hold him

25   to the responsibility of knowing whether that would constitute

1  illegal bribery or illegal gratuity.

2          So, whether it's granting credit under 3E1.1, whether

3  it's recognizing this in some way and where he falls in the

4  range, or whether it's recognizing it in terms of a *Booker*

5  variance, we would just like for Mr. Dixon to have some credit

6  for having come forth, not trying to mislead anybody on the

7  jury, and admitted important facts to the real substantive

8  crimes that were alleged.

9          THE COURT:  All right.  My finding on this is that

10  the presentence report is correct, and that Mr. Dixon --

11  Mr. Dixon's offense level should not be reduced for acceptance

12  of responsibility under Section 3E1.1.

13          It is certainly true that he is in a different

14  position than someone who came in and denied having sex at

15  all.  He did admit that, and that makes a difference for

16  sentencing purposes.  So I will take it into account.  But

17  it's not acceptance of responsibility within the meaning of

18  3E1.1.

19          MR. FINDLEY:  The second objection that we made was

20  the same one Mr. Harper just argued, the --

21          THE COURT:  Right.

22          MR. FINDLEY:  -- vulnerable victim enhancement.

23          I would just add to what he said, there is a case,

24  *United States versus Frank*, out of the Eleventh Circuit that

25  talks about someone can't be considered to be vulnerable just

1    because they are in a particular class of persons.  So,

2    therefore, here, we don't believe that any of these so-called

3    victims should be called unusually vulnerable victims simply

4    because they are inmates.  There has to be evidence that the

5    defendant selected that person because they were unusually

6    vulnerable.  That's what _U.S. versus Frank_ says, and we don't

7    think there is any evidence to support that.

8              Secondly, we would submit that under --

9              THE COURT:  I think what _Frank_ said is the

10   determination that a defendant targeted a victim based on his

11   or her vulnerability to a particular crime must take into

12   account the totality of the circumstances, including in some

13   cases the victim's membership in a certain class or

14   occupation.

15             MR. FINDLEY:  Right, and then --

16             THE COURT:  It can't be the case that, if someone is

17   elderly and destitute, that that fact can't be taken into

18   account, because one could articulate a class of people who

19   are elderly and destitute.

20             MR. FINDLEY:  According to the Eleventh Circuit in

21   that case, that can only be taken into account if the

22   defendant selected that person for that reason.  So, I think

23   in a lot of cases where you're talking about telemarketing

24   fraud of the elderly, or something like that, that is

25   appropriate to take that into account.  But what the case very

 1   clearly says --

 2          THE COURT:  Fair enough.

 3          MR. FINDLEY:  -- it can't be considered vulnerable

 4   solely because you are in a certain class, and it did say

 5   that.

 6          THE COURT:  True.  Not every elderly, destitute

 7   person is a vulnerable victim.  That may be happenstance that

 8   they were the victim and that they also had those

 9   characteristics.

10          MR. FINDLEY:  And not every inmate should be

11   considered to be a vulnerable victim simply because of their

12   status.  There would have to be proof that the defendant

13   selected that person because he believed that they were

14   unusually vulnerable, according to the Eleventh Circuit.

15          The second aspect of that argument is one that I

16   don't think was raised by Mr. Harper directly, but it would

17   apply equally to Mr. Moore; and, that is, that in this case,

18   or especially in Mr. Dixon's case, you have a conspiracy to

19   accept illegal gratuities and three bribery counts.  If

20   somebody is giving an illegal gratuity or if they are giving

21   an illegal bribe, then they are a participant in an offense;

22   they have committed an offense, although they weren't charged

23   with it in this case, and those were the counts of conviction

24   for Mr. Dixon.

25          So, there is a case that we have cited to the court,

 1   *U.S. versus Wright*, where an individual recruited particularly

 2   vulnerable and destitute people to engage in a scheme to

 3   defraud the IRS by filing false tax returns and getting

 4   refunds.  The district court found that those were unusually

 5   vulnerable victims because of their circumstances, and the

 6   Court of Appeals reversed that and said, "*These are*

 7   *participants in the crime.*"

 8           So, we would also submit that in this situation --

 9   and you read some of the testimony, for example, from

10   Ms. Coonrod, "We had sex in order to get contraband," and then

11   the rest of the testimony from the inmates was that that

12   contraband was sold inside the institution at substantial

13   profits.

14           These aren't unusually vulnerable people.  They are

15   engaging in some type of a mutual criminal activity, according

16   to the government's theory and the testimony from those

17   inmates that sold the contraband, to -- they're participants;

18   and, under that circumstance, I don't think they can be

19   considered victims, much less unusually vulnerable victims.

20           THE COURT:  All right.

21           MR. FINDLEY:  We have some arguments under *Booker*.

22   Would you like me to wait and --

23           THE COURT:  Let me give you a ruling on the

24   vulnerable victim objection.

25           I find that the presentence report is correct, and

1  that the increase under 3A1.1(b) for vulnerable victim should

2  be applied in this case.

3       The test is the totality of the circumstances.  I

4  reject, though, the defense assertion that, in order to be a

5  vulnerable victim, an inmate has to be particularly vulnerable

6  when compared to other inmates.

7       My conclusion is that the women whom the defendants

8  had sex -- and in Mr. Moore's case, the victim of the -- the

9  witness with whom he tampered -- my conclusion is that those

10  are vulnerable victims within the meaning of the guidelines

11  provision.

12       It is true that one who gives a bribe commits a

13  crime, and in some circumstances would properly be viewed as a

14  participant in the offense and not as a victim within the

15  meaning of this guideline.  In other instances, that's not so.

16  It seems to me to depend on the totality of the circumstances.

17       An inmate is particularly susceptibility to this kind

18  of offense.  This is not a circumstance where these inmates

19  did anything to indicate that they wanted to give a bribe.

20  It's not an instance where they initiated the crime.  It is,

21  instead, an instance where these defendants picked the

22  inmates.  So that, even though the inmates gave a bribe, it

23  seems to me appropriate to view them as victims of the

24  offense.

25       I would go through the same analysis in any ordinary

 1   more traditional bribe situation.  Someone who paid a hundred

 2   dollars to a public official for an act might be the one who

 3   initiated the transaction, or it might have been shaken down.

 4   It just depends on what the circumstances are.

 5         A person might go to a public official and say,

 6   "Rezone my property, here's a hundred dollars I'll give you in

 7   exchange."  In that instance, that person it seems to me is a

 8   participant and not a victim.

 9         On the other hand, if the official says, "Your

10   property is coming up for vote, and you give me a hundred

11   dollars, you'll get it zoned properly," and the person pays a

12   hundred dollars under duress, I think that person is a victim

13   of the offense.

14         My conclusion here is that these inmates were

15   victims, and that they were vulnerable victims.

16         I cited the case law that supports that on the record

17   when I sentenced Mr. Barnes.  There are cases that support the

18   assertion that an inmate can be a vulnerable victim.  And I

19   would note that *United States versus Herbert*, H-e-b-e-r-t,

20   cited by Mr. Moore, had a holding the other way around.  The

21   holding there was that the parents of inmates were vulnerable

22   victims in that case.

23         Let's talk then about the sentence that should be

24   imposed.  I think I resolved all of the objections.

25         MR. DAVIS:  Your Honor, just as a point of clarity, I

1   may not have been listening closely, but the probation noted

2   in the case of Mr. Moore there was also an objection for

3   failure to accept responsibility.  I didn't hear Mr. Harper --

4            THE COURT:  I didn't have it on my list.

5            Mr. Harper, is there an assertion that Mr. Moore

6   should be given an increase for acceptance?

7            MR. DAVIS:  It was paragraph 92 in the --

8            MR. HARPER:  I think the only argument I had was that

9   he shouldn't be punished for going to trial.

10            MR. DAVIS:  If that's been ruled in the negative, I

11   just wanted to be sure --

12            MR. HARPER:  I thought it was covered by your ruling.

13            THE COURT:  Okay.

14            MR. DAVIS:  Thank you, Your Honor.

15            THE COURT:  Mr. Moore did not accept responsibility

16   within the meaning of 3E1.1.

17            All right.  I'll hear from -- Mr. Harper?

18            MR. HARPER:  Your Honor, we would like to present, if

19   it please the court, Mr. Moore and Mrs. Moore only as in the

20   way of additional evidence or allocution.

21            THE COURT:  She can speak, if she'd like to.  My only

22   request of people, if they're going to speak, is that you,

23   please, address the question of the day, which is the

24   appropriate sentence in the case, and do it as briefly as you

25   can, consistent with conveying the information that you think

1   would help me.

2          MR. HARPER:  Thank you, Your Honor.

3          May I ask a few questions to make the record clear,

4   Your Honor?

5          THE COURT:  You may.

6          Start for me, Ms. Moore, with your full name.

7          MS. MOORE:  Jacquelyn Crumby Moore.

8          THE COURT:  All right.

9          MR. HARPER:  And you are the wife of Defendant Alan

10  Moore?

11         MS. MOORE:  Yes, I am.

12         MR. HARPER:  And how long have y'all been married?

13         MS. MOORE:  Twenty-two years.

14         MR. HARPER:  And y'all have one child; is that right?

15         MS. MOORE:  One 18-year-old son.

16         MR. HARPER:  Okay.  And do you have a position or a

17  recommendation to the court as to the appropriate disposition?

18         MS. MOORE:  I don't understand the question.

19         MR. HARPER:  Do you have something you want to say to

20  the judge about the right sentence or what you think would be

21  the right sentence for Mr. Moore?

22         MS. MOORE:  Yes, I do.

23         MR. HARPER:  Will you please go ahead.

24         MS. MOORE:  Your Honor, I stand on behalf of my

25  husband, Alan Moore, to just ask you to please have mercy on

1   him.  He's a perfect father, perfect husband to me.  I sat and

2   I listened at the trial the whole time, I was always here, and

3   I listened at everything that was said, and I still stand for

4   Alan Moore.  I stand for everything that he does.  He's my

5   husband, he's my partner, and he's my son's father.  And I

6   just ask you to, please, have mercy on him.

7            THE COURT:  All right.  Thank you.

8            MR. HARPER:  And Mr. Moore, Your Honor.

9            THE COURT:  Mr. Moore?

10           DEFENDANT MOORE:  Your Honor, I've read the

11  presentence investigation report, and I know there is

12  questions about my integrity and my credibility.  But I still

13  consistently stand here today and say I did not do the things

14  that I was accused of, and I am not guilty as convicted.

15           Now, I have spent most of my life with the United

16  States Government.  I have spent 6 years, 7 months overseas,

17  two tours, two good conduct metals, two honorable discharges.

18  And left there and come back here, I worked for the Leon

19  County Sheriff's Department 6 years; I worked in the boot camp

20  a short stint.  I went on to work at FCI-Tallahassee for

21  12 years.

22           During that tenure and time, my record is virtually

23  spotless; and, all of sudden, my name comes in a federal

24  indictment.  Why and how, I don't know.  I'm not here to

25  defend myself, but I'm here to say that I pray that you and I

1    pray to God that you give me leniency and give me a second

2    chance at life.

3            That's all I have to say.

4            THE COURT:  All right.  Thank you.

5            MR. HARPER:  That's all we have, Your Honor.

6            THE COURT:  All right.

7            Mr. Findley?

8            MR. FINDLEY:  Yes, sir.

9            I would like to just reiterate some points from the

10   PSR that are in favor of Mr. Dixon.

11           As the court is fully aware, under 3553(a) and (b),

12   there are many factors that can now be considered at

13   sentencing, and I suppose there always was, but after *Booker*

14   maybe they have more impact.  And, of course, the goal is to

15   provide a sentence that is sufficient, but not greater than

16   necessary, to comply with the goals of sentencing.

17           I would just reiterate, in light of Mr. Dixon's past,

18   his character, his military history, his good employment

19   history, that a couple of the goals set forth in 3553(a) are

20   particularly useful in terms of fashioning a sentence.

21           One of those goals is to protect the public from

22   further crimes of the defendant.  I think this is a case where

23   Mr. Dixon has lived a life of 45 years, raised in difficult

24   circumstances, where he lost three siblings at a very young

25   age, and he lived an exemplary life.  He was not accused of

1    any crimes.  He was not convicted of any crimes.  He graduated

2    from high school.  He went to the United States Navy.  He

3    served in the Navy well and was honorably discharged.  And got

4    employment with the Bureau of Prisons.

5            Now he's in a situation that he is not going to be

6    able to go back to the Bureau of Prisons.  I think there is a

7    real absence of any risk of recidivism in this case, and I

8    think that's a very important factor for the court to consider

9    in looking at his case.

10           Another goal of sentencing is to provide the

11   defendant with needed educational or vocational training,

12   medical care, or other correctional treatment in the most

13   effective manner.

14           We have here two gentlemen that have worked for the

15   Bureau of Prisons for a long period of time.  It's going to be

16   very difficult for them to obtain employment, and it's going

17   to prejudice them that much more by their absence from the

18   work force for any significant period of time.

19           If there is a way the court can fashion an

20   alternative sentence that would allow them to get back, either

21   through a halfway house or through home detention, or

22   something like that, or a short sentence, that would help them

23   rehabilitate their lives and rehabilitate their families.

24           Just to reiterate, Mr. Dixon's military history,

25   honorably discharged in 1991, he won the Defense Service

1   medal, the Meritorious Unit Commendation, the Sea Service

2   Deployment Ribbon, the Battle E Ribbon, and two good conduct

3   stars, all before he joined the Bureau of Prisons.

4        I won't repeat all of the evaluations that he

5   received from the Bureau of Prisons, but you may recall that

6   we put those into evidence and emphasized that he was an

7   exceptional employee at the Bureau of Prisons.

8        There is no question that he acknowledges the serious

9   mistakes on his part.  He is very sorry for the pain that

10   that's caused his family.  But I think even under a pre-*Booker*

11   analysis, there are several factors here that would support a

12   sentence outside of the guidelines range.  As I mentioned one,

13   he has lived 45 years.  That's a long period of time with no

14   criminal activity.  The absence of a risk of recidivism, I

15   mentioned.  Solid employment history has been a basis for a

16   departure and/or *Booker* variance.  Good military service has

17   been a factor.

18        In fact, in a case involving law enforcement

19   officers, there was the case of *United States versus Koon*,

20   K-o-o-n, that everyone is familiar with, in which the Supreme

21   Court held that the departure was appropriate if you are

22   sentencing a law enforcement officer.  And, in this case, we

23   would say a prison guard to prison, that is a circumstance

24   that can give rise to particular danger that is not present

25   with some other defendants.

1          So, we would suggest that, based on the totality of

2    these circumstances, and Mr. Dixon, maybe not acceptance of

3    responsibility under the clear terms of 3E1.1, but the fact

4    that he did come forward and admit things that the government

5    would have otherwise had to prove beyond a reasonable doubt

6    with no physical evidence, we think that he has done the right

7    thing.  This was a complexed indictment.  Other guards have

8    been in this situation, and they have been charged in a

9    straightforward manner with having sex with an inmate, which

10   was a misdemeanor.

11         In order to avoid disparity in the sentencing, I

12   think it would be appropriate to depart to a level where you

13   could sentence them consistent with 2A3.3, which is the basic

14   offense level for having sex with an inmate.

15         THE COURT:  Have you calculated that?

16         MR. FINDLEY:  That is, I believe is a 12.  I don't

17   think there is any adjustments other than --

18         THE COURT:  He probably goes up two for having three

19   different victims, doesn't he?

20         MR. FINDLEY:  Under 2A3.3, base offense level is 12,

21   and then --

22         THE COURT:  But he had two other offenses, so he gets

23   two units added.

24         MR. FINDLEY:  It could be.

25         THE COURT:  It wouldn't be three.

1        MR. FINDLEY:  Okay.  I haven't analyzed that fully.

2   I just know you started at 12, and I didn't see any obvious

3   enhancements from there.

4        And he's extremely sorry.  He has caused a lot of

5   pain to his family.  And Mrs. Dixon is here and would like to

6   say some things.

7        THE COURT:  All right.  Tell me your full name,

8   please.

9        MS. DIXON:  Wanda Dixon.

10        THE COURT:  Okay.

11        MS. DIXON:  Good afternoon, Your Honor.

12        Your Honor, this has been my husband for 13 years,

13   and he's a good man.  He is not perfect, and he has made

14   mistakes.  But he has apologized to me, and I have accepted

15   them.

16        I ask the court to, please, have leniency on him.  We

17   have a son that's graduating from high school, and I would

18   love to -- I know he won't be home to see him graduate; but,

19   if he is not gone for too long, to bring any more hardship on

20   the family, I would be greatly appreciative.

21        Like I say, he has apologized, and I stand by him, I

22   love him, and any mistakes that he has made can be corrected.

23   So, I ask the court to please be lenient on him.

24        THE COURT:  All right.  Thank you.

25        MR. FINDLEY:  That's all I have.  Thank you.

1          THE COURT:  For the government?

2          MR. HARPER:  Your Honor, if it please.  I didn't

3    realize the lawyers were supposed to speak if we had anything

4    to say at that moment.  If you want me to go before the

5    government or --

6          THE COURT:  Yes.  If you have anything else you want

7    to add, certainly, now would be the time.

8          MR. HARPER:  Your Honor, briefly.

9          The point that I feel, as a lawyer, is important to

10   make is that, I've said it several times during the course of

11   the proceedings, I feel like Mr. Moore was sort of the add-in

12   in this case.  It's one event, if you will, involving two

13   women that goes back 2 years before the indictment, back when

14   it was really a misdemeanor.  And, if he had been charged

15   under that misdemeanor statute, there are a lot of practical

16   considerations to say whether there should be a trial or not,

17   but he wasn't.  He is charged with this elaborate conspiracy,

18   which I would submit didn't really occur with what he has been

19   charged, but that's been laid to rest.

20         THE COURT:  But if he had been charged with a

21   misdemeanor, there would have been a trial, because he says

22   he's not guilty of the misdemeanor, either.

23         MR. HARPER:  I said, Your Honor -- what I was careful

24   to say was there are practical considerations that say --

25   guarantees are worth a lot more than other things, and I

1   understand exactly what you're saying.  I'm just saying there

2   are other considerations here.  I was more particularly

3   thinking about the gratuity business.  But I would still say

4   that the misdemeanor sex thing, the lawyer would say, look,

5   here is a guarantee, it's a lot more appropriate and a lot

6   more predictable than going to trial with six strangers.

7        But the real point that I want to get to was, I

8   haven't seen a class of defendants in a conspiracy with this

9   kind of background, military background, service to their

10  country, and their community, really.  And here is stepping

11  out -- and, if it was a night club or something -- but

12  stepping out on a job.  If it was in a bank, if it's a lawyer,

13  if it was other people, there are very few places where this

14  would be a criminal conduct.  To be raised to felony criminal

15  conduct and to expose somebody to a number of years, as the

16  prosecution has done, it just seems out of kilter with real

17  life.  And I particularly think that Mr. Moore is a

18  Johnny-come-lately to this investigation.

19       There is no money involved here; there's no profit

20  here.  These other guys, $20,000 deposits, $20,000

21  withdrawals, the paperwork is huge, the use of the mail is

22  obvious and rampant.  This is something totally different --

23  and I know you ruled against me, but -- I would submit totally

24  different than what was presented to the grand jury.

25       But the point is that it is unusual, and it is

1    different than what we usually see in these courtrooms.  And I

2    think the culpability is different than we usually see in

3    criminal conduct.  And I would ask that -- I ask that you

4    consider the sentences that have been imposed on the other

5    defendants.  I think a lot of them should be saying, thank

6    you, because of seeing the truth being explored here and being

7    brought out here of what really did happen; that they're

8    gratuities instead of bribes in some cases, and what the

9    actual conduct and misconduct was and who did it, who are the

10   bad guys.

11          And I would submit, when you start stacking up bad

12   guys and whose the worst and who is the least, Mr. Moore is

13   the least culpable of the bad guys.

14          Thank you.

15          THE COURT:  All right.

16          Mr. Sprowls?

17          MR. SPROWLS:  Judge, we certainly have no quarrel

18   with the defendants' past, much of it is exemplary.  Each has

19   had noteworthy employment, each served honorably in our

20   military.  They were qualified for and were selected to work

21   in a position of trust for the United States Government.

22          They had a daunting task of keeping about 1200

23   inmates and detainees in good order, shifts around the clock,

24   a duty to protect the inmates and ensure they weren't harmed,

25   whether that harm was suicidal or from other inmates -- all

1 while keeping themselves from harm.  They had considerable

2 discretion and supervision over the inmates.

3      They also enjoyed an income, benefits that many would

4 envy.  Each was a senior officer who had priority in job

5 assignments.  There are accomplishments to show that they were

6 indeed intelligent and resourceful men.  And that's what makes

7 this case so dumbfounded.

8      They took an honorable position of public trust and

9 traded it for self-gratification; and, in Mr. Dixon's case,

10 profiting in a closed environment where prices were greatly

11 inflated.  And their conduct cannot be explained or understood

12 due to a pressing personal hardship, lack of a living wage or

13 education, not a bit.

14      Perhaps their familiarity with the institution, the

15 authority, the power, if you will, that they had fostered some

16 contempt of the regulations.  A feeling that they were above

17 them, above the ethical rules, and maybe most noteworthy some

18 human decency.

19      Their conduct was a complete abandonment of what they

20 knew was right, what they were taught annually to be right.

21 It was not a mistake, an accident or aberrant behavior.

22 Actually, it was long-term, ongoing, all while knowingly

23 turning their back on the other officers that were doing the

24 same.

25      This case is an abandonment of duty by intelligent,

1    experienced, senior government officials.  Their conduct

2    deserves a significant period of incarceration.

3            Thank you.

4            THE COURT:  Any rebuttal?

5            MR. FINDLEY:  No, Your Honor.

6            MR. HARPER:  Nothing further, Your Honor.

7            THE COURT:  All right.  Let me tell you the sentence

8    I'm going to impose; then I'll explain it; then I'll formally

9    impose it.

10           I'm going to impose a sentence in each case of

11   12 months in the Bureau of Prisons.

12           That is a downward departure.  The ruling is that it

13   is a departure on grounds that would have been authorized when

14   the guidelines were mandatory, based on the totality of the

15   circumstances.  If it were not a departure authorized on that

16   basis, it would be the sentence I would find appropriate under

17   all of the factors set forth in 3553(a), and treating the

18   guidelines as advisory in accordance with the decision in

19   _Booker_.

20           The most substantial factor in the case that cuts

21   toward increasing the sentence is the nature of the offense,

22   the position of the victims, and the importance that this kind

23   of conduct not take place within a correctional institution.

24           The importance of correctional officers conducting

25   themselves professionally and appropriately cannot be

1    overstated.   Correctional facilities present very difficult

2    problems of management.   It is essential that people who are

3    sent there be treated appropriately.   And so, when an officer

4    fails to do that, it is a serious offense.

5          Now, in every sentencing one must take into account,

6    not just the crime, but also the defendant.   One must consider

7    both the offense and the offender.   As I just indicated, I

8    view the offense as a very serious one.

9          When you turn to these offenders, up until the point

10   at which they committed these offenses, they had outstanding

11   records.   By all accounts, they had performed a very difficult

12   job very well.   The importance of doing it well cuts against

13   them in terms of the offense.   They also did it well for a

14   long time, and in doing that provided an important public

15   service.

16         Each of the defendants had long and honorable

17   military service.   So, both of them had careers of good public

18   service, both in the military and as civilians.

19         Neither has any criminal record at all up until the

20   point of these offenses.

21         By all accounts, they have been responsible in their

22   personal lives as well, and with their families, and so forth,

23   up until the time of these offenses.

24         Another factor that is appropriately considered under

25   3553(a) is the need to avoid unwarranted sentence disparities

1   among defendants with similar records that have been found

2   guilty of similar conduct.  I think under that provision it is

3   appropriate to compare -- to consider, not only the guidelines

4   for the offenses of which the defendants were convicted, but

5   also to consider, at least to look at, to compare, to take

6   into account, the guidelines that would have been applicable

7   had the charge simply been having sex with inmates.  The part

8   of the offense that leads me to characterize it as

9   particularly serious, the description I just gave a moment

10  ago, deals with that -- deals with the mistreatment of the

11  inmates.

12          The fact that there was an exchange for contraband

13  makes it a little bit worse, but it's not the part that makes

14  it the most serious.  What makes it the most serious is the

15  mistreatment of the inmate.

16          The fact that there was tampering with the witness is

17  all by itself a serious offense, separate and apart from any

18  sex with inmates.

19          So, I have looked at least briefly at the guidelines

20  that might have applied had the charges been different, but

21  had the crux of the conduct been the same.  I think it's the

22  case, for example, that in Mr. Dixon's case, had he simply

23  been convicted of what he says he did, which is to have sex

24  with three different inmates, I think the offense level would

25  be 12, increased two because there were two other offenses,

1   and that would be two more units, and we go to 14.   If he

2   pled, it might come back down.   If he didn't, it might be 14.

3   If it was 14, level one, the guidelines range would be 15 to

4   21 months.   If it was 12, level one -- that is, if he admitted

5   that conduct -- it would be 10 to 16 months.   Of course, the

6   guidelines, as he was convicted, are 27 to 33 months.

7            I think when one looks at unwarranted sentencing

8   disparity, one can appropriately look at all of those.   Please

9   don't misunderstand me.   The guidelines range in this case is

10   27 to 33 months.   That's the guidelines range that is

11   considered as the beginning point, but I think the others can

12   also be considered.

13            Let me just note two other things.

14            It does seem to me that the public service, the fact

15   that these were both public employees, to some extent that's a

16   factor that cuts both ways.   They did provide good public

17   service for a long time.   It's also true that public servants

18   take on an obligation; and, when they fall short, that itself

19   is, to some extent, an aggravating factor.   So, as I say, the

20   fact that they held public jobs when they did this is a factor

21   that cuts both ways.

22            It was noted by one of the defendants that this

23   wasn't a financial situation.   I guess to some extent that

24   cuts both ways.   On balance, it seems to me that the offense,

25   as it was committed, is probably more serious for the reasons

1   I gave than if it was just a financial crime.  But, in any

2   event, those are circumstances that to some extent cut both

3   ways.

4        I won't go through each of the factors one by one or

5   all of the circumstances.  I have considered all of the

6   circumstances.  I have been back through my trial notes very

7   carefully and gone back over the list of factors under

8   3553(a).

9        If there is anything that any party wants me to

10  address specifically, tell me, and I will consider doing that.

11  Otherwise, I'm going to impose the sentence.

12       MR. SPROWLS:  Not from this side, Judge.

13       MR. HARPER:  Nothing on behalf of Mr. Moore, Your

14  Honor.

15       MR. FINDLEY:  I have one small comment.  It's not a

16  factor that needs to be considered.  I think the court has

17  considered all of the factors.

18       Mr. Dixon has informed me, with his superior

19  knowledge of the Bureau of Prisons, if you give a sentence of

20  12 months and one day, it helps.

21       THE COURT:  He is right, and I do know that, and I'm

22  not going to.  I knew that before I gave the sentence.  A

23  13-month sentence is sometimes less than a 12-month sentence.

24  And if you behave within the Bureau, you wind up serving a

25  little less time.  I know that.

1          MR. FINDLEY:   Okay.

2          THE COURT:   It's an unusual circumstance in which I

3    give the day in order to bring it back.   The line has to be

4    drawn somewhere.   That's where Congress drew it.   It's an odd

5    system in that respect, but it seems to me the best thing to

6    do is to impose the sentence that I think is fair, and the

7    chips fall where they may under the counting that the Congress

8    put in space.   So, it's a fair point, and I do know that to be

9    the case, but I think here the appropriate sentence is the 12

10   months.

11          If each of the defendants would please stand.

12          I find that each presentence report is accurate

13   together with the additional findings that I have made on the

14   record here today.

15          I suppose I should clarify that statement in this

16   respect:

17          The facts as set forth in the presentence report are,

18   at least to some extent, the facts as found by the jury; and,

19   as I've indicated, I think that the jury's findings were

20   within its sphere and the findings are accepted on that basis,

21   just as they were set forth in the presentence report on that

22   basis.

23          Pursuant to the Sentencing Reform Act of 1984, as

24   amended, it is the judgment of the court that each of these

25   defendants -- Gregory Dixon and Alan Moore -- is hereby

1   committed to the custody of the Bureau of Prisons to be

2   imprisoned for a term of 12 months.

3            Upon release from imprisonment, each defendant will

4   be on supervised release for a period of 3 years.  Supervision

5   will be under the standard conditions adopted by this court

6   and the following special conditions:

7            The defendant shall report in person to the probation

8   office in the district to which he is released within 72 hours

9   of release from the custody of the Bureau of Prisons.

10           The defendant shall not own or possess a firearm,

11  dangerous weapon, or destructive device.

12           The defendant shall provide the probation officer all

13  requested financial information -- business or personal.

14           The defendant shall cooperate with the probation

15  office in the collection of DNA samples as required by law.

16           Mr. Dixon is ordered immediately to pay the United

17  States a special monetary assessment of $100 per count for a

18  total of $400.

19           Mr. Moore is ordered immediately to pay the United

20  States a special monetary assessment of $100 per count for a

21  total of $200.

22           A fine is imposed upon Mr. Moore in the amount of

23  $6,000.

24           A fine is imposed upon Mr. Dixon in the amount of

25  $3,000.

1          Mr. Sprowls, there is no forfeiture involved that

2    should be included in the judgment, is there?

3          MR. SPROWLS:  No, sir.

4          THE COURT:  It is an additional condition of

5    supervision for each defendant that the defendant make

6    payments toward any unpaid fine or special assessment balance.

7          In Mr. Moore's case, the monthly payment will be at

8    least $200.

9          In Mr. Dixon's case, the monthly payment will be at

10   least $100.

11         And full payment will be required before

12   consideration of any early termination of supervision.

13         The monthly amount can be adjusted based on the

14   defendant's ability to pay from time to time.  That will be

15   done on a motion of any party or at the request of the

16   probation department, depending on the circumstances at the

17   time.

18         The total sentence, therefore, for each defendant is

19   12 months in the Bureau of Prisons; 3 years of supervised

20   release; in Mr. Moore's case, there is a $6,000 fine and a

21   $200 special assessment; in Mr. Dixon's case there's a $3,000

22   fine and a $400 special assessment.

23         Are there any objections to the sentence as imposed

24   other than objections to the calculation of the guidelines

25   range as specifically set forth on the record of this hearing?

1          MR. HARPER:  None on behalf of Mr. Moore, Your Honor.

2          MR. FINDLEY:  None on behalf of Mr. Dixon.

3          MR. SPROWLS:  Your Honor, the government may consider

4   appealing this sentence as well as the ruling on Count 16.  So

5   to that extent, we object.

6          THE COURT:  Surely.  I treat your position on those

7   as fully preserved.

8          Well, make it this way, I assume that the basis of a

9   sentencing appeal would be reasonableness and failure to

10  sentence within the guidelines range.

11         MR. SPROWLS:  Yes, sir.

12         THE COURT:  I don't think there was any objection to

13  the guidelines range calculation.

14         MR. SPROWLS:  No, sir, there was not.

15         THE COURT:  All right.  I treat those objections as

16  fully preserved.

17         The circuit has recently approved and perhaps invited

18  the district judges to indicate whether rulings on the

19  guidelines have made a difference in the sentence.  I try to

20  do that.  I'm not sure that any of my rulings on guideline

21  issues have made a difference.  The 12-month sentence takes

22  into account all of the 3553(a) factors.  You would have had

23  to win several of the objections.  It would have taken a

24  significantly lower guidelines range to bring that sentence

25  below where it is.

1          It seems to me that the sentence I've imposed is the

2    one that is necessary to serve the sentencing purposes and a

3    lower sentence would not be adequate.  This is the lowest

4    sentence that I deem adequate to serve the purposes of

5    sentencing.  So, in accordance with 3553(a), that's the

6    sentence I have imposed.

7          Each of you, Mr. Moore and Mr. Dixon, you each have

8    the right to appeal.  Any appeal needs to be filed within

9    10 days.  If you are unable to afford a lawyer for an appeal,

10   then a lawyer would be appointed for you.

11         The presentence report indicates that, Mr. Findley,

12   you were appointed.  Were you appointed in the case?

13         MR. FINDLEY:  That's correct.

14         THE COURT:  Then, Mr. Dixon, in your case,

15   Mr. Findley would continue as our court-appointed lawyer.

16         If for any reason -- your lawyer, of course, can file

17   a notice of appeal for you.  For any reason your lawyer

18   doesn't, then the clerk of the court would be happy to file a

19   notice for you at your request.

20         Just make sure that, if you wish to appeal, a notice

21   of appeal gets filed within the next 10 days.

22         You should talk with your lawyer right now, today, to

23   make sure that your lawyer has a clear understanding of

24   whether you do or do not wish to appeal in the case.

25         And then for the lawyers I would ask that, if your

1    client decides not to appeal, please, write him a letter and

2    confirm that decision, both to bring home to him the

3    importance of the decision he's made, and so that there will

4    be no misunderstanding, and we will have a clear record that

5    he made that decision.

6            Each of the defendants is on release.  What says the

7    government about self-surrender?

8            MR. SPROWLS:  Your Honor --

9            THE COURT:  You may all be seated.  Thank you.

10           MR. SPROWLS:  Pursuant to 3143, we request that the

11   defendants be detained, unless there is a showing otherwise

12   that they should be released.

13           THE COURT:  I take it the defense would prefer to

14   self-surrender.

15           MR. FINDLEY:  We would prefer to voluntarily

16   surrender.

17           THE COURT:  You may or may not know what's going to

18   happen next, but often what happens in these circumstances is

19   next there is a motion for release pending appeal.  You

20   haven't had a chance to talk, and I don't want to bring you up

21   short.  If you know that you are going to be filing such a

22   motion, if you tell me that now, we can --

23           MR. HARPER:  We would, Your Honor.  I've got the

24   notice of appeal that we were thinking in the event of this,

25   that we would file a notice of appeal and ask for bond pending

1   appeal -- bail pending appeal, if the government were going to

2   oppose self-surrender.

3       THE COURT:  So, the question today is, first, his

4   release from today, and then we are going to have a question

5   of release pending appeal.

6       I will allow the defendants to self-surrender.  My

7   finding is that, as a matter of clear and convincing evidence,

8   that either poses a risk of flight or a danger to any other

9   person or the community.

10      Mr. Moore and Mr. Dixon, you're to report to your

11  designated institutions by March the 12, 2007.  That's

12  2 months -- only exactly 2 months would be on a weekend.  So

13  that's the next day after 2 months.  My standard practice is

14  to give 2 months, because it sometimes takes the Bureau of

15  Prisons that long to designate the facility.

16      I'll include in the judgment a recommendation for

17  each defendant regarding place of service.  I don't know

18  whether they want to be near Tallahassee or as far away from

19  Tallahassee as they can get, or somewhere in between.  Tell me

20  what you --

21      MR. FINDLEY:  Mr. Dixon would like to be as near to

22  Quincy as he can be, Tallahassee.  And, hopefully, if the

23  court would recommend a camp, that would be appreciated.

24      THE COURT:  I'll do that.  I ordinarily make a

25  geographic recommendation.  This is a little different

1    circumstance, and I'll recommend the lowest appropriate

2    classification.

3         MR. SPROWLS:  Your Honor, with regard to that, there

4    may be, just noted, some special concerns that the Bureau of

5    Prisons is going to be confronted with.  I don't know, I heard

6    Your Honor say before, it's just a recommendation, and BOP

7    does not have to follow it.

8         I would encourage the other side, if BOP frees its

9    hand, it can, because they may determine for safety purpose,

10   or whatever, that an institution far from here would be the

11   safest for these gentlemen.

12        THE COURT:  Yeah.  I'll include a recommendation that

13   Mr. Dixon be designated as near as possible to Quincy.  I will

14   also include a recommendation that his history as a

15   correctional officer within the Bureau of Prisons be taken

16   into account, and that a facility be selected appropriately.

17   One hopes that, when the classification officer reads through

18   the presentence report, all of that would be obvious, but I'll

19   highlight it in the recommendation section.

20        In Mr. Moore's case, is it Tallahassee?

21        MR. HARPER:  Yes, sir.  He has family in Pensacola.

22   His parents' side of the family is in Pensacola, but he's --

23        THE COURT:  But he's got family here in Tallahassee.

24        MR. HARPER:  Immediate family is here in Tallahassee.

25        THE COURT:  Then, Mr. Harper, if you're going to move

1  for release pending appeal, or Mr. Findley, if you decide to

2  do that, get that in as quickly as you can.  I, of course,

3  need to deal with that before the day, and the longer they

4  know ahead the better.  So, if you will get that motion in

5  promptly, I'll deal with it.  I don't need a long motion.  I

6  know Mr. Harper has my template order in the file; and, Mr.

7  Findley, you probably do, too.  I know the standards in the

8  circuit.  I just need to sit down with the record and make a

9  determination whether I think the issues are ones that match

10  the requirements under the Bail Reform Act, as set forth in

11  the circuit.  So, I don't need long argument.  I'll certainly

12  read anything you get to me; but, if you get it to me as

13  quickly as you can, I will try to rule on it.

14        I, of course, will read anything the government has

15  to say in response.  If you respond within 10 days after they

16  serve their motion, I will deal with it as quickly as I can.

17        What else, if anything, do we need to do in this

18  case?

19        MR. FINDLEY:  One very minor matter.

20        Mr. Dixon has had -- this relates to the conditions

21  of release, which he still continues to be on.

22        He has had some trouble communicating regarding his

23  employment status.  For example, BOP did something where they

24  reinstated him for a day to pay his back pay.  And when he has

25  questions about that, he's prohibited from contacting them

1   directly.  So, I would hope that there could be an exception,

2   where he can contact the Bureau of Prisons when he has

3   questions about his Thrift Savings Plan or leave status, or

4   whatever it may be.

5           THE COURT:  To be modified to allow him to

6   communicate with the Bureau of Prisons regarding employment?

7           MR. SPROWLS:  I think the ban on communication is

8   sort of muted right now so --

9           MR. FINDLEY:  Okay.

10          THE COURT:  I was going to say that -- I was going to

11  give an exception for anything related to his employment.

12          MR. SPROWLS:  That's fine.

13          THE COURT:  That's all you really need, isn't it,

14  Mr. Findley?

15          MR. FINDLEY:  That should do.  Thank you.

16          THE COURT:  All right.  And I should have told each

17  you, you are still subject to the conditions of release that

18  you have been subject to up and until this point, with that

19  modification.  And if that same provision is enforce for

20  Mr. Moore, I will make the modification there, too.

21          In addition, it would be a separate federal crime to

22  fail to report for service of your sentence.  So, make sure

23  that you do report by 2:00 p.m. on March 12th, unless your

24  lawyer has sent you a copy of an order saying that you can

25  stay out longer.

1          MR. SPROWLS:  Judge, I don't know the status here.  I

2    talked to Ms. Sanchez, the supervising officer, earlier today,

3    and I thought I understood her saying that Mr. Dixon was no

4    longer subject to an electronic monitor; that she took the

5    bracelet off due to what he thought would happen this

6    afternoon, in terms of his immediate surrender.  So, we would

7    like to have that reestablished, if they are going to be

8    released under the same terms of conditions.

9          PROBATION OFFICER:  I don't know whether that

10   happened.  I believe Mr. Dixon had earlier expressed a desire

11   to possibly go immediately to custody.  I think we would have

12   to ask Mr. Dixon whether his monitor was taken off or not.

13         MR. FINDLEY:  Could I have a second to consult with

14   Mr. Dixon?

15         THE COURT:  Surely.

16         MR. FINDLEY:  Your Honor, this is an unusual request,

17   but Mr. Dixon would prefer to be remanded into custody at this

18   point and get started on his sentence.

19         THE COURT:  All right.

20         MR. SPROWLS:  We don't have any problem with that.

21         THE COURT:  I should have asked before I dealt with

22   self-surrender what the defense position was, and I failed to.

23         All right.  Then, Mr. Dixon is remanded to custody.

24         What else?  Anything else?

25         MR. SPROWLS:  That's all from this side, Judge.

1          THE COURT:  Thank you all.  We'll be in recess.

2      (The proceedings adjourned at 2:57 p.m.)

3                  *   *   *   *   *   *   *   *   *

4

5

6

7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
8    redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
9    transcript.

10

11

12   s/Judy A. Nolton                          04/17/2007
     Judy A. Nolton, RPR                          Date
13   Official U.S. Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25